Frances L. Kern
Colleen Robbins
Federal Trade Commission
600 Pennsylvania Ave, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202)326-3395 (Fax)

*Attorneys for Plaintiff Federal Trade Commission*

**U.S. DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

2024 JUN -3  A 9: 26

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. _____ |
| Plaintiff, | |
| v. | **FILED UNDER SEAL** |
| THEFBAMACHINE INC., a corporation; | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |
| PASSIVE SCALING INC., a corporation; | |
| SALES.SUPPORT NEW JERSEY INC., a corporation; | |
| 1HR DELIVERIES INC., a corporation; | |
| HOURLY RELIEF INC., a corporation; | |
| 3PL LOGISTIC AUTOMATION INC., a corporation; | |
| FBA SUPPORT NJ CORP., a corporation; | |
| DAILY DISTRO LLC, a limited liability company; | |
| CLOSTER GREEN CORP., doing business as WRAITH & CO., a corporation; and | |
| BRATISLAV ROZENFELD, also known as Steven Rozenfeld and Steven Rozen, individually and as an officer or owner of THEFBAMACHINE | |

1

INC.; PASSIVE SCALING INC.;
SALES.SUPPORT NEW JERSEY INC.; 1HR
DELIVERIES INC.; HOURLY RELIEF INC.;
3PL LOGISTIC AUTOMATION INC.; FBA
SUPPORT NJ CORP.; DAILY DISTRO LLC; and
CLOSTER GREEN CORP., doing business as
WRAITH & CO.,

    Defendants.

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction; monetary relief; and other relief, including an asset freeze, appointment of a receiver, and immediate access to Defendants' business premises, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; the Business Opportunity Rule; and the CRFA.

## SUMMARY OF THE CASE

2. Defendants use deceptive earnings claims to convince consumers to shell out tens of thousands of dollars each to invest in what Defendants claim is a surefire business opportunity powered by artificial intelligence ("AI"). Defendants claim consumers will quickly earn thousands of dollars in passive income, which will be generated from sales in online stores on e-commerce platforms such as Amazon.com and Walmart.com. In reality, the promised gains never materialize, and consumers are left with depleted bank accounts

and hefty credit card bills. Defendants' scheme has defrauded consumers of at least

$11.1 million.

3. Defendants called one version of their operation "Passive Scaling" and promised

consumers that they could make six figures per year and more in income by investing their

hard-earned money with Passive Scaling. When Passive Scaling failed to live up to its

promises and consumers sought refunds and brought lawsuits, Defendants rebranded as

"FBA Machine" and repeated the scam anew.

4. Defendants consistently make false or unsubstantiated earnings claims in their marketing.

They also use contracts with illegal non-disparagement clauses and wield them to cajole or

threaten consumers who share their honest reviews of the company online into taking the

comments down. Further, Defendants often condition refunds on consumers removing or

withdrawing any complaints about the company.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and

1345.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2), and 15

U.S.C. § 53(b).

## PLAINTIFF

7. The FTC is an independent agency of the United States Government created by the FTC

Act, which authorizes the FTC to commence this district court civil action by its own

attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15

U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting

commerce. The FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437,

which requires sellers to provide disclosure documents and prohibits false or

3

unsubstantiated earnings claims. The FTC also enforces the CRFA, 15 U.S.C. § 45b(a)(2), which prohibits standardized provisions that threaten or penalize people for posting honest reviews.

## DEFENDANTS

8. Led by individual defendant Bratislav Rozenfeld, the nine corporate defendants have worked together to conduct the law violations described below.

### *Corporate Defendants*

9. Defendant **TheFBAMachine Inc.** ("FBA Machine") is a New Jersey and Delaware corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032. FBA Machine transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, FBA Machine has advertised, marketed, distributed, or sold e-commerce automation business opportunities and coaching to consumers throughout the United States.

10. Defendant **Passive Scaling Inc.** ("Passive Scaling") is or was a New Jersey corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. Passive Scaling transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Passive Scaling has advertised, marketed, distributed, or sold e-commerce automation business opportunities and coaching to consumers throughout the United States.

11. Defendant **Sales.Support New Jersey Inc.** ("Sales Support") is a New Jersey corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. Sales Support transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Sales Support has advertised, marketed, distributed, or sold e-commerce store

management software to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

12. Defendant **1HR Deliveries Inc.** ("1HR") is a New Jersey corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. 1HR transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, 1HR has advertised, marketed, distributed, or sold inventory purchasing services to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

13. Defendant **Hourly Relief Inc.** ("Hourly Relief") is a New Jersey corporation with its principal place of business at a residential address in Edgewater, New Jersey 07020 ("the Edgewater, New Jersey address"). Hourly Relief transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Hourly Relief advertised, marketed, distributed, or sold virtual assistant services, including e-commerce store management services, to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

14. Defendant **3PL Logistic Automation Inc.** ("3PL") is a New Jersey corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. 3PL transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, 3PL has advertised, marketed, distributed, or sold product processing and shipping services to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

5

15. Defendant **FBA Support NJ Corp.** ("FBA Support NJ") is a New Jersey corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. FBA Support NJ transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, FBA Support NJ has advertised, marketed, distributed, or sold warehousing and order fulfillment services for e-commerce businesses to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

16. Defendant **Daily Distro LLC** ("Daily Distro") is a New York corporation with its principal place of business at 78 John Miller Way, Suite 2111, Kearney, New Jersey 07032. Daily Distro transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Daily Distro has advertised, marketed, distributed, or sold wholesale distribution services to consumers throughout the United States, including consumers who purchased the Passive Scaling and FBA Machine business opportunities.

