Frances L. Kern
Colleen Robbins
Federal Trade Commission
600 Pennsylvania Ave, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202) 326-3395 (Fax)

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CIVIL ACTION NO. |
| Plaintiff, | **FILED UNDER SEAL** |
| v. | |
| THEFBAMACHINE INC. et al., | |
| Defendants, | |

## PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENT *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER EQUITABLE RELIEF

i

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS .................................................................................... 2

    A.   Defendants' Deceptive Business Practices .................................................. 2

      1.   The Prequel: Daily Distro and FBA.Support LLC ............................. 2

      2.   The Passive Scaling Business Opportunity Scheme .......................... 3

        a.   Passive Scaling's Deceptive Marketing ................................. 3

        b.   Entities that Facilitated Passive Scaling's Scheme ................ 6

        c.   Passive Scaling's Conduct and Consumers' Results ............... 7

        d.   Passive Scaling's Response to Refund Requests, Consumer Complaints, and Lawsuits ........................................................ 9

      3.   The FBA Machine Business Opportunity ...................................... 12

      4.   Contracts with Non-Disparagement Clauses and Unfair Practices ............. 16

    B.   Defendants ................................................................................................ 18

      1.   Corporate Defendants ................................................................... 18

      2.   Individual Defendant .................................................................... 22

    C.   Consumer Injury ....................................................................................... 23

III.  THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER ............. 23

    A.   The Court Has the Authority to Issue the TRO ........................................ 23

    B.   The FTC Is Likely to Succeed on the Merits of Its Claims. ..................... 26

      1.   Defendants Have Violated the FTC Act. ....................................... 26

        a.   Defendants Utilize Deceptive Earnings Claims ................... 26

        b.   Defendants Engage in Unfair Complaint Suppression .......... 28

      2.   Defendants Have Violated the Business Opportunity Rule. .......... 31

        a.   Defendants Misrepresent Income and Profit ........................ 33

        b.   Defendants Fail to Provide the Required Written Disclosure Document 33

    c.  Defendants Make Earnings Claims to Prospective Purchasers Without Substantiation .................................................................................. 34

    d.  Defendants Make Earnings Claims in the General Media Without Substantiation .................................................................................. 35

    e.  Defendants Disseminated Industry Financial Information Without Substantiation .................................................................................. 35

  3.  Defendants have violated the Consumer Review Fairness Act. ................. 36

C.  The Equities Weigh in Favor of Granting the TRO. ........................................ 36

D.  The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise. ....................................................................................... 37

E.  The Individual Defendant Is Personally Liable. ............................................. 38

IV.  **AN *EX PARTE* TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF AND PREVENT CONTINUING CONSUMER HARM.......................................................................................... 40**

A.  The Court Should Issue the TRO *Ex Parte*........................................................ 40

B.  The Court Should Stop the Defendants' Ongoing Scam. ............................... 42

C.  The Court Should Temporarily Freeze Defendants' Assets to Preserve the Possibility of Providing Refunds to Defendants' Victims. ......................................... 43

D.  The Court Should Appoint a Temporary Receiver for the Corporate Defendants to Maintain the Status Quo. ....................................................................................... 45

E.  The Court Should Grant Immediate Access to Corporate Defendants' Business Premises, Turnover of Defendants' Business Records, and Limited Expedited Discovery. ....................................................................................................... 46

V.  **CONCLUSION .............................................................................................. 47**

## TABLE OF AUTHORITIES

**Cases**

*AMG Capital Management v. FTC*, 593 U.S. 67 (2021) ................................................................ 24

*BA Enterprise LLC v. Passive Scaling Inc.*, 2023-137620-CC-23 (Fla. Cir. Ct. Oct. 5, 2023) .... 40

*Beneficial Corp. v. FTC*, 542 F.2d 611(3d Cir. 1976) ............................................................ 26, 27

*Cenergy Corp. v. Bryson Oil & Gas PLC*, 657 F. Supp. 867, 870 (D. Nev. 198PA7) ............. 40-41

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3d Cir. 1993) ...................................................... 43

*CFTC v. Noble Wealth Data Info. Servs.*, 90 F. Supp. 2d 676 (D. Md. 2000) ......................... 7, 38

*FTC v. Atlantex Assocs.*, No. 87-0045, 1987 WL 20384 (S.D. Fla. Nov. 25, 1997) .................... 28

*FTC v. Atlantex Assocs.*, 872 F.2d 966 (11th Cir. 1989) ............................................................. 28

*FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023) ........................................ 25

*FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023) ......................... 25

*FTC v. Car Checkers of Am., Inc.*, No. 93-623, 1993 WL 56815 (D.N.J. Feb. 8, 1993) ............. 24

*FTC v. Chinery*, No. 05-3460, 2007 WL 1959270 (D.N.J. July 5, 2007) .................................... 39

*FTC v. Click4Support, LLC*, No. 15-cv-05777 (E.D. Pa. Oct. 27, 2015) ..................................... 24

*FTC v. Clifton Telecard All. One, Inc.*, No. 08-1480 (D.N.J. Mar. 28, 2008) .............................. 24

*FTC v. Cyberspace.com*, 453 F.3d 1196 (9th Cir. 2006) ............................................................. 26

*FTC v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548 (W.D. Pa. 2006) ......................................... 26

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010). ................................................ 27

*FTC v. Dutchman Enters.*, LLC, No. 09-161 (D.N.J. Jan. 14, 2009) ........................................... 24

*FTC v. First Consumers LLC*, No. 14-cv-01608 (E.D. Pa. Mar. 18, 2014) .................................. 24

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ............................... 26, 28

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ............................................. 23

*FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) ..................................................... 25

*FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307 (S.D. Fla. 2013) ...................................... 44

*FTC v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011) ............................................................. 36-37

*FTC v. Millennium Telecard Inc.*, No. 11-2479, 2011 WL 2745963 (D.N.J. July 12, 2011). passim

*FTC v. Money Now Funding, LLC*, No. CV-13-01583, 2015 WL 11120847 (D. Ariz. July 1, 2015) .................................................................................................................. 32

*FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492 (D.N.J. Aug. 11, 1997) 24, 37

*FTC v. NHS Sys., Inc.*, No. 08-cv-02215 (E.D. Pa. May 16, 2008) ............................ 24

*FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) ............. 25, 43, 45

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ...................................... 23, 26, 28

*FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193 (3d Cir. 2019) ............................ 25

*FTC v. Rando*, No. 22-cv-00487 (M.D. Fla. May 3, 2022) ...................................... 25

*FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018) ............................ 29, 30

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) .................................... 7

*FTC v. Simple Health Plans LLC*, 58 F.4th 1322 (11th Cir. 2023) ............................ 24

*FTC v. SL Fin. LLC*, No 23-cv-00698 (C.D. Cal. May 2, 2023) ................................ 25

*FTC v. Smith*, No. 23-cv-04848 (E.D. Pa. Dec. 8, 2023) ...................................... 24, 25

*FTC v. Sparta Chem Inc.*, No. 96-3228 (D.N.J. Nov. 13, 2007) ................................ 24

*FTC v. Stout*, No. 99-5705, 1999 WL 34833240 (D.N.J. Dec. 8, 1999) ........................ 24

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ............................................ 26

*FTC v. United Credit Adjusters, Inc.*, No. 09-798 (D.N.J. Feb. 24, 2009) .................... 24

*FTC v. Vemma Nutrition Co.*, No. 15-cv-1578, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015).... 26

*FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) ........................................ 27

*FTC v. Vision Online, Inc.*, No. 23-cv-01041 (M.D. Fla. June 7, 2023) ........................ 25

*FTC v. World Patent Mktg., Inc.*, No. 17-cv-20848, 2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) ............................................................................................ passim

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ............................ 25, 36

*FTC v. Zuccarini*, No. 01-4854, 2001 WL 34131411 (E.D. Pa. Sept. 25, 2001) ................ 24

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (FTC 1984) ................................ 26

*In re Int'l Harvester Co.*, 104 F.T.C. 949, 1074 (1984) ...................................... 29, 30, 31

*In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424 (D.N.J. 1998) ............................ passim

*In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380 (D. Md. 2019) ........................... 43-44

*Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974) ......................................... 44

*Leone Indus. v. Associated Packaging Inc.*, 795 F. Supp. 117 (D.N.J. 1992) .............. 45

*SEC v. First Fin. Grp. of Tex.*, 645 F.3d 429 (5th Cir. 1981) ...................................... 45

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ................................................ 43

*SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082 (2d Cir. 1972) ................................ 44

*SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801 (2d Cir. 1975) ...................................... 43

*Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995) ....................................... 46

*United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172 (9th Cir. 1987) ........ 25

*Valiant Consultants Inc. v. FBA Support LLC*, 2:21-cv-12047 (D.N.J. June 2, 2021) ... 3

**Statutes**

15 U.S.C. § 45(a)(1) ............................................................................................ 26

15 U.S.C. § 45(n) ........................................................................................... 28, 29

15 U.S.C. § 45b(a)(2) ........................................................................................... 36

15 U.S.C. § 45b(a)(3)(A) ...................................................................................... 36

15 U.S.C. 45b(b)(1) .............................................................................................. 36

15 U.S.C. 55b(b)(d)(1) ......................................................................................... 36

15 U.S.C. 57b(b) ................................................................................................... 24

15 U.S.C. § 53(b) .................................................................................................. 23

15 U.S.C. 57b(b) ................................................................................................... 24

**Rules**

Fed. R. Civ. P. 1 .................................................................................................... 46

Fed. R. Civ. 26(d) ................................................................................................. 46

Fed. R. Civ. 34(b) ................................................................................................. 46

Fed. R. Civ. P. 65(b)(1)(A) ................................................................................... 40

**Regulations**

16 C.F.R. Pt. 437 ........................................................................................ 16, 31

16 C.F.R. § 437.1(c) ............................................................................................ 31

16 C.F.R. § 437.1(c)(3)(ii) ................................................................................... 32

16 C.F.R. § 437.1(d) ............................................................................................ 32

16 C.F.R. § 437.1(f) ............................................................................................. 34

16 C.F.R. § 437.1(h) ............................................................................................ 35

16 C.F.R. § 437.1(m) ........................................................................................... 32

16 C.F.R. § 437.2 ........................................................................................... 31, 33

16 C.F.R. § 437.3 ................................................................................................. 31

16 C.F.R. § 437.3(a)(1)–(5) ................................................................................. 33

16 C.F.R. § 437.4 ................................................................................................. 34

16 C.F.R. § 437.4(a) ............................................................................................ 31

16 C.F.R. § 437.4(a)(1)–(4) ................................................................................. 34

16 C.F.R. § 437.4(b) ............................................................................................ 35

16 C.F.R. § 437.4(c) ...................................................................................... 35, 36

16 C.F.R. § 437.6 ................................................................................................. 31

16 C.F.R. § 437.6(d) ............................................................................................ 33

**Other Authorities**

Eric Goldman, *The Regulation of Reputational Information*, in The Next Digital Decade: Essays
    on the Future of the Internet 293 (Berin Szoka & Adam Marcus eds., 2010) .......................... 30

H.R. Rep. No. 114-731 (2016) ............................................................................ 30

## TABLE OF EXHIBITS

**Notes on exhibits**: The FTC submits 21 exhibits—each a declaration, many with attachments—in support of this Application. All exhibits cited in the Memorandum are referenced as "PX [exhibit number]." References include citations to erlevant paragraphs by number, and to relevant attachments by page number. The 1,531 pages of exhibits are consecutively numbered.

| Exhibit | Description | Bates Range |
|---------|-------------|-------------|
| PX 1 | Declaration of Kirk Bausch | 1–75 |
| PX 2 | Declaration of Eueal Berta | 76–124 |
| PX 3 | Declaration of Michael Hickenlooper | 125–53 |
| PX 4 | Declaration of Giordano Lanuto | 154–77 |
| PX 5 | Declaration of Carlos Angeles, III | 178–222 |
| PX 6 | Declaration of Acacia Chidi | 223–58 |
| PX 7 | Declaration of Alvaro Lizaraso | 259–324 |
| PX 8 | Declaration of Kayleigh Severn | 325–410 |
| PX 9 | Declaration of Pankil Shah | 411–513 |
| PX 10 | Declaration of Shona Killoughery | 514–73 |
| PX 11 | Declaration of Alpesh Patel | 574–630 |
| PX 12 | Declaration of Nichelle Washington | 631–63 |
| PX 13 | Declaration of Lynn Rojas | 664–762 |
| PX 14 | Declaration of Kenny Craig | 763–876 |
| PX 15 | Declaration of Ross Laughter | 877–911 |
| PX 16 | Declaration of Ernest Balenzuela | 912–81 |
| PX 17 | Declaration of Andrew Easton | 982–1073 |
| PX 18 | Declaration of Tyler Broome | 1074–1100 |
| PX 19 | Declaration of Elizabeth Anne Miles | 1101–28 |
| PX 20 | Declaration of Reeve Tyndall | 1129–1503 |
| PX 21 | Declaration of Alison Briginshaw | 1504–31 |

## I.     INTRODUCTION

The Federal Trade Commission ("FTC") respectfully requests that the Court immediately halt a business opportunity that has bilked consumers seeking to generate income online of at least $11.1 million dollars. Defendants, led by Bratislav Rozenfeld, lure consumers into investing in a "100% automated" e-commerce store with promises that it will generate passive income and become a "profit generating engine." They also currently offer programs that purport to teach consumers how to become "7-figure" successful online sellers and claim they will "get your store to $10,000 in 90 days or else we continue working for free until you do." Defendants further claim that they use artificial intelligence ("AI") in the software they require their clients to purchase for use in their e-commerce stores.

Defendants—using the names TheFBAMachine Inc., Passive Scaling Inc., Sales.Support New Jersey Inc., 1HR Deliveries Inc., Hourly Relief Inc., 3PL Logistic Automation Inc., FBA Support NJ Corp., Closter Green Corp. dba Wraith & Co, and Daily Distro LLC—have sold online business opportunities ranging in price from $16,000 to $500,000 and coaching programs starting at $6,900. In addition to that initial fee, purchasers must provide tens of thousands of dollars for "working capital" for the e-commerce stores Defendants promise to run for them. The vast majority of Defendants' clients have not made the promised earnings and have instead lost their investment—and more.

Defendants started managing consumers' e-commerce stores in 2021 under the company Passive Scaling Inc. By mid-2023, Passive Scaling Inc. was inundated with refund requests, complaints, and lawsuits. Soon after, Defendants simply repackaged their marketing and continued the same deceptive scheme under a new name, TheFBAMachine Inc.

