## DECLARATION OF ALISON BRIGINSHAW
### Pursuant to 28 U.S.C. § 1746

I, Alison Briginshaw, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Alison Briginshaw. I am over the age of 18 and reside in Marengo, Illinois.

2. Sometime in late 2019, I found Valiant Consultants ("Valiant") through an advertisement on Facebook. The video ad said that, for a fee, Valiant managed third-party e-commerce stores through Amazon's website. Valiant researched products for the stores, found suppliers of those products, managed and performed customer service, and fulfilled customer orders. I had been looking for a passive income opportunity, though I was not exactly sure what kind, and this opportunity sounded enticing.

3. After I saw the ad, I contacted Valiant and spoke with a sales representative, Anthony Steele. Anthony said that all I had to do was pay the upfront fee of $30,000 and then Valiant would do everything to set up and run an Amazon store on my behalf. Once the store was up and running, I would pay them 30% of profits and keep the remaining 70%. I thoroughly explained that I knew nothing about running Amazon stores and I was not sure that this was a good fit for me. Anthony reassured me that it was okay because Valiant would run the store for me, and I would not need to do anything at all. He explained that because the operations were largely automated, the stores could generate significant passive income for me. Anthony also encouraged me to sign up right away because the initial fee would increase to $35,000 the next week.

4. Anthony said that I could earn back my initial $30,000 investment quickly, but the timing depended on how much working capital I was willing to allow for product purchases. He said I should try to make $30,000-$40,000 available on my credit card for the store. I got

1

the sense that during these conversations he was trying to see how much money I had and was willing to make available. He said some people made hundreds of thousands of dollars, and again, how quickly they could do so depended on how much working capital they made available. These statements were critical to my consideration of this opportunity and my ultimate decision to sign a contract with Valiant.

5. Anthony told me that Valiant had 2,000 wholesalers waiting with product for Valiant's clients and Valiant had only 700 clients, so I could expect to see huge returns fast. He told me that my store would stock and sell items from well-known brands such as Nike, Disney, Johnson and Johnson, and more. I understood from Anthony that I would not be charged for a product until a customer ordered it. I later learned that this was called a drop-shipping model, which is different from a wholesale model where I would have to fund inventory purchases up front and then sales would be made from that inventory. He explained that my credit card would be used to purchase the products already sold in my Amazon store, and this appealed to me because I fly a lot and could get miles through these substantial credit card purchases. This was very significant to my decision to work with Valiant.

6. Anthony sent me an Account Management Agreement ("Contract"). According to the Contract, in exchange for my payment of $30,000, Valiant would manage my Amazon account "according to the FBA wholesale automation business model I have been presented with," including "managing and performing functions such as (but not limited to), customer service, product research and order fulfillment." The Contract also included a revenue share provision: I would pay $500/month for the first two months and keep all profits, and after that Valiant would take 30% of store net profits to cover account

management. The Contract also said "that there are no guarantee for profits or longevity of my account(s)." **Attachment A** is a true and correct copy of the Contract.

7. The Contract also included a "money back guarantee" wherein, after 487 days from my 60-day growth phase, Valiant would buy back my store for the amount paid less any profits earned in the preceding 547 days. The money back guarantee required that I meet certain requirements including, among others, that: (1) the store have a credit card limit or working capital "with up to $40,000;" (2) "[a]ll account/store requirements are followed from Valiant Consultants Inc. back office videos;" (3) invoices are paid timely and in full; and (4) my store was not put into vacation mode. Under this guarantee, Valiant would buy my account "on the 547th day with a notice and written request from the Client," and after the 548th day, "this money back guarantee shall be null and void." **Attachment A**.

8. As a result of my conversations with Anthony and based on the ads and materials I reviewed, I decided to sign the Contract and purchase the business opportunity. On approximately December 13, 2019, I signed the Contract. Steven Mayer signed as the Founder of Valiant. *See* **Attachment A**.

