## DECLARATION OF ALVARO LIZARASO
### Pursuant to 28 U.S.C. § 1746

I, Alvaro Lizaraso, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Alvaro Lizaraso.  I am over the age of 18 and reside in Doral, Florida.

2. In approximately August 2021, I was looking online for an opportunity to make passive income.  I searched for automated businesses that could be run online and found a company called Optimyze Digital.  I got in touch with the company and spoke with a sales agent named Shion Galata.  He said that they open ecommerce stores for clients on Walmart and Amazon to sell products to Walmart and Amazon customers.  He sent me an email with links to videos describing the backend of Walmart and Amazon stores under their management; videos of the backend software their development team created, known as sales.support, and  how it is implemented in stores under their management; and recordings from previous Client Live Q&As.  These were question and answer zoom calls for prospective clients.  Attached as **Attachment A** is a true and correct copy of this email.

3. I watched the Loom videos linked to in **Attachment A**.  In one video titled Amazon Seller Central - Walkthrough, an Optimyze Digital employee walked through two of their Amazon stores' accounts on the Amazon Seller Central portal.  The first store was open for approximately eighteen months and the sales revenue was over $5.3 million and could hit $7 million to $8 million during that current year.  He said that the owner received 20% of the total revenue in profit and that the owner received profits from the store almost immediately.  In another video titled Walmart Seller Center, a narrator showcased two different seller accounts.  One made over $25,000 in revenue in one month and made $232,000 total revenue in the six months the store was open.  The profit margin for that

store was 25% or $50,000.  He said that the average profit margin we could expect was between 15-30%.  The second store made $34,000 in revenue in the first month and $200,000 in revenue in the first 6 months.  This one too had a profit margin of 25%.  This meant the owner profited approximately $50,000 in six months.  He said Walmart paid out every 14 days.  In another video titled Screen Shot, the same employee of Optimyze Digital who was in the Amazon video, showed how the sales.support software worked and why it was an important addition to Amazon Seller Central.  He showed a store that had over $400,000 in sales in one month and the profit to the store owner was approximately 17% or approximately $80,000.  He commented that if we have additional questions, they can make more videos to show the backend of the software programs clients will be viewing when they own a store with their programs.  In another video titled Google Chrome – Walmart Seller Central, the screen showed a Walmart store account that had been open 90 days and that had sales of $254,300 in the last two months.  The links to these videos are in the email in **Attachment A** that I turned over to the Federal Trade Commission in February 2024.

4. I spent a few weeks discussing the opportunity with Shion.  He told me that there was a refund policy that included a money-back guarantee if I didn't receive a return on my investment within 18 months.  He reiterated several times that there was a guaranteed return on investment.  I asked if I could speak with an existing client, and Shion emailed me contact information for someone named Quincy Roe.  I spoke to Quincy, and he said that he made his money back and the money had changed his life.  *See* **Attachment A**.

5. Shion sent me the contract, and I noticed that it was between me, and a company called Passive Scaling.  He explained that this was their partner company and they worked

together.  He made it sound like Optimyze Digital was the parent company for Passive

Scaling.  Passive Scaling was the company that was actually supposed to run the automated

e-commerce stores for its clients on Amazon or Walmart.  Passive Scaling handled all the

work, and I would receive the income.  I did not ask a ton of questions after that because

Quincy really convinced me that I could earn a lot of money and the money-back guarantee

policy lowered the risk considerably.

6.   When I received the contract, I also received wiring instructions from Steven Bratislav

Rozenfeld using the email sales@passivescaling.com for the $30,000 initial fee Passive

Scaling charged for its services.  I discovered that Steven was the CEO of Passive Scaling.

Attached as **Attachment B** is a true and correct copy of this email.

7.   I decided to sign the contract and pay the initial fee for a Walmart store because I believed

I would be able to make passive income at very low risk because of the money-back

guarantee.  In mid-September 2021, I sent a direct deposit of $30,000 to "Passive Scaling,

Inc." (a New Jersey-based company).  The contract also required me to pay a $99 software

fee ("paid directly to the software provider"), and Passive Scaling would take 35% of the

net profit or $199 per month for a management fee.  The contract was signed by Amananda

Peremen, Operations Manager at Passive Scaling, Inc.  I never had any contact with this

person.  The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd.,

Carlstadt, NJ 07020.  Attached as **Attachment C** is a true and correct copy of the contract.

8.   The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree
> that any issues or problems that either party has regarding the other with respect to
> this Agreement shall be discussed with the other party in a professional and private
> manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate
> information regarding the other party in any online or offline forum or any other
> forum whatsoever, including but not limited to social media channels, regardless of

3

whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

9. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating the earning and profit claims contained in their promotional videos or over the phone with the sales agent. I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

10. I sent an email to both Optimyze Digital and Passive Scaling to ask about the onboarding process, and I received an email back from Optimyze Digital referring me to Tatiana at Passive Scaling. Attached as **Attachment D** is a true and correct copy of this email.

11. My Walmart store opened in approximately January 2022. Passive Scaling used the dropshipping method for fulfilling customers' orders. This means that when a customer orders a product from my store, Passive Scaling would order that product from another retailer, like Amazon, to fulfill that order. This is different from ordering products wholesale in bulk and storing them in a warehouse waiting for customers' orders. Although I do remember Passive Scaling mentioning that it had one more warehouses from which they shipped some products out.

12. Passive Scaling mentioned at some point that Walmart tends to suspend new merchants, but it said it would take care of appealing the suspension if that happened. Then, Walmart suspended any payouts from my store in approximately May 2022, but Passive Scaling never gave me a real reason why. Tatiana told me that the suspension was random and she told me that Passive Scaling would try and recover my account. Attached as **Attachment E** is a true and correct copy of my message to Jerdonna Palmer, another point of contact for me at Passive Scaling, and Tatiana about the Walmart suspension.

4

13. Passive Scaling made it sound like it did appeal because it repeatedly claimed it was waiting for Walmart's response for months.

14. My Walmart store performed poorly and barely received any sales. I reported this to Passive Scaling, but I always received a vague answer, including "we will have the team look into it." I never saw any progress. At some point I even pointed out to Passive Scaling that, as a client, I felt my store was being neglected since I would rarely get real reasons as to why performance was dropping. Under our contract, Passive Scaling was supposed to do the work for the store and I was supposed to collect passive income.

15. After a few months, to make up for my suspended Walmart store, Passive Scaling asked me if it could open Facebook and Amazon ecommerce stores. I agreed in approximately June 2022.

