## DECLARATION OF ERNEST BALENZUELA
### Pursuant to 28 U.S.C. § 1746

I, Ernest Balenzuela, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Ernest Balenzuela. I am over the age of 18 and reside in Fort Collins, Colorado.

2. In March 2020 I began looking for a way to make money online. I tried running an ecommerce store on Shopify by myself. By December 2020, I lost $20,000 trying to run this Shopify store. I decided I wanted to hire a professional company to manage an ecommerce store for me rather than continue to lose money running a store on my own. I found a company named Optimyze Digital LLC ("Optimyze") through an ad I saw on Facebook. Over the course of a few months, I spoke with someone named Roman Sterling, a senior sales officer with Optimyze. Optimyze was located at 3349 Michelson Dr., Suite 22, Irvine, CA 92612-0653. It had an "A" rating on the Better Business Bureau's ("BBB") website. Roman told me that the company had a warehouse and inventory, and I watched a marketing video that showed the warehouse. This was attractive to me because two of the issues I had with my store were finding vendors for products to sell and renting warehouse space. Roman also told me that I would make passive income because the management company would do all the work on my store and they just needed investment capital.

3. At first Roman told me that Optimyze could manage my store for approximately $100,000. I thought that was too high and said no. Then Roman told me that he could also offer me a $50,000 or a $30,000 option. Roman told me that if I spent $50,000, I would make $50,000 back within two years, my store would be profitable, and my store would be an

1

asset that was valuable.  He also told me that if I didn't make $50,000 within 18 months, there was a guaranteed refund.  So, worst case scenario was if I did not make my money back in 18 months, I would get the initial $50,000 fee back. The $99 a month management fee seemed like the most I would lose.

4.   A big selling point for me was that the company had a warehouse and, after 18 months, if the ecommerce stores did not make money, I would get my $50,000 deposit back.  Because I believed my store would be profitable and there was little risk because of the money-back guarantee, I decided to go with the $50,000 option, which included two Amazon ecommerce stores and one Walmart ecommerce store.  Roman sent me a contract that was with a company called Passive Scaling Inc.  I was confused because I assumed it would be with Optimyze.  Roman told me that Passive Scaling had a great success rate.  The contract stated that the initial fee was for "warehousing expenses, full time employees and benefits, consulting expertise, web build and store build, web build and store build for Amazon subaccounts, product selection & initial inventory."  Attached as **Attachment A** is a true and correct copy of the contract.

5.   I signed the contract for two Amazon stores and one Walmart store in June 2021 with Passive Scaling Inc.  My initial fee for these stores was $50,000.  In addition to the initial fee, the contract also required me to pay a $99 software salesforce management fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a management fee (starting "the following month after fulfillment of the initial payment").  My initial fee was supposed to include these two additional charges (a total of $50,298).  The contract was signed by Steven Bratislav Rozenfeld, CEO of Passive Scaling Inc.  The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, New Jersey 07020.  *See* **Attachment A**.

2

6. The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

7. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in their advertisements or over the phone with the sales agent.  I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

8. I wired $50,000 to Passive Scaling's bank account at JP Mogan Chase in two wires. I first wired $5,000 to Passive Scaling and my point of contact was Shion Galata. Tatiana@passivescaling.com, a Passive Scaling employee, confirmed she received the wire.  Then I wired the remaining $45,000 directly to  Passive Scaling.

9. I was told that through this contract, Passive Scaling was committed to providing me with three profitable online stores or fully refunding my $50,000 deposit.

10. Passive Scaling opened two Amazon stores on my behalf, one using the "Fulfilled by Amazon" or "FBA" model and the other one using the "Fulfilled by Merchant" or "dropshipping" or "FBM" model.  The main difference between the two models is how inventory is handled.  With FBA, inventory is ordered in bulk and stored in a Passive Scaling warehouse.  Then, Passive Scaling processes those items and ships those items in bulk to Amazon's warehouse for my store.  Amazon fulfills customers' orders as they are purchased from my store.  With dropshipping, once a client orders an item on my store, inventory is purchased from another retailer (like Walmart) and shipped to the client.  I

thought Passive Scaling would use my $50,000 to buy products under the FBM model and ship them to customers directly from their warehouse.

11. In approximately December 2021, I started having monthly meetings with Michael at Passive Scaling for my FBA store, and I began paying what I believe to be a third party $99 per month for software to manage the sales and backend of my store. My FBA store had its first sales in approximately February 2022. I spent approximately $4,200 in inventory that was sent to Passive Scaling's warehouse at 10 Milltown Court, Unit B, Union, NJ 07083, and I made approximately $1,000 in sales the first few months. Passive Scaling took its profit off the top and used the rest to pay five months of the monthly software fee.

12. Sales slowed after a few months. I had approximately ten different items to offer in the FBA store and two sold out. The other ones did not sell very much, but I was hopeful the store would do well because two items sold out.

13. In approximately May 2022, Michael told me that Passive Scaling was going to set up an Amazon FBM store for me because I would make more profit with the FBM model. The FBA store was just part of the store setup process to build trust with Amazon, but the FBM store is where the real profit is made. Michael met with me through a Google meet call and walked me through how to se up the Amazon FMB store.

14. In approximately August 2022, my Amazon FBM store took off, and it looked like I was going to make money with the store. When a customer ordered a product on my store, Passive Scaling fulfilled that order by purchasing the product at Walmart. I spent $15,984.53 for inventory purchased from Walmart and made $20,984.53 in sales. I asked Michael@passivescaling.com, my client support, why Passive Scaling used Walmart to

PX16                                000915

purchase inventory and he told me that e-commerce rules are always changing, but Passive Scaling has many customers and knows how to properly handle all of the rule changes.

15. Soon after, customers started complaining. There were many mistakes in orders and consumers complained for a variety of reasons. For example, one complaint was about selling subpar products. Apparently, the headphones Passive Scaling sold on my store were used, even though Passive Scaling marketed the headphones as new and priced them as if they were new. Of the $15,984.53 spent on inventory, I only received approximately $12,365.16 of my sales because of the refunds. So, I lost approximately $3,619.37 initially for the FBM inventory.

16. In approximately August 2022, I received an Amazon notice that my store was selling products without permission, and that my store was violating trademark laws. Passive Scaling said they had permission to sell these products, but it failed to include my store name on the documentation, so it appeared like I was infringing on a trademark. Passive Scaling said it would fix the documentation and it would be fine. Passive Scaling said they have many stores and this happens once in a while.

