## DECLARATION OF EUEAL BERTA
### Pursuant to 28 U.S.C. § 1746

I, Eueal Berta, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Eueal Berta.  I am over the age of 18 and reside in Aldie, Virginia.

2. In approximately fall 2021, I started looking for help online to set up an ecommerce store.  I came across a company called Optimyze Digital while performing Google searches and looked up the company.  It seemed like a legitimate company that helped people set up ecommerce stores—third party stores that sell products to consumers on Walmart's or Amazon's websites.  I reached out, and the company sent me a video explaining what they do and their business model.

3. I watched the video that was dated August 31, 2021.  The beginning had text that said the company name, Optimyze Digital, and the video was about a client Testimonial and Q&A by the moderator, co-founder Asante Monadjemi.  There was also text that said the testimonial was from someone who purchased a Walmart store in June 2021 that went live on July 4th, 2021, and was producing over $50,000 in sales revenue by August 31, 2021.  The video was of a zoom call that appeared to be of employees of Optimyze Digital and prospective clients.  I learned that Optimyze Digital was responsible for marketing, sales, and customer support, but the company passed their clients off to other companies to open the stores and perform all of the work for those stores.  Optimyze Digital mentioned it partners with two companies, Ascend and Passive Scaling.  I thought the video was helpful and the company appeared legitimate.  I provided a video of this Zoom call on approximately December 19, 2023 to the FTC called "Optimyze Digital – Live QA 8-31-21."

1

4. I watched another video where Asante Monadjemi narrated and showed a store that had total sales revenue of $5,297,625.23 from September 26, 2019 to April 26, 2021. Apparently, the sales within the first 3 months of the store were $339,000.

5. I reached out to Optimyze Digital to learn more. While I was discussing the business opportunity with the sales agents at Optimyze Digital, I was sent a projections calculator where I could put in how much I wanted to invest, and it would tell me how much I would make in profit based on my investment. I was told that with a $35,000 budget for inventory, I could make approximately $7,000 to $8,000 per month within 3 to 4 months. The more I invested, the more I would make. Attached as **Attachment A** is a true and correct copy of this projections calculator.

6. I learned that Optimyze Digital was going to partner me with a company called Passive Scaling Inc. According to the contract, Passive Scaling was supposed to source wholesale products, fulfill customer orders, handle customer support, and manage the entire store.

7. Because I thought I would be able to make $7,000 to $8,000 per month, I decided to invest $65,000; $30,000 for the initial fee for two Amazon stores and then the rest for purchasing inventory for both stores. I was required to spend a minimum of $10,000 for inventory per store (but the contract says, "Recommended credit available for expedited scaling process is $25,000"). I decided to provide $35,000 using business credit cards. I signed the contract and submitted all the necessary documents in October 2021. I made an ACH payment to "Passive Scaling, Inc." (a New Jersey-based company) for $30,000. The contract also required me to pay a $99 software fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a

management fee.  The contract was signed by Amanada Peremen, Operations Manager at Passive Scaling, Inc.  The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, NJ 07020.  Attached as **Attachment B** is a true and correct copy of the contract.

8.  The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

9.  I never received any document from Optimyze Digital or Passive Scaling with any information substantiating the earning and profit claims contained in their advertisements, projections calcuator, or over the phone with the sales agent.  I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past three years.

10.  One of my stores was verified and ready to open by October 27, 2021.

11.  Prior to signing the contract, the sales agents responded immediately to any questions I had.  The problems started after I paid the initial fee.  Communication became difficult, and it was difficult to get a hold of anyone to help me at Passive Scaling.

12.  A store manager was eventually assigned to me on November 29, 2021.

13.  I delayed opening my second store and reached out to my assigned representatives.  I told my representatives, Toni (support@mail.salessupport.ladesk.com) and Russel

(russel@hourlyrelief.com), that I had no limit on the credit card I would use for inventory on the second store, so we could raise the budget at any time.  I reminded them of the projections calculator estimate they gave me during the sales process and that they told me that with a $35,000 budget, my store could hit $7,000 to $8,000 per month in profits. I asked if that was doable for this second store with a budget of $40,000.  I told them my target was to make at least $7,000 monthly profit.  Attached as **Attachment C** is a true and correct copy of this email.  I did not receive a response.

14. After eight months of operation, my first store had only generated $23,500 in sales with no profit, despite the expectation that it would generate $80,000 in sales and $8,000 profit per month.

