## DECLARATION OF GIORDANO LANUTO
### Pursuant to 28 U.S.C. § 1746

I, Giordano Lanuto, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Giordano Lanuto.  I am over the age of 18 and reside in Bartow, Florida.

2. In approximately March 2022, I found a company named Optimyze Digital on Facebook that manages e-commerce stores for clients that want to sell items on Amazon and Walmart.  The ads showed several customers saying that they all made money using this service.  I signed up for a call and I spoke with a sales agent, Shion Galata.  He told me that I was guaranteed to make my initial fee back within 2 years or the company would give me a refund.  He also told me that I would make passive income because the company would handle all the work for the store.  I spoke with Shion approximately 4 or 5 times and he told me several times that there was no risk because the company guaranteed I would make my money back in two years.

3. Based on the guaranteed refund and passive income I would make, I decided to sign a contract for four Amazon stores and one Walmart store.  I wired $90,000 to a company called Passive Scaling.  Even though I spoke with Shion at Optimyze Digital originally, my contract was with Passive Scaling.  I learned that the two companies work together since Optimyze Digital does the marketing for Passive Scaling.  Attached as **Attachment A** is a true and correct copy of the contract titled "Ecommerce Consulting contract 2x Amazon/1 Walmart 90k Bundle."

4. The contract contains a clause that says:

   > "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private

1

**PX4**                                                                 **000154**

manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

5. I never received any document from Optimyze Digital or Passive Scaling with any information backing up the money-making claims in their ads or over the phone with the sales agent.  I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or giving me a list of consumers who purchased their services in the past 3 years.

6. I allowed Passive Scaling to purchase inventory on my credit cards.  Under the contract, we were supposed to spend at least $10,000 per store.  I allowed them to spend $20,000 on each store.  I believe they spent approximately $80,000-$90,000 on inventory.

7. My Amazon stores opened before my Walmart store because Walmart's approval took longer.  My Amazon stores were only open for approximately six months before they were shut down by Amazon within days of each other.  My Walmart store was only open for approximately four months before Walmart shut it down. I believe it was because Passive Scaling was using the dropshipping method of fulfilling customers' orders on my Amazon and Walmart stores.  This means that when a customer purchases an item on my store, Passive Scaling would buy it from a retailer, rather than a wholesaler, and fulfill the order. I believe this is a violation of Amazon and Walmart's policies.

8. I asked for a refund because I met the criteria for a refund under the contract.  I was told that Passive Scaling's legal department was reviewing my account and would get back to me.  Attached as **Attachment B** is a true and correct copy of the email.

9. Passive Scaling told me that it was trying to appeal to Amazon and have my stores reopened, but that did not happen.

10. Based on the gross sales of my stores (approximately $40,000), Amazon owed me approximately $24,000 (normally Amazon pays out on sales every two weeks). However, because my stores were shut down, Amazon would not release my money. I never received the $24,000 from my sales. Amazon also charged me a fee to send the inventory from my stores back to Passive Scaling. Passive Scaling told me that it would resell the inventory and send me the money, but I never received any payments from Passive Scaling.

11. I never heard from Passive Scaling again. I emailed several people multiple times over the course of several months, including the owner, Steven, but no one responded to me. Now all the phone numbers are disconnected. I lost approximately $180,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 02/13, 2024
Bartow, Florida

Giordano Canuto

**PX4**                                                                    **000156**

# Ecommerce consulting contract 2 X Amazon/ 1 Walmart 90k Bundle

**Initial Consulting Fee "Store Infrastructure Fee" – this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, & product selection:**

**Price $90,000 ~ Quantity 1 ~ Total Price $90,000**

**Management Fee – $199 or 30% Minimum management fee of $199 per month or thirty percent (30%) of net profit – this fee begins the following month after fulfillment of initial payment:**

**Price $199 ~ Monthly $199 ~ Total Price $199**

**Software Fee – Fee paid directly to software provider:**

**Price $99 ~ Monthly $99 ~ Total Price $99**

**Minimum Working Capital – $10,000 This is the minimum requirement of available credit or capital to cover inventory & wholesale price of products. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout.**

**Recommended credit available for expedited scaling process is $15,000.**

**Total one time fee: $90,000**

This E-Commerce Consulting Agreement ("Agreement"), is dated as of, May 13, 2021, by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and, Giordano Lanuto, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Amazon FBA platform (the "Store"):CONSULTANT'S SERVICES – Consultant agrees to perform the following services ("Services"):Maintain Client's Store, including configuring the Amazon FBA storefront and configuring the

**Attachment A**

frontend back end systems necessary to manage the Store. Review, research, source, select, and list products for the Client's Store.Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

# CLIENT RESPONSIBILITIES.

Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a minimum credit limit of fifteen thousand ($15,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon FBA account or Store in Vacation Mode, such terms being defined or referenced on the Amazon FBA website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.(B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.COMPENSATION. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of ninety thousand  dollars ($90,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (30%) of the Net Profit from Client's Store per month (the "Ongoing

**Attachment A**

Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider.Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than E-Commerce Consulting Agreement due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days). Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.TERM – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.TERMINATION – Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon FBA may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.NON-DISPARAGEMENT – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.SALES / USE TAX – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.INTELLECTUAL PROPERTY – Client understands that Client's Store is a service hosted on the Amazon FBA platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon FBA, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon FBA may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's

**Attachment A**

Store, or Amazon FBA, and Consultant holds no legal or equitable rights in Client's Store.RESTRICTED ACTIVITIES – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter

**Attachment A**

required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.


# LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL,   PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN

**Attachment A**

ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

# DISCLAIMERS AND RELEASE

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's

**Attachment A**

economic needs and requirements or reach any particular level of sales, income, or net profits.Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon FBA via Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon FBA products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with  the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon FBA products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon FBA Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer-term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.Amazon FBA Terms and Conditions – Client hereby understands that Amazon FBA, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in the Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon FBA to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon FBA will in such cases return Client's Store to active status.   Furthermore,   Client agrees and understands that the Consultant

**Attachment A**

makes no guarantees or representations regarding the Store in relation to any Amazon FBA policy, whether currently in effect or as may be amended by Amazon FBA from time to time. Client understands that Consultant has no control over or input in when and whether Amazon FBA elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies.

# GENERAL PROVISIONS

Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to  , with a courtesy copy sent to .Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement. Severability, Headings - If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such

**Attachment A**

arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.Amendment. This Agreement cannot be amended except in writing and signed by both Parties.Electronic Signatures - This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under forum non conveniens principles.Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.Attorneys' Fees – If either party breaches this Agreement, or one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the

**Attachment A**

aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to

**Attachment A**

Client, and shall survive expiration or termination of this Agreement.Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OFLITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfillment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for

**Attachment A**

Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.DEFINITIONS − Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

EXHIBIT A Definitions: Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A."Cash Back" means any revenue derived from cash back programs like Be Frugal."Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users."Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure."Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon FBA fees related to Client's store."Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein."Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected

**Attachment A**

delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon FBA transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com FBA.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon FBA)."Suspension" means an action or actions by Amazon FBA which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action."Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

TERMINATION –
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart/Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

REFUND POLICY –

**Attachment A**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option("Refund Option") to request a refund. Additionally, following an eighteen(18)month period if the Client has not made back their initial store costs, Client has the option to request a refund within a thirty (30) day period following their 18thmonth of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C),Consultant will refund a portion of the Fee, as defined in Paragraph (B) below(the "Refund Amount").

B.  The Refund Amount shall be calculated by the following formula: (x) the Feeless (y) any Net Profit and Cash Back Client received during the Refund Period,and less (z) any Net Profit and Cash Back Client received through Passive Scaling; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Store or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

C. Client's right to exercise the Refund Option under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also results in a Prohibited Action.

**Attachment A**

**PX4**                                    **000170**

I, Giordano Lanuto, agree to the terms of this agreement and I agree that my typed name below can be used as a digital representation of my signature to that fact.

*giordano lanuto*

SIGNED BY
Giordano Lanuto

SIGNED ON
Date Signed: 2 Mar 2022

Time Signed: 14:57

IP ADDRESS FROM SIGNATURE LOCATION
173.163.212.114



**SIGNED WITH BETTERPROPOSALS.COM**
Build and send beautiful sales documents in minutes to help your business close more deals and get paid faster.

**Attachment A**

**PX4**                                                      **000171**

# Wire Instructions

PASSIVE SCALING INC

78 JOHN MILLER WAY SUITE 2111
KEARNY NJ 07032

Signature Bank
565 Fifth Avenue, New York, NY 10017

Account#  ███████████
Routing #  ██████████

**Attachment A**

**PX4**                                                **000172**



---------- Forwarded message ---------
From: **Passive Scaling Support** <sales@passivescaling.com>
Date: Fri, Nov 17, 2023, 4:43 PM
Subject: Re: Refund Update / News Letter
To: Giordano Lanuto <​█████████████████>

Hello Giordano,

Apologies for the delay in response
Our team is currently looking in to your request and will provide an update by the end of the week next week

On Tue, Nov 7, 2023 at 6:38 PM Giordano Lanuto <██████████████████> wrote:
 Hello, I am try reaching you,please call me Giordano lanuto ██████████.thanks

 On Tue, Aug 1, 2023, 8:27 PM Passive Scaling Support <sales@passivescaling.com> wrote:
  Dear  Giordano Lanuto

  We hope this newsletter finds you well. We understand that you have been waiting patiently for updates on your refund requests, which were put on hold due to our company's financial situation. We deeply appreciate your understanding and continued trust in Passive Scaling Inc.

  To ensure complete transparency and keep you informed about the progress, we have prepared this newsletter to provide you with all the essential details regarding your refund status and our plans moving forward.

