## DECLARATION OF KAYLEIGH SEVERN
### Pursuant to 28 U.S.C. § 1746

I, Kayleigh Severn, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Kayleigh Severn.  I am over the age of 18 and reside in Seattle, Washington.

2. In approximately September 2021, my business partner, Jerome Brown, and I were looking for someone to manage an Amazon or Walmart ecommerce store for us so we could make passive income.  Jerome ("Romeo") found a company called Optimyze Digital LLC.  We reached out and spoke with someone named Roman Hicks.  He told us that Optimyze Digital partnered with a company called Passive Scaling Inc. to provide their clients with passive income through Amazon and Walmart online stores.  Roman presented this business opportunity as one that would be extremely lucrative and guaranteed that we would make back our initial fee of $30,000 in 18 months or we would get a full refund.  We watched testimonials that showed clients who were successful and making money.  The opportunity sounded promising, and the companies seemed legitimate.

3. Based on the guaranteed refund if we didn't make our money back in 18 months and how lucrative the opportunity sounded, we decided to purchase a Walmart store.  We also liked the fact that Passive Scaling used the dropshipping model for fulfilling customers' orders.  This means that when a customer orders a product from our store, Passive Scaling would order that product from another retailer, like Amazon, to fulfill that order.  This is different from ordering products wholesale in bulk and storing them in a warehouse waiting for customers' orders.  It meant that we would only pay for inventory as it was ordered rather than paying in bulk for inventory and storing it.

4.  We signed the contract in September 2021 with Passive Scaling.  In addition to the initial $30,000 fee, the contract also required us to pay a $99 software fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a management fee.  The software we paid for was called sales.support.  The contract was signed by Amanada Peremen, Operations Manager at Passive Scaling, Inc.  The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, NJ 07020.  Attached as **Attachment A** is a true and correct copy of the contract.

5.  The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

6.  We never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in their online ads, testimonials, or over the phone with the sales agent.  We also never received a document from either Optimyze Digital or Passive Scaling telling us whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

7.  We received a confirmation email after we signed the contract from Amanada Peremen (sales@passivescaling.com) with wire instructions.  My partner and I sent a wire transfer of $30,000 to "Passive Scaling, Inc." (a New Jersey-based company).  We had to email a receipt of the wire transfer to info@passivescaling.com and payments@optimyzedigital.com.  We received a confirmation of this wire from Frances Schaper at Optimyze Digital.  She said, "I wanted to confirm with you that Passive Scaling

has received your wire."  Attached as **Attachment B** is a true and correct copy of these emails.

8. Our Walmart store started in approximately November 2021.  We could see on our account that orders were not being fulfilled and complaints by customers were not being addressed. We received an email from Jerdonna P (jerdonna@passivescaling.com) (onboarding specialist) that cc'd Kerry Anne Sadler (kerryanne@optimyzedigital.com) letting us know that our store had been making some sales, but we have some orders past due.  Jerdonna said that this should not result in a suspension or termination of our store because Passive Scaling is "maintaining compliance with Walmart."  Jerdonna said that the company is turning off sales to our account to allow the warehouse to catch up with the orders and the company will resume slowly to "ensure the warehouse team has the time to build up staff to process every order within a same-day window." A few days later, we received an email from Jerdonna stating that Passive Scaling anticipates resuming store operations in two days.  Attached as **Attachment C** is a true and correct copy of these emails.

9. We received an email from Amazon in December 2021 (we had an Amazon account to fulfill our Walmart customers' orders) saying that we were violating Amazon's policies because our account is being used for the "purpose of resale, rental or to ship such products to your customers."  The email said that if we continue the behavior, we will not be allowed to buy products on Amazon.  Attached as **Attachment D** is a true and correct copy of this email.

10. In approximately June 2022, Walmart suspended our store for "excessive number of orders with missing carrier scan."  We reached out to Jerdonna and Tatiana and asked who was

responsible for this suspension.  Attached as **Attachment E** is a true and correct copy of this email.

