## DECLARATION OF LYNN ROJAS
### Pursuant to 28 U.S.C. § 1746

I, Lynn Rojas, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Lynn Rojas.  I am over the age of 18 and reside in West Orange, New Jersey.

2. In approximately August 2021, I knew someone who had opened up a third-party store on Amazon selling products to customers.  I was interested in this and researched this type of opportunity online.  As a result of my research, I received ads on Facebook about companies who managed ecommerce stores for their clients.  I clicked on one of the ads for a company called Optimyze Digital.  I spoke with a woman named Michelle Tedesco. She told me that they would create a Walmart storefront, manage the entire store and process, and I would get a commission on all items sold on my Walmart store.

3. Michelle sent me an email after we spoke.  She sent me links to a video of the owners of the company going through one of their seven warehouses, a slide deck, videos of clients' stores, a revenue projection table, and a link to a funding partner if I need to seek financial assistance.  Attached as **Attachment A** is a true and correct copy of this email.  I forwarded this email and links to the Federal Trade Commission on approximately March 5, 2024.

4. Michelle sent me two different profit projection spreadsheets.  One spreadsheet showed profits if I purchased an Amazon and Walmart bundle, (purchase two stores—Amazon and Walmart—for $50,000), and the second spreadsheet showed profits for just a single Walmart store.  The top of the spreadsheet said "2 Year Financial Projections."  These were dynamic spreadsheets and showed how much profit I could make depending on how much working capital I paid (how much inventory I purchased).  For a single Walmart store, spending $25,000 on working capital, I could make a profit of $63,496 in Year 1 and

$149,134 in Year 2. Starting around month 4, the spreadsheet said that I would make approximately $5,000-$7,000 per month during the first year. For two stores, with $25,000 working capital, my profit after one year was projected to be $101,526 and after two years, $240,852. Attached as **Attachment B** is a true and correct copy of these spreadsheets.

5. Michelle also told me that I would earn my initial investment back within the first year. I decided to move forward because it appeared that I could make thousands of dollars monthly with little to no work, I decided to open a Walmart store first.

6. Walmart seemed like the better option because the store would be operated using the dropshipping model. This meant that I would not have to purchase inventory in bulk ahead of time and store in a warehouse waiting for customer orders. When a customer orders a product from my Walmart store, the item would be purchased from another retailer, like Amazon, and sent directly to the purchaser to fulfill that order. This also meant that I would not have to spend as much money up front for inventory.

7. Michelle told me that Passive Scaling Inc. was the company that would handle the management of my automated Walmart store using the dropshipping model. Passive Scaling would fully operate and manage my account, and I would just sit back and receive the passive income from the store. Michelle sent me a contract from Passive Scaling Inc. She said, "our amazing team at Passive Scaling Inc will be taking care of you." Attached as **Attachment C** is a true and correct copy of this email.

8. I had some questions about certain contract provisions and reached out to Michelle. Michelle consulted with Asante Monadjemi, the founder and COO of Optimyze Digital who said that he would review the questions. Michelle then responded to my questions, although she agreed to only a few minor changes in the contract. In one of her answers,

she noted, "part of the benefit of working with Optimyze Digital is that we have designated customer support managers to provide additional assistance and support for any requests, questions, or inquiries regarding client stores." She also said, "the faster our clients begin making money, the faster we are making money with the profit share." The way she responded to my questions led me to believe that Optimyze Digital and Passive Scaling were working closely together as a team. Attached as **Attachment D** is a true and correct copy of these emails.

9. I signed the contract with Passive Scaling for an automated Walmart store in October 2021 and wired the initial fee of $30,000 to Passive Scaling Inc. In addition to the initial $30,000 fee, the contract also required me to pay a $99 software fee ("paid directly to the software provider"), and Passive Scaling would take 35% of the net profit or $199 per month for a management fee. The contract was signed by Amanada Peremen, Operations Manager at Passive Scaling Inc. The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, New Jersey 07020. Attached as **Attachment E** is a true and correct copy of the contract and wire instructions from Amanada Peremen.

10. The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

11. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating the earning and profit claims contained in their advertisements,

profit calculator, or made over the phone with the sales agent.  I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

12. Once I signed the contract, I received an email from Frances Schaper at Optimyze Digital letting me know that Passive Scaling received the payment.  She told me that "within 24 hours business hours you will receive your next steps for onboarding, as well as an email from Kerry Anne, our client success manager.  She can be reached at support@optimyzedigital.com and will be your go-to point of contact moving forward for any questions or concerns.  Attached as **Attachment F** is a true and correct copy of this email.

13. I received an email from Odain at Passive Scaling about the onboarding process.  Attached as **Attachment G** is a true and correct copy of this email.

14. It took several weeks for Passive Scaling to answer some basic questions I had about setting up my store.  Michelle at Optimyze finally answered me and told me that the onboarding process takes several weeks and that she would reconnect me with the support team.  Attached as **Attachment H** is a true and correct copy of these emails.

15. Passive Scaling had to submit an application to Walmart to open my store.  In November 2021, I sent Odain at Passive Scaling an email asking about my application.  He told me my site was up and running.  However, when I logged into my Walmart account, there was a notice that said, "your application has been declined and access to your account is restricted."  Odain sent me an email saying I should set up a meeting with them to discuss.  He cc'd Tatiana S, Jerdonna P, Optimyze Support and Trudy S.  Passive Scaling submitted

two appeals on my Walmart store, but the appeals were denied.  Attached as **Attachment I** are true and correct copies of some of these emails.

16. I wanted a refund.  In approximately December 2021, I had a video call with the owner of Passive Scaling, Steven Rozenfeld, and Tatiana, a Client Success Manager, and I asked for my money back.  Steven told me that Passive Scaling already incurred costs totaling approximately 30% of my initial fee in advertising and so it would not be a complete refund.  He said I had several options.  Passive Scaling could: (1) submit another application to Walmart; (2) give me a newly approved Walmart store; (3) or open an Amazon store for me.  Steven thought Amazon was better for me.  He said with Amazon there are no terminations, no approval issues, and more sales.  In addition, I could just purchase $750 in inventory to validate my store and then Passive Scaling would switch me to dropshipping.  He said Amazon doesn't have an approval process, but it approves sellers if the sellers prove their identities.   Steven then said that he has a distribution company and has warehouses full of inventory.  He said he could load $5,000 of inventory in the Amazon store as a way of refunding me.

17. I had previously heard from Passive Scaling that Walmart suspended and closed 60,000 storefronts in August that were using the dropshipping model.  I mentioned this to Steven. I did not sign my contract until October 2021.  I believe Steven knew before I sent Passive Scaling $30,000 for a Walmart store using the dropshipping model, that Walmart had closed these 60,000 accounts for the same conduct.

18. I decided to switch to Amazon because I was already out my $30,000 and wanted to try and recoup my money.  The one downside to switching to Amazon was that I would have

to use the "Fulfilled by Amazon" or "FBA" model.  This meant I would have to purchase inventory in bulk for storage at a warehouse.

19. In January 2022, I received an email confirming that Passive Scaling would give me a $5,000 refund that would be used to purchase inventory on my Amazon store.  Attached as **Attachment J** is a true and correct copy of this confirmation email.

20. After Passive Scaling opened the Amazon store, in April 2022, I received an email that said Adriane F is sourcing items for my store with 1HR vendor and this is the first purchase order on my behalf using the $5,000 credit.  I reached out in May 2022 and asked why there was only 1 purchase order so far for my store.  Michael (support@mail.salessupport.ladesk.com) responded and said the team is "in the process of sourcing items for your store with the 1 HR vendor."  But then the email stated that Amazon must approve all items sold in new stores and my store is restricted from selling items from 1 HR during the "ungating" process (being "ungated" means gaining approval from Amazon to sell certain products).  Amazon does not accept invoices from 1 HR for their ungating process.  Then Michael stated, "when the team begins to work on a new store we make purchases from a range of vendors in which we can use the invoices to ungate categories for selling on Amazon, then we secure items from 1 HR."  I responded by asking incredulously "why would you order from a vendor that Amazon does not accept items from and then tell me you are still in the process of sourcing items from this same vendor????"  When I responded I cc'd Michelle at Optimyze Digital.  After Passive Scaling used the $5,000 credit to source products from 1 HR, products which could not be used to sell on my store, Passive Scaling asked me for a credit card to purchase additional products for my store.  I said no.  I could not understand why Passive Scaling would order products

that could not be sold in my store. I flat out refused to give Passive Scaling my credit card or any more money. Attached as **Attachment K** is a true and correct copy of this email chain.

21. Although the Amazon store opened, no products were ever sold and I did not make any sales or profit on that store.

22. In May 2022, I sent a Breach of Contract and Refund Demand notification letter via certified mail to Amanda Peremen, Operations Manager at Passive Scaling. I discovered through research that Amanada Peremen is Amanda Peremen, Steven's wife. I sent her the demand letter since she signed the contract and sent me the wire transfer instructions. I said, "Passive Scaling has not delivered on any of its commitments and has failed to perform its contractual obligations. I have sent countless emails and had many conversations various representations of Passive Scaling and nothing happens other than more unkept promises. I am a meticulous recordkeeper and have documented all the written and oral communications with Passive Scaling regarding this matter." I demanded the entire $30,000 I paid for my initial fee. Attached as **Attachment L** is a true and correct copy of this letter.

23. I received a response in approximately June 2022 and I asked for two payments of $15,000. On June 6, 2022, Jerdonna emailed me and countered with $6,000 over five payments. There was some back and forth and Steven was added on to the emails. Attached as **Attachment M** is a true and correct copy of these emails.

24. I did not receive any payments from Passive Scaling. I then filed a lawsuit pro se in the Superior Court of New Jersey, Essex County on August 2, 2022. I named Passive Scaling

Inc. and asked for the full $30,000 I paid for my initial fee.  Attached as **Attachment N** is a true and correct copy of the complaint. (complaint)

25. After I filed the lawsuit, I had some communications again with Passive Scaling about a refund, and the company agreed to pay me $18,000 in 18 monthly installments.  I received one payment of $12,000 in October 2022.

26. In September 2022, there was a press release about Steven Rozenfeld and Passive Scaling saying that he helps ecommerce entrepreneurs build, grow and scale businesses.  The article said, "his company, Passive Scaling, is making giant strides in the ecommerce industry and lessening the operational burden of ecommerce business owners."  The article also said that he has nine warehouses and his team ensures the longevity, scalability and increased profitability of their clients' businesses.  This is not what I experienced at all.  Attached as **Attachment O** is a true and correct copy of this press release.

27. I reached out to Passive Scaling in November 2022 asking for my November payment.  The company missed the payment, and Jerdonna told me that the legal team would reach out to me.  In December 2022, I said to her, "I expect you to continue with your payment schedule making good on your proposed agreement to refund me…you would think a reputable company with ethical ownership and employees would not want this to continue…"  Jerdonna emailed me back and cc'd steven@dailydistro.com and asante@optimyzedigital.com and said, "since you filed the lawsuit, our legal team got involved and we can't do anything at this time without their approval.  If you're comfortable dismissing the suit, we can go back to regular payments.  The suit will likely take much longer.  We would prefer to just resume the payments but we can't do that when the legal team is involved.  With that said, you will always have option to open another suit

**PX13**                                                                    **000671**

if we don't resume payments." Attached as **Attachment P** is a true and correct copy of this email.

28. Because Passive Scaling stopped making any payments, the case went to mediation in July 2023. Steven showed up with his lawyer, and we came to a written agreement that Passive Scaling would pay me $18,000: $4,000 in one lump sum by July 25, 2023, and $1,000 per month for 14 months starting August 25, 2023. I received one payment of $4,000 on July 25, 2023, and then I received $1,000 on September 1, 2023. I never received another payment. The wire came from B Rosenfeld, Passive Scaling Inc. Steven's real name is Bratislav Rosenfeld. Steven defaulted on the rest of the payments. I sent a letter to Steven Rozenfeld and Usher Law Group giving formal notice that they have failed to make the required payments under the Memorandum of Agreement. I also wrote to the judge in the case asking for a judgment in the amount of $13,000, the balance due to me. The Judge granted this request and issued an Order requiring Passive Scaling to pay me $13,000 plus costs. Attached as **Attachment Q** are true and correct copies of the Memorandum of Agreement, emails, request for judgment and judgment.

29. I found other Passive Scaling clients through a Facebook group and realized that there are many others who had a similar experience and who lost tens of thousands of dollars. In addition, there are others who sued the company.

