## DECLARATION OF PANKIL SHAH
### Pursuant to 28 U.S.C. § 1746

I, Pankil Shah, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Pankil Shah.  I am over the age of 18 and reside in Jersey City, NJ.

2. In approximately December 2021 I was searching online for an automated ecommerce business to make money from.  I found a company called Optimyze Digital.  I spoke with Roman Sterling, a senior sales officer with Optimyze Digital.  Roman sent me an email with Optimyze Digital's contact information and the senior executives at the company.  He also gave me an amazing sales pitch.  He showed me a spreadsheet for "Amazon 2 Year Financial Projections" that calculated the profits I would make depending on how much I paid for inventory.  The spreadsheet was editable so I could see how the profits changed.  The spreadsheet said that if I invested $100,000 in working capital (inventory) over a two-year period, by month three I would start making a profit, and by month seven, I would make between $8,000 to $11,000 per month.  By the end of year one, I would make $78,686 in profit, and by the end of year two, I would make $204,148 in profit.   Attached as **Attachment A** is a true and correct copy of the spreadsheet and contact list.

3. Roman told me that Passive Scaling Inc was the company that would handle the management of my automated Amazon store.  Passive Scaling would fully operate and manage my account and I would just sit back and receive the passive income from the store.  Roman also set up a zoom call with Asante Monadjemi, co-owner with Justin Jeffers of Optimyze Digital, and he reiterated that this was a great way to make money.  He convinced me that Passive Scaling was a legitimate company and great to work with.

4. I decided to purchase this business opportunity because I thought I could make significant passive income based on the spreadsheet and because there was also a money back guarantee if I did not make my initial fee back in 18 months.

5. I signed the contract in January 2022 with Passive Scaling and wired the initial fee of $30,000 to Passive Scaling Inc.  In addition to the initial $30,000 fee, the contract also required me to pay a $99 software fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a management fee.  The contract was signed by Amananda Peremen, Operations Manager at Passive Scaling, Inc. The contract says that Passive Scaling Inc. is located at 78 John Miller Way, Suite 227 Kearny, NJ 07032.  Attached as **Attachment B** is a true and correct copy of the contract, welcome email and receipt.

6. The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

7. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in their profit calcuator or over the phone with the sales agent.  I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

8. It took approximately two months for my Amazon store to open.  At first, Passive Scaling was using the Fulfilled by Amazon or "FBA" model.  This meant that products that Passive

Scaling picked to sell in my Amazon store were purchased in bulk and stored in one of Passive Scaling's warehouses. Passive Scaling then shipped those items to the Amazon warehouse for Amazon to fulfill once Amazon customers placed orders.

9. I had to pay Passive Scaling for inventory for my store. I gave Passive Scaling a credit card to use on my behalf. Passive Scaling asked for $5,000-$10,000 monthly for inventory, but products were not selling, and I was getting a lot of complaints and negative customer reviews. I tried to talk to Passive Scaling employees about the complaints. I was not able to, but I did speak often with Sherica, a Passive Scaling employee who was my account manager.

10. Passive Scaling mismanaged my store throughout the time it was open and there was a lack of clarity on many aspects of the business Passive Scaling was supposed to be managing. For example, (1) I had questions regarding the profit sharing document Passive Scaling sent me because it appeared that not all business expenses were accounted for, (2) Passive Scaling never filed a claim for reimbursement as required when customers are refunded by Amazon (I had to do it myself), (3) shipments of inventory were missing and not resolved, (4) Passive Scaling failed to remove expired items from my store and failed to request credits from suppliers, and (5) product listings were wrong and didn't match what customers received which caused refunds and negative feedback. Attached as **Attachment C** is a true and correct copy of a summary of these issues with specific examples of emails and chats with Passive Scaling.

11. As a result of this mismanagement, my store had negative customer reviews and a low rating.

**PX9**                                                                 **000413**

12. I made some sales on my Amazon store, but I did not see the type of profits I was promised before I purchased this store.  Before I purchased, I was promised $2500-$3000 per month if I spent $10k in inventory, but I never made this type of money.

13. Despite the lack of promised profits, Passive Scaling repeatedly asked me to invest additional capital every month.

14. I had an intense conversation with Steven Rozenfeld, the owner of Passive Scaling, and told him that I wanted my money back.  He said that I had not given him enough time to work on my store and that he would switch me to a new business model called dropshipping.  This meant that when a customer ordered a product from my store, Passive Scaling would order that product from another retailer, like Walmart, to fulfill that order.  This is different from ordering products wholesale in bulk and storing them in a warehouse.  It meant that I would only pay for inventory as it was ordered rather than paying in bulk for inventory and storing it.

15. Passive Scaling transitioned my store to the dropshipping model or "FBM" in July 2022.  Although the store started out making more of a profit under this model, Passive Scaling didn't manage my store using this model any better.  For example, Passive Scaling did not process returns on time and then lied to Walmart by claiming it didn't receive the returned items to cover up that the returns were not processed.  This caused Walmart to stop allowing Passive Scaling to place new orders and my Amazon account was paused due to return policy violations.  I had to resolve the issue myself even though I paid Passive Scaling $30,000 to manage my store completely.  Attached as **Attachment D** is a true and correct copy of a summary of these issues and examples of messages regarding these issues.

16. Amazon ultimately deactivated my store because of policy violations that were never addressed, and issues Passive Scaling failed to properly handle.

17. In August 2022, I was starting to have panic attacks because of my experience with Passive Scaling, and this negatively affected my performance in my full-time job.

18. I asked Steven Rozenfeld for my money back and had a tough conversation with him. I told him how this situation was negatively affecting my health and pleaded for my money back. I told Steven that I would sue him if he did not give me my money back. He said he would give me $15,000 back because Optimyze Digital received half of my initial fee.

19. In October 2022, I had to sign a new agreement to get out of my first contract. Steven promised me he would pay me $15,000 by October 2023. This agreement was called a "Waiver Release for Pankil Shah" that Bratislav (Steven) Rozenfeld and I signed on October 24, 2022. Attached as **Attachment E** is a true and correct copy of this agreement.

20. I started reaching out to Steven in approximately March 2023 asking when I could expect my refund as per the agreement. I did not receive a response from him until September 2023. Steven told me that I had to reach out to Jerdonna, an employee of Passive Scaling, because she was paying out refunds. He said he was not involved with the company any longer and his personal accounts were depleted. He said although it may seem like he is rich, he is not. I told him that I saw him post a video on Instagram about selling successfully on Amazon, and Steven responded that he was just offering coaching now to pay his personal bills. I told Steven I would reach out to Jerdonna, but I may have to try other options. Steven said, "if you try to hurt me personally it will not be better for you." He then said Passive Scaling is not taking new clients. In October 2023, Steven said he would be back in the office the following week and Jerdonna was communicating with the "legal

team." This same conversation happened again, and Steven said Jerdonna will have updates after she speaks with legal. At one point Steven also told me that the company is dead and that I could sue him and get a judgment, but I would never get any money because the company is gone and he has no intention of paying if we go the judgment route. Attached as **Attachment F** is a true and correct copy of some of these texts.

21. In October 2023, I told Steven that my lawyer drafted a notice/demand letter for the payment. I also asked him if he was open to negotiating the payment amount as I was getting desperate and wanted some money back. Steven said that he could not honor our first contract, so Passive Scaling drafted a revised agreement called "Settlement Agreement and Release of Claims" that I signed on November 15, 2023. I never received a counter-signed copy of this agreement. I do not know if Steven ever signed it. This agreement stated that the money for my refund would come from the profits of a company called 3PL Logistics, an "unaffiliated entity owned by an officer of Passive." 3PL Logistics would pay me between $1,000 to $5,000, on a monthly basis, starting December 15 until the $15,000 was paid in full. The agreement also contains a clause that says, "client further agrees to leave no Bad Reviews (Meaning any post, public writing, message, statement, report or complaint that is derogatory or damages the reputation of Passive and its directors, officers, employees, subsidiaries, affiliates, agents and representatives) against Passive and its directors, officers, employees, subsidiaries, affiliates, agents and representatives. If Client has already left a Bad Review, Client agrees to take it down within thirty (30) days of execution of this Agreement. Client acknowledges that the failure to meet its obligations under this section shall be deemed a default under this Agreement and Client would waive its rights and entitlement to payment from the Settlement Fund." Attached as **Attachment**

6

**G** is a true and correct copy of this agreement and texts between me and Steven regarding the agreement.

22. I did not receive any payment in December 2023 and continued to text with Steven.  He told me that Jerdonna was handling refunds, he was not involved, and he could not do anything about the situation.  He said he is not making any decisions and is not paying his lawyer. *See* **Attachment G**.

23. I have been in touch with some other people who took legal action against Passive Scaling and who are part of a Facebook group.

24. On December 27, 2023, I received an email from Jerdonna (jerdonna@passivescaling.com) asking me for my bank details for my first payment, which she acknowledged was delayed. I sent her the information the next day.  I then reached out every few days until I finally heard from Jerdonna (jerdonna@hourlyrelief.com) on March 4, 2024 that the first payment was sent out and if I don't receive it by March 6, to reach back out to her.  Attached as **Attachment H** is a true and correct copy of these emails.

25. Meanwhile, on February 21, 2024, I received an email from legal@passivescaling.com with the subject line, "Update on Refund Payment Schedule from Passive Scaling Inc. through 3PL Logistics."  The email apologized for the late payments and stated that the company is "restarting the payment process through our partnership with 3PL Logistics.  We have assessed our financial situation and are committed to initiating refund payments starting March 1st."  It also said, "we are confident in our ability to proceed, especially considering that the company currently has disposable income earmarked for settling obligations, including refunds for customers who have signed settlement agreements for the last three

months."  The email was signed, "Legal Team Passive Scaling Inc."  Attached as **Attachment I** is a true and correct copy of this email.

