## DECLARATION OF ROSS LAUGHTER
### Pursuant to 28 U.S.C. § 1746

I, Ross Laughter, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Ross Laughter.  I am over the age of 18 and reside in Prosper, Texas.

2. In approximately June 2021, a friend of mine told me about a company that ran Amazon and Walmart ecommerce stores for its clients and the clients received passive income from the stores.  He signed an agreement with the company and I decided to look into it.

3. I spoke with a sales agent, Michelle Tedesco, at a company called Optimyze Digital.  She gave me several documents to review, including a pricing sheet, and I spoke with her several times.  I also did some research on my own and found positive testimonials and a promotional video.  I only found one Better Business Bureau ("BBB") complaint at the time, and I figured if that was the worst I could find, then the company should be legitimate.  Attached as **Attachment A** is a true and correct copy of this pricing schedule.

4. Michelle gave me a spreadsheet that calculated the amount of profit I could make from an Amazon and Walmart store.  If I spent $50,000 on working capital, I could profit $508,370 at the end of year one and starting in month five, I would make approximately between $40,000 to $60,000 per month in profit.  Attached as **Attachment B i**s a true and correct copy of this spreadsheet.

5. I decided to sign up because it appeared that the business worked, I could make a lot of money, and there would be very low risk.  The testimonials showed that other clients were very successful, and the spreadsheet showed me that I would make a significant amount of profit and income from having Amazon and Walmart stores.  In addition, Passive Scaling

had a refund policy that said, in part, I could get a refund if I did not make back my initial fee payment in 18 months.  This provision made this opportunity less risky.

6.  The sales agent sent me the contract and I was a little confused because the sales agent was with Optimyze Digital and the contract was with a company called Passive Scaling Inc.

7.  I signed the contract for Amazon and Walmart stores in July 2021 with Passive Scaling Inc.  My initial fee for the two stores was $50,000.  In addition to the initial fee, the contract also required me to pay a $99 software fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a management fee (starting "the following month after fulfillment of the initial payment").  My initial fee was going to include these two additional charges.  The contract was signed by Steven Bratislav Rozenfeld, CEO of Passive Scaling Inc.  The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, New Jersey 07020.  Attached as **Attachment C** is a true and correct copy of the contract.

8.  After I signed the contract, I received a confirmation email from Steven Bratislav Rozenfeld with wiring instructions for my initial fee.  I also notified Frances Schaper at Optimyze Digital that I sent my payment.  She responded by saying, "Excited to get your stores started.  I will let you know when I confirm receipt with Steven from Passive Scaling."  As instructed, I wired $50,298 to Passive Scaling Inc.  Attached as **Attachment D** is a true and correct copy of these emails.

9.  The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner.  The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of

2

whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

10. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in their advertisements, profit calcuator, or over the phone with the sales agent. I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

11. In August 2021, I received an onboarding email from Tatiana S who said she was my personal account manager. Attached as **Attachment E** is a true and correct copy of this email.

12. Once Passive Scaling opened my Walmart store, within two weeks, Walmart flagged it for fraud and shut it down. I had created a new LLC for this store and now I could not use it again because Walmart flagged it. I am not sure why this happened, but I believe it had something to do with the way Passive Scaling set up the store on the backend.

13. I wanted to get my money back, but instead of giving me a refund for this store, Passive Scaling offered to set up a Facebook store for me. Once this store was up and running, it only made a few sales, and I never made a profit from the store.

14. At the same time Passive Scaling opened my Walmart store, it also opened an Amazon store for me. Once the store was opened, I received several cease-and-desist letters from the companies whose products Passive Scaling stocked my store with. I was told that I was not allowed to sell their products. Attached as **Attachment F** is a true and correct copy of these letters.

3

15. I allowed Passive Scaling to use my credit card to buy inventory and Passive Scaling purchased approximately $15,000 for inventory. However, the products that were listed on my store were not selling and I was losing money. Passive Scaling started to sell my items at a loss just to get rid of them. Passive Scaling asked me for more money to buy more inventory, but I said no. I was not going to continue to shell out money just to lose it. I was not making any profit.