17. Defendant **Closter Green Corp.**, doing business as **Wraith & Co.** ("Wraith"), is a New York corporation with its principal place of business at 3616 29th Street, Long Island City, New York 11106. Wraith transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Wraith has advertised, marketed, distributed, or sold goods in online e-commerce stores to consumers throughout the United States.

### *Individual Defendant*

18. Defendant **Bratislav Rozenfeld**, also known as Steven Rozenfeld and Steven Rozen ("Rozenfeld"), is the owner of FBA Machine; president of Passive Scaling, Sales Support,

1HR, 3PL, and FBA Support NJ; director of Hourly Relief; sole member of Daily Distro; and majority owner and chief technology officer of Wraith.

- He is the signatory on bank accounts for all Corporate Defendants, and he also registered and paid for each company's corporate internet domain.

- He narrated marketing videos containing false or unsubstantiated earnings claims for Passive Scaling and FBA Machine.

- He has signed consumer contracts containing non-disparagement clauses on behalf of Passive Scaling.

- He knows about consumer complaints against—and requests for refunds from—Passive Scaling.

- He knows that e-commerce stores belonging to Passive Scaling customers have been suspended or terminated.

- He has negotiated settlements with Passive Scaling customers, including settlements that contain non-disparagement clauses.

- He has threatened customers, demanding that they withdraw complaints and remove online reviews as a condition of obtaining a refund from Passive Scaling, and then subsequently failed to pay the promised refunds.

- He has been sued by Passive Scaling customers and has defaulted on court-ordered judgments.

19. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of FBA Machine, Passive Scaling, Sales Support, 1HR, Hourly Relief, 3PL, FBA Support NJ, Daily Distro, and Wraith, including the acts and practices described in this Complaint. Rozenfeld resides in Florida and, in connection with the matters alleged herein,

transacts or has transacted business in this District and throughout the United States. Through his direct participation in, and control over, FBA Machine, Passive Scaling, Sales Support, 1HR, Hourly Relief, 3PL, FBA Support NJ, Daily Distro, and Wraith, Rozenfeld has knowledge of the acts and practices constituting the violations alleged herein.

## COMMON ENTERPRISE

20. Defendants FBA Machine, Passive Scaling, Sales Support, 1HR, Hourly Relief, 3PL, FBA Support NJ, Daily Distro, and Wraith (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, business functions, employees, and office locations, and that commingled funds.

- Rozenfeld owns and operates all Corporate Defendants.

- Rozenfeld is a signatory on bank accounts of all Corporate Defendants, and registered and pays for internet domains for all Corporate Defendants.

- All but one of Corporate Defendants use one or both of two addresses—78 John Miller Way, Suite 2111, in Kearney, New Jersey, or the residential Edgewater, New Jersey address.

- FBA Machine, Passive Scaling, Sales Support, Hourly Relief, and Daily Distro are named as secondary users on the e-commerce stores of Passive Scaling and FBA Machine clients, which allows FBA Machine, Passive Scaling, Sales Support, Hourly Relief, and Daily Distro to access and manage clients' stores.

- Rozenfeld's own e-commerce store on Amazon.com is registered under Wraith, and Sales Support and Wraith are named as secondary users on the store.

- Prospective purchasers and clients of the Passive Scaling business opportunity interacted with employees using email addresses or contact information affiliated with Passive Scaling, Sales Support, 3PL, 1HR, Hourly Relief, and Daily Distro.

- Rozenfeld communicated with Passive Scaling clients using email addresses affiliated with Passive Scaling, Sales Support, Daily Distro, and Wraith.

- FBA Machine sales agents use a Wraith Google account to store scripts and recordings of consumer sales calls.

- Passive Scaling and FBA Machine require clients to use and pay for software offered and sold by Sales Support for their e-commerce stores.

- 1HR purchased inventory for the e-commerce stores of Passive Scaling clients.

- Hourly Relief hired virtual assistants to manage the e-commerce stores of Passive Scaling clients.

- 3PL processes and ships products on behalf of Passive Scaling clients' e-commerce stores.

- Rozenfeld told Passive Scaling clients who sought a refund that he would pay the refund from 3PL's bank account.

- FBA Support NJ and Daily Distro provide warehousing, distribution, and order fulfillment services to Passive Scaling clients.

- FBA Support NJ receives money from Sales Support and 1HR, and pays FBA Machine sales agents' salaries.

- FBA Machine and Passive Scaling sell similar e-commerce automation business opportunities and coaching materials, and they share the same or substantially similar advertising and marketing materials.

- FBA Machine, Passive Scaling, Sales Support, 1HR, Hourly Relief, 3PL, FBA Support NJ, and Daily Distro have commingled funds.