Because Defendants have already injured significant numbers of consumers, continue to harm additional consumers on a daily basis, and, among other things, have dissipated assets, ignored prior court orders, hidden beneath a maze of confusingly similar business names, and failed to show for arbitration proceedings, the FTC seeks an *ex parte* temporary restraining order ("TRO"). The proposed order would enjoin Defendants' illegal practices and order ancillary

equitable relief, including an asset freeze, the appointment of a temporary receiver, immediate access to business premises, turnover of business records, limited expedited discovery, and an order to show cause why a preliminary injunction should not issue. These measures are necessary to prevent continued consumer injury and the destruction of evidence, and to preserve this Court's ability to provide effective final relief to the victims of Defendants' scheme at the conclusion of this litigation.

## II.    STATEMENT OF FACTS

Since early 2021, Defendants TheFBAMachine Inc. ("FBA Machine"), Passive Scaling Inc. ("Passive Scaling"), Sales.Support New Jersey Inc. ("Sales Support"), 1HR Deliveries Inc. ("1HR"), Hourly Relief Inc. ("Hourly Relief"), 3PL Logistic Automation Inc. ("3PL"), FBA Support NJ Corp. ("FBA Support NJ"), Closter Green Corp. dba Wraith & Co. ("Wraith"),[1] Daily Distro LLC ("Daily Distro"), and Bratislav Rozenfeld, aka Steven Rozenfeld and Steven Rozen, ("Rozenfeld") have been tricking consumers into spending their hard-earned money for Amazon- and Walmart-related business opportunities using deceptive earnings claims.

### A.    Defendants' Deceptive Business Practices

#### 1.    The Prequel: Daily Distro and FBA.Support LLC

Before embarking on running his own online business opportunity, Rozenfeld ran his own online stores and provided support services to other e-commerce management companies. Specifically, from 2017 through early 2021, Rozenfeld operated Daily Distro, FBA.Support LLC ("FBA Support"), and Wraith,[2] and contracted with other e-commerce management companies to (1) manage those companies' clients' Amazon stores, (2) source products for those stores, (3) provide software called sales.support to manage and track inventory, and (4) warehouse inventory.[3] Rozenfeld charged these other companies' clients directly for the software and for

---

[1] Rozenfeld used Wraith starting in 2015 to sell products through his own Amazon seller account. PX 19, Att. C, p. 1128; *see also* PX 5, Att. F, p. 201.

[2] It appears Wraith was involved in warehousing goods, but the extent of its involvement is unknown. PX 5, Att. F, p. 201.

[3] PX 5 ¶¶ 5, 7–8; PX 17 ¶ 20; PX 18 ¶ 4; PX 20 ¶¶ 2(h-j), 36, 45 & Att. CC, p. 1355; PX 21 ¶¶ 12, 15.

inventory.[4] Stripe, the payment processor Rozenfeld used at the time, notified him of high chargebacks and disputes from customers, and eventually shut down several of his Daily Distro and FBA Support accounts.[5] In June 2021, one of FBA Support's e-commerce management company partners sued FBA Support and Rozenfeld for, *inter alia*, fraudulent inducement and fraudulent misrepresentation, alleging they made false promises about managing Amazon stores for clients, their ability to source products,[6] their ability to store and process inventory in their warehouse, and the number and experience of employees who service the e-commerce stores.[7]

### 2. The Passive Scaling Business Opportunity Scheme

#### a. *Passive Scaling's Deceptive Marketing*

In February 2021, the same month Stripe terminated Rozenfeld's Daily Distro and FBA Support accounts, Rozenfeld founded and started operating Passive Scaling. Rozenfeld advertised his programs to consumers worldwide, primarily through Instagram using the handle *kingofamzn* and his website, passivescaling.com, as offering a way to make significant passive income through an online store (typically on Amazon.com or Walmart.com) run by Passive Scaling.[8] Passive Scaling's website claimed "most of our clients hit six-figure monthly revenues within 12-16 months" and "our most successful clients generate over $100,000 per month in

---

[4] PX 5 ¶¶ 7–8; PX 17 ¶ 5.

[5] PX 20 ¶ 37 & Att. BB, pp. 1313–15. In January 2020, an FBA Support account was terminated because the overall dispute rate was 10.6%, exceeding the 1% threshold. In February 2021, after notifying Rozenfeld about his account termination, Stripe notified Wells Fargo that Stripe terminated an FBA Support account (that used the url sales.support) for excessive chargebacks. This resulted in its addition to Mastercard's Member Alert to Control High-risk Merchants ("MATCH") list, which identifies terminated merchants and the reason for termination. *Id.*

[6] Despite signing a contract with a manufacturer explicitly stating Rozenfeld did not have permission to sell certain products in Amazon resellers' stores, he did so anyway. PX 5 ¶¶ 9, 28. One such consumer's Amazon store was ultimately terminated. *Id.* ¶ 11. When the consumer initiated a chargeback, Rozenfeld lied to the bank and falsely claimed he already provided the consumer a refund. *Id.* ¶¶ 5, 22, 28. In fact, the consumer never received a refund. *Id.* ¶ 30.

[7] *Valiant Consultants Inc. v. FBA Support LLC*, 2:21-cv-12047 (D.N.J. June 2, 2021). The case settled in July 2023. PX 20 ¶ 40(a).

[8] PX 20 ¶¶ 2(b), 32.

3

profit!"[9] Passive Scaling falsely claimed that it had been in business over seven years, had seven warehouses, and had 800 or more active automation clients.[10] The website claimed, "we build you a fully automated Walmart store from the ground up and use our expertise to manage it into a successful 7 figure business."[11] The website also contained enticing client testimonials, such as "I went from struggling to pay my bills to being financially independent in a span of 5 months," and statistics, such as "$100,600 in last 30 days."[12]

Passive Scaling also partnered with a company called Optimyze Digital ("Optimyze") to handle sales and marketing until approximately early 2022.[13] Optimyze was based in Irvine, California, and the company advertised on Instagram and Facebook.[14] Once consumers connected with an Optimyze sales agent, the sales agent would lure consumers in by showing them profit calculator spreadsheets, giving profit projections, hosting question-and-answer sessions, and sending consumers links to videos of Rozenfeld.[15] After Optimyze split with Passive Scaling in early 2022,[16] Rozenfeld and Passive Scaling employees continued to use a profit calculator and give oral profit projections.[17]

---

[9] PX 20 ¶ 26 & Att. V, pp. 1279–80.

[10] PX 20 ¶ 26 & Att. V, p. 1272. In January 2021, one month prior to starting Passive Scaling, Rozenfeld told one of his e-commerce partners that he was evicted from his warehouse and would likely be filing for bankruptcy. He also stated there was a lien on the clients' products in the warehouse, but then said that someone cleared out the warehouse months before and disposed of all clients' products, leaving those clients without any products to sell. PX 5, Att. F, p. 201. One of those clients continually asked for his products back or an accounting but received neither. PX 5, Att. G, p. 203.

[11] PX 20 ¶ 26 & Att. V, p. 1272.

[12] PX 20 ¶ 26 & Att. V, pp. 1275, 1280.

[13] PX 1 ¶ 3; PX 2 ¶ 3; PX 4 ¶ 3; PX 6 ¶¶ 2, 4; PX 7 ¶¶ 2, 5; PX 8 ¶ 2; PX 9 ¶¶ 2–3; PX 10 ¶¶ 4,6; PX 12 ¶¶ 2–3; PX 13 ¶¶ 2, 7; PX 14 ¶¶ 2,11; PX 15 ¶ 3; PX 16 ¶¶ 2, 4; PX 18 ¶¶ 55–56.

[14] PX 1 ¶ 4; PX 16 ¶ 2; PX 20 ¶¶ 28–29.

[15] PX 1 ¶¶ 3, 5, 10 & Att. A, p. 12; PX 2 ¶¶ 3–5; PX 3 ¶¶ 2–3 & Att. A, p. 130; PX 6 ¶ 3; PX 7 ¶¶ 2–3 & Att. A, p. 268; PX 9 ¶¶ 2 & Att. A, p. 419; PX 10 ¶¶ 2, 4 & Att. A, p. 522, Att. C, p. 538; PX 13 ¶¶ 3–4 & Att. A, p. 673, Att. B, pp. 674–75; PX 14 ¶ 7 & Att. A, p. 774; PX 15 ¶ 4 & Att. B, p. 883; PX 20 ¶ 31 & Att. Z, pp. 1294–1310, Att. DD, pp. 1502–03.

[16] Optimyze appears to have ceased operations. PX 20 ¶¶ 28, 30.

[17] PX 3 ¶ 3 & Att. A, p. 130; PX 11, ¶¶ 3–4; see also PX 1 ¶ 19 (explaining that, when consumer asked Rozenfeld for a refund, he showed the consumer a profit spreadsheet and convinced the consumer to purchase a replacement store).

4



PX 2, Att. A, p. 83

Throughout the sales process, Optimyze and Passive Scaling's marketing videos,

question-and-answer sessions, and websites were replete with earnings claims, such as:

- "20% return on investment"
- "We are talking about five figures per month in pure profit!"
- "$1.3 [m]illion [a]verage gross revenue in first two years"[18]

In addition to touting high monthly profits for both Amazon and Walmart stores,

Defendants' sales agent also promised consumers that this was a "risk free" opportunity.

Defendants claimed that if the consumer did not earn back the initial investment fee, ranging in

cost between $30,000 and $500,000, within 18 months, the consumer could request a refund.[19]

Once consumers were hooked, the sales agent would send over a contract from Passive

Scaling.[20] The contract outlined Passive Scaling's duties, including configuring storefronts;

---

[18] PX 20 ¶ 31 & Att. V, p. 1279, Att. DD, pp. 1497, 1503.

[19] PX 1 ¶ 3; PX 3 ¶ 4; PX 7 ¶ 4; PX 8 ¶ 2; PX 14 ¶ 5; PX 15 ¶ 5 & Att. A, p. 882; PX 16 ¶ 3; see also PX 1, Att. B, p. 21 (outlining Passive Scaling's refund policy in its contract).

[20] PX 1 ¶ 5; PX 2 ¶ 6; PX 4 ¶ 3; PX 6 ¶ 4; PX 7 ¶ 5; PX 8 ¶ 4; PX 9 ¶ 5; PX 10 ¶ 6; PX 12 ¶ 5; PX 13 ¶ 7; PX 14 ¶ 8; PX 15 ¶ 6; PX 16 ¶ 4.

selecting, sourcing, and listing products; customer support; and general oversight of the store.[21] Consumers were told that Passive Scaling employees would handle the day-to-day operations of the stores and 99% of the work.[22] The purchaser's role was to pay the initial fee and receive passive income.[23] In addition to the initial investment, the contract required purchasers to have access to no less than $10,000 for inventory to fulfill store orders.[24]

> b. *Entities that Facilitated Passive Scaling's Scheme*

Rozenfeld started Sales Support, 1HR, Hourly Relief, and 3PL at the same time as Passive Scaling, and he used those corporations, as well as FBA Support NJ and Daily Distro, to facilitate the scheme.[25] Clients of Passive Scaling were charged a monthly management fee of $199 or 35% of monthly profit, plus a $99 fee for software to manage their e-commerce store accounts.[26] The software was provided by Sales Support.[27] Rozenfeld used Sales Support to track and manage inventory, and he used Sales Support, FBA Support NJ, and Daily Distro to receive client payments for inventory, monthly revenue share, and monthly software subscriptions.[28] The virtual assistants who purportedly managed clients' stores worked for Hourly Relief and Passive Scaling.[29] These virtual assistants were added on to clients' Amazon

---

[21] *See, e.g.*, PX 1, Att. B, pp. 13–33.

[22] *Id*; PX 2 ¶ 6; PX 4 ¶ 2; PX 9 ¶ 3; PX 11 ¶ 2; PX 12 ¶¶ 2–3; PX 13 ¶ 7; PX 14 ¶ 2; PX 16 ¶ 2; PX 20, Att. V, pp. 1272–73, 1276–77.

[23] PX 4 ¶¶ 2–3; PX 6 ¶¶ 2–3; PX 7 ¶¶ 5, 7; PX 8 ¶ 2, 4; PX 9 ¶¶ 3, 5; PX 11 ¶¶ 3–5; PX 12 ¶ 5; PX 13 ¶¶ 7, 9; PX 14 ¶¶ 2, 7; PX 15 ¶¶ 2, 7; PX 20, Att. V, p. 1273.

[24] *See, e.g.*, PX 1, Att. B, p. 14. Passive Scaling used both the Fulfilled by Merchant ("FBM") model, also known as "dropshipping," and the Fulfilled by Amazon ("FBA") model to handle inventory for its clients' stores. PX 1 ¶ 13; PX 6 ¶ 11; PX 7 ¶ 11; PX 8 ¶¶ 11–12; PX 9 ¶¶ 8, 15; PX 13 ¶¶ 17–18; PX 16 ¶¶ 10, 14. The dropshipping method can cause policy violations for both Amazon and Walmart e-commerce stores and has resulted in store suspensions and terminations. PX 13 ¶ 17; PX 16 ¶ 19 & Att. D, pp. 952–57.

[25] PX 20 ¶ 2.

[26] *See, e.g.*, PX 1, Att. B, p. 14 (Walmart contract); PX 15, Att. C, p. 885 (Amazon contract).

[27] PX 1 ¶ 32; PX 2, Att. H, p. 123; PX 3 ¶ 11; PX 6 ¶ 4; PX 8 ¶ 4; PX 11 ¶ 5; PX 13, Att. M, p. 733; PX 14 ¶ 4; *see also* PX 5 ¶ 7; PX 17 ¶ 15; PX 20 ¶ 9; PX 21 ¶ 12.

[28] PX 1 ¶¶ 22, 32 & Att. F, p. 38; PX 2, Att. H, p. 123; PX 3 ¶ 11; PX 6 ¶ 4; PX 8 ¶ 4; PX 10 ¶ 11 & Att. E, pp. 554–60; PX 11 ¶ 5; PX 13, Att. M, p. 733; PX 14 ¶ 4; PX 16 ¶¶ 22, 38 & Att. E, p. 958, Att. G, p. 965; PX 18 ¶¶ 57, 62.