9. After I signed the Contract, I wired $30,000 from my bank account to a Wells Fargo account owned by Valiant. **Attachment B** is a true and correct copy of the record of that payment.

10. I never received any document from Valiant or otherwise with any information backing up its earning and profit claims contained in social media ads, on its website, or over the phone with the sales agent. I also never received a document from Valiant telling me

3

whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

11. After I paid the initial fee, I expected Valiant to set up my store. When I checked with Anthony about the status of opening my store, he told me I needed to set it up with Amazon by myself because it would be illegal for Valiant do it. So I had to open the store myself and do all the paperwork to set up my LLC and meet sales tax requirements. It was a lot of work considering I had been reassured that Valiant would do "everything" and it was okay that I did not have the background and experience in this type of business. I understood this kind of service is what I paid them for. My store did not get up and running until March 2020—four months after I signed the Contract.

12. During the set-up process, I had to sign up for Bqool, an AI-powered repricing software, which cost $25 per month, and I had to pay $74.99 per month for sales.support software. I was charged and paid for sales.support during the early months when my store was not yet opened. Eventually I asked for a refund for those charges during the period when my store was not opened, which I received only after complaining repeatedly. **Attachment C** is a true and correct copy of charges for sales.support and Bqool with my annotations regarding refunded and non-refunded charges.

13. Valiant instructed me to get a credit card with a large credit limit and one that had miles or points to take full advantage of the large amounts of money that would be going through my account to pay for inventory. My husband and I decided to use his credit card, as it had a higher limit, and I understood that making more capital available would lead to greater profits. I filled out a form to provide Valiant authorization to use the credit card to make purchases.

14. Eventually, in late March or April 2020, the first products for my store were purchased, and they were ceramic mugs and make-up glasses. Those products were never actually sold out of my store. I was confused that there were upfront inventory purchases rather than what I thought I signed up for, which was that I would pay for a product only after a customer ordered it. I also questioned why these products were purchased when Valiant said it would source products from name brands like Nike and Disney. Despite the earlier statements during the sales pitch that Valiant had relationships with wholesalers who would sell name brand products—statements I now think were made up to make this opportunity sound more enticing—I was told that those name brands are not as profitable and I would make "only pennies" on those items.

15. Along with other inventory I paid for, I was told that the mugs and glasses "went missing" in Valiant's storeroom. This was part of a pattern that after I received invoices and was charged for products, I noticed that they were not listed in my store. At some point when I started looking into this issue, I learned that a company called FBA Support was helping Valiant manage my store. Valiant or FBA Support sometimes said items were missing or damaged, and other times they said the products were sold even though I could see that they were not and that my store did not have any revenue from them.

16. As another example, I received an invoice for $95.10 from Daily Distro for stuffed animal toys, which I paid, and the products were never sold in my store. **Attachment D** is a true and correct copy of that invoice. I thought that items that could not be sold would be sent to me, but when I checked in my account, I noticed that the address for sending unsold inventory had been changed. I switched it to my address, and some of the unsold Daily Distro products were sent to me in Illinois. **Attachment E** is a true and

correct copy of the delivery label. But later I noticed that the shipping address in my account was changed back to the address that was not mine. **Attachment H** shows the address in New Jersey. I do not know if it was an address of Valiant or FBA Support.

17. As another example of the confusing and questionable purchases for my store, FBA Support sent me an invoice for $1,942.80 for products (cleaning products, conditioner, body wash) from a company called Attitude, which I paid, but the products never arrived in my store. **Attachment F** is a true and correct copy of that invoice. I called Attitude, and they said they had never heard of me, had not received an order, and had not fulfilled an order. Fortunately, I was able to successfully dispute the charge with the credit card company and receive my money back. The same thing happened with a supplier called Kehe; FBA Support sent me an invoice, I paid it, the items never showed up in my store, I called Kehe and they knew nothing about the order, and I had to dispute the credit card charge, which fortunately was successful.