16. In June 2022, I received an email from Trudy (support@mail.salessupport.ladesk.com), a Client Success Manager with Passive Scaling, telling me that my Amazon store was assigned to the Vendor Management Team and that team will open vendor accounts for my store. Soon after that, I will be assigned to an Account Manager. Someone named Martin was cc'd on that email (martin@wraithco.com). Attached as **Attachment F** is a true and correct copy of this email.

17. I generated minimal sales on my Facebook and Amazon stores. I reached out to Passive Scaling to try and get some answers and assistance, but I kept getting different excuses. Jerdonna Palmer would always try and give me a solution to calm me down, but I knew that it was not going to get better. The communication was terrible, and I had no confidence in Passive Scaling's ability to run my stores.

5

18. Tatiana had told me that Passive Scaling submitted appeals for my Walmart store and it was waiting on Walmart's final decision.  However, on December 23, 2022, Tatiana informed me that Walmart terminated my store and said it was likely a glitch in the system.  Tatiana suggested I set up a new LLC and reapply on Walmart marketplace as the approval rates are higher than on Amazon.  I asked her what happened to the approximately $4,000 from sales in my account that was on hold because of the suspension.  She said that Walmart would release the funds to my account.  I did eventually receive those funds.  Attached as **Attachment G** is a true and correct copy of this email.

19. I thought for sure the company would respect the refund clause, so four months before the deadline, I asked about the process to request a refund.  Jerdonna told me that I needed to request a Profit and Loss statement from Passive Scaling's legal department for my company which will be proof that I did not make my investment back.  Once I have that, Passive Scaling will issue my refund.  Jerdonna said she would make sure I received a response from the legal department, but that did not happen.

20. I requested a Profit and Loss statement a few times in approximately January and February 2023, but I never received a Profit and Loss statement from Passive Scaling.  Attached as **Attachment H** is a true and correct copy of these emails.

21. In approximately March 2023, at the 18-month mark, I asked for a refund but never received one.  I sent multiple emails requesting a refund.  Attached as **Attachment I** is a true and correct copy of these emails.

22. Right after I requested a refund, I received an email from Kycheree, support@mail.salessupport.ladesk.com, who said that she needed an updated budget for my Amazon store and if I choose not to purchase more inventory, she will mark my store

as inactive.  I responded by telling her I requested a refund and to please give me a contact person in Passive Scaling's legal department.  Attached as **Attachment J** is a true and correct copy of this email.

23. Before I requested a refund, I had some communications with Jerdonna Palmer, the Director of Client Support at Passive Scaling.  Once I put in my request for a refund, I only heard from her a few times telling me she would follow up and get back to me.  I never heard from her after that and it appeared that her phone number was disconnected or the company blocked my number.  She missed three online meetings I set up.

24. My Walmart store made approximately $4000 in sales.  I did receive one payment from Walmart, but I had to cover inventory payments and fees with the small sales I made.  I really don't know the exact amount of profit I made because Passive Scaling never sent me the Profit and Loss statement it promised to send me, but I never came close to recouping my initial fee of $30,000.

25. In approximately May 2023, I spoke with the owner of Passive Scaling, Steven Rozenfeld. I received a text from Passive Scaling asking me to have this call with Steven a few days after I posted a complaint online with the Better Business Bureau ("BBB").  On the call, I told him I wanted a refund, and I remember he told me that my initial fee of $30,000 that I paid was gone.  I remember he mentioned Passive Scaling was having the same issue with other clients and the company was dealing with lawsuits from its clients.  I also remember he said that posting a negative review on BBB was against our agreement because it was considered a harmful action against the company and Passive Scaling could sue me for that.  He asked me several times to remove the negative complaint and told me that by doing so, I would help ease the situation. In other words, to my understanding, he was

saying he would be willing to work out a resolution so long as I removed the review.  I responded to Steven that all I did was report the facts with proof attached to my review, and I did not appreciate the fact that he was trying to intimidate me as it's my right as a consumer to publicly report my experience with the company.  Steven also implied that I might not be eligible for a refund and the team had to review my case first.  At the end of the call, Steven told me that I would get a resolution from the company within the next 30 days, but I never heard from Steven again.

26. Considering Passive Scaling had been ignoring my texts, emails, and calls for several weeks before this phone call with Steven, and give Steven asked me to remove my negative complaint several times during the call, I believe that the only reason why Steven set up this call was to get me to remove the review and intimidate me with what seemed to be legal threats.  I believe that Steven had no intention of working on an actual resolution.

27. I spoke with another Passive Scaling client who reported a similar experience on a group chat that I was on.  He said he received a formal letter from Passive Scaling telling him the company intended to sue him unless he removed his BBB complaint.  I did not receive a formal letter, but just had the phone call with Steven.

28. In June 2023, Jerdonna told me that Passive Scaling's legal team was working on a resolution for me and she would let me know on June 20.  I never heard back.  Attached as **Attachment K** is a true and correct copy of this text as well as some other texts from March

000266

and April 2023 requesting a response to my refund requests.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: Friday, March 1, 2024
Doral, Florida

_____
Alvaro Lizaraso

9



---------- Forwarded message ---------
From: **Shion Galata** <shion@optimyzedigital.com>
Date: Tue, Aug 10, 2021 at 1:33 PM
Subject: Info
To:

Please take a look at the following information:

Videos going into the backend of Walmart & Amazon store under management:
https://www.loom.com/share/876634ee36a3453e98b222a8f0b834df
https://www.loom.com/share/6a31e3a4f91a4ec2a7ed310ae5773bb4?
sharedAppSource=personal_library
https://www.loom.com/share/bf5bc54306ae414aab66ae1bf9c11cf6

Thought it would be valuable to you if I provided a video going into the backend software that
our development team has created, known as Sales.Support. https://www.sales.support/

Our teams have invested a lot of money into this software, for which it routinely pulls Profit and Loss
data from Amazon or Walmart. More importantly, it is heavily utilized for product identification,
research, and automating listings. If you watch this video, you will see how Sales.Support works and
how it is implemented in the Amazon/Walmart stores under our
management: https://www.loom.com/share/46bb608236a44300bb20a87fbf2b45b5

here are three recordings from previous Client Live Q&As:
- https://zoom.us/rec/share/UEISFGVScoqXCuciNwR5omjzks5YOXxtej1Zko__L84G77rRhrWezAl4sMwuJafv.wi8JMtiMML2bUDCn
- https://drive.google.com/file/d/154TAzLTUSYbzSVhouwkTeM9Kr2UALTWP/view
- https://drive.google.com/file/d/1d_US1-Do2puZab_7iZnprU_Ez_iRi4j9/view?usp=sharing

Best Regards,
Shion Galata

--



**Shion Galata**
Director of Sales
Optimyze Digital

_____

shion@optimyzedigital.com

www.optimyzedigital.com

3333 Michelson Dr Suite 300, Irvine, CA 92612

**Attachment A**

 Gmail

**Alvaro Lizaraso** ▓▓▓▓▓▓▓▓▓▓ >

## Reference
4 messages

**Shion Galata** <shion@optimyzedigital.com>                    Mon, Sep 13, 2021 at 1:14 PM
To: QUINCY ROE ▓▓▓▓▓▓ >
Cc: ▓▓▓▓▓▓▓▓

Hey Quincy,

Hope all is well man! I wanted to introduce you to Alvaro, Alvaro is a potential client of ours that wanted to hear from a reference with a client who ha been with u   Quincy began with an affiliate marketing funnel and diver ified into a Walmart store.