17. In early September 2022, I received several notices from Amazon that my listings had pricing errors and inaccurate information, and some of my products were not registered with California as per state regulations. Amazon deactivated some of my listings as a result. Passive Scaling did not respond in a timely manner, and Amazon sent a notice reminding us that we had to respond. Since Passive Scaling was supposed to be managing my store, it was Passive Scaling's responsibility to respond. Attached as **Attachment B** is a true and correct copy of these notices.

18. Within a few days of receiving these notices, on September 7, 2022, Amazon deactivated my stores due to suspected nefarious activity and violations of "Amazon's Seller Policies

and Seller Code of Conduct" and "the Amazon Drop Shipping policy." Because I had lost $20,000 on my own, at this point I was still trusting in Passive Scaling's professional experience and their representations that they had many successful Amazon and Walmart store owners and that filing corrected paperwork was just part of the ecommerce online business process. Attached as **Attachment C** is a true and correct copy of the deactivation notice.

19. On approximately September 9, 2022, Amazon responded to Passive Scaling's appeal letter and said that my store was deactivated due to violating the dropshipping policy. Passive Scaling said, "we acknowledge that our carelessness is to blame" and "the majority of the time, this occurs when we process a lot of orders and an employee isn't fully aware of how crucial the packaging is to the client." Attached as **Attachment D** is a true and correct copy of this message.

20. Passive Scaling told me that Amazon shuts down stores all the time and Passive Scaling will handle it. During my monthly meeting, I was told that the appeal did not work and Passive Scaling would appeal again and would appeal multiple times if necessary.

21. Passive Scaling attempted to open my Walmart store, but the application was denied. Passive Scaling tried two separate storefronts with Walmart and both were denied.

22. In October 2022, I received a revenue share invoice from a company called FBA Support NJ Corp. located at ███████████ Edgewater, NJ ████ It said it was for monthly revenue share for my Amazon store sales in August 2022, even though I never made a profit from those sales and the sales were wiped out by the high volume of returns. Attached as **Attachment E** is a true and correct copy of this invoice. Passive Scaling took the money for this invoice out of my initial sales from my FBA store.

23. In approximately November 2022, during a monthly meeting with Jerdonna Palmer,

6

Director of Client Support at Passive Scaling, I asked about my reimbursement for FBA products I purchased and that were warehoused by Passive Scaling for my store. These products were worth approximately $3,271.08. I never received a response to any of my questions about the whereabouts of my products.

24. In approximately December 2022, I began discussions with Jerdonna for obtaining a refund. Under the contract, I was entitled to a refund since two of my stores were deactivated. Jerdonna just engaged in delay tactics by stating that Passive Scaling would continue to appeal Amazon's decision to deactivate my stores.

25. Between December 2022 through July 2023, I reached out to Passive Scaling at least ten times through various means, including emails, phone calls, mail via USPS, mail via Fedex, and text requesting a refund. I did not receive any resolution. By February 2023, I was also entitled to a refund because I hit the 18-month mark and I did not make my $50,000 back. Jerdonna again asked for more time to complete the Amazon appeal process. Because Amazon was holding over $12,000 of my funds from sales and Jerdonna claimed that Passive Scaling had an Amazon appeals process that worked 10 out of 10 times, I agreed to wait for one more Amazon appeals attempt.

26. Not only did I spend $50,000 for the initial fee, I also spent approximately $25,000 for merchandise, and $2,400 in monthly software fees.

27. In April 2023 Jerdonna Palmer said she had an Amazon appeals process that had worked 10 out of 10 times. so I gave Passive Scaling one more chance., I found out that Passive Scaling's latest attempt to reactivate my Amazon stores failed.

28. In approximately May 2023, I noticed that Passive Scaling now had an "F" rating on the BBB website. I also hired a lawyer who suggested that I avoid the expense of arbitration, which was supposedly required under the contract. My legal counsel advised me to start

filing complaints to persuade Passive Scaling to issue my refund. I filed a complaint with the BBB. Passive Scaling did not reply to this complaint, and the BBB closed the complaint as "Passive Did not respond" after 40 days. I ended up paying $5,000 in legal fees and had nothing to show for it.

29. It wasn't until May 2023, that I learned that the deactivations occurred due to dropshipping, trademark infringement, sale of used items as new, and discrepancies between listed and delivered product versions (e.g., high-end models listed vs. low-end models delivered). In May 2023 I began the process of reviewing the Amazon FBM store closure process, and began my the appeals process on my own.

30. During approximately June through August 2023, I filed complaints with the Colorado State Attorney General, the New Jersey State Attorney General, and the Federal Trade Commission.

31. In approximately July 2023, I received a response from Passive Scaling that it received my May 2023 request for a refund and was working on a settlement agreement.

32. In the meantime, I made several attempts to get the money I made from my Amazon stores which Amazon had been holding onto because of the deactivation status. In approximately September 2023, I was able to obtain a payout from Amazon FBM for $12,365.16. I spent approximately $16,000 for products. Amazon was supposed to pay me for $20,000 in sales, but $4,000 went to refunds, so Amazon paid me approximately $12,000. Both of my Amazon stores (FBM & FBA) are still closed, though.

33. In approximately October 2023, I hired a new lawyer to handle arbitration proceedings.

34. In approximately November 2023, Passive Scaling finally got back to me with a settlement offer. It offered to refund me $35,000 of $50,000 with a minimum of $1,000 monthly payments. I was sent a settlement agreement that was very one-sided and included a clause

8

that looked like a gag order.  It said, in part, 'Client further agrees to leave no Bad Reviews (Meaning any post, public writing, message, statement, report or complaint that is derogatory or damages the reputation of Passive)….If Client has already left a Bad Review, Client agrees to take it down within thirty (30) days of execution of this Agreement."  I had to remove all complaints and agree not to speak about the case.  The agreement said that a company called 3PL Logistics Inc. (a warehousing company registered in New Jersey, with its principal place of business located at 525 South Ave, Plainfield, NJ 07060-1925 and phone number of 908-561-2624) would make the payment on the settlement from a "Repayment Fund" sourced from 3PL "profits."  In addition, the "Repayment Fund" was set up to "provide the Settlement Amount for all parties who have requested a refund with Passive."  The agreement felt very one-sided in Passive Scaling's favor, and I felt as if it would set me up to fail.  Attached as **Attachment F** is a true and correct copy of this agreement.