15. I reported the lack of profits via email with supporting documents, but no one at Passive Scaling helped me to make the promised forecasted profitability.  In July 2022, I reached out to Toni (toni@passivescaling.com) and Russel and said, "we are in the 7th month since this store started selling but we are still under $4,000 in total sales per month.  I only have few 0% interest months left on the card and this has become a big concern." Attached as **Attachment D** is a true and correct copy of this email.

16. Communication issues were one of the major problems as my main account managers, Toni and Russel, disappeared without notification, and new account managers would also disappear without notice. In August 2022, I reached out to Toni and asked why I was not hearing from him.  I received a notice that his email account did not exist any longer.  I then reached out to Sherica, another person at the company I'd communicated with, to ask who was managing my accounts.  Attached as **Attachment E** are true and correct copies of these emails.

17. In August 2022, I received an email from info@sales.support that said if I need to update my credit card for sales.support, I  had to do it through a payment page in the 3PL Shipments section of the website.   I sent an email confirming to Steven R at info@sales.support.  Attached as **Attachment F** is a true and correct copy of this email.

18. I gave Passive Scaling my credit cards for purchasing inventory.  Passive Scaling mismanaged my inventory, which did not sell or was not in my store to sell.  This led to $20,000 in credit card debt in addition to my initial $30,000 investment. Since signing the contract, I incurred additional debt and expenses from interest charges and subscription fees, with no profit to show for it.  The subscription was for the sales.support software that I was required to use to track inventory, sales, and shipments and integrated with Amazon's marketplace.  Even though the contract said the money was to be paid to the software provider, I believe that the same owner of Passive Scaling also owned sales.support; Steven R.  I eventually cancelled the sales.support subscription, but I put a freeze on my credit cards so I would not get charged any longer.  When I received reminders of my credit card being charged from sales.support, the messages came from info@sales.support and the profile of the email address was of Steven R. and a picture of him was attached to the message.  I compared this picture to one I found on the Internet about  him,  https://www.getnews.info/1256644/steven-rozenfeld-and-passive-scaling-helping-ecommerce-entrepreneurs-build-grow-and-scale.html.   *See* **Attachment H** below.

19. Between approximately October 2022 and March 2023, I texted Sherica about my credit card debt and issues with inventory.  I told her, "as I was very afraid and as I was telling you, now credit card company started charging interest.  This billing cycle they started

charging the amount was huge.  Interest Charges $823.27 I could not pay down the credit card balance as we are not selling fast and the amount I get paid from AMZ is no where close to repay CC balance for what we paid for inventory.  This takes my losses to a whole new level.  PLEASE TAKE ACTION ASAP."  I also told her, "By now I should have been making 5-7k net as per the initial agreement but I am loosing [sic] hundreds to thousands in fees and interest.  What are my options to exit."  In March 2023, I wrote, "I am DONE with you guys…I have never been frustrated in my life this much.  You really tested my patience to its extreme limits…I don't know how you sleep at night working for a company that drains people's money every day…I lost a lot of money, time and energy in this.  A complete disaster."  By the end of March 2023, Sherica's email no longer worked.  Attached as **Attachment G** is a true and correct copy of this text thread.

20. In March 2023, I could not get a hold of anyone at Passive Scaling and I sent an email to info@sales.support, the company that services the software to find out who was currently in charge.  I never heard back.  Attached as **Attachment H** is a true and correct copy of this email and the photo of Steven Rozenfeld from an online article mentioned in paragraph 18.

21. The contract I signed has a clause that allows me to exit the program and receive a refund after 18 months.  I have attempted to exit the program and receive a refund according to the agreement, but no one has responded to my inquiries.

22. I filed a complaint with the Better Business Bureau ("BBB") and I noticed it has received several similar complaints about Optimyze Digital LLC and Passive Scaling.

23. It is disheartening that I put my trust and hard-earned capital into a company that failed to deliver on its promises and has left me in a worse financial situation than before.  My

total net from one store was a loss of -$20,120.82 and my total net from my second store was $168.12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___02 / 01___, 2024
Aldie, Virginia

Eueal Berta

7



**Attachment A**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Amazon Automation

**Delivered on**
October 14, 2021

**Client**
Eueal Berta

**Company**
PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| "*Store Infrastructure Fee*" - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit **- this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $10,000** | $10,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon pay every two weeks, and this money covers orders until the scheduled store payout. | | | |
| **Recommended credit available for expedited scaling process is $25,000 +** | | | |
| **TOTAL** | | | **$30,298** |

1

**Attachment B**
**PX2**

000085

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of October 14, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd,, Carlstadt, NJ 07020 (hereinafter "Consultant"), and Eueal Berta, (hereinafter "Client"),

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000,00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-account), (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.