   **What is the current status of my refund request?**

**Attachment B**

**Current all refunds including active settlement agreements that were being conducted are currently on pause for the next 120 days.**

**Where do I stand on the list of refund requests?**

- **Your first official refund request was submitted on March 2023.**

**Can you provide an estimated wait time for my refund to be processed?**

- **At present the company is not taking on any new clients and thus we are issuing refunds from the monthly generated profits of our current active clients. With that said we are hoping to be able to provide a between answer to this question within the next 90 days. Please note that all refunds are processed in the order they are submitted.**

Refund Updates: Since we have received an overwhelming number of refund requests, and dues to varying factors most of which are outside of our direct control our finance team has been working tirelessly to process each request carefully. We are pleased to inform you that we have already been able to come to some form of agreement with over half of the requests that we currently have and have been able to partially process a significant portion of the refund requests.

However, due to the complexity of some requests and the need to ensure fairness to all clients, some refunds have taken longer than expected. Rest assured, your request is in the queue, and we are committed to addressing it as quickly as possible.

**What actions will the company take over the next 90 days to expedite the refund process?**

- **The aim of the company over the next 90 days is to continue to equip our current team to improvise the profitability of our currently active client which along with other avenues being explored to increase revenue or secure funding to expedite the refund process. With additional revenue and the stability of our company finances our aim is to be able to not only start/restart the refund execution process but also if possible expedite it where needed and if possible.**

**Can you provide details about the steps being taken to resolve the financial situation?**

- **The team has been focused on minimizing costs and increasing profits over the last two quarters. With that in mind, we have repurposed most none essential staff and also put measures in place to improve communication and transparency. We aim to do**

**all of the above while primarily focusing on our active clients, as their success is a major part of our plans to move forward.**

Future Plans: Over the next 90 days, we are implementing various measures to expedite the refund process while ensuring our financial stability. These measures include streamlining internal processes, optimizing resource allocation, and exploring strategic partnerships.

We understand the importance of timely refunds, and we want to assure you that these initiatives are geared toward delivering the best possible outcomes for our clients.

**How will the refund contract be created?**
- **All refund contracts/settlement agreements will be provided in line with the client's original contract terms and thus will be handled on a client-by-client base.**

**What factors are considered in determining the order of refund processing?**
- **The refund teams are in Section 10 of each client contract.**
- **The reason for the refund request**
- **The legal and financial teams' investigation and findings**
- **Any details provided by the clinet in support of their request**

Refund Contract and Priority: Each refund request is assessed based on the terms outlined in our refund contract and the date the request was submitted. We are following a fair and transparent approach to prioritize refunds based on these factors.

**How will the payment be issued?**
- **At the time when a written agreement is provided the company if needed will seek to negotiate with the client on payment amount and duration.**

**Are there any specific requirements for payment processing?**
- **The client will be provided with a bank authorization form which will have to be authorized by the client's bank of choice.**
- **If applicable the client will be advised of the store transition process &/ inventory liquidation process.**

Payment Process: Once your refund request is approved, we will process the payment using your approved deposit method. If there are any changes to your payment details, please inform our support team to ensure a smooth and timely

payment process.

**How will the communication gaps be addressed, and what improvements can clients expect in the future?**
- **Starting this month all clients on the list for refunds will be provided with a single monthly newsletter, along with the option of meeting with our client Support Manager for a 30-minute meeting once per month to discuss any concerns or any additional clarification that may be needed.**
- **Additionally if in the event that the company is able to expedite the excitation of any refund, the client will be contacted at that time to discuss the process over a call.**
- **While we would like to provide a weekly update, based on all the factors involved and details that may need time to provide to a number of clients we think that updates every 30 days will not only be more accurate but will yield better results.**

Improving Communication: We acknowledge that there have been communication gaps during this challenging period. To address this issue, we are actively enhancing our communication channels and ensuring regular updates on the status of your refund requests.

Our goal is to foster better communication and transparency throughout the refund process, and we appreciate your patience and understanding as we work towards making significant improvements.

Once again, we would like to express our sincere gratitude for your continued support and understanding during this time. Rest assured, we remain fully committed to executing our contracts in a timely manner, and we are confident that we will resolve your refund request as quickly as possible.

If you have any further questions or concerns, please do not hesitate to discuss your concerns on your next scheduled call or by responding to the newsletters. The team is still available by phone at **201-503-4116** between the hrs of **10:30 am est to 2:30 pm est Monday through Friday**. Please also feel free to email your concerns to Info@passivescaling.com please CC jerdonna@passivescaling.com

Thank you for your trust in Passive Scaling. We are honored to have you as a valued client.

**Attachment B**
**PX4**

000176

Best regards,

Client Support team

*Passive Scaling Inc*

Contact Information: **Info@passivescaling.com**

                              **jerdonna@passivescaling.com**

Phone Number: 201-503-4116