11. In approximately June 2022, our Walmart store was terminated.  We asked Jerdonna for a partial refund and she said that the Passive Scaling team is still working on reactivating the Walmart store and offered to open an Amazon store for us using the same dropshipping model.  However, she explained that Passive Scaling will use a two-step shipping process to ensure compliance with Amazon's policies.  This meant the product would be ordered from another retailer, but then re-packaged by Passive Scaling so that it doesn't appear the product was ordered from another retailer.  We did not believe the Walmart store could be reactivated.  Romeo emailed Jerdonna and said, "if you look at the screenshots below, you can find the email where the suspension was made, which called for an appeal (explanation on how things will be fixed) presented to Walmart and denied.  It says clearly that the store is terminated and will not be reinstated."  During this time, we also reached out to Optimyze Digital and Roman Sterling emailed Tatiana, Steven and Jerdonna asking someone at Passive Scaling to respond to us.  Attached as **Attachment F** is a true and correct copy of these emails.

12. Our Amazon store opened in approximately July 2022.  We wanted to try and recoup the money we already spent.  Passive Scaling said that in addition to using the dropshipping model, it would also  use the Fulfilled by Amazon or "FBA" model for this store.  This meant we had to buy inventory in bulk and store in Passive Scaling's warehouse.  Once an order was placed by a customer, Passive Scaling would send the product to an Amazon warehouse so that Amazon could fulfill that order and send the product to the customer.  We also had to provide a credit card for inventory purchases.  We gave Passive Scaling our

4

credit card to spend an additional approximately $4000 on inventory. Some products were added to our store and some products sold, however, we only received approximately $1500 from Amazon even though we spent nearly $5,000. The rest of our inventory just sat in our store, and I never received the inventory back. At some point, we ended up owing Amazon money because our products were not selling. We were frustrated because we had no control over anything since we paid Passive Scaling to do all the work for the store. We were supposed to just sit back and receive passive income, but Passive Scaling was not managing our store and we were not making the amount of money promised. Attached as **Attachment G** is a true and correct copy of a Weekly Performance Update we received for our Amazon store.

13. Because our Walmart store was terminated, we asked for a partial refund and Jerdonna set up a meeting so that we could talk to Steven, the CEO. The meeting was set for July 30, 2022. Jerdonna used the email jerdonna@hourlyrelief.com as well as jerdonna@passivescaling.com. Steven's email was steven@sales.support. During this meeting, Steven made excuses about why our Walmart store was terminated. In our initial calls with Optimyze Digital, we were told that Walmart was more profitable and less expensive for us since we did not have to purchase inventory. However, in the meeting with Steven, Steven said that Walmart was a new platform for him and he had more experience with Amazon. Steven told us that instead of a refund, he would give us a $5,000 credit for inventory for our Amazon store. Attached as **Attachment H** is a true and correct copy of the invitation.

14. On approximately August 3, 2022, Jerdonna (support@mail.salessupport.ladesk.com) emailed us to follow up on the meeting from July 30. She reiterated that their team advised

against re-applying for Walmart.  Passive Scaling formally offered the Amazon store in place of the Walmart store instead of giving us a refund.    In subsequent emails, Jerdonna reiterated that Passive Scaling was going to provide a $5000 credit with their vendor 1HR and the products should be ready to send to Amazon.   Attached as **Attachment I** are true and correct copies of these emails.

15. In November 2022, we sent Tatiana, Trudy, Jerdonna and Toni at Passive Scaling and Roman at Optimyze Digital an email outlining: (1) why our Walmart store was terminated (over 100 complaints from clients not receiving their items that Passive Scaling never resolved and Passive Scaling selling items, like Goli gummies, in violation of Goli's policies); (2) how Passive Scaling did not respond to customer complaints and remedy Walmart's concerns despite our payment of $30,000 to Passive Scaling to manage our store; (3) the lack of communication and updates from Passive Scaling; (4) and how Passive Scaling has breached our contract over and over again.  Roman told Steven, CEO at Passive Scaling, that he received feedback from us regarding our account and forwarded him the email we sent in November 2022.  I followed up on December 10, 2022 with Roman, Steven, Tatiana, Jerdonna and Trudy and asked for a response regarding the status of our store and our agreement with Passive Scaling.  I said that there has been no communication regarding our store and that this was unacceptable.  Roman followed up again on December 14, 2022 asking for a response from Steven and Tatiana.  Attached as **Attachment J** are true and correct copies of these emails.

16. We continued to follow up in January and February 2023 to no avail.   Attached as **Attachment K** is a true and correct copy of these emails.