30. Passive Scaling has ignored the court order and still owes me $13,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 19, 2024
West Orange, New Jersey

Lynn Rojas

9

| | |
|---|---|
| **From:** | Michelle Tedesco <michelle@optimyzedigital.com> |
| **Sent:** | Thursday, August 19, 2021 11:18 PM |
| **To:** | ███████████████ |
| **Subject:** | Walmart & Amazon Automation |

Hi Lynn,

It was great connecting with you today and getting to discuss our Walmart and Amazon programs. I am sending you a few links for you to review. First is a video of the owners of our company going through one of our seven e-commerce warehouses, the second is a link to our slide deck with a lot of the information we spoke of and videos of the backend of our clients' Amazon and Walmart stores as well as a revenue projection table, and the third link is to our funding partner if you decide you want apply for additional funding. The funding takes about five minutes to apply to see what you would qualify for and there is no requirement to follow through with their offer. They will respond within 72 hours with your offers and can fund within 7-10 days if it fits in alignment with what you are looking for to supplement for working capital. Please let me know if you have any questions or concerns and I look forward to speaking with you Friday August 27th at 1:30pm EST. Have a great evening.

https://youtu.be/TN-1PuO7mUo

https://my.visme.co/view/01yy7qg0-amazon-and-walmart-slide-deck#s1

https://apply.fundwise.com/optimyze

Best Regards,
Michelle
████████████

**Attachment A**



| | Starting Period | Q3 |
|---|---|---|
| | Bundle type | Single Walmart Store |
| | Working Capital Per Store | 25000 |
| | Management Profit Percentage | 35% |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $488,431 | $1,147,187 | $1,635,618 |
| Expenses | $424,935 | $998,053 | $1,422,988 |
| Client's Profit | $63,496 | $149,134 | $212,630 |

| Projected Asset Value at Mo 25 | - | $688,312 |
|---|---|---|

### Twenty Four Month Forecast

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | - | 5,423 | 7,989 | 11,975 | 14,602 | 19,969 | 14,992 | 13,756 | 16,453 | 18,245 | 18,636 | 16,701 | |
| Gross Revenue | - | 16,685 | 24,581 | 36,847 | 44,930 | 61,442 | 46,129 | 42,326 | 50,624 | 56,138 | 57,340 | 51,389 | 488,431 |
| Cost of Goods | - | 10,845 | 15,978 | 23,951 | 29,205 | 39,937 | 29,984 | 27,512 | 32,906 | 36,490 | 37,271 | 33,403 | 317,480 |
| Amazon Fees | - | 2,503 | 3,687 | 5,527 | 6,740 | 9,216 | 6,919 | 6,349 | 7,594 | 8,421 | 8,601 | 7,708 | 73,265 |
| Store Profit | - | 3,337 | 4,916 | 7,369 | 8,986 | 12,288 | 9,226 | 8,465 | 10,125 | 11,228 | 11,468 | 10,278 | 97,686 |
| Management Fee | - | 1,168 | 1,721 | 2,579 | 3,145 | 4,301 | 3,229 | 2,963 | 3,544 | 3,930 | 4,014 | 3,597 | 34,190 |
| Clients Profit | - | 2,169 | 3,196 | 4,790 | 5,841 | 7,987 | 5,997 | 5,502 | 6,581 | 7,298 | 7,454 | 6,681 | 63,496 |

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | 26,703 | 25,276 | 21,393 | 20,231 | 29,174 | 43,152 | 30,845 | 27,789 | 34,458 | 38,889 | 39,855 | 35,072 | |
| Gross Revenue | 82,163 | 77,771 | 65,826 | 62,249 | 89,765 | 132,774 | 94,908 | 85,504 | 106,024 | 119,657 | 122,631 | 107,915 | 1,147,187 |
| Cost of Goods | 53,406 | 50,551 | 42,787 | 40,462 | 58,347 | 86,303 | 61,690 | 55,578 | 68,916 | 77,777 | 79,710 | 70,145 | 745,672 |
| Amazon Fees | 12,324 | 11,666 | 9,874 | 9,337 | 13,465 | 19,916 | 14,236 | 12,826 | 15,904 | 17,949 | 18,395 | 16,187 | 172,078 |
| Store Profit | 16,433 | 15,554 | 13,165 | 12,450 | 17,953 | 26,555 | 18,982 | 17,101 | 21,205 | 23,931 | 24,526 | 21,583 | 229,437 |
| Management Fee | 5,751 | 5,444 | 4,608 | 4,357 | 6,284 | 9,294 | 6,644 | 5,985 | 7,422 | 8,376 | 8,584 | 7,554 | 80,303 |
| Clients Profit | 10,681 | 10,110 | 8,557 | 8,092 | 11,669 | 17,261 | 12,338 | 11,116 | 13,783 | 15,555 | 15,942 | 14,029 | 149,134 |

| | Q3 - 2021 | | | Q4 - 2021 | | | Q1 - 2022 | | | Q2 - 2022 | | | Q3 - 2022 | | | Q4 - 2022 | | | Q1 - 2023 | | | Q2 - 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | 16,685 | 24,581 | 36,847 | 44,930 | 61,442 | 46,129 | 42,326 | 50,624 | 56,138 | 57,340 | 51,389 | 82,163 77,771 | 65,826 | 62,249 | 89,765 132,774 | 94,908 | 85,504 106,024 119,657 122,631 | 107,915 |
| Total Cost | - | 14,516 | 21,385 | 32,057 | 39,089 | 53,455 | 40,132 | 36,824 | 44,043 | 48,840 | 49,886 | 44,708 | 71,482 67,661 | 57,269 | 54,157 | 78,096 115,513 | 82,570 | 74,388 92,241 104,102 106,689 | 93,886 |
| Client's Profit | - | 2,169 | 3,196 | 4,790 | 5,841 | 7,987 | 5,997 | 5,502 | 6,581 | 7,298 | 7,454 | 6,681 | 10,681 10,110 | 8,557 | 8,092 | 11,669 17,261 | 12,338 | 11,116 13,783 15,555 15,942 | 14,029 |

| | | |
|---|---|---|
| Starting Period | Q3 | |
| Bundle type | $50k Bundle Amazon/Walmart | |
| Working Capital Per Store | 25000 | |
| Management Profit Percentage | 35% | |



Amazon & Walmart 2 Year Financial Projections

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $928,015 | $2,179,659 | $3,107,674 |
| Expenses | $826,489 | $1,938,807 | $2,765,295 |
| Client's Profit | $101,526 | $240,852 | $342,379 |

Projected Asset Value at Mo 25   -   $1,111,626

## Twenty Four Month Forecast

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | - | 10,303 | 15,179 | 22,753 | 27,744 | 37,941 | 28,484 | 26,136 | 31,260 | 34,665 | 35,407 | 31,733 | |
| Gross Revenue | - | 31,702 | 46,704 | 70,008 | 85,366 | 116,740 | 87,644 | 80,419 | 96,186 | 106,661 | 108,946 | 97,639 | 928,015 |
| Cost of Goods | - | 20,606 | 30,358 | 45,505 | 55,488 | 75,881 | 56,969 | 52,272 | 62,521 | 69,330 | 70,815 | 63,465 | 603,210 |
| Amazon Fees | - | 6,340 | 9,341 | 12,601 | 15,366 | 21,013 | 15,776 | 14,475 | 17,313 | 19,199 | 19,610 | 17,575 | 168,611 |
| Store Profit | - | 4,755 | 7,006 | 11,901 | 14,512 | 19,846 | 14,899 | 13,671 | 16,352 | 18,132 | 18,521 | 16,599 | 156,194 |
| Management Fee | - | 1,664 | 2,452 | 4,165 | 5,079 | 6,946 | 5,215 | 4,785 | 5,723 | 6,346 | 6,482 | 5,810 | 54,668 |
| Clients Profit | - | 3,091 | 4,554 | 7,736 | 9,433 | 12,900 | 9,685 | 8,886 | 10,629 | 11,786 | 12,039 | 10,789 | 101,526 |

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | 50,736 | 48,024 | 40,648 | 38,439 | 55,430 | 81,988 | 58,606 | 52,799 | 65,470 | 73,888 | 75,725 | 66,638 | |
| Gross Revenue | 156,110 | 147,765 | 125,070 | 118,274 | 170,553 | 252,271 | 180,325 | 162,458 | 201,446 | 227,349 | 232,999 | 205,039 | 2,179,659 |
| Cost of Goods | 101,472 | 96,047 | 81,296 | 76,878 | 110,859 | 163,976 | 117,211 | 105,598 | 130,940 | 147,777 | 151,449 | 133,275 | 1,416,778 |
| Amazon Fees | 28,100 | 26,598 | 22,513 | 21,289 | 30,700 | 45,409 | 32,459 | 29,242 | 36,260 | 40,923 | 41,940 | 36,907 | 392,339 |
| Store Profit | 26,539 | 25,120 | 21,262 | 20,107 | 28,994 | 42,886 | 30,655 | 27,618 | 34,246 | 38,649 | 39,610 | 34,857 | 370,542 |
| Management Fee | 9,289 | 8,792 | 7,442 | 7,037 | 10,148 | 15,010 | 10,729 | 9,666 | 11,986 | 13,527 | 13,863 | 12,200 | 129,690 |
| Clients Profit | 17,250 | 16,328 | 13,820 | 13,069 | 18,846 | 27,876 | 19,926 | 17,952 | 22,260 | 25,122 | 25,746 | 22,657 | 240,852 |

| | | Q3 - 2021 | | | Q4 - 2021 | | | Q1 - 2022 | | | Q2 - 2022 | | | Q3 - 2022 | | | Q4 - 2022 | | | Q1 - 2023 | | | Q2 - 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | 31,702 | 46,704 | 70,008 | 85,366 | 116,740 | 87,644 | 80,419 | 96,186 | 106,661 | 108,946 | 97,639 | 156,110 | 147,765 | 125,070 | 118,274 | 170,553 | 252,271 | 180,325 | 162,458 | 201,446 | 227,349 | 232,999 | 205,039 |
| Total Cost | - | 28,611 | 42,150 | 62,272 | 75,933 | 103,840 | 77,959 | 71,533 | 85,557 | 94,875 | 96,907 | 86,850 | 138,860 | 131,437 | 111,250 | 105,205 | 151,707 | 224,395 | 160,399 | 144,506 | 179,186 | 202,227 | 207,253 | 182,382 |
| Client's Profit | - | 3,091 | 4,554 | 7,736 | 9,433 | 12,900 | 9,685 | 8,886 | 10,629 | 11,786 | 12,039 | 10,789 | 17,250 | 16,328 | 13,820 | 13,069 | 18,846 | 27,876 | 19,926 | 17,952 | 22,260 | 25,122 | 25,746 | 22,657 |

**From:**               Michelle Tedesco <myproposal@proposify.com>
**Sent:**               Friday, August 27, 2021 2:36 PM
**To:**
**Subject:**          Walmart Automation

Hi Lynn,

It was great speaking with you!

Here is a live link for your program contract:

<u>   Click to view proposal   </u>

From this point, our amazing team at Passive Scaling Inc. will be taking care of you. As you review, please let them know if you have any questions or requested revisions. They're here to help! You can reach them by email at <u>info@passivescaling.com</u>

We look forward to developing this program for you!

Kind regards,

Michelle Tedesco

**Attachment C**

**From:**        Michelle Tedesco <michelle@optimyzedigital.com>
**Sent:**         Thursday, September 23, 2021 9:08 PM
**To:**           Lynn Rojas
**Subject:**      Re: Contract Review

Hi Lynn,

Thank you for sending your concerns and requests. Some of these questions we can discuss on tomorrow's call. The amendments will need to reviewed by owners and before any adjustments can be made and we also schedule a follow up call for next week once they have reviewed and made potential adjustments where approved.

Have a great evening and talk to you soon.

Kindly
Michelle

Sent from my iPhone


On Sep 23, 2021, at 5:50 PM, Lynn Rojas █████████████████ wrote:


Hi Michelle,

I attached contract and highlighted a few areas that I have questions. Questions or comments below.


First Paragraph on first page- the date needs to be updated to the current date

Section 1 Section C- How frequently will Consultant respond to Customers' phone and email inquiries?

Section 2A- What are the obligations?  Shouldn't there be some sort of time limit on Consultant to delay the Commencement?  Shouldn't there be a time frame for the commencement to begin once client satisfies whatever obligations it is required to satisfy?