26. As of March 11, 2024, I did not receive the wire Jerdonna told me was sent out on March 4, 2024.

27. I hired a lawyer and Attached as **Attachment J** is a true and correct copy of the demand letter my lawyer sent to Passive Scaling and emails he had with Passive Scaling, Steven, Jerdonna and their lawyer.

 I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _____March,12th___, 2024

Jersey City, New Jersey                    Pankil Shah

8

**PX9**

**000418**

| Starting Period | Q1 |
|---|---|
| Bundle type | Single Amazon Store |
| Working Capital Per Store | 100000 |
| Management Profit Percentage | 35% |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $756,596 | $1,962,957 | $2,719,553 |
| Expenses | $677,910 | $1,758,809 | $2,436,720 |
| Client's Profit | $78,686 | $204,148 | $282,834 |

| Projected Asset Value at Mo 25 | - | $785,183 |
|---|---|---|



**Twenty Four Month Forecast**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year 1 | Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | - | - | 4,052 | 10,009 | 17,765 | 28,199 | 40,584 | 62,003 | 54,804 | 43,788 | 49,186 | 52,776 | | |
| Gross Revenue | - | - | 8,441 | 20,853 | 37,011 | 58,747 | 84,550 | 129,173 | 114,176 | 91,226 | 102,471 | 109,949 | 756,596 | |
| Cost of Goods | - | - | 5,065 | 12,512 | 22,207 | 35,248 | 50,730 | 77,504 | 68,506 | 54,736 | 61,483 | 65,969 | 453,958 | 60.00% |
| Amazon Fees | - | - | 2,026 | 5,005 | 8,883 | 14,099 | 20,292 | 31,001 | 27,402 | 21,894 | 24,593 | 26,388 | 181,583 | 24.00% |
| Store Profit | - | - | 1,351 | 3,336 | 5,922 | 9,400 | 13,528 | 20,668 | 18,268 | 14,596 | 16,395 | 17,592 | 121,055 | 16.00% |
| Management Fee | - | - | 473 | 1,168 | 2,073 | 3,290 | 4,735 | 7,234 | 6,394 | 5,109 | 5,738 | 6,157 | 42,369 | 5.60% |
| Clients Profit | - | - | 878 | 2,169 | 3,849 | 6,110 | 8,793 | 13,434 | 11,874 | 9,488 | 10,657 | 11,435 | 78,686 | 10.40% |

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year 2 | Margin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | 49,203 | 46,786 | 58,771 | 82,224 | 105,334 | 92,693 | 103,421 | 92,590 | 79,011 | 60,152 | 69,393 | 102,641 | | |
| Gross Revenue | 102,507 | 97,471 | 122,440 | 171,299 | 219,445 | 193,111 | 215,460 | 192,896 | 164,606 | 125,317 | 144,569 | 213,836 | 1,962,957 | |
| Cost of Goods | 61,504 | 58,483 | 73,464 | 102,779 | 131,667 | 115,867 | 129,276 | 115,738 | 98,764 | 75,190 | 86,741 | 128,302 | 1,177,774 | 60.00% |
| Amazon Fees | 24,602 | 23,393 | 29,386 | 41,112 | 52,667 | 46,347 | 51,710 | 46,295 | 39,505 | 30,076 | 34,697 | 51,321 | 471,110 | 24.00% |
| Store Profit | 16,401 | 15,595 | 19,590 | 27,408 | 35,111 | 30,898 | 34,474 | 30,863 | 26,337 | 20,051 | 23,131 | 34,214 | 314,073 | 16.00% |
| Management Fee | 5,740 | 5,458 | 6,857 | 9,593 | 12,289 | 10,814 | 12,066 | 10,802 | 9,218 | 7,018 | 8,096 | 11,975 | 109,926 | 5.60% |
| Clients Profit | 10,661 | 10,137 | 12,734 | 17,815 | 22,822 | 20,084 | 22,408 | 20,061 | 17,119 | 13,033 | 15,035 | 22,239 | 204,148 | 10.40% |

Working Capital = For each two week period

| | Q1 - 2022 | | Q2 - 2022 | | | Q3 - 2022 | | | Q4 - 2022 | | | Q1 - 2023 | | | Q2 - 2023 | | | Q3 - 2023 | | | Q4 - 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | - | 8,441 | 20,853 | 37,011 | 58,747 | 84,550 | 129,173 | 114,176 | 91,226 | 102,471 | 109,949 | 102,507 | # | 122,440 | 171,299 | 219,445 | 193,111 | 215,460 | 192,896 | 164,606 | 125,317 | 144,569 | 213,836 |
| Total Cost | - | - | 7,563 | 18,684 | 33,162 | 52,637 | 75,757 | 115,739 | 102,302 | 81,738 | 91,814 | 98,514 | 91,846 | # | 109,706 | 153,484 | 196,623 | 173,027 | 193,052 | 172,835 | 147,487 | 112,284 | 129,534 | 191,597 |
| Client's Profit | - | - | 878 | 2,169 | 3,849 | 6,110 | 8,793 | 13,434 | 11,874 | 9,488 | 10,657 | 11,435 | 10,661 | # | 12,734 | 17,815 | 22,822 | 20,084 | 22,408 | 20,061 | 17,119 | 13,033 | 15,035 | 22,239 |

**Attachment A**

**PX9**

**000419**



**Roman Sterling H.** <roman@optimyzedigital.com>
to Pankil ▼

Tue, Dec 14, 2021, 2:17 PM    ☆    ☺    ↩    ⋮

  

Dear Pankil,

Hope you are well.  Here is link of all Executives:

Optimyze Digital - E-commerce website page
3333 Michelson Dr. Suite 300
Irvine, Ca 92612
BBB profile

YouTube Channel

Co-Founders

Justin Jeffers (CEO) - ███████████
Justin@Optimyzedigital.com
Linkedin Profile

Asante Monadjemi (COO) - ███████████
Asante@Optimyzedigital.com
Linkedin Profile

Roman Sterling - ██████████
Senior Sales Officer
Roman@OptimyzeDigital.com
Linkedin Profile

**Attachment A**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Amazon Automation

**Delivered on**
December 14, 2021

**Client**
Pankil Shah

**Company**
PASSIVE SCALING INC

**Attachment B**

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* – this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee – $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit – **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital – $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$30,298** |

1

**Attachment B**

PX9

**000422**

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of December 14, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 78 John Miller Way, Suite 227 Kearny, NJ 07032 (hereinafter "Consultant"), and Pankil Shah, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-account) (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.

   B. Review, research, source, select, and list products for the Client's Stores.

   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2022-41-07 07:04:06 (PST)

2

2. **CLIENT RESPONSIBILITIES -**

A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION -**

A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



2022-11-07 07:04:06 (PST)

3

Attachment B

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**
   This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
   Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2022-05-07 07:04:01 (PST)

4

**Attachment B**

6.  **NON-DISPARAGEMENT –**

    During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7.  **SALES / USE TAX –**

    Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8.  **INTELLECTUAL PROPERTY –**

    Client understands that Client's Stores is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon, and Consultant holds no legal or equitable rights in Client's Stores.



2022-01-07 07:04:06 (PST)

5

**Attachment B**

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2022-01-07 07:04:06 (PST)

**Attachment B**

PX9                                                    000427

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information.** The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



2022-01-07 07:04:06 (PST)

7

**Attachment B**

10. **REFUND POLICY –**

    A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

    B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00).

    C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.



2022-01-07 07:04:06 (PST)

8

**Attachment B**

11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



2022-01-07 07:04:06 (PST)

9

**Attachment B**

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2022-01-07 07:04:06 (PST)

10

**Attachment B**

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



**Attachment B**

D. **Amazon Terms and Conditions** – Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199,00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS** –

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ███████████████ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



2022-01-07 07:04:06 (PST)

Attachment B

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Hudson County, New Jersey. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2022-01-07 07:04:06 (PST)

13

H. **Injunctive Relief -**In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



2022-01-07 07:04:06 (PST)

14

**Attachment B**

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client -** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers. directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.


2022-01-07 07:04:06 (PST)

15

**Attachment B**

O.  **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P.  **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2022-01-07 07:04:06 (PST)

16

**Attachment B**

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



17

**Attachment B**

14. **DEFINITIONS** –

   Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1.  "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2.  "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3.  The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4.  The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5.  "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.



2022-01-07 07:04:08 (PST)

18

Attachment B

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

19

**Attachment B**

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Pankil Shah authorized representative and agent for service of process Date:  January 07, 2022

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:



2022-01-07 07:04:46 (PST)

Pankil Shah

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  January 07, 2022

2022-01-07 12:27:15 (PST)

Amanada Peremen

20

Attachment B

PX9                                    000441

Hi Pankil,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

Download now

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Address: 78 John Miller Way, Suite 2111, Kearny, NJ 07032

Name of Bank: Chase Bank

Bank Address: 188-190 Main St, Fort Lee, NJ 07024
Account # ▮▮▮▮▮▮▮
Routing # ▮▮▮▮▮▮▮ (WIRE)
#▮▮▮▮▮▮▮ (ACH)
*****PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS

**Attachment B**

**PX9**            **000442**

# Passive Scaling

223 Veterans Blvd
Carlstadt, NJ 07072, USA
931 398 3524
sales@passivescaling.com

**PASSIVE
SCALING**

RECEIPT #1101

**BILL TO**

Pankil Shah

**Date** 21/01/2022

| DESCRIPTION | QTY | UNIT PRICE | TOTAL |
|---|---|---|---|
| Automation Bundle= Amazon | 1+1 | 30000 | 30000.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |
| | | | 0.00 |

|  |  |
|---|---|
| SUBTOTAL | 30000.00 |
| DISCOUNT | 0.00 |
| SUBTOTAL LESS DISCOUNT | 30000.00 |
| TAX RATE | 0.00% |
| TOTAL TAX | 0.00 |
| SHIPPING/HANDLING | 0.00 |
| **Balance Paid** | **$ 30,000.00** |

Tank you for your business!