16. Once my store was open for 18 months, I asked for a refund because I had not made back my initial fee. In fact, I was in the negative.

17. I started the refund process as is outlined in the contract, but Passive Scaling intermittently responded to me and then just stopped responding to me. My contact for the refund process was a woman named Jerdonna. She rarely responded to my emails, and I would have to set up video meetings. However, she would only show up to those about half the time. When she did respond, she would tell me that it was the Legal Department's responsibility.

18. Jerdonna then sent me a settlement agreement. I was told that because Passive Scaling incurred some expenses, it could not refund me the full amount. I was told I could receive $30,000 back. I agreed because I wanted to at least recoup some of my costs.

19. I had filed a complaint with the BBB, and I was told that before I could sign the settlement agreement, I had to remove my BBB complaint. I agreed and I did remove the complaint. Then, I signed the agreement. However, Passive Scaling never paid me any of the money agreed to in the settlement agreement and it completely ignored all my attempts to contact it after that. I noticed when I was on the BBB website, that other complaints I had seen when I filed my complaint were also gone. Attached as **Attachment G** is a true and correct copy of emails I sent to Passive Scaling regarding my refund.

4

20. I found out that my friend who introduced me to this opportunity also had issues and walked away from his contract.  He never received any refund either.

21. I've emailed multiple people, including the owner, and not a single person will respond. All phone numbers I can find have been disconnected or are no longer in service.  It is very clear that Passive Scaling does not intend on honoring its refund policy.

22. I started researching the owner, Steven Rozenfeld, and I found a court case against Mr. Rozenfeld that looks very similar to the situation I am in.  In that case, the plaintiffs are asserting that Mr. Rozenfeld also overstated his company's ability to provide the services outlined in their contract.

23. I never understood the relationship between Optimyze Digital and Passive Scaling because the employees I dealt with often had email addresses for both companies.  I was also confused about each company's responsibilities with my stores.

24. I lost $65,000 from this business opportunity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____, 2024
Prosper, Texas

_Ross Laughter_
Ross Laughter

**PX15**                                                                 **000881**

# Pricing

Programs for all budgets. All include money-back guarantee.
The more you spend upfront, the higher percentage of profits you keep in your pocket.

| SINGLE | BUNDLE | SMALL PORTFOLIO | LARGE PORTFOLIO |
|---|---|---|---|
| **$30k** | **$50k** | **$100k+** | **$500k+** |
| Single Amazon or Walmart store | Includes both Amazon and Walmart store | Includes 2+ bundles | Includes 10+ bundles |
| Profit share fee = 35% | Profit share fee = 35% | Profit share fee = 25% | Profit share fee = 20% |

*Portfolios of $250k+ now include personal warehouse and fulfilment facility*

Attachment A

**PX15**                                                                                                    **000882**

| | | |
|---|---|---|
| **Starting Period** | Q3 | |
| **Bundle type** | $100k Bundle Amazon/Walmart | |
| **Working Capital Per Store** | 50,000 | |
| **Management Profit Percentage** | 25% | |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $3,389,131 | $7,825,031 | $11,214,161 |
| Total Expenses | $2,880,761 | $6,651,276 | $9,532,037 |
| Client's Profit | $508,370 | $1,173,755 | $1,682,124 |

| | | |
|---|---|---|
| Projected Asset Value at Mo 24 | - | $4,695,018 |
| Working Capital Utilized by Mo 24 | | $368,047 |