21. Because the Corporate Defendants, under Rozenfeld's direction, have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

22. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### PREQUEL: DAILY DISTRO AND FBA SUPPORT

23. From 2017 until early 2021, Rozenfeld operated Daily Distro, which he incorporated on September 14, 2017, along with a New York entity called FBA.Support LLC ("FBA Support"). These entities contracted with other e-commerce management companies to provide store management software called sales.support, store merchandise, and a warehouse for inventory. Daily Distro and FBA Support charged these other e-commerce management companies and clients directly for the software and inventory.

24. In early 2020 and early 2021, the payment processor Rozenfeld used to process payments received by Daily Distro and FBA Support shut down several accounts used for this processing, after notifying Rozenfeld of high chargebacks and customer disputes on the accounts.

25. In June 2021, one of FBA Support's e-commerce management company partners sued FBA Support and Rozenfeld in federal district court in the District of New Jersey, No. 21-CV-12047, alleging that they falsely promised to manage Amazon e-commerce stores for clients, source high-margin and trending products, store and process inventory in their

warehouse, and use their purported hundreds of employees and decades of experience to deliver professional ecommerce services. FBA Support appears to have ceased operations.

### THE PASSIVE SCALING BUSINESS OPPORTUNITY SCHEME

26. Beginning in approximately February 2021, Rozenfeld began marketing e-commerce business opportunities through Passive Scaling, an entity Rozenfeld incorporated on February 8, 2021. Consumers who purchased the e-commerce business opportunity became the clients for various services provided by Defendants.

27. Passive Scaling used two different models for the e-commerce stores it sold to consumers. For stores on the Walmart.com platform, Passive Scaling used the "fulfilled by merchant" model, also known as dropshipping. In this model, when a customer orders an item from a Passive Scaling client's e-commerce store on Walmart.com, Passive Scaling workers then buy the item on Amazon.com or from another retailer and ship it directly (or repackage first and then ship) to the customer, reselling the product for a small profit based on the price difference.

28. For stores on the Amazon platform, Passive Scaling used the dropshipping model along with another model called "fulfilled by Amazon" ("FBA"). In this model, Passive Scaling clients purchase inventory and store it in Passive Scaling's warehouses. When orders are placed on the client's Amazon store, Passive Scaling would be responsible for packaging and shipping those items to Amazon for fulfillment to the purchaser.

### *Advertisements for the Passive Scaling Business Opportunity*

29. Rozenfeld advertised the Passive Scaling business opportunity online, including through Instagram under the handle *kingofamzn* and on Passive Scaling's website, passivescaling.com.

30. Passive Scaling's website claimed that the company had been in business for over seven

11

years, with over 800 "[a]ctive automation clients," seven warehouses, and more than 120 employees in six countries. The site stated that Passive Scaling would "build you a fully automated Walmart store from the ground up and use our expertise to manage it into a successful 7 figure business."

31. Passive Scaling's website boasted that "Most of our clients hit six-figure monthly revenues within 12-16 months," and "[o]ur most successful clients generate over $100,000 per month in profit!" The website also featured enticing client testimonials, such as "I went from struggling to pay bills to being financially independent in a span of 5 months," and statistics, such as "$275,000 average profit in the first two years."

32. The website also included graphs claiming to show the revenue of Passive Scaling clients, as in the screenshot below:



33. In its earnings claims made through general media, including the examples above from Passive Scaling's website, Passive Scaling failed to include information required by the Business Opportunity Rule, namely the beginning and ending dates when represented earnings were achieved and the number and percentage of all persons who purchased Passive Scaling's business opportunity prior to that ending date who achieved at least the

stated level of earnings.

34. Passive Scaling also partnered with an Irvine, California-based company called Optimyze Digital ("Optimyze") to handle sales and marketing of the Passive Scaling business opportunity until approximately mid-2022. (Optimyze appears to have ceased operations.) In conversations with prospective purchasers, Optimyze representatives described Optimyze as a sister company of Passive Scaling and pointed consumers to online videos where Rozenfeld and representatives of Optimyze describe themselves as partners.

35. Optimyze advertised the Passive Scaling business opportunity online, including through Facebook and Instagram. Some prospective purchasers did not know, until they received a contract, that they would be working with Passive Scaling, not Optimyze, to set up and run their e-commerce stores.

***Representations to Prospective Purchasers of the Passive Scaling Business Opportunity***

36. Once prospective purchasers connected with an Optimyze sales agent, Optimyze lured them in by showing them profit calculator spreadsheets; hosting question-and-answer sessions with the owners of Optimyze, which included interviews of purported current clients; and sending prospective purchasers links to videos showing Rozenfeld at his warehouse.

37. The profit calculator that Optimyze representatives showed prospective purchasers set out what they could expect to make in twenty-four months, given the number and type of stores they purchased and the amount of "working capital" the consumers had available to use to purchase inventory for the stores. For example, as shown in the image below, Optimyze represented that, by purchasing a single Amazon store from Passive Scaling and having $35,000 of working capital available for inventory, a prospective purchaser should expect to make over $200,000 in profit after two years.