[29] PX 14 ¶¶ 22-24 & Att. G, p. 805, Att. H, p. 806, Att. I, p. 807.

stores as secondary users, and their email addresses included the domains @hourlyrelief.com, @passivescaling.com, @dailydistro.com, @fba.support, @wraithco.com, and @sales.support.[30] Clients were told to purchase inventory through 1HR, Hourly Relief, and FBA Support NJ.[31] 3PL was used for shipping and warehousing and purportedly refunding Passive Scaling clients.[32] FBA Support NJ and Passive Scaling also appear to have paid payroll for Passive Scaling's virtual assistants.[33] Passive Scaling often made it appear that these companies were unaffiliated entities, when in fact they are all owned by Rozenfeld.[34]

### c. *Passive Scaling's Conduct and Consumers' Results*

For approximately two years, February 2021 to approximately July 2023,[35] Passive Scaling marketed its offers to consumers with the earnings claims described above and knowing the profit calculator it used to solicit consumers to purchase its business opportunity was false.[36]

---

[30] PX 19 ¶ 6. Passive Scaling set up clients' Walmart stores using the clients' unique business name, making it difficult to ascertain information on these stores. PX 20 ¶ 38.

[31] PX 1 ¶ 22 & Att. F, p. 38; PX 2, Att. G, pp. 120–21; PX 3 ¶ 9; PX 6, Att. H, p. 251; PX 8 ¶ 14, Att. I, p. 384; PX 10 ¶ 11 & Att. E, pp. 554–60; PX 13 ¶ 20 & Att. K, p. 729–31.

[32] PX 2 ¶ 17 & Att. F, p. 110–11, Att, G, pp. 112, 120; PX 8, Att. G, p. 380; PX 9 ¶¶ 21, 25 & Att. G, p. 477, Att. I, p. 498; PX 16 ¶ 34 & Att. F, p. 960; *see also infra* n.128.

[33] PX 18 ¶¶ 69–70.

[34] PX 2 ¶ 7 (showing that the Passive Scaling contract says the $99 software fee is "paid directly to the software provider," despite the fee being paid to Rozenfeld's company) & Att. G, p. 121 ("I just received some invoices from the 1hr [sic] team, I am checking those out to conclude the credits due to you from that particular vendor"); PX 6 ¶ 15 & Att. H, p. 251; PX 8 ¶ 14 & Att. G, p. 380, Att. I, p. 384; PX 13, Att. K, pp. 729–31; PX 20 ¶ 2.

[35] Although Passive Scaling does not appear to have advertised its business opportunities since July 2023, the Commission "has reason to believe that [it] is violating or about to violate" the FTC Act, 15 U.S.C. § 53(b)(1). *See FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) (holding that Section 13(b) of the FTC Act "prohibits existing or impending conduct"). As discussed in Section III.D below, Passive Scaling is part of a common enterprise with FBA Machine. In fact, FBA Machine is the *same scam* operating under a different name. Because FBA Machine continues to violate the FTC Act, (*see* PX 20 ¶¶ 20–24), all Defendants, including Passive Scaling, are "violating or about to violate" the FTC Act. *See CFTC v. Noble Wealth Data Info. Servs.*, 90 F. Supp. 2d 676, 691 (D. Md. 2000) (holding successor companies liable as part of common enterprise for initial company's violations when they were formed as successor companies, were funded through the original company, were operated by the same individuals as the original company, and used the same marketing materials and advertising to tout the same scheme as the original company).

[36] PX 20, Att. CC, p. 1408 (stating that arbitrator found "Respondent used a financial forecast that it has admitted was false to solicit Claimant's investment in Respondent's business and to *(continued)*

As a result, clients rarely, if ever, achieved the promised results, and most lost money. Comparing 326 of Passive Scaling clients' aggregate sales to the profit calculator shows 88% did not generate the promised gross revenue projections.[37] This is not surprising, given that Passive Scaling clients experienced delayed or unopened stores;[38] store suspensions, deactivations, and terminations;[39] lost or mismanaged inventory;[40] mismanaged accounts;[41] high returns and customer complaints;[42] Amazon policy violations (e.g., dropshipping violations, trademark infringement, listing used items as new, and intellectual property violations);[43] and tens of thousands of dollars in losses.[44] Consumer declarations show that, despite having some gross sales in their stores, after subtracting the initial fee, Amazon or Walmart fees, inventory payments, client refunds, credit card fees, monthly subscription and revenue share fees, and operating costs, not only did consumers not earn the promised profits, but they actually lost

---

secure his execution of the E-Commerce Consulting Agreement and payment of amounts due thereunder").

[37] PX 19 ¶ 13. The remaining 12% only had sales for five months or less. *Id. See* profit calculators at PX 1, Att. A, p. 12, Att, E, pp. 36–37; PX 2, Att. A, p. 83; PX 3, Att. A, p. 130; PX 9, Att. A, p. 419; PX 13, Att. B, p. 674; PX 15, Att. B, p. 883.

[38] PX 3 ¶¶ 8–9; PX 6 ¶ 13; PX 11 ¶¶ 9–12; PX 12 ¶ 11; PX 13 ¶ 15; PX 16 ¶ 21.

[39] PX 1 ¶¶ 14, 20; PX 4 ¶ 7; PX 7 ¶ 12; PX 8, ¶ 15; PX 9 ¶ 16; PX 11 ¶ 13; PX 13, Att. H, pp. 718–21; PX 15 ¶ 12; PX 16 ¶¶ 17–18 & Att. C, p. 951. Rozenfeld sold in four marketplaces on Amazon, and Amazon blocked or suspended three of the four multiple times. PX 19 ¶ 15.

[40] PX 1 ¶¶ 25, 30–34, 42 & Att. G, pp. 62–66; PX 2 ¶ 18; PX 3 ¶¶ 13, 16 & Att. D, p. 151; PX 6 ¶¶ 16–17, 21; PX 9 ¶ 10; PX 20, Att. CC, p. 1409. FBA Support had similar issues. PX 5 ¶ 19; PX 17 ¶¶ 21–22; PX 20 ¶ 40 & Att. CC, p. 1322; PX 21 ¶¶ 15–17; *see also supra* n.10.

[41] PX 6 ¶¶ 19, 21; PX 9 ¶¶ 10, 15; PX 12 ¶ 10; PX 13 ¶ 20 & Att. K, pp. 729–31; PX 14 ¶ 26.

[42] PX 8 ¶¶ 8, 15; PX 9 ¶¶ 9–11; PX 16 ¶¶ 15, 19.

[43] PX 1 ¶¶ 14, 20 & Att. D, p. 35; PX 8 ¶¶ 9–10, 15 (Passive Scaling sold products in its client's store in violation of the manufacturer's policies, which Rozenfeld was told about a few years prior, *see supra* n.6); PX 9 ¶ 15–16; PX 14 ¶¶ 26–27 & Att. K, pp. 814–17; PX 15 ¶ 14 & Att. F, pp. 908–10; PX 16 ¶¶ 16, 29 & Att. B, pp. 946–50, Att. C, p. 951. Amazon blocked or suspended Rozenfeld's marketplaces for, *inter alia*, selling restricted products. PX 19 ¶ 15.

[44] PX 1 ¶ 42 ($30,000 initial fee and $10,000 additional fees); PX 2 ¶¶ 7, 23 ($65,000 initial fee and store loss of approximately $20,000); PX 3 ¶ 5 ($50,000 initial fee, $45,000 for inventory, and store losses of approximately $28,700); PX 4 ¶ 11 ($90,000 initial fee and additional $90,000 in losses); PX 6 ¶ 4 ($15,000 initial fee); PX 7 ¶ 7 ($30,000 initial fee); PX 8 ¶ 4 ($30,000 initial fee); PX 9 ¶ 5 ($30,000 initial fee); PX 11 ¶ 5 ($30,000 initial fee and $4,000 in additional fees); PX 12 ¶ 5 ($120,000 initial fee and approximately $3,000 additional fees); PX 14 ¶ 52 ($30,000 initial fee); PX 15 ¶ 7 ($50,000 initial fee and $15,000 additional fees), PX 16 ¶ 4 ($50,000 initial fee).

money.[45] Data obtained from Amazon.com corroborates this.[46]

        d.     *Passive Scaling's Response to Refund Requests, Consumer Complaints, and Lawsuits*

As a result of Passive Scaling's egregious conduct and gross misrepresentations about the amount consumers could earn from their e-commerce stores, Passive Scaling was inundated with refund requests, complaints, and lawsuits.[47] Passive Scaling's contract contained a refund clause that obligated the company to refund clients if two of their stores were shut down through no fault of the client's or if they did not recoup their initial investment within 18 months.[48] Despite this clause, Passive Scaling made it next to impossible to obtain a refund, even when clients fulfilled the requirements.[49] For example, clients were unable to reach their account managers by phone or email, managers failed to appear on video conferences, and sporadic contact strung clients along for months.[50]

Passive Scaling sent out a newsletter addressing settlements and refunds starting in at least August 2023.[51] The company said, "since we have an *overwhelming number of refund requests*, and dues [sic] to varying factors most of which are outside of our direct control our finance team has been working tirelessly to process each request carefully . . . rest assured, your

---

[45] PX 1 ¶ 24; PX 2 ¶ 18; PX 3 ¶¶ 10–14 & Att. C, pp. 147–49; PX 4 ¶¶ 3, 6, 10; PX 7 ¶¶ 7, 24; PX 10 ¶¶ 6, 10; PX 11 ¶¶ 5, 10, 13; PX 14 ¶¶ 14, 52; PX 15 ¶¶ 7, 15–16; PX 16 ¶¶ 26, 32, 37.

[46] Of the 461 known clients for whom Passive Scaling operated e-commerce stores on Amazon.com between February 2021 and March 2024, approximately 76% made less than $60,000 in gross sales, which does not account for the cost of the products sold or the initial investment, and does not include refunds or cancelled orders. PX 19 ¶¶ 7, 9–10. Approximately 14% of clients' stores had no sales.

[47] PX 1 ¶ 36; PX 2 ¶ 21; PX 3 ¶ 15; PX 4 ¶ 8; PX 6 ¶ 22; PX 7 ¶¶ 19, 21; PX 8 ¶¶ 11, 13, 17; PX 9 ¶ 18; PX 10 ¶¶ 13–14; PX 11 ¶ 12; PX 12 ¶ 12; PX 13 ¶ 22, 24 & Att. L, p. 732, Att. N, pp. 741–45; PX 14 ¶¶ 30, 32, 43 & Att. U, pp. 851–56; PX 15 ¶¶ 16–17; PX 16 ¶ 24; PX 20 ¶ 40.

[48] *See, e.g.*, PX 1, Att. B, p. 21.

[49] PX 1 ¶ 38; PX 2 ¶ 21; PX 3 ¶¶ 15–17; PX 4 ¶¶ 8, 11; PX 6 ¶¶ 22–23; PX 7 ¶¶ 19–23; PX 8 ¶¶ 18–20, 22; PX 9 ¶¶ 18–27; PX 10 ¶¶ 14–19; PX 11 ¶ 12; PX 12 ¶ 15; PX 13 ¶¶ 22–28; PX 14 ¶ 30–36, 39; PX 15 ¶¶ 17–21; PX 16 ¶¶ 25, 31, 34–36.

[50] PX 1 ¶ 38; PX 2 ¶¶ 16, 20–21; PX 3 ¶¶ 16–17; PX 4 ¶ 11; PX 6 ¶¶ 22–23 & Att. L, p. 258; PX 7 ¶¶ 19–23 & Att. E, p. 299; PX 8 ¶¶ 18–20, 22; PX 9 ¶¶ 18–27; PX 11 ¶¶ 11, 12, 15; PX 13 ¶¶ 22–28; PX 14 ¶¶ 30–36; PX 15 ¶ 21 & Att. G, p. 911; PX 16 ¶¶ 24–27, 34–36.

[51] The newsletter said Passive Scaling was not taking new clients. PX 4, Att. B, p. 174.

9

request is in the queue." (Emphasis added).[52] A client who received this newsletter in October *2023* was told "your first official refund request was submitted on [sic] August 2022 and this makes your request #13 in the *second* batch of pending settlements." (Emphasis added).[53] Another client received an email that said, "we have started to provide clients with settlements. These settlements are 50-70% of the initial amount paid."[54] These three Passive Scaling clients who were promised a refund received nothing.[55]

      Consumers complained to their account managers and Rozenfeld, as well as online to the Better Business Bureau ("BBB").[56] One consumer's lawyer sent Rozenfeld and Passive Scaling a demand letter stating that his client "did not receive any of the promised store management services and her stores have been inactive."[57] Another consumer begged for a refund, and Rozenfeld said to trust him because he had clients earning $100,000 per month. The consumer emailed, "I paid $30k last year and have zero profits to show" and "so for the last 5 months . . . no inventory, no communication, lost items, roughly 40k!! Out of pocket. I was told I'd be at profit by this point of 10k++per month...nope."[58] In sharing his profit and loss statement, another consumer emailed, "I have not 'recouped' my initial store costs. In fact, the businesses are operating at a loss, so I would expect the full cost will be eligible for the refund."[59] Despite Passive Scaling's promises of a settlement agreement and refund, the consumer never received one.[60] Another consumer accrued large amounts of credit card debt from inventory purchases and emailed saying, "By now I should have been making 5-7k net as

---

[52] PX 4, Att. B, pp. 173–77; PX 8 ¶ 19, Att. N, pp. 399–401.

[53] PX 8, Att. N, p. 399.

[54] PX 3 ¶ 17 & Att. D, p. 150.

[55] PX 3 ¶ 17; PX 4 ¶¶ 10–11; PX 8 ¶¶ 20, 22–23.

[56] PX 20 ¶ 39; PX 1 ¶¶ 14–15, 23, 39; PX 2 ¶ 22; PX 3 ¶ 15; PX 4 ¶ 11; PX 6 ¶¶ 19–20, 22–23; PX 7 ¶ 25; PX 8 ¶¶ 13, 15, 22; PX 9 ¶ 18; PX 10 ¶¶ 13–14, 17; PX 11 ¶¶ 12, 15; PX 12 ¶ 12; PX 13 ¶¶ 16, 22, 27; PX 14 ¶¶ 37, 39; PX 15 ¶¶ 17, 19; PX 16 ¶¶ 24, 28, 30.

[57] PX 12, Att. E, p. 661.

[58] PX1, Att. G, p. 40.

[59] PX 3, Att. D, p. 151.