18. At some point, I was suddenly asked to wire transfer another $802.00 to Valiant for products. When I questioned why my credit card was not being used for purchases, they said that practice no longer stands. I did not want to make a wire payment, and I asked Valiant to find suppliers that would accept credit card payments. Even when they were charging my credit card like I expected, I would receive invoices for items like soft toys for $330, but my credit card was charged $1,176 for those same items. The amounts I was being charged did not add up to what was on the invoices I received from FBA Support. I was able to dispute some of the credit card charges and get the money back, but I did not recover all the money I was charged for inventory that disappeared or was never put for sale in my store.

19. While some of the inventory I paid for actually was put up for sale and sold in my store, the sales amounts were very low and the revenue was nothing near the amounts I expected from Valiant's sales pitch.

20. In October 2020, Valiant sent another confusing and frustrating email informing customers that the "warehouse and distribution team" was implementing a new $35 monthly fee for storage of goods in the warehouse, adding additional, undisclosed fees for returned inventory, and requiring clients to sign a new vendor agreement. Any client who didn't agree to these new terms could stay with FBA Support, but only if they agreed to have their account on pause for 1 to 3 months. I did not understand this change, and it left me with only bad options: either stay with the team that was not doing what was promised, or switch and have my store closed for three months.

21. I sent multiple emails to different people at Valiant and got no help or answers. The contact information kept changing, and I was told repeatedly that people I talked to previously had left the company. At one point, I found Steven Mayer on Instagram at the handle @mrecomking, and I sent him a message asking for assistance. He instructed me to "please call not email" and "I promise you if you call we will handle this." **Attachment G** is a true and correct copy of the messages. But calling for assistance did not help, and it was virtually impossible to reach anyone over the phone. The only way to try to get assistance through a phone call was to schedule one through Valiant's portal, and calls usually were scheduled over a month in advance and then were not helpful.

22. At some point, a different person named Steven R, from FBA Support, contacted me. He was reaching out to Valiant customers and offering to do for them what Valiant had promised, but he said he would do it better. I was not interested in this offer given the

7

time and money I had already lost. And my impression was FBA Support had been part of making a mess of things for Valiant customers. Valiant did not do anything to help its customers out of that mess.

23. I tried to continue to monitor what was going on in my store. I could not just close it or stop as I had paid the $30,000 start-up fee, which was supposed to have a 100% money-back guarantee but only after a year and a half from store opening. By the time I could have asked for my money back under that guarantee, Valiant was not responding to communications and I had given up on them to do anything they had promised. So I did not earn back my $30,000 investment "quickly" as promised, or at all, let alone make any profit on my store.

24. The stress of the year I spent trying to get the store running and profitable was insurmountable. This was supposed to be a "do nothing" investment—they make their share and I get mine. Valiant just took my money and did nothing, and my hands were tied.

25. I researched online and saw that others were struggling with Valiant's broken promises. Some people said that they lost their homes. While this was happening, Valiant was still advertising on Facebook for more clients, and Steven Mayer and friends were all over social media showing how wealthy they were and how we could be like them.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Alison Briginshaw

Executed on 24 May, 2024 in Marengo, Illinois

8

# Attachment A

## ACCOUNT MANAGEMENT AGREEMENT

THE SECRET INFORMATION: From time to time, we (Valiant Consultants Inc., its affiliates and/or related entities), or others on our behalf, may share with you information that we consider valuable and take reasonable steps to keep secret - our confidential information. We are not giving you any rights in it (ifs all ours), nor are we creating any agency, partnership, joint venture, or other joint relation with this agreement. We also are not making any representations, guarantees or warranties about the information. But we are sharing it, so we also want to protect it.

KEEPING THE INFORMATION SECRET: You agree to keep our confidential information just that. Confidential, and not to share it with others without our written permission. We are sharing the information -- verbally, in writing. Electronically, or otherwise — only for discussions or possibly to engage you, and you agree not to use our confidential information for any other purpose. Of course, you are free to use information generally available to the public (unless, of course. you caused our confidential information to be publicly available) or that you had or independently create(d) without our confidential information (but be prepared to prove it). You will return our confidential information (and all copies and excerpts from it) within five business days if we ask you to and/or if we stop our discussions indefinitely. At our option, we instead may allow you to destroy the materials and confirm that in writing. Lastly, you agree to take care of our confidential information like you would your own.