Quincy, it would be extremely appreciative if you were able to speak to Alvaro about your experience. I have CC'd Alvaro in the email  If not, I totally under tand a  the la t thing I want to do i  bombard any of our current client  I thank you for your time.


Be  t Regard  ,
Shion Galata
--



### Shion Galata
Director of Sales
Optimyze Digital

─────────────────

shion@optimyzedigital.com

www.optimyzedigital.com

3333 Michelson Dr Suite 300, Irvine, CA 92612


**QUINCY ROE** < ▓▓▓▓▓▓▓ >                                      Tue, Sep 14, 2021 at 8:58 AM
To Shion Galata    hion@optimyzedigital com
Cc:

Good morning Alvaro! Give me a call today so we can discuss the opportunity. ▓▓▓▓▓ is my direct number. I look forward to speaking with you.



On Sep 13, 2021, at 12:14 PM, Shion Galata <shion@optimyzedigital.com> wrote:


[Quoted text hidden]


**Alvaro Lizaraso - Potencia tu Agencia** ▓▓▓▓▓▓▓▓        Tue, Sep 14, 2021 at 12:25 PM
To: QUINCY ROE < ▓▓▓▓▓ >

**Attachment A**

**PX7**                                                          **000269**

Hi Quincy! Just left you a message. Let me know when is a good time to give you a call. Thank you so much in advance for taking a minute to talk to me.

[Quoted text hidden]

---

**QUINCY ROE** ████████████ >                                    Tue, Sep 14, 2021 at 12:42 PM
To: Alvaro Lizaraso - Potencia tu Agencia ███████████████

No problem. Sorry I missed your call.

Sent from my iPhone

On Sep 14, 2021, at 11:24 AM, Alvaro Lizaraso - Potencia tu Agencia ████████████████ > wrote:

[Quoted text hidden]

 Gmail

Alvaro Lizaraso ██████████████ >

## Confirmation Email - Congratulations!

1 message

**Steven Bratislav Rozenfeld** <no-reply@proposify.com>          Thu, Aug 12, 2021 at 6:50 PM
Reply-To: Steven Bratislav Rozenfeld <sales@passivescaling.com>
To: ████████████████

Hi Alvaro,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

Download now

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Name of Bank: Chase Bank
Address: 223 Veterans Blvd., Carlstadt, NJ 07020
Account # ████████
Routing # ████████ (WIRE)
# ████████ (ACH)
**\*\*\*\*\*PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS**

Once the payment has been submitted, please email a receipt to info@passivescaling.com and payments@optimyzedigital.com so we can match the sender name to our records as soon as possible, and once payment has cleared to our account, our team will reach out with instructions for your next steps!

**Attachment B**

**PX7**                                          **000271**

Gmail - Confirmation Email - Congratulations!

Please reach out to both emails if you have not received an onboarding email within 24 business hours of payment completion, *and include your confirmation.* We will be there every step of the process!

For alternative payment conditions, please reach out to payments@optimyzedigital.com.

Thanks again, and we look forward to building your program!



# Delivering on Your eCommerce Objectives

**Project Proposal**
Walmart Automation

**Delivered on**
September 13, 2021

**Client**
Alvaro Lizaraso

**Company**
PASSIVE SCALING INC

Attachment C

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit – **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $10,000** | $10,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Walmart pays every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $25,000 +** | | | |
| **TOTAL** | | | **$30,298** |

Attachment C

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of September 13, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Alvaro Lizaraso, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with one (1) e-commerce stores on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.
   B. Review, research, source, select, and list products for the Client's Stores.
   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



**Attachment C**

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



Attachment C

3

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



Attachment C

PX7                    000277

6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



**Attachment C**

5

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties, Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation**, During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



Attachment C

6

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information**, The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



**Attachment C**

7

10. **REFUND POLICY –**

   A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

   B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00).

   C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



11. **LIMITATION OF LIABILITY -**

 A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

 A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



**Attachment C**

9

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



Attachment C

10

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



Attachment C

11

D. **Walmart Terms and Conditions -** Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS –**

   A. **Non-exclusivity –** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

   B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

   C. **Notices –** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ███████████████████ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



**Attachment C**

12

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



**Attachment C**

13

H. **Injunctive Relief -**In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



**Attachment C**

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client -** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



**Attachment C**

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial** - EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



**Attachment C**

16

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



**Attachment C**

17

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.



Attachment C

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

Attachment C

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Alvaro Lizaraso authorized representative and agent for service of process Date: September 14, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

*Alvaro Lizaraso*
2021-09-13 17:30:20 (PDT)
_____

Alvaro Lizaraso

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  September 14, 2021

*Amanada Peremen*
2021-09-13 21:33:31 (PDT)
_____

Amanada Peremen

**Attachment C**

PX7                                                      000293

4/17/23, 6:01 PM                          Gmail - Re: Re: Welcome to Support

 **Gmail**                                    **Alvaro Lizaraso** ████████████████

---

## Re: Re: Welcome to Support

1 message

---

**Tatiana from Customer Support** <info@passivescaling.com>                     Mon, Sep 20, 2021 at 2:31 PM
Reply-To: Tatiana from Customer Support and 1 other
<n+u_61436d58e38fb183d478e21f_1447c3d3ed8fa4555186b28093df8ea1@customer-support-2301c51db431.intercom-mail.com>
To: ████████████████

**This message was sent to the following 2 people: support@optimyzedigital.com, Alvaro Lizaraso. Replying to this email will notify them.**

Hi Alvaro,

Welcome aboard to our Passive Scaling family!

My name is Tatiana and I'm your personal account manager that will be
handling your Amazon store setup process.