35. After all this time, I did not trust Passive Scaling, and I declined the offer.  I responded with a counteroffer.  I asked for $45,000 with payments of $2,000 per month.  I also wanted a clause that said if Passive Scaling missed a payment, we would revert back to the original contract and go back to arbitration.  Passive Scaling did not respond to my counteroffer.

36. I started the arbitration process in December 2023.  Passive Scaling has been nonresponsive throughout the arbitration process.  On April 5, 2024, I had a preliminary hearing with an Arbitrator and Passive Scaling did not show up or participate.  No one from Passive Scaling has responded to any correspondence since November 2023 and the American Arbitration Association representative confirmed that Passive Scaling has not responded to any of its direct communications either.  There will be a final hearing on May 31, 2024.

37. My losses from my Amazon FBM store totaled approximately $3,619, and my losses from my Amazon FBA store totaled approximately $3,271. So far, I have spent approximately $18,427 in legal fees just to try and get my money back from something that was supposed to have a money-back guarantee.

38. Passive Scaling uses a warehouse company that I believe resells returned products bought with the client's credit card. This happens when an ecommerce store, like Amazon FBA, returns products. The company name is Daily Distro LLC, its website is dailydistro.com, and its address is 78 John Miller Way, Suite 2107, Kearny, NJ 07032. Daily Distro and Passive Scaling use many of the same employees. I received an invoice from Daily Distro in June 2022. Attached as **Attachment G** is a true and correct copy of this invoice.

39. Some of the Passive Scaling employees I worked with include Jerdonna Palmer, Director of Client Support, whose email is Jerdonna@passivescaling.com; Charisse V, my Amazon Business Manager, whose email is charisse@hourlyrelief.com; Tatiana S., Senior Procurement Manager, whose email is Tatiana@passivescaling.com; Kathleen Camasura, whose email is kathleen@hourlyrelief.com; Anna Marie S., an account specialist with FBA.Support, whose email address is annamarie@hourlyrelief.com; Michael, Amazon FBM/FBA client support, whose email address is support@mail.salessupport.ladesk.com; Kristel L, FBM Support Direct, whose email is FBM@hourlyrelief.com; Kycheree Kaye Calo, managing data entry for Amazon store and Customer Service Specialist with Sales.Support, whose email is kycheree@sales.support; Michael, Amazon FBA client support, whose email is Michael@passivescaling.com; and Hally, onboarding for Passive Scaling, whose email address is hally@passivescaling.com.

40. I printed out part of Passive Scaling and Optimyze's websites.  Attached as **Attachment H** is a true and correct copy of these printouts.

 I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _____, 2024

Fort Collins, Colorado                         _____

                                                Ernest Balenzuela



# Delivering on Your eCommerce Objectives

**Project Proposal**
Amazon & Walmart Automation

**Delivered on**
June 10, 2021

**Client**
Ernest Balenzuela

**Company**
PASSIVE SCALING INC

Attachment A

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** <br> Minimum management fee of $199 per month **or** twenty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | $199 | Monthly | $199 |
| **Software Fee** <br> Fee paid directly to software provider | $99 | Monthly | $99 |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. <br><br> *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* <br><br> **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

Attachment A

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of June 10, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Ernest Balenzuela, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $50,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-accounts), and one (1) e-commerce stores on the Walmart platform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Amazon/Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.

   B. Review, research, source, select, and list products for the Client's Stores.

   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2021-06-11 02:49:34 UTC

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon/Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon/Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifty thousand dollars ($50,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



2025-06-11 12:49:34 GMT3

Attachment A

3

000926

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM -**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon/Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.


2021-06-11 12:49:34 GMT3

<div align="center">Attachment A</div>

4

6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Amazon/Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon/Walmart, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon/Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon/Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



Attachment A

5

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2021-06-11 12:49:34 GMT3

Attachment A

6

E. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

F. **Maintenance of Confidential Information**, The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

G. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

H. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



2021-06-11 12:45:34 GMT3

**Attachment A**

10. **REFUND POLICY –**

    A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

    B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($50,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($50,000.00).



2021-06-11 12:49:34 (ADT)

**Attachment A**

8

000931

11. **LIMITATION OF LIABILITY -**

   A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.



2021-06-11 12:49:34 (MT)

**Attachment A**

9

12. **DISCLAIMERS AND RELEASE -**

   A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES, CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

   B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2021-06-11 12:49:34 GMT

C.  **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon/Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon/Walmart products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon/Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon/Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



2021-06-11 12:40:34 GMT3

Attachment A

D. **Amazon/Walmart Terms and Conditions –** Client hereby understands that Amazon/Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon/Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon/Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Amazon/Walmart policy, whether currently in effect or as may be amended by Amazon/Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Amazon/Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS –**

A. **Non-exclusivity –** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices –** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ▮▮▮▮▮▮▮▮▮▮▮▮ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.


2023-08-11 17:49:34 (MDT)

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution –** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2021-06-11 12:49:34 GMT0

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel –** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.


2021-06-11 12:49:34 GMT3

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client -** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



2021-06-11 12:49:34 (MDT)

**Attachment A**

15

O.  **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P.  **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2021-08-11 12:49:34 GMT

Attachment A

16

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



2021-06-11 12:49:34 (MDT)

**Attachment A**

17

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's



2021-08-11 12:45:34 (MDT)

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

**Attachment A**

19

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Ernest Balenzuela authorized representative and agent for service of process Date: June 11, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

*Ernest Balenzuela*
2021-06-11 12:49:14 (ADT)
_____

Ernest Balenzuela

**CONSULTANT:**

By: PASSIVE SCALING INC. STEVEN BRATISLAV ROZENFELD, CEO, authorized representative and agent for service of process.

Date:  June 11, 2021

*Steven Bratislav Rozenfeld*
2021-06-11 12:50:54 (ADT)
_____

Steven Bratislav
Rozenfeld

**Attachment A**

20

**Auden GameTimeTables**

| | |
|---|---|
| **From:** | no-replies-appeals@amazon.com <donotreply@amazon.com> |
| **Sent:** | Sunday, September 4, 2022 2:55 PM |
| **To:** | Auden GameTimeTables |
| **Subject:** | Your Amazon.com Listing |



Dear Game Time Tables,

We are contacting you because we have observed that your listings may include inaccurate information, such as potentially inaccurate pricing. In order to ensure that customers can shop with confidence on Amazon, please review your listing information, confirm the accuracy of listings and make sure you are capable to fulfill orders with the listing price set by you. You can find Amazon's policies regarding information accuracy in Seller Central Help, including:

-- Selling Policies and Seller Code of Conduct

(https://sellercentral.amazon.com/gp/help/G1801)

How do I address this issue?