    B. Review, research, source, select, and list products for the Client's Stores.

    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2021-10-14 19:53:34 (PDT)

2

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



3

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**

This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2021-10-14 19:53:34 (PDT)

4

6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon, and Consultant holds no legal or equitable rights in Client's Stores.



2021-10-14 19:53:34 (PDT)

5

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2021-10-14 19:53:34 (PDT)

6

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information**, The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



2021-10-14 19:53:34 (PDT)

**Attachment B**
**PX2**

000091

10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00).

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



2021-10-14 19:53:34 (PDT)

8

11. **LIMITATION OF LIABILITY –**

A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE –**

A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



2021-10-14 19:53:34 (PDT)

**Attachment B**
**PX2**

**000093**

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2021-10-14 19:53:34 (PDT)

**Attachment B**
**PX2**                                                    **000094**

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



2021-10-14 19:53:34 (PDT)

11

D. **Amazon Terms and Conditions -** Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ███████████ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



2021-10-14 19:53:34 (PDT)

12

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2021-10-14 19:53:34 (PDT)

13

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



2021-10-14 19:53:34 (PDT)

**Attachment B**
**PX2**

000098

L.  **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M.  **Indemnification of Client –** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N.  **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



2021-10-14 19:53:34 (PDT)

**Attachment B**
**PX2**

**000099**

O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2021-10-14 19:53:34 (PDT)

16

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



2021-10-14 19:53:34 (PDT)

17

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.



2021-10-14 19:53:34 (PDT)

18

6.  "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7.  "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

8.  "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9.  "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

Attachment B
PX2

000103

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Eueal Berta authorized representative and agent for service of process Date:  October 15, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:


2021-10-14 19;53;14 (PDF)

Eueal Berta

**CONSULTANT:**

By: PASSIVE SCALING INC. Amananda Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  October 15, 2021

Amananda Peremen
2021-10-14 22;55;07 (PDF)

Amananda Peremen

 Gmail

**Eueal Berta** ▮▮▮▮▮▮

---

## Amazon Whole ale Buyer for FE Online LLC

**Eueal Berta** ▮▮▮▮▮▮
To: Toni <support@mail.salessupport.ladesk.com>
Cc  Russel C  russel@hourlyrelief.com

Hi Tony and Russel,
Nice to see you here again for  his second store  Regarding the budget, the card we have for the second store has no solid limit  So if the store performs well, we can raise the budget with no ▮▮▮▮
me understand this.
The screenshot below is the forecast/es imate I was given at  he time I signed up for  his program  With a 35K budget, it shows  he store can hit 7 8K client pro it in 3 4 months  Is that doable
40,000 USD.

My target is to get around at least 7K mon hly profit so let me know what budget will get us  here. If my understanding/expecta ion is not correct, please let me know.



| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $621,406 | $1,468,297 | $2,089,703 |
| Expenses | $552,831 | $1,306,050 | $1,858,881 |
| Client's Profit | $68,575 | $162,247 | $230,822 |
| Projected Asset Value at Mo 25 | - | | $748,831 |

Starting Period: Q4
Bundle type: Single Amazon Store
Working Capital Per Store: 35,000
Management Profit Percentage: 35%

**Twenty Four Month Forecast**

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | - | - | 2,259 | 5,648 | 8,391 | 26,156 | 21,975 | 24,683 | 34,430 | 25,849 | 28,30 |
| Gross Revenue | - | - | 6,951 | 17,378 | 25,818 | 80,479 | 67,614 | 75,949 | 105,939 | 79,535 | 87,28 |
| Cost of Goods | - | - | 4,518 | 11,296 | 16,782 | 52,311 | 43,949 | 49,367 | 68,860 | 51,698 | 56,7 |
| Amazon Fees | - | - | 1,390 | 3,128 | 4,647 | 14,486 | 12,171 | 13,671 | 19,069 | 14,316 | 15,7 |
| **Store Profit** | - | - | 1,043 | 2,954 | 4,389 | 13,681 | 11,494 | 12,911 | 18,010 | 13,521 | 14,8 |
| Management Fee | - | - | 365 | 1,034 | 1,536 | 4,789 | 4,023 | 4,519 | 6,303 | 4,732 | 5,1 |
| **Clients Profit** | - | - | 678 | 1,920 | 2,853 | 8,893 | 7,471 | 8,392 | 11,706 | 8,789 | 9,6 |