17. In August 2023, we made a formal demand to Steven and Jerdonna that we are exercising our right under the contract to obtain a refund, that Passive Scaling breached the contract, and we will take further steps if we do not receive a refund.  Hearing nothing, I resent it again on September 15, 2023.  Attached as **Attachment L** are true and correct copies of these emails.

18. On September 21, 2023, I received an email from the "Client Support Director" at Passive Scaling Inc saying that the company received our email and Passive Scaling's legal and finance teams are evaluating our request for a refund.  Attached as **Attachment M** is a true and correct copy of this email.

19. We followed up again on October 2, 2023 asking for a response regarding our refund request and on October 3, 2023 we received a "newsletter."  The newsletter appeared to be sent out to a group of people.  It said it was providing us with details regarding our refund status and Passive Scaling's plans moving forward.  The newsletter stated: (1) all active refund and settlement agreements are on pause for 120 days; (2) my request was #13 in the "second batch of pending settlements," and (3) the company is not taking on new clients and issuing refunds from "the monthly generated profits of our current active clients."  In addition, the newsletter stated that the company has received "an overwhelming number of refund requests."  Attached as **Attachment N** is a true and correct copy of this newsletter.

20. I emailed Jerdonna on October 9, 2023 stating that 120 days was not acceptable and that we would take legal action if Passive Scaling did not come up with a different course of action. We received no response.  I emailed Jerdonna again on December 5, 2023 and asked for an update.  On December 6, 2023 I received an email from info@passivescaling.com stating that the team "has a pending settlement offer for your company, for us to send that out please

7

**PX8**                                                      **000331**

resend the signed copy of your contract so that we can finalize the agreement. Once finalized we will have the contract sent out with in 72 hrs." I emailed the agreement back that same day. I emailed again 72 hours later stating that we never received a response. I emailed periodically throughout December 2023 asking for an update. Finally, on December 19, 2023 Jerdonna responded "I will follow up with the team at 10am est when they arrive. Apologies again for the delay." She did not respond after that, and I emailed again a few times after that with no response. Attached as **Attachment O** are true and correct copies of these emails.

21. I learned that several clients were suing Passive Scaling and I connected with a customer named Kenny Craig who won a Default Judgment against Passive Scaling and Steven Rozenfeld, the CEO. As far as I know, Kenny has not been able to recover his money back under the Default Judgment. Attached as **Attachment P** is a true and correct copy of emails with Kenny and the process server's proof of service of the civil action against Passive Scaling.

22. I tracked down the CEO, Steven Rozenfeld, and messaged him through his Instagram account, *kingofamzn*. I asked him for my money back and he claimed that he was no longer the owner of the company because the company was insolvent and that Jerdonna Palmer was handling all refund requests. I told him that he is listed as the owner of Passive Scaling with the Secretary of State. Attached as **Attachment Q** is a true and correct copy of this text exchange and Passive Scaling's Certificate of Incorporation.

23. Romeo and I invested $30,000 with this company and Passive Scaling breached every part of the contract and are now non-responsive to us. Essentially, they scammed us and stole

$30,000 from us. Despite claims that we would make back our investment, we only made

approximately $3000 between both stores. This was not nearly what we were promised,

and we never recouped our investment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: *March 6 th*, 2024
Seattle, Washington

Kayleigh Severn

9

**PX8**                                                           **000333**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Walmart Automation

**Delivered on**
September 12, 2021

**Client**
Jerome Brown & Kayleigh Severn

**Company**
PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit **– this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $10,000** | $10,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Walmart pays every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $25,000 +** | | | |

| **TOTAL** | **$30,298** |
|---|---|

**Attachment A**

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of September 12, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Jerome Brown & Kayleigh Severn, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with one (1) e-commerce stores on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including configuring the Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.
    B. Review, research, source, select, and list products for the Client's Stores.
    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
    D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



**Attachment A**

2

2. **CLIENT RESPONSIBILITIES -**

    A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

    B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

    C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION -**

    A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



B.  Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C.  Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4.  **TERM –**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5.  **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



**Attachment A**

6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



**Attachment A**

5

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



**Attachment A**

6

000340

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information.** The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



**Attachment A**

7

**PX8**

## 10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00),

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



**Attachment A**

8

11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



**Attachment A**

9

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



Attachment A

C. **Business Risk** – Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



**Attachment A**

11

D. **Walmart Terms and Conditions -** Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Stores to active status. Furthermore. Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS –**

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ▮▮▮▮▮▮▮▮▮▮ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



**Attachment A**

12

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



Attachment A

13

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment —** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



**Attachment A**

14

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client -** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers. directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law,



**Attachment A**

O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



**Attachment A**

16

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



Attachment A

**PX8**                                                                            000351

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.