Section 2B- Confirm that you will use your best efforts to maintain a credit card or total credit limit of $30,000 within the first 8 months of the Agreement. Why 30K when your chart of income doesn't show that much needed to earn initial investment back within 18 months?

Section 3B-  You are required to pay the Consultant on a monthly basis the greater of $199 or 35% of the Net Profit from your stores – one or the

**Attachment D**

**PX13**                                                                **000677**

other?? So a monthly 199 is not required if the income supersedes that amount?

Section 5- On the second line it says that Consultant can terminate the Agreement "for cause" with 14 days prior written notice to Client. "Cause" is defined way too broadly. It is an act or omission by Client that interferes with the operation of the stores in Consultant's sole discretion or Client's breach of the Agreement. Needs to be much more objectively defined.

Section 5- Consultant is also permitted to terminate the Option Term without cause at any time. Why? This **should really be deleted**.

Section 9- This should apply bilaterally to Consultant, meaning that Consultant should not divulge any of Client's confidential information and Consultant should not solicit any employee or contractor of Client as well! Specifically, Consultant should agree to be bound by the first paragraph of Section 9, Section 9A and Section 9G.

Section 10A- The definition of "Prohibited Action" to trigger the Refund Policy is too broad. At a minimum, the words "and as to which actions under (1) and (2) above have resulted in the Suspension of Client's Store" should be deleted from the definition (which is on page 19 of the Agreement).

Section 11- The Limitation on Liability Section should either apply to both Client and Consultant or to neither Client nor Consultant. It is unfair or Consultant to be able to insulate itself with this provision unilaterally.

Section 13E- There is no connection to Florida in this transaction. Disputes should be resolved via arbitration in accordance with the law and in the location where the store is situated.

Section 13H- The last sentence **should be deleted** in its entirety. It is not reasonable at all.

Section 13N- The words "for a period of two (2) years" should be added to the end of the Section. Nothing should survive longer than that.

Section 13Q- This indicates that Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. What are those expenses?


Thank you for your time with this – your help is much appreciated.

Have a good night,
Lynn


**Attachment D**

&lt;Walmart Automation Contract Reply.pdf&gt;

**Attachment D**

**PX13**                                                                 **000679**

| From: | Michelle Tedesco <michelle@optimyzedigital.com> |
| Sent: | Wednesday, September 29, 2021 5:10 PM |
| To: | Lynn Rojas |
| Subject: | Re: Contract Review |

Hi Lynn,

Contract has been updated to reflect the notes below!

First Paragraph on first page- the date needs to be updated to the current date

- Updated

Section 1 Section C- How frequently will Consultant respond to Customers' phone and email inquiries?

- Responses are provided at the soonest time of availability, typically within no more than 24 business hours. However, part of the benefit of working with Optimyze Digital is that we have designated customer support managers to provide additional assistance and support for any requests, questions, or inquiries regarding client stores.

Section 2A- What are the obligations?  Shouldn't there be some sort of time limit on Consultant to delay the Commencement?  Shouldn't there be a time frame for the commencement to begin once client satisfies whatever obligations it is required to satisfy?

- During the setup process, the client has to obtain a few standard things such as an EIN, business bank account to be associated with the store, etc. We walk people through all of this, and handle as much as we can on our end to make it a simple and streamlined experience. Regarding timelines for commencement, we do all we can to launch as soon as possible, as we are on a broader timeline with our guarantee in place. The faster our clients begin making money, the faster we are making money with the profit share.

Section 2B- Confirm that you will use your best efforts to maintain a credit card or total credit limit of $30,000 within the first 8 months of the Agreement. Why 30K when your chart of income doesn't show that much needed to earn initial investment back within 18 months?

- Our forecasting charts reflect stores growing naturally without credit limit increases. With that said, the more credit available a client has, the further we can push stores meaning both parties have a higher earning potential. For that reason we encourage clients to scale their credit lines.

Section 3B- You are required to pay the Consultant on a monthly basis the greater of $199 or 35% of the Net Profit from your stores – one or the other?? So a monthly 199 is not required if the income supersedes that amount?

**Attachment D**

**PX13**                                                    **000680**

- That's correct, it is $199/mo until 35% of store profit exceeds that threshold. I.e. if 35% of profit = $200, that would be the total amount owed from client to consultant.

Section 5- On the second line it says that Consultant can terminate the Agreement "for cause" with 14 days prior written notice to Client. "Cause" is defined way too broadly. It is an act or omission by Client that interferes with the operation of the stores in Consultant's sole discretion or Client's breach of the Agreement. Needs to be much more objectively defined.

- This is broad because of the speed of changes with the policies of the Walmart platform, meaning definitions in this section would require constant updates. For this reason it is general, but you'll always be kept updated and our team will communicate with you to ensure everything is in alignment to keep stores open. This would only be acted upon if a client was refusing to, for example, provide some type of identity verification, work with us to change account details, etc. This is an important protection for us relative to our guarantee.

Section 5- Consultant is also permitted to terminate the Option Term without cause at any time. Why? This **should really be deleted.**

- This is in place for a situation in which case platform changes create a business scenario that is no longer profitable for Consultant. With that said, this would come after the availability of the guarantee, which means it does not create any risk for the client. Additionally, the store at this point could be sold at the sole benefit of the Client. Lastly, if the Client would want in this scenario to continue operation of the store under management, a new contract could be negotiated, or alternatively Optimyze will make sure a new team is put in place.

Section 9- This should apply bilaterally to Consultant, meaning that Consultant should not divulge any of Client's confidential information and Consultant should not solicit any employee or contractor of Client as well! Specifically, Consultant should agree to be bound by the first paragraph of Section 9, Section 9A and Section 9G.

- Updated - although it is worth noting that the confidentiality of Consultant's practices is what this section is referring to, i.e. trade secrets and process, and that does not apply mutually. There were already mutual terms regarding the disclosure of private information.

Section 10A- The definition of "Prohibited Action" to trigger the Refund Policy is too broad. At a minimum, the words "and as to which actions under (1) and (2) above have resulted in the Suspension of Client's Store" should be deleted from the definition (which is on page 19 of the Agreement).

- The definition "and as to which actions under (1) and (2) above" is very specific, and is defining under which terms (1) and (2) under "Prohibited Action" will result as a prohibited action granting client the right to a refund. This does not need to be changed.

**Attachment D**

Section 11- The Limitation on Liability Section should either apply to both Client and Consultant or to neither Client nor Consultant. It is unfair or Consultant to be able to insulate itself with this provision unilaterally.

- "THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT

    AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES

    OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY,

    CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS

    LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO

    THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL."

- With the protections granted in the contract

    regarding Consultant management of the store, this section of section 11 makes this fair. This is the clients business, our team is just managing. If there is mismanagement involved, there is a refund in place. But if there is a liability problem as a result of the normal business operation of our client's company, i.e. someone buys a scooter and they fall, resulting in a lawsuit, it would be your business that is responsible for the liability (although in almost all cases like this one, the manufacturer would be the liable party.)

Section 13E- There is no connection to Florida in this transaction. Disputes should be resolved via arbitration in accordance with the law and in the location where the store is situated.

- This has been updated to Hudson County, NJ, the county of operation of the consultant.

Section 13H- The last sentence **should be deleted** in its entirety. It is not reasonable at all.

- "Arm's-length negotiated amount" meaning: "both parties have equal bargaining power and are not subject to undue pressure or influence from the other party."

- "this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client." Meaning this section does not waive the fact that all other remedies of Consultant are prohibited.

- This section will remain as it's entirely mutual in the event of liquidated damage upon Consultant.

Section 13N- The words "for a period of two (2) years" should be added to the end of the Section. Nothing should survive longer than that.

- This is another mutual term. All protections granted will survive the maximum period by applicable law.

**Attachment D**

<u>Section 13Q</u>-  This indicates that Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act.  What are those expenses?

- This would be the brokering of the store, as applicable to this agreement, which could be negotiated and would be relevant to the current market expectations. Our service in this way would always be cheaper than using a service such as flippa or empire flippers.

Kind regards,

Michelle

On Sun, Sep 26, 2021 at 8:04 AM Michelle Tedesco <michelle@optimyzedigital.com> wrote:

Hi Asante,
Sounds great, I really appreciate.
Talk to you soon.

Best
Michelle

On Sep 25, 2021, at 3:17 PM, Asante Monadjemi <asante@optimyzedigital.com> wrote:

Hi Michelle,

Wasn't able to finish reviewing these requests with the team before leaving Friday. Quite a few sections are in question to be revised so it will take some time. I'll try to push to have this done by Monday.

Thanks!

Kind regards,

Asante Monadjemi

Founder & COO
Optimyze Digital
█████████████

**Attachment D**

**PX13**                                                        **000683**

On Thu, Sep 23, 2021, 6:04 PM Michelle Tedesco <michelle@optimyzedigital.com> wrote:

Hi Asante,
My accountant/ CPA client has sent me their contract requests. I wanted to forward them to you to review to see what we are able to amend and approve.

Talk to you soon
Michelle

Begin forwarded message:

**From:** Lynn Rojas ███████████████
**Date:** September 23, 2021 at 5:50:22 PM PDT
**To:** Michelle Tedesco <michelle@optimyzedigital.com>
**Subject: Contract Review**


Hi Michelle,

I attached contract and highlighted a few areas that I have questions.
Questions or comments below.


<u>First Paragraph on first page</u>- the date needs to be updated to the current date

<u>Section 1 Section C</u>- How frequently will Consultant respond to Customers' phone and email inquiries?


<u>Section 2A</u>- What are the obligations?  Shouldn't there be some sort of time limit on Consultant to delay the Commencement? Shouldn't there be a time frame for the commencement to begin once client satisfies whatever obligations it is required to satisfy?


<u>Section 2B</u>- Confirm that you will use your best efforts to maintain a credit card or total credit limit of $30,000 within the first 8 months of the Agreement. Why 30K when your chart of income doesn't show that much needed to earn initial investment back within 18 months?


<u>Section 3B</u>-  You are required to pay the Consultant on a monthly basis the greater of $199 <span style="color:red">or</span> 35% of the Net Profit from your stores – one or the other?? So a monthly 199 is not required if the income supersedes that amount?


**Attachment D**

**PX13**                                    **000684**

<u>Section 5</u>- On the second line it says that Consultant can terminate the Agreement "for cause" with 14 days prior written notice to Client. "Cause" is defined way too broadly. It is an act or omission by Client that interferes with the operation of the stores in Consultant's sole discretion or Client's breach of the Agreement. Needs to be much more objectively defined.

<u>Section 5</u>- Consultant is also permitted to terminate the Option Term without cause at any time. Why? This **should really be deleted**.

<u>Section 9</u>- This should apply bilaterally to Consultant, meaning that Consultant should not divulge any of Client's confidential information and Consultant should not solicit any employee or contractor of Client as well! Specifically, Consultant should agree to be bound by the first paragraph of Section 9, Section 9A and Section 9G.

<u>Section 10A</u>- The definition of "Prohibited Action" to trigger the Refund Policy is too broad. At a minimum, the words "and as to which actions under (1) and (2) above have resulted in the Suspension of Client's Store" should be deleted from the definition (which is on page 19 of the Agreement).

<u>Section 11</u>- The Limitation on Liability Section should either apply to both Client and Consultant or to neither Client nor Consultant. It is unfair or Consultant to be able to insulate itself with this provision unilaterally.

<u>Section 13E</u>- There is no connection to Florida in this transaction. Disputes should be resolved via arbitration in accordance with the law and in the location where the store is situated.

<u>Section 13H</u>- The last sentence **should be deleted** in its entirety. It is not reasonable at all.

<u>Section 13N</u>- The words "for a period of two (2) years" should be added to the end of the Section. Nothing should survive

**Attachment D**

000685

longer than that.

Section 13Q- This indicates that Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. What are those expenses?

Thank you for your time with this — your help is much appreciated.

Have a good night,

Lynn

Sent from my iPhone

On Sep 23, 2021, at 6:08 PM, Lynn Rojas ███████████████ wrote:

Perfect..

Thanks, talk tomorrow.

Lynn

**From:** Michelle Tedesco <michelle@optimyzedigital.com>
**Sent:** Thursday, September 23, 2021 9:08 PM
**To:** Lynn Rojas ███████████████
**Subject:** Re: Contract Review

Hi Lynn,

**Attachment D**

**PX13**                                              **000686**

Thank you for sending your concerns and requests. Some of these questions we can discuss on tomorrow's call. The amendments will need to reviewed by owners and before any adjustments can be made and we also schedule a follow up call for next week once they have reviewed and made potential adjustments where approved.