**Attachment B**

Below are few issues/screenshots of emails/Google chats etc. that I have sent the team over past few months only to get no response or had to do multiple follow-ups and still to date some issues are not resolved.

1. **Profit Sharing between client and company**
   a.  No clarity around profit sharing between client and consultant have been provided till date. I have sent multiple emails/ messages but no response. When I got my first profit share spreadsheet in October not all business expense were accounted for and I raised my concerns and no response since then



   b.  When I got revenue sharing spreadsheet I followed up multiples times asking for clarity and no update or response, all I m told we get back to you.



 **Pankil Shah**  Oct 12, 11:47 AM
@Sherica S - just recap on followups
1. rev share doesnt have any shipping/handling expenses listed
2. there is no mention of fuel surcharges as expense
3. Cost price of above listed item is inaccurate
4. on FBM there is no mention of return shipping cost for items that are returned back to warehouse as mentioned above
5. Update or having repricing team check on last remaining item on FBA
6. Missing BOL for shipment (its been pending since july)
7. If you around exit plan were that to happen or move forward with as reaching out to Jerdonna has been challenge lately

 **Sherica S**   Oct 12, 5:23 PM
Hey Pankil, I've passed on the rev share questions to the correct person, as soon as they update me I will let you know.

👍 1

2. **FBA orders reimbursement issues**: When order is fulfilled by amazon customers are refunded and then seller must file a claim for reimbursement as not all orders are refunded by itself. Not a single claim was file on my store, and I had to files all claims for such type of orders. Emails were sent asking about the same and no response. Had I not file them I would have taken some severe losses and still today they have resulted in few losses



Re: Multiple refunds being issued on FBA

**Pankil Shah** <​███████████​>
to Sherica ▾                                                    Mon, Jul 25, 4:45 PM

Hi Sherica-

Do you have an update on this request/ask ?

Best,
Pankil Shah

3. When shipment is sent to Amazon they are not reconciled sometimes and when there are missing units' reimbursement needs to be requested with proper documentation. I have raised this shipment since August till today they haven't file the claim as I keep getting same answer we can't find shipment documents.





**Pankil Shah** Sep 19, 8:35 AM

@Sherica S  can you followup on this missing inbound units. Its been months and weeks with no update

I m going in circles with CS team as nobody seems to have any update. Last i heard was they arent able find BOL for this shipment and unable to submit a claim. Its a big amount of loss we can't get reimbursed for 15 uints of walden and 1 units of tom's maine toothpaste as highlighted below.



4. Products expired since weren't sold in time and no action was taken until I made multiple attempts to contact amazon and get all details. Even then to request the credit from supplier they made send emails multiple time when they should have managed this from beginning. This is me asking team to request the credit from Kehe supplier when I provided them with details from amazon and it took them weeks and weeks to get this resolve



There was another item where remaining units of this product were on verge of expiry and had to be removed. They took no action to get more details from amazon. I constantly followed up with emails after which amazon sent me pictures of product with expiry date. When I sent this info over asking to act nothing was done until I made multiple follow ups and had to keep sending some info over and over.



Re: [CASE 10531015081] Inquiry for units of FSM-271031-1PK

Gmail ·                                                                    Thu, Aug 11, 6:03 AM
to Sherica

Sherica-

Removal order to the SKU listed below was cancelled because 21 units of this item are 50 days away from expiry date. What happens here ?
Do I have to take a loss on these units since they will be thrown out ?

Why things are like these are happening and not being take care of in advance given these are food items ? I have mentioned about this item product multiple times on the call as well.

We have other food items in inventory over 90 days and not sure if they will end up just like this.

Really disappointed on how things are managed lately.

Thanks
Pankil Shah

On Aug 11, 2022, at 5:01 AM, Amazon Seller Support <merch.service05@amazon.com> wrote:

Hello from Amazon Selling Partner Support,

On Aug 11, 2022, at 5:01 AM, Amazon Seller Support <merch.service05@amazon.com> wrote:

Hello from Amazon Selling Partner Support,

Thank you for your patience.

We've completed our review and found the following:

The product you asked about has an expiration date of 02/09/22.

Since the expiration date is less than 50 days from today's date, it is no longer eligible for FBA. Units within 50 days of expiration are automatically set to unsellable status and will be removed for disposal. We're unable to return these units to sellers or provide reimbursement.

Images : https://wave.qubit.a2z.com/api/downloadImage?imageId=6efc8e8a-297c-4f1e-861a-7d18629c4507.png
https://wave.qubit.a2z.com/api/downloadImage?imageId=4c750f80-4aee-4d3e-9555-fb0e3ee3e653.png
https://wave.qubit.a2z.com/api/downloadImage?imageId=b0df92c8-0122-4285-9b3e-5c74ae864e71.png

-----Original message-----
From: Pankil Shah -
Sent: 08/25/2022 19:00:31

Hi Glydel and Zell-

There seems to be confusion in what credit request has been sent to Kehe.

I have sent all the information multiple times so this one more time with info:

  1. **We have 21 units of Nellie lime juice with a shorter expiry date which makes it unsellable given they are expired.**
  2. **we have 2 units (pack of 3) of Shikai gel with no expiry label and amazon marked it unfillable/unsellable.**

I am looking for a total of $68.16 of credit.

Nellie's Lime Juice : 21 units * cost price $2.02 = $42.48
Shikai Shower Gel : 2 units (bundle of 3) * cost price $12.84 = $25.68

@Glydel.M you have info via chat that I sent you along with proof of pictures.

Attachment C
PX9

000451



Need Info

**Pankil Shah ·** ▮▮▮▮▮▮▮▮                                    Mon, Aug 15, 6:37 AM
to Sherica, Sherica ▾

Sherica-  my meeting with Steven got postponed so I'm still awaiting a new time. So can you confirm or check on 2 asks and get an update by this week?

1. 12 units for a product are expired and a removal order is created for warehouse return. Need info to know what happens after that and how will these losses be consumed if any ?

2. **FBM returns** on who manages it and how they are returned back to Walmart after being delivered to the warehouse. We have a short window for most items, especially electronics and I want to make sure they get processed on time for credit.
I have 2 TVs and 1 dvd player at warehouse as of now


Best,
Pankil Shah

5. There were lot of instances where I had brought things to their attention when they should have checked the store frequently and fixed the issues.

   a. Mismatch of products with listings as result of which lot of refunds were issued by amazon and created a loss of few items including lot of negative feedback on store impacting the health of the store



   b. Usually, items over 90+ get repriced so we can sell them faster and until I brought to them no action was taken again highlighting their ineffectiveness of doing their job



6. When my issues weren't resolved I had raised them multiple times highlighting all inefficiencies and things that were not take care on the store they repeatedly ignored me. Initially there was no response until few meetings ago when they told me a cure clause will be drafted for me that will plan of action on resolving these issues. Still no update to date



7.  When I started getting issues with wholesale model (FBA) I expressed my disappointment multiples and asked for refund, and they said no so they put me on Dropship model which is referred to as FBM. Even then they didn't do responsibilities well.
    Email below confirms the transition to new model



a.  In this model items are shipped from Walmart and when amazon customers return the item due specific issues they are sent to company's warehouse. They haven't until today processed returns on time and have take multiple emails, phone calls, messages to Steven (Passive Scaling's Owner I believe) to resolve this issue and every time I was told things will get better and still to date, I have few item sitting in their warehouse to be returned and passed return due date.

**Attachment D**

**PX9**                                                                **000455**



**Attachment D**



b. When returns weren't processed on time team responsible for my store started lying to Walmart saying we didn't receive the item so Walmart the processed the refunds. When this happened multiple times, Walmart didn't let us place new orders and FBM was pause due to return policy violations. I sent multiple emails to team letting them know and no action was taken until I was one calling Walmart multiple times a day to get this issue resolve. After a week of back and forth the issue was resolved by me when in fact they should have worked and take care of this. No responses either



**Attachment D**



c. My account health is at risk and still has notification of deactivation and they haven't taken enough steps to fix the pending issues. None of A-to-Z claims were appealed for when it's their responsibility to do.



**Attachment D**

8. This is list of all miscellaneous follow up multiple times whether its inventory related issues, returns, pricing issues, follow-ups etc. I even called out how ineffective they were in managing things and how it started impacting my health and stressed me out.



**Attachment D**

Pankil Shah Yesterday 11:23 AM
@Sherica S - things for today's call

1. Update on BOL issue
2. Pending Returns for FBM to walmart (i have 2 items in warehouse pending return to walmart, 2 items on the way)
3. Actual PO (TBKBRW) of newly issued FBA
4. Followup on rev share questions from past meeting

Pankil Shah Yesterday 11:25 AM
2nd item refund issued (lied to wmt by saying didnt received the item) but still want to do good and send item back and first one has return due by Oct 22nd



thanks for all your help as always !

Few text messages between Steven and me around Walmart returns, overall stuff, either got responses by saying it will be fixed or no response sometimes.





WELCOME TO

# Waiver Release for Pankil Shah



**WAIVER OF LIABILITY SETTLEMENT AGREEMENT**

This Waiver of Liability Settlement Agreement ("Agreement"), is dated as of
21st October 2022  by and between PASSIVE SCALING INC, a New Jersey
Corporation company, whose address is 78 John Miller Way, Kearny NJ 07032
(hereinafter "Consultant"), and , Pankil Shah
whose address is {{address}} (hereinafter
"Client").