**Twenty Four Month Forecast**

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | - | 59,446 | 87,644 | 132,779 | 162,248 | 215,836 | 157,323 | 144,353 | 172,655 | 191,459 | 195,560 | 175,263 | |
| **Gross Revenue** | - | 118,892 | 175,289 | 265,558 | 324,495 | 431,673 | 314,646 | 288,705 | 345,310 | 382,917 | 391,120 | 350,526 | 3,389,131 |
| **Cost of Goods** | - | 65,390 | 96,409 | 146,057 | 178,472 | 237,420 | 173,055 | 158,788 | 189,920 | 210,604 | 215,116 | 192,789 | 1,864,022 |
| **Amazon Fees** | - | 29,723 | 43,822 | 66,390 | 81,124 | 107,918 | 78,661 | 72,176 | 86,327 | 95,729 | 97,780 | 87,631 | 847,283 |
| **Store Profit** | - | 23,778 | 35,058 | 53,112 | 64,899 | 86,335 | 62,929 | 57,741 | 69,062 | 76,583 | 78,224 | 70,105 | 677,826 |
| **Management Fee** | - | 5,945 | 8,764 | 13,278 | 16,225 | 21,584 | 15,732 | 14,435 | 17,265 | 19,146 | 19,556 | 17,526 | 169,457 |
| **Clients Profit** | - | 17,834 | 26,293 | 39,834 | 48,674 | 64,751 | 47,197 | 43,306 | 51,796 | 57,438 | 58,668 | 52,579 | 508,370 |

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | 280,219 | 265,240 | 224,502 | 212,303 | 306,146 | 452,829 | 323,686 | 291,615 | 361,598 | 408,095 | 418,236 | 368,047 | |
| **Gross Revenue** | 560,438 | 530,480 | 449,004 | 424,605 | 612,292 | 905,658 | 647,373 | 583,229 | 723,196 | 816,189 | 836,472 | 736,094 | 7,825,031 |
| **Cost of Goods** | 308,241 | 291,764 | 246,952 | 233,533 | 336,760 | 498,112 | 356,055 | 320,776 | 397,758 | 448,904 | 460,059 | 404,852 | 4,303,767 |
| **Amazon Fees** | 140,110 | 132,620 | 112,251 | 106,151 | 153,073 | 226,415 | 161,843 | 145,807 | 180,799 | 204,047 | 209,118 | 184,024 | 1,956,258 |
| **Store Profit** | 112,088 | 106,096 | 89,801 | 84,921 | 122,458 | 181,132 | 129,475 | 116,646 | 144,639 | 163,238 | 167,294 | 147,219 | 1,565,006 |
| **Management Fee** | 28,022 | 26,524 | 22,450 | 21,230 | 30,615 | 45,283 | 32,369 | 29,161 | 36,160 | 40,809 | 41,824 | 36,805 | 391,252 |
| **Clients Profit** | 84,066 | 79,572 | 67,351 | 63,691 | 91,844 | 135,849 | 97,106 | 87,484 | 108,479 | 122,428 | 125,471 | 110,414 | 1,173,755 |

| | | Q3 - 2021 | | | Q4 - 2021 | | | Q1 - 2022 | | | Q2 - 2022 | | | Q3 - 2022 | | | Q4 - 2022 | | | Q1 - 2023 | | | Q2 - 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | - | 118,892 | 175,289 | 265,558 | 324,495 | 431,673 | 314,646 | 288,705 | 345,310 | 382,917 | 391,120 | 350,526 | 560,438 | 530,480 | 449,004 | 424,605 | 612,292 | 905,658 | 647,373 | 583,229 | 723,196 | 816,189 | 836,472 | 736,094 |
| **Total Cost** | - | 101,058 | 148,996 | 225,725 | 275,821 | 366,922 | 267,449 | 245,400 | 293,513 | 325,480 | 332,452 | 297,947 | 476,373 | 450,908 | 381,653 | 360,914 | 520,448 | 769,809 | 550,267 | 495,745 | 614,717 | 693,761 | 711,001 | 625,680 |
| **Client's Profit** | - | 17,834 | 26,293 | 39,834 | 48,674 | 64,751 | 47,197 | 43,306 | 51,796 | 57,438 | 58,668 | 52,579 | 84,066 | 79,572 | 67,351 | 63,691 | 91,844 | 135,849 | 97,106 | 87,484 | 108,479 | 122,428 | 125,471 | 110,414 |



# Delivering on Your eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

July 18, 2021

**Client**

Ross Laughter

**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit **- this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of July 18, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Ross Laughter, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $50,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-accounts), and one (1) e-commerce stores on the Walmart platform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Amazon/Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.