38. Rozenfeld and Passive Scaling sales agents also showed consumers the same profit calculator.

39. In a YouTube video filmed at Rozenfeld's warehouse and shared in an email to prospective Passive Scaling purchasers, viewers see several luxury cars leave Optimyze's offices and arrive at a warehouse, where Rozenfeld warmly greets them. He proceeds to give them a tour of the warehouse, showing them items he says "are selling on a constant basis." He explains that the warehouse receives shipments of goods, and workers "prepare [the items] as per Amazon's prep requirements" and ship them to Amazon. Rozenfeld remarks that he is "happy to be on board with this [Optimyze Digital] team."

40. Rozenfeld himself told potential purchasers that they could expect to earn a few thousand dollars every month by purchasing the Passive Scaling business opportunity, and even more if they opened additional e-commerce stores.

41. Optimyze and Passive Scaling told prospective purchasers that Passive Scaling employees

14

would handle the day-to-day operations of the e-commerce stores and the vast majority of the work. Passive Scaling would share the profits from the store with the client, whose main role was investing. The opportunity was presented as a substantial source of passive income for potential purchasers. In addition to the initial investment and monthly fees, Passive Scaling required clients to establish bank accounts or obtain credit cards or loans allowing access to no less than $15,000, which would be used to pay for the inventory purchased to fulfill store orders. Thus, in addition to paying tens or even hundreds of thousands of dollars in initial fees to Passive Scaling, prospective purchasers also needed to borrow or provide thousands more dollars for their stores to operate.

42. Throughout the sales process, Optimyze and Passive Scaling's marketing videos, question-and-answer sessions shared with prospective Passive Scaling purchasers, and websites were replete with earnings claims, such as:

- "$69,320 in last 7 days"

- "20% return on investment"

- "We are talking about five figures per month in pure profit!"

- "$1.3 million average gross revenue in first two years"

- "$100,600 in last 30 days"

43. In addition to touting high monthly profits for both Amazon and Walmart stores established through Passive Scaling, a sales agent highlighted that the e-commerce store was a "risk free" opportunity. If the client did not earn back the initial investment fee, typically costing between $30,000 and $500,000, within eighteen months, the client could request a refund.

### The Passive Scaling Contracts

44. Once prospective purchasers expressed interest, the Optimyze or Passive Scaling sales agents would provide a contract from Passive Scaling.

15

45. The contract outlined Passive Scaling's duties, including configuring storefronts; selecting, sourcing, and listing products; providing customer support; and providing general oversight of the store.

46. It also outlined the fees prospective purchasers would pay for the business opportunity. In addition to an initial payment for the set-up of the stores, the amount of which was based on the number of stores purchased, the contracts required clients to pay ongoing fees to Passive Scaling and Sales Support. The fee to Passive Scaling, characterized as a "Management Fee," was the greater of $199 per month or 35% of the store's monthly net profits. Clients also paid a $99 per month "Software Fee" "directly to the software provider," Sales Support, for the software used to run their e-commerce stores.

47. Prospective purchasers were directed to wire their initial payments to a Passive Scaling bank account.

48. The Passive Scaling contract also contained the following non-disparagement clause:

> During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

49. The Passive Scaling contracts also contained a refund clause that stated a client could receive a refund of their initial investment, less any net profit the client earned from their store, in certain instances, as discussed below.

50. Neither Optimyze nor Passive Scaling ever provided prospective purchasers with a document substantiating the earnings and profit claims that the companies made: (1) in

their advertisements; (2) in materials provided to prospective purchasers, including profit

calculators and profit projection spreadsheets; or (3) by representatives communicating

with the prospective purchaser. In addition, neither Optimyze nor Passive Scaling ever

provided prospective purchasers with a list of purchasers and contact information of

individuals who purchased the business opportunity within the last three years.

51. Rozenfeld and FBA Support were sued for fraud and misrepresentations in 2021, and

Passive Scaling was sued at least seven times between August 2022 and March 2024,

including one lawsuit that named Rozenfeld individually. Yet neither Optimyze nor Passive

Scaling ever provided prospective purchasers with a document, required under the Business

Opportunity Rule, stating whether the companies, any of their prior or affiliate companies,

or any of the companies' officers or directors has been subject to civil or criminal action for

misrepresentation, fraud, securities law violations, or unfair or deceptive practices,

including violations of any FTC rule, within the previous ten years.

### *Rozenfeld's Other Entities Further the Passive Scaling Scheme*

52. Rozenfeld filed the incorporation documents for Sales Support, 1HR, Hourly Relief, and

3PL on February 8, 2021. He also incorporated FBA Support NJ on November 4, 2019, and

Wraith on September 6, 2013. He used each corporate entity to further his operation of the

Passive Scaling scheme.

53. Passive Scaling clients paid a monthly $99 fee directly to Sales Support for the software

Passive Scaling used to manage their e-commerce store accounts.

54. Hourly Relief typically hired virtual assistants who purportedly managed the e-commerce

stores.

55. 1HR's bank account was often used to pay payroll for the virtual assistants.

56. Passive Scaling clients were told to purchase inventory through 1HR and FBA Support NJ,

and 3PL was used for product warehousing and shipping.

57. FBA Support and Daily Distro continued to purchase inventory and receive client payments for store inventory and monthly software subscriptions.