[60] PX 3 ¶ 17.

per the initial agreement but I am loosing [sic] hundreds to thousands in fees and interest," "at this point I lost so much (forget about making a profit), I just need to exit . . . I want to request my initial investment back so I can at least stop the bleeding by paying down the debts and walk away with a loss," and "I don't know how you sleep at night working for a company that drains people's money every day . . . I lost a lot of money, time and energy in this. A complete disaster."[61]

The BBB sent the complaints it received to Passive Scaling.[62] The BBB ultimately gave Passive Scaling an "F" rating due to the number of complaints filed and its failure to respond to them.[63] Rozenfeld was aware of complaints, and he often conditioned refunds on clients removing BBB and other online complaints.[64] In fact, Defendants often required clients to sign new agreements ("settlement agreements") with this condition.[65] Some clients who signed these settlement agreements still did not receive their refunds, in violation of the agreements.[66] When confronted with refund requests, Rozenfeld often claimed that he was no longer the owner, the company was insolvent, or he was broke.[67] While some clients were refunded some of their money, most either never heard anything or were strung along with more false promises of future

---

[61] PX 2 ¶ 19 & Att. G, pp. 113, 118, 122.

[62] PX 20 ¶ 39.

[63] *Id.*

[64] PX 6 ¶¶ 22–23; PX 7 ¶ 25; PX 8 ¶¶ 22, 26; PX 9 ¶ 22; PX 10 ¶ 14; PX 11 ¶ 12; PX 12 ¶ 12; PX 15 ¶ 19; PX 16 ¶ 34; *see also* PX 13 ¶¶ 27, 28, 30 & Att. P, p. 751 (Passive Scaling had a refund payment schedule with a client and missed a payment. When confronted by the client, Passive Scaling said it could not continue payments while the "legal team is involved," since the client initiated a lawsuit. If she dismissed the lawsuit, Passive Scaling said it could resume the refund payments. Even after the court entered a $13,000 judgment against Passive Scaling, it has not paid.).

[65] PX 9 ¶ 21 & Att. G, pp. 476–81; PX 10 ¶¶ 14, 15; PX 15 ¶ 18; PX 16 ¶ 34 & Att. F, pp. 959–64.

[66] PX 9 ¶¶ 21–26 (consumer was told his refund was sent to him via wire transfer, but he never received it) & Att. G, pp. 476–81, Att. I, pp. 498–99, Att. J, pp. 500–13; PX 15 ¶¶ 18–19.

[67] PX 8 ¶ 22 & Att. Q, pp. 408–09; PX 9 ¶ 22 & Att. F, pp. 469–75, Att. G, pp. 483–91; PX 11 ¶ 12. While Passive Scaling may not be active, Rozenfeld is still the owner. PX 20 ¶ 2(b).

payments that never materialized.[68] Clients have sued both Passive Scaling and Rozenfeld in state court and have sought relief through arbitration, and both defendants have failed to appear in multiple arbitrations.[69] In at least three such lawsuits, the clients received a monetary judgment but have been unable to collect.[70]

### 3.    The FBA Machine Business Opportunity

In approximately mid-2023, as Passive Scaling's deceptive conduct was causing it to unravel due to the refund demands of large numbers of clients in dire financial distress, Rozenfeld struck out on a new scam. He began marketing a recycled version of his automation and coaching services on social media, including Facebook, Instagram, TikTok, and YouTube, under the names FBA Machine and FBA Machine Accelerator Program.[71] Both programs rely on sales.support software that purportedly utilizes AI to identify products with high demand but low competition, and FBA Machine ads tout an "AI-powered repricing tool."[72] FBA Machine offers a "Done for You" program and a "Done with You" program.[73] However, the sales agent during an undercover call told an FTC investigator that, even with the "Done with You" program, FBA Machine will mentor the client but still do "99%" of the work in building and managing the store.[74] The contracts for the two programs vary only in the cost, the amount of the profit split,

---

[68] PX 1 ¶¶ 38, 42; PX 2 ¶ 21; PX 3 ¶ 17; PX 4 ¶ 11; PX 6 ¶¶ 22–23; PX 7 ¶¶ 25–28; PX 8 ¶¶ 20, 23 & Att. M, p. 398, Att. N, pp. 399–401, Att. O, pp. 402–04; PX 9 ¶¶ 18–26; PX 10 ¶¶ 13–19; PX 11 ¶ 12; PX 12 ¶¶ 12, 15; PX 13 ¶¶ 28, 30; PX 14 ¶¶ 39, 45; PX 15 ¶¶ 17–19; PX 16 ¶¶ 31, 34–35, 37.

[69] PX 13, ¶ 24; PX 14, ¶ 43 & Att. U, pp. 851–56; PX 16 ¶ 36 (Passive Scaling failed to appear in arbitration). We are aware of seven lawsuits filed against Passive Scaling, two of which were filed because Passive Scaling failed to respond in arbitration and failed to pay the final arbitration awards. PX 20 ¶ 40 & Att. CC, p. 1404, 1414, 1421; see also PX 1 ¶ 37 (consumer spoke with another Passive Scaling client who said Rozenfeld failed to appear in arbitration).

[70] PX 13, Att. Q, p. 762 (court entered judgment in amount of $13,000 after Passive Scaling failed to pay pursuant to a signed memorandum of agreement); PX 14 ¶¶ 44, 45 & Att. V, p. 857, Att. W, pp. 858–59 (court entered a default judgment in amount of $30,000, and consumer has been unable to collect); PX 20, Att. CC, pp. 1414, 1489–90 (court entered a default judgment on May 14, 2024, in the amount of $200,899.66, and a writ was executed on May 24, 2024).

[71] PX 20 ¶¶ 3–24, 32-35.

[72]  PX 20 ¶ 9 & Att. N, p. 1194.

[73] PX 20 ¶ 12 & Att. P, p. 1206.

[74] PX 20 ¶ 16 & Att. T, p. 1264.

and an added guarantee of getting to $20,000 in revenue in 90 days for the "Done with You" package.[75]

Rozenfeld's Facebook ads tell consumers FBA Machine will launch, manage, and scale consumers' own Amazon stores and that it is 100% automated.[76] The ads also claim FBA Machine will transform Amazon businesses into "profit-generating engine[s]".[77] Rozenfeld claims on his Instagram page that he has a "transformative Amazon FBA strategy" and consumers can earn $5,000 to $10,000 per month.[78] Here is an example of an ad Rozenfeld ran on his Instagram page, telling readers, "If you want to generate to [sic] $10k/month in sales from anywhere in the world":



PX 20, Att. AA, p. 1311

The FBA Machine website includes purported testimonials that claim, "thanks to my Amazon store, I was able to pay off my mortgage and now I finally own a house . . . They grew my Amazon store in a matter of a couple of months . . . after just two months I started to see

---

[75] *Id.* at 1265.

[76] PX 20 ¶ 19.

[77] *Id.*

[78] PX 20 ¶¶ 32–35 & Att. AA, p. 1312.

some big numbers" and "thanks to the team, I have enough money to travel the world."[79] The website also includes the same screenshots of purported clients' Amazon accounts from the Passive Scaling website, including showing a screenshot of an Amazon store that made $100,600 in sales in the prior 30 days.[80]

After viewing FBA Machine ads on social media and its website, prospective purchasers reach out to FBA Machine to learn more about the business opportunity, and FBA Machine emails them a pitch deck that touts the purportedly spectacular performance of FBA Machine clients as well as the e-commerce industry generally.[81] FBA Machine then schedules a call with the prospect. During undercover calls conducted by the FTC, the sales agents told the FTC's investigator that "Steven" is the CEO of the company and will be managing the stores.[82] One sales agent said that clients are seeing 20 to 30% return on investment and "we guarantee our team will get your store to $10,000 in 90 days or else we continue working for free until you do."[83] Another sales agent claimed, "we have clients making 10k months. We have clients making $100,000 a month. We have a client making a million dollars a month in profit."[84]

---

[79] PX 20 ¶ 27 & Att. W, pp. 1284–85.

[80] PX 20 ¶ 27 & Att. W, pp. 1282–87. FBA Machine added secondary users onto its clients' Amazon accounts to manage the stores, and those email addresses included @thefbamachine.com, @dailydistro.com, @hourlyrelief.com, @passivescaling.com, and @sales.support. PX 19 ¶ 6.

[81] PX 20 ¶¶ 3–4, 9 & Att. N, pp. 1187–99, ¶ 14, Att. R, pp. 1226–31, ¶ 23.

[82] PX 20 ¶ 13 & Att. Q, p. 1216.

[83] PX 20 ¶¶ 7–8 & Att. M, pp. 1181, 1183, Att. N, p. 1197.

[84] PX 20 ¶ 13 & Att. Q, p. 1213.

Defendants provide this spreadsheet on sales calls with consumers:[85]



PX 20 ¶ 16.

FBA Machine sells its "Done for You" course for $35,000 with a profit share and a monthly $99 software fee. Consumers are also expected to purchase $40,000 to $50,000 in inventory. The "Done with You" model costs $16,000 plus monthly software fees and inventory costs.[86]

FBA Machine's earnings claims are false. Data from Amazon.com shows that FBA Machine client stores have very low aggregate sales volume.[87] Of the 42 known clients for whom FBA Machine operated e-commerce stores on Amazon.com between February 2021 and March 2024, approximately 86% had gross aggregated sales of less than $15,000, which does not

---

[85] This screenshot displays a tab at the top that shows the sales agent using a Wraith Google account that appears to contain scripts, call reviews, sales objections, and FBA Machine's standard operating procedure. PX 20 ¶ 16.

[86] PX 20 ¶ 9 & Att. N, p. 1198, ¶ 15 & Att. S, pp. 1238, 1240.

[87] Comparing 33 of FBA Machine clients' aggregate sales to the profit calculator shows 85% did not generate the promised gross revenue projections. The other 15% only had sales for one month. PX 19 ¶ 12.

account for the cost of the products sold, the initial investment cost, or include refunds or cancelled orders. Approximately 12% of FBA Machine clients' stores had no sales at all.[88] No client came near the spreadsheet's claim that consumers will gross over $22,000 by month three.[89] On top of that, the testimonials and case studies used for FBA Machine were simply recycled from Passive Scaling's deceptive marketing,[90] and, as described above, those clients also did not make the advertised earnings.[91]

Defendants offer business opportunities as defined by the Business Opportunity Rule.[92] In both iterations of the scheme, Passive Scaling and FBA Machine, Defendants do not provide prospective buyers with the disclosure document and earnings claim statement required under the Business Opportunity Rule, and they have no substantiation for the earnings claims they make.[93]

### 4.    Contracts with Non-Disparagement Clauses and Unfair Practices

Passive Scaling and FBA Machine's contracts contain a non-disparagement clause that prohibits clients from sharing complaints or negative reviews about Passive Scaling, even if factual allegations are true.[94] In addition, Passive Scaling and Rozenfeld conditioned refunds on removal of online complaints, and threatened and intimidated clients who did not remove their complaints. For example, Passive Scaling told one consumer that he had to withdraw his complaint from the BBB before signing the settlement agreement. He did so and noticed that other complaints he had previously seen had been taken down from the BBB website. Despite

---

[88] PX 19 ¶¶ 7, 9–10.

[89] PX 20 ¶ 16.

[90] The FBA Machine website contains testimonial videos that appear on Passive Scaling's website and that were created in 2020 and 2022. In a website comparison of the two companies, the written testimonials are almost verbatim, and the Amazon earnings are identical. The "about" section also contains the same data points. PX 20 ¶ 27 & Att. W, pp. 1282–87.

[91] *See supra* nn.45–46.

[92] *See generally* 16 C.F.R. Pt. 437 and *infra* Section III.B.2.

[93] PX 1 ¶ 12; PX 2 ¶ 9; PX 3 ¶ 7; PX 4 ¶ 5; PX 6 ¶ 6; PX 7 ¶ 9; PX 8 ¶ 6; PX 9 ¶ 7; PX 10 ¶ 8; PX 11 ¶ 7; PX 12 ¶ 7; PX 13 ¶ 11; PX 14 ¶ 17; PX 15 ¶ 10; PX 16 ¶ 7; PX 20 ¶ 8, 18.

[94] *See, e.g.*, PX 1, Att. B, p. 18 (Passive Scaling); PX 20, Att. S. p. 1241(FBA Machine). The FBA Machine coaching contract did not contain the clause. PX 20, Att. U, p. 1268.

signing the agreement and removing his complaint, he did not receive his refund.[95] One day after filing a BBB complaint, another client received an "official notice" from Passive Scaling that said after reviewing the complaint, the company is proceeding to move forward with an action against him for breach of the terms of the contract. If he did not remove his complaint within seven days, the company would terminate his contract and proceed with a breach of contract case.[96]

Rozenfeld reinforced this position. He spoke on the phone with a client who asked for a refund and told the client that he knew a BBB complaint had been filed, doing so was against the contract because it was a harmful action against the company, and Passive Scaling could sue him.[97] Rozenfeld asked several times for the client to remove the negative complaint and told him that, if he did, Rozenfeld would be willing to work out a resolution.[98]

Passive Scaling also required some clients to sign settlement agreements that included a non-disparagement clause.[99] A client who signed the agreement and had not received her refund told Rozenfeld she would sue him; he threatened her by saying "you're free to do as you wish but please note the waiver has a disparagement agreement that would hold you liable up to 25k for any damages."[100]

---

[95] PX 15 ¶ 19.

[96] PX 1 ¶ 40 & Att. H, pp. 72–75; *see also* PX 7, ¶ 27 (consumer spoke with another Passive Scaling client who received a formal letter from Passive Scaling stating it would sue him unless he removed his BBB complaint).

[97] PX 7 ¶ 26.

[98] *Id.* ¶¶ 25–26.

[99] *See, e.g.*, PX 9, Att. G, p. 479.

[100] PX 10 ¶ 15, Att. I, p. 568. After this conversation, she received an email that said, "we would also like to take this opportunity to remind you of the clause in the contract that discusses the results of doing anything that can damage the company's reputation. As per the agreement, the fine is upwards of 25000 plus legal fees. In light of this, we wanted to give you the opportunity to withdraw the complaint filed based on the fact that the company has paid what was due." In fact, the consumer had <u>not</u> received her refund at that point. PX 10 ¶ 18 & Att. K, p. 570. The consumer ultimately received a refund. *Id.* ¶ 19.