If asked to disclose our confidential information in connection with any legal process, you will first (and promptly) notify us so we can try to protect our information. And no matter what, for such legal process, you will reveal only the specific information legally required and nothing more. Also, we understand that you may need to share our confidential information with your contractors, subcontractors, or agents in connection with our discussions or possible engagement. Before you do that, you will first require those representatives to agree to keep the information confidential, as you are also responsible for any of their actions with our confidential information. Keep in mind that timing for notices and time periods under this agreement matter, or, as our lawyers say, 'time is of the essence."

You acknowledge that violating this agreement can irreparably harm us, which means money probably cannot completely fix things. Therefore, to prevent a violation of this agreement, you agree that we can ask a court to get involved and issue an order requiring that you do or not do something related to our confidential information. Our name is also important to us, so you agree not to use our name or logos or issue press releases or tell anyone about our talks without our written permission. Also, you cannot assign this agreement to someone else — we want you to keep this just between us.

TIME FRAMES AND SUCH: The obligations in this agreement start when we disclose(d) confidential information and continue: (i) for trade secrets, as long as it remains a trade secret under applicable law; and (ii) for confidential information that is not a trade secret until five years after it is returned to us (or, at our option, destroyed) or, if sooner until such information no longer qualifies as confidential information under this agreement.

THE LEGAL STUFF: Our lawyers tell us this paragraph contains important language that continues even after this agreement ends. California law governs this agreement (regardless of anything that could apply to change that). If we have a dispute related to this agreement, you agree to the personal jurisdiction of state and federal courts in Contra Costa County, California, and both parties agree to waive all objections and defenses of personal jurisdiction, improper venue, or inconvenient forum. Any waiver must be in writing and signed by the party granting the waiver. Also, any failure or delay in exercising a right does not mean that right is waived, nor does partially exercising rights prevent a party from exercising other rights it has. If a part of this agreement is held invalid or unenforceable, then that part will be enforced as much as possible, or removed, and will not affect the validity or enforceability of the other parts. This agreement can only be changed by a writing signed by both parties. By signing below, you confirm that your execution of this agreement is duly authorized, and that this agreement is a legal, valid, and binding obligation.

| CLIENT INFORMATION: | VALIANT CONSULTANTS INC. INFORMATION: |
|---|---|
| Client Full Name: Beauport LLC | Name: Steven Mayer |
| Title: Client | Title: Founder |
| Date: 12/13/2019 | |
| Signature: Beauport LLC (DocuSigned by: FA93CA83BFB645F...) | Signature: Steven Mayer |