1. Your first step is to complete and fill out this important On-Boarding form for me at:

https://docs.google.com/forms/d/e/1FAIpQLSfG5_u9fWtQyOcNVrmxnOVkj5FbYdWhiKnP88VqxZAYWW9YeQ/viewform?usp=sf_link

2. Next I want you to schedule a phone call in my calendar so we can cover some basic
getting started steps. Book our call now at

https://calendly.com/tatiana-s/60min

We will cover the many questions I'm sure you have about the process of getting your stores up & running!

You can also email me with any questions for a faster response.

I and our team are excited to have you on board and look forward to
a prosperous working relationship!


Warm Regards,

Tatiana

Passive Scaling

**Tatiana** from Customer Support


On Mon, Sep 20, 2021 at 02:30 PM, "support@optimyzedigital.com" <support@optimyzedigital.com> wrote:

**Attachment D**

**PX7**                                                                    **000294**

Hello Tatiana,

Can we get an onboarding email over to Alvaro, please?

https://drive.google.com/uc?id=1Jqi2Sw96yy7iPUdi-SXbaC5LGm1WdrFdhttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/facebook-icon-2x.pnghttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/linkedin-icon-2x.png Kerry Anne Sadler Support Team

Optimyze Digital LLC

https://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/email-icon-2x.pngsupport@optimyzedigital.comhttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/link-icon-2x.pngwww.optimyzedigital.com
https://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/address-icon-2x.png
3349 Michelson Dr. Suite 200, Irvine, CA

On Fri, Sep 17, 2021 at 10:22 AM Alvaro Lizaraso < ███████████ > wrote:

Hello Kerry Anne,

Thanks for reaching out! I just received payment confirmation from Francis. I'm just waiting for the onboarding process to start. What's the first step?

Thanks again,

Alvaro.

On Fri, Sep 17, 2021 at 12:15 PM Optimyze Support <support@optimyzedigital.com> wrote:

Hello Alvaro!

My name is Kerry Anne, and I would like to introduce myself to you as your Client Success Manager at Optimyze Digital. I will be your main point of contact moving forward for any questions or concerns you may have regarding your account. My goal is to ensure our clients receive the best service possible, with questions and concerns addressed promptly. Please feel free to reach out to me through this support@optimyzedigital.com to ask questions, schedule a phone call or set up a video meeting with me.

I look forward to meeting you and assisting you in the future. Enjoy the rest of your day!

**Attachment D**

**PX7**    **000295**

https://drive.google.com/uc?id=1Jqi2Sw96yy7iPUdi-SXbaC5LGm1WdrFdhttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/facebook-icon-2x.pnghttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/linkedin-icon-2x.png Kerry Anne Sadler Support Team

Optimyze Digital LLC

https://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/email-icon-2x.pngsupport@optimyzedigital.comhttps://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/link-icon-2x.pngwww.optimyzedigital.com
https://cdn2.hubspot.net/hubfs/53/tools/email-signature-generator/icons/address-icon-2x.png
3349 Michelson Dr. Suite 200, Irvine, CA

--
https://d36urhup7zbd7q.cloudfront.net/85d9e852-1280-46dc-beed-6b17ff5a236c/82204805_1167681366913018_1574362335848431616_n.crop_1471x1579_930.96.preview.format_png.resize_200x.jpeg

**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL
https://cdn.gifo.wisestamp.com/social/linkedin/0077b5/32/0.png

Create your own email signature



# Walmart Payments Suspension

**Alvaro Lizaraso** < ██████████ >

to Jerdonna, tatiana, Tatiana ▾

Mon, May 23, 2022, 7:23 PM

English (UK)    Spanish    **◈ Translate email**    ←    → Forward translated email

Hello Jerdonna and Tatiana,

I'm very concerned about my Walmart store situation at the moment. Last time we spoke we agreed the team was going to make some improvements. I just logged into my account to see there's a payout suspension and sales have only slowed down even more.

Once again, I'm the one bringing these issues to light when I've already been told multiple times that the store is being monitored for improvement when it actually seems like it's being neglected.

This is turning into a very frustrating situation as a client. I'm worried that if I don't report these issues, the store is left neglected. Please let me know how this is going to be handled.

Thank you,
Alvaro.

**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL

**Attachment E**

 Gmail

Alvaro Lizaraso ███████████

## Vendor Management process started on (Store Name)
3 messages

**Trudy** <support@mail.salessupport.ladesk.com>
To: ████████████████
Cc: Martin <martin@wraithco.com>

Tue, Jun 28, 2022 at 9:17 PM

Hello Alvaro,

My name is Trudy Client Success Manager,
from Passive Scaling.
This email is a confirmation that your store has been assigned to the Vendor Management team.

Vendor Management team will be working on opening vendor accounts for your store and with that enabling us to place future orders, ungate your store on different categories and different brands.

The first vendor account opening process can take up to one week, after which you will be assigned with an Account Manager who will take over the vendor account and start placing orders and continue to work on your store.

As soon as the opening on the first vendor account has been completed, I will formally introduce you to the Account Manager that will be handling your store.

If you have any questions or concerns, please reach out to me directly and I will be happy to answer your questions.

Kind Regards,
Trudy S.
Client Success Manager
Direct: (850)721-1791
Email: trudy@passivescaling.com

**If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.**

**Alvaro Lizaraso** ████████████████
To: Trudy <support@mail.salessupport.ladesk.com>

Tue, Jul 5, 2022 at 12:07 PM

Hi Trudy,

Thanks for reaching out. Following up since it's been almost a couple of months now since we started this whole Amazon process with Passive Scaling.
Can we expect the opening of the first vendor account to be completed by this week?

Thank you,
Alvaro.
[Quoted text hidden]



**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL

in

**Attachment F**          **PX7**          **000298**

4/17/23, 6:00 PM                           Gmail - Vendor Management process started on (Store Name)

---

**Alvaro Lizaraso** ███████████████████                               Wed, Apr 5, 2023 at 5:28 PM
To: Trudy <support@mail.salessupport.ladesk.com>

Hello Trudy,

I'm writing to officially request a refund on my investment per section 10. REFUND POLICY, point A in the Walmart Automation agreement signed between PASSIVE SCALING INC and me on September 14, 2021. Attaching a copy of the agreement.

I requested a P&L report a month ago (Feb 20th) and still haven't received it. Not even a response from the legal team yet.

I'm reaching out for the 6th time in the last 45 days to request the initiation of the refund process as March 14th, 2023 marked 18 months from the date of signing.