Go to Inventory menu on Seller Central, and select "Manage Inventory" to

(a) Review your offer price and quantity on the ASIN mentioned below

(b) Update your offer price and quantity if it is inaccurate

ASIN: B07W4XNFV8

We're here to help.

If you have questions about these policies or your account, please contact us at

(https://sellercentral.amazon.com/cu/contact-us).

Thank you,

Amazon.com

<u>Was this email helpful?</u>

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2022 Amazon, Inc, or its affiliates. All rights reserved.

Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210



**Attachment B**
**PX16**

**000945**

**Auden GameTimeTables**

| | |
|---|---|
| **From:** | Amazon Seller Central Notifications <donotreply@amazon.com> |
| **Sent:** | Sunday, September 4, 2022 11:59 PM |
| **To:** | Auden GameTimeTables |
| **Subject:** | Listings deactivated due to potential pricing error |



Dear Seller,

We have deactivated the listings noted in this email due to detected pricing errors or in accordance with Amazon's Marketplace Fair Pricing Policy. You can view more information and take steps to reinstate these listings by visiting the Pricing Health page in Seller Central.

Examples of pricing errors include offers priced below your specified 'minimum price', above your specified 'maximum price', or offers priced significantly higher than recent prices offered on or off Amazon. Sellers are responsible for setting their own prices in our store. When possible, we share reference prices for these products to help inform typical price ranges expected by customers.

If you believe that we took this action in error, or have questions or need help, click the "Help" link at the top of Seller Central.

Regards,

Amazon Services

---------------------- Listings with Potential Pricing Errors ----------------------

**Note:** If you have more than 100 listings with potential pricing errors, only the first 100 are listed here.

| ASIN | SKU | PRICE |
|---|---|---|
| B00XW1RJ80 | SKU-FBM-AM-1348048 | 734.58 |

**Attachment B**
**PX16**

**000946**

**Was this email helpful?**

If you have any questions visit: Seller Central

To change your email preferences visit: Notification Preferences

Copyright 2022 Amazon, Inc, or its affiliates. All rights reserved.

Amazon.com, 410 Terry Avenue North, Seattle, WA 98109-5210



**Attachment B**

**PX16**

**000947**

**Auden GameTimeTables**

| | |
|---|---|
| **From:** | Amazon Services <seller-info@amazon.com> |
| **Sent:** | Tuesday, September 6, 2022 4:17 AM |
| **To:** | Auden GameTimeTables |
| **Subject:** | Important: Restriction on plumbing product sales in the state of California on Amazon.com |

Hello,

We are contacting you to inform you that we have identified some of your ASINs as plumbing products that are not registered with the state of California Energy Commission (CEC).

The sales of plumbing products in California are regulated by the CEC. As per the CEC, your plumbing products must be registered in the CEC's database to be sold in California.

Note: This will not cause your product to be restricted from sale in the Amazon store. However, your products won't be available for sale into California until further action is taken.

Click the below link to view your ASINs:
https://rp-messaging-secure.s3.amazonaws.com/PreSigned_URL/CEC_JSR/Seller/2022/09/01/408954128902.csv?X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Credential=AKIAV45YJ5OTUO2GK2P3%2F20220901%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Date=20220901T195558Z&X-Amz-Expires=604800&X-Amz-SignedHeaders=host&X-Amz-Signature=a53190fa5e90ee84245bdcdf50873133b39770c1ce44e2ac6ff5a087348ff2d2

For more information on this policy, go to California Energy Commission (CEC):
https://sellercentral.amazon.com/gp/help/external/help.html?itemID=7PNYFCP46WHA3RL

Why is this happening?
The CEC requires that certain plumbing products sold into California meet minimum efficiency standards and product registration requirements.

For more information on the CEC efficiency standards and product registration requirements, go to the CEC's website:
https://www.energy.ca.gov/rules-and-regulations/appliance-efficiency-regulations-title-20

What do you need to do to ensure you can continue to sell these products in California?
There are two steps to ensure your products can be sold into California:

1. Your plumbing products must be properly registered under the CEC's Modernized Appliance Efficiency Database System (MAEDbS): https://www.energy.ca.gov/rules-and-regulations/appliance-efficiency-regulations-title-20/appliance-regulations-certification

For details on how to register your products, go to: https://cacertappliances.energy.ca.gov/Login.aspx

Note: It will take several weeks to register your products with the CEC.

2. Once your products are registered in the database, update the (a) model number, (b) manufacturing company name, and (c) brand name of your product on your Amazon detail page through the "Manage Inventory" setting, and ensure that the information matches with the CEC database.

1

**Attachment B**
**PX16**                                                                              **000948**

For more information, go to Update your listing:
https://sellercentral.amazon.com/help/hub/reference/G201836910

Once you have completed the above steps, you do not need to take any additional steps and your ASINs will be reinstated automatically on a biweekly basis.

What happens if I do not provide the requested information?
If you do not provide the requested information for the above products, your listings will continue to be restricted from sale in California.

What should you do if you think we made an error?
If you believe that your listings are incorrectly identified as plumbing products, you can contact us at:
https://sellercentral.amazon.com/help/hub/support

If products have been removed from sale into California, you can contact us via your Account Health page:
https://sellercentral.amazon.com/performance/dashboard?reftag=ah_em_rp

We appreciate your compliance with the state and local regulations.

The Amazon Services team

**Auden GameTimeTables**

| | |
|---|---|
| **From:** | csba-us2us-t1-paragon@amazon.com |
| **Sent:** | Tuesday, September 6, 2022 3:49 PM |
| **To:** | Auden GameTimeTables |
| **Subject:** | RE:[CASE 10720771001] Amazon CSBA Order ID: [111-0028688-2939459] |

We haven't received your reply yet and wanted to remind you to respond within 24 hours of the initial request so that we can get a timely resolution for your customer. If we don't receive a response, we'll take the next best action for the customer according to the Amazon policy outlined on the CSBA Help Page.

Thank you for your help.

Thank you for selling with Amazon,

Mary S
Amazon.com CSBA
=====================================

MORE WAYS TO GET HELP:
Browse all Seller Help topics: http://sellercentral.amazon.com/gp/help

**Attachment B**
**PX16**                                                    **000950**



**Your Amazon seller account has been deactivated**

Amazon <no-replies-appeals@amazon.com>
To  Auden GameTimeTables

Wed 9/7/2022 9:32

If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

Hello,

Your Amazon seller account has been deactivated in accordance with section 3 of Amazon's Business Solutions Agreement. Your listings have been removed.