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | 32,340 | 30,048 | 37,630 | 41,302 | 44,056 | 33,541 | 34,824 | 51,509 | 36,819 | 41,132 | 46,4 |
| Gross Revenue | 99,508 | 92,455 | 115,785 | 127,084 | 135,558 | 103,202 | 107,151 | 158,490 | 113,290 | 126,559 | 142,8 |
| Cost of Goods | 64,680 | 60,096 | 75,260 | 82,605 | 88,113 | 67,081 | 69,648 | 103,019 | 73,639 | 82,263 | 92,8 |
| Amazon Fees | 17,911 | 16,642 | 20,841 | 22,875 | 24,400 | 18,576 | 19,287 | 28,528 | 20,392 | 22,781 | 25,7 |
| **Store Profit** | 16,916 | 15,717 | 19,683 | 21,604 | 23,045 | 17,544 | 18,216 | 26,943 | 19,259 | 21,515 | 24,2 |
| Management Fee | 5,921 | 5,501 | 6,889 | 7,561 | 8,066 | 6,141 | 6,375 | 9,430 | 6,741 | 7,530 | 8,4 |
| **Clients Profit** | 10,996 | 10,216 | 12,794 | 14,043 | 14,979 | 11,404 | 11,840 | 17,513 | 12,519 | 13,985 | 15,7 |

Working Capital = For each two week period

[Quoted text hidden]

 **Gmail**

**Eueal Berta** ████████████

---

## PO for Today

**Eueal Berta** ████████████                                          Tue, Jul 5, 2022 at 11:39 AM
To: Russel C <russel@solydonlinellcstore.com>
Cc: Toni S <toni@passivescaling.com>

Hi Toni/Ruel,
The payments I am receiving are way small to pay down the expenses of the POs we are putting on my card. We are in the 7th month since this store started selling but we are still under $4000 in total sales per month. I only have few 0% interest months left on the card and this has become a big concern.

Can you please provide me a forecast of the next 3 months? How much total revenue/month are we targeting for the next 3 months?

On Tue, Jul 5, 2022 at 9 59 AM Ruel C ruel@olydonlinellctore com wrote

Hi Eueal,

Here is a copy of the PO that we intend to place for Solyd Online LLC today with KEHE.
The total etimated cot of the PO before  KEHE  confirm the availability of the item i $13,420 14
The cost of the PO may be lower than what is stated above depending on the availability of inventory.
We will be placing this order immediately to make sure we secure as much stock as possible. If you have any remarks or comments in regards to this PO, feel free to reply to this email with.

https://docs.google.com/spreadsheets/d/175iWrMM2ZKFU3dhc8tlFPZGPdr8LZTWvUBUtNDa38mU/edit#gid=1219419379

Bet Regard,
RusselC
Amazon Wholesale Buyer
**Solyd Online LLC**

 Gmail

**Eueal Berta** ▇▇▇▇▇▇▇▇

## No updates
3 me  age

---

**Eueal Berta** ▇▇▇▇▇▇▇▇                                    Sat, Aug 13, 2022 at 3:53 PM
To: Toni S <toni@passivescaling.com>

Hello Toni,
Why am I not hearing from you?

I asked multiple times to update the credit card for FE Online LLC but still see big charges on the wrong card. Also no weekly update

I scheduled a meeting with you, Toni and you didn't show up.

Can you plea e let me know if you are  till re pon ible for my account

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>            Sat, Aug 13, 2022 at 3:53 PM
To: ▇▇▇▇▇▇▇▇



### Address not found

Your message wasn't delivered to **toni@passivescaling.com** because the address couldn't be found, or is unable to receive mail

**LEARN MORE**

The response was:

```
550 5.1.1 The email account that you tried to reach does not exist. Please try double-checking
the recipient's email address for typos or unnecessary spaces. Learn more at
https://support.google.com/mail/?p=NoSuchUser r20-20020ab07414000000b00382a831871bsor583352uap.58 -
gsmtp
```

Final-Recipient: rfc822; toni@passivescaling.com
Action: failed
Status: 5.1.1
Diagno tic Code  mtp; 550 5 1 1 The email account that you tried to reach doe  not e i t Plea e try
550-5.1.1 double-checking the recipient's email address for typos or
550-5.1.1 unnecessary spaces. Learn more at
550 5.1.1 https://support.google.com/mail/?p=NoSuchUser r20-20020ab07414000000b00382a83187
1b or583352uap 58  g mtp

**Attachment E**

**PX2**                                                      **000107**

Last-Attempt-Date: Sat, 13 Aug 2022 12:53:31 -0700 (PDT)

---------- Forwarded message ----------
From: Eueal Berta ████████████
To: Toni S <toni@passivescaling.com>
Cc:
Bcc:
Date: Sat, 13 Aug 2022 15:53:20 -0400
Subject: No updates
Hello Toni,
Why am I not hearing from you?