**Attachment A**

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e–commerce location on the third–party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

Attachment A

PX8                                                      000353

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Jerome Brown authorized representative and agent for service of process Date: September 14, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto, Accepted and Agreed to by Principal of Client:

*Jerome Brown*
2021-09-13 13:11:48 (PDT)

*Kayleigh Severn*
2021-09-13 12:40:41 (PDT)

Jerome Brown &
Kayleigh Severn

Jerome Brown &
Kayleigh Severn

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  September 14, 2021

*Amanada Peremen*
2021-09-13 21:42:17 (PDT)

Amanada Peremen

**Attachment A**

 **Gmail** Kayleigh Severn

---

## Fwd: Confirmation Email - Congratulations!

1 message

---

**Romeo Brown**
To: Kayleigh Severn

Mon, Jan 8, 2024 at 7:52 AM

Sent from my iPhone

Begin forwarded message:

> **From:** Amanada Peremen <no-reply@proposify.com>
> **Date:** September 13, 2021 at 9:45:25 PM MST
> **To:**
> **Subject: Confirmation Email - Congratulations!**
> **Reply-To:** Amanada Peremen <sales@passivescaling.com>

Hi Jerome,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

Download now — *This links to proposed contract (I have submitted seperately)*

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Name of Bank: Chase Bank
Address: 78 John Miller Way, Suite 227, Kearny, NJ 07032
Account #
Routing #            (WIRE)

**Attachment B**

**PX8**                            **000355**

1/8/24, 10:01 AM

#  (ACH)
# *****PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS

Once the payment has been submitted, please email a receipt to info@passivescaling.com and payments@optimyzedigital.com so we can match the sender name to our records as soon as possible, and once payment has cleared to our account, our team will reach out with instructions for your next steps!

Please reach out to both emails if you have not received an onboarding email within 24 business hours of payment completion, *and include your confirmation.* We will be there every step of the process!

For alternative payment conditions, please reach out to payments@optimyzedigital.com.

Thanks again, and we look forward to building your program!

**Attachment B**

**PX8**    **000356**

Gmail - Payment Confirmation                                                    1/8/24, 10:01 AM

 Gmail                                Kayleigh Severn <

## Payment Confirmation
2 messages

**Frances Schaper** <payments@optimyzedigital.com>                  Fri, Sep 17, 2021 at 11:31 AM
To

Hi Jerome & Kayleigh,

I hope you are well!

I wanted to confirm with you that Passive Scaling has received your wire.

Within 24 hours business hours you will receive your next steps for onboarding, as well as an email from Kerry Anne, our client success manager. She can be reached at support@optimyzedigital.com and will be your go-to point of contact moving forward for any questions and concerns.

Kind regards,

Frances


### Payments
Optimyze Digital LLC

payments@optimyzedigital.com

www.optimyzedigital.com

3333 Michelson Dr. Suite 300, Irvine, CA

**Romeo Brown**                                                      Mon, Jan 8, 2024 at 7:53 AM
To: Kayleigh Severn

Sent from my iPhone

Begin forwarded message:

> **From:** Frances Schaper <payments@optimyzedigital.com>
> **Date:** September 17, 2021 at 11:31:24 AM MST
> **To:**
> **Subject: Payment Confirmation**

**Attachment B**

PX8                                                          000357

Gmail - Fwd: Walmart Automation

1/8/24, 10:11 AM

 **Gmail**

Kayleigh Severn ███████

## Fwd: Walmart Automation
1 message

**Romeo Brown** ███████
To: Kayleigh Severn ███████

Fri, Jan 21, 2022 at 10:51 PM

Romeo Brown
Artist I Philanthropist
███████

Begin forwarded message:

**From:** Roman Sterling Hicks <myproposal@proposify.com>
**Subject: Walmart Automation**
**Date:** September 12, 2021 at 2:54:24 PM PDT
**To:** ███
**Reply-To:** Roman Sterling Hicks <roman@optimyzedigital.com>

Hi Jerome,

It was great speaking with you!