Have a great evening and talk to you soon.

Kindly
Michelle

Sent from my iPhone


On Sep 23, 2021, at 5:50 PM, Lynn Rojas ███████████████ wrote:

Hi Michelle,

I attached contract and highlighted a few areas that I have questions.
Questions or comments below.


First Paragraph on first page- the date needs to be updated to the current date

Section 1 Section C- How frequently will Consultant respond to Customers' phone and email inquiries?

Section 2A- What are the obligations?  Shouldn't there be some sort of time limit on Consultant to delay the Commencement?  Shouldn't there be a time frame for the commencement to begin once client satisfies whatever obligations it is required to satisfy?

Section 2B- Confirm that you will use your best efforts to maintain a credit card or total credit limit of $30,000 within the first 8 months of the Agreement. Why 30K when your chart of income doesn't show that much needed to earn initial investment back within 18 months?

Section 3B- You are required to pay the Consultant on a monthly basis the greater of $199 or 35% of the Net Profit from your stores – one or the other?? So a monthly 199 is not required if the income supersedes that amount?


**Attachment D**

Section 5- On the second line it says that Consultant can terminate the Agreement "for cause" with 14 days prior written notice to Client. "Cause" is defined way too broadly. It is an act or omission by Client that interferes with the operation of the stores in Consultant's sole discretion or Client's breach of the Agreement. Needs to be much more objectively defined.

Section 5- Consultant is also permitted to terminate the Option Term without cause at any time. Why? This **should really be deleted.**

Section 9- This should apply bilaterally to Consultant, meaning that Consultant should not divulge any of Client's confidential information and Consultant should not solicit any employee or contractor of Client as well! Specifically, Consultant should agree to be bound by the first paragraph of Section 9, Section 9A and Section 9G.

Section 10A- The definition of "Prohibited Action" to trigger the Refund Policy is too broad. At a minimum, the words "and as to which actions under (1) and (2) above have resulted in the Suspension of Client's Store" should be deleted from the definition (which is on page 19 of the Agreement).

Section 11- The Limitation on Liability Section should either apply to both Client and Consultant or to neither Client nor Consultant. It is unfair or Consultant to be able to insulate itself with this provision unilaterally.

Section 13E- There is no connection to Florida in this transaction. Disputes should be resolved via arbitration in accordance with the law and in the location where the store is situated.

Section 13H- The last sentence **should be deleted** in its entirety. It is not reasonable at all.

Section 13N- The words "for a period of two (2) years" should be added to the end of the Section. Nothing should survive longer than that.

Section 13Q- This indicates that Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. What are those expenses?

**Attachment D**

Thank you for your time with this – your help is much appreciated.

Have a good night,
Lynn

<Walmart Automation Contract Reply.pdf>

**Attachment D**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Walmart Automation

**Delivered on**
August 27, 2021

**Client**
Lynn Rojas

**Company**
PASSIVE SCALING INC

**Attachment E**

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $10,000** | $10,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Walmart pays every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $25,000 +** | | | |
| **TOTAL** | | | **$30,298** |

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of September 29, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Lynn Rojas, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with one (1) e-commerce stores on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.
   B. Review, research, source, select, and list products for the Client's Stores.
   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2021-10-04 13:29:43 (PDT)

2

**Attachment E**



2. **CLIENT RESPONSIBILITIES -**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION -**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



3

**Attachment E**

**PX13**                                                    **000693**



B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2021-10-04 13:28:45 (PDT)

4

**Attachment E**

**PX13**                                                    **000694**



6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



2021-10-04 13:28:42 (PDT)

5

**Attachment E**

**PX13**                                                      **000695**



9. **RESTRICTED ACTIVITIES –**

Parties acknowledge that during the Term of this Agreement both parties will have access to the other's Confidential Information which, if disclosed, could assist in competition against the exposed party by third parties. Parties recognize the highly competitive nature of the business performed under this contract including services and trade secrets of Consultant, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Parties agree that the following restrictions on activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of both parties, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, parties agree that they will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of the other party to leave the employ or contract of that party, or in any way interfere with the relationship between either party and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of either party to cease doing business with the other party, or in any way interfere with either party's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2023-10-04 15:28:42 (PDT)

6

**Attachment E**

**PX13**                                                                    **000696**



D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information.** The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Both parties acknowledge that they have carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on both parties, throughout the United States, under this Section 9. Both parties agree that all such restraints are necessary for the reasonable and proper protection of each party, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e,. throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



**Attachment E**



10. **REFUND POLICY –**

    A.  Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

    B.  The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00).

    C.  Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



2021-10-04 13:28:43 (PST)

8

**Attachment E**



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



9

**Attachment E**

**PX13**                                             **000699**



B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2023-10-04 13:28:43 (PDT)

10

**Attachment E**

**PX13**                                                                 **000700**



C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



2021-10-04 15:26:43 (PDT)

11

**Attachment E**



D. **Walmart Terms and Conditions -** Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to lynn ███████████. Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



12

Attachment E

**PX13**

**000702**



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Hudson County, New Jersey. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



13

**Attachment E**



H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment —** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



2021-10-04 13:20:43 (EDT)

14

**Attachment E**

PX13                                                    000704

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client –** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers. directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



**Attachment E**

**PX13**                                                                 **000705**



O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial –** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2021-10-04 13:28:43 (PDT)

**Attachment E**

PX13                                                      000706



Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"), Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



**Attachment E**

**PX13**                                              **000707**



14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.



2021-10-04 13:26:43 (PDT)

18

**Attachment E**

**PX13**                                                                 **000708**

6.  "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7.  "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8.  "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9.  "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

10. The term "Store" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

19

**Attachment E**

**PX13**                                                        **000709**



# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Lynn Rojas authorized representative and agent for service of process Date: October 04, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:


2021-10-04 13:28:43 (PDT)
_____

Lynn Rojas

**CONSULTANT:**

By: PASSIVE SCALING INC. Amananda Peremen, Operations Manager, authorized representative and agent for service of process.

Date: October 04, 2021

*Amananda Peremen*
2021-10-04 13:46:49 (PDT)

Amananda Peremen

20

**Attachment E**

**PX13**                                    **000710**

| From: | Amanada Peremen <no-reply@proposify.com> |
| Sent: | Monday, October 4, 2021 4:50 PM |
| To: | ████████████ |
| Subject: | Confirmation Email – Congratulations! |

| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Hi Lynn,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

Download now

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Name of Bank: Chase Bank
Address: 78 John Miller Way, Suite 227, Kearny, NJ 07032
Account # ████████
Routing # ████████ (WIRE)
# ████████ (ACH)
**\*\*\*\*\*PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS**

Once the payment has been submitted, please email a receipt to info@passivescaling.com and payments@optimyzedigital.com so we can match the sender name to our records as soon as possible, and once payment has cleared to our account, our team will reach out with instructions for your next steps!

**Attachment E**

**PX13**                                              **000711**

Please reach out to both emails if you have not received an onboarding email within 24 business hours of payment completion, *and include your confirmation.* We will be there every step of the process!

For alternative payment conditions, please reach out to payments@optimyzedigital.com.

Thanks again, and we look forward to building your program!

| | |
|---|---|
| **From:** | Frances Schaper <payments@optimyzedigital.com> |
| **Sent:** | Tuesday, October 12, 2021 1:32 PM |
| **To:** | Lynn Rojas |
| **Subject:** | Re: Payment Confirmation |

Hi Lynn,

I apologize for the delay, but I just got confirmation from Passive Scaling that they received your payment!

Within 24 hours business hours you will receive your next steps for onboarding, as well as an email from Kerry Anne, our client success manager. She can be reached at support@optimyzedigital.com and will be your go-to point of contact moving forward for any questions and concerns.

Kind regards,

Frances

On Mon, Oct 11, 2021 at 9:04 AM Lynn Rojas ██████████████ wrote:

> Hi Frances,
>
> We're you able to receive confirmation on my wires from Passive Scale?
>
> Thank you,
> Lynn
>
> Get Outlook for iOS
> _____
> **From:** Frances Schaper <payments@optimyzedigital.com>
> **Sent:** Friday, October 8, 2021 2:16:42 PM
> **To:** Lynn Rojas ██████████████
> **Subject:** Re: Payment Confirmation
>
> Hi Lynn,
>
> Thank you for sending this over!
>
> I am waiting on confirmation from Passive Scaling, but will be in touch ASAP.
>
> Looking forward to this partnership!
>
> Frances

**Attachment F**

**PX13**                                                                **000713**

On Wed, Oct 6, 2021 at 11:42 AM Lynn Rojas ‹ ██████████████ › wrote:

Good Afternoon,

Both payment conformations attached.

I look forward to working with you!!

Best,

Lynn Rojas
████████████

--



**Payments**
Optimyze Digital LLC

_____

☐   payments@optimyzedigital.com
☐   www.optimyzedigital.com
☐   3333 Michelson Dr. Suite 300, Irvine, CA

--

**Payments**
Optimyze Digital LLC

_____

☐   payments@optimyzedigital.com
☐   www.optimyzedigital.com
☐   3333 Michelson Dr. Suite 300, Irvine, CA

**Attachment F**

**PX13**                                                    **000714**

| From: | Odain K <odain@passivescaling.com> |
| Sent: | Tuesday, October 26, 2021 5:19 PM |
| To: | Lynn Rojas |
| Cc: | Tatiana S; Jerdonna P; Tracey T; Trudy S; Optimyze Support |
| Subject: | Re: We are very excited to have you on board! |

Hi Lynn,

Congratulation! on completing the Onboarding process!

This email is just to set the expectation for the next steps in the process:
1. You will receive an email from your resales team by the end of today into tomorrow regarding assisting you with getting your Resales Certificate.
2. Now that onboarding is completed, please schedule an appointment with our application specialist who will assist with setting up your accounts for amazon, Please Click Here and select **Application Team.**

For your call with the **Application Team** please have on hand the following documents:
1. Drivers License or Passport
2. Bank Account
3. Recent Bank statement or Credit Card statement in your name or that of the business
4. Photo of front and back of Drivers' License.

As advised the call may take 30mins-1 hour to have your application completed. If for any reason you are unable to make the call please let us know in advance.

## *Kind Regards,*

### *Odain K*



**Onboarding Specialist**
**Direct:** ▮▮▮▮▮▮▮
**Email *odain@passivescaling.com***

On Tue, Oct 26, 2021 at 3:06 PM Lynn Rojas ▮▮▮▮▮▮▮▮▮▮ wrote:

Hi Odain,

Attached is my W9. I believe Tatiana said this form should match my EIN document, which has my maiden name on it.
If this form needs to be corrected, please let me know.

Thank you,

**Attachment G**

Lynn

**From:** Odain K <odain@passivescaling.com>
**Sent:** Tuesday, October 26, 2021 3:40 PM
**To:** ███████████████
**Subject:** We are very excited to have you on board!

Hello Lynn,

We are very excited to have you on board! We know you are as excited as we are to get your storefront live and you probably have many questions. We want to assure you we are here to assist you every step of the way.

To get the process going, please click the link below to get started on filling out the Onboarding form:
 https://sjbzqk86dde.typeform.com/to/i8uHEYno

## Please use the link below to add your credit card information

https://sjbzqk86dde.typeform.com/to/yvVX4FtU?typeform-source=www.google.com

If you have any questions, please do not hesitate to contact us by phone: +18 507 211 791

We look forward to connecting with you soon. Have a great day!

--
*Kind Regards,*

*Odain K*



*Onboarding Specialist*
*Direct:* +███████████
*Email* odain@passivescaling.com

--
*Kind Regards,*

*Odain K*

**Attachment G**

**PX13**                                                **000716**

***Role: Onboarding Specialist***
***Direct:*** +■■■■■■■■
***Email*** **[odain@passivescaling.com](mailto:odain@passivescaling.com)**

**Attachment G**

**PX13**                    **000717**

| | |
|---|---|
| **From:** | Michelle Tedesco <michelle@optimyzedigital.com> |
| **Sent:** | Monday, October 25, 2021 10:27 AM |
| **To:** | Lynn Rojas |
| **Cc:** | Optimyze Support |
| **Subject:** | Re: Sloan Barrett LLC client Lynn Rojas |

Hi Lynn,
Thank you for reaching out and explaining your concerns. The on boarding process does take several weeks as mentioned but I do want to make sure you have been communicated with by our teams. I am going to reconnect you with the support team so you can schedule a call or time to communicate to get the updates on your store, process, and timeline. The support email will have access to your account management and is your go to resource. They should be in touch soon.