WHEREAS, all parties agree that Clients wants to exercise the buyback
provision of their
agreement and as such Client shall accept the amount of $15,000.00 as full
and complete settlement
of any and all claims that the Client may have against Passive Scaling Inc.
that accrued prior to the
execution of this agreement are herein waived.
WHEREAS, all parties agree that any and all claims shall include any claims
for breach of
contract, monetary damages, claims to Courts, Arbitration, claims in Equity
and in law.
NOW THEREFORE, all parties agree as follows:

**1. CONSIDERATION**

(A) All Parties to this agreement as described above that upon acceptance
of
$15,000.00 from Passive Scaling Inc., constitutes a full and complete waiver
of any and all
Liability or Claims that the Client may have against Passive Scaling Inc. from
the beginning of time until
the date of the full execution of the instant agreement.
(B) No Officer, Party, Successor or Assign of Client shall be able to bring any
action against
Passive Scaling, Inc., and if such action is brought in violation of this
agreement, the Client shall be
responsible in addition to all attorneys fees costs of Passive Scaling, Inc. in
Defending such an action
also for Liquidated Damages in the about of Twenty Five Thousand Dollars
($25,000.00). This
liquidated damages fee shall not preclude Passive Scaling from seeking
additional damages against client
pursuant to the laws Governing the State of New Jersey as well as Federal
law.
(C) The payment will be processed by October 2023.

2 of 7

ADDITIONALLY, THIS CONTRACT WOULD ALLOW FOR US TO CONTINUE WORKING WITH THE CLIENT on an as needed basis.


## 2. GENERAL PROVISIONS

(A) Notices - All notices to either party shall be sent electronically to the email address(es)
provided by each Party to the other and as otherwise set forth below. All notices to Consultant
shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to
, with a courtesy copy sent to .
Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt
or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested,
or by a recognized private delivery service, to the addresses stated above.
(B) Severability &amp; Headings - If any provision is held to be invalid or unenforceable for any
reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby

acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed
replaced with a valid provision or part of the provision that most closely approximates and gives effect to the
intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part
thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are
used for convenience of reference only, and in no way define, limit, construe or describe the scope or
extent of any section of this Agreement.
(C) Dispute Resolution - Except where otherwise expressly set forth in this Agreement, any
dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration.
The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration
Association ("AAA") rules, as modified by this Agreement, which shall take place in the State of New
Jersey in the County where PASSIVE SCALING INC, has its principle place of business. Any
arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the

**Attachment E**
**PX9**

**000464**

existence, content or results of any arbitration, except as may be required by law or for purposes of

enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

All administrative fees and expenses of such arbitration proceeding will be divided equally between the

parties, Amendment. This Agreement cannot be amended except in writing and signed by both Parties.

(D) Litigation – Nothing in Paragraph (C) above shall be construed to mean that Passive

Scaling is giving up their rights to seek Court intervention for any reason. The arbitration clause may be

invoked by Passive Scaling, Inc. at any time, but Passive Scaling may also initiate litigation against

client for damages cause, however if an action is brought by any means by Client against Passive

Scaling, Inc.; such action initiated by Client must comply with Paragraphs 1(A), 1(B) &amp; 2(C)

(E) Electronic Signatures - This Agreement may be executed by electronic means and in

any number of counterparts, each of which when so executed and delivered will be deemed an original,

and all such counterparts together will constitute one and the same instrument.

(F) Governing Law; Jurisdiction - This Agreement, the negotiations thereunder, and

performance thereof shall be interpreted, construed and enforced in all respects in accordance with the

laws of the State of New Jersey without reference to principles of conflicts of laws. Client hereby

irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising

in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located

within New Jersey. Client agrees not to commence or prosecute any such action, claim or proceeding

other than in such aforementioned courts. The parties hereto agree that New Jersey law shall apply

regardless of any choice or conflicts of law principles. Client agrees that the County, where Passive

Scaling Inc, has its principle place of business in New Jersey is a convenient forum, and waives any

objection to same under forum non conveniens principles.

(G) Waiver - The failure of any party to insist on or enforce strict performance of any

provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law
shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision,
right or remedy.

(H) Entire Agreement – This Agreement constitutes the entire agreement between the parties
and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter
herein.

(I) Attorneys' Fees – If either party breaches this Agreement, or one party brings any action
(including appeal) against the breaching party in connection with this Agreement, the substantially
prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable
attorneys' fees

.

(J) Independent Counsel - The Parties acknowledge that each has been advised to seek, and
each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in
connection with this matter. The Parties have either sought such counsel or voluntarily waived such right
to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party.
Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed
neutrally, and no rule of construction shall apply to the disadvantage of any Party.

(K) Waiver of Jury Trial – EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF
ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Attachment E**
**PX9**

**000466**

IN WITNESS WHEREOF, this Agreement is deemed executed as of the last execution date
below.

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement
applicable to Client as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

I, Pankil Shah , agree to the terms of this agreement and I agree that my typed name below can be used as a digital representation of my signature to that fact.

*Pankil Shah*

SIGNED BY

Pankil Shah

SIGNED ON

Date Signed: 21 Oct 2022

Time Signed: 18:44

IP ADDRESS FROM SIGNATURE LOCATION

100.8.25.11



**SIGNED WITH BETTERPROPOSALS.COM**
Build and send beautiful sales documents in minutes to help your business close more deals and get paid faster.

6 of 7

I, Bratislav Rozenfeld , agree to the terms of this agreement and I agree that my typed name below can be used as a digital representation of my signature to that fact.

*Bratislav Rozenfeld*

SIGNED BY

Bratislav Rozenfeld

SIGNED ON

Date Signed: 24 Oct 2022

Time Signed: 12:41

IP ADDRESS FROM SIGNATURE LOCATION

104.225.1.212



**SIGNED WITH BETTERPROPOSALS.COM**
Build and send beautiful sales documents in minutes to help your business close more deals and get paid faster.

**Attachment E**
**PX9**

**000468**



**Steven Passive scaling** >

Hey steven, this is Pankil. Hope all is well.
Checking to see when can I expect installment payout that you suggested back then. Would appreciate if you give me an update.

Mar 2, 2023 at 11:19 AM

Can I get an update please ? Thank you

Tue, Sep 19 at 3:08 PM

Steven, reaching out on personal level. Help me with what you can. I waited for a year since you promised and signed the contract. I hope you will honor the contract and promise you made

The best thing is to wait for jerdonna. She's paying out money whenever available

Unfortunately I'm not involved with the company and my personal is depleted

iMessage

**Steven Passive scaling** >

I know it seems like I'm rich but I assure you that's not the case and I'm using any income I make to give back

I m shocked to hear this because you were different than others out there and that's why I decided to go with you guys. Please whatever you can do Steven.

I m not like your other rich clients who had their money invested as side income. I have family back home that I have take care and I put all my savings back then into this.

I m have been waiting on this money to take care of mom surgery which I have delayed for past few months. Please I m requesting you whatever you can do. You were owner and ceo so have some say in this or able to work with jerdonna to resolve this.

So sorry to hear that

I m sorry to hear about your situation as well



iMessage





## Steven Passive scaling ›

I m sorry to hear about your situation as well

Can I followup with you if I don't hear back from jerdonna by this week ?



**FBA Machine on Instagram: "How to sell on Amazon successfully....**
instagram.com

You just posted this video 3 weeks ago so I m just having hard time understanding all this honestly

Yes this is me. I'm offering coaching now



**10:08 AM**

S

Steven Passive scaling ›

I'm doing that to help pay my personal bills

And any additional income I get I give it to passive scaling for refund clients

As you can see it's brand new so not making much income yet

It's hard for me believe but I will take your word. I will wait to see if I hear from Jerdonna if not I will have to try other options. Let's not get there hopefully Steven. I just can't let go because I m tough situation. You helped me back then in good faith and I hope you or company will do the same now.

If you try to hurt me personally it will not be better for you.

It's just got to make it worse for both parties

I m not that person steven, you should know

iMessage



**S**

Steven Passive scaling ›

What else you suggest Steven? I don't what to do

It's a very bad situation for all parties.

But you see passive scaling is not taking new clients

I understand but I have no other options steven

I will wait this week if not will check with my options Ty

Sure. Lmk however I can help

I asked steven for your help if you can with payment so we don't have do all this but you said you cant help

Personally no. I have a lot of issues personally which I don't want to bother you with

I m not asking you to put my needs above your personal needs. I just

    iMessage    

AT&T 10:08 AM 90%

S

Steven Passive scaling ›

Thu, Oct 19 at 1:31 PM

I'll be back in office next Thursday.

Jerdonna is communicating with the legal team so she can give you better update

But I can talk Thursday

Last week you said Thursday so I waited for you. Now you are asking me to wait for another week ?

I am not getting any updates from Jerdonna so what am I suppose to make out of the situation ? I just want to ask are you going to make the payment by this month ?

Or should I move forward with my plan?

What is it going to be Steven ? I have waited in good faith and communicated with you everything that's going on.

We can end all of this by you making



iMessage



AT&T 📶   10:09 AM   @ ⏰ 90% 🔋

S

Steven Passive scaling ›

We can end all of this by you making the promised payment and move on

Sorry we got disconnected

Hey, sorry in a meeting. Can I call you right back?

I want to talk about an offer can you call me ?

No I have to go into a meeting

After jerdonna goes to meeting with legal she might have updates

**1 Reply**

I don't have any. I'm sorry.

Can you ask jerdonna to contact me ? I haven't got a single response from her for this month and neither info email is getting me any response

+ 　iMessage 🎤

# Settlement Agreement and Release of Claims

This Settlement Agreement and Release of Claims dated **October 21, 2022** (the "Agreement") is made between **Pankil Shah**, ("Client"), with a [place of business (or)residence] at **SEVEN STAR MARKETPLACE LLC** at ███████████ ███████████ ███, and Passive Scaling Inc. ("Passive"), a company registered in the State of New Jersey. Client and Passive are sometimes referred to herein individually as a Party and collectively as the Parties. This Agreement is effective as of the date it is signed by the last Party to sign it, as indicated by the date next to such Party's signature ("Effective Date").

Whereas, the Parties entered into an agreement executed on **November 10, 2023** (the "Contract"), a copy of which is attached hereto], pursuant to which Passive agreed to perform certain services to manage Amazon and/or Walmart online storefronts for Client as more fully set forth in the Contract.