   B. Review, research, source, select, and list products for the Client's Stores.

   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2021-07-28 18:04:24 (ADT)

2

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon/Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon/Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifty thousand dollars ($50,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



1921-07-28 18:04:24 (MDT)

3

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**

This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon/Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2021-07-28 18:04:24 (ADT)

4

6. **NON-DISPARAGEMENT –**

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands that Client's Stores is a service hosted on the Amazon/Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon/Walmart, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon/Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon/Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



2021-07-28 18:04:24 (MDT)

5

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2021-07-28 18:04:24 (MDT)

6

E.  **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

F.  **Maintenance of Confidential Information.** The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

G.  **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

H.  **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.


2021-07-28 18:04:24 (MDT)

Attachment C
PX15

000891

10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($50,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($50,000.00).



2021-07-28 18:04:24 (GDT)

8

11. **LIMITATION OF LIABILITY –**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.



2021-07-28 18:04:24 (ADT)

9

12. **DISCLAIMERS AND RELEASE –**

A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2021-07-28 18:04:24 (MDT)

10

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon/Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon/Walmart products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon/Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon/Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.


2021-07-28 18:04:24 (MDT)

11

D. **Amazon/Walmart Terms and Conditions -** Client hereby understands that Amazon/Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon/Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon/Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Amazon/Walmart policy, whether currently in effect or as may be amended by Amazon/Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Amazon/Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties -** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ███████████ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



2021-07-28 18:04:24 (GMT)

12

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2021-07-28 19:04:24 (ADT)

13

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



1921-07-28 18:04:24 (MDT)

Attachment C
PX15                                             000898

L.  **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M.  **Indemnification of Client –** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N.  **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



2021-07-28 18:04:24  (MDT)

Attachment C
PX15                                                        000899

O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2021-07-28 18:04:24 (MDT)

16

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



2021-07-28 18:04:24 (GMT)

17

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's



2021-07-28 18:04:24 (MDT)

18

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

19

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Ross Laughter authorized representative and agent for service of process Date: July 28, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

*Ross Laughter*
2021-07-28 18:04:24 (ADT)

Ross Laughter

**CONSULTANT:**

By: PASSIVE SCALING INC. STEVEN BRATISLAV ROZENFELD, CEO, authorized representative and agent for service of process.

Date: July 28, 2021

*Steven Bratislav Rozenfeld*
2021-07-28 20:23:19 (ADT)

Steven Bratislav
Rozenfeld

Attachment C
PX15

000904

## Confirmation Email - Congratulations! Inbox ×

**Steven Bratislav Rozenfeld** <no-reply@proposify.com>
to me ▼



Hi Ross,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

**Download now**

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Name of Bank: Chase Bank
Address: 223 Veterans Blvd., Carlstadt, NJ 07020
Account # ▮▮▮▮▮▮
Routing # ▮▮▮▮▮▮ (WIRE)
# ▮▮▮▮▮ (ACH)
**\*\*\*\*\*PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS**

**Attachment D**



## Payment Scheduled  Inbox ×

**Ross**
Hello, My payment has been scheduled. It should arrive Monday. Thanks, Ross Laughter

Fri, Jul 30, 2021, 1:01PM

**Frances Schaper** <payments@optimyzedigital.com>
to me ▾

Fri, Jul 30, 2021, 2:13 PM    ☆  ☺  ↩ Reply  ⋮

Hi Ross,

I will let you know when I confirm receipt with Steven from Passive Scaling.

Have a great weekend.

Frances

**Payments**
Optimyze Digital LLC

✉ payments@optimyzedigital.com
⑧ www.optimyzedigital.com
📍 3333 Michelson Dr. Suite 300, Irvine, CA

**Attachment D**

## Welcome aboard to our Passive Scaling family! Inbox ×

**Tatiana S** <tatiana@passivescaling.com>
to me ▾

Fri, Aug 6, 2021, 9:39 AM

Hi Ross!

Welcome aboard to our Passive Scaling family!

My name is Tatiana and I'm your personal account manager that will be
handling your initial Walmart & Amazon store setup process.