58. Prospective purchasers and clients of Passive Scaling interacted with employees using email addresses or contact information affiliated with Passive Scaling, Sales Support, Hourly Relief, and Daily Distro.

59. Email addresses associated with not only Passive Scaling but also Sales Support, Hourly Relief, and Daily Distro are named as secondary users on Passive Scaling clients' e-commerce stores, allowing Passive Scaling, Sales Support, Hourly Relief, and Daily Distro to access and manage those stores.

60. Sales Support and Wraith are named as secondary users on Rozenfeld's own e-commerce store on Amazon.com, which is registered under Wraith.

61. Rozenfeld communicated with at least one Passive Scaling client using a Wraith email address.

62. Clients were not told that Rozenfeld owned any of these companies and were led to believe they were separate entities.

### Consumers' Experiences After Joining the Passive Scaling Operation

63. After signing their contracts with Passive Scaling, clients often discovered that it took several months until their stores were operational, if they ever became operational at all. Even when clients' stores were established and operating, the stores sold nowhere near the amount Optimyze and Passive Scaling represented they would before clients signed the contract, and many clients lost money.

64. When clients asked questions or raised concerns with Passive Scaling about the operation of their stores, Passive Scaling representatives routinely ignored communications and failed

to attend scheduled meetings or phone calls.

65. Moreover, Amazon and Walmart suspended stores for violating dropshipping and intellectual property policies, making processing errors, and selling used items as new. Although Passive Scaling told its clients it was appealing these suspensions, the process often took several months, and many clients ultimately ended up with permanently terminated accounts.

66. Defendants often instructed clients to pay for inventory on credit cards. Once an account is suspended by Amazon or Walmart, any earnings are locked. Thus, some of Defendants' clients were left with large amounts of credit card debt that they were unable to repay with earnings.

67. Optimyze stopped working with Passive Scaling in approximately late spring of 2022 and has apparently ceased operations.

***Earnings Claims for the Passive Scaling Business Opportunity Were False or Unsubstantiated***

68. For nearly two years, Passive Scaling advertised and marketed its online e-commerce automation business opportunities to consumers using the earnings claims described above.

69. Even when clients' stores were not suspended or terminated, they sold nowhere near the amount represented in Optimyze and Passive Scaling's marketing. After taking into account the initial fee to Passive Scaling, ongoing fees to Amazon or Walmart, payments for inventory, refunds, credit card fees, and onboarding and operation costs, numerous Passive Scaling clients lost money. In other words, not only were clients out the money they paid Passive Scaling, but they also suffered further harm from the additional costs of operating the stores.

70. Of the 461 known clients for whom Passive Scaling operated e-commerce stores on Amazon.com between February 2021 and March 2024, approximately 76% made $60,000

or less in gross sales, which does not account for the cost of the products sold and does not include refunds or cancelled orders. In all or most cases, the costs for inventory and Defendants' services consumed most, if not all, of the money Passive Scaling clients realized from their stores. Approximately 14% of clients' stores had no sales at all.

### Consumer Complaints and Lawsuits

71. As the scheme continued, Passive Scaling was inundated with refund requests, complaints, and lawsuits. Rozenfeld knew about such requests, complaints, and lawsuits and was involved in Passive Scaling's responses.

72. If Amazon or Walmart suspended or terminated a client's account, rather than issuing a refund, Passive Scaling would often offer a replacement store on a different e-commerce platform. Rather than walking away and losing their hefty initial fee, clients typically opted to try a different store. However, these new stores fared no better.

73. The refund clause of Passive Scaling's contract provides that clients can obtain a refund if they have not recouped their initial investment within eighteen months or if two of their stores are shut down through no fault of their own. Despite this clause, Passive Scaling made it exceedingly difficult to obtain a refund even when clients fulfilled the requirements. Clients were unable to reach their account managers by phone or email, managers failed to appear on video conferences and calls, and sporadic contact strung clients along for months.

74. Around October 2023, Passive Scaling sent out an email newsletter regarding refund requests it had received. The message announced that "all refunds including active settlement agreements that were being conducted are currently on pause for the next 120 days" because the company "received an overwhelming number of refund requests, and dues [sic] to varying factors most of which are outside of our direct control our finance

team has been working tirelessly to process each request carefully." The email stated that Passive Scaling planned to "issu[e] refunds from the monthly generated profits of current active clients."

75. One client who received this email newsletter was told, "Your first official refund request was submitted on [sic] August 2022 and this makes your request#13 [sic] in the second batch of pending settlements."

76. In November 2023, one client received an email from Passive Scaling that said, "we have started to provide clients with settlements [sic] these settlements are 50-70% of the initial amount paid."

77. Some clients received refunds, but Passive Scaling ignored many client refund requests, strung clients on for a long time without taking action, or promised to send a refund and then failed to follow through on the promise.

78. Sometimes Defendants entered into written settlement agreements with clients seeking a refund. According to such agreements, funds for negotiated settlements were to be paid from 3PL's bank account. Many clients who executed such settlement agreements never received any refund, in violation of these agreements.

79. Between August 2022 and March 2024, Passive Scaling was sued at least seven times by clients seeking the return of funds they had given Passive Scaling for its business opportunity.