B. **Defendants**[101]

1. **Corporate Defendants**

**FBA Machine** is a New Jersey corporation, incorporated in August 2022, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[102] Rozenfeld is the owner of the company, is the signatory on its bank account, and registered and paid for the domain thefbamachine.co.[103] FBA Machine offers business opportunities and coaching programs replicating marketing materials from Passive Scaling and utilizing Sales Support software.[104] Funds from the sale of Rozenfeld's sales.support software have been deposited into an FBA Machine bank account.[105]

**Passive Scaling** is or was a New Jersey corporation, incorporated in February 2021, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032. Rozenfeld is the president of the company, is the signatory on Passive Scaling bank accounts, and registered and paid for the domain passivescaling.com.[106] Rozenfeld commingled funds in Passive Scaling accounts with FBA Support NJ, Daily Distro, 1HR, Hourly Relief, and 3PL.[107] Passive Scaling's accounts also received funds from Sales Support.[108] Passive Scaling offered Defendants' business opportunities from February 2021 through approximately mid-2023.[109]

**Sales Support** is a New Jersey corporation, incorporated in February 2021, with its

---

[101] As discussed below in Section III.D, Defendants operate as a common enterprise and are therefore jointly and severally liable for the unfair and deceptive practices of each other.

[102] PX 20 ¶ 2(a) & Att. A, p. 1148. An entity by the same name registered as a domestic corporation in Delaware twelve days after the NJ entity was registered. *Id.* at 1152.

[103] PX 20 ¶ 36.

[104] PX 20 ¶ 27 & Att. W, pp. 1282–87.

[105] PX 18 ¶¶ 17, 54.

[106] PX 20 ¶ 36.

[107] PX 18 ¶ 17.

[108] *Id.*

[109] PX 4, Att. B, p. 174. Rozenfeld and representatives from Passive Scaling were corresponding with consumers until at least March 2024. PX 8 ¶ 22 & Att. Q, pp. 408–09 (December 2023); PX 9 ¶ 26 (March 2024).

principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[110] Rozenfeld is the president of the company, is a signatory on its bank account, and registered and paid for the domain sales.support.[111] Sales Support is a software company that charges monthly subscription fees, and consumers who signed contracts with Passive Scaling and FBA Machine were required to pay the monthly fee for the software.[112] Prior to opening Passive Scaling, Rozenfeld also partnered with other e-commerce management companies where he required the use of his software.[113] The Sales Support bank account received funds from 1HR and FBA Support NJ, and sent funds to Passive Scaling and Daily Distro.[114] Funds from Sales Support also were transferred to FBA Support NJ's account, which was used to pay FBA Machine sales agents.[115]

**1HR** is a New Jersey corporation, incorporated in February 2021, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[116] Rozenfeld is the president of the company, is a signatory on its bank account, and registered and paid for the domain 1hrdelivery.com.[117] 1HR is the company Rozenfeld used to source inventory for Amazon and Walmart e-commerce stores for his Passive Scaling clients.[118] Rozenfeld commingled funds in the 1HR bank account with funds from Passive Scaling, Daily Distro, FBA Support NJ, 3PL, and Hourly Relief.[119] 1HR also received funds from Sales Support.[120] Funds from 1HR were transferred to FBA Support NJ's account which was used to pay FBA Machine

---

[110] PX 20 ¶ 2(c).

[111] PX 18 ¶ 4; PX 20 ¶ 36.

[112] *See, e.g.*, PX 1, Att. B, pp. 13–33; PX 20 ¶ 45; *see also supra* n.28.

[113] PX 5 ¶ 7.

[114] PX 18 ¶ 17.

[115] *Id.*

[116] PX 20 ¶ 2(d).

[117] PX 18 ¶ 4; PX 20 ¶¶ 2(d), 36.

[118] PX 13 ¶ 20 & Att. K, pp. 729–31; PX 20 ¶ 44

[119] PX 18 ¶ 17.

[120] *Id.*

sales agents.[121]

**Hourly Relief** is a New Jersey corporation, incorporated in February 2021, with its principal place of business at a residential address in Edgewater, New Jersey 07020.[122] Rozenfeld incorporated the company in February 2021, is the director and a signatory on its bank account, and registered and paid for the domain hourlyrelief.com.[123] Hourly Relief is the company Rozenfeld used to hire virtual assistants to manage Passive Scaling clients' stores.[124] Rozenfeld commingled funds in the Hourly Relief bank account with Passive Scaling and 1HR, and the Hourly Relief account also sent funds to FBA Support NJ.[125]

**3PL** is a New Jersey corporation, incorporated in February 2021, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[126] Rozenfeld is the president of the company, is a signatory on its bank account, and registered and paid for the domain 3plautomations.com.[127] 3PL is the company that processes and ships products to clients' customers, and consumers who asked for refunds from Passive Scaling were often asked to sign a settlement agreement in which 3PL was the entity providing the refund payments.[128] Rozenfeld commingled funds in the 3PL account with Passive Scaling and 1HR, and received funds from FBA Support NJ.[129]

---

[121] *Id.*; PX 20 ¶¶ 13, 16.

[122] PX 20 ¶ 2(e). Rozenfeld has used this address as a residence. *Id.*

[123] PX 18 ¶ 4; PX 20 ¶¶ 2(e), 36.

[124] PX 2 ¶ 13 & Att. C, p. 105; PX 3 ¶¶ 10, 14; PX 8 ¶ 13; PX 9 ¶ 24; PX 14 ¶¶ 23–24 & Att. H, p. 806, Att. I, p. 807, Att. S, p. 845; PX 16 ¶ 39.

[125] PX 18 ¶ 17.

[126] PX 20 ¶ 2(f).

[127] PX 18 ¶ 4; PX 20 ¶¶ 2(f), 36.

[128] *See supra* n.32. Passive Scaling offered settlement agreements to consumers that stated refunds would be paid through 3PL. *See, e.g.*, PX 9, Att. I, p. 498. Despite stating "3PL Logistics has allotted $2000 to be provided for the first refund payment" and "the company currently has disposable income earmarked for settling obligations, including refunds for customers who have signed settlement agreements over the last three months," *id.*, 3PL had approximately $200 in its bank account at that time. PX 18 ¶ 13. There is no record of any refunds to Passive Scaling clients coming from this account. *Id.*

[129] PX 18 ¶ 17.

**FBA Support NJ** is a New Jersey corporation, incorporated in November 2019, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[130] Rozenfeld is the president of the company, is a signatory on its bank account, and registered and paid for the domain fba.support.[131] Consumers who signed contracts with Passive Scaling were required to pay invoices for inventory and revenue sharing to FBA Support NJ.[132] Rozenfeld pays FBA Machine sales agents from FBA Support NJ's account, and he commingled funds from the FBA Support NJ account with Passive Scaling, Sales Support, Daily Distro, and 1HR.[133] The FBA Support NJ account also sent funds to 3PL and received funds from Hourly Relief.[134]

**Daily Distro** is a New York corporation, incorporated in September 2017, with its principal place of business at 78 John Miller Way, Suite 2111, Kearny, New Jersey 07032.[135] Rozenfeld is a signatory on its bank accounts and a contact on the Stripe merchant accounts, and he registered and paid for the domain dailydistro.com.[136] Daily Distro is a wholesale distributor company that Rozenfeld uses to process and ship products to e-commerce stores.[137] Rozenfeld commingled funds from the Daily Distro bank account with Passive Scaling, FBA Support NJ, and 1HR, and Daily Distro also received funds from Sales Support.[138]

**Wraith** is a New York corporation, incorporated in 2013, with its principal place of business at 3616 29th Street, Long Island City, New York 11106. Rozenfeld is the majority owner and Chief Technology Officer of Wraith, is a signatory on its bank account, and registered

---

[130] PX 20 ¶ 2(g).

[131] PX 18 ¶ 4; PX 20 ¶¶ 2(g), 36.

[132] *See supra* n.31.

[133] PX 18 ¶¶ 17, 67–68; PX 20 ¶¶ 13, 16.

[134] PX 18 ¶ 17.

[135] PX 20 ¶ 2(h).

[136] PX 18 ¶ 4; PX 20 ¶¶ 36–37.

[137] PX 5 ¶¶ 5–10; PX 16 ¶ 38 & Att. G, p.965; PX 18 ¶ 63.

[138] PX 18 ¶ 17.

and paid for the domain wraithco.com.[139] Rozenfeld opened an Amazon seller account in 2015 that is registered under Wraith. He uses this seller account to sell goods on Amazon.com, and the account is managed, in part, by employees of Sales Support.[140] In an undercover call the FTC conducted with an FBA Machine sales agent, the agent appeared to access FBA Machine documents through a Wraith Google account.[141]

## 2.    Individual Defendant

**Rozenfeld** is an owner, president, or sole member of each of the named corporate defendants.[142] For each corporate defendant, he is the signatory on the bank accounts, and he registered and paid for corporate domains.[143] Several of these corporate defendants are named as secondary users on the accounts that serviced Passive Scaling and FBA Machine's clients.[144] Rozenfeld narrated marketing videos on Facebook, Instagram, and YouTube for Passive Scaling and continues to do so with FBA Machine; makes earnings claims to prospective clients; and signed contracts with clients containing non-disparagement clauses.[145] Rozenfeld is aware of client complaints, suspensions of Passive Scaling's clients' stores by Amazon and Walmart, and requests for refunds.[146] He is aware of settlement agreements with clients on behalf of Passive Scaling, and those agreements also included non-disparagement clauses.[147] Rozenfeld has directly threatened consumers with lawsuits for violating the non-disparagement clauses, and he has demanded consumers withdraw complaints to receive refunds and then failed to honor his

---

[139] PX 20 ¶¶ 2(j), 36 & Att. CC, pp. 1331–36, 1344, 1355.

[140] PX 19 ¶¶ 14, 16 & Att. C, p. 1128; *see also* PX 20, Att. CC, p. 1344.

[141] PX 20 ¶ 17.

[142] PX 18 ¶ 4; PX 20 ¶ 2.

[143] PX 18 ¶ 4; PX 20 ¶ 36.

[144] PX 19 ¶ 6; PX 20 ¶ 2(a-j).

[145] PX 15, Att. C, pp. 884–904; PX 16, Att. A, pp. 923–43; PX 20 ¶¶ 32–35 & Att. AA, pp. 1311–12 & Att. CC, pp. 1467–87; *see supra* nn.17, 94.

[146] *See supra* nn.56, 64; PX 20 ¶ 39.

[147] *See supra* nn.65, 99 and accompanying text.

promise to pay those refunds.[148] Rozenfeld has been sued by Passive Scaling clients and has

defaulted on court-ordered judgments.[149]

### C.  Consumer Injury

The evidence collected by the FTC indicates that the typical consumer loss from the

Passive Scaling scam is approximately $30,000.[150] Many consumers lost $100,000 or more, and

one lost over $200,000.[151] The FTC estimates that, in total, Defendants have defrauded

consumers of at least $11.1 million since 2021.[152]

## III.  THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER.

### A.  The Court Has the Authority to Issue the TRO.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers the Court to enjoin violations

of "any provision of law enforced by" the FTC. "Section 13(b) provides a Federal court with

broad power to fashion appropriate remedies for violations of the FTCA," which "includes the

ability 'to grant any ancillary relief necessary to accomplish complete justice.'" *In re Nat'l Credit*

*Mgmt. Grp.*, 21 F. Supp. 2d 424, 462 (D.N.J. 1998) (quoting *FTC v. Pantron I Corp.*, 33 F.3d

1088, 1102 (9th Cir. 1994)). Such ancillary relief includes *ex parte* TROs, preliminary

injunctions, asset freezes, appointments of a receiver, and immediate access to business

premises. *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.6 (10th Cir. 2005)

("[Section] 13(b)'s grant of authority to provide injunctive relief carries with it the full range of

equitable remedies."); *see also infra* nn.154-56 (citing examples). Although asset freezes

premised solely on Section 13(b) liability are no longer available in FTC enforcement actions

---

[148] *See supra* Section II.a.4 and nn.60, 64, 66, 68, 97–98, 100.

[149] *See supra* nn.69–70.

[150] PX 18 ¶ 7.

[151] *Id.*

[152] *Id.* ¶ 15. This number excludes known refunds and chargebacks and does *not* include merchant deposits for clients' credit card transactions that total approximately $6.8 million. Because we do not yet have those records, we have not been able to analyze the transactions. *Id.* ¶¶ 12–16.

following *AMG Capital Management v. FTC*, 593 U.S. 67 (2021),[153] this action is brought under

both Sections 13(b) and 19 of the FTC Act. The latter section authorizes relief that includes

"recission or reformation of contracts, the refund of money or return or property, [and] the

payment of damages," 15 U.S.C. 57b(b), for violations of FTC trade regulation rules—here, the

Business Opportunity Rule and the Consumer Review Fairness Act ("CRFA").

This Court,[154] other courts in the Third Circuit,[155] and courts throughout the nation have

granted injunctive relief like the relief sought here, including in enforcement actions brought

after *AMG*.[156]

---

[153] In *AMG*, the Supreme Court held that the FTC does not have authority to obtain equitable monetary relief when proceeding solely under Section 13(b) but noted that "[n]othing we say today . . . prohibits the Commission from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers." 593 U.S. at 75, 82.

[154] *See, e.g., FTC v. Millennium Telecard, Inc.*, No. 11-cv-2479 (D.N.J. May 5, 2011) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery); *FTC v. United Credit Adjusters, Inc.*, No. 09-798 (D.N.J. Feb. 24, 2009) (granting *ex parte* TRO with conduct prohibitions and asset freeze); *FTC v. Dutchman Enters.*, LLC, No. 09-141 (D.N.J. Jan. 14, 2009) (granting *ex parte* TRO with conduct prohibitions, asset freeze, and expedited discovery); *FTC v. Clifton Telecard All. One LLC.*, No. 08-1480 (D.N.J. Mar. 28, 2008) (granting TRO with conduct prohibitions and appointment of monitor); *FTC v. Sparta Chem, Inc.*, No. 96-cv-3228 (D.N.J. Nov. 13, 2007) (granting *ex parte* TRO with asset freeze, appointment of receiver, immediate access, and expedited discovery); *FTC v. Stout*, No. 99-5705, 1999 WL 34833240 (D.N.J. Dec. 8, 1999) (granting *ex parte* TRO with conduct prohibitions, immediate access, and expedited discovery); *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 461–63 (granting preliminary injunction with asset freeze and appointment of receiver); *FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492, at *1 n.1 (D.N.J. Aug. 11, 1997) (noting court's previous grant of *ex parte* TRO with conduct prohibitions, asset freeze, immediate access, and expedited discovery); *FTC v. Car Checkers of Am., Inc.*, No. 93-623, 1993 WL 56815 (D.N.J. Feb. 8, 1993) (granting *ex parte* TRO with conduct prohibitions, asset freeze, immediate access, and expedited discovery).