## ACCOUNT MANAGEMENT AGREEMENT

On the  12/13/2019 , I  Beauport LLC , agree to the full payment, in the total amount of $30,000 USD, in exchange for the service(s) of having my Amazon account(s) created and/or managed on my behalf according to the FBA wholesale automation business model I have been presented with and have agreed to. I have been informed and agree to the business model and to the way my account(s) will be operated and managed. This will include managing and performing functions such as (but not limited to), customer service, product research and order fulfillment. I fully understand and accept that there are no guarantees for profits or longevity of my account(s), and I am fully aware and understand all of the risks associated with this business model and the service(s) provided. I understand and accept that my account(s) will be will managed as safely and effectively as possible for the benefit of all parties. I understand and accept that there are intangibles that may affect my Amazon account(s) performance in sales and metrics. This can include (but is not limited to) variables that are out of the control of all third-party sellers on Amazon.com, such as fluctuations in Amazon.com site traffic or competition. I understand and accept that I maintain 100% ownership of my Amazon account(s) and business, which gives me the ability to sell it or take over management duties at any time. I understand and accept that the initial 60 days is a growth phase where I will be invoiced $500 USD monthly, from 60 days onward 30% of the net profit from the sales of my online Amazon store, will be invoiced to me monthly, and is only for having my account managed for me but does not relinquish any of my ownership. In the scenario that my account is suspended, all parties involved agree that all viable attempts to recover my account will be made. Should any recovery attempts of my suspended amazon account fail, all parties agree that a new account (that I agree to create) will be managed for me, in the same capacity as my previous account, at no upfront charge. I understand and agree that if my account(s) is suspended because of my own doing (this includes (but is not limited to) any sabotage, intentional manipulation or wrongdoing on my account(s) that could cause a suspension), that I will not be eligible for our services to continue at no upfront cost. I understand and agree that my account will require the same growing period that the original account required. All parties agree that the 30% of the net profit that was originally agreed upon and invoiced, will remain the same. This also includes any new account(s) that was created in lieu of any suspension from an existing account(s). All new future accounts will be negotiated independently. I understand and agree that if I decline to pay the invoices for the building phase of my online Amazon store and 30% of net profit of my account(s), the service(s) originally agreed upon, will cease to operate in all capacities that were agreed upon until payment is received. I understand that Valiant Consultants Inc. offers a money back guarantee that's a one-time offer effective 487 days after the 60 day growth phase is completed, which allows them to buy back my Amazon account(s) from me for the same price I paid for their service(s) less any profits made by the store that were earned through the store in the preceding 547 days as long as the following conditions are met: (a) No account(s) suspensions occur resulting in the account(s) being in-active for more than 90 days. (b) An account(s) suspension due to my error cannot occur. (c) A credit card(s) limit or working capital with up to $40,000 USD must be provided for the account(s) in the first 10 months. (d) The account(s) cannot be put into vacation mode at any time. (e) Account(s) access and required information to allow the account(s) to become active, must be given within 30 days of purchasing the service. (f) All account/store requirements are followed from Valiant Consultants Inc. back office videos, and all videos are completed in first 30 days. (g) All invoices through the 60- day growth period and the 30% of monthly net profits must be paid by the 5th of each month. (h) No refunds will be made on deposits or full payments. Valiant Consultants Inc. shall buy, on the 547th day the clients account with a notice and written request from the Client. After the 548th day of the initial fee being paid in full, this money back guarantee shall be null and void. I understand that I am signing this document with full understanding and agreement of all its terms and am doing so willingly.

**CLIENT INFORMATION:**

Client Full Name: Beauport LLC

Title: Client

Date: 12/13/2019

Signature: *Beauport LLC*
FA93CA83BFB645F...

**VALIANT CONSULTANTS INC. INFORMATION:**

Name: Steven Mayer

Title: Founder

Signature: *Steven Mayer*

# Attachment B



# DOMESTIC WIRE TRANSFER AUTHORIZATION

The undersigned originator requests payment to be made to the beneficiary and account number named below. The undersigned agrees that this wire transfer is irrevocable and that the sole obligation of Prairie Community Bank is to exercise ordinary care in processing this wire transfer and that it is not responsible for any losses or delays which occur as a result of any other party's involvement in processing this transfer.

Wire Amount: $30,000.00
Charge: $30.00
Total Amount: $30,030.00

**Receiving Bank Information**
Bank Name: Wells Fargo
Address: 420 Montgomery
Routing/ABA: ███
City/State: San Francisco, CA 94104

**Originator's Information**
Customer's Name: Beauport LLC
Address: ███
Phone Number:
Purpose of Wire: Franchise pmt
City/State: ███
Account #: ███

**Beneficiary's Information**
Beneficiary FI:
Address:
Beneficiary: VALIANT Consultants, Inc
Address: 1200 Brickell Ave Ste 1950
Routing/ABA:
City/State:
Account #: ███
City/State: Miami, Fl 33131

Originator to Beneficiary Info / Reference Info:

Signature of Requester

Date: Mon Dec 19

PX21                                                                001516