I expect a response as soon as possible.

Thank you,
Alvaro Lizaraso.

On Tue, Jun 28, 2022 at 9:17 PM Trudy <support@mail.salessupport.ladesk.com> wrote:
[Quoted text hidden]


[Quoted text hidden]

**Attachment F**                              **PX7**                              **000299**

4/17/23, 5:59 PM                                Gmail - Re: Walmart Store - [KRK-HXLQD-158]

 Gmail

**Alvaro Lizaraso** ▢▢▢▢▢▢▢▢▢▢

## Re: Walmart Store - [KRK-HXLQD-158]
18 messages

**Tatiana S** <support@mail.salessupport.ladesk.com>
▢▢▢▢▢▢▢▢▢   <lizarasobusiness@gmail.com>

**Hi Alvaro,**

We are taking care of  his, thank you!

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email:** Tatiana@passivescaling.com

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso <▢▢▢▢▢▢▢▢▢▢>
Sent: 12/07/2022 17 51 03

Hi Tatiana,

Thank you for  he update. Please keep me posted.

On another note, I'm receiving emails from customers from the Fb Marketplace Store. I have forwarded you a recent one. I'm assuming someone else is receiving these messages and taki

Attaching a screenshot for your reference.

Best,
Alvaro.

-----Original message-----
From: Ta iana S <support@mail salessupport.ladesk.com>
Sent: 12/07/2022 16:47 08

Hi Alvaro,

I wanted to follow up with your about the Walmart store.

We have submitted the appeal yesterday, and we are wai ing on Walmart's final decision.

Please check  he confirmation below:

**Walmart Marketplace Support**   December 06, 2022 09:55 AM



Hello Alvaro L,

Thank you for contacting Walmart.com Partner Support!

We received your request and your case # is 04459526. Be on the lookout for an email or phone call, if you requested a call, from one of our support specialists who will be h

In the meantime you can always continue to add more information by replying to this email or viewing your case information https://sellerhelp.walmart.com/seller/s/cases?cas
In the meantime, please try searching our help articles by clicking here.

Thank you for your partnership,
Walmart.com Partner Support

We will follow up with you once we have more details.

**Kind Regards,**
**Tatiana S.**

Senior Procurement Manager
Email: Tatiana@passivescaling.com

**If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.**

---

Tatiana S <support@mail.salessupport.ladesk.com>                    Fri, Dec 23, 2022 at 10:01 AM
To: Alvaro Lizaraso

Hi Alvaro,

Walmart has terminated  he account, most likely it's a glitch in their system as they did not respond to our appeal.

Are you interested in setting up a new LLC and re-applying on the Walmart marketplace?

This will be the best solution, and  heir approval rates are higher.

I look forward to hearing from you.

[Quoted text hidden]

---

Alvaro Lizaraso                                                    Fri, Dec 23, 2022 at 10:15 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>

Hi Tatiana,

First of all, what happened  with the funds that were on hold on  hat account? I had around $4k on hold.

Also, my contract ends on March. It doesn't make sense to me to open a new LLC at this point. I will just con inue with the Facebook Shop until then.

Thanks,
Alvaro.
[Quoted text hidden]

Alvaro Lizaraso
Client Acquisition Systems Developer, Digital Marketing Specialist
Miami,  L

in

---

Tatiana S <support@mail.salessupport.ladesk.com>                    Fri, Dec 23, 2022 at 10:35 AM
To: Alvaro Lizaraso

Hi Alvaro,

They will release the funds to your Hyperwallet account.

Got it, we will work on the Facebook shop.

Please let me know if you have any questions.

Kind Regards,
Tatiana S.
Senior Procurement Manager
Email: Tatiana@passivescaling.com

**If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.**

----Original message----
From: Alvaro Lizaraso
Sent: 12/23/2022 16:16 03

Hi Tatiana,

First of all, what happened  with the funds that were on hold on  hat account? I had around $4k on hold.

Also, my contract ends on March. It doesn't make sense to me to open a new LLC at this point. I will just continue with the Facebook Shop until then.

Thanks,
Alvaro.

[Quoted text hidden]

---

Alvaro Lizaraso                                                    Fri, Dec 23, 2022 at 10:46 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>

**Attachment G**

PX7                                    000301

4/17/23, 5:59 PM                                Gmail - Re: Walmart Store - [KRK-HXLQD-158]

Hi Tatiana,

Do you know when this funds will be released?

[Quoted text hidden]
--
[Quoted text hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                          Fri, Dec 23, 2022 at 1:23 PM
To: Alvaro Lizaraso ██████████████████

**Hi Alvaro,**

I don't have a  imeframe, but we can try to open a case with them and find out.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso ██████████████  >
Sent: 12/23/2022 16:46:37

> Hi Tatiana,
>
> Do you know when this funds will be released?
>
> [Quoted text hidden]

---

**Alvaro Lizaraso** ██████████████                                           Fri, Dec 23, 2022 at 1:34 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>

Yes, please. Let's open a case asap.

Thank you.

[Quoted text hidden]
--
[Quoted text hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                          Tue, Dec 27, 2022 at 10 52 AM
To: Alvaro Lizaraso ██████████████

**Hi Alvaro,**

We have opened a case with them, we just need to wait for  heir response.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso ██████████████
Sent: 12/23/2022 19:34 54

> Yes, please. Let's open a case asap.
>
> Thank you.
>
> [Quoted text hidden]

---

**Alvaro Lizaraso** ██████████████                                           Tue, Jan 10, 2023 at 2:04 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>

Hi Tatiana,

Any updates on this? I'd assume Walmart already responded to  he case.

Thanks,
Alvaro.

[Quoted text hidden]
--
[Quoted text hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>
To: Alvaro Lizaraso ████████████████

**Hi Alvaro,**

Nothing yet, we will keep you posted.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso <████████████████ >
Sent: 01/10/2023 20 04:37

Hi Tatiana,

Any updates on this? I'd assume Walmart already responded to  he case.

Thanks,
Alvaro.

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

**Walmart Marketplace Support**   December 06, 2022 09:55 AM

Hello Alvaro L,

Thank you for contacting Walmart.com Partner Support!

We received your request and your case # is 04459526. Be on the lookout for an email or phone call, if you requested a call, from one of our support s

In the meantime you can always continue to add more information by replying to this email or viewing your case information https://sellerhelp.walmart.
In the meantime, please try searching our help articles by clicking here.