Why did this happen?
We took this measure due to your violation of Amazon's Seller Policies and Seller Code of Conduct https://sellercentral.amazon.com/gp/help/G1801, and your violation of the Amazon Drop Shipping policy https://sellercentral.amazon.com/gp/help/G201808410.

After 90 days following this notification, you may separately request a funds disbursement by contacting disbursement-appeals@amazon.com. We will conduct a separate investigation to evaluate your account. If we find that you have engaged in deceptive, fraudulent, or illegal activity; or have abused our systems or repeatedly violated our policies that protect our customers and selling partners, we may withhold some or all funds in your account.

You can view your account performance at https://sellercentral.amazon.com/performance/dashboard?reftag=email_suspend or select Account Health on the home screen of the Amazon Seller app on your iOS or Android device. The Account Health page shows how well your account is performing against the performance metrics and policies required to sell on Amazon.

We may not respond to further emails about this issue.

**Attachment C**

**PX16**                                **000951**



6/4/23, 11:13 AM                                                                                              Amazon

FEEDBACK ✕

Attachment D

**PX16**

**000953**

6/4/23, 11:13 AM                                        Amazon

Overview                    Reply                    Confirmation

Account Health  >  Reactivate your account

# Reactivate your account

**Need help on next steps?**

We notice that you have repeatedly submitted requests for this issue.
Speak to an Account Health Specialist for immediate support!

Call me now

ⓘ We completed our evaluation of your submission. We do ✕
not have enough information to remove the violation at
this time.

## Next Steps

- Check Performance Notifications for more information on your submission.
- You can submit new information for review.

Submit new information

## History

### Submission

April 7, 2023 3:43 PM MDT
Additional information
Dear Amazon Seller Performance Team,

I am submitting an appeal for my account to address the Drop Shipping
Policy and Seller Code of Condcut Violation that was flagged on my
account. I am including user permission history showing that I have already
removed third party service provider access on my account and I am the one
managing it now together with documents showing that I have also cut ties
with this provider.


Thank you so much for your time!


Sincerely,
Game Time Tables LLC



**Attachment D**

Attached

Help | Program Policies | English | Download the Amazon Seller mobile app
© 1999-2023, Amazon.com, Inc. or its affiliates

Gam... lan ... .pdf
E-Commerce Consulting Contract Agreement - Game Time Tables.pdf
Letter to Optimyze Digital.pdf
Payment confirmation from Optimyze Digital.pdf
This is where they gave me back the access to my account.pdf
This is where I revoked their permission from the account.pdf

view less

**Submission**

April 4, 2023 3:14 PM MDT
Additional information
Dear Amazon Seller Performance Team,

I am submitting an appeal today to address the alledged violation happened in my account. I have also added supporting documents as proof that this violation happened while the account is under the management of the third party service provider that I previously hired.

I can assure you that I have done my best to ensure that this violation will never happen again.

Thank you for your time and patience while going through my submission.

Sincerely,
Ernest Balenzuela
Game Time tables LLC

Attached
Game Time Tables Plan of Action.pdf
E-Commerce Consulting Contract Agreement - Game Time Tables.pdf
Letter to Optimyze Digital.pdf
Payment confirmation from Optimyze Digital.pdf

view less

**Submission**

March 20, 2023 12:22 PM MDT
Additional information
Dear Amazon,

I am submitting an appeal today for my account about the violation that it was flagged for. I just got a full access to this account from the third party service provier who I hired before to manage it for me. I take full responsibility of any wrongdoings that happend in my account. Please know that I do not condone nor agree to any of it. I would like to be a better Amazon seller moving forward. I had laid out my plan to this appeal on how I would like to move forward with my business.

Thank you for your time in reviewing it.

FEEDBACK ×

Sincerely,

Attachment D

6/4/23, 11:13 AM                                                                                                Amazon

Sincerely,
Ernest Balenzuela
Game Time Tables

Attached
    Game Time Tables – Plan of Action.pdf
    E-Commerce Consulting Contract Agreement - Ernest Balen... view more

### Submission

February 28, 2023 2:54 PM MST
Additional information
Dear Amazon,

I am writing to submit an appeal in regard to my violation of the Amazon
Seller Policies, Seller Code of Conduct, and Dropshipping Policy. I would like
to take this opportunity to provide an explanation and express my sincere
regret for any inconvenience this may have caused.

Thank you for your time and consideration.

Sincerely,
Game Time Tables

Attached
    Game Time  Tables_Plan of Action.pdf
    GAME TIME TABLES 2.pdf
    GAME TIME TABLES 3.pdf
    GAME TIME TABLES 4.pdf
    GAME TIME TABLES 1.pdf
... view more

### Submission

January 30, 2023 1:42 PM MST
Additional information
Dear Amazon Seller Performance Team,

We are submitting this appeal to share our plan of action for resolving the
Dropshipping violation in our account. We deeply regret any inconvenience
caused and assure you that we are fully committed to rectifying our mistake
and implementing preventive measures to avoid such incidents in the
future.

With this plan, we vow to always strive to be an exceptional Amazon Seller
that consistently upholds customer trust and satisfaction.

Yours sincerely,
Game Time Tables

Attached
    GameTimeTables_POA.docx.pdf
    Game Time Tables Seller Fulfilled Orders - Sheet1.pdf

### Submission                    **Attachment D**

Amazon

January 15, 2023 4:30 PM MST
Additional information
Dear Seller Performance Team,

Our Amazon Seller account is currently deactivated due to our violation of
the Amazon Dropshipping policy and Amazon Selling policy and seller code
of conduct. We understand that Amazon does not take this kind of violation
lightly and we are taking full responsibility for our mistake that led us to
unintentionally violate these Amazon policies.

Sincerely Yours,
Game Time tables LLC

Attached
    Game Time Tables Plan of Action.docx.pdf

---

## Submission

September 9, 2022 7:46 AM MDT
Has your account been deactivated in error?
Dear Amazon USA Seller Performance Team,

This has to do with my seller account's current situation. I'm deactivated for
violating the Dropshipping Policy. I sincerely sorry for the inconvenience our
carelessness has caused you and your customer. My team had no idea that
this was going to occur. Definitely, the future will not repeat this mistake.
Below is a copy of our plan of action.