 I asked multiple times to update the credit card for FE Online LLC but still see big charges on the wrong card. Also no weekly update

 I scheduled a meeting with you, Toni and you didn't show up.

Can you plea  e let me know if you are   till re  pon  ible for my account

---

**Eueal Berta** ████████████                                  Sat, Aug 13, 2022 at 3:55 PM
To  Sherica S     herica@hourlyrelief com  , Tatiana   tatiana@  ale    upport

Who is currently managing my accounts? I am having huge problems getting responses from both Toni and Russell
[Quoted text hidden]

**Attachment E**
**PX2**

**000108**

 **Gmail**

**Eueal Berta** ███████████

---

## No updates

**Eueal Berta** ███████████                                    Sat, Aug 13, 2022 at 3:55 PM
To: Sherica S <sherica@hourlyrelief.com>, Tatiana <tatiana@sales.support>

Who is currently managing my accounts? I am having huge problems getting responses from both Toni and Russell

---------- Forwarded message ---------
From: **Eueal Berta** <███████████>
Date: Sat, Aug 13, 2022, 3:53 PM
Subject  No update
To: Toni S <toni@passivescaling.com>

Hello Toni,
Why am I not hearing from you?

I asked multiple times to update the credit card for FE Online LLC but still see big charges on the wrong card. Also no weekly update

I scheduled a meeting with you, Toni and you didn't show up.

Can you plea  e let me know if you are   till re  pon  ible for my account



---------- Forwarded message ---------
From: **Eueal Berta** ██████████████████
Date: Wed, Aug 17, 2022 at 7:55 PM
Subject: Re: Shipments are ON HOLD! Please update ASAP!
To: Steven R <info@sales.support>


Hi Steven,
I was waiting on Toni from Passive scaling because last time your system had a glitch and removed my subscription, I was not able to re-add it and Toni said he is looking into the issue. Looks he is not with the company anymore.

I have updated both the subscription and 3PL sections and hit the retry. Please let me know

On Thu, Aug 4, 2022 at 7:05 PM <info@sales.support> wrote:

> Hello, Eueal Berta, ██████████████████
>
> Previously you added a credit card for your Sales.Support subscription.
>
> However, we have recently implemented a new payment solution and payment page specifically for 3PL SHIPMENTS.
>
> You will see this charge coming from Opulent Automation INC.
>
> You have the following invoices being rejected or unpaid:
>
> 04/19/2022 - SHIPMENT ID FBA16M5NV5RJ - $270.55
>
> 05/02/2022 - SHIPMENT ID FBA16PDZN9W5 - $59.62
>
> 05/02/2022 - SHIPMENT ID FBA16PDYKMS2 - $65.91
>
> 05/06/2022 - SHIPMENT ID FBA16PHLMK22 - $29.81
>
> 05/11/2022 - SHIPMENT ID FBA16PL51TG0 - $73.15
>
> 05/12/2022 - SHIPMENT ID FBA16PV51XW6 - $150.36
>
> 05/25/2022 - SHIPMENT ID FBA16QFN1332 - $161.0
>
> 07/18/2022 - SHIPMENT ID FBA16S81254B - $151.05
>
> Please click HERE"https://sales.support/payments?tab=3pl" to go to the 3PL section of the Payment page to update your card.

It needs to be specifically done on 3PL section, not the subscription tab.

If you had a fraud alert and the card is now OK to charge , please go to the 3PL section and click "RETRY PAYMENT".

--
Thanks,
Eueal

--
Thanks,
Eueal

**Attachment F**
**PX2**

**000111**

Eueal Berta

,

Oct 17, 5:11 PM

<mark>Hi Sherica, as I was very afraid and as I was telling you, now credit company started charging interest. This billing cycle they started charging the amount was huge Interest Charges $823.27 I could not pay down the credit card balance as we are not selling fast and the amount I get paid from AMZ is no where close to repay CC balance for what we paid for inventory This takes my losses to a whole new level. PLEASE TAKE ACTION ASAP</mark>

Sherica S

,

Oct 18, 4:34 PM

Understood, I will have the store looked into again

Eueal Berta

,

Oct 19, 9:20 PM

How much inventory do we have at amz or at the 3PL in dollar amount?