Here is a live link for your program contract:

Click to view proposal

As you review, if you have any questions or concerns I'm available for a Zoom call.

We look forward to developing this program for you!

Kind regards,

**Attachment B**

**PX8**                                    **000358**

Roman Sterling

**Attachment B**

**PX8**                                    **000359**

 **Gmail**

Kayleigh Severn

## Fwd: Walmart Update for ASNF61
1 message

**Romeo Brown**
To: Kayleigh Severn

Thu, Nov 18, 2021 at 5:37 PM

Romeo Brown
Artist | Philanthropist

Begin forwarded message:

> **From:** Jerdonna P <jerdonna@passivescaling.com>
> **Date:** November 18, 2021 at 4:59:33 PM PST
> **To:**
> **Cc:** Kerry Anne Sadler <kerryanne@optimyzedigital.com>
> **Subject: Walmart Update for ASNF61**

Hello Jerome

We wanted to reach out and provide you with an update regarding your Walmart storefront.

As you may have noticed, your account has been making sales and you may have some of those orders past due. This is not a cause for concern as we are maintaining compliance with Walmart by shipping the item to our warehouse, repackaging the item, and providing the customer with a live tracking number. In our experience, we have noticed very few account suspensions or TERMINATIONS despite orders being past due, versus canceling orders and updating with factitious tracking numbers to portray on-time shipping, which bears termination risk.

In order to ensure store health, we are turning off sales to allow the warehouses to catch up with orders. We will resume slowly to ensure the warehouse team has the time to build up staff to process every order within a same-day window.

We have also noticed with one of our suppliers that the shipping time is much longer than anticipated, so we are discontinuing orders with this supplier to prevent additional orders from being delayed. We have additional supplies we will be working to put in place with more rapid shipping time.

**Attachment C**

**PX8**                                    **000360**

We appreciate your patience with us as we work to keep an eye on the current Walmart marketplace. If you would like to schedule a meeting with us, please feel free to click the link here.

*Kind Regards,*
*Jerdonna Palmer*


WELCOME TO
PASSIVE SCALING

*Role: Onboarding Specialist*
*Direct:*
*Email jerdonna@passivescaling.com*


Sender notified by
Mailtrack

**Attachment C**

**PX8**                    **000361**

Gmail - Fwd: Walmart update for ASNF61                                                                    1/8/24, 10:09 AM

 Gmail                                                          Kayleigh Severn

## Fwd: Walmart update for ASNF61
1 message

**Romeo Brown**                                                              Mon, Nov 22, 2021 at 3:49 PM
To: Kayleigh Severn

Update

Romeo Brown
Artist  | Philanthropist

Begin forwarded message:

> **From:** Jerdonna P <jerdonna@passivescaling.com>
> **Date:** November 22, 2021 at 2:22:25 PM PST
> **To:**
> **Cc:** Kerry Anne Sadler <kerryanne@optimyzedigital.com>
> **Subject: Walmart update for ASNF61**

Hello Jerome,

We appreciate your patience with us as we work to keep your WALMART account healthy and profitable.

Great news! Over the past few days, we have focused on placing strategic shipping operations at warehouses across the US in preparation for the upcoming holiday rush. We have replaced 2 regional warehouses with new warehouses to make sure they can accommodate same-day fulfillment for our orders. We anticipate resuming store operations on Wednesday. If you have any further questions, please feel free to schedule a meeting with our client support team here.

Thank you again for your patience and we look forward to updating you in the next 24-48 hours.