I hope you have a great Monday.
Kindly
Michelle

On Oct 23, 2021, at 6:52 AM, Lynn Rojas ██████████████ wrote:

Morning Michelle,

Sorry for the early morning email, but, at this point, needed to get the questions and concerns that are starting to swirl around in my mind out of there and on paper. I'm sending this email to you as you have been the only one that responds.

Almost 3 weeks ago I wired $30,000 to Passive Scaling. I spoke to Kerry Anne on October 15th and sent her my questions below, about 45 minutes after I got off the phone with her. Legitimate questions that stemmed from our first and only conversation – questions that I need answered before I can move on. She told me I was able to use my current LLC since it is aged and not have to purchase one. I then had the following questions, no answer. No answer from my email 10-15 , no answer from my follow up email 10-18 , no answer from your email to me CC'ing your support team to assist 10-19, and then phone number Kerry Ann gave me to call her if I needed (347) 3684-8872 – I get a recording that no one is available to answer my call at this time – anytime I call it.

Its actually insane. 3 weeks in, I have no idea if I can use my current LLC, I have no other LLC formed if not, because I cant get any responses to my questions, no bank account opened, and honestly – no further in the process then when you and I first connected, other than a contract is sign and paid for.

The 5-6 weeks on boarding process you mention below, I hope that's not a 5-6 week response time??

Nothing that is happening right now is coming close to our discussions. I am upholding my end of the agreement – I want this website up and running and am here to assist in

**Attachment H**

any way I can.

I was sent an email to upload docs to Tatiana. I can't upload if I cant get answer to questions raised below.
I just emailer Tatiana also, hoping to get some assistance.

What do you suggest I do at this point? It cant be just wait patiently as I haven't completed anything so far.

Thanks again for all of your assistance, its much appreciated.
I feel much better after writing this – thank you 😊

Enjoy the weekend,
Lynn

████████████

---

**From:** Michelle Tedesco <michelle@optimyzedigital.com>
**Sent:** Tuesday, October 19, 2021 1:49 PM
**To:** Lynn Rojas ◄█████████████
**Cc:** Optimyze Support <support@optimyzedigital.com>
**Subject:** Re: Sloan Barrett LLC client Lynn Rojas

Hi Lynn,
Thank you for reaching out today. I want to make sure that I connect you with our support team to assist. The on boarding process takes can take about 5-6 weeks. It looks like are right on track and our support team is here as your go-to resource for business management and operational support. I appreciate your patience as our team makes sure all aspects are set up. They will be able to give you status updates of your process as well.

They will be in touch shortly!
I hope you have a wonderful week.

Kindly
Michelle

On Oct 19, 2021, at 10:33 AM, Lynn Rojas ◄███████████████ wrote:

Get Outlook for iOS

**Attachment H**

**PX13**                                                                      **000719**

**From:** Lynn Rojas ██████████████████
**Sent:** Monday, October 18, 2021 4:47 PM
**To:** support@optimyzedigital.com
**Subject:** FW: Sloan Barrett LLC

Hi Kerry Anne,

Checking in to see if you were able to get any answers to my questions below?


Thank you,
Lynn

---

**From:** Lynn Rojas
**Sent:** Friday, October 15, 2021 12:09 PM
**To:** Optimyze Support <support@optimyzedigital.com>
**Subject:** RE: Sloan Barrett LLC

Hi Kerry Anne,

So, attached is what I received from NJ.
LLC's in NJ have "Certificate of Formation" where as Corporations have "Articles of Incorporation."

I did notice on my Cert of Form that it notes my business service is Accounting and Bookkeeping – Will I still be able to use my company name or will I need to file for another?
If I do have to file for another – what would my "business purpose" be?

If I can continue to use my current company – I have all information needed to send to you.

Also, my company was formed prior to my marriage – so my maiden name is listed on company. Is that a problem?

Thank you for your help.

Lynn

---

**From:** Optimyze Support <support@optimyzedigital.com>
**Sent:** Friday, October 15, 2021 11:15 AM
**To:** Lynn Rojas ██████████████████
**Subject:** Sloan Barrett LLC


**Attachment H**

**PX13**                                    **000720**

https://www.njportal.com/DOR/businessrecords/EntityDocs/BusinessCopies.aspx

**Kerry Anne Sadler**
**Support Team**

Optimyze Digital LLC

_____

support@optimyzedigital.com

www.optimyzedigital.com

3349 Michelson Dr. Suite 200, Irvine, CA

<Cert of Formation.pdf>

**Attachment H**

**PX13**                    **000721**

| | |
|---|---|
| **From:** | Odain K <odain@passivescaling.com> |
| **Sent:** | Friday, November 12, 2021 8:11 AM |
| **To:** | Lynn Rojas |
| **Cc:** | Tatiana S; Jerdonna P; Optimyze Support; Trudy S |
| **Subject:** | Re: We are very excited to have you on board! |

Hi Lynn,

I'm so sorry to hear that your store was denied, please use the link below to schedule a meeting so we can discuss the next steps forward.

**https://go.oncehub.com/OdainK**

Regards

Odain.

On Thu, Nov 11, 2021 at 9:11 PM Lynn Rojas █████████████████ > wrote:

> Hi Odain,
>
> I just logged into my seller account for Walmart and I got this notice.
>
> Can you provide me an update or what my next steps are?
>
> <span style="color:red">Your application has been declined and access to your account is restricted.</span>
>
> Thanks,
> Lynn Rojas
> ███████████

> **From:** Odain K <odain@passivescaling.com>
> **Sent:** Wednesday, November 3, 2021 2:41 PM
> **To:** Lynn Rojas <███████████████
> **Cc:** Tatiana S <help@passivescaling.com>; Jerdonna P <jerdonna@passivescaling.com>; Trudy S <trudy@passivescaling.com>; Optimyze Support <support@optimyzedigital.com>; Sherica S

**Attachment I**

**PX13**                                                                 **000722**

<sherica@passivescaling.com>
**Subject:** Re: We are very excited to have you on board!

Hi Lynn,

I just made some checks and I see that your site is up and running also, I've asked Sherica to reach out to you to help with the resale certificate.

Regards
Odain

On Wed, Nov 3, 2021 at 12:44 PM Lynn Rojas ███████████████ wrote:

> Hi Odain,
>
> I have not been contacted by your resales team as of today.
> I also had a call Monday with Alex to set up my account but my site wasn't up and running yet. I have re scheduled to this Friday.
> Is there any way to confirm the site is ready before that call?
>
> I need to open operating bank account also, and didn't want to do that until I have confirmed my application was approved by Walmart.
>
> Thank you for your assistance,
>
> Lynn Rojas
> ████████████

> **From:** Odain K <odain@passivescaling.com>
> **Sent:** Tuesday, October 26, 2021 5:19 PM
> **To:** Lynn Rojas ███████████████
> **Cc:** Tatiana S <help@passivescaling.com>; Jerdonna P <jerdonna@passivescaling.com>; Tracey T <tesheena@passivescaling.com>; Trudy S <trudy@passivescaling.com>; Optimyze Support <support@optimyzedigital.com>
> **Subject:** Re: We are very excited to have you on board!
>
> Hi Lynn,
>
> Congratulation! on completing the Onboarding process!
>
> This email is just to set the expectation for the next steps in the process:
>
> 1.    You will receive an email from your resales team by the end of today into tomorrow regarding assisting you with getting your Resales Certificate.
> 2.    Now that onboarding is completed, please schedule an appointment with our application specialist who will assist with setting up your accounts for amazon. Please Click Here and select **Application Team.**

**Attachment I**

For your call with the **Application Team** please have on hand the following documents:

1. Drivers License or Passport
2. Bank Account
3. Recent: Bank statement or Credit Card statement in your name or that of the business
4. Photo of front and back of Drivers' License.

As advised the call may take 30mins-1 hour to have your application completed. If for any reason you are unable to make the call please let us know in advance.

*Kind Regards,*

*Odain K*



***Onboarding Specialist***
**Direct:** ▮▮▮▮▮▮▮
**Email** **odain@passivescaling.com**

On Tue, Oct 26, 2021 at 3:06 PM Lynn Rojas ▮▮▮▮▮▮▮▮▮▮ wrote:

Hi Odain,

Attached is my W9. I believe Tatiana said this form should match my EIN document, which has my maiden name on it.
If this form needs to be corrected, please let me know.

Thank you,
Lynn

**From:** Odain K <odain@passivescaling.com>
**Sent:** Tuesday, October 26, 2021 3:40 PM
**To:** ▮▮▮▮▮▮▮▮▮▮
**Subject:** We are very excited to have you on board!

Hello Lynn,

We are very excited to have you on board! We know you are as excited as we are to get your storefront live and you probably have many questions. We want to assure you we are here to assist you every step of the way.

To get the process going, please click the link below to get started on filling out the Onboarding form:  https://sjbzqk86dde.typeform.com/to/i8uHEYno

**Attachment I**

Please use the link below to add your credit card information

https://sjbzqk86dde.typeform.com/to/yvVX4FtU?typeform-source=www.google.com

If you have any questions, please do not hesitate to contact us by phone: +18 507 211 791

We look forward to connecting with you soon. Have a great day!

--

*Kind Regards,*

*Odain K*



*Onboarding Specialist*
*Direct:* ███████████
*Email* **odain@passivescaling.com**


--
*Kind Regards,*

*Odain K*



*Role: Onboarding Specialist*
*Direct:* ███████████
*Email* **odain@passivescaling.com**

**Attachment I**

**PX13**                                           **000725**

| | |
|---|---|
| **From:** | Odain K <odain@passivescaling.com> |
| **Sent:** | Wednesday, November 17, 2021 10:53 AM |
| **To:** | Lynn Rojas |
| **Cc:** | Tatiana S; Optimyze Support; Jerdonna P; Trudy S |
| **Subject:** | Re: Meeting follow up |

Good morning Lynn,

We submitted the appeal to Walmart for the store but unfortunately, they denied the appeal for the store.

Please use the link below to schedule some time with us so we can discuss the next steps forward.

**https://go.oncehub.com/OdainK**

Regards,
Odain

On Wed, Nov 17, 2021 at 10:41 AM Lynn Rojas ▮▮▮▮▮▮▮▮▮▮▮ wrote:

> Morning Odain,
>
> I was wondering if you have heard anything back on my appeal. Hoping you have good news 😊
>
> Talk soon,
>
> Lynn
>
> **From:** Odain K <odain@passivescaling.com>
> **Sent:** Friday, November 12, 2021 3:54 PM
> **To:** Lynn Rojas ▮▮▮▮▮▮▮▮
> **Cc:** Tatiana S <help@passivescaling.com>; Optimyze Support <support@optimyzedigital.com>; Jerdonna P <jerdonna@passivescaling.com>; Trudy S <trudy@passivescaling.com>
> **Subject:** Meeting follow up
>
> Hi Lynn
>
> We have submitted the appeal for your Walmart store that was denied and we should get a response within 24-48 business hours. As mentioned, if your appeal isn't granted we can move forward to purchase an aged LLC from Wyoming corp and reapply for a Walmart store for you. Also, we will not be applying for the resale certificate for you as per your request. I'll be following up with you in the coming week regarding your appeal and what the next steps are.
> --

**Attachment I**

*Kind Regards,*

*Odain K*



*Onboarding Specialist*
*Direct:* █████████
*Email* ***odain@passivescaling.com***

**Attachment I**

**From:**           Tatiana S <support@mail.salessupport.ladesk.com>
**Sent:**           Monday, January 17, 2022 11:31 AM
**To:**             Lynn Rojas; Tatiana S; Tatiana S; Support
**Subject:**        Re: Email - [PFN-QNTPN-833]

**Follow Up Flag:**     Follow up
**Flag Status:**        Flagged

Hey Lynn,

This email is confirming we have agreed to give you a partial refund of your initial investment of $5,000.

This is going to you in the form of inventory sent to your amazon account and will reflect on invoices.

This will also be considered against any buyback obligations in the future.