WHEREAS, to avoid the expense and uncertainty of further litigation, the Parties have agreed to settle as between themselves pursuant to the following terms. The Parties have agreed to settle said disputes and differences with respect to the Contract (the "Dispute") by executing this mutual Settlement Agreement and Release.

Whereas, the Parties recognize that by the execution of this mutual Settlement Agreement and Release, they are relinquishing their respective legal rights with respect to the aforementioned Contract.

Therefore, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

1. **Consideration.** Client acknowledges and agrees that it has received good, valuable and sufficient consideration for executing this Release. In particular, upon execution of this release by Client, Passive shall enroll Client in the Repayment Fund until Client receives $**15000 UDS** (the "Settlement Amount") as explained in Section 2 of this Agreement. Client acknowledges and agrees that it will not be entitled to and shall not assert any claim for any additional amount from Passive other than the payment to be made hereunder. Client agrees that it will not seek anything further, directly or indirectly, for itself or any person, corporation, partnership or other entity, including any other payment or consideration, with respect to the Dispute and the claims released pursuant to this Agreement. Client shall be solely responsible for any and all taxes that may be owed to any federal, state, or local taxing authority as a result of the settlement payment received under this Agreement.

2. **Repayment Fund.** Client acknowledges and agrees that it shall receive the Settlement Amount pursuant to its participation in the Repayment Fund. The Repayment Fund is set up to provide the Settlement Amount for all parties who have requested a refund with Passive. Each month Passive will take the total amount of money in the Repayment Fund and distribute it equally among the participants of the Repayment Fund. The Repayment Fund shall be sourced from the profits of 3PL Logistics, a warehousing company whose principal place of business is in New Jersey. Client acknowledges and understands that 3PL Logistics is an unaffiliated entity owned by an officer of Passive. Nothing in this Agreement establishes any relationship, obligation or promise between Client and 3PL Logistics. 3PL Logistics is referenced herein solely to the extent necessary to establish the parameters in which Passive shall place money into the Repayment Fund.

   a. Each month, starting on **October 30, 2023**, Passive shall place **10%** of the monthly profits of **3PL Logistics** into the **Repayment Fund**. Passive shall additionally provide a monthly Profit and Loss Statement so that the Client can have insight into the monthly amount being placed into the fund by Passive. The client understands that the amount being placed into the Repayment Fund is subject to change from month to month. A payment could be much higher or lower from one month to another.

   b. The client will receive their first payment from the fund **30 days after** signing this agreement. The payments will continue monthly until the sum mentioned under **Consideration (USD 15,000)** is paid in full.

   c. The Clinet will receive a **minimum** of **USD 1,000 or a maximum of USD 5,000** per month

3. **Release.** Client and Passive do hereby release, cancel, and forever discharge the other Party and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives from any and all claims, complaints, causes of action, demands, damages, obligations, liabilities, losses, promises, agreements, controversies, penalties, expenses, and executions of any kind or nature whatsoever, whether known or unknown, actual or potential, whether arising in law or in equity, which each Party may have, may have had, or may in the future obtain, arising out of or relating out of the acts, omissions, agreements, or events relating in any manner to the Contract and the Dispute (the "Release").

4. **Effect.** This Release is intended to be a general release in the broadest form. It is understood and agreed that the Parties hereby expressly waive any and all laws and statutes, of all jurisdictions whatsoever, which may provide that a general release does not extend to claims not known or suspected to exist at the time of

executing a release which if known would have materially affected the decision to give said release. It is expressly intended and agreed that this Release does, in fact, extend to such unknown and unsuspected claims related to anything which has happened to the date hereof which is covered by this Release, even if knowledge thereof would have materially affected the decision to give this Release. In addition, the Parties warrant and represent to the other that the execution and delivery of this Release does not, and with the passage of time will not, violate any obligation of the Party to any third party. Each Party further represents and warrants that it has not assigned any of its rights with respect to the Dispute and the Contract to any other party.

5. **No Admission.** Client and Passive expressly agree and acknowledge that this Release represents the settlement and compromise of disputed claims, and that by entering into this Agreement neither Party hereto admits or acknowledges the existence of any liability, obligation, or wrongdoing on its part. Each Party expressly denies any and all liability with respect to the Dispute. Client understands that they are being provided this settlement offer even if they might not otherwise be entitled to a refund under their Contract with Passive in the interest of avoiding further litigation.

6. **Independent Legal Counsel.** The Parties acknowledge that they have had the opportunity to consult with independent legal counsel regarding the legal effect of this Agreement and the Release and that each Party enters into this Agreement freely and voluntarily.

7. **Who is Bound.** Each Party is bound by this Agreement. Any person or corporation, partnership or other entity which succeeds to a Party's rights and responsibilities is also bound. This Agreement is made for the benefit of the Parties, their past, present and future officers, directors, shareholders, employees, and agents, and the Parties' affiliates and subsidiaries, and all who succeed to their rights and responsibilities, as well as any successors and assigns of the Parties.

8. **Governing Law; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, notwithstanding its choice of law provisions. The Parties agree that any claims or legal actions by one Party against the other to enforce the terms of this Agreement or concerning any rights under this Agreement shall be commenced and maintained in any state court located in the State of New Jersey.

9. **Confidentiality.** The Parties agree to keep confidential all the terms and conditions of this Agreement, as well as all negotiations and discussions leading up to this Agreement.

10. **Reformation/Severability.** If any court determines that any term of this Agreement is excessive in duration or scope or is unreasonable or unenforceable under the applicable laws, it is the intention of the Parties that such restriction

may be modified or amended by the court to render it enforceable to the maximum extent permitted by the applicable laws.  In the event that any portion, word, clause, phrase, sentence or paragraph of this Agreement is declared void or unenforceable by any court, tribunal or arbiter of competent jurisdiction, the Parties mutually agree that such portion shall be considered severable and separable from the remainder, and the validity of the remainder of the Agreement shall remain unaffected, including the releases set forth hereinabove, and shall remain binding and enforceable.

11. **No Active Lawsuits.** Client understands that in signing this Agreement, Client agrees to discontinue and refrain from initiating any lawsuits related to the Dispute and the Contract within thirty (30) days of the execution of this Agreement. Client further agrees to leave no Bad Reviews (Meaning any post, public writing, message, statement, report or complaint that is derogatory or damages the reputation of Passive and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives) against Passive and its directors, officers, employees, subsidiaries, affiliates, agents, and representatives. If Client has already left a Bad Review, Client agrees to take it down within thirty (30) days of execution of this Agreement. Client acknowledges that the failure to meet its obligations under this section shall be deemed a default under this Agreement and Client would waive its rights and entitlement to payment from the Settlement Fund.

12. **Fees and Expenses.** Each Party hereto shall bear its own fees and expenses (including attorneys' fees) incurred in connection with the Dispute, this Agreement and the consummation of the transactions contemplated hereby.

13. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument, without necessity of production of the others. An executed signature page delivered via facsimile transmission or electronic signature shall be deemed as effective as an original executed signature page.

14. **Waiver.** No waiver of any term or right in this Agreement shall be effective unless in writing, signed by an authorized representative of the waiving Party. The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision or any other provision of this Agreement thereafter.

15. **No Negative Interpretation:**  This Agreement embodies the arms-length negotiation and mutual agreement between the Parties and shall not be construed against either party as having been drafted by such party. As such, the Parties further agree that this Agreement has been jointly drafted, so that in the event any portion, word, clause, phrase, sentence or paragraph of the Agreement is deemed

ambiguous, said ambiguity shall not be construed against either of the Parties. Each of the Parties acknowledges that it: (i) has read this Agreement and fully understands the contents and legal effects thereof; (ii) has been given a reasonable amount of time to consider this settlement; (iii) has been advised by counsel as to the meaning and implications of this Agreement or has voluntarily waived procurement of counsel; and (iv) desires to enter into this Agreement and is doing so voluntarily and without coercion.

16. **Entire Agreement.** This Agreement sets forth the entire and complete understanding and agreement between the Parties regarding the subject matter hereof including, but not limited to the settlement of all disputes and claims with respect to [the Contract and] the Dispute, and supersedes any and all other prior agreements or discussions, whether oral, written, electronic or otherwise, relating to the subject matter hereunder. Any additions or modifications to this Agreement must be made in writing and signed by authorized representatives of both Parties. The Parties acknowledge and agree that they are not relying upon any representations or statements made by the other Party or the other Party's employees, agents, representatives or attorneys regarding this Agreement, except to the extent such representations are expressly set forth herein.

17. **Successors.** This Settlement Agreement is binding upon the heirs, successors and assigns of the Parties, and inures to the benefit of the heirs, successors and assigns of the Parties.

18. **Further Documents.** The parties agree to execute any further documents, instruments and agreements reasonably necessary to effectuate the terms and intentions of this Settlement Agreement

19. **Headings.** The headings in this Settlement Agreement are inserted for convenience only and shall not affect its construction.

20. **Authority to Bind.** By signing below the Parties represent that the signatories are authorized to execute this Agreement on behalf of themselves and/or their respective business entities and that the execution and delivery of this Agreement are the duly authorized and binding acts of their respective businesses.

*<signature page follows>*

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be executed as of the date first set out above.

PASSIVE SCALING, INC.

By: Pankil Shah

Title: Client/Owner

Dated: 11/15/2023

By:

Title:

Dated:

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **dtup18B8FkvUZioq4ckRaUNy** |
| Signed by: | Pankil Shah |
| Sent to email: | ███████████████ |
| IP Address: | 100.8.25.11 |
| Signed at: | Nov 15 2023, 12:55 pm EST |

**Attachment G**



**Steven Passive scaling** ›

> We have drafted notice/demand letter and will ready to sent it out as we near contract terms. So just wanted to let you know incase you change your mind.
>
> Nothing from jerdonna or you so I assume no plans to make the payment.