1. Your first step is to complete and fill out this important On-Boarding form for me at:

https://docs.google.com/forms/d/e/1FAIpQLSfG5_u9fWtQyOcNVrmxnOVkj5FbYdWhiKnP88VqxZAYWW9YeQ/viewform?usp=sf_link

2. Next I want you to schedule a phone call in my calendar so we can cover some basic
getting started steps. Book our call now at

https://calendly.com/tatiana-s/60min

We will cover the many questions I'm sure you have about the process of getting your stores up & running!

You can also email me with any questions for a faster response.

I and our team are excited to have you on board and look forward to
a prosperous working relationship!


Warm Regards,

Tatiana

Passive Scaling

**Attachment E**



December 22, 2021

**VIA EMAIL & FIRST CLASS MAIL**

**Re: Infringement of Nutrex Hawaii Mark USPTO Registration No. 5510619, 5450685, 6009248, 5733011, 5025414, 3129144, 3688534, and 4248460**

To Whom It May Concern:

NUTREX HAWAII, INC. ("Nutrex Hawaii"), is the owner of the Nutrex Hawaii trade names, trademarks, and domain names (the "Nutrex Hawaii Marks"), which Nutrex Hawaii has used extensively for many years in connection with its well-known nutritional supplement products (the "Nutrex Hawaii Products").

**It has recently come to our attention that you and/or your company have been offering for sale and selling Nutrex Hawaii Products (bearing Nutrex Hawaii Marks) on Amazon.com without prior authorization from Nutrex Hawaii.** Prior authorization in this context means, namely, an executed Nutrex Hawaii Authorized Reseller Agreement.

Although we appreciate your enthusiasm to promote and sell Nutrex Hawaii products, we have to be diligent to ensure that the Nutrex Hawaii Marks are used correctly. Our diligence includes, without limitation, making sure that Nutrex Hawaii Products are only offered by third-party resellers that have been approved by Nutrex Hawaii and that have agreed, in writing, to all of the quality control and intellectual property usage guidelines, requirements, and restrictions associated with Nutrex Hawaii Marks and Products. If Nutrex Hawaii were to allow you to continue to sell Nutrex Hawaii Products without an Authorized Reseller Agreement in place, or to continue to use Nutrex Hawaii Marks without being bound by Nutrex Hawaii brand guidelines (among other things), Nutrex Hawaii runs the risk of its Marks being weakened, tarnished, or (worst case) forfeited.

All things considered, we hope you understand our need to contact you. To resolve this matter, please immediately cease and desist offering for sale or selling Nutrex Hawaii Products on Amazon.com. **In addition, please confirm by January 5, 2022 via email to sellercompliance@nutrex-hawaii.com that you have ceased offering for sale and selling Nutrex Hawaii Products on Amazon**. If we do not receive your confirmation of the above, we will escalate your case and take further legal action.

We thank you in advance for your prompt attention to this matter. In the meantime, if you have any questions or concerns, please do not hesitate to contact our team at **sellercompliance@nutrex-hawaii.com.**

Sincerely,

**Seller Compliance Team**
Nutrex Hawaii, Inc.

Please view our policy on our website at https://www.nutrex-hawaii.com/pages/authorized-resale-policy
**Attachment F**

**PX15**                                                                 **000908**



January 5, 2022

VIA EMAIL & FIRST-CLASS MAIL

**Re: Second Letter Regarding Common Trademark Infringement of the following Nutrex Hawaii Marks: USPTO Registration No. 5510619, 5450685, 6009248, 5733011, 5025414, 3129144, 3688534, and 4248460**

To Whom It May Concern:

Nutrex Hawaii ("Nutrex Hawaii"), is the owner of the Nutrex Hawaii trade names, trademarks, and domain names (the "Nutrex Hawaii Marks"), which Nutrex Hawaii has used extensively for many years in connection with its well-known nutritional supplement products (the "Nutrex Hawaii Products"). We previously sent you a cease and desist letter regarding you or your company's unauthorized and unlawful use of Nutrex Hawaii's trade names, trademarks, and domain names, including, without limitation, the above-referenced registered marks. The letter requested that you immediately cease and desist offering for sale Nutrex Hawaii Products on Amazon.com. The letter also requested that you confirm in writing that you have ceased offering for sale Nutrex Hawaii Products on Amazon.com.