### *Defendants Conditioned Refunds on Removal of Online Complaints*

80. In connection with the Passive Scaling scheme, Defendants conditioned refunds on removal of online complaints, and threatened and intimidated clients who did not take down such complaints.

81. For example, Passive Scaling sent an email to one client that said, "We would also like to

take this opportunity to remind you of the clause in the contract that discusses the results of doing anything that can damage the company's reputation. As per the agreement, the fine is upwards of 25000 plus legal fees. In light of this, we wanted to give you the opportunity to withdraw the complaint filed based on the fact that the company has paid what was due and also that you are aware that the details of the report were highly exaggerated." The email asks the client to provide written proof of the withdrawal of the complaint and states that if she does not, Passive Scaling will sue her.

82. One day after filing a BBB complaint, another client received an "official notice" via email from Passive Scaling that stated, "After reviewing the complaint in its entirety the company is proceeding to move forward with action against the [Passive Scaling client] for Blatant [sic] breach of the terms of the contract that was attached to the BBB complaint." In the email, Passive Scaling gave the client seven business days to remove the complaint.

83. Rozenfeld specifically reinforced this position. Rozenfeld spoke on the phone with a client who asked for a refund. Rozenfeld told him that Rozenfeld knew the client had filed a complaint with the BBB, doing so was against the Passive Scaling contract the client signed because it was a harmful action against the company, and Passive Scaling could sue him. Rozenfeld asked several times for the client to remove the negative complaint and told him that, if he did, Rozenfeld would be willing to work out a resolution.

84. Passive Scaling also required some clients to sign settlement agreements that included another non-disparagement clause. For example, one settlement agreement included the following clause:

> Client further agrees to leave no Bad Reviews (Meaning any post, public writing, message, statement, report or complaint that is derogatory or damages the reputation of Passive and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives) against Passive and its directors, officers,

employees, subsidiaries, affiliates, agents and representatives. If Client has already left a Bad Review, Client agrees to take it down within thirty (30) days of execution of this Agreement. Client acknowledges that the failure to meet its obligations under this section shall be deemed a default under this Agreement and Client would waive its rights and entitlement to payment from the Settlement Fund.

### PASSIVE SCALING REBRANDS AS THE FBA MACHINE BUSINESS OPPORTUNITY

85. Around June 2023, while Passive Scaling was unable to meet the refund demands of large numbers of unhappy clients, Rozenfeld started hawking a new e-commerce automation business opportunity under the names FBA Machine and FBA Machine Accelerator Program.

86. FBA Machine offers a "Done for You" program, where FBA Machine purports to do all the work of running a client's e-commerce store. It also offers a "Done with You" program, where the client purportedly learns how to run the business.

87. FBA Machine describes its "Done for You" program, also called TheFBAMachine Accelerator Program, as a "partnership" between the company and the consumer, where FBA Machine is the CEO and the client is the investor. The program requires a $35,000 initial payment to FBA Machine, along with a $99 monthly software fee for sales.support software. In addition, prospective purchasers are advised to have $40,000 to $50,000 available for inventory. Under the agreement, FBA Machine receives 35% of the profit the online store earns.

88. FBA Machine bills its "Done with You" program as an "MBA in Amazon" where the clients are CEOs and FBA Machine teaches and mentors them to build and run an e-commerce business. The "Done with You" program costs $16,000 plus a $99 monthly software fee. Clients of the "Done with You" program are not required to share their profits with FBA Machine, and FBA Machine guarantees it will generate $20,000 in revenue in 90

days on the client's e-commerce store or the company will work for free until the consumer's e-commerce store generates $20,000 in revenue.

89. With both the "Done for You" and "Done with You" models, FBA Machine claims that it will do "99% of the work."

### *Advertisements for the FBA Machine Business Opportunity*

90. Rozenfeld is the face of the FBA Machine brand and markets the business opportunity on social media sites, including Facebook, Instagram, TikTok, and YouTube.

91. On his Instagram account, Rozenfeld claims that he went from a struggling business owner to someone who had made over $120 million in sales on Amazon. He also says that his underrated business model helped him generate over $1 million per month in sales, open multiple warehouses, and help over 750 of his students to unlock consistent passive income with Amazon. He claims that his step-by-step program can elevate any Amazon business to $10,000 per month in sales.

92. In Facebook ads, Rozenfeld tells consumers that FBA Machine will launch, manage, and scale their clients' Amazon stores and that the process is 100% automated. He also claims to transform Amazon businesses into a "profit-generating engine."

93. Rozenfeld claims on his Instagram page that he has a "transformative Amazon FBA strategy" and consumers can earn $5,000 to $10,000 per month. He shows himself on a boat and says that he quit his 9 to 5 job and started earning over $1 million per month with Amazon. He also talks about his "students" and how one student generated over $69,000 in one month by following Rozenfeld's proven systems.