[155] *See, e.g., FTC v. Smith*, No. 23-cv-04848 (E.D. Pa. Dec. 8, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, turnover of business records, and expedited discovery); *FTC v. Click4Support, LLC*, No. 15-cv-05777 (E.D. Pa. Oct. 27, 2015) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, and immediate access); *FTC v. First Consumers LLC*, No. 14-cv-01608 (E.D. Pa. Mar. 18, 2014) (granting *ex parte* TRO with conduct prohibitions, asset freeze, access to business records, and expedited discovery); *FTC v. NHS Sys., Inc.*, No. 08-cv-02215 (E.D. Pa. May 14, 2008) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, access to business premises, and expedited discovery); *FTC v. Zuccarini*, No. 01-cv-4854, 2001 WL 34131411 (E.D. Pa. Sept. 25, 2001) (granting *ex parte* TRO with conduct prohibitions, access to defendant's business records, and expedited discovery).

[156] *See, e.g., FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1329–30 (11th Cir. 2023) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery that was issued in 2018 but challenged after
(continued)

In determining whether to grant preliminary injunctive relief, the FTC must demonstrate that it is likely to succeed on the merits of its claims and that a balancing of the equities weighs in favor of granting the requested relief. *See FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193, 197 (3d Cir. 2019). In statutory enforcement actions like the one here, "[h]arm to the public interest is presumed," *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989), because "[t]he passage of the FTC [Act] . . . results in an implied finding that violations of this statutory enactment will harm the public and should be restrained if necessary," *Nat'l Credit Mgmt.*, 21 F. Supp. 2d at 439. Accordingly, the Court "'need only to find some chance of probable success on the merits'" to grant the requested relief. *World Wide Factors*, 882 F.2d at 347 (quoting *United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172, 176 (9th Cir. 1987)). Furthermore, when a court balances the equities, "the public interest should receive greater weight" against a private interest. *Id.* Effective relief for the FTC is a public interest. *Id.*

As demonstrated below, the FTC is likely to succeed on the merits of its claims, and the equities weigh in favor of granting the requested TRO to enjoin Defendants' scheme and preserve effective relief for consumers.

---

*AMG*, because complaint alleged violations of Section 19); *Smith*, No. 23-cv-04848; *FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023) (granting, post *AMG*, *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, turnover of business records, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. Vision Online, Inc.*, No. 23-cv-01041 (M.D. Fla. June 7, 2023) (granting, post *AMG*, *ex parte* TRO with conduct prohibitions, asset freeze, appointment of monitor, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023) (granting, post *AMG*, *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. SL Fin. LLC*, No 23-cv-00698 (C.D. Cal. May 2, 2023) (same); *FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) (same); *FTC v. Rando*, No. 22-cv-00487 (M.D. Fla. May 3, 2022) (same); *FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery that was issued in 2020 but challenged after *AMG*, because complaint alleged violations of Section 19).

**B.**    **The FTC Is Likely to Succeed on the Merits of Its Claims.**

**1.**    **Defendants have violated the FTC Act.**

*a.*    *Defendants utilize deceptive earnings claims.*

Section 5 of the FTC Act declares "deceptive acts or practices in or affecting commerce" unlawful. 15 U.S.C. § 45(a)(1). To establish liability for deception under the FTC Act, the FTC must prove that "there was a material misrepresentation which was likely to mislead consumers acting reasonably under the circumstances." *FTC v. Davison Assocs., Inc.*, 431 F. Supp. 2d 548, 559 (W.D. Pa. 2006) (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)); *see also FTC v. Millennium Telecard Inc.*, No. 11-2479, 2011 WL 2745963, at *3 (D.N.J. July 12, 2011) (quoting *Tashman*, 318 F.3d at 1277) (same).

Material representations are those that "involve[] information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (FTC 1984)). Explicit claims made to induce the purchase of a product are presumptively material. *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 441. "Courts consistently conclude that misrepresentations regarding income potential are material and violate the FTC Act." *FTC v. Vemma Nutrition Co.*, No. 15-cv-1578, 2015 WL 11118111, at *5 (D. Ariz. Sept. 18, 2015) (citing *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528–29, 532–33 (S.D.N.Y. 2000)).

A representation is likely to mislead consumers if (1) the express or implied message conveyed is false or (2) the maker of the representation lacked a reasonable basis for asserting that the message was true. *Pantron I Corp.*, 33 F.3d at 1096. In determining whether a representation is likely to mislead, a court "must consider the overall, common sense, net-impression of the [representation] on a reasonable consumer." *Davison Assocs.*, 431 F. Supp. 2d at 559–60 (citing *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)). Where makers of a representation lack adequate substantiation for a claim, they necessarily lack a reasonable basis

for it, and the claim is therefore deceptive. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

To prove deception under Section 5, the FTC need not prove that a representation was made with the intent to deceive. *Beneficial Corp.*, 542 F.2d at 617. Nor must the Commission show actual reliance by consumers on the misrepresentation; "it is enough that the representations . . . were likely to mislead consumers acting reasonably."[157] *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006).

Throughout the sales process, Defendants made extensive express representations about the income consumers could expect to earn by purchasing Defendants' services. For example, Passive Scaling's website overflowed with earnings claims like "most of our clients hit six-figure monthly revenues within 12-16 months,"[158] underscored with testimonials from purported clients like, "I went from struggling to pay my bills to being financially independent in a span of 5 months."[159] FBA Machine utilized the same types of claims on its website and in Facebook advertisements. On his Instagram feed, Rozenfeld boasts of having a "transformative Amazon FBA strategy" that consumers can use earn $5,000 to $10,000 per month.[160] Some of the claims used on Passive Scaling's website are nearly identical to those found on FBA Machine's website,[161] and, on sales calls with consumers, both Passive Scaling and FBA Machine employed a profit calculator that purported to show, month by month, what consumers could earn in passive income by purchasing the business opportunity.[162] Contrary to Defendants' claims, most consumers did not receive returns anywhere near those presented in advertisements. When comparing 33 FBA Machine client accounts to FBA Machine's profit calculator, 85% did not

---

[157] Moreover, the record shows that consumers did *in fact* rely on Defendants' earnings claims, underscoring their materiality. PX 1 ¶ 8; PX 3 ¶ 4; PX 4 ¶ 3; PX 7 ¶ 7; PX 8 ¶ 3; PX 9 ¶ 4; PX 11 ¶ 5; PX 12 ¶ 5; PX 14 ¶ 13; PX 15 ¶ 5; PX 16 ¶ 4.

[158] PX 20, Att. V, p. 1280.

[159] *Id*. at 1275.

[160]  PX 20, Att. AA, p. 1312.

[161] PX 20 ¶ 27.

[162] *See supra* nn.15, 17 (Passive Scaling); PX 20 ¶ 16 (FBA Machine).

meet the company's sales projections—and the remaining 15% had sales for only one month, whose sales projection is $0.[163] The percentage is even lower for Passive Scaling, where only 12% of 326 clients met the represented sales projects.[164] In fact, most consumers lost money.[165]

Defendants' misrepresentations are material, as they are express claims about the amount of money consumers can expect to earn by purchasing Defendants' services. Express claims and claims about income potential are presumptively material because they involve information that is important to consumers and therefore likely to affect their decision to buy a good or service. *Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 528–29, 532–33

Finally, Defendants' misrepresentations are likely to mislead consumers acting reasonably under the circumstances. Representations that are false or lack a reasonable basis are likely to mislead consumers. *Pantron I Corp.*, 33 F.3d at 1096. "When claims at issue are express, it is appropriate to infer that reasonable consumers interpret them to mean what they say." *FTC v. Atlantex Assocs.*, No. 87-0045, 1987 WL 20384, at *11 (S.D. Fla. Nov. 25, 1997), *aff'd*, 872 F.2d 966, 969 (11th Cir. 1989). Because Defendants' claims are false, they are likely to mislead consumers acting reasonably.

Defendants misrepresented that consumers could make thousands of dollars in passive income by purchasing their services, and these material misrepresentations are likely to mislead reasonable consumers. Accordingly, the FTC is likely to prevail in establishing that Defendants have engaged in deceptive acts or practices, in violation of Section 5 of the FTC Act.

> b.    *Defendants engage in unfair complaint suppression.*

Under Section 5 of the FTC Act, an act or practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). In determining whether an act or practice is unfair, the FTC "may consider

---

[163] PX 19 ¶ 12.

[164] PX 19 ¶ 13.

[165] *Supra* nn.44–46; PX 19 ¶¶ 12–13.

established public policies." *Id.* Unfairness actions are brought "to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." Unfairness Policy Statement, appended to *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1074 (1984). Courts have previously determined that complaint suppression tactics like those used by Defendants are unfair under Section 5 of the FTC Act. *See FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1393 (M.D. Fla. 2018) (granting summary judgment to FTC on unfairness count based on contract gag clauses); *FTC v. World Patent Mktg., Inc.*, No. 17-cv-20848, 2017 WL 3508639, at *18 (S.D. Fla. Aug. 16, 2017) (granting preliminary injunction against defendants' use of threats and intimidation in response to complaints or comments about their products, including requests to withdraw or remove negative comments from public sites).

Here, Defendants have engaged in complaint-suppression tactics that unfairly limit the availability of truthful information to other prospective purchasers of Defendants' services, thereby harming consumers and providing no countervailing benefits to consumers or competition.[166] They conditioned refunds on the removal of negative online reviews and threatened consumers with lawsuits if consumers refused to take down their complaints or reviews.[167] Such practices are unfair.[168]

First, Defendants' complaint-suppression practices cause substantial injury because they limit the flow of truthful information to prospective purchasers of Defendants' services. Consumers often look to online reviews as reliable indicators of the quality of a product or

---

[166] These practices are related to but distinct from Defendants' use of contract clauses that aim to suppress complaints or negative reviews. As discussed below in Section III.B.3, such provisions violate the CRFA. Defendants' complaint-suppression tactics extend beyond the illegal contract provisions and are separately an unfair practice under the FTC Act.

[167] *Supra* nn.64–65, 95–100.

[168] In addition, Defendants also used form contract provisions that attempt to prohibit consumers from sharing their reviews of Defendants and their services. *See supra* n.94. While these contracts are related to Defendants' unfair practices, they are expressly prohibited by the Consumer Review Fairness Act. *See infra* Section III.B.3.

service,[169] as purchasers of Defendants' services did.[170] "By depriving consumers of truthful, critical customer reviews and testimonials, Defendants' complaint suppression practices enabled them to deceive more consumers with their misrepresentations and sell more . . . services than they might have otherwise." *World Patent Mktg.*, 2017 WL 3508639, at *15. Accordingly, Defendants' complaint-suppression practices cause substantial tangible harm.

Next, consumers cannot reasonably avoid this harm—they simply cannot *find* negative reviews that Defendants have suppressed. "It has long been recognized that certain types of sales techniques may prevent consumers from effectively making their own decisions. . . . Some [sellers] may withhold or fail to generate critical price or performance data, for example, leaving buyers with insufficient information for comparisons." Unfairness Policy Statement, 104 F.T.C. at 1074. "[W]ithout any or very little access to consumers' negative experiences, prospective buyers . . . are prohibited from making an informed choice. *Roca Labs*, 345 F. Supp. 3d at 1395; *see also World Patent Mktg.*, 2017 WL 3508639, at *15 ("Defendants' consumer complaint suppression tactics keep material, negative information hidden from consumers, and such obstacles make it nearly impossible for consumers to make informed decisions." (citing Unfairness Policy Statement, 104 F.T.C. at 1074)). For this reason, consumers cannot reasonably avoid the harm caused by Defendants' practices.

Finally, the injury from Defendants' practices is not outweighed by any countervailing benefits to consumers or to competition. As the court in *World Patent Marketing* recognized, "existing customers do not benefit from having their complaints suppressed and prospective

---

[169] *See, e.g.*, H.R. Rep. No. 114-731, at 5 (2016), *available at* https://www.congress.gov/114/crpt/hrpt731/CRPT-114hrpt731.pdf; Eric Goldman, *The Regulation of Reputational Information*, in The Next Digital Decade: Essays on the Future of the Internet 293, 296 (Berin Szoka & Adam Marcus eds., 2010) ("When information is costly, reputational information can improve the operation of the invisible hand [of the marketplace] by helping consumers make better decisions about vendors. . . . [I]n an information economy with transactional costs, reputational information can play an essential role in rewarding good producers and punishing poor ones. Given this crucial role in marketplace mechanisms, any distortions in reputational information may effectively distort the marketplace itself."), *available at* https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1622&context=facpubs.

[170] *See* PX 14 ¶ 6; PX 15 ¶ 3; PX 16 ¶ 2.

consumers do not benefit from being denied access to material information." 2017 WL 3508639, at *16. The net effects of Defendants' complaint suppression "prevent consumers from effectively making their own decisions" and "undermine[] an essential precondition to . . . free and informed consumer transaction[s]." Unfairness Policy Statement, 104 F.T.C. at 1073, 1074. Moreover, Defendants' practices "hinder competition and harm legitimate competitors in the marketplace." *World Patent Mktg.*, 2017 WL 3508639, at *16. In other words, "no countervailing benefits exist" to Defendants' complaint suppression. *Id.*

Because the evidence demonstrates that Defendants' complaint-suppression strategy causes harm to consumers that they cannot reasonably avoid and such harm is not outweighed by countervailing benefits to consumers or competition, the FTC is likely to prevail on its unfairness claim against Defendants.

### 2.    Defendants have violated the Business Opportunity Rule.

The Business Opportunity Rule requires sellers of business opportunities that fall within its ambit (1) to provide prospective purchasers with specified information in a disclosure statement; (2) if making earnings claims, to provide an earnings claim statement; and (3) to abide by a number of common-sense truth-in-advertising principles. *See generally* 16 C.F.R. Pt. 437. Violations of the Rule constitute violations of Section 5(a) of the FTC Act. 16 C.F.R. §§ 437.2, 437.3, 437.4, 437.6.

The Rule applies to "commercial arrangement[s] in which

(1) A seller solicits a prospective purchaser to enter into a new business; and

(2) The prospective purchaser makes a required payment; and

(3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will: . . .

(ii) Provide outlets, accounts, or customers, including Internet outlets, accounts, or customers, for the purchaser's goods or services."