Thank you for your partnership,
Walmart.com Partner Support

[Quoted text hidden]

**Attachment G**

**PX7**                                                                                    **000303**

4/17/23, 5:59 PM                                    Gmail - Re: Walmart Store - [KRK-HXLQD-158]

**Alvaro Lizaraso** ▮▮▮▮▮▮▮▮                                                        Thu, Jan 19, 2023 at 8:50 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>

Hi Tatiana,

Can we please try to contact them again? My contract with Passive Scaling is coming to an end soon and my money is still being held.

Thanks,
Alvaro.
[Quoted text hidden]
--
[Quoted text hidden]

---

**Tatiana S <support@mail.salessupport.ladesk.com>**                               Fri, Jan 20, 2023 at 10:12 AM
To: Alvaro Lizaraso <lizarasobusiness@gmail.com>

**Hi Alvaro,**

Could you please check if you are referring to this payout, that was processed back in August?

**Kind Regards,
Tatiana S.
Senior Procurement Manager
Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso ▮▮▮▮▮▮▮
Sent: 01/20/2023 02 50 52

Hi Tatiana,

Can we please try to contact them again? My contract with Passive Scaling is coming to an end soon and my money is still being held.

Thanks,
Alvaro.
[Quoted text hidden]

📄 LIZARASO HOLDINGS LLC_10001128460_MP_08302022_statementssummary.pdf
112K

---

**Alvaro Lizaraso** ▮▮▮▮▮▮▮▮                                                        Fri, Jan 20, 2023 at 4:57 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>

Hi Tatiana,

Thanks for sending this over. I'm trying to find  he link to the Hyperwallet portal login but can't seem to find it. All the ones I've tried do not recognize my email address.

Can you please help me regain access?

Thanks,
Alvaro.
[Quoted text hidden]
[Quoted text hidden]

---

**Tatiana S <support@mail.salessupport.ladesk.com>**                               Mon, Jan 23, 2023 at 10:39 AM
To: Alvaro Lizaraso ▮▮▮▮▮▮▮

**Attachment G**

**PX7**

**000304**

4/17/23, 5:59 PM                                    Gmail - Re: Walmart Store - [KRK-HXLQD-158]

**Hi Alvaro,**

Here is the link: https://walmart.hyperwallet.com/

You should try to login with ███████████

Please let me know if you have any questions or issues.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso <███████████
Sent: 01/20/2023 22 57:29

> Hi Tatiana,
>
> Thanks for sending this over. I'm trying to find  he link to the Hyperwallet portal login but can't seem to find it. All the ones I've tried do not recognize my email address.
>
> Can you please help me regain access?
>
> Thanks,
> Alvaro.
>
> [Quoted text hidden]

---

**Alvaro Lizaraso**                                                                    Fri, Feb 17, 2023 at 9:57 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: Jerdonna@passivescaling.com

Hi Tatiana,

I tried to reach out to Jerdonna about put ing toge her my P&L. I need to do a reconciliation ASAP since my contract is ending in March.

Can you please help me with this? Or put in me in touch with her. She hasn't responded to any of my emails this mon h.

Many Thanks,

Alvaro.
[Quoted text hidden]
--
[Quoted text hidden]

---

**Tatiana S <support@mail.salessupport.ladesk.com>**                                   Mon, Feb 20, 2023 at 10:28 AM
To: Alvaro Lizaraso ███████████
Cc: Jerdonna@passivescaling.com

**Hi Alvaro,**

I will forward your concern to Jerdonna.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Alvaro Lizaraso ███████████
Sent: 02/18/2023 03 57:32

> Hi Tatiana,
>
> I tried to reach out to Jerdonna about put ing toge her my P&L. I need to do a reconciliation ASAP since my contract is ending in March.
>
> Can you please help me with this? Or put in me in touch with her. She hasn't responded to any of my emails this mon h.
>
> Many Thanks,
>
> Alvaro.
> [Quoted text hidden]

---

**Alvaro Lizaraso** ███████████                                                        Wed, Mar 15, 2023 at 5:38 PM

**Attachment G**

**PX7**                                                                                 **000305**

4/17/23, 5:59 PM                                      Gmail - Re: Walmart Store - [KRK-HXLQD-158]

To: Tatiana S <support@mail.salessupport.ladesk.com>, Tatiana S <tatiana@passivescaling.com>

Hi Tatiana,

Hope you are doing well.

I'm trying to get ahold of Jerdonna or  he legal team at Passive Scaling in regard to my refund status. I have not been able to reach  hem via email but Jerdonna told me I could give her a call. Could you please provide me wi h her number? Or any support number I can reach out to?

I'd also appreciate it if you can pin Jerdonna about  his as I was expec ing legal to reach out on Monday but haven't heard back.

Many thanks in advance,
Alvaro.
[Quoted text hidden]
[Quoted text hidden]

---

**Alvaro Lizaraso**                                                      Mon, Mar 20, 2023 at 7:19 PM
To: Tatiana S <ta iana@passivescaling.com>, Tatiana S <support@mail.salessupport ladesk.com>

Hello Tatiana,

Can you please give a support phone number I can reach out to?

Thanks,
Alvaro.
[Quoted text hidden]
[Quoted text hidden]

**Attachment G**
**PX7**                                                                  **000306**

4/17/23, 6:02 PM                                    Gmail - P&L - Alvaro's Contract

 Gmail                                  Alvaro Lizaraso ███████████████

---

## P&L - Alvaro's Contract
2 messages

**Alvaro Lizaraso** ███████████████████        Mon, Jan 30, 2023 at 11:27 AM
To: Jerdonna@passivescaling.com
Cc: Tatiana S <tatiana@passivescaling.com>

Hello Jerdonna,

I'm revisiting our last conversation a few months ago.

My 18-month contract with Passive Scaling is coming to an end in March and I'd like to start the P&L reconciliation process as you recommended to get this process started about a month prior to the contract expiration date.

Please let me know if you need anything on my end.

Many thanks,
Alvaro.



**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL

in

---

**Alvaro Lizaraso** ███████████████████        Wed, Feb 8, 2023 at 11:28 AM
To: Jerdonna@passivescaling.com

Hello Jerdonna,

Following up on this.

Thank you.
[Quoted text hidden]

---

**Attachment H**
https://mail.google.com/mail/u/2/?ik=1c62e552cb&view=pt&search=all&permthid=thread-a:r-586878543572432060&simpl=msg-a:r342934586651113290&simpl…    1/1

 **Gmail**                                                    Alvaro Lizaraso ◄ ████████████████

## 18-Month P&L

4 messages

---

**Alvaro Lizaraso**████████████████                    Mon, Feb 20, 2023 at 5:15 PM
To: info@passivescaling.com
Cc: Jerdonna@passivescaling.com

Hello,

In view that next March 14, 2023, will be 18 working months since I signed the Walmart Automation agreement
with PASSIVE SCALING INC on September 14, 2021, I would like to formally request a P&L report for the stores we
worked on during this period.