The root cause of the issue

The packaging of the product that the consumer got was the source of their
displeasure. A consumer may have been confused after receiving a product
in the incorrect packaging. The majority of the time, this occurs when we
process a lot of orders and an employee isn't fully aware of how crucial the
packaging is.
to the client. We acknowledge that our carelessness is to blame.

Corrective Steps or Plan of Action
... view more

**FBA Support NJ Corp**



Edgewater, NJ ███ US

## INVOICE

BILL TO
Ernest Balenzuela

| | INVOICE | 2116 |
| --- | --- | --- |
| | DATE | 10/03/2022 |
| | TERMS | Due on receipt |
| | DUE DATE | 10/03/2022 |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
| --- | --- | --- | --- | --- | --- |
| | Services | Amazon Monthly Revshare- August 2022 | | | 381.43 |

BALANCE DUE  **$381.43**

# Settlement Agreement and Release of Claims

This Settlement Agreement and Release of Claims dated **June 10, 2021** (the "Agreement") is made between **Ernest Balenzuela** ("Client"), with a place of business (or) residence at **191 UNIVERSITY BLVD STE 364 DENVER, CO 80206,** and Passive Scaling Inc. ("Passive"), a company registered in the State of New Jersey. Client and Passive are sometimes referred to herein individually as a Party and collectively as the Parties. This Agreement is effective as of the date it is signed by the last Party to sign it, as indicated by the date next to such Party's signature ("Effective Date").

Whereas, the Parties , entered into an agreement executed on **November 2, 2023** (the "Contract"), a copy of which is attached hereto], pursuant to which Passive agreed to perform certain services to manage Amazon and/or Walmart online storefronts for Client as more fully set forth in the Contract.

WHEREAS, to avoid the expense and uncertainty of further litigation, the Parties have agreed to settle as between themselves pursuant to the following terms. The Parties have agreed to settle said disputes and differences with respect to the Contract (the "Dispute") by executing this mutual Settlement Agreement and Release.

Whereas, the Parties recognize that by the execution of this mutual Settlement Agreement and Release, they are relinquishing their respective legal rights with respect to the aforementioned Contract.

Therefore, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1. **Consideration.** Client acknowledges and agrees that it has received good, valuable and sufficient consideration for executing this Release. In particular, upon execution of this release by Client, Passive shall enroll Client in the Repayment Fund until Client receives **$35,000 USD** (the "Settlement Amount") as explained in Section 2 of this Agreement. Client acknowledges and agrees that it will not be entitled to and shall not assert any claim for any additional amount from Passive other than the payment to be made hereunder. Client agrees that it will not seek anything further, directly or indirectly, for itself or any person, corporation, partnership or other entity, including any other payment or consideration, with respect to the Dispute and the claims released pursuant to this Agreement. Client shall be solely responsible for any and all taxes that may be owed to any federal, state, or local taxing authority as a result of the settlement payment received under this Agreement.

**Attachment F**

2. **Repayment Fund.** Client acknowledges and agrees that it shall receive the Settlement Amount pursuant to its participation in the Repayment Fund. The Repayment Fund is set up to provide the Settlement Amount for all parties who have requested a refund with Passive. Each month Passive will take the total amount of money in the Repayment Fund and distribute it equally among the participants of the Repayment Fund. The Repayment Fund shall be sourced from the profits of 3PL Logistics, a warehousing company whose principal place of business is in New Jersey. Client acknowledges and understands that 3PL Logistics is an unaffiliated entity owned by an officer of Passive. Nothing in this Agreement establishes any relationship, obligation or promise between Client and 3PL Logistics. 3PL Logistics is referenced herein solely to the extent necessary to establish the parameters in which Passive shall place money into the Repayment Fund.

   a. Each month, starting on **October 30, 2023**, Passive shall place **10%** of the monthly profits of **3PL Logistics** into the **Repayment Fund**. Passive shall additionally provide a monthly Profit and Loss Statement so that the Client can have insight into the monthly amount being placed into the fund by Passive. The client understands that the amount being placed into the Repayment Fund is subject to change from month to month. A payment could be much higher or lower from one month to another.

   b. The client will receive their first payment from the fund **30 days after** signing this agreement. The payments will continue monthly until the sum mentioned under **Consideration (USD 35,000)** is paid in full.

   c. The Clinet will receive a **minimum** of **USD 1,000 or a maximum of USD 5,000** per month

3. **Release.** Client and Passive do hereby release, cancel, and forever discharge the other Party and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives from any and all claims, complaints, causes of action, demands, damages, obligations, liabilities, losses, promises, agreements, controversies, penalties, expenses, and executions of any kind or nature whatsoever, whether known or unknown, actual or potential, whether arising in law or in equity, which each Party may have, may have had, or may in the future obtain, arising out of or relating out of the acts, omissions, agreements, or events relating in any manner to the Contract and the Dispute (the "Release").

4. **Effect.** This Release is intended to be a general release in the broadest form. It is understood and agreed that the Parties hereby expressly waive any and all laws and statutes, of all jurisdictions whatsoever, which may provide that a general release does not extend to claims not known or suspected to exist at the time of executing a release which if known would have materially affected the decision to

**Attachment F**

give said release. It is expressly intended and agreed that this Release does, in fact, extend to such unknown and unsuspected claims related to anything which has happened to the date hereof which is covered by this Release, even if knowledge thereof would have materially affected the decision to give this Release. In addition, the Parties warrant and represent to the other that the execution and delivery of this Release does not, and with the passage of time will not, violate any obligation of the Party to any third party. Each Party further represents and warrants that it has not assigned any of its rights with respect to the Dispute and the Contract to any other party.

5. **No Admission.** Client and Passive expressly agree and acknowledge that this Release represents the settlement and compromise of disputed claims, and that by entering into this Agreement neither Party hereto admits or acknowledges the existence of any liability, obligation, or wrongdoing on its part. Each Party expressly denies any and all liability with respect to the Dispute. Client understands that they are being provided this settlement offer even if they might not otherwise be entitled to a refund under their Contract with Passive in the interest of avoiding further litigation.

6. **Independent Legal Counsel.** The Parties acknowledge that they have had the opportunity to consult with independent legal counsel regarding the legal effect of this Agreement and the Release and that each Party enters into this Agreement freely and voluntarily.

7. **Who is Bound.** Each Party is bound by this Agreement. Any person or corporation, partnership or other entity which succeeds to a Party's rights and responsibilities is also bound. This Agreement is made for the benefit of the Parties, their past, present and future officers, directors, shareholders, employees, and agents, and the Parties' affiliates and subsidiaries, and all who succeed to their rights and responsibilities, as well as any successors and assigns of the Parties.