Sherica S

,

Oct 20, 4:28 PM

I would have to comb through to see but I will follow up on this

Sherica S

,

Oct 25, 12:26 PM

Hi Euael

Eueal Berta

,

Oct 25, 12:26 PM

Hey

Sherica S

,

Oct 25, 12:34 PM

So for inventory being sold, we have $11256.80 worth in Amazon's warehouse, I cannot say for sure the dollar amount at 3pl but based on the checks I see approximately 316 units from different POs that have been shipped or is pending shipment

Eueal Berta

,

Oct 25, 12:46 PM

Thanks for checking

**Attachment G**

Eueal Berta

,

Oct 25, 12:53 PM

So what's holding the team from selling these items faster? Like for example, we were selling 1k+ per day on first week of Oct but then sales died after the first week. Why are we not keeping the sales consistent?

Sherica S

,

Oct 26, 1:09 PM

In a lot of cases, it has to do with the BuyBox on Amazon, it fluctuates very often and we do have the AI Repricer set up with different strategies to compete but if it is that we may sell at a loss, the prices will not always be adjusted

Eueal Berta

,

Oct 26, 4:57 PM

Something is not right. Either we purchased these items at high price or something not going well on the sale side of the business. By now I should have been making 5-7K net as per the initial agreement but I am loosing hundreds to thousands in fees and interest. What are my options to exit

Sherica S

,

Oct 27, 9:09 AM

I would have to reach out to someone from the CS team to provide you with some insight, I am only on the operational side of the business.

Eueal Berta

,

Oct 28, 1:26 PM

Yes please do so. I want to have that conversation

Sherica S

,

Oct 31, 9:28 AM

Sure, no problem, I will reach out and have someone contact you

Eueal Berta

,

Nov 4, 8:52 AM

Hi Sherica, any plan for the holiday season

Sherica S

,

Nov 7, 8:59 AM

**Attachment G**

**PX2**                                                                 **000113**

Hi Eueal, we do have the option to switch you to the hybrid model, but that is a bit risky, the profits are higher but there's always the chance of a deactivateion

Eueal Berta
,
<mark>Nov 8, 9:25 PM</mark>
<mark>I need to pay down the credit card. I still have around 25k</mark>

Sherica S
,
Nov 10, 11:39 AM
Hi Eueal, I could have someone assigned to your store to start FBM, let me know your thoughts

Eueal Berta
,
Nov 10, 2:47 PM
Hi Sherica, can we have a phone call so I can assess the risks to make a decision? I want to make sure we have a good plan in case the store is suspended. You know I am stuck with the slow converting inventory and the credit card charges are driving me crazy. I want to make sure we have a plan so the problem does not get worse

Sherica S
,
Nov 10, 5:33 PM
Hi Eueal, let us set up a call here:https://go.oncehub.com/Sherica



Online appointment scheduling
go.oncehub.com

Eueal Berta
,

**Attachment G**

**PX2**                                                                              **000114**

Nov 16, 10:30 AM
Hi Sherica, any updates on the undelivered inventory and the repricing??

Sherica S
,
Nov 17, 9:25 AM
Hi Eueal, I am waiting for the warehouse team to update me on the individual POs, as for the repricing, I have already reached out to the team, usually once the repricing is completed they will alert me.

Eueal Berta
,
Nov 24, 4:47 PM
I saw we had high revenue but I see we are selling with a loss. I compared the sale price with the PO. Are you guys liquidating? Seems to me those guys really put my credit at risk buying unsellable items :(

Sherica S
,
Nov 25, 3:42 PM
Hi Eueal, I will double check that. I also did receive an update from the team regarding the orders that showed as pending, they did confirm that the orders were shipped out but an update from sales.support kicked some statuses back.

Sherica S
,
Nov 28, 7:28 PM
Hi Eueal, I see you sent some bank statements over, do they cover all charges associated with the store?

Eueal Berta
,
Nov 28, 8:47 PM
Mostly yes. I used my personal card for the first few expenses while waiting for the business card. I have indicated those main expenses in the email

Sherica S
,
Nov 29, 4:36 PM
I can request a recon from the team, do these include all changes from vendors? I just want to make sure that these are all included.

Eueal Berta
,
Nov 29, 7:38 PM
yes, I used that card for almost all the charges except the few first charges

**Attachment G**
**PX2**                                                                           **000115**

Sherica S

,
Nov 30, 9:10 PM
Okay, can you send the statements for the first charges when you get the chance?