*Kind Regards,*
*Jerdonna Palmer*

 WELCOME TO
PASSIVE SCALING

**Attachment C**

**PX8**                                                                        **000362**

*Role: Onboarding Specialist*
*Direct:* +18 507 211 791
*Email jerdonna@passivescaling.com*

 Sender notified by
Mailtrack

**Attachment C**

## M Gmail

Kayleigh Severn

## Fwd: Your Amazon.com account

1 message

**Romeo Brown**
Thu, Dec 23, 2021 at 7:31 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>, Kayleigh Severn, Roman Sterling
<Roman@optimyzedigital.com>

Romeo Brown
Artist | Philanthropist

e:

Begin forwarded message:

> **From:** Support S <support@asnf61store.com>
> **Date:** December 23, 2021 at 5:04:34 AM PST
> **To:** Romeo Brown, Tatiana S <support@mail.salessupport.ladesk.com>
> **Subject:** Fwd: Your Amazon.com account

Begin forwarded message:

> **From:** dsappeal@amazon.com
> **Date:** December 22, 2021 at 11:14:15 PM PST
> **To:** support@asnf61store.com
> **Subject:** Your Amazon.com account

Hello,

We have noticed that you purchased products from you Amazon account for the purpose of resale, rental, or to ship such products to your customers. This is not allowed by Amazon Terms and Conditions of Use.

If this type of behavior continues, we may not allow you to buy on Amazon.com.

For more details about buying and selling on Amazon, visit our Conditions of Use pages using the links below:
www.amazon.com/conditionsofuse
www.amazon.com/gp/help/customer/display.html?nodeId=13819201

If you believe you may have received this message in error, or if you would like to clarify the actions you have made on your account, please respond to this email within 30 days.

**Attachment D**

**PX8**                                                                **000364**



---------- Forwarded message ---------
From: **Support S** <support@asnf61store.com>
Date: Sat, Jun 11, 2022 at 12:54 PM
Subject: Fwd: Walmart Marketplace Suspension
To: Tatiana <tatiana@sales.support>, Kayleigh Severn ███████████████████>, Jerdonna
P <support@mail.salessupport.ladesk.com>


This is exactly what I didn't want to happen, who's responsible for this suspension?

Romeo Brown
Artist  | Philanthropist
███████████████████████

Begin forwarded message:


> **From:** MP Alarms <mpperformancealarms@walmart.com>
> **Date:** June 11, 2022 at 12:31:54 PM PDT
> **To:** Warehouse+187@sales.support, support@asnf61store.com
> **Subject: Walmart Marketplace Suspension**




**Quick Links:**
**Performance Standards** • **Code of Conduct** • **Customer Care Requirements** • **Shipping Policy**

Hello ASNF61,

 **Your account has been suspended due to excessive number of orders with missing carrier scan.**

Please note that you are still required to handle all customer service-related matters for **Walmart** during your **suspension**, and all open orders must be shipped by their Expected Ship Date (ESD) with valid tracking.

**Attachment E**

**How to Appeal for Reinstatement**

1. **Analyze your performance** – Review your "Performance -> Order and Fulfillment -> Shipping Performance" in Seller Center.

2. **Create a Business Plan of Action** – Detail steps you will take to correct the performance issue.

3. **Submit your plan**– Create a [Partner Support case](#) Go to My Account --> Performance Issues -> Appealing Account Suspension to appeal with your Business Plan of Action.

A decision will be given to you within five business days of receipt. If your selling privileges are reinstated, you should continue following the steps outlined in your Business Plan of Action to improve your performance metrics and avoid future violations.

**Payment Related:**

Please note that your account has been placed on a payment hold due to this suspension and your pending balance will be held while your account is being re-instated. Once your account is reinstated & post risk assessment, any held funds will be released, and we will return your account back to the normal payment schedule.

If your account is not being reinstated, your outstanding balance, if any, will be released within **180 days** or earlier depending on the timing of any pending refunds, chargebacks, and any other liabilities. The final payment will be net of customer refunds, credit card chargebacks and any other amounts owed to Walmart. Our partner payments team will notify you separately if any additional action is required on your part.



- **Performance Standards**
- **On Time Delivery Best Practice**
- **Shipping Method and Timing**

Thanks for your business,

**The Walmart Marketplace team**

**Security & Privacy**

Walmart protects your security and privacy. We will never ask for personal information (such as passwords or credit card numbers) in an email. If you receive such a request, please do not respond to the email.

**Seller Resources**

Seller Center

Seller Help

Developer Portal

Walmart eCommerce, 850 Cherry Ave, San Bruno, CA | Privacy Policy

© 2021 Walmart Inc. All rights reserved. Please do not reply to this email; this mailbox is not monitored.

**Attachment E**