**Kind Regards,**
**Tatiana S.**
**Client Success Manager**
**Direct:**▮▮▮▮▮▮▮▮▮▮
**Email:** Tatiana@passivescaling.com

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

**Attachment J**

**PX13**                                                  **000728**



**From:** Lynn Rojas
**Sent:** Wednesday, May 4, 2022 10:05 PM
**To:** Michael <support@mail.salessupport.ladesk.com>; Adriane F <adriane@cataliquestore.com>; jerdonna@passivescaling.com
**Cc:** Tatiana S <tatiana@passivescaling.com>; Tatiana <Tatiana@sales.support>; Michelle Tedesco <michelle@optimyzedigital.com>
**Subject:** RE: Hi there,Here is a... - [WQR-VTQXM-215]
**Importance:** High

Michael and Jerdonna,

You start your email with "The team is still in the process of sourcing items for your store with the 1HR vendor" then proceeded to state that "Amazon does not accept the invoices from 1HR for their ungating process."
Why would you order from a vendor that Amazon does not accept items from and then tell me you are still in the process of sourcing items from this same vendor????

Tatiana,
You instructed them to place order from 1HR – why would you place an order "supposably" from a vendor that Amazon does not accept items from to ungate my store?

I want you to forward to me **today** where Amazon notified you that they would not accept any items from the 1HR Vendor for sale on my store.

Lynn Rojas

---

**From:** Michael <support@mail.salessupport.ladesk.com>
**Sent:** Wednesday, May 4, 2022 9:42 PM
**To:** Lynn Rojas ⬛⬛⬛⬛⬛⬛⬛⬛>; Adriane F <adriane@cataliquestore.com>
**Cc:** Tatiana S <tatiana@passivescaling.com>; Tatiana <Tatiana@sales.support>; Michelle Tedesco <michelle@optimyzedigital.com>
**Subject:** Re: Hi there,Here is a... - [WQR-VTQXM-215]

**Attachment K**
**PX13**
**000729**

Hi Lynn,

A pleasant good evening to you, I do hope you enjoyed the day.

<mark>The team is still in the process of sourcing items for your store with the 1HR vendor</mark>. Kindly be advised as a new store on Amazon it is required to get approval from Amazon to sell products in different categories, that is, the store is restricted from selling items in a category until it has been ungated. <mark>Amazon does not accept the invoices from 1HR for their ungating process</mark>, hence the team is sourcing limited items that your store is allowed to sell without requiring to complete the ungating process, which is proving difficult.

Generally when the team begins to work on a new store we make purchases from a range of vendors in which we can use the invoices to ungate categories for selling on Amazon, then we secure items from 1HR. Kindly note we will be pushing for additional items from the vendor, however, we may encounter more delays.

Sincerely,

Michael

-----Original message-----
From: Lynn Rojas ██████████████
Sent: 05/02/2022 18:30:26

Good Evening Michael.

Touching base on the additional orders. I only see one PO from 04/13.
Why have there not been and additional orders placed since?
Per our last conversation, you said orders should be placed every week in order to keep up inventory and streamline sales.
Not sure why there haven't been at least 2 or 3 more orders placed.

Tatiana,

We spoke March 17th and you told me orders would be placed immediately.
Again, almost 7 weeks have since past and there is no movement on the account.
I would like an update as to WHY this is taking so long...

Lynn Rojas

**From:** Michael <support@mail.salessupport.ladesk.com>
**Sent:** Sunday, April 17, 2022 9:26 PM
**To:** Lynn Rojas ███████████████>; Adriane F <adriane@cataliquestore.com>
**Subject:** Re: Hi there,Here is a... - [WQR-VTQXM-215]

Hi Lynn,

A pleasant good evening to you, I do hope you are enjoying the weekend.

Adriane has been sourcing items with the 1HR vendor, and yes this is the first purchase order being submitted on your behalf. We will be working with the vendor to utilize the remaining credits available on your account in the shortest possible time.

Sincerely,


Michael


-----Original message-----
From: Lynn Rojas ███████████████
Sent: 04/14/2022 07:35:30

**Attachment K**
**PX13**

000731

LYNN SCAFIDI ROJAS



May 26, 2022

**VIA CERTIFIED MAIL RRR**
Ms. Amanda Peremen
Operations Manager
Passive Scaling Inc.
223 Veterans Blvd.
Carlstadt, NJ 07020

Re: BREACH OF CONTRACT – REFUND DEMAND

Dear Ms. Peremen,

In October 2021, I paid $30,000.00 to Passive Scaling Inc. to set up 1 e-commerce store on the Walmart platform. Passive Scaling committed to setting up this store and having initial transactions within three (3) months.

I fully performed each and every time something was requested from me without delay and on a timely basis. To the contrary, Passive Scaling has not delivered on any of its commitments and has failed to perform its contractual obligations.

I have sent countless emails and had many conversations various representatives of Passive Scaling and nothing happens other than more unkept promises. I am a meticulous recordkeeper and have documented all the written and oral communications with Passive Scaling regarding this matter.

It is clear that Passive Scaling has failed to perform and is unwilling or unable to do so. I have made multiple requests for my money back. I am once again demanding the full and immediate return of my $30,000.00. If the entire $30,000.00 is not returned to me, in cash, within the next five (5) business days, I will be turning this matter over to the law firm I work with. They will pursue litigation that will include breach of contract and consumer fraud claims (seeking treble damages).

Please email me at lynn_rojas@outlook.com for my wire instructions.

Sincerely,

Lynn Scafidi Rojas

Cc:  Mark A. Lustbader, Esq.

**Attachment L**

**PX13**                                                                 **000732**

| | |
|---|---|
| **From:** | Jerdonna P |
| **To:** | ████████████ |
| **Cc:** | info@passivescaling.com; STEVEN |
| **Subject:** | Re: Breach of Contract - Refund Demand - [HTW-LSQRV-288] |
| **Date:** | Monday, June 6, 2022 3:50:25 PM |

Hi Lynn,

I hope this email finds you well

This is a follow-up to your email on the terms of your refund request.

Before I go into providing our counter terms you did mention that we have a card on file that we charged 99 for the sales. support subscription, we would just like to clarify that unless you had agreed for that card to be charged for purchasing products we would have only been able to use the card on file for its intended purpose which was to pay for the sale. support subscriptions. You made it very clear on several occasions that you would not be proving a card or nor would you be giving approval for us to charge your card for the purchase of products for the stores. Thus we are maintaining that we did not have a card on file for purchasing products for the store.

**Re: Payment Terms**

**Your above terms were  2 month payback period. 2 payments, 30 days apart, each payment being $15,000.00 USD**

**At this time we are unable to process the above request instead we are asking you to consider the repayment of the 30,000 payable to you in 5 months at 6,000 per month. We are also willing to include the first month's payment of 6,000 as soon as the waiver is signed.**

Sincerely,

-----Original message-----
From: Jerdonna P <support@mail.salessupport.ladesk.com>
Sent: 06/03/2022 17:27:46

Hi Lynn,
Thank you for responding

The above was sent to the team a follow up will be provided with in 24 business hrs

Thanks again for your patience

Sincerely,



**From:** Lynn Rojas
**Sent:** Wednesday, June 22, 2022 10:36 PM
**To:** 'Jerdonna P' <support@mail.salessupport.ladesk.com>; STEVEN <SALES@PASSIVESCALING.COM>
**Cc:** Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com; Tatiana S <support@mail.salessupport.ladesk.com>; Tatiana S <tatiana@passivescaling.com>; Tatiana S <help@passivescaling.com>
**Subject:** RE: Proposal from PASSIVE SCALING - [HRQ-WKXRH-166]

Jerdonna,

Section C in the updated proposal I received states: (I have added the yellow comments.)

**1. CONSIDERATION**
(A) All Parties to this agreement as described above that upon acceptance of
$30,000.00 from Passive Scaling Inc., constitutes a full and complete waiver of any and all
Liability or Claims that the Client may have against Passive Scaling Inc. from the beginning of time until
the date of the full execution of the instant agreement.
(B) No Officer, Party, Successor or Assign of Client shall be able to bring any action against
Passive Scaling, Inc., and if such action is brought in violation of this agreement, the Client shall be
responsible in addition to all attorneys fees costs of Passive Scaling, Inc. in Defending such an action
also for Liquidated Damages in the about of Twenty Five Thousand Dollars ($25,000.00). This

liquidated damages fee shall not preclude Passive Scaling from seeking additional damages against client
pursuant to the laws Governing the State of New Jersey as well as Federal law.

ADDITIONALLY, THIS CONTRACT WOULD ALLOW FOR US TO CONTINUE WORKING WITH THE CLIENT on an as needed basis.

**(C) The $30,000.00 payment will be processed according to the schedule below:**

**-The first payment of $6,000.00 will be processed when the proposal is signed.**

**-The second payment (off $6,000.00 USD) will be processed in July 2022.**

**-The third payment (off $6,000.00 USD) will be processed in August 2022.**

**-The fourth payment (off $6,000.00 USD) will be processed in September 2022.**

**-The fifth payment (off $6,000.00 USD) will be processed in October 2022.**

The agreement we had is in email attached. Please note your offer on attached email:

**"At this time we are unable to process the above request instead we are asking you to consider the repayment of the 30,000 payable to you in 5 months at 6,000 per month. We are also willing to include the first month's payment of 6,000 as soon as the waiver is signed."**

You must add $6,000 per payment and re send proposal to me so we can sign and get the ball rolling.
This agreement was made 15 days ago and we are still here emailing about a proposal that your legal department can't get right???
This change is simple enough to make – I want this completed and signed by Friday, June 24, 2022 .

Lynn Rojas

**From:** Jerdonna P <support@mail.salessupport.ladesk.com>

**Attachment M**

**Sent:** Wednesday, June 22, 2022 9:20 PM
**To:** Lynn Rojas ██████████████████>; STEVEN <SALES@PASSIVESCALING.COM>
**Cc:** Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com
**Subject:** Re: Proposal from PASSIVE SCALING - [HRQ-WKXRH-166]


Hi Lynn,

The waiver you have has been adjusted to reflect the requested updates

Please review with your team and confirm if the updates are satisfactory

Sincerely,



-----Original message-----
From: Lynn Rojas ████████████████████
Sent: 06/21/2022 10:47:31



Jerdonna,

Did you receive my last email from this past Sunday?
If so - I haven't gotten anything since that email.

Lynn

Get Outlook for iOS

**From:** Jerdonna P <support@mail.salessupport.ladesk.com>
**Sent:** Tuesday, June 21, 2022 11:41:59 AM
**To:** Lynn Rojas ██████████████████>; STEVEN <SALES@PASSIVESCALING.COM>
**Cc:** Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com
<info@passivescaling.com>; Mark Lustbader <mark@hubnj.com>
**Subject:** Re: Proposal from PASSIVE SCALING - [HRQ-WKXRH-166]

Hi Lynn,

Please confirm if you have received my other emails sent to the previous emails thread
asking you to confirm if you have received the updated waiver with the additions you
requested ?

<div align="center">

**Attachment M**
**PX13**

</div>

Sincerely,

-----Original message-----
From: Lynn Rojas ███████████████
Sent: 06/15/2022 18:48:16

**From:** Lynn Rojas
**Sent:** Monday, July 24, 2023 4:54 PM
**To:** Jerdonna P <jerdonna@passivescaling.com>
**Cc:** Passive Scaling Support <sales@passivescaling.com>
**Subject:** RE: Settlement Agreement

Jerdonna,

After review, I would like a $5,000 payment made to me today.

The balance of $13,000 will then be paid on the 24th of each month following until paid in full.

These payments can be wired into my account that you have on file.

Please review and adjust your offer below to reflect these changes if you agree.

If so, Steven would need to physically sign (no stamped signature) and send me a copy so I can counter sign and get back to you.


Lynn


**From:** Jerdonna P <jerdonna@passivescaling.com>
**Sent:** Monday, July 24, 2023 4:29 PM
**To:** ████████████
**Cc:** Passive Scaling Support <sales@passivescaling.com>
**Subject:** Settlement Agreement


Dear Lynn Rojas,

Following our meeting with the support team of Passive Scaling, we are pleased to present the following refund agreement as a settlement for the matter discussed:

Refund Amount: The settlement amount offered by Passive Scaling is 18,000 USD.

Payment Terms: The refund amount of 18,000 USD will be paid in monthly installments over a period of 18 months.

Installment Details: Each monthly installment will amount to 1,000 USD.

Initial Payment: Once this agreement is accepted by both parties, Passive Scaling will initiate the process by sending the first payment of 1,000 USD today, July 24,2023.