**Edited**

Sun, Oct 22 at 10:40 AM

> Are you open to negotiating the payment amount ? I wanted to ask before the letter gets send out

Thu, Nov 16 at 10:10 AM

> Steven, I have signed the updated the waiver in good faith this time thinking you will honor the terms after the discussion with my attorney.
>
> I sent a signed copy yesterday morning so can you please have it counter signed and sent it back to us by today ?

iMessage

.ıll AT&T 📶                    **10:12 AM**                    89% 🔋

**S**

Steven Passive scaling ›

I got the 15k agreement. Is there a timeframe you can let me know when I will get so I have peace of mind before signing ?

Yeah it will be 3-6 months

That's a long time steven

Can you do something by end of this year ?

Or can yo give installment like 10k

We can do installments

So then when should I expect it ?

Can you please tell me ?

Within 12 months

That's a long time steven

I am willing to be work with you

➕    iMessage    🎤



Steven Passive scaling >

I am willing to be work with you steven, would appreciate if you can have in sooner if not 12 months is ok. Can you have it in agreement?

She's adding it.

Will be one time payment or installments within 12 months from now ?

Installments

but full 15k will be within 12 months right ?

Yeah

Ok and if I sign it I owe you and company nothing and you guys owe me nothing outside of 15k refund ?

Attachment G
PX9

000485

AT&T 10:09 AM 90%

**S**

Steven Passive scaling ›

Thu, Nov 16 at 3:53 PM

What the latest ? We haven't yet received a signed copy form your side

Thu, Nov 16 at 5:07 PM

Pankil I don't work in the company anymore

You have to ask Jerdonna

We are but they haven't been responding and neither is your attorney Mr. Usher. We are trying to make all this work in good faith and new terms you all put in. So if you can assist in anyway will be much appreciated. Thank you !

Maybe she's sick or her internet is out

My lawyer not responding because I don't have money to pay him

So you are suggesting you are not in touch with Jerdonna and she is working by herself with new contract

iMessage



**AT&T** 10:09 AM 90%

**S**

Steven Passive scaling >

So you are suggesting you are not in touch with Jerdonna and she is working by herself with new contract and payment terms

Yes under new management

Do they or you have any intention on paying the money ? Or this another run around like first contract ?

I'm sure no one wants to keep it going longer than necessary.

Doesn't look like after making me wait for year and now having to go through this. You gave me your word and we even signed a contract.
I hope this time it will be different and honor the new terms.

Fri, Nov 17 at 9:50 AM

Since you have mentioned couple of times in past that you are happy to help in some way, can you contact jerdonna from your side and see

 iMessage 

**S**

Steven Passive scaling ›

Thu, Nov 30 at 12:28 PM

Can you reply or call me ? I tried calling you

Mon, Dec 4 at 4:46 PM

What's going ok steven ? My attorney said passive scaling email ids are un reachable

You seriously want to consider because I m not messing around. You have tested my patience for long time now and I was dealing on good faith until now.

Please remember this money isn't going to do any good to you and I know for sure karma will do its thing when time comes.

Please don't deal in bad faith, you said after signing new contract payment will be made in installments. So I signed it and now you guys aren't signing it so what should I make of it.

iMessage

.ıll AT&T 🌐

**10:09 AM**

📷 ⏰ 90% 🔋

S

Steven Passive scaling ›

What's going on steven ? It's been a month since I signed contract from my side and no update from your side

Neither jerdonna or your attorney is responding

Mon, Dec 18 at 4:42 PM

Hey Pankil,

I'm sorry I'm not involved with it. Jerdonna is handling it. You would have to wait on her because it's coming from legal and I can't do anything about it

Steven- I have been waiting for a month. Not update since then and I signed new contract with updates terms as you suggested for payment to come through back then.

Edited

Neither is Jerdonna or your attorney responding despite multiple attempts made by me and my lawyer.

 iMessage 🎤

S

Steven Passive scaling ›

> Ok it's hard for me to understand that you are not involved since your attorney has repeatedly mentioned he needs to talk to you in regard to my matter.
> Can you please atleast let me know who is so signing the contract on company's behalf ?

> Or anyone else I can reach out to outside Jerdonna or your attorney

No one else would have any information besides the 2 of them unfortunately. I'm not even making any decisions.

> Ok then why can't you honor original contract that you signed and had me wait for a year. Because I did everything in good faith you asked for to get resolve this

> **Edited**

Tue, Jan 23 at 12:53 PM

> Steven I haven't got a single payment
> and no new agreement has been

iMessage




.ıll AT&T 📶    10:10 AM    🕙 ⏰ 90% 🔋

‹    **S**    📹

Steven Passive scaling ›

No one else would have any information besides the 2 of them unfortunately. I'm not even making any decisions.

Ok then why can't you honor original contract that you signed and had me wait for a year. Because I did everything in good faith you asked for to get resolve this

**Edited**

Tue, Jan 23 at 12:53 PM

Steven I haven't got a single payment and no new agreement has been signed from your side despite hundreds of attempt made. I will be filing lawsuit against you and everyone involved including your wife whose name is on original contract soon like everyone else is doing as I understand.
Before that I wanted to reach out and see if you have any intention of resolving this.

**Delivered**

 iMessage 





---------- Forwarded message ---------
From: **Jerdonna P** <jerdonna@hourlyrelief.com>
Date: Mon, Mar 4, 2024 at 3:41 PM
Subject: Re: Re Payment Details/Pankil Shah
To: Pankil Shah ███████████████ >

Hi Pankil
The first payment was sent out if you don't get it by Wednesday this week please let me know so that I can request payment invoice


Sender notified by
Mailtrack

On Mon, Mar 4, 2024 at 1:27 PM Pankil Shah ██████████████ > wrote:
Any updates on payments Jerdonna ?

Best,
Pankil

On Fri, Mar 1, 2024 at 11:48 AM Pankil Shah ████████████ > wrote:
Jerdonna- any updates ? when can i expect payments to start ?
Best,
Pankil

On Wed, Feb 21, 2024 at 1:27 PM Pankil Shah ████████████ > wrote:
Hi Jerdonna, any updates on payment ? Its been 3 months since I signed the contract and you said back then payment should start from 30 days of signing the contract which was mid-november for me.

Please assist.

Best,
Pankil

**Attachment H**

**PX9**                                                    **000492**



On Mon, Feb 19, 2024 at 10:16 AM Pankil Shah ███████████████ > wrote:
Jerdonna , any updates on payment ?
Best,
Pankil

On Wed, Feb 14, 2024 at 1:25 PM Pankil Shah ███████████████ > wrote:
Any updates Jerdonna ?
Best,
Pankil

On Mon, Feb 12, 2024 at 11:06 AM Pankil Shah ███████████████ > wrote:
Any updates? Jerdonna
Best,
Pankil

On Fri, Feb 9, 2024 at 7:13 AM Pankil Shah ███████████████ > wrote:
any updates Jerdonna ?
Best,
Pankil

On Tue, Feb 6, 2024 at 11:28 AM Pankil Shah ███████████████
wrote:
any updates Jerdonna ?

Best,
Pankil

On Mon, Feb 5, 2024 at 10:14 AM Pankil Shah ███████████████ >
wrote:
any updates Jerdonna ?
Best,
Pankil

On Thu, Feb 1, 2024 at 7:29 AM Pankil Shah ███████████████ >
wrote:
any updates Jerdonna ?
Best,
Pankil

On Tue, Jan 30, 2024 at 7:45 AM Pankil Shah
███████████████ > wrote:
Any updates ?

**Attachment H**
**PX9**

Best,
Pankil


On Sun, Jan 28, 2024 at 3:29 PM Pankil Shah
███████████████ > wrote:
Anything on payment Jerdonna ?

Best,
Pankil


On Wed, Jan 24, 2024 at 11:50 AM Pankil Shah
███████████████ > wrote:
Anything Jerdonna on payment ?


Best,
Pankil


On Tue, Jan 23, 2024 at 12:03 PM Pankil Shah
███████████████ > wrote:
@Jerdonna P - can you please respond and update
whats going on ?

My situation is not great and I could really get some
help with partial payments that we agreed on.

Best,
Pankil


On Mon, Jan 22, 2024 at 6:36 AM Pankil Shah
███████████████ > wrote:
any update Jerdonna ?


Best,
Pankil


On Thu, Jan 18, 2024 at 5:56 PM Pankil Shah
███████████████ > wrote:
any update Jerdonna?


Best,
Pankil


On Wed, Jan 17, 2024 at 4:18 PM Pankil Shah

████████████████ > wrote:

any updated on payment Jerdonna ?

Best,
Pankil

On Tue, Jan 16, 2024 at 4:25 PM Pankil Shah
████████████████ > wrote:

Any updates on payments ?

Best,
Pankil

On Mon, Jan 15, 2024 at 1:27 PM Pankil Shah
████████████████ > wrote:

@Jerdonna P - any idea when can I expect
the payment ?

Best,
Pankil

On Fri, Jan 12, 2024 at 9:54 AM Pankil Shah
████████████████ > wrote:

@Jerdonna P - any updated on payment ?

Please help me here, my situation is not well
and I'm struggling financially, so any
payment of $1000 and over as mentioned in
the new contract will help me

Best,
Pankil

On Wed, Jan 10, 2024 at 7:03 AM Pankil Shah
████████████████ > wrote:

@Jerdonna P - any updates?

Looks like there is no intention to make
payments given the runaround, I trusted
you but unfortunately that was not the
case.

Anyways, you and I know people don't get
away with this kind of thing.

**Attachment H**
**PX9**

Best,
Pankil

On Mon, Jan 8, 2024 at 1:50 PM Pankil Shah
███████████████ > wrote:
@Jerdonna P - any update on payments?

Best,
Pankil

On Thu, Jan 4, 2024 at 4:27 PM Pankil Shah
███████████████ > wrote:
Any intention to make the payments,
Jerdonna?

Best,
Pankil

On Tue, Jan 2, 2024 at 11:26 AM Pankil Shah
<███████████████ > wrote:
Jerdionna any update ? when can I
expect the first payment ?