**We have seen no compliance in regards to our initial cease and desist letter.** In addition, we have confirmed that you and/or your company are continuing to offer for sale Nutrex Hawaii Products on Amazon.com without having executed an Authorized Reseller Agreement with Nutrex Hawaii.

<u>**This letter is notice that unless you immediately cease and desist the activities outlined above and in our prior letter, our next action may be to file a lawsuit against you.**</u>  If Nutrex Hawaii files such a lawsuit against you, it may be entitled to seek: (1) preliminary and permanent injunctions; (2) actual monetary damages; (3) disgorgement of any profits you have realized through your use of the Marks; (4) reimbursement of attorney's fees required to prosecute a lawsuit against you; and (5) monetary damages for damage to Nutrex Hawaii's goodwill in the market.

Only resellers or distributors expressly authorized by Nutrex Hawaii (hereinafter, "Authorized Resellers") are permitted to sell Nutrex Hawaii Products, and they are required to sell products only in certain channels and to abide by Nutrex Hawaii's Resale Policy and/or other Nutrex Hawaii policies (collectively, the "Policies"). It is only by limiting authorized sales to Authorized Resellers who are required to follow the Policies that Nutrex Hawaii is able to ensure the satisfaction of consumers and to maintain the integrity and reputation of the Nutrex Hawaii brands. Authorized Resellers are not permitted to sell Nutrex Hawaii Products on the internet or any e-commerce format without the prior written consent of Nutrex Hawaii.

To protect the Nutrex Hawaii brands and prevent consumer confusion, Nutrex Hawaii has secured a number of trademarks relating to its business (including, without limitation, the Nutrex Hawaii Marks). Nutrex Hawaii is the only entity permitted to use or license the Nutrex Hawaii Marks in the United States. Your sales of these Products is illegal as the sales do not have any of the quality controls or any of the unique benefits that only Authorized Resellers can provide, and your repeated use and misappropriation of one or more Nutrex Hawaii Marks constitutes trademark infringement pursuant to 15 U.S.C. § 1114, unfair competition, and false advertising pursuant to 15 U.S.C. § 1125(a), and a violation of numerous state laws. Your acquisition and resale of any products received from Nutrex Hawaii's Authorized Resellers also constitutes tortious interference with Nutrex Hawaii's contracts and/or business relationships. Any time you purchase products from an Authorized Reseller and then attempt to resell those products, you have induced a breach of the agreement between Nutrex Hawaii and its Authorized Reseller and/or interfered with Nutrex Hawaii's agreement and business relationship with its Authorized Reseller, for which you may be held liable for tortious interference with Nutrex Hawaii's contracts and/or business relationships.[1]

Your use of the Nutrex Hawaii Marks is likely to cause – and we believe, has already caused – confusion and deception to consumers because it falsely suggests that (1) you are affiliated with or sponsored by Nutrex Hawaii, (2) the products

---

[1] *See, e.g., Australian Gold, Inc. v. Hatfield,* 436 F.3d 1228, 1235-38 (10th Cir. 2006) (affirming a $500,000.00 damages award for tortious interference with a dealer agreement)

**Attachment F**

you sell are delivered with all the same benefits, characteristics, and quality controls as Nutrex Hawaii Products sold by Authorized Resellers in authorized channels, and (3) Nutrex Hawaii approves of the products you sell.[2]

Because the products you sell are not distributed in accordance with the quality controls or with the benefits established by Nutrex Hawaii, the products you sell are not genuine Nutrex Hawaii Products and amounts to infringement of Nutrex Hawaii marks.[3] This violation of Nutrex Hawaii's Marks is likely to dilute the distinctive quality of the Marks and Nutrex Hawaii's reputation and goodwill in the marketplace. In addition, consumers who purchase products from you are likely to be confused by the lack of information and guidance concerning the use of such products, which damages the reputation of Nutrex Hawaii and further infringes on the Nutrex Hawaii Marks.