94. Rozenfeld's Instagram feed is also replete with images of him living a luxurious lifestyle, like exiting a Lamborghini sportscar and, as shown in the example below, flying first class while advertising a business that can "generate to [sic] $10K/month in sales from anywhere

in the world":



95. The FBA Machine website includes purported client testimonials that claim, "Thanks to my Amazon store, I was able to pay off my mortgage and now I finally own a house. . . . They grew my Amazon store in a matter of a couple of months. . . . after just two months I started to see some big numbers" and "thanks to the team, I have enough money to travel the world." It also includes the same graphics from the Passive Scaling website, including a screenshot of an Amazon store that made $100,600 in sales in the last 30 days, as shown below:



96. In their earnings claims made through general media, including the examples from Defendants' websites and social media feeds described above, Defendants failed to include information required by the Business Opportunity Rule, namely the beginning and ending dates when represented earnings were achieved and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

97. FBA Machine also claims to incorporate AI software and an "AI[-]Powered Repricing Tool" in its fully automated processes for managing clients' stores.

*Representations to Prospective Purchasers of the FBA Machine Business Opportunity*

98. When consumers reach out to FBA Machine, they receive a slide deck explaining the business opportunity.

99. The slide deck includes industry financial, earnings, or performance information about e-commerce sales on Amazon.com. For example, the slide deck states that nearly 60% of units sold on Amazon.com come from third-party sellers, the average annual revenue for such sellers is approximately $160,000, and "55% make more than $5000 per month in

sales." The industry performance information contained in the slide deck exceeds, or does not reflect, the performance experience of typical purchasers of the FBA Machine business opportunity.

100.  The slide deck boasts that Rozenfeld, creator of the FBA Machine Accelerator Program, has nine years of experience in Amazon wholesaling, "[h]elped manage and oversee over $120m lifetime sale [sic] on Amazon," and "[a]ssisted more than 200 clients unlock [sic] a consistent passive income on Amazon."

101.  During sales calls, FBA Machine representatives identify Rozenfeld as the CEO of FBA Machine and say that he will manage clients' stores.

102.  One sales agent said that FBA Machine clients are seeing a 20 to 30% return on their investment. Another stated, regarding the "Done with You" model, that "the guarantee is we need to get your store to 20K in revenue, so $20,000, in those 90 days or—we pretty much have to keep working until we get there." The same FBA Machine representative claimed, "we have clients making 10K months. We have clients making $100,000 a month. We have a client making a million dollars a month in profit."

103.  FBA Machine uses a profit projection spreadsheet, shown below, similar to the one Passive Scaling showed to its prospective purchasers.



*The FBA Machine Contracts*

104.  Like the Passive Scaling contract, the contracts for both the FBA Machine's "Done for You" and "Done with You" programs outline FBA Machine's duties, including configuring storefronts; selecting, sourcing, and listing products; and operating and providing general oversight of the store.

105.  The FBA Machine contract for the "Done for You" program also contains the following non-disparagement clause, which is identical to the non-disparagement clause used in the Passive Scaling contract:

> During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually

true.

106.  FBA Machine does not provide prospective purchasers with a document substantiating the earnings and profit claims made: (1) in its advertisements; (2) in any materials provided to prospective purchasers, including profit calculators and profit projection spreadsheets; or (3) by representatives communicating with the prospective purchaser. In addition, FBA Machine does not provide prospective purchasers with a list of purchasers and contact information of individuals who purchased the business opportunity within the last three years.

107.  Although Passive Scaling, FBA Machine's predecessor, has been sued at least seven times, and Rozenfeld has been sued individually at least twice in conjunction with the FBA Support and Passive Scaling schemes, FBA Machine does not provide prospective purchasers with a document stating whether the company, any of its prior or affiliate companies, or any of the company's officers or directors has been subject to civil or criminal action for misrepresentation, fraud, securities law violations, or unfair or deceptive practices, including violations of any FTC rule, within the previous ten years.

### *Rozenfeld's Other Entities Further the FBA Machine Scheme*

108.  Purchasers of the FBA Machine business opportunity must purchase the Sales Support software for their e-commerce stores.

109.  3PL provides automated warehousing services to purchasers of the FBA Machine business opportunity.

110.  FBA Support NJ pays for FBA Machine sales agents' salaries.

111.  Email addresses associated with not only FBA Machine but also Passive Scaling, Sales Support, and Hourly Relief are named as secondary users on FBA Machine clients' e-commerce stores, allowing FBA Machine, Passive Scaling, Sales Support, and Hourly

Relief to access and manage those stores.

112.  FBA Machine sales agents use a Wraith Google account to store scripts and recordings of consumer sales calls.

***Earnings Claims for the FBA Machine Business Opportunity Are False or Unsubstantiated***

113.  Rozenfeld continues to market the FBA Machine business opportunity based at least in part on his purported success in creating profitable e-commerce automation stores for others through Passive Scaling.

114.  Of the 42 known clients for whom FBA Machine operated e-commerce stores on Amazon.com between February 2021 and March 2024, approximately 86% had gross aggregated sales of $15,000 or less, which does not account for the cost of the products sold or include refunds or cancelled orders. In all or most cases, the costs for inventory and Defendants' services consumed most, if not all, of the money FBA Machine clients realized from their stores. Approximately 12% of FBA Machine clients' stores had no sales at all.