*Id.* § 437.1(c). A "designated person" is "any person, other than the seller, whose goods or services the seller suggests, recommends, or requires that the purchaser use in establishing or

operating a new business." *Id.* § 437.1(d). "Providing locations, outlets, accounts, or customers means furnishing the prospective purchaser with existing or potential locations, outlets, accounts, or customer . . . or otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts, or customers." *Id.* § 437.1(m).

Defendants offer business opportunities, as defined by the Rule. First, Defendants solicit prospective purchasers to enter into a new business. In both the Passive Scaling[171] and FBA Machine iterations of the scheme, Defendants solicit consumers to purchase a new business—here, an e-commerce store on Amazon.com or Walmart.com.[172] Next, prospective purchasers make a required payment. For consumers to avail themselves of Defendants' opportunity, Defendants require them to pay initially tens of thousands of dollars—most commonly $30,000 or $50,000—to purchase their services.[173] Finally, Defendants represent that they or other specified "designated persons," 16 C.F.R. § 437.1(d), will "[p]rovide outlets, accounts, or customers, including Internet outlets, accounts, or customers," *id.* § 437.1(c)(3)(ii), for the prospective purchasers' goods or services. In advertising and in one-on-one communications with consumers, Defendants tell consumers that Defendants will provide outlets, in the form of an e-commerce store on an identified platform, for consumers' goods, and that other designated persons—Amazon.com or Walmart.com—will provide customers for consumers' goods sold through their e-commerce store.[174] *See FTC v. Money Now Funding, LLC*, No. CV-13-01583, 2015 WL 11120847, at *3 (D. Ariz. July 1, 2015) (holding that "providing an Internet outlet in the form of a website on which small businesses could sign up and be referred by the consumer to [defendant] for cash advances" constitutes providing "outlets, accounts, or customers" under 16 C.F.R. § 437.1(c)(3)(ii)). Therefore, Defendants offer business opportunities.

---

[171] *See supra* n.35.

[172] PX 20 ¶¶ 3–4 (FBA Machine) & Att. V, p. 1272–73 (Passive Scaling).

[173] *Supra* n.41 (Passive Scaling); PX 20, Att. S, p. 1238 (FBA Machine); PX 18 ¶ 7.

[174] *Supra* nn.8, 11, 73-74, 76; PX 20 Att. R, pp. 1226-1231.

Because Defendants are sellers of business opportunities, they must comply with the Business Opportunity Rule. As discussed below, they have repeatedly failed to do so.

        *a.       Defendants misrepresent income and profit.*

The Business Opportunity Rule prohibits sellers of business opportunities from "[m]isrepresent[ing] the amount of sales, or gross or net income a prospective purchaser may earn, or that prior purchasers have earned." 16 C.F.R. § 437.6(d). As discussed in Section III.B.1.a above, Defendants have misrepresented the amount of sales, income, or profits prospective purchasers can expect to achieve by buying an e-commerce store through Passive Scaling or FBA Machine. Although Defendants' advertisements and other representations to consumers are replete with claims that they will make thousands of dollars in sales or even profit per month,[175] Defendants' clients frequently complained to Defendants that they did not earn anywhere near what Defendants' represented they would, sought refunds, and brought lawsuits.[176] Data from Amazon.com corroborates these complaints.[177] Therefore, the FTC is likely to demonstrate that Defendants' misrepresentations violate Section 437.6(d) of the Business Opportunity Rule.

        *b.       Defendants fail to provide the required written disclosure document.*

Under the Business Opportunity Rule, sellers of business opportunities must provide prospective purchasers with a disclosure document, in the form and using the language set forth in Appendix A of the Rule, at least seven days before the earlier of a prospective purchaser signing a contract or making a payment to the seller. 16 C.F.R. § 437.2. The disclosure document must disclose five categories of information: basic identifying information about the seller, an earnings claim statement, the seller's litigation history, the material terms of any cancellation or refund policy, and the contact information of prior purchasers as references. *Id.* § 437.3(a)(1)–(5).

---

[175] *See, e.g., supra* nn.9–12, 15, 18, 77–80, 83–84.

[176] *Supra* nn.45–47, 56, 58–61, 68–69.

[177] *See supra* nn.46, 87–89.

The record shows that Defendants did not provide their customers or an FTC investigator with the required disclosure document and also did not given them the required information.[178] Accordingly, the FTC is likely to prevail on this claim.

        c.    *Defendants make earnings claims to prospective purchasers without substantiation.*

The Business Opportunity Rule prohibits sellers from making earnings claims[179] unless they (1) have a reasonable basis for the claim at the time it is made, (2) have in their possession written materials that substantiate the claim at the time the claim is made, (3) make the written substantiation available upon request to the prospective purchaser and the FTC, and (4) furnish the prospective purchaser with an earnings statement, in the form of and using the language set forth in the Rule, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(a)(1)–(4).

Although Defendants have made earnings claims in connection with the marketing and sale of their business opportunities,[180] they have not provided prospective purchasers with an earnings claim statement.[181] Therefore, the FTC is likely to demonstrate that Defendants have violated Section 437.4(a) of the Rule.

---

[178] *Supra* n.93.

[179] The Rule defines an "earnings claim" as any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits. Earnings claim include, but are not limited to: (1) Any chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and (2) Any statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income (e.g., "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year"). 16 C.F.R. § 437.1(f).

[180] *See supra* Sections II.A.2.a and II.A.3.

[181] *Supra* n.93.

> d.    *Defendants make earnings claims in the general media without substantiation.*

Under the Rule, "general media" is defined as "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h). Sellers of business opportunities may not make earnings claims in the general media in connection with the sale or promotion of a business opportunity unless they (1) have a reasonable basis for the claim at the time it is made, (2) have in their possession written materials that substantiate the claim at the time the claim is made, and (3) state in immediate conjunction with the claim (i) the beginning and ending dates when the represented earnings were achieved and (ii) the number and percentage of all persons who purchased the business opportunity prior to the ending date who achieved at least the stated level of earnings. *Id.* § 437.4(b).

As described above in Sections II.A.2.a and II.A.3, Defendants used earnings claims in their advertisements of the business opportunity on social media—including on Facebook, Instagram, Twitter (now known as X), and TikTok—and their own websites. In none of these instances did Defendants state in immediate conjunction with the earnings claims the information required by the Rule regarding the stated earnings.[182] Accordingly, the FTC is likely to prevail on this claim.

> e.    *Defendants disseminated industry financial information without substantiation.*

The Business Opportunity Rule prohibits sellers of business opportunities from "disseminat[ing] industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial, earnings, or performance experience of purchasers of the business opportunity being offered for sale." 16 C.F.R. § 437.4(c). As demonstrated by an FTC investigator declaration,[183] Defendants have disseminated industry financial, earnings, or

---

[182] *See, e.g., supra* nn.9–12, 15, 18, 71, 77–80; PX 20 ¶¶ 19–20, 26 & Att. V, pp. 1272–81, ¶¶ 32–35 & Att. AA, pp. 1311–12.

[183] PX 20, Att. R, p. 1226.

performance information in connection with the offering for sale, sale, or promotion of a business opportunity while lacking written substantiation. For this reason, the FTC is likely to prevail in demonstrating that Defendants have violated Section 437.4(c) of the Rule.

### 3. Defendants have violated the Consumer Review Fairness Act.

The CRFA was enacted to prohibit clauses in form contracts that restrict consumers' ability to communicate reviews, performance assessments, and similar analyses of a seller's goods, services, or conduct. Specifically, the CRFA renders void any provision of a form contract that "prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication,"[184] 15 U.S.C. § 45b(b)(1), and violations of the CRFA are treated as violations of rules defining unfair and deceptive acts or practices, *id.* § 45b(d)(1).

As established in Section II.A.4 above, in the course of selling their business opportunities, consumer declarations show that defendants employ form contracts that include non-disparagement provisions prohibiting or restricting consumers from sharing reviews or performance assessments of Defendants' conduct.[185] Because such provisions violate the CRFA, the FTC is likely to prevail on its CRFA claim.

### C. The Equities Weigh in Favor of Granting the TRO.

Once the FTC establishes the likelihood of success on the merits, preliminary injunctive relief is warranted if the Court, weighing the equities, finds that relief is in the public interest. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347. Not only is "the public interest in ensuring the enforcement of federal consumer protection law . . . strong,"

---

[184] A "form contract" is a contract with standardized terms used by a person in the course of selling goods or services and that is imposed on a consumer without a meaningful opportunity for the consumer to negotiate the standard terms. 15 U.S.C. § 45b(a)(2). A "covered communication" is "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." *Id.* § 45b(a)(3)(A).

[185] These provisions are *in addition to* the threats of lawsuits or refusal to provide refunds that Defendants use to unfairly suppress consumer complaints, *see supra* Section III.B.1.b., and compound the harm those tactics cause.

*FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011), but also a TRO requiring Defendants to comply with federal law "does not work any undue hardship" on Defendants, *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 461.

The public interest in this case—in halting Defendants' illegal practices to prevent consumer harm and preserving assets to redress harmed consumers—is compelling. Defendants, by contrast, have no legitimate interest in continuing their unlawful scheme, and a TRO will prevent them from further harming consumers. *See Nat'l Invention Servs.*, 1997 WL 718492, at *3 ("[P]articularly given that deception appears to be involved, the public interest in preventing further violations of the law and preserving viable assets outweighs an individual's interest in protecting potentially ill-gotten profits."). Here, the equities tip decidedly in the public's favor, and the FTC's request for a TRO should be granted.

### D.     The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise.

The corporate defendants have operated as a common enterprise. When people or entities form a common enterprise, they may be held jointly and severally liable for injuries caused by their violative conduct. *Millennium Telecard*, 2011 WL 2745963, at *8. To determine whether a common enterprise exists, courts consider various factors, including whether the companies: (1) operate under common control; (2) share office space and officers; (3) operate the business through a maze of interrelated companies; (4) comingle corporate funds; and (5) share advertising and marketing. *Id.* Rozenfeld owns and operates all the proposed Corporate Defendants, is signatory on each bank account, and registered and pays for all the corporate domains.[186] All but one of the corporate defendants use the same two addresses, including Rozenfeld's residential address.[187] Corporate defendants FBA Machine, Passive Scaling, Sales Support, Hourly Relief, and Daily Distro are all named as secondary users on Defendants' clients' Amazon accounts so that Defendants' employees can manage the clients' Amazon

---

[186] *Supra* nn.142-43; PX 18 ¶ 4.

[187] PX 20 ¶ 2.

stores.[188] Consumers who purchased Passive Scaling's business opportunity had interactions with employees who used email addresses or contact information (often interchangeably) for Passive Scaling, Sales Support, Hourly Relief, Daily Distro, and Wraith.[189] Passive Scaling consumers purchased inventory for their stores from 1HR and used 3PL to process and ship inventory to their store customers.[190]

After Rozenfeld shuttered Passive Scaling, he immediately started selling under the name FBA Machine.[191] FBA Machine sells similar Amazon automation and coaching packages as Passive Scaling, and both share the same advertising and marketing materials.[192] An FBA Machine sales agent accessed FBA Machine documents through a Wraith Google account.[193] As mentioned above, Rozenfeld commingled the corporate funds, and FBA Support NJ is being used to pay FBA Machine's employees.[194] *See Noble Wealth*, 90 F. Supp. 2d at 691 (finding common enterprise when two companies were formed as successor companies to Noble Wealth, were funded through Noble Wealth, were operated by the same individuals who operated Noble Wealth, and used the same marketing materials and advertising to tout the same scheme as Noble Wealth). Accordingly, Defendants operate as a common enterprise and are therefore jointly and severally liable for the violations alleged in the Complaint.

**E.      The Individual Defendant Is Personally Liable.**

To establish individual liability for corporate violations and obtain an injunction, the FTC must show that the individual defendant participated directly in the deceptive acts or practices or had the authority to control them. *Millennium Telecard*, 2011 WL 2745963, at *9. To obtain monetary relief from an individual, the FTC must show that the individual had some knowledge

---

[188] *Supra* n.144; PX 19 ¶ 6.

[189] *See, e.g.*, PX 2 ¶ 13 (Hourly Relief); PX 7, Att. F, p. 298 (Wraith); PX 13, Att. P, p. 750 (Daily Distro, Passive Scaling).

[190] *See, e.g.*, PX 2, Att. F, p. 110, Att. G, p. 120; PX 13, Att. K.

[191] *Supra* n.71.

[192] *Supra* nn.71-72, 80, 104.

[193] PX 20 ¶¶ 16–17.

[194] *See supra* nn.105, 107-08, 114-15, 119-121, 125, 129, 133-34, 138.

of the corporation's unlawful acts or practices. *Id.* Here, the evidence establishes that Rozenfeld should be held liable for injunctive and monetary relief for Defendants' violations.

Authority to control can be evidenced by active involvement in business affairs, the making of corporate policy, or assumption of duties of a corporate officer. *FTC v. Chinery*, No. 05-3460, 2007 WL 1959270, at *6 (D.N.J. July 5, 2007). As noted above, Rozenfeld owns each corporate defendant, he is the signatory on each bank account, and he registered and paid for each domain.[195] Rozenfeld signed consumer contracts on behalf of Passive Scaling and plays an active role in managing the corporate defendants.[196] Rozenfeld used various corporate email addresses when interacting with consumers, including ones from Wraith, Passive Scaling, Sales Support, and Daily Distro.[197] Rozenfeld is also directly involved in the marketing and advertising of the scheme.[198] As such, he has authority to control the misconduct at issue and directly participated in the deceptive conduct.

The knowledge element required for monetary relief need not involve proof of a subjective intent to defraud; it may be satisfied by a showing of actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. *Millennium Telecard*, 2011 WL 2745963, at *9. Rozenfeld should be aware that the purported success Defendants boast about in their advertising does not represent what a typical consumer can achieve, and that Defendants lack substantiation for the income claims they make.[199] Rozenfeld has received numerous complaints, chargebacks, and requests for refunds, and is aware that Passive Scaling's clients' stores were suspended and terminated by Walmart and

---

[195] *Supra* nn.142-43.

[196] PX 15, Att. C, p. 904; PX 16, Att. A, p. 943; PX 20 ¶ 13.

[197] PX 20 ¶ 45.

[198] *Supra* n.145.

[199] PX 19, ¶¶ 6, 11-13, 17. In an arbitration proceeding, Passive Scaling admitted the profit calculator used to induce consumers to purchase the business opportunity was false and the arbitrator found the "respondent engaged in these unlawful actions knowingly and willfully." PX 20, Att. CC, pp. 1408, 1410.

Amazon, resulting in significant losses.[200] As a result, consumers have sued Passive Scaling at least seven times alleging fraudulent misrepresentations, deceptive and unfair practices, breach of contract, and consumer fraud.[201] Despite this, Rozenfeld recycled his earnings claims from Passive Scaling and currently uses them with FBA Machine.[202] Thus, Rozenfeld has the requisite knowledge of the unlawful conduct.

## IV.    AN *EX PARTE* TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY TO PRESERVE EFFECTIVE FINAL RELIEF AND PREVENT CONTINUING CONSUMER HARM.

In addition to an injunction stopping Defendants' illegal conduct, the FTC seeks refunds pursuant to Section 19 of the FTC Act for consumer victims of Defendants' fraudulent scheme. To preserve the possibility of such relief, an *ex parte* TRO is crucial to prevent Defendants from dissipating assets and destroying evidence. The FTC respectfully requests a TRO to (a) immediately freeze Defendants' assets, (b) appoint a temporary receiver over the corporate defendants, (c) allow the temporary receiver and the FTC immediate access to Defendants' business premises, (d) grant a turnover of Defendants' business records and other relevant information, and (e) permit the FTC limited expedited discovery. As discussed in Section III.A above, many courts have granted such relief in similar cases.

### A.    The Court Should Issue the TRO *Ex Parte.*

Federal Rule of Civil Procedure 65(b) authorizes the issuance of a temporary restraining order *ex parte* upon a showing "that immediate and irreparable injury, loss, or damage will result" if notice is provided to Defendants. Fed. R. Civ. P. 65(b)(1)(A). In cases involving pervasive fraudulent practices, "it [is] proper to enter the TRO without notice, for giving notice itself may defeat the very purpose for the TRO." *Cenergy Corp. v. Bryson Oil & Gas PLC*, 657 F.

---

[200] *See supra* nn.56, 64. In fact, Rozenfeld only grossed approximately $70,000 in his own Amazon e-commerce stores over a four-year period despite his claims on Instagram that he generates "over $1M a month." PX 19 ¶ 17; PX 20, Att. AA, p. 1312.

[201] *See supra* n.69. One complaint also named Rozenfeld personally. *See BA Enter. LLC v. Passive Scaling, Inc.*, 2023-137620-CC-23 (Fla. Cir. Ct. Oct. 5, 2023), *available at* PX 20, Att. C, pp. 1373–96.

[202] PX 20, Att. W, pp. 1282–87.

Supp. 867, 870 (D. Nev. 1987). Granting an *ex parte* TRO in this instance is in the interest of justice to maintain the status quo, including preserving evidence pending a preliminary injunction hearing and securing assets needed to provide full and effective relief.

An *ex parte* TRO is necessary because, if provided with advance notice, Defendants are likely to dissipate and conceal assets and destroy evidence. Rozenfeld has used corporate funds for personal expenses, including a $1.275 million home, automobile expenses, and alcohol.[203] Defendants have repeatedly failed to pay required judgments, to appear in court and arbitration proceedings, and to respond to BBB complaints, illustrating their willingness to disregard lawful court orders.[204] Rozenfeld has demonstrated that he is willing to lie and disclaim responsibility when confronted with the consequences of his actions.[205] Moreover, Defendants have continued their fraudulent conduct despite complaints and at least seven lawsuits.[206] Given these facts and the fact that FBA Machine is the second iteration of Rozenfeld's fraudulent scheme,[207] there is a significant likelihood that if provided with notice, Defendants would also disregard the Court's TRO or evade its provisions, including those related to the preservation of assets and records. This would defeat the purpose of a TRO.

Records also show Defendants' apparent willingness to misrepresent or mislead in order to avoid accountability for their business practices. Rozenfeld lied to a bank about providing a refund to avoid a chargeback, Defendants failed to refund numerous clients after explicitly promising to do so, and Rozenfeld lied to consumers about his ownership of and involvement with Passive Scaling when confronted with complaints.[208] Only one month before he started

---

[203] PX 18 ¶ 83.

[204] *See supra* nn.62-63, 68, 70.

[205] *See supra* nn.6, 10, 67.

[206] *See supra* nn.56, 62, 69, 71.

[207] Arguably this is the third iteration, as Passive Scaling started the same month Daily Distro and FBA Support's merchant accounts were terminated by Stripe for high chargebacks and complaints. *See* PX 20 ¶ 2(b) & Att. BB, p. 1314.

[208] *See supra* nn.6, 60, 66-68.

Passive Scaling and boasted about having seven warehouses for his clients' inventory, Rozenfeld admitted that his warehouse had been liquidated and he was filing for bankruptcy.[209]

Finally, Defendants demonstrated their willingness to knowingly conceal and misrepresent the true nature of their business. Rozenfeld masks his control of the scheme by employing a maze of interconnected entities he owns and paying for a privacy protection service to hide ownership of the corporate defendants' domains.[210] And Defendants have represented that some entities within the common enterprise, like Daily Distro and 3PL, are unaffiliated third-party vendors, when in fact they are owned and controlled by Rozenfeld.[211]

The FTC's experience demonstrates that defendants engaged in fraudulent schemes like the one here often withdraw funds from bank accounts and move to destroy or conceal documents and other evidence upon learning of impending legal action. *See* Rule 65 Declaration of Frances L. Kern, submitted in conjunction with this memorandum (citing numerous instances where FTC defendants have dissipated assets or destroyed evidence when given notice of an FTC action). Defendants' conduct and the nature of the ongoing pernicious scheme make it highly likely that Defendants would conceal or dissipate assets, or attempt to spoliate evidence if provided with notice. For this reason, courts in this District and throughout the nation have entered *ex parte* TROs like the one requested here in numerous similar FTC enforcement actions.[212]

### B.     The Court Should Stop the Defendants' Ongoing Scam.

Because Defendants' scheme is ongoing,[213] conduct relief enjoining Defendants' deceptive practices is essential. To prevent ongoing consumer injury, Section I of the proposed TRO prohibits Defendants from making false or unsubstantiated earnings claims, engaging in unfair complaint-suppression tactics, and violating the Business Opportunity Rule and the

---

[209] PX 5 ¶ 19.

[210] *See* PX 20 ¶¶ 2, 36.

[211] *See supra* n.34.

[212] *See supra* nn.154-156.

[213] *See supra* n.35.

CRFA. These measures simply require Defendants to comply with the law and fit squarely within the Court's injunctive authority under Section 13(b) of the FTC Act.[214]

"[T]he commission of past illegal conduct is highly suggestive of the likelihood of future violations." *SEC v. Mgmt. Dynamics, Inc.*, 515 F. 2d 801, 807 (2d Cir. 1975). That is certainly true here, as Defendants have continued their unlawful business practices unabated when challenged with evidence of their fraudulent activity. They are uniquely situated to know that virtually none of their clients has made the represented earnings claims.[215] Further, specific notice that their practices are deceptive from their own customers, along with seven lawsuits and multiple arbitration proceedings, has left them unmoved. Under these circumstances, immediate injunctive relief is necessary to protect additional consumers from being harmed by Defendants' ongoing unlawful practices.

## C. The Court Should Temporarily Freeze Defendants' Assets to Preserve the Possibility of Providing Refunds to Defendants' Victims.

Through this action, the FTC seeks refunds for consumers harmed by Defendants' scheme. To preserve the possibility of such relief, the FTC respectfully requests that the Court freeze Defendants' assets and order an immediate accounting to prevent concealment or dissipation of assets pending a final resolution. (*See* Proposed TRO Sections III–VII.)

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits of a Section 19 claim and the refund of money would be an appropriate final remedy. *See Noland*, 2021 WL 4318466, at *5. "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993)). Where "the law presumes irreparable harm, as in an FTC enforcement action, the FTC need only establish 'a possibility of dissipation of assets'" to obtain an asset freeze. *In re*

---

[214] *See supra* Section III.A.

[215] Defendants were added as secondary users on their clients' Amazon accounts. PX 19 ¶ 6. Clients also told Defendants that their stores were not generating the represented income. *See, e.g.*, PX 1 ¶ 32; PX 6 ¶ 19; PX 15 ¶¶ 12–16.

*Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 419 (D. Md. 2019). Moreover, "[d]issipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress." *World Patent Mktg.*, 2017 WL 3508639, at *17. "When . . . business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of the legal proceedings is strong." *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 462; *see also Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 (2d Cir. 1974) (affirming asset freeze to assure compensation for victims of securities fraud); *SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (affirming asset freeze based on the fraudulent nature of appellants' conduct and uncertainty about the extent of assets).

An asset freeze is necessary here to preserve the status quo, ensure that funds do not disappear during the course of the action, and preserve assets for consumer redress. As described above, Defendants' business model is permeated with deceptive and unfair practices, and has taken in at least $11.1 million from consumers. Where a company's business operations are permeated by fraud, as they are here, courts have found a strong likelihood that assets may be dissipated during the pendency of the case. *Manor Nursing Ctr.*, 458 F.2d at 1106 ("Because of the fraudulent nature of appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money"). Some courts also consider whether the amount of frozen assets will be sufficient to compensate consumers.[216]

Here, an asset freeze is needed to preserve the Court's ability to provide restitution to victims. Bank records indicate that the amount of consumer injury far exceeds the amount of funds available for consumer redress.[217] Rozenfeld has used some of the spoils of his scheme to

---

[216] *See, e.g., World Patent Mktg.*, 2017 WL 3508639, at *17 ("Dissipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress."); *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze. The asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement." (internal citations and quotations omitted)).

[217] PX 18 ¶¶ 15, 82.

purchase a $1.275 million home, luxury cars, Robinhood investment accounts, jewelry, and personal travel.[218] Despite this, when speaking with consumers seeking refunds, Rozenfeld told consumers he is broke and warned a consumer not to come after him personally.[219] Finally, when promising refunds to Passive Scaling clients, Rozenfeld has told them that the refunds are funded by earnings from current sellers' stores.[220] Without an asset freeze, Defendants are likely to dissipate assets, rendering effective relief impossible.

### D. The Court Should Appoint a Temporary Receiver for the Corporate Defendants to Maintain the Status Quo.

By moving for a TRO, the FTC seeks to both prevent ongoing consumer harm and preserve assets and evidence. To effectuate these goals, the FTC respectfully requests that the Court appoint a temporary receiver. Appointment of a receiver "is appropriate where 'fraud, or the imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate.'" *Nat'l Credit Mgmt.*, 21 F. Supp. 2d at 463 (quoting *Leone Indus. v. Associated Packaging Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992)). When a defendant has used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste." *SEC v. First Fin. Grp. of Tex.*, 645 F.3d 429, 438 (5th Cir. 1981). The Court also has authority to appoint a receiver when, as here, "the purpose of the receivership is to prevent the same sort of ongoing harm that the ultimate object of the § 13(b) litigation—the issuance of a permanent injunction—is intended to achieve." *Noland*, 2021 WL 4318466, at *4.

Here, appointment of a receiver over the corporate defendants is necessary to prevent the destruction of documents and dissipation of assets, assist the Court in understanding Defendants' activities and assessing the extent of the fraud, and provide information to consumers harmed by Defendants' scheme. A receiver can also ascertain whether the corporate defendants have legitimate operations that might be carved out and maintained apart from the proposed action and

---

[218] *Id.* ¶ 83.

[219] PX 9 ¶ 20 & Att. F, p. 472.

[220] PX 8 ¶ 19 & Att. N, p. 399.

whether any of them could be operated legally and profitably. Accordingly, appointment of a temporary receiver over corporate defendants is appropriate.

**E.    The Court Should Grant Immediate Access to Corporate Defendants' Business Premises, Turnover of Defendants' Business Records, and Limited Expedited Discovery.**

To unravel the tangle of corporations involved in this matter, ensure the preservation of relevant documents, and locate assets wrongfully obtained from consumers, Sections V, XX, XXI, and XXIII of the proposed TRO provide the receiver and FTC immediate access to Defendants' business premises, require Defendants to immediately turn over their business records to the receiver and the FTC, order Defendants to produce certain financial information, and permit the FTC to conduct expedited discovery to ascertain the existence and whereabouts of relevant assets and evidence.

District courts are authorized to depart from normal discovery procedure and fashion a discovery schedule that meets the needs of a particular case. *See* Fed. R. Civ. P. 1, 26(d), 34(b); *see also Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3d Cir. 1995) ("[D]istrict courts have broad discretion to manage discovery."). Here, an immediate access to Defendants' business premises, turnover of Defendants' business records, and limited expedited discovery are essential to ensure that the FTC and the Court are fully informed of (1) the scope and scale of Defendants' business operations, financial status, and role in the scheme, (2) the range and extent of Defendants' unlawful conduct, (3) the identity of injured consumers, (4) the total amount of consumer harm, and (5) the location, nature, and extent of Defendants' assets.

Defendants have demonstrated that they will obstruct justice at every turn. Defendants have failed to appear in court and arbitration proceedings and have defaulted on monetary judgments.[221] For example, Passive Scaling failed to answer a complaint after being served, and the court ultimately ordered a default judgment in the amount of $30,000.[222] Rozenfeld has also

---

[221] PX 20 ¶ 40(A); PX 14 ¶ 30; PX 15 ¶¶ 45–51.

[222] PX 14 ¶ 44 & Att. V, p. 857.

threatened and intimidated consumers who may jeopardize his reputation and lies at will to suit his needs.[223]

The proposed TRO provisions will assist in implementing the asset freeze, preventing the dissipation of assets, and preserving relevant documents. Numerous courts in this district and throughout the country have entered TROs with such provisions in appropriate FTC matters in the past.[224] Any hardship to Defendants from the relief sought would be temporary and is dwarfed by the public's interest in preserving evidence and securing assets obtained through Defendants' unlawful conduct.

## V.    CONCLUSION

Defendants have bilked consumers of at least $11.1 million through their use of false earnings claims, illegal contract provisions, and unfair complaint-suppression tactics. It is past time to bring an end to their pernicious scheme. To ensure that Defendants cease their unlawful conduct during the pendency of this matter and to preserve effective final relief, the FTC respectfully requests that the Court grant its motion for an *ex parte* temporary restraining order with ancillary equitable relief against Defendants.

Respectfully submitted,

Dated: 6/3/24

Frances L. Kern (Minnesota Bar No. 0395233)
Colleen Robbins (New Jersey Bar No. 027091997)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202) 326-3395 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[223] *See supra* nn.64, 97-98, 100, 208.
[224] *See, e.g., supra* nn.154-56.