Kind regards,
Alvaro.

    **Alvaro Lizaraso**
                         Client Acquisition Systems Developer, Digital Marketing Specialist

                         Miami, FL

                         [in]

---

**Alvaro Lizaraso**████████████████                    Tue, Feb 28, 2023 at 10:21 AM
To: info@passivescaling.com
Cc: Jerdonna@passivescaling.com

Hello,

Can someone please confirm the reception of this email?

I don't want to have to schedule a call just to see if my email has been received.

Thank you,
Alvaro.
[Quoted text hidden]
--
[Quoted text hidden]

---

**Alvaro Lizaraso**████████████████                    Wed, Mar 15, 2023 at 10:00 AM
To: Jerdonna@passivescaling.com
Cc: info@passivescaling.com

Hello Jerdonna,

I tried calling you yesterday but couldn't reach you. I haven't gotten an email from legal yet. I was expecting it on Monday.

Can you please help me with this?

Many thanks,
Alvaro.
[Quoted text hidden]

---

**Alvaro Lizaraso**████████████████    **Attachment H**    Wed, Mar 15, 2023 at 4:07 PM

4/17/23, 5:58 PM                                                Gmail - 18-Month P&L

To: Jerdonna@passivescaling.com

I've scheduled a call with you on the 3rd but I need an update earlier for obvious reasons. Can you please put me in touch with legal?

[Quoted text hidden]

4/17/23, 6:00 PM                                    Gmail - Request for Refund

 Gmail                                    **Alvaro Lizaraso** ███████████████

---

## Request for Refund
4 messages

---

**Alvaro Lizaraso** ███████████████                        Fri, Mar 17, 2023 at 4:37 PM
To: info@passivescaling.com
Cc: Jerdonna@passivescaling.com, amanada@passivescaling.com, Tatiana S <tatiana@passivescaling.com>

Hello,

I'm writing to officially request a refund on my investment per section 10. REFUND POLICY, point A in the Walmart Automation agreement signed between PASSIVE SCALING INC and me on September 14, 2021. Attaching a copy of the agreement.

I requested a P&L report a month ago (Feb 20th) and still haven't received it. Not even a response from the legal team yet.

I'm reaching out for the 5th time in the last 30 days to request the initiation of the refund process as March 14th, 2023 marked 18 months from the date of signing.

I expect a response as soon as possible.

Thank you,
Alvaro Lizaraso.

--

**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL


in

---

 **Walmart Automation.pdf**
891K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>          Fri, Mar 17, 2023 at 4:37 PM
To: lizarasobusiness@gmail.com

### Address not found

Your message wasn't delivered to
**amanada@passivescaling.com** because the address couldn't be found, or is unable to receive mail.

**LEARN MORE**

**Attachment I**

The response was:

```
550 5.1.1 The email account that you tried to reach does not exist. Please try double-
checking the recipient's email address for typos or unnecessary spaces. Learn more at
https://support.google.com/mail/?p=NoSuchUser fy18-20020a17090b021200b0023b3a78ae
f1sor1260737pjb.29 - gsmtp
```

Final-Recipient: rfc822; amanada@passivescaling.com
Action: failed
Status: 5.1.1
Diagnostic-Code: smtp; 550-5.1.1 The email account that you tried to reach does not exist. Please try
 550-5.1.1 double-checking the recipient's email address for typos or
 550-5.1.1 unnecessary spaces. Learn more at
 550 5.1.1  https://support.google.com/mail/?p=NoSuchUser fy18-20020a17090b021200b0023b3a78ae
f1sor1260737pjb.29 - gsmtp
Last-Attempt-Date: Fri, 17 Mar 2023 13:37:52 -0700 (PDT)

---------- Forwarded message ----------
From: Alvaro Lizaraso ██████████████████
To: info@passivescaling.com
Cc: Jerdonna@passivescaling.com, amanada@passivescaling.com, Tatiana S <tatiana@passivescaling.com>
Bcc:
Date: Fri, 17 Mar 2023 15:37:36 -0500
Subject: Request for Refund
----- Message truncated -----

---

**Alvaro Lizaraso** ██████████████████                              Fri, Mar 17, 2023 at 4:39 PM
To: Sherica S <sherica@passivescaling.com>

[Quoted text hidden]

📄 **Walmart Automation.pdf**
   891K

---

**Alvaro Lizaraso** ██████████████████                              Mon, Mar 27, 2023 at 1:16 PM
To: info@passivescaling.com, Jerdonna@passivescaling.com

Hello,

I'm following up once again in regard to the status of the refund I requested. If I do not get an answer this week, I'll be
getting my lawyers involved.

Thank you,
Alvaro.
[Quoted text hidden]

**Attachment I**

**PX7**                                                              **000311**



Alvaro Lizaraso <lizarasobusiness@gmail.com>

## Sherica S <sherica@passivescaling.com> messaged you on Google Chat while you were away

1 message

**Sherica S (via Google Chat)** <chat-noreply@google.com>                     Mon, Mar 20, 2023 at 11:17 PM
To: ███████████████

**Attachment I**

**PX7**

**000313**

Sherica S <sherica@passivescaling.com> messaged you on Google Chat while you were away



**Sherica S**
Hi there, this is Sherica from Passivescaling sending you a message request.



**Alvaro Lizaraso**
Hello



**Sherica S**
Hello, how are you?



**Alvaro Lizaraso**
Hello,

I'm writing to officially request a refund on my investment per section 10. REFUND POLICY, point A in the Walmart Automation agreement signed between PASSIVE SCALING INC and me on September 14, 2021. Attaching a copy of the agreement.

I requested a P&L report a month ago (Feb 20th) and still haven't received it. Not even a response from the legal team yet.

I'm reaching out for the 5th time in the last 30 days to request the initiation of the refund process as March 14th, 2023 marked 18 months from the date of signing.

I expect a response as soon as possible.

Thank you,
Alvaro Lizaraso.



**Sherica S**
Hi there, I will pass this on to our escalation team.

[ Open in Google Chat ]

Google Chat: An intelligent messaging app, built for teams.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you have been mentioned in this conversation by a Google Chat user. You cannot reply to this email. You may have received this email from Google Chat even if you use classic Hangouts. Learn more

Unsubscribe from these emails by changing your email reminder preferences for Google Chat.

Email reminder preferences cannot be set on mobile devices. Learn more

**Google™**

Gmail - Sherica S <sherica@passivescaling.com> messaged you on Google Chat while you were away

**Attachment I**

**PX7**

**000315**

4/17                                           Gmail - Payment Receipt

**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL

in

Create your own email signature

---

**Alvaro Lizaraso**                                         Wed, Apr 5, 2023 at 5:26 PM
To: Frances Schaper <payments@optimyzedigital.com>

Hello Frances,

I'm writing to officially request a refund on my investment per section 10. REFUND POLICY, point A in the Walmart Automation agreement signed between PASSIVE SCALING INC and me on September 14, 2021. Attaching a copy of the agreement.

I requested a P&L report a month ago (Feb 20th) and still haven't received it. Not even a response from the legal team yet.

I'm reaching out for the 6th time in the last 45 days to request the initiation of the refund process as March 14th, 2023 marked 18 months from the date of signing.

I expect a response as soon as possible.

Thank you,
Alvaro Lizaraso.

On Fri, Sep 17, 2021 at 11:57 AM Frances Schaper <payments@optimyzedigital.com> wrote:
> Hi Alvaro,
>
> I apologize for the typo in your name in my last email!
>
> I confirmed with Passive Scaling that they received your payment.
>
> Tatiana, from onboarding, as well as our client success team will be reaching out to you in the next 24 business hours regarding next steps.
>
> Have a great weekend!
>
> Frances
>
> On Thu, Sep 16, 2021 at 12:10 PM Frances Schaper <payments@optimyzedigital.com> wrote:
>> Hi Alvarp,
>>
>> Thank you for sending this over!
>>
>> I will confirm with Passive Scaling that they received your wire and reach back out to you ASAP.
>>
>> Best,
>> Frances
>> [Quoted text hidden]
>> --

**Payments**
Optimyze Digital LLC

_____

payments@optimyzedigital.com

**Attachment I**

**PX7**                                                      **000316**

4/17/23, 6:19 PM                                          Gmail - Payment Receipt

www.optimyzedigital.com

3333 Michelson Dr. Suite 300, Irvine, CA



## Payments

Optimyze Digital LLC

payments@optimyzedigital.com

www.optimyzedigital.com

3333 Michelson Dr. Suite 300, Irvine, CA

[Quoted text hidden]

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Wed, Apr 5, 2023 at 5:26 PM
To:

### Address not found

Your message wasn't delivered to
**payments@optimyzedigital.com** because the address couldn't
be found, or is unable to receive mail.

**LEARN MORE**

The response was:

550 5.1.1 The email account that you tried to reach does not exist. Please try double-
checking the recipient's email address for typos or unnecessary spaces. Learn more at
https://support.google.com/mail/?p=NoSuchUser m31-20020a634c5f000000b005130d9f6e
6fsor5727733pgl.67 - gsmtp

Final-Recipient: rfc822; payments@optimyzedigital.com
Action: failed
Status: 5.1.1
Diagnostic-Code: smtp; 550-5.1.1 The email account that you tried to reach does not exist. Please try
 550-5.1.1 double-checking the recipient's email address for typos or
 550-5.1.1 unnecessary spaces. Learn more at
 550 5.1.1  https://support.google.com/mail/?p=NoSuchUser m31-20020a634c5f000000b005130d9f6e
6fsor5727733pgl.67 - gsmtp
Last-Attempt-Date: Wed, 05 Apr 2023 14:26:58 -0700 (PDT)

**Attachment I**

**PX7**                                                                    **000317**

4/17/23, 6:19 PM                                              Gmail - Payment Receipt

---------- Forwarded message ----------
From: Alvaro Lizaraso ███████████████
To: Frances Schaper <payments@optimyzedigital.com>
Cc:
Bcc:
Date: Wed, 5 Apr 2023 17:26:44 -0400
Subject: Re: Payment Receipt
----- Message truncated -----

4/17/23, 5:59 PM                                    Gmail - Updated Budget [Lizaraso Holdings]

 Gmail                                    **Alvaro Lizaraso** ▉▉▉▉▉▉▉▉▉

## Updated Budget [Lizaraso Holdings]
3 messages

**Kycheree** <support@mail.salessupport.ladesk.com>                Tue, Mar 21, 2023 at 3:23 PM
To: Alvaro Lizaraso ▉▉▉▉▉▉▉▉▉▉▉▉▉ >

Hi ,

My name is Kycheree, I am managing all the data entry for your Amazon Store, including messages, performance notification, and any stranded inventory issues, etc.
I wanted to reach out and get an updated budget for your store Lizaraso Holdings  for FBA inventory. Please let us know about the remaining budget for the month.
If you choose not to purchase more inventory, I will mark your store appropriately to make sure no new orders are placed for the store. This would also mean we will mark your store as inactive for the next week.

Sincerely,
Kycheree
Kind Regards,
Kycheree.
Passive Customer Support
Direct: (850)721-1791
Email orders@passivescaling.com

\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\*

**Alvaro Lizaraso** ▉▉▉▉▉▉▉                                Tue, Mar 21, 2023 at 3:43 PM
To: Kycheree <support@mail.salessupport.ladesk.com>

Hello,

I've been trying to reach support for several weeks now about my refund. Can I please get in touch with someone at the legal department?

Thank you,
Alvaro.
[Quoted text hidden]


**Alvaro Lizaraso**
Client Acquisition Systems Developer, Digital Marketing Specialist

Miami, FL

in

**Alvaro Lizaraso** ▉▉▉▉▉▉▉                                Tue, Mar 21, 2023 at 11:52 PM
To: Kycheree <support@mail.salessupport.ladesk.com>

Hello,

I'm writing to officially request a refund on my investment per section 10. REFUND POLICY, point A in the Walmart Automation agreement signed between PASSIVE SCALING INC and me on September 14, 2021. Attaching a copy of the

**Attachment J**

**PX7**                                                            **000319**

4/17/23, 5:59 PM                          Gmail - Updated Budget [Lizaraso Holdings]

agreement.

I requested a P&L report a month ago (Feb 20th) and still haven't received it. Not even a response from the legal team yet.

I'm reaching out for the 5th time in the last 30 days to request the initiation of the refund process as March 14th, 2023 marked 18 months from the date of signing.

I expect a response as soon as possible.

Thank you,
Alvaro Lizaraso.
[Quoted text hidden]

---

📄 **Walmart Automation.pdf**
891K



**PX7**                    **000321**



**PX7**

**000322**



000323