8. **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, notwithstanding its choice of law provisions. The Parties agree that any claims or legal actions by one Party against the other to enforce the terms of this Agreement or concerning any rights under this Agreement shall be commenced and maintained in any state court located in the State of New Jersey.

9. **Confidentiality.** The Parties agree to keep confidential all the terms and conditions of this Agreement, as well as all negotiations and discussions leading up to this Agreement.

10. **Reformation/Severability.**   If any court determines that any term of this Agreement is excessive in duration or scope or is unreasonable or unenforceable under the applicable laws, it is the intention of the Parties that such restriction may be modified or amended by the court to render it enforceable to the

**Attachment F**

maximum extent permitted by the applicable laws. In the event that any portion, word, clause, phrase, sentence or paragraph of this Agreement is declared void or unenforceable by any court, tribunal or arbiter of competent jurisdiction, the Parties mutually agree that such portion shall be considered severable and separable from the remainder, and the validity of the remainder of the Agreement shall remain unaffected, including the releases set forth hereinabove, and shall remain binding and enforceable.

11. **No Active Lawsuits.** Client understands that in signing this Agreement, Client agrees to discontinue and refrain from initiating any lawsuits related to the Dispute and the Contract within thirty (30) days of the execution of this Agreement. Client further agrees to leave no Bad Reviews (Meaning any post, public writing, message, statement, report or complaint that is derogatory or damages the reputation of Passive and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives) against Passive and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives. If Client has already left a Bad Review, Client agrees to take it down within thirty (30) days of execution of this Agreement. Client acknowledges that the failure to meet its obligations under this section shall be deemed a default under this Agreement and Client would waive its rights and entitlement to payment from the Settlement Fund.

12. **Fees and Expenses.** Each Party hereto shall bear its own fees and expenses (including attorneys' fees) incurred in connection with the Dispute, this Agreement and the consummation of the transactions contemplated hereby.

13. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument, without necessity of production of the others. An executed signature page delivered via facsimile transmission or electronic signature shall be deemed as effective as an original executed signature page.

14. **Waiver.** No waiver of any term or right in this Agreement shall be effective unless in writing, signed by an authorized representative of the waiving Party. The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision or any other provision of this Agreement thereafter.

15. **No Negative Interpretation:** This Agreement embodies the arms-length negotiation and mutual agreement between the Parties and shall not be construed against either party as having been drafted by such party. As such, the Parties further agree that this Agreement has been jointly drafted, so that in the event any portion, word, clause, phrase, sentence or paragraph of the Agreement is deemed ambiguous, said ambiguity shall not be construed against either of the Parties.

**Attachment F**

Each of the Parties acknowledges that it: (i) has read this Agreement and fully understands the contents and legal effects thereof; (ii) has been given a reasonable amount of time to consider this settlement; (iii) has been advised by counsel as to the meaning and implications of this Agreement or has voluntarily waived procurement of counsel; and (iv) desires to enter into this Agreement and is doing so voluntarily and without coercion.

16. **Entire Agreement.** This Agreement sets forth the entire and complete understanding and agreement between the Parties regarding the subject matter hereof including, but not limited to the settlement of all disputes and claims with respect to [the Contract and] the Dispute, and supersedes any and all other prior agreements or discussions, whether oral, written, electronic or otherwise, relating to the subject matter hereunder. Any additions or modifications to this Agreement must be made in writing and signed by authorized representatives of both Parties. The Parties acknowledge and agree that they are not relying upon any representations or statements made by the other Party or the other Party's employees, agents, representatives or attorneys regarding this Agreement, except to the extent such representations are expressly set forth herein.

17. **Successors.** This Settlement Agreement is binding upon the heirs, successors and assigns of the Parties, and inures to the benefit of the heirs, successors and assigns of the Parties.

18. **Further Documents.** The parties agree to execute any further documents, instruments and agreements reasonably necessary to effectuate the terms and intentions of this Settlement Agreement

19. **Headings.** The headings in this Settlement Agreement are inserted for convenience only and shall not affect its construction.

20. **Authority to Bind.** By signing below the Parties represent that the signatories are authorized to execute this Agreement on behalf of themselves and/or their respective business entities and that the execution and delivery of this Agreement are the duly authorized and binding acts of their respective businesses.

*<signature page follows>*

**Attachment F**

**PX16**                                            **000963**

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed as of the date first set out above.

PASSIVE SCALING, INC.

_____          _____
By:                                  By:
Title:                               Title:
Dated:                               Dated:

**Attachment F**



**DAILY DISTRO LLC**
4211 35TH ST
LONG ISLAND CITY
NY, 111012301
2012557995

**INVOICE**

June 29, 2022
06292022_ERNEST

**BILL TO**

Ernest Balenzuela

**SHIP TO**

FBA16RL4PL19
Amazon
Amazon ABE8

| Description | Vendor SKU UPC | Vendor | Prep Totals | | | | Product Costs | | |
| | | | Prep Required | Bundle Quantity | Shipped Bundles | Total | Single | Price | Total |
|---|---|---|---|---|---|---|---|---|---|
| Tiptree Preserve, Tawny Orange Marmalade 340g x 3 Pack | 106039 43647390011 | KeHe - 111 | Labeling: $0.34 Pack: $0.46 | 3 | 48 | Labeling: $16.32 Pack: $22.08 Total: $38.40 | 144 | -- | -- |
| Mix 2D Labels | | -- | -- | -- | -- | -- | 24 | $0.34 | $8.16 |
| Box Labels | | -- | -- | -- | -- | -- | 24 | $0.34 | $8.16 |

**Remarks / Payment Instructions: Credit Card**

| | |
|---|---|
| SUBTOTAL | $0.00 |
| DISCOUNT | $0.00 |
| SUBTOTAL LESS DISCOUNT | $0.00 |
| PREP TOTAL | $54.72 |
| TAX RATE | 0.00% |
| TOTAL TAX | $0.00 |
| SHIPPING/HANDLING | $14.40 |
| TOTAL | $69.12 |
| CREDIT CARD SURCHARGE (3.5%) | $2.42 |

| | |
|---|---|
| **Total** | **$71.54** |
| **Balance Due** | **$71.54** |

Passive Scaling – Your Partner in Automated eCommerce Solutions

☰

(https://passivescaling.com)

# Your Trusted Partner
# in e-Commerce Solutions

**We'll set up, manage, and optimize your automated Amazon or Walmart store giving you a hands-free passive income stream.**

Passive Income  |  **100**% Transparent  |  Stres-Free Onboarding  |  Customer Support

Attachment H

PX16

**000966**

Passive Scaling – Your Partner in Automated eCommerce Solutions

# Who We Are



## 1+

Clients



## 1+

Million sold



## 1

Warehouses



## 1+

Employees

**Attachment H**

**PX16**

**000967**

Passive Scaling – Your Partner in Automated eCommerce Solutions

# Our Areas
# Of Expertise

## Fully Automated Walmart Business

We will build you a fully automated Walmart Store from the ground up and use our expertise to
manage it into a successful 7 figure business. Our research methods help us know which
products are profitable to sell.

LEARN MORE ABOUT WALMART
(https://passivescaling.com/walmart-business/)

**Attachment H**

**PX16**

**000968**

Passive Scaling – Your Partner in Automated eCommerce Solutions

# Fully Automated Amazon Business

Your Amazon Business will be set up, managed, and expanded by us. Our team of professionals will work on your store continually and around-the-clock to ensure that the company is moving in the proper way.

LEARN MORE ABOUT AMAZON
(https://passivescaling.com/amazon-fba/)

# Why Partner With Us



**Attachment H**

**PX16**

**000969**

5/26/23, 4:42 AM

Passive Scaling – Your Partner in Automated eCommerce Solutions

## Hands-Free Passive Income

This is a **fully automated investment** service. After providing the required documentation and the capital for this investment, we can take over. We will **launch, operate and scale** your eCommerce Store. In simple words, you are the investor, we are the experts leading the charge.



## 100% Transparent

We like to keep things 100% transparent and ethical. Our company has **strong moral leadership.** We understand that transparency is key and we plan on providing you with all the information you require. Once you give us the green light, you can sit back and **get paid.**

Passive Scaling – Your Partner in Automated eCommerce Solutions



## Stress-Free Onboarding

Our goal is to provide a **stress-free onboarding**. Our process is very **informative** and on point. Our skilled team will provide you with all the information you need to know. At the end of the onboarding, there will be **no questions unanswered**. If you are new to the eCommerce Business, we will guide you and educate you on the backend to ensure that you have a complete understanding of your business.



## Customer Support

Our Customer Support team consists of highly skilled individuals that will answer all your questions and concerns regarding your account. We offer 24/7 communication via **LiveChat, telephone,** and **e-mail.**  To reach us by, click on the About us page in the top menu. Whatever way of communication you choose, our team will provide you with a fast and accurate answer. We got your back at all times.

# What We Do
# For You



**Attachment H**

**PX16**

Passive Scaling – Your Partner in Automated eCommerce Solutions

Onboarding
Process



**Build Business
Website**



**Set up of Store on
Amazon/Walmart**



**Product Research, Analytics,
and Listing**



**Order Processing
and Repricing**



**Attachment H**

**PX16**

**000972**

Passive Scaling – Your Partner in Automated eCommerce Solutions

**Inventory
Management**



**Confirm Shipments
and Tracking**



**Optimize Feedback
Service**

# Are you ready to take your business to the next level?

**SCHEDULE A FREE CONSULTATION
(https://go.oncehub.com/NewClientConsultation)**

**Attachment H**

**PX16**

Passive Scaling – Your Partner in Automated eCommerce Solutions

# Client Testimonials

*I went from struggling to pay bills to being financially independent in a span of 5 months. Words cannot describe how thankful I am to the Passive Scaling team. Even from day one I just had this feeling that I can trust the team. I am really satisfied with the support that I received each time I had a question.*

‹ ›

**Jacob L.**

**Attachment H**

**PX16**

**000974**

Passive Scaling – Your Partner in Automated eCommerce Solutions

# About Us

Passive Scaling is a growth agency that mainly focuses on increasing our clients' access to automated online business ventures. The company was founded in 2014.

Since then, we have helped over 1750 clients and sold over 120 million in eCommerce via Amazon FBA, Dropship, and Walmart Dropship. We have 7 warehouses across the USA set up for Next day shipping in the future. Our team consists of over 120 employees from four countries.

If you are looking to invest in a completely hands-free eCommerce Business, please click the button below to get in touch with us. The consultation is free, and by the end of the call, you will know if this works for you.

LEARN MORE
(https://passivescaling.com/about-us/)

(https://passivescaling.com)

Copyright ©2022 Passive Scaling

**Attachment H**

**PX16**

**000975**

Contact – Passive Scaling

(https://passivescaling.com)

# Contact Us

## Questions, comments? Here's how to reach us:



info@passivescaling.com



(201) 503-4116



2011 8th, Street Suite 102, North Bergen, NJ 07047

## Or, use the form and we'll get in touch

Name

Email

Phone

Message

**Attachment H**

**PX16**

**000976**

5/26/23, 4:43 AM

Contact – Passive Scaling

Send

(https://passivescaling.com)

Copyright ©2023 Passive Scaling

≡

https://passivescaling.com/contact/

**Attachment H**

**PX16**

2/2

**000977**

PROGRAMS ∨     CASE STUDIES     BLOG          ABOUT US     CONTACT     FAQ

WHY WE DO WHAT WE DO

# Optimizing Digital Strategies



In 2017, Founder & CEO Justin Jeffers started an e-commerce venture to supplement his income between undergrad and med school. Three months later, his business flew past seven figures of revenue, marking the beginning of an explosive entrance into digital entrepreneurship. After starting several largely successful e-commerce companies, Justin began offering his online expertise as a comprehensive digital service.

Shortly after, Justin teamed up with Asante Monadjemi , a social entrepreneur with a passion for philanthropy, specialized in operational management and rapidly scaling businesses. Together Justin and Asante founded Optimyze Digital with a mission to help people grow their companies without the risk of traditional services.

Today Optimyze manages over seven figures a month in advertising spend for our clients, ensuring that we stay informed and continue to deliver the best possible services in the constantly evolving digital space.

Attachment H

**PX16**                                                                                      **000978**

About Us | Digital Marketing Strategies | Optimyze Digital

As a minority owned business, our ambition is to be a catalyst for the growth of our community. We are committed to empowering, uplifting, and collaborating with businesses and people who have a common interest in equality, justice, and progress. We take tremendous pride in our work, and strive to be a model for successful business in the space of digital marketing strategies.

I

II

III

Attachment II

PX16

000979



Attachment H

**PX16**    **000980**

About Us | Digital Marketing Strategies | Optimyze Digital



Attachment II

PX16

000981