Eueal Berta

,
Dec 2, 1:16 PM
email sent

Sherica S

,
Dec 5, 9:20 AM
I will look out for that and compile them in a file so that I can send it over to the recon team

Eueal Berta

,
Dec 12, 10:37 AM
Sherica, what is the update on this store? Did you find out about the stuck inventory? Also any plan how to recover the expenses on inventory which is on my card?

Sherica S

,
Dec 13, 3:23 PM
Hi Eueal, I've passed the bank statements on to our recon team, it may take up to six weeks for them to get back to me with the full report as they are currently facing some backlogs, the report should give a full breakdown of where the store is in regards to profit/loss

Eueal Berta

,
Dec 19, 5:39 PM
0 sales again

Eueal Berta

,
Dec 21, 10:53 AM
Hi Sherica, are you there

Sherica S

,
Dec 21, 1:45 PM
Hi Eueal, I apologize for the delayed response, I have been out of the office, give me a few moments to check out the above

Sherica S

**Attachment G**

,
Dec 21, 1:54 PM
I do see that there is a small gap in sales for the past few days, we still have inventory so the sales will continue, some days are like that.

Eueal Berta

,
Dec 30, 8:29 AM
Hi Sherica.. where is the reconciliation report?

Sherica S

,
Dec 30, 1:46 PM
Hey Eueal, the team responsible confirmed that the report is not yet ready, it may take some time because they are dealing with some backlogs at the moment.

Eueal Berta

,
Jan 26, 1:55 PM
Sherica .. it has been 2 months now .. no report on the recon .. no report on the pending inventory ...

Sherica S

,
Jan 27, 12:45 PM
Hi Eueal, I do apologize for the delay, unfortunately, the recons are prepared by our accounting team so I do have to wait for them to complete the reports and then give me access so that I can share it with you.

Eueal Berta

,
Feb 7, 2:55 PM
Let's forget about the formal report .. can you quickly tell me how much inventory is left (unsold) in dollar amounts
forget about it for a moment I mean. I need to PAY DOWN my credit card!!

Sherica S

,
Feb 7, 4:47 PM
Fba sellable inventory is $3485.56, I see some inbound as well, 36 units of USDA Organic Extra Virgin Olive Oil worth 260.00, that is the information that I have access to at the moment

Eueal Berta

,
Feb 10, 11:20 PM

**Attachment G**

Sherica .. please have some empathy .. I am paying $319 in interest every month and have about 23,000 on my credit card balance .. how is this even possible? I am not even breaking even. Can you please escalate this to your managers?

Sherica S

,
Feb 13, 4:37 PM
Hi Eueal, I will on my next meeting with them.

Eueal Berta

,
Feb 13, 4:37 PM
Thanks

Eueal Berta

,
Feb 15, 12:55 PM
When will be the meeting, Sherica?

Sherica S

,
Feb 16, 3:26 PM
Hi Eueal, I have a meeting scheduled for tomorrow.

Eueal Berta

,
Feb 16, 3:29 PM
Thank you Sherica. Please present that at this point I lost so much (forget about making a profit), I just need to exit. As you can see, the expenses still continue. I want to request my initial investment back so I can at least stop the bleeding by paying down the debts and walk away with a loss

Sherica S

,
Feb 20, 12:58 PM
Hey Eueal, the meeting was rescheduled for tomorrow, I apologize for the delay but I will give you an update as soon as I have one.

Eueal Berta

,
Feb 20, 2:43 PM
k thanks

Sherica S

,

**Attachment G**

Feb 22, 11:55 AM
Hey Eueal, the team has decided to stop recons but I did bring up your situation on our last meeting and for now we are analyzing your bank statements for the vendor charges and comparing them with the inventory and sales so that we can come up with a plan for you. I will keep you in the loop.

Eueal Berta

,
Feb 22, 11:59 AM
Thank you Sherica for the update. You know I am throwing away almost 500 usd a month on interests and fees. I need a decision asap please. Let's wind down everything and process my exit When are you going to come up with the plan?

Sherica S

,
Feb 23, 11:35 AM
Quick question, the statements that you provided are only linked to solyd, correct?

Eueal Berta

,
Feb 23, 11:39 AM
No I provided statement of both stores

Sherica S

,
Feb 23, 11:41 AM
I only needed the ones for solyd, is there any way for you to differentiate them, I received 7 statements but I need to know exactly what is linked to solyd alone, I can add the statements that I have here
I can post them here for you to highlight what belongs to the other store

Sherica S

,
Feb 23, 11:46 AM
Bank Statements for Eueal Berta, Solyd Online LLC-20230223T164600Z-001.zip
Open in new tab

Just highlight the charges belonging to the second store

Eueal Berta

,
Feb 23, 12:01 PM
Everything is applicable to the first store. The second store statement is just the pdf marked second store.

Sherica S

**Attachment G**
**PX2**                                          **000119**

,
Feb 23, 12:02 PM
Got it, thanks.

Eueal Berta

,
Feb 23, 12:41 PM
When are you expecting to get back to me

Eueal Berta

,
Feb 24, 7:15 AM
?

Eueal Berta

,
Feb 24, 8:01 AM
Also I am seeing multiple charges for shipping from the 3pL. What are those?

Sherica S

,
Feb 28, 11:23 AM
Can you confirm the charge amounts and dates?

Sherica S

,
Feb 28, 11:26 AM
Also, based on a few checks, it is confirmed that you do have some credits with 1hr delivery for unshipped goods, I will get the exact figures for you, there are other things outstanding but we are first looking to see where those went and to also see if there are other unfulfilled orders from other vendors.

Eueal Berta

,
Feb 28, 4:39 PM
I am going to forward the emails. Pls check your email
or I will share screenshots here


I actually forwarded one of the emails to you 4 days ago
this


There are other charges that happened on Feb 16 and 17 as well

Sherica S

,

**Attachment G**

Mar 1, 2023, 1:42 PM
Sure, I'll check out the above and follow up, I was trying to check sales.support directly but I am having issues with loading the fba shipment tab

Eueal Berta
,
Mar 1, 2023, 10:43 PM


Sherica S
,
Mar 6, 12:32 PM
I spoke with the team, and they confirmed that these were for shipping invoices dating back to last year that the team failed to charge clients.

Eueal Berta
,
Mar 6, 12:34 PM
"Hey Eueal, the team has decided to stop recons but I did bring up your situation on our last meeting and for now we are analyzing your bank statements for the vendor charges and comparing them with the inventory and sales so that we can come up with a plan for you. I will keep you in the loop."
What is the update on the above

Sherica S
,
Mar 7, 11:12 AM
So there are definitely some discrepancies with the charges vs inventory, there is also some 1hr inventory that may not have been shipped so I just received some invoices from the 1hr team, I am checking those out to conclude the credits due to you from that particular vendor.

Eueal Berta
,
Mar 7, 12:04 PM
I appreciate your looking into it but my question is when can this be concluded. It has been months

Sherica S
,
Mar 7, 2:01 PM
I passed it on to Steven, and he sent it over to the accounting team to actually have a recon expedited, it is in Managements hands and I am waiting for them to get back to me, I apologize for all the delays but we should have some answers soon.

Eueal Berta
,

**Attachment G**

**PX2**                                                    **000121**

Tue 8:45 PM

Sherica, your cal does not work - https://go.oncehub.com/Sherica. I neeed one final meeting



Online appointment scheduling
go.oncehub.com


Eueal Berta
,
Tue 8:55 PM

I am DONE with you guys .. I have never been frustrated in my life this much. You really tested my patience to its extreme limits ... I know you personally are a nice person but I don't know how you sleep at night working for a company that drains people's money every day .. I lost a lot of money, time and energy in this. A complete disaster .. Now, April 14 will be the end of my contract. I am let you know officially, I would like to withdraw from the program. Based on the agreement: 1) I will need you to please liquidate all the remaining inventory asap. 2) I will need my initial payment refunded

Please let me know who I should contact for the refund and for the exit



No response from Steven R

His profile comes up like this



info@sales.support
Hi Eueal Berta You have been charged an amount of $99.0 for your Premiur

---------- Forwarded message ---------
From: **Eueal Berta**
Date: Fri, Mar 31, 2023 at 10:57 AM
Subject: Re: Subscription Charge Notification
To: <info@sales.support>

Hi I am unable to get hold of anyone from passive scaling side. Do you know who is currently in charge?

On Tue, Mar 28, 2023 at 8:05 PM <info@sales.support> wrote:

> Hi Eueal Berta
>
> You have been charged an amount of $99.0 for your Premium Subscription on Sales Support. Please refer to [Payment Page](Payment Page) of our site to view it.
>
> Regards
>
> Sales Support

--
Thanks,
Eueal

--
Thanks,
Eueal

**Attachment H**
**PX2**

**000123**



**Attachment H**