Acceptance of Terms: To confirm your acceptance of this agreement, please provide your signature below:

[Signature of Lynn Rojas]

By signing above, both parties agree to the terms and conditions outlined in this refund agreement. The acceptance of these terms signifies the willingness of both parties to resolve the matter in an amicable manner.

This agreement shall be legally binding upon acceptance and shall be governed by the laws of the New Jersey USA.

Please e-sign and return a copy of this agreement to Passive Scaling today  from the date of receipt to proceed with the settlement process.

We value your cooperation and look forward to the successful resolution of this matter.

Sincerely,

Jerdonna P.
Client Support Manager
Passive Scaling

[Signature of Company Representative]

Accepted and Agreed by:

[Signature of Lynn Rojas]
Lynn Rojas (Client)

Date: [Insert Date]

**Attachment M**
**PX13**                                                          **000740**

ESX-L-004500-22  08/02/2022  Pg 1 of 5  Trans ID: LCV20222813369
# 02290

## Form A

**Plaintiff or Filing Attorney Information:**

Name  Lynn Rojas

NJ Attorney ID Number

Address  ███████████████

Telephone Number  ████████████

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
ESSEX VICINAGE

AUG − 2 2022

FINANCE DIVISION
RECEIVED/FILED

|  |  |
|---|---|
| Lynn Rojas _____, Plaintiff, | Superior Court of New Jersey |
| v. | Civil   Division  Essex   ▾ County |
| Passive Scaling Inc. | _____ Part |
| 223 Veterans Blvd, Carlstadt, NJ 07020 _____, Defendant(s). | Docket No: _____ (to be filled in by the court) |
|  | Civil Action |
|  | **Complaint** |

Plaintiff, Lynn Rojas _____ , residing at
(your name)

████████████████ , City of West Orange
(your address)                                        (your city or town)

County of Essex _____ .
(your county)

State Of New Jersey, complaining of defendant, states as follows:

1.  On Octover 4 _____ , 2021 ___ , Passive Scaling Inc. _____ , Defendant
(name of person being sued)

(Summarize what happened that resulted in your claim against the defendant. Use additional pages if necessary.)
Entered into contract with me for a $30,000.00 fee. Passive Scaling was hired to apply for a storefront
with Walmart, configure Walmart storefront, list products on that site that would be up and operational
within 3 months, respond to my calls and emails and excercise good faith efforts to resolve all matters.
After I paid my fee to Passive Scaling, Walmart denied both applications set forth by Passive Scaling,
Inc. for my storefront. (See attached)

The defendant in this action resides at 223 Veterans Blvd, Carlstadt, NJ 07020 _____ .
(defendant's address)

In the County of Hudson _____ , State of New Jersey.
(name of county where defendant lives)

2.  Plaintiff is entitled to relief from defendant under the above facts.

Revised 11/17/2014, CN 10553
Revised 11/01/2013, CN 11210

BATCH # 122 FILED 8 2.2022
CHECK/RECEIPT# 391 AMT 250

page 6 of 7

**Attachment N**

**PX13**                                              **000741**

I was notified on December 9, 2021, via phone call by one "said" owner (Steven) and Client Success Manager (Tatiana S.) that they (Passive Scaling) knew in August 2021 that Walmart was not opening any more seller accounts but closed approximately 60,000 current operational storefronts because of shipping issues Walmart was having. I requested a refund of my investment and Passive Scaling sent me a proposal to refund me $6,000 per month for the next 5 months. To date, I have not received any monies. I am suing for breach of contract and consumer fraud (seeking treble damages).

**Attachment N**

**PX13**                                                            **000742**

## Form A

3. The harm that occurred as a result of defendant's acts include:  (list each item of damage and injury)

1. $30,000.00 fee paid to Passive Scaling for services not rendered

2.

3.

Wherefore, plaintiff requests judgment against defendant for damages, together with attorney's fees, if applicable, costs of suit, and any other relief as the court may deem proper.

Dated: 08/01/2022                    Signature:

## CERTIFICATION OF NO OTHER ACTIONS

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief.  Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated.  Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit.  In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Dated:  08/01/2022                    Signature:

**OPTIONAL:  If you would like to have a judge decide your case, do not include the following paragraph in your complaint.  If you would prefer to have a jury to decide your case, please sign your name after the following paragraph.**

## JURY DEMAND

The plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court *Rules* 1:8-2(b) and 4:35-1(a).

Dated:                    Signature:

Revised 11/17/2014, CN 10553
Revised 11/01/2013, CN 11210                                             page 7 of 7

**Attachment N**

**PX13**                                             **000743**

## New Jersey Judiciary
## Civil Practice Division
# Civil Case Information Statement (CIS)

Use for initial Law Division Civil Part pleadings (not motions) under Rule 4:5-1.
Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the
black bar is not completed, or attorney's signature is not affixed.

### For Use by Clerk's Office Only

| Payment type ☐ check ☐ charge ☐ cash | Charge/Check Number | Amount $ | Overpayment $ | Batch Number |
|---|---|---|---|---|

| Attorney/Pro Se Name | Telephone Number | | County of Venue |
|---|---|---|---|
| Lynn Rojas | ██████████ ext. | | Essex |

| Firm Name (if applicable) | Docket Number (when available) |
|---|---|
| | |

| Office Address - Street | City | State | Zip |
|---|---|---|---|
| ██████████ | West Orange | NJ | 07052 |

| Document Type | Jury Demand |
|---|---|
| Complaint | ☐ Yes ■ No |

| Name of Party (e.g., John Doe, Plaintiff) | Caption Lynn Rojas, Plaintiff vs. Passive Scaling, Inc., Defendant |
|---|---|
| Lynn Rojas, Plantiff | |

Case Type Number (See page 3 for listing) _599_

| | | |
|---|---|---|
| Are sexual abuse claims alleged? | ☐ Yes | ■ No |
| Does this case involve claims related to COVID-19? | ☐ Yes | ■ No |
| Is this a professional malpractice case? | ☐ Yes | ■ No |

If "Yes," see N.J.S.A. 2A:53A-27 and applicable case law regarding your obligation to file an affidavit of merit.

| Related Cases Pending? | ☐ Yes | ■ No |
|---|---|---|
| If "Yes," list docket numbers | | |

| Do you anticipate adding any parties (arising out of same transaction or occurrence)? | ☐ Yes | ■ No |
|---|---|---|

| Name of defendant's primary insurance company (if known) | ☐ None | ■ Unknown |
|---|---|---|

Revised Form Promulgated by 04/19/2022 Notice to the Bar (effective 05/01/2022). CN 10517 (Appendix XII-B1)     page 1 of 4

**Attachment N**

| The Information Provided on This Form Cannot be Introduced into Evidence. |
|---|

Case Characteristics for Purposes of Determining if Case is Appropriate for Mediation

Do parties have a current, past or recurrent relationship?  ☐ Yes  ■ No
  If "Yes," is that relationship:
  ☐ Employer/Employee  ☐ Friend/Neighbor  ☐ Familial  ☐ Business
  ☐ Other (explain) _____

Does the statute governing this case provide for payment of fees by the losing party?  ■ Yes  ☐ No

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition.

♿ Do you or your client need any disability accommodations?  ☐ Yes  ☐ No
  If yes, please identify the requested accommodation:

  Will an interpreter be needed?  ☐ Yes  ■ No
  If yes, for what language?

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).**

Attorney/Self-Represented Litigant Signature:

Revised Form Promulgated by 04/19/2022 Notice to the Bar (effective 05/01/2022), CN 10517 (Appendix XII-B1)          page 2 of 4

**Attachment N**

**PX13**                                                        **000745**

# Steven Rozenfeld and Passive Scaling Helping E-commerce Entrepreneurs Build, Grow, and Scale

by AB Digital Inc

September 17, 2022 3:21 AM | 3 min read

    

Learn More



Novel Therapy Shows Promising Results In...

Diamond Lake Minerals $DLMI Takes 24%...

ETF Trends:

00:34

10:40 

Become An Options Master in Today's Market!

Wow! The S&P 500 hit an all-time high. Tech and health sectors are red hot. Now's the time to learn Nic Chahine's 411% gains-with-options secret. **Grab his free report now.**

Passive income has been demystified, and many solutions continue to spring up for people who want to earn passively. Steven Rozenfeld is one of the entrepreneurs who have developed a passive income earning model, implemented it, tried it out, and is now getting other entrepreneurs on that model. His company, Passive Scaling, is making giant strides in the e-commerce industry and lessening the operational burden of e-commerce business owners.



As a done-for-you e-commerce management firm, Passive Scaling specializes in marketplaces, including Amazon, and operates over eight warehouses nationwide. Its service focuses on managing e-commerce stores using safe marketplace-approved business practices merged with the latest technology to reduce shipping costs and last-mile delivery timelines. With over seven years of experience specializing in marketplaces, Passive Scaling is set to help e-commerce businesses get their jumpstart while giving them all the support they need to thrive.

The founder, Steven Rozenfeld's interest in business goes as far back as over a decade. His first experience was in warehousing, wholesale, and distribution as an automobile buyer for a family dealership in 2012. This experience gave him a solid understanding of negotiations and persistence, which positioned him to negotiate with big brands and distributions. It took him another three years to open his first Amazon store, which he operated profitably while scaling his monthly revenue to over 1 million dollars in sales per month. However, success in business for Steven didn't stop at just himself. He believed growth would be easier to attain if he focused on helping others, and he got the chance when someone hired him to help some clients.

He realized how rewarding it is to help people who weren't capable of doing the things he could do and achieve success on their behalf. Thus, Passive Scaling became a thing, and he focused on helping others and formed partner agreements to enable swift growth and expansion. He built and managed large-sized teams and placed them in departments with clear SOPs and KPIs. He implemented procedures that enabled him to extend the strategies he applied to his businesses to other people's businesses.

With Passive Scaling current growth trajectory, the company is looking to partner with entrepreneurs globally, irrespective of background. The goal is to diversify the company's investment portfolio and break into the e-commerce industry in a low-maintenance way.

"Our program packages range from 30k, with additional minimum working capital. Our team handles it all: from sourcing wholesale products for your store, responding to customer inquiries, order fulfillment and overall store management. In addition to our strategic team structure, we also guide you on the right business model through each stage to ensure the longevity of your business, scalability and increased profitability," Steven explained.

Passive Scaling introduces a less risky and marketplace compliant two-step shipping procedure that ensures store safety while maintaining profitability. With this model, e-commerce store owners don't have to do any heavy lifting but trust Passive Scaling to do all the work. And with nine warehouses, the company has a robust in-house network of warehouses across the United States that effectively moves products from one point to another.

Media Contact

**Company Name:** Passive Scaling

### Bitcoin Breaks Out New ATH Ahead?

The leading cryptocurrency broke key resistance. A green light for bulls. Gianni di Poce shares his thoughts in this week's Insider Report. **to Click Here to Grab a Copy for Just $0.99!**

**Contact Person:** Steven Rozenfeld

**Email:** Send Email

**Phone:** (850 ) 721-1791

**Country:** United States

**Website:** https://passivescaling.com/

## Become An Options Master in Today's Market!

Wow! The S&P 500 hit an all-time high. Tech and health sectors are red hot. Now's the time to learn Nic Chahine's 411% gains-with-options secret. **Grab his free report now.**

© 2024 Benzinga.com. Benzinga does not provide investment advice. All rights reserved.

**Posted In:**    News    Press Releases

More Press Releases from AB Digital Inc

How Can People Remotely Update IoT Devices?

Smart Micro Hydropower Systems Market Size, Share, Trends, Growth, Forecast (2024-2031)

ECG Patches and Holter Monitor Market Size, Share, Industry, Forecast and Outlook (2024-2031)



**From:** Lynn Rojas
**Sent:** Thursday, December 15, 2022 3:19 PM
**To:** Passive Scaling Support <sales@passivescaling.com>
**Cc:** Jerdonna P <support@mail.salessupport.ladesk.com>; Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com; asante@optimyzedigital.com; steven@dailydistro.com; Tatiana S <tatiana@passivescaling.com>; Michelle Tedesco <michelle@optimyzedigital.com>; amonadjemi22@gmail.com
**Subject:** RE: Re: Payment Transfer from Passive Scaling - [CVZ-CTQWS-016]

Steven and Asante,

There is no legal team, so let's just stop.

If there actually was, you should just let them know you owe me and need to pay me.

If there actually was, they would have contacted the courts within the 30 days of you both receiving the summons – it's the law. Date you both were served and signed was October 4th.

I did not pursue and further legal action since you started paying and will **not** if I receive my November and December payments by the end of this month.

The suit will not be dismissed until you pay me in full.


Lynn


**From:** Passive Scaling Support <sales@passivescaling.com>
**Sent:** Thursday, December 15, 2022 2:39 PM
**To:** Lynn Rojas ▮▮▮▮▮▮▮▮▮▮
**Cc:** Jerdonna P <support@mail.salessupport.ladesk.com>; Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com; asante@optimyzedigital.com; steven@dailydistro.com
**Subject:** Re: Re: Payment Transfer from Passive Scaling - [CVZ-CTQWS-016]

Hi Mrs Rojas,

**Attachment P**
**PX13**

**000750**

Since you filed a lawsuit, our legal team got involved and we cant do anything at this time without their approval.

If you're comfortable dismissing the suit, we can go back to regular payments. The suit will likely take much longer. We would prefer to just resume the payments but we cant do that when the legal team is involved. With that said , you will always have option to open another suit if we dont resume payments.


On Wed, Dec 14, 2022 at 6:00 PM Lynn Rojas ███████████████████> wrote:

Jerdonna,

Surprisingly enough - your legal team has not reached out.

All,

I expect you to continue with your payment schedule making good on your proposed agreement to refund me.
As you are well aware, when the remaining full payment of $18,000.00 is received by me, this suit becomes null and void.
This suit is no reason not to continue payments as you proposed and agreed to – you all know that, common sense guys.

You would think a reputable company with ethical ownership and employees would not want this to continue…

Your November payment is late.

Lynn Rojas
███████████

---

**From:** Jerdonna P <support@mail.salessupport.ladesk.com>
**Sent:** Monday, November 21, 2022 6:12 PM
**To:** Lynn Rojas ██████████████████
**Cc:** Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com
**Subject:** Re: Re: Payment Transfer from Passive Scaling - [CVZ-CTQWS-016]


Hi Lynn,

Apologies for the delay in response

**Attachment P**
**PX13**                                                                 **000751**

The current matter is with the legal due to the lawsuit filed

The legal team will provide a follow-up

Sincerely,

-----Original message-----
From: Lynn Rojas ████████████████
Sent: 11/17/2022 10:58:09

Jerdonna,

Please confirm I will be receiving my November installment by the end of this month.

Thank you,
Lynn

**From:** Jerdonna P <support@mail.salessupport.ladesk.com>
**Sent:** Monday, November 7, 2022 7:51 PM
**To:** Lynn Rojas ████████████████
**Cc:** Jerdonna P <jerdonna@passivescaling.com>
**Subject:** Re: Re: Payment Transfer from Passive Scaling - [CVZ-CTQWS-016]

Hi Lynn,

Thanks again

Sincerely,

**Attachment P**
**PX13**

**000752**

-----Original message-----
From: Lynn Rojas ███████████████
Sent: 11/07/2022 18:47:23

 SIGNATURE BANK®

## Wire Approval Confirmation

**The requests below have been transmitted successfully.**

Transmitted:                    07/25/2023 04:54:59 PM (ET)

Transmitted By:                 BROSENFELD

## Approved Wires

The requests below have been approved by you.

| Account | Template | Recipient | Amount | Currency | Effective | Confirmation Number | Approval Status |
|---------|----------|-----------|--------|----------|-----------|---------------------|-----------------|
| PASSIVE SCALING INC - ▓▓▓ | CLIENT - LYNN NEW - DO NOT USE! | Lynn Rojas | 4,000.00 | USD | 07/25/2023 | 2767440123 | 1 of 1 |
| | | Total : 1 items for | 4,000.00 | USD | | | |

**Attachment Q**

PX13                                                    000754

ESX-L-004500-22   2023-10-05 11:41:39.044   Pg 1 of 1   Trans ID: LCV20233050829

October 5, 2023

RE:        Rojas vs. Passive Scaling

Docket#:    ESX L 004500 22

To:    Essex County – Civil Division

Superior Court of New Jersey

465 Martin Luther King Jr Blvd

Newark, NJ 07102

Honorable Robert H. Gardner:

I am respectfully requesting a Judgement be entered against Passive Scaling Inc. for nonpayment of Memorandum of Agreement signed on July 25, 2023.

Passive Scaling Inc made their initial payment on July 25, 2023, of $4,000.00 and 1 subsequent payment on September 1, 2023, of $1,000.00.

I contacted both the defendant and representing counsel on September 25, 2023, with no response from either defendant or counsel.

At this time, I am requesting a Judgement be entered for the balance due to me of $13,000.00.

If you have any questions, please contact me at your earliest convenience.

Respectfully,

Lynn Rojas

**Attachment Q**

**PX13**                                                  **000755**

ESX-L-004500-22   2023-10-05 11:41:39.044   Pg 1 of 1   Trans ID: LCV20233050829

**September 25, 2023**

**RE:**          **Lynn Rojas vs. Passive Scaling Inc.**

**Docket No.:**     **ESX-L-004500-22**

**Memorandum of Agreement**

**To:**          **Passive Scaling, Inc. / Steven Rozenfeld**

               **Ushler Law Group**

               **This is formal notice under section 2a of the above referenced Memorandum of Agreement that you failed to make the required payment of $1,000.00 to me that was due on September 25, 2023.**

               **If this payment is not made in full by September 30, 2023, I will enter judgement for the full amount owed under the settlement agreement per the terms of the Memorandum of Agreement.**

**Sincerely,**

**Lynn Rojas**

## Lynn Scafidi

| | |
|---|---|
| **From:** | Lynn Rojas ▮ |
| **Sent:** | Thursday, October 5, 2023 11:14 AM |
| **To:** | Lynn Scafidi |
| **Subject:** | FW: Non Payment |
| **Attachments:** | Non payment 09-25-2023.docx |

**From:** Lynn Rojas
**Sent:** Monday, September 25, 2023 7:57 PM
**To:** 'STEVEN' <sales@passivescaling.com>; 'Jerdonna P' <jerdonna@passivescaling.com>
**Cc:** 'musheresq@gmail.com' <musheresq@gmail.com>
**Subject:** RE: Non Payment

All,

Please see attached.

Thank you,
Lynn Rojas
▮

**From:** Lynn Rojas
**Sent:** Friday, August 25, 2023 5:19 PM
**To:** STEVEN <sales@passivescaling.com>; Jerdonna P <jerdonna@passivescaling.com>
**Cc:** musheresq@gmail.com
**Subject:** Non Payment
**Importance:** High

All,

Please see attached.

Thank you,
Lynn Rojas
▮

1

**Attachment Q**

**PX13**                                    **000757**

**Lynn Scafidi**

| | |
|---|---|
| **From:** | Microsoft Outlook <MicrosoftExchange329e71ec88ae4615bbc36ab6ce41109e@sct-15-20-4755-11-msonline-outlook-cd57b.templateTenant> |
| **To:** | 'STEVEN'; 'Jerdonna P' |
| **Sent:** | Monday, September 25, 2023 7:57 PM |
| **Subject:** | Relayed: RE: Non Payment |

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

'STEVEN' (sales@passivescaling.com)

'Jerdonna P' (jerdonna@passivescaling.com)

Subject: RE: Non Payment

1

**Attachment Q**

**PX13**                                        **000758**

**Lynn Scafidi**

| | |
|---|---|
| **From:** | Microsoft Outlook <MicrosoftExchange329e71ec88ae4615bbc36ab6ce41109e@sct-15-20-4755-11-msonline-outlook-cd57b.templateTenant> |
| **To:** | 'musheresq@gmail.com' |
| **Sent:** | Monday, September 25, 2023 7:57 PM |
| **Subject:** | Relayed: RE: Non Payment |

**Delivery to these recipients or groups is complete, but no delivery notification was sent by the destination server:**

'musheresq@gmail.com' (musheresq@gmail.com)

Subject: RE: Non Payment

1

**Attachment Q**

**PX13**                                                                        **000759**

*Lynn Rojas vs. Passive Scaling, Inc.*

Docket No.: ESX-L-004500-22

Memorandum of Agreement

This matter having been the subject of a mediation session conducted on July 25, 2023 by the Court-Appointed Mediator, Lisa A. Freed, Esq. in the presence of: (i) Plaintiff(s), Lynn Rojas ("Rojas"), and (ii) Defendant(s), Passive Scaling, Inc. ("Passive"), and his/her counsel, Mikhail Usher, Esq. (The Usher Law Group, P.C.).

The parties have agreed that all matters in issue in this litigation are settled and resolved on the following terms:

1. Defendants, jointly and severally, shall:

   a. Wire transfer the sum of $4,000.00 to Plaintiff by 5:00 p.m. on July 25, 2023.

   b. Wire transfer $1,000.00 per month on the 25th of each month, commencing August 25, 2023, for the next 14 months for a total of $14,000.00.

2. Plaintiff, jointly and severally, shall:

   a. Notify Defendant and their counsel of any missed payments on or before the 26th of each month, providing Defendant with a five (5) day cure period. If Defendant does not provide the payment within the cure period, then Plaintiff will Enter Judgment for the full amount owed under this Settlement Agreement.

3. Upon completion of the matters as stated under paragraphs 1 and 2 above, counsel shall execute and file Stipulations of Dismissal with Prejudice and Without Costs as to both the Complaint and the Counterclaim in this matter. The Court shall retain jurisdiction to enforce the provisions of this settlement.

**Attachment Q**

**PX13**                                                                 **000760**

4. The parties have had the full opportunity to consult with counsel and have stated to the Mediator that each party is acting without any coercion or duress and are entering into this settlement of their own free will and accord.

5. Each party understands and agrees that no settlement may be forced upon them by the Mediator and that they are entering into this settlement freely and without reservation.

6. Each party represents that he or she or they have the ability to consummate and complete the terms of the settlement.

7. Each party has specifically stated that they have had ample opportunity to consult with their counsel and have engaged in such consultations.

8. Each party has specifically stated that they are satisfied with the quality of the legal services provided by their respective counsel.

9. Each party specifically stated that they have no further questions for the Mediator.

10.    The parties and counsel will work diligently and expeditiously to execute and deliver a fully integrated Settlement Agreement which shall be drafted by Plaintiff's counsel and shall include the above terms.

    It is the intention of the parties that this Memorandum of Agreement shall satisfy the requirements set forth by the New Jersey Supreme Court in <u>Willingboro Mall, LTD v. 240/242 Franklin Avenue LLC</u>, 215 <u>N.J.</u> 242 (2013) which confirms the requirement for settlement agreements reached as the result of a mediation to be reduced to a writing and a copy provided to each party. See, also, <u>R</u>. 1:40-4(i).

By: _____            By: _____
    Lynn Rojas, Plaintiff                    Passive Scaling, Inc., Defendant

                                       By: _____
                                           Mikhail Usher, Esq., Attorney for Defendant

**Attachment Q**

**PX13**                                              **000761**

**Form C**

**Plaintiff or Filing Attorney Information:**

Name  Lynn Rojas

NJ Attorney ID Number

Address

Email Address

Telephone Number

**FILED**

*11:10 am, Jan 05, 2024*

Superior Court of New Jersey
Law Division

Essex_____ County

Lynn Rojas_____,
            Plaintiff,

            v.

Passive Scaling Inc_____,
            Defendant(s).

Docket Number  ESX L 004500 22

Civil Action

**Order**

This matter having been brought before the Court on Motion of ■ plaintiff /□ defendant for an Order (describe relief requested):

Plaintiff requests entry of Judgment against Defendant in the amount of $13,000.00 for failure to make full and timely payments per amounts owed to Plaintiff pursuant to the MOA signed July 25, 2023.

and the Court having considered the matter and for good cause appearing,

On this  5th day of  January_____, 20 24, it is **ORDERED** as follows:

Defendant is hereby ordered to pay Plaintiff the sum of $13,000.00 and it is further

ORDERED that Judgment be entered in the amount of $13,000 plus cost against the Defendant, and it is further

ORDERED that a copy of this order shall be served upon all parties/counsel of record, within seven (7) days of the date hereof, per the Rules of Court.

□ **Opposed**        ☒ **Unopposed**        _____

                                            Hon. ROBERT H. GARDNER,  J.S.C.

Revised 08/15/2022, CN 10555                                    page 14 of 14

**Attachment Q**

**PX13**                                                        **000762**