Best,
Pankil

On Thu, Dec 28, 2023 at 11:49 AM Pankil Shah
███████████████ > wrote:
Any update Jerdonna ?

Best,
Pankil

On Wed, Dec 27, 2023 at 2:32 PM Pankil
Shah ███████████████ > wrote:

Thanks Jerdonna, here are my bank
details. What or how much can I
expect and if so when?

Bank Name: **Bank of America**

Name on the account: **Pankil Shah**



Bank Address: ███████████████

Account Holder Address: ███████████████

Routing Number: ██████████ **(paper & electronic),** ██████ **(wires)**

Account Number: ███████████

**Alternatively, I am open for zelle transfer if that's easier for you. My zelle contact will be** ██████████████ **or** ████████ **.**

Best,
Pankil

On Wed, Dec 27, 2023 at 2:11 PM Jerdonna <jerdonna@passivescaling.com> wrote:

Hi Pankil,

Please provide me with your bank details today so that I can expedite the first patent that is already delayed
Sorry for the inconvenience i am trying my best to ensure the team follows through

**Attachment H**





---------- Forwarded message ---------
From: **Legal** <legal@passivescaling.com>
Date: Wed, Feb 21, 2024 at 1:12 PM
Subject: Subject: Update on Refund Payment Schedule from Passive Scaling Inc. through 3PL
Logistics
To: Pankil Shah

Dear Pankil Shah,

I hope this message finds you well. We are reaching out on behalf of Passive Scaling Inc. to provide an update regarding your refund payment scheduled for the first and second months. We sincerely appreciate your understanding and patience as we navigate through some challenging financial circumstances.

As you may be aware, Passive Scaling Inc. is currently closed but is making every effort to settle outstanding obligations with a few clients, including yourself. Unfortunately, due to unforeseen difficulties, particularly the financial constraints faced by the company, we have been unable to initiate payments over the last two months. The financial state of the company has hindered our ability to fulfill our commitments to you, and for that, we sincerely apologize.

However, we are pleased to inform you that Passive Scaling Inc. is actively working towards resolving these issues and restarting the payment process through our partnership with 3PL Logistics. We have assessed our financial situation and are committed to initiating refund payments starting March 1st. Additionally, we are grateful to announce that 3PL Logistics has allotted $2000 to be provided for the first refund payment. We are confident in our ability to proceed, especially considering that the company currently has disposable income earmarked for settling obligations, including refunds for customers who have signed settlement agreements over the last three months.

We understand the importance of fulfilling our financial responsibilities and the inconvenience that this delay may have caused you. Please be assured that our commitment to resolving this matter remains steadfast. Our legal and financial teams are dedicated to ensuring that your refund is processed promptly and efficiently.

**Attachment I**

We acknowledge the importance of clear communication and transparency in such matters, and we apologize for any lack of communication on our part. Moving forward, we are committed to providing you with regular updates on the status of your payments each month.

If you have any concerns or require further clarification, please do not hesitate to contact us at legal@passivescaling.com. Your satisfaction and trust are paramount to us, and we are here to address any issues or queries you may have.

Thank you for your understanding, patience, and continued partnership with Passive Scaling Inc. We value your trust and look forward to resolving this matter to your satisfaction.

Sincerely,

Legal Team
Passive Scaling Inc.





---------- Forwarded message ---------
From: **Erdal Turnacioglu** <erdal@erdalemploymentlaw.com>
Date: Fri, Nov 17, 2023 at 11:04 AM
Subject: RE: Matter of Pankil Shah, Passive Scaling
To: Pankil Shah ███████████████>, Passive Scaling Support
<sales@passivescaling.com>, Jerdonna P <jerdonna@passivescaling.com>,
info@passivescaling.com <info@passivescaling.com>
Cc: Christina Davidesko <████████████████████>, Mike Usher
<████████████████>

My client informed me that according to Jerdonna, the agreement is enforceable "as is".

Jerdonna - To protect Mr. Shah's rights and interests under the contract, specifically Paragraph 16
("Entire Agreement") – please respond to this email **today** and confirm that this modification is
being made by you as an authorized representative of Passive Scaling and/or 3PL Logistics.



**Erdal Turnacioglu (He/him/his)**

Owner and Managing Partner

Erdal Employment Law

**Phone** 973-559-7540 ext. 1000

**Web** www.erdalemploymentlaw.com

**Attachment J**

**PX9**                                    **000500**

**Email** erdal@erdalemploymentlaw.com

25 Pompton Avenue, Ste. 101, Verona, NJ 07044

42 Broadway, 12th Fl., New York, NY 10004

 

You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

---

**From:** Pankil Shah ██████████████
**Sent:** Friday, November 17, 2023 10:33 AM
**To:** Passive Scaling Support <sales@passivescaling.com>; Jerdonna P <jerdonna@passivescaling.com>; info@passivescaling.com
**Cc:** Erdal Turnacioglu <erdalemploymentlaw.com>; Christina Davidesko <████████████████████>; Mike Usher <█████████████████>
**Subject:** Re: Matter of Pankil Shah, Passive Scaling

Hello-

We haven't received the signed copy from your side. **Please send it to us by EOD today Novemeber 17th by 5.00 pm**

And as per the contract agreement since I have signed the contract on Nov. 15th our understanding is the 30 day period for first payment begins as of client signing date.

That said, I wanted to pass on my bank details for payment.

*Bank Transfer-*

Bank Name: ████████████████

Name on the account: **Pankil Shah**
Bank Address: ████████████████████████████
Account Holder Address: █████████████████████████████
Routing Number: ██████████████████████████████
Account Number: ███████████████

**Attachment J**

**PX9**                                                         **000501**

**Alternatively, I am open for zelle transfer if that's easier for you. My zelle contact will be** ███████████████████ **or** ██████████
██████

Please acknowledge the receipt of this email and that bank details have been updated from your side.


Best,

Pankil Shah




On Thu, Nov 16, 2023 at 2:29 PM Erdal Turnacioglu <erdal@erdalemploymentlaw.com> wrote:

Mr. Usher:


I have not heard back from you or your associate on my previous email.


Please note that it has been almost a week since I first reached out to you to resolve this matter. Given that there has been no update, we respectfully demand that your client sign the revised Waiver/Settlement for the $15,000 **by the close of business today**.


After receipt of the signed copy, my client will advise as his updated banking information to send payment.


Thank you,


**Erdal Turnacioglu, Esq.**

Erdal Employment Law

25 Pompton Avenue, Suite 101

**Attachment J**
**PX9**

Verona, NJ 07044

(973) 559-7540 ext. 1000

erdal@erdalemploymentlaw.com

www.ErdalEmploymentLaw.com

You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

On Nov 16, 2023, at 10:32 AM, Erdal Turnacioglu
<erdal@erdalemploymentlaw.com> wrote:

Mr. Usher:

Please be advised that we have not received a response or any information from
you regarding the updated contract. As you had advised last week, you or an
associate of your firm was scheduled to speak to your client this week regarding
this matter and the updated contract, which only needs to be signed (and
thereafter enforced) by Passive Scaling (or rather, the entity-in-interest) by your
client.

Please advise at your earliest convenience.

<image007.png>        **Erdal Turnacioglu (He/him/his)**

Owner and Managing Partner

Erdal Employment Law

**Phone** 973-559-7540 ext. 1000

**Web** www.erdalemploymentlaw.com

**Attachment J**
**PX9**

**000503**

**Email** erdal@erdalemploymentlaw.com

25 Pompton Avenue, Ste. 101, Verona, NJ 07044

42 Broadway, 12th Fl., New York, NY 10004

<image002.png>

<image003.png>

You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

---

**From:** Pankil Shah <███████████████████>
**Sent:** Wednesday, November 15, 2023 1:05 PM
**To:** Passive Scaling Support <sales@passivescaling.com>;
info@passivescaling.com; Jerdonna P <jerdonna@passivescaling.com>
**Cc:** Christina Davidesko ██████████████████>; Erdal Turnacioglu
<erdal@erdalemploymentlaw.com>; Mike Usher <musheresq@gmail.com>
**Subject:** Re: Matter of Pankil Shah, Passive Scaling

Hello Team-

After speaking with my attorney Mr. Turnacioglu, I am ready to
sign the updated waiver agreement that was sent to him on
Nov 9th, 2023.

I am attaching the signed copy of the same from my side. **Can
you please counter-sign and send us back a copy by 5.00
pm 11/15 (today).**

I would appreciate no further delay with respect to this
agreement so please reach out if you have any questions.

My attorney and I are waiting to hear from you.

**From:** Passive Scaling Support <sales@passivescaling.com>
**Sent:** Thursday, November 9, 2023 8:40 AM
**To:** Erdal Turnacioglu <erdal@erdalemploymentlaw.com>
**Cc:** info@passivescaling.com; musheresq@gmail.com; Christina Davidesko
███████████████████>; Jerdonna P
<jerdonna@passivescaling.com>
**Subject:** Re: Matter of Pankil Shah, Passive Scaling


Hello Erdal,


Apologies for the delays in response.


I hope this message finds you well. Thank you for reaching out to us
regarding the matter of your refund. Our team has conducted a thorough
review of the situation, and we appreciate your patience as we address the
concerns you've raised.

To provide you with some clarity regarding the refund process, we want to
assure you that your concerns are important to us please note that the refund
would range between 40-60% of the initial investment made by the clinet. In
the case of Mr. Shah, he had previously agreed to settle for $15000.

Please understand that our inability to offer a full one-time payment to your
clinet any client at this point is due to the current status of the company,
Passives Scaling, and the settlement process in place. We are actively
working to address these challenges and strive to provide the best possible
resolution for all our clients.

Once again, we deeply regret any confusion or inconvenience caused and we
genuinely hope that the information provided in this response helps clarify
any concerns you may have. Your satisfaction is of utmost importance to us,
and we remain committed to resolving this matter fairly and transparently.


We have gone ahead to review the clarification requested from your red line
and have attached a revised agreement below.

If you have any further questions or require additional assistance, please do
not hesitate to reach out to us. We are here to support you through this
process and address any additional concerns you may have.

Best regards,

On Wed, Nov 8, 2023 at 4:38 PM Erdal Turnacioglu <erdal@erdalemploymentlaw.com> wrote:

> Please be advised that as of today's date, I have not received any response to our redlined revisions to the terms of the revised Waiver. Accordingly, the terms of the initial contract – including the $15,000 owed to my client – is still in full force and effect.
>
> Please contact me at your earliest convenience to discuss this. Failure to respond by the close of business Friday, November 10, 2023 will mean that you are not interested in discussing resolution and my client reserves all rights and remedies under the applicable laws.
>
> <image004.png>    **Erdal Turnacioglu (He/him/his)**
>
> Owner and Managing Partner
>
> Erdal Employment Law
>
> **Phone** 973-559-7540 ext. 1000
>
> **Web** www.erdalemploymentlaw.com
>
> **Email** erdal@erdalemploymentlaw.com
>
> 25 Pompton Avenue, Ste. 101, Verona, NJ 07044
>
> 42 Broadway, 12th Fl., New York, NY 10004
>
> <image002.png>
>
> <image003.png>

**Attachment J**
**PX9**

You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

---

**From:** Erdal Turnacioglu
**Sent:** Wednesday, November 1, 2023 11:15 AM
**To:** info@passivescaling.com
**Cc:** Passive Scaling Support <sales@passivescaling.com>;
musheresq@gmail.com; Christina Davidesko
<████████████████████>
**Subject:** RE: Matter of Pankil Shah, Passive Scaling
**Importance:** High

Jerdonna:

Per our call, here is the updated version with our revisions (redlined and in comments) for the settlement agreement.

**Kindly review and have the agreement finalized by Passive Scaling <u>by the close of business (5 pm) Friday, November 3, 2023</u>.** As I had mentioned, my client has been **<u>extremely</u>** patient throughout this year-long ordeal, and Passive Scaling and/or Steven Rozenfeld has failed to honor their obligations under the previous contract.

Indeed, based on egregious misrepresentations, along with unfair and deceptive practices by Passive Scaling, Mr. Rozenfeld, their agents, employees, representatives, etc., Mr. Shah reserves his rights to pursue all remedies available to him under Federal, New Jersey State, and common law, including but not limited to treble damages under the Consumer Fraud Act.

Please be guided accordingly.

<image005.png>     **Erdal Turnacioglu (He/him/his)**

**Attachment J**
**PX9**

000507

Owner and Managing Partner

Erdal Employment Law


**Phone** 973-559-7540 ext. 1000

**Web** www.erdalemploymentlaw.com

**Email** erdal@erdalemploymentlaw.com

25 Pompton Avenue, Ste. 101, Verona, NJ 07044

42 Broadway, 12th Fl., New York, NY 10004

<image002.png>

<image003.png>



You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

---

**From:** Passive Scaling Support <sales@passivescaling.com>
**Sent:** Monday, October 30, 2023 6:20 PM
**To:** Erdal Turnacioglu <erdal@erdalemploymentlaw.com>
**Cc:** info@passivescaling.com; musheresq@gmail.com; Christina
Davidesko ████████████████ >
**Subject:** Re: Matter of Pankil Shah, Passive Scaling


Hello Erdal Turnacioglu,


Please see attached below the new proposed settlement agreement
approved by the company's legal team.


Please follow up via email if you have any queries or concerns.

On Mon, Oct 30, 2023 at 11:04 AM Erdal Turnacioglu
<erdal@erdalemploymentlaw.com> wrote:

Ms. Jerdonna Palmer:

Following up on this matter.

Please be advised that I just spoke with Steve Rozenfeld, and he advised
me that you would be sending a new waiver for Mr. Shah to execute on
behalf of a company that will be paying Mr. Shah the full $15,000.
(Strangely, Mr. Rozenfeld refused to name the company, but stated that it
is the one through which he does his coaching work and is in the new
waiver.)

Please send over the new waiver to me. As you know, the deadline for
Passive Scaling to provide Mr. Shah with the $15,000 under the current
waiver is tomorrow, October 31, 2023.

Regards,

<image006.png>     **Erdal Turnacioglu (He/him/his)**

Owner and Managing Partner

Erdal Employment Law

**Phone** 973-559-7540 ext. 1000

**Web** www.erdalemploymentlaw.com

**Email** erdal@erdalemploymentlaw.com

25 Pompton Avenue, Ste. 101, Verona, NJ 07044

42 Broadway, 12th Fl., New York, NY 10004

<image002.png>

<image003.png>

**Attachment J**
**PX9**

You can easily see my real-time availability and schedule time with me at

https://calendly.com/erdal-law

---

**From:** Erdal Turnacioglu
**Sent:** Wednesday, October 25, 2023 3:23 PM
**To:** info@passivescaling.com
**Cc:** musheresq@gmail.com; sales@passivescaling.com; Christina
Davidesko ███████████████████ >
**Subject:** Matter of Pankil Shah, Passive Scaling

Mr. Rozenfeld:

Please be advised that this office represents Pankil Shah with respect to the
Waiver Release for Pankil Shah/Waiver of Liability Settlement Agreement
from Passive Scaling. Attached, please find our demand letter regarding
same.

Please contact me at your earliest convenience to discuss the attached
letter.

.

Regards,

**Erdal Turnacioglu, Esq.**

Erdal Employment Law

25 Pompton Avenue, Suite 101

Verona, NJ 07044

(973) 559-7540 ext. 1000

**Attachment J**
**PX9**

**000510**

erdal@erdalemploymentlaw.com

https://www.erdalemploymentlaw.com

You can easily see my real-time availability and schedule time with me at
https://calendly.com/erdal-law

# ERDAL EMPLOYMENT LAW

25 Pompton Avenue, Suite 101
Verona, New Jersey 07044
(973) 559-7540
erdal@erdalemploymentlaw.com
http://www.erdalemploymentlaw.com

Erdal Turnacioglu, Esq.
Admitted in NJ and NY

October 25, 2023

**Via E-Mail**
*info@passivescaling.com*
Passive Scaling Inc.
78 John Miller Way
Kearny, NJ 07032
Attn: Steven Rozenfeld

Re:             Pankil Shah, Passive Scaling

Dear Mr. Rozenfeld:

Please be advised that this office represents Pankil Shah with respect to the Waiver Release for Pankil Shah/Waiver of Liability Settlement Agreement ("Waiver") from Passive Scaling, Inc. ("Passive Scaling") that was entered into by the parties on October 24, 2022. **Kindly address any and all future communications with this firm.**

This letter is in response to Passive Scaling's correspondences and communications with Mr. Shah, which first advised that Passive Scaling would fund the **$15,000.00** in consideration for Mr. Shah waiving any and all claims, and then advised that it would either not be able to provide Mr. Shah with the agreed-to amount, or that it would be paid "in October 2023." To date, my client has not received the payment, nor is it clear to him that Passive Scaling will honor their obligations as provided in the Waiver.

Fundamentally, at no time has Mr. Shah breached the Waiver, including but not limited to the terms and conditions provided in Paragraph 1 ("Consideration").

As you may know, in New Jersey, contracts such as the Waiver between my client and Passive Scaling are governed under common law. The elements of a breach of contract claim are "first, that 'the parties entered into a contract containing certain terms'; second, that 'plaintiff[] did what the contract required them to do'; third, that 'defendants did not do what the contract required them to do,' defined as a 'breach of the contract'; and fourth, that 'defendants' breach, or failure to do what the contract required, caused a loss to the plaintiff[].'" Goldfarb v. Solimine, 245 N.J. 326 (2021).

"A contract is an agreement resulting in obligation enforceable at law." Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 24 (1958). "[T]he basic features of a contract" are "offer, acceptance, consideration, and performance by both parties." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 439 (2013). "A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting Caldwell, 26 N.J. at 24-25).

**Attachment J**
**PX9**
**000512**

Furthermore, the implied covenant of good faith and fair dealing "prohibits the contracting parties from 'do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Lamme v. Client Instant Access, LLC, No. A-2689-20 (App. Div. Apr. 29, 2022) (citing Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997) (internal quotation marks omitted)). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." Wade v. Kessler Inst., 172 N.J. 327, 341 (2002).

Here, Passive Scaling has failed to meet the promised obligations under Paragraph 1 of the Agreement, and instead has breached the implied-in-law covenant of good faith and fair dealing by continuing to delay and/or mislead my client regarding payment of the $15,000.00 owed. **Accordingly, Mr. Shah demands that Passive Scaling provide him with expectation damages.** "The traditional remedy for breach of contract is expectation damages." Goldfarb, supra. (citing Coyle v. Englander's, 199 N.J. Super. 212, 214, (App. Div. 1985) (characterizing expectation damages, "i.e., loss of the benefit of the bargain," as the "traditional" form of damages for breach of contract"). "The purpose of such compensating damages "is to put the injured party in as good a position as if performance had been rendered." Id. (citing Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1 (2007) (ellipsis omitted) (quoting Donovan v. Bachstadt, 91 N.J. 434, 444 (1982); see Restatement (Second) of Contracts: Purposes of Remedies, § 344(a) (Am. Law Inst. 1981) ("Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promisee: (a) his 'expectation interest,' which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed."). **My client also demands costs and attorneys' fees for Passive Scaling's breach in accordance with Paragraph 2(I) of the Waiver.**

I invite you to reconsider your position and discuss Passive Scaling's breach of the Waiver with me at your earliest convenience. If you do not respond by the close of business on **October 31, 2023**, I will take that to mean that you are not interested in negotiating, and my client reserves the right to pursue all remedies that he is entitled to under the law.

Please contact me at your earliest convenience to discuss the terms and conditions of this letter.

Very Truly Yours,

Erdal Turnacioglu, Esq.

cc:    Usher Law, LLC (*musheresq@gmail.com*)
       *sales@passivescaling.com*