Even if you purchased or otherwise obtained the products legally from an Authorized Reseller, the "first sale doctrine" does not protect you from liability for your trademark infringement because your products are materially different and do not (or cannot) offer the quality controls that Nutrex Hawaii provides. Authorized Resellers are subject to the Nutrex Hawaii Resale Policy that imposes certain obligations, including quality control specifications and customer service requirements that impact Nutrex Hawaii's consumer warranty policy. Because you are not an Authorized Reseller, Nutrex Hawaii cannot ensure that you provide these services to your customers, making the products you sell materially different from genuine Nutrex Hawaii Products. Your unauthorized sale of Nutrex Hawaii Products without adhering to Nutrex Hawaii's quality control standards harms both the Nutrex Hawaii brands and consumers.[4] It is also well-recognized that goods are not genuine, and are therefore infringing, if they fail to conform to the trademark holder's quality control standards. Authorized Resellers also are required to assist with recalls and other consumer safety information efforts. Courts have held that when purchasers of unauthorized products are limited in their ability to be informed of recall and safety information, they are not receiving the "full bundle of services and product features that typically accompany such a purchase" and have not received a genuine product.[5]

**Please be advised that Nutrex Hawaii will undertake all appropriate steps to protect the Nutrex Hawaii Marks and its associated goodwill.** You can avoid legal action by immediately ceasing and desisting from any and all infringing activity including offering for sale and selling Nutrex Hawaii Products on Amazon.com or other unauthorized third-party online marketplaces. In addition, you are hereby put on notice that Nutrex Hawaii is and will continue monitoring your activities for this purpose.

If Nutrex Hawaii files a lawsuit, it will seek all available monetary damages (including, without limitation, disgorgement of profits, compensatory damages, attorneys' fees, and investigative and other costs as well as all injunctive relief to which it may be entitled). In connection with its lawsuit against you, Nutrex Hawaii will investigate and obtain the identities of all individuals and entities involved in your sales. If you ignore this notice and any subsequent lawsuit, Nutrex Hawaii may seek and execute a default judgment against you for all of the relief outlined above.

We thank you in advance for your prompt attention to this matter. Please email our team at **sellercompliance@nutrex-hawaii.com** by **January 19, 2022** to confirm your compliance with the demands set forth herein.

Sincerely,

**Seller Compliance Team**
Nutrex Hawaii, Inc.

Please view our policy on our website at https://www.nutrex-hawaii.com/pages/authorized-resale-policy

---

[2] 15 U.S.C. § 1114; *Courtenay Comrac'ns Corp. v. Hall*, 334 F.3d 210, 213 n.1 (2d Cir. 2003)
[3] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1072 (10th Cir. 2009) (quoting *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001)); *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)
[4] *SKF United States, Inc. v. ITC*, 423 F.3d 1307, 1312 (Fed. Cir. 2005); *Zino Davidoff SA v. CVS Corp*, 571 F.3d 238, 243 (2d Cir. 2009); *Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 643 (1st Cir. 1992); *Ahava (USA), Inc. v. JW.G., Ltd.*, 250 F. Supp. 2d 366, 369 (S.D.N.Y. 2003
[5]

**Attachment F**



**Closing Account Update**  APL Discounts ×

**Ross**
to Tatiana, jerdonna, Tatiana ▾

Wed, Oct 18, 2023, 4:16 PM

Hello,

I initially requested to close my account on February 1st, and it's now October without resolution. I have a scheduled meeting with Jerdonna on Monday. I expect to receive detailed information during this meeting on both the account closure process and the repayment plan.

Failure to provide this information will leave me with no choice but to consult legal counsel. I've already agreed to the terms for account closure; further delays are unacceptable.

I anticipate your timely response on Monday.

-Ross

**Ross**
to jerdonna ▾

Mon, Oct 23, 2023, 2:45 PM

Jerdonna,

I've scheduled 2 meetings with you today and you didn't show up to either one.  You also missed our last scheduled meeting, totaling 3 missed meetings.  Are the times I'm setting for these meetings not working for you?  If not, please propose some times that work for you.  You rescheduled the first meeting to a different date and time and then didn't show.  I've scheduled all meetings using your calendar link to pick appropriate dates and times.  Why are you not showing up?

-Ross

↩ Reply    ↪ Forward    ☺

**Attachment G**