115.  Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things: Defendants engaged in their unlawful acts or practices over a period of at least three years, Defendants engaged in their unlawful acts or practices knowingly, Defendants earned at least $11.1 million from participating in these unlawful acts or practices, and Defendants not only continued their unlawful acts or practices despite knowledge of numerous complaints and lawsuits, but shut down and relaunched under a new name running the same unlawful scheme.

## VIOLATIONS OF THE FTC ACT

116.  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

117. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

118. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### False or Unsubstantiated Earnings Claims

119. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' business opportunities and e-commerce automation training programs, Defendants represent, directly or indirectly, expressly or by implication, that purchasers of Defendants' business opportunities and e-commerce automation training programs are likely to earn substantial income.

120. Defendants' representations as described in paragraph 119 are false or misleading or were not substantiated at the time the representations were made.

121. Therefore, Defendants' representations as described in paragraph 119 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Unfairness

122. In numerous instances, Defendants have used tactics including threats, intimidation, and non-disparagement contract clauses to discourage purchasers from speaking or publishing truthful or non-defamatory comments or reviews about Defendants and their services.

123. Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by

31

countervailing benefits to consumers or competition.

124.  Therefore, Defendants' acts or practices as described in paragraph 122 constitute unfair

acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

125.  The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in

scope to cover certain work-at-home opportunities, became effective on March 1, 2012,

and has since that date remained in full force and effect.

126.  Defendants are "sellers" who, as described in paragraphs 23 to 114, have sold or offered

to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R.

§ 437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers

for sale or sells a business opportunity. 16 C.F.R. § 437.1(q). Under the Rule, a "business

opportunity" means a "commercial arrangement" in which a "seller solicits a prospective

purchaser to enter into a new business;" the "prospective purchaser makes a required

payment;" and the "seller, expressly or by implication, orally or in writing, represents that

the seller or one or more designated persons will . . . [p]rovide outlets, accounts, or

customers, including, but not limited to, Internet outlets, accounts, or customers, for the

purchaser's goods or services[.]" 16 C.F.R. § 437.1(c).

127.  Among other things, the Business Opportunity Rule requires sellers to provide

prospective purchasers with a disclosure document in the form and using the language set

forth in the Business Opportunity Rule and its Appendix A, and any required attachments.

In the disclosure document, the seller must disclose to prospective purchasers five

categories of information, including: basic identifying information about the seller, any

earnings claims the seller makes, the seller's litigation history, any cancellation and refund

policy the seller offers, and contact information of prior purchasers. 16 C.F.R.

§ 437.3(a)(1)–(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

128.  Defendants, as described in paragraphs 30 to 43 and 90 to 103, have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

129.  The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an earnings claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

130.  Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but

not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

131. The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(b).

132. Defendants, as described in paragraph 99, have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity.

133. The Business Opportunity Rule prohibits sellers from disseminating industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale. 16 C.F.R. § 437.4(c).

134. Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT III

**Misrepresentations Regarding Income or Profits**

135. In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have misrepresented the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned.

136.  Therefore, Defendants' acts and practices, as described in paragraph 135, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Disclosure Document Violations

137.  In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments within the time period prescribed by the Business Opportunity Rule.

138.  Therefore, Defendants' acts and practices, as described in paragraph 137 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Earnings Claims to Prospective Purchasers Violations

139.  In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have made earnings claims to prospective purchasers while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made, (2) lacking written substantiation for the earnings claim at the time it was made, and (3) failing to provide an earnings claim statement to the prospective purchasers, as required by the Business Opportunity Rule.

140.  Therefore, Defendants' acts and practices, as described in paragraph 139 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VI

### General Media Earnings Claims Violations

141. In numerous instances in connection with the offer for sale, sale, or promotion of a business opportunity, Defendants have made earnings claims in the general media while failing to state in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

142. Therefore, Defendants' acts and practices, as described in paragraph 141 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Industry Financial, Earnings, or Performance Information Violations

143. In numerous instances in connection with the offer for sale, sale, or promotion of a business opportunity, Defendants have disseminated industry financial, earnings, or performance information while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience, of purchasers of the business opportunity being offered for sale.

144. Therefore, Defendants' acts and practices, as described in paragraph 143 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(c), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT

145. The CRFA defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the

36

goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

146. The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

147. Subsection (b) of the CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. 15 U.S.C. § 45b(b)(l).

148. The CRFA prohibits any person from offering a form contract containing a provision described as void in subsection (b) of the CRFA. 15 U.S.C. § 45b(c).

149. Pursuant to the CRFA, a violation of subsection (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d).

150. Defendants have offered form contracts, as that term is defined in the CRFA. 15 U.S.C. § 45b(a)(3).

## COUNT VIII

### Violations of the CRFA

151. In numerous instances, as described in paragraphs 44 to 49 and 104 to 105, Defendants have offered, in the course of selling their business opportunities, form contracts containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

152. Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

## CONSUMER INJURY

153. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity Rule, and the CRFA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, and the CRFA by Defendants.

B.      Grant temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, and the appointment of a receiver.

C.      Award monetary and other relief within the Court's power to grant.

D.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:    6 - 3 - 24

Frances L. Kern (Minnesota Bar No. 0395233)
Colleen Robbins (New Jersey Bar No. 027091997)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202) 326-3395 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION