## DECLARATION OF SHONA KILLOUGHERY
### Pursuant to 28 U.S.C. § 1746

I, Shona Killoughery, have personal knowledge of the facts and matters set forth below.  If called as a witness, I could and would testify as follows:

1. My name is Shona Killoughery.  I am over the age of 18 and reside in Fountain Valley, California.

2. In approximately March 2022, I was looking for a way to make passive income through small ecommerce stores, like on Amazon or Walmart.  I saw a Google ad for a company called Optimyze Digital, and I reached out.  I spoke with a man named Shion Galata.  He said he worked for Optimyze Digital and his company manages Amazon and Walmart ecommerce stores for its clients.  Shion sent me an email with links to various videos, including an informational slide deck and a financial projection sheet.  The company that Optimyze Digital partnered with was called Ascend Ecom LLC.  Apparently, the company has warehouses in California and Texas.  Attached as **Attachment A** is a true and correct copy of this email.  I sent the email with the links to the Federal Trade Commission on March 3, 2024.

3. I decided to purchase a Walmart store for $30,000 because I believed I would make passive income and I would not have to do any work.  I signed the contract on April 4, 2022.  Attached as **Attachment B** is a true and correct copy of this contract.

4. In approximately April 2022, soon after I purchased the Walmart store, Shion approached me and asked me if I wanted to also purchase a Facebook ecommerce store from a different company called Passive Scaling.  Shion told me he worked for Optimyze Digital and Passive Scaling and Optimyze Digital works with Ascend.  Passive Scaling used the dropshipping model for this store.  This meant that when a customer purchased an item on

1

a third-party ecommerce site, like Facebook, Passive Scaling would purchase the product on a different retail website, like Amazon or Walmart, and it would be sent to the customer directly from that retailer website. I would not have to buy inventory in bulk, like I had to do with the Walmart store, and store that inventory at a warehouse. I could just pay for the orders as they are placed. He told me the net margins are usually 40% and I could earn $10,000 per month in revenue quickly. He also said that I could easily make a consistent $3,000 to $4,000 per month in net profit. I could purchase this store for $15,000 and Passive Scaling would take 35% of the profits. I also would need $10,000 in working capital available to purchase products to fulfill customer orders. Attached as **Attachment C** is a true and correct copy of the text thread with Shion.

5. I decided to purchase the Facebook store as well because it sounded like I would make consistent profits quickly. I inquired about the wire information, and Shion told me that he works at Passive Scaling as well as managing the sales team. Shion sent me the wire information. *See* **Attachment C**.

6. I received a Facebook Marketplace Consulting Agreement with Passive Scaling Inc. and signed it on April 19, 2022. In addition to the initial $15,000 fee, the contract also required me to pay a $99 software fee ("paid directly to the software provider") and Passive Scaling would take 35% of the net profit or $199 per month for a management fee. The contract says that Passive Scaling Inc. is located at 223 Veterans Blvd., Carlstadt, NJ 07020. Attached as **Attachment D** is a true and correct copy of the contract.

7. The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate

information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

8. I never received any document from Optimyze Digital, Ascend Ecom, or Passive Scaling with any information substantiating the earning and profit claims contained in their advertisements, profit calculator, or over the phone with the sales agent. I also never received a document from Optimyze Digital, Ascend Ecom, or Passive Scaling telling me whether the companies had been subject to legal action or giving me a list of consumers who purchased their services in the past 3 years.

9. After I signed up to receive the Facebook store, I set up an LLC and completed the onboarding. I was told that it would take 8 weeks to start to receive profits, and so I sat back and waited for Passive Scaling to manage my store.

10. I kept checking on my Facebook store, and nothing much was going on. I received a handful of sales, but it was never put in full ecommerce mode, according to Passive Scaling. Between April and September 2022, I only made approximately $9.84 in profit despite claims that I would make $3,000 to $4,000 per month in net profit.

11. In August 2022, Tatiana sent me an invoice from FBA Support NJ Corp. that included the product costs and profit split. The total was $42.74. I did not understand how the total was calculated so I asked Tatiana to explain. We emailed several times and ended up having a phone call. Apparently Passive Scaling changed the plan I signed up for and was charging me 12% on products purchased rather than 35% on the profit I made from sales. I told her I was uncomfortable with this, and I wanted to talk about it further. Steven, steven@fba.support, was cc'd on the email thread. Attached as **Attachment E** is a true and correct copy of this email thread.

3

12. Then, on approximately September 14, 2022, about five months after I signed the contract, Tatiana at Passive Scaling sent me an email saying, "please be advised that we have paused the work on the Facebook Commerce accounts for the time being. Our goal is to achieve the best results for you as a client and at the moment, Facebook is going through some changes and we don't want to utilize the platform until this is figured out." Tatiana then said that Walmart is a better platform and Passive Scaling could switch me to Walmart. I emailed Tatiana back and said that I was not interested in a Walmart account because the one I had with Ascend failed miserably. I asked for a refund of my $15,000. Tatiana responded that "unlike your store, which I believe was shut down, our Walmart stores are stable." I responded that I would like a refund. Tatiana then emailed me with a different story about the Facebook stores. She said, "we are moving the Facebook stores to the Facebook dropdown. This is a new version of a store on Facebook and it's working a lot better. This change may take us 1-2 weeks." She said she would keep the Facebook store active and work on the Facebook dropdown. I emailed back that this was not what she told me in the initial email. Her initial email said Passive Scaling was pausing the Facebook stores because it did not want to utilize the Facebook platform until Facebook's changes were figured out. I was very angry and asked again for a refund. Tatiana told me that Passive Scaling is not offering any refunds except for what is provided in the contract and that it is making a one-time offer to switch to Walmart. Attached as **Attachment F** is a true and correct copy of these emails.

13. I asked to speak with a manager, and I finally spoke with someone named Jerdonna. She told me that she would have to ask the legal department about a refund. She said she would get back to me on September 26, 2022, but I never heard from her on that date. I sent

several more emails and finally received a response on October 6, 2022. Jerdonna said in the email that I could not get a refund and Passive Scaling would continue to manage my Facebook store. I responded that Passive Scaling "will not continue to manage a facebook store that doesn't work." I also said again that I did not want a Walmart store. I reminded them, "you were already aware that I had a Walmart store as the sales person, Shion Galata, who sold me on a Facebook store already sold me a Walmart store." Attached as **Attachment G** is a true and correct copy of these emails.

14. After I sent this message, I was able to speak with the CEO of Passive Scaling, Steven Rozenfeld. I argued with him, and he finally agreed to give me a refund, but in installments over a six-month period. I thought it was ridiculous that he could not refund me all at once because he claims on his Instagram page, *kingofamzn*, that he manages over $10 million per month in sales. But I agreed to this because I wanted to get my money back, and I thought this was the only way. He said that I would receive $2500 every month for six months, starting in October 2022. We both signed an agreement regarding this arrangement. Passive Scaling missed my first payment, and I had some communication with Tatiana back and forth asking for my first installment. On November 15, 2022, Tatiana asked me if I received my first wire. I emailed Tatiana, Steven, Shion, and Jerdonna, "I've already told you, multiple times, I have not received my refund. In any form. I'm starting legal proceedings. These email responses are pointless and a waste of my time. This company is a scam and I'm not putting up with it any longer. For documentation purposes-this is the 4th email regarding not getting my first installment of a refund payment. On this thread are Tatiana S, Jerdonna P, Shion Galata and Steven." I

5

received my first payment that afternoon.  *See* **Attachment G**.  Attached as **Attachment H** is a true and correct copy of Steven's Instagram cover page and a few of his posts.

15. I received an email from Steven, steven@wraithco.com, on November 15, 2022, telling me he could not guarantee the installment payments would be sent out on the timeline he agreed to on our call.  He then said this was an accommodation for me.  I emailed back that he requested the payment plan, not me.  I had asked for a full refund.  I told him that I would not continue to chase him every month.  If he failed to pay, I would take an alternate route to getting my money back.  I meant that I would sue him.  Steven responded and said, "you're free to do as you wish but please note the waiver has a disparagement agreement that would hold you liable up to 25k for any damages."  I did not receive a payment in December 2022 and emailed Steven, Shion, Jerdonna, and Tatiana and said, "oh look, no payment.  Again.  The $25k is only enforceable with a valid agreement.  Since you were late last month and I have received no payment this month, you have voided that agreement."  I sent emails in January 2023 noting I did not receive a January payment.  Attached as **Attachment I** is a true and correct copy of these emails.

16. In the meantime, I had contact with Shion in December 2022 and told him that I had not received my refund.  He said that he was sorry and "I can ensure you that Steven and passive scaling isn't a scam.  I know you'll be refunded, I'm just not sure why it's taken so long."  He also said, "no one is trying to scam you.  You will absolutely be returned your money, passive scaling is not a scam."  Shion also said that he would reach out to Steven because "he is the CEO and controls finances.  I have zero control on those aspects."  Attached as **Attachment J** is a true and correct copy of these texts.

17. In January 2023, I filed a complaint with the Better Business Bureau ("BBB") in California. After I did that, I had another call with Steven about my refund. Steven agreed to send me a lump sum of $10,000 as the final payment.

18. On January 20, 2023, I received an email from Jerdonna following up on the call we had about the outstanding refund payments. She reiterated that I would receive $10,000. Then she said, "we would also like to take this opportunity to remind you of the clause in the contract that discusses the results of doing anything that can damage the company's reputation. As per the agreement, the fine is upwards of 25000 plus legal fees. In light of this, we wanted to give you the opportunity to withdraw the complaint filed based on the fact that the company has paid what was due and also that you are aware that the details of the report were highly exaggerated. Please provide witten [sic] proof that you have with Drew [sic] the complaint or will proceed with legal action in line with the contract signed." I responded that I made it very clear on the phone with Steven that day that I would not remove the complaint until the final payment was received in my account. I also told her I had written proof of everything said in the complaint. Attached as **Attachment K** is a true and correct copy of these emails.

19. I finally received my refund, but I believe I only received it because I filed a complaint with the BBB. I did reach out to the California BBB and notified it that I received a refund. I looked at both Shion Galata and Steven Rozenfeld's Linkedin pages, and neither of them list Passive Scaling or Optimyze Digital under "Experience." Attached as

**Attachment L** is a true and correct copy of the first page of their Linkedin pages.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____, 2024
Fountain Valley, California

_____
Shona Killoughery

8

3/3/24, 4 59 PM                        Gmail  Amazon/Walmart Automation Opportunity



**Shona Killoughery** ▮▮▮▮▮▮▮▮▮▮▮▮

---

## Amazon/Walmart Automation Opportunity
1 message

---

**Shion Galata** <shion@optimyzedigital.com>                      Wed, Mar 30, 2022 at 1:46 PM
To: ▮▮▮▮▮▮▮▮▮▮

Hi Shona!

What a wonderful pleasure meeting you! It was lovely to hear your accent and devotion to football (soccer). COYS!

Take a look at the resources below for more details about this opportunity with our team, this will help paint a clear picture of exactly what we will do for you as your partner in this journey.

Here's a video of our team taking you through the backend of our **Los Angeles warehouse** displaying the operations (there are 6 other warehouses at this moment and time with upwards of 380 employees):
https://youtu.be/TN-1PuO7mUo

Dallas Warehouse:

https://www.youtube.com/watch?v=TbK8FPLsJF8

Background about our opportunity: https://www.youtube.com/watch?v=Nq-a_0cP-pk

**Amazon** backend store video (one of the best-performing clients that generated **$5.7 Million** in revenue in the past 2 years)
https://www.loom.com/share/a0db0322e492401e93f2559cc9094aba

Here's a link to an **informational slide deck** with pricing of packages on slide 9 and a link to a financial projection sheet: https://my.visme.co/view/x43rkxrw-ascend-amazon-walmart-presentation

Lastly, Here an **online article** recently published about myself if you are interested in getting to know a little bit more about my background! https://nyweekly.com/business/shion-galata-opening-up-new-ways-for-people-to-earn-passive-income-and-build-scalable-online-business-operations/?utm_source=rss&utm_medium=rss&utm_campaign=shion-galata-opening-up-new-ways-for-people-to-earn-passive-income-and-build-scalable-online-business-operations

Don't hesitate to ask any questions! Talk to you on Friday! Have a wonderful evening!:)

Kind regards,
Shion Galata
▮▮▮▮▮▮▮▮

--



### Shion Galata
Director of Sales
Optimyze Digital

_____

shion@optimyzedigital.com

www.optimyzedigital.com

3333 Michelson Dr Suite 300, Irvine, CA 92612

---

**Attachment A**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Walmart Automation

**Delivered on**
April 04, 2022

**Client**
Shona Killoughery

**Company**
Ascend Ecom LLC

# Walmart Costs

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $40,000 | 1 | $40,000 |
| *"Store Infrastructure Fee"* – warehousing infrastructure, employees & benefits, dedicated VA team, store build, product sourcing & procurement, contract negotiation, & customer service systems | | | |
| **Management Fee / Commission - 30%** | Percentage | Semi-Monthly | |
| Management fee of 30% of net profit from store to be paid twice a month (*relative to Walmart payout schedule*) | | | |
| **Amazon Business Prime Membership** | $179 | Annual | |
| For supply of products sold on Walmart store. Inventory purchased per order on Amazon and upsold on Walmart Marketplace**. (Annual)** | | | |
| **Software Fee** | $24.50 | Semi-Annual | |
| Product software for wholesale analyzing, keyword searching, product research, & organization | | | |
| **Minimum Working Capital** | $15,000 | | |
| Minimum available starting credit/capital to cover inventory & wholesale price of products for both online arbitrage and wholesale orders. **(per store)** | | | |
| **AMZ Tax Exemption** | | | |
| One time fee providing Amazon Tax Exemption – We take care of this for you! **(for OA orders)** | | | |
| ☐ **State Tax Filing** | $50-100 | Monthly | |
| We automate your store taxes with our software | | | |

| | | | |
|---|---|---|---|
| **SUBTOTAL** | | | **$40,000** |
| **BUNDLE DISCOUNT (- $10,000)** | | | **-$10,000** |
| **TOTAL** | | | **$30,000** |

1

# Private Label Costs

| Description | Price | Frequency | Total Price |
|---|---|---|---|
| ☐ **Private Label Package** | $20,000 | 1 | $20,000 |
| Two private label products with services including but not limited to product research, supplier outreach, sampling, production mapping, competitor research & analysis, logos & branding, and pricing strategy. | | | |
| **Initial Inventory** | Included | - | Included |
| Initial inventory orders will vary depending on product, and will be covered at no extra cost by our team. | | | |
| **Ad Strategy** | Included | - | Included |
| Our team will run PPC ads on Walmart to rank your products higher on search pages and attract consumers to your products. We will also facilitate giveaways in exchange for reviews to boost social proof on your seller account, boosting sales and also increasing it's valuation. | | | |
| **Backup Products** | Included | - | Included |
| If private label products do not perform to our standards, we do the research to replace them up to two times at no additional package costs. | | | |
| **TOTAL** | | | **$0** |

2

# WALMART MASTER SERVICES AGREEMENT

This Walmart Master Services Agreement (this "Agreement"), made April 04, 2022, and effective as of the last identified on the signature page below to this Agreement (the "Effective Date") is entered into by and between Ascend Ecom LLC, (hereafter referred to as "Manager"), and Shona Killoughery, the individual or entity set forth on the signature page attached here to (hereafter referred to as "Client"), Manager and Client are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## BACKGROUND

WHEREAS, Walmart.com are websites that allows users to buy and sell products, Walmart.com use an infrastructure that permits, buying, selling, storage, and shipping.

WHEREAS, Manager is engaged in providing Walmart.com seller account management services, Manager desires to provide Client with Walmart.com seller account management services, and Client is willing and desires to retain Manager to provide Walmart.com seller account management services as outlined in this Agreement.

NOW, THEREFORE, for and in consideration of mutual covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties here to, intending to be legally bound, hereby agree as follows:

3

# AGREEMENT :

## 1. MANAGER SERVICES

### 1.1 Services

.The Manager agrees to provide, but is not limited to, the following services to fully prepare, manage, and operate a Walmart.com store on behalf of Client:

- Walmart.com Marketplace Account Application Services
- Reseller Certificate Services
- Product research, sourcing, selecting and listing of products for sale on Walmart.com via WFS
- Sourcing a minimum of 10 Brands on behalf of client (tracked via CRM)
- Product research for Private Label products and sourcing/ manufacturing of these products on  behalf of client (Only Applicable to PL clients)
- Handling customer service, returns, issuing refunds, bookkeeping, and handling all issues that  arise concerning Client's Walmart.com seller account including customer claims, chargebacks,  and negative feedback
- Provide oversight of the store and the financial performance and provide proper billing for account management services as described in Section 2.5.
- In the rare and unlikely event Client's Walmart.com store becomes suspended, Manager will handle all duties to reinstate the store for active sales, but there are no guarantees of reinstatement. If Walmart.com permanently suspends Client's store for any reason, Manager will build Client another e-commerce store (whether that be another Walmart.com store, Amazon.com, or other) at no additional cost.

The Manager retains the right to provide and use an outside contractor at the Manager's discretion without notifying the Client as long as the services are being provided as stated above (the "Services").

### 1.2 Independent Contractor Status.

The Parties are not entering into a partnership or joint  venture by virtue of this Agreement. In all matters covered by this Agreement, Manager will act  as an independent contractor. Accordingly, Manager will not be required to devote its full time  to representing Client. Manager may perform the same or similar services for others, as well as  engage in any other business activities.

4

000527

### 1.3 Non-Exclusive Services.

Manager's services hereunder shall not be exclusive to Client, and at all times Manager shall be free to perform the same or similar services for others, as well as to engage in any and all other business activities, provided that such other activities do not interfere with Manager's services to Client hereunder.

### 1.4 No Financial Responsibility.

In no event shall Manager be responsible for payment of any kind or any other obligation under Client's credit cards or working capital, all of which payment obligations shall be solely that of Client. Manager also does not provide financial or tax advice to Client.

### 1.5 Best Efforts.

Manager will service Client in a professional manner and to the best of its abilities. Manager cannot and does not guarantee the outcome of its services. Manager cannot and does not guarantee that Client will generate a certain amount of income.

## 2. CLIENT REQUIREMENTS

### 2.1 Account Setup Requirements.

Prior to Manager's performance of the Services outlined above, Client shall assist Manager with establishing Walmart.com seller account (the "Account") to be owned by Client and prepare and execute the necessary documentation and fulfill all other requirements necessary in order to establish Manager and its representatives as an "authorized user" on the Account, with full access and privileges to the Account.

5

## 2.2 Access to Working Capital.

Client will use best efforts to obtain and maintain, for the duration of this Agreement, credit cards issued through the United States federally insured banking institution or other working capital with a minimum credit line of at least $25,000 USD to be used to purchase goods for resale on Client's Walmart.com store. Client shall notify Manager if Client uses this credit / working capital for any reason outside the scope of this agreement. This minimum credit must be maintained and fully accessible to Manager throughout the duration of the term in order for the buyback guarantee to remain valid. Client must provide the Manager with credit/debit card and billing information for the Manager to fulfill orders and monthly supplier / third party software and Walmart.com professional seller fees. Client shall pay off the credit cards / working capital fully to the extent possible from Walmart.com store revenues within 3 business days after Walmart.com respectively remit payments to Client, typically every two weeks.

## 2.3 Initial Service Fee.

Client will pay Manager an initial service fee of $30,000.00 USD, of which $30,000.00 is due upon signing of this agreement to initiate Manager's services to build Client's Walmart.com store and obtain Walmart.com store(s) approval, in conjunction with Section 2.1 above. This initial service fee is fully refundable if client is unsuccessful obtaining approval to become a Walmart.com Seller, however Manager will provide optional alternative methods for client to obtain approval, some of which may be subject to extra costs. Manager is not obligated to initiate any work until this upfront service fee is paid by Client.

## 2.4 Ongoing Compensation.

Manager provides ongoing services to maintain and operate Client's Walmart.com store in exchange for a commission share of 30% of Net Profits, as defined below. Commission is payable on all net compensation/profits when it is received by Client or by any third Party on Client's behalf minus returns & supplier software cost. Manager will provide the Client with a written statement of account showing the net compensation/profits received by Manager on Client's behalf and the expenses (if any) incurred by Manager under this Agreement. Client's payment to Manager is due upon receipt that is earned from selling on Walmart.com.

6

**2.5 Optional Payment for Additional Profit Share.**

After Client's Walmart.com store has been operational for at least 3 months, Client has the option to pay Manager an additional $5,000 to reduce Manager's ongoing compensation commission share by 5%. Client may additionally offer to pay Manager an additional $5,000 for another 5% commission share, which Manager has sole discretion whether to accept. To enact this optional payment to reduce Manager's commission share, Client must submit this notice in writing and submit payment to Manager no less than 30 days prior to enactment, but in all cases the change in Manager's commission share will be enacted at the beginning of the following month after 30 days from Client's written request.

**2.6 Store Access and Functionality.**

Client must provide Manager with full access to its Walmart.com account via Walmart.com's "User Permissions" to grant Manager "admin access" to the Walmart.com account. Unless Manager provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Walmart account or Store in Vacation Mode, such terms being defined or referenced on the Walmart website or in other written materials made available to Client, and (ii) Client shall not allow its Store to remain shut down for more than sixty (60) days during the term of this Agreement.

**2.7 Engagement.**

Client agrees to not engage any other person or entity to act for Client in the same capacity in which Client has engaged Manager for account management services or otherwise. Client shall reasonably inform Manager of inquiries concerning Manager's services so that Manager may advise Client whether the same are compatible with and in the interests of Client's.

**2.8 Entity Formation.**

Client is responsible for any business formation/management concerning its own affairs, including but not limited to: entity formation, obtaining an employer identification number, and obtaining a resale certificate.

7

## 3. TERM, TERMINATION, AND REFUND OPTION

### 3.1 Term and Termination.

The initial term of this Agreement will be for 24 months to begin once Client's Walmart.com store has been approved and launched with products actively listed for sale. The term shall pause if for any reason the Client's Walmart.com store becomes suspended or no longer active, or if client is not providing at least $25,000 in working capital monthly for inventory after the 6 month mark since launch, the term will then continue to run once Client once again has an active ecommerce store operating with products actively listed for sale and sufficient working capital of $25,000. The term will automatically renew for an additional 12 months, unless Client or Manager provides written notice of termination for any reason with 60 days notice.

### 3.2 Option to Request Buyback.

After the initial 24-month term, if the Client has not made back their initial service fee of $40,000 in their allocated share of Net Profits (Private Label costs are not covered in the Buyback), Client has the option to request the Manager to buy the Client's Walmart.com account store within a 45-day period following the 24th month. To exercise this buyback option, Client must notify Manager of that election in writing. Manager will refund the remaining portion of the initial service fee of $40,000 that was not recovered by Client from any Net Profit and "cash back" credits on earned from Client's credit cards used on Client's Walmart.com store business or any other profits earned from an Ascend Ecom program provided that (1) Client has not engaged in any act that interferes or interfered with the operation of the Client's Walmart.com store or of the Manager's services or which would be in material breach of this Agreement, including, without limitation, a suspension of Client's Walmart.com store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises this refund option. The Parties further agree that under no circumstances shall this refund amount exceed the initial service fee of $40,000.

### 3.3 Client's Sale of Store(s).    If Client decides to sell the store to a buyer at any time during or after term of agreement, Manager will provide a " transitional period" of 45 days where Manager will provide business plan and educational /transfer services of Walmart operation to said buyer as well as assistance in sourcing a buyer. Manager will be owed 10% commission of the sale of the store.

8

## 4. NET PROFIT STATEMENT

**4.1 Statement of Invoice.**  Clients will receive a statement with an invoice on the first of the month detailing Client's Net Profits and Manager's commission share to be paid by Client. Payment to Manager from Client will be due no later than 5 days (five days) from receipt of invoice. If client fails to pay within 5 days (five days) a late fee of 5% (five percent) will be incurred on payment due.

**4.2 Net Profit.**  Net Profit is defined as total sales, less cost of goods sold, less Walmart.com professional seller fees, less supplier / third party software costs, multiplied by the commission percentage as per Section 2.4 of this Agreement.

**4.3 Seller Fees and Software Costs.**

The Walmart.com professional seller fees and supplier / third party software costs are taken into account within the Net Profit calculation before Manager's commission rate as stated in Section 2.5 is applied. Walmart.com professional seller fees are outlined on Walmart.com's seller website and are not subject to Manager's control. The supplier / third party software costs vary and will be presented to client for approval ahead of time of purchase or charge. These are subject to change as the business grows and evolves.

## 5. DEFAULT

**5.1 Manager Default.**

Manager will not be liable or deemed in default under this agreement for any failure to perform or delay in performing any of its obligations due to, or arising out of any act not within its control, including, without limitation, unexpected Walmart Seller Central termination or suspension of clients store by Walmart.com. No refunds will be given. Client will be provided alternative options such as new ecommerce store(s) with no upfront commission cost to fulfill their investment.

**5.2 Client Default.**

Client shall be considered in default and material breach of this contract if it engages or permits any conduct that results in Manager being unable to access Client's Walmart.com account for a period of three (3) days, or does not pay Manager the ongoing commission share earned within thirty (30) days of invoice.

9

## 6. MISCELLANEOUS

### 6.1 Authority to Act.

Client authorizes Manager to act for Client by doing the following: product research; listing products for sale; fulfilling orders when products are sold; handling customer service; handling returns; issuing refunds; bookkeeping; and handling all issues that arise concerning Client's Walmart.com account including A to Z claims, chargebacks, and negative feedback.

### 6.2 Rescission and Refund.

Client is entitled to a three (3) calendar day rescission period and entitled to cancel the contract. After the three (3) calendar day rescission period has passed the Client will not be entitled to a refund outside the parameters set forth in section 3.2 of this agreement.

### 6.3 Assignment.

Neither Client nor Manager has the right to assign this Agreement or any rights or obligations under the Agreement without the express written consent of the other, except that Manager may assign this Agreement without Client's consent to any firm, corporation or other entity of which Manager is an officer, partner, employee, or consultant.

### 6.4 No Encumbrances.

Each Party warrants that it is free to enter into and to perform under this Agreement and to grand the rights, options, powers and privileges herein granted, and to perform every service described in this Agreement, and neither Party is a party to any presently existing contract, nor has or will have any obligation, that would interfere with full performance of the terms of this Agreement.

10

### 6.5 Indemnification.

In the event that either Party hereto does not fully perform or cause to be performed any agreement or obligation undertaken by such Party hereunder (the "Indemnitor"), the Indemnitor agrees to indemnify, defend and hold the other Party hereto (the "Indemnitee") harmless from any and all claims, demands, actions, judgments and awards against the Indemnitee by third Parties in connection with such non-performance. In connection with the foregoing indemnity, the Indemnitee agrees to give the Indemnitor prompt written notice of any claim against the Indemnitee. Further, the Indemnitor shall not be liable for such indemnity unless such claim has been adjudicated in a court of competent jurisdiction and reduced to a final adverse judgment, arbitrated pursuant to any agreement requiring arbitration and resulting in a final binding award, or settled with the Indemnitor's prior written consent, which consent shall not be unreasonably withheld.

### 6.6 Additional Services.

All services outside the scope of this Agreement that are requested by Client and which Manager agrees to perform will be billed at a separate negotiated rate. Client will be notified and must approve in writing additional services before they will be performed, although Manager may not necessarily be able to inform Client in advance of the total cost of such additional services.

### 6.7 Limitation of Liability.

Manager shall not be liable for any incidental, consequential, indirect or special damages, or for the loss of profits or business interruptions caused or alleged to have been caused by the performance or nonperformance of Manager's services. Client agrees that, in the event that Manager is determined to be liable for any such loss, Client's sole remedy against Manager is limited to a refund of payments made by Client for services, less expenses paid to subcontractors or to third parties. Manager is not responsible for errors which result from faulty or incomplete information supplied to Manager by Client. Client also agrees to not seek damages in excess of the contractually agreed upon limitations directly or indirectly through suits by or against other parties. Manager shall not be liable to Client for any costs, damages or delays due to causes beyond its control, expressly including without limitation, unknown site characteristics; changes in policies, changes in terms of service, and viruses.

11

**6.8 Disputes and Governing Law.**

The Parties agree that any dispute regarding this Agreement, and any claim made by Client for return of fees paid to Manager, shall be handled in accordance with applicable State and Federal Laws. This Agreement and the rights and obligations of the Parties hereunder shall be governed by and construed and enforced in accordance with the laws of Sheridan County in the State of Wyoming applicable to contracts made and to be performed wholly within such state.

**6.9 Arbitration.**

Any controversy or claim arising out of or relating to this Agreement, or the breach hereof, on behalf of the Client shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

**6.10 Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties. Any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement are of no force and effect. Any amendment to this Agreement shall be of no force and effect unless it is in writing and signed by the Parties.

**6.11 Severability.**

Any provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, and shall not in any manner affect the remaining provisions hereof in such jurisdiction or render any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**6.12 Independent Counsel.**

The Parties acknowledge that they had the right and adequate time to have independent legal counsel of their own choosing review and advise on this Agreement prior to execution.

**6.13 Counterparts.**

This Agreement may be executed in one or more counterparts. All such counterparts shall constitute one agreement binding on the Parties notwithstanding that both of the Parties are not signatories to the original or same counterpart. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the Parties. The Agreement shall be considered executed and binding once one of the Parties possesses an Agreement that expresses signatures by all Parties.

## Signature Page

By signing below, the undersigned acknowledge reading, understanding, and agreeing to the terms of this Agreement thereby causing it to be executed once signed by all Parties.

IN WITNESS WHEREOF, by the execution of both parties below, this consulting agreement is declared valid and will form a part of the Contract in conjunction with any other relevant documents and agreements presented on behalf of either party.

CLIENT:

By: Shona Killoughery authorized representative and agent for service of process.

Date: April 04, 2022

*Shona Killoughery*
2022-04-04 14:43:18 GMT

Shona Killoughery

MANAGER:

By: Ascend Ecom LLC, Will Basta, Co-Founder & authorized representative and agent for service of process.

Date: April 04, 2022

*Will Basta*
2022-04-04 15:52:40 GMT

Will Basta

14

# Text Messages with Shion - April 2022 when he sold me the facebook store.





# Facebook Marketplace Consulting Agreement

This E-Commerce Consulting Agreement ("Agreement"), is dated as of February 7th, 2022, by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and , Shona Killoughery

whose address is (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an e-commerce store on the Facebook Marketplace platform (the "Store"):CONSULTANT'S SERVICES – Consultant agrees to perform the following services ("Services"):Maintain Client's Store, including configuring the Facebook Marketplace storefront and configuring the frontend back end systems necessary to manage the Store.Review, research, source, select, and list products for the Client's Store.Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

## CLIENT RESPONSIBILITIES.

Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a

**Attachment D**

credit card issued through a United States federally insured banking institution with a minimum credit limit of ten thousand ($10,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Facebook Marketplace account or Store in Vacation Mode, such terms being defined or referenced on the Facebook Marketplace website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement.(B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.COMPENSATION. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifteen thousand dollars ($15,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. The client will not be required to pay software fee until client is profitable and seeing sales. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other thanE-Commerce Consulting Agreement due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days).Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.TERM – This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.TERMINATION –  . Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. If Client breaches any term under this Agreement, independent of any actions Facebook Marketplace may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.NON-DISPARAGEMENT – During this Agreement and for one (1) year thereafter, the

**Attachment D**

Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.SALES / USE TAX – Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.INTELLECTUAL PROPERTY – Client understands that Client's Store is a service hosted on the Facebook Marketplace platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Facebook Marketplace , or any of Facebook's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Facebook Marketplace may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Facebook Marketplace , and Consultant holds no legal or equitable rights in Client's Store.RESTRICTED ACTIVITIES – Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, co-venturer or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.Non-Solicitation. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or

**Attachment D**

3 of 14

(ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.Non-Disclosure. The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party."Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.Maintenance of Confidential Information. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.Confidentiality Term: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject

**Attachment D**

**PX10**                    **000543**

matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

# LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL,   PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY Facebook MarketplaceOR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE).AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11.(C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

# DISCLAIMERS AND RELEASE

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS

**Attachment D**

WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in theStore; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.Business Risk – Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Facebook Marketplace via Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Facebook Marketplace products; (iv) changes in Facebooks terms and conditions, which can materially affect or even interfere with   the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Facebook Marketplace products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Facebook Marketplace Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that

**Attachment D**

there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer-term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.Facebook Marketplace Terms and Conditions – Client hereby understands that Facebook Marketplace , from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in the Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Facebook Marketplace to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Facebook Marketplace will in such cases return Client's Store to active status.  Furthermore,  Client agrees and understands that the Consultant makes no guarantees or representations regarding the Store in relation to any Facebook Marketplace policy, whether currently in effect or as may be amended by Facebook Marketplace from time to time. Client understands that Consultant has no control over or input in when and whether Facebook Marketplace elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Facebook's current policies.


Refund- The $15,000 is protected by a 24 month money back guarantee. For which if the clients net profits have not exceed $15,000 at the 24 month mark, consultant will buy back the store for $15,000 minus net profits earned.

# GENERAL PROVISIONS

Non-exclusivity - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.Relationship of the Parties – Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.Notices - All notices to either party shall be sent electronically to the email address(es) provided by each Party

**Attachment D**

to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to  , with a courtesy copy sent to .Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement. Severability, Headings – If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.Dispute Resolution – Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami–Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.Amendment. This Agreement cannot be amended except in writing and signed by both Parties.Electronic Signatures – This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.Governing Law; Jurisdiction – This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the

**Attachment D**

PX10                                    000547

State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection with this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to same under forum non conveniens principles.Waiver - The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.Force Majeure - Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.Entire Agreement - This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.Attorneys' Fees – If either party breaches this Agreement, or one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable attorneys' fees.Injunctive Relief - In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 orSection 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and(ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.Independent Counsel - The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party.

**Attachment D**

Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.Assignment – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.Cure - If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.Indemnification – Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.Survival – Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.Client Data Management – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all

**Attachment D**

applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OFLITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.Ministerial Services – In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.DEFINITIONS – Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

EXHIBIT ADefinitions: Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A."Cash Back" means any revenue derived from cash back programs like BeFrugal."Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally

**Attachment D**

identifiable information from Client, Client affiliated third-parties, and other users."Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a non-confidential basis prior to its disclosure."Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Facebook Marketplace fees related to Client's store."Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein."Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Facebook Marketplace transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property,

**Attachment D**

information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.The term "Store" means the Client's wholly owned e-commerce location on the third-party Facebook.com FBA.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Facebook Marketplace )."Suspension" means an action or actions by Facebook Marketplace which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action."Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

I, Shona Killoughery, agree to the terms of this agreement and I agree that my typed name below can be used as a digital representation of my signature to that fact.

*Shona Killoughery*

SIGNED BY
Shona Killoughery

SIGNED ON
Date Signed: 19 Apr 2022

Time Signed: 14:20

IP ADDRESS FROM SIGNATURE LOCATION
45.48.147.75



**SIGNED WITH BETTERPROPOSALS.COM**
Build and send beautiful sales documents in minutes to help your business close more deals and get paid faster.

**Attachment D**

# Wire Instructions

PASSIVE SCALING INC

78 JOHN MILLER WAY SUITE 2111
KEARNY NJ 07032

Signature Bank
565 Fifth Avenue, New York, NY 10017

Account# ███████████
Routing # ██████████

**Attachment D**

 **Shona Killoughery** ██████████████████

---

## Re: Invoice 1836 from FBA Support NJ Corp- Amazon Business Prime purchases for the Facebook Shop - [MFW-XZBLZ-786]

13 messages

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                  Fri, Aug 5, 2022 at 7:34 AM
To: Shona Killoughery ████████████████, steven@fba.support, tatiana@passivescaling.com

> **Hi Shona,**
>
> I hope that everything is going well.
>
> The invoice includes the product costs and the profit split you have with our company, as we specified in the email.
>
> We have combined that into one invoice rather than sending you an invoice each month.
>
> Please let me know if you have any questions.
>
> **Kind Regards,**
> **Tatiana S.**
> **Senior Procurement Manager**
> **Direct:** ████████████
> **Email:** **Tatiana@passivescaling.com**
>
>
> **\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***
>
>
>
> -----Original message-----
> From: Shona Killoughery < ████████████████ >
> Sent: 08/05/2022 05:45:06
>
>
> > Hello,
> >
> > Can you please explain how the total came to $42.74? Can you also add the calculation to the spreadsheet?
> >
> > Thank you,
> > Shona
> >
> > On Thu, Aug 4, 2022 at 7:55 AM FBA Support NJ Corp <quickbooks@notification.intuit.com> wrote:
> >
> > > ―――――――――――――――――――――――――
> > > INVOICE 1836 DETAILS
> > > ――――――――――――――――――――――――――
> > >
> > > 
> > >
> > > FBA Support NJ Corp
> > >
> > >
> > >
> > > **DUE 08/04/2022**

# $42.74

Review and pay

Powered by QuickBooks

Dear Shona Killoughery,

Here's your invoice! We appreciate your prompt payment.

Have a great day,
FBA Support NJ Corp

| **Bill to** | Shona Killoughery |
|---|---|

| **Terms** | Due on receipt |
|---|---|

| **Services** | $42.74 |
|---|---|
| Amazon Business Prime purchases for the Facebook Shop | |

| | Balance due | $42.74 |
|---|---|---|

Review and pay

FBA Support NJ Corp

█████████ Edgewater, NJ ██████ US

**Attachment E**

**PX10**                                                    **000555**

steven@fba.support

If you receive an email that seems fraudulent, please check with the business owner before paying.



© Intuit, Inc. All rights reserved.

Privacy | Security | Terms of Service

---

**Shona Killoughery** <span style="background:black">    </span>                                        Fri, Aug 5, 2022 at 7:42 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: steven@fba.support, tatiana@passivescaling.com

Hi Tatiana,

I'm aware of what you stated was included in your email. That's not my question. My question was how you came to a total of $42.72? Im not coming to the same total, which is why I also asked that the calculation be added to the spreadsheet.

Thank you,
Shona
[Quoted text hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                          Fri, Aug 5, 2022 at 7:49 AM
To: Shona Killoughery <span style="background:black">    </span>
Cc: steven@fba.support, tatiana@passivescaling.com

**Hi Shona,**

Please check the following sheet with the added calculation: https://docs.google.com/spreadsheets/d/1jrt2XN6sZoCocPkNbdnEnVTSSzJtHUVFNsnCmBTsMXo/edit#gid=0

Please let me know if you have any quesitons.

[Quoted te t hidden]

---

**Shona Killoughery** <span style="background:black">    </span>                                        Fri, Aug 5, 2022 at 9:02 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: steven@fba.support, tatiana@passivescaling.com

I'm not sure where the miscommunication is happening but this is not helpful. Is there someone else I can speak with regarding my questions?

Thanks,
Shona
[Quoted te t hidden]

**Attachment E**

**Tatiana S** <support@mail.salessupport.ladesk.com>    Fri, Aug 5, 2022 at 9:12 AM
To: Shona Killoughery ██████████████
Cc: steven@fba.support, tatiana@passivescaling.com

Hi Shona,

I apologize for the miscommunication.

In the grand total amount, we have included the shipping fees and the taxes, that's why your calculation is not adding to our calculation.

Please let me know if you still have questions or concerns.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:** ████████
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Shona Killoughery <████████████████
Sent: 08/05/2022 18:02:56

I'm not sure where the miscommunication is happening but this is not helpful. Is there someone else I can speak with regarding my questions?

Thanks,
Shona

[Quoted text hidden]

---

**Shona Killoughery** ████████████████    Fri, Aug 5, 2022 at 9:15 AM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: steven@fba.support, tatiana@passivescaling.com

I still have questions. I want a clear bill that shows everything, including why you are adding 12% to the total.
[Quoted te  t hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>    Fri, Aug 5, 2022 at 11:08 AM
To: Shona Killoughery ██████████████
Cc: steven@fba.support, tatiana@passivescaling.com

Hi Shona,

Please check the explanation below:

Total Purchased to a supplier: $38.16
Amazon Monthly Fee: $2.28
Taxes: 2.9%
Shipping Fees: 2.70%

**Attachment E**
**PX10**                                                     **000557**

3/7/24, 11 05 AM        Gmail   Re  Invoice 1836 from FBA Support NJ Corp  Amazon Business Prime purchases for the Facebook Shop   [MFW XZBLZ 786]

Grand Total:  $42.74

Please let me know if you have any questions or concerns.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:** ▓▓▓▓▓▓▓▓▓▓
**Email:** Tatiana@passivescaling.com


**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***


-----Original message-----
From: Shona Killoughery <▓▓▓▓▓▓▓▓▓▓▓▓>
Sent: 08/05/2022 18:15:49


I still have questions. I want a clear bill that shows everything, including why you are adding 12% to the total.

[Quoted te  t hidden]

---

**Shona Killoughery** ▓▓▓▓▓▓▓▓▓▓▓                          Fri, Aug 5, 2022 at 12:28 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: steven@fba.support, tatiana@passivescaling.com

What's the amazon monthly fee for? Can you provide a link to where I can find info on that?
What am I being charged tax on and why is it 2.9%?
Why is shipping being charged as a %? I have never seen that before. Additionally, why am I paying the shipping? That should be paid by the customer buying the products and be a wash.

These fees below still don't add up to $42.74, from my calculations.

[Quoted text hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                     Wed, Aug 10, 2022 at 12:00 PM
To: Shona Killoughery ▓▓▓▓▓▓▓▓▓▓▓
Cc: steven@fba.support, tatiana@passivescaling.com

**Hi Shona,**

Amazon has a monthly fee for the Amazon prime account.

Please let me know if you have any questions.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:** ▓▓▓▓▓▓▓▓▓▓
**Email:** Tatiana@passivescaling.com


**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***


-----Original message-----

**Attachment E**
**PX10**                                                    **000558**

3/7/24, 11 05 AM          Gmail  Re  Invoice 1836 from FBA Support NJ Corp  Amazon Business Prime purchases for the Facebook Shop   [MFW XZBLZ 786]

From: Shona Killoughery █████████ >
Sent: 08/05/2022 21:28:57

What's the amazon monthly fee for? Can you provide a link to where I can find info on that?
What am I being charged tax on and why is it 2.9%?
Why is shipping being charged as a %? I have never seen that before. Additionally, why am I paying the shipping? That should be paid by the customer buying the products and be a wash.

These fees below still don't add up to $42.74, from my calculations.

[Quoted te  t hidden]

---

**Shona Killoughery** █████████                                    Wed, Aug 10, 2022 at 1:27 PM
To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: steven@fba.support, tatiana@passivescaling.com

Please have a manager call me. I sent you 5 questions and you only answered one. Clearly there is an ongoing issue here and I'm getting very frustrated.
[Quoted te  t hidden]

---

**Tatiana S** <support@mail.salessupport.ladesk.com>                 Thu, Aug 11, 2022 at 7:22 AM
To: Shona Killoughery █████████
Cc: steven@fba.support, tatiana@passivescaling.com

**Hi Shona,**

I'm the manager. Please let me know when I can give you a call.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:** ████████
**Email:** **Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Shona Killoughery < ████████ >
Sent: 08/10/2022 22:27:34

Please have a manager call me. I sent you 5 questions and you only answered one. Clearly there is an issue here and I'm getting very frustrated.

[Quoted text hidden]

---

**Shona Killoughery** <shonak@gmail.com>                             Thu, Aug 11, 2022 at 8:07 AM

**Attachment E**

3/7/24, 11 05 AM          Gmail  Re  Invoice 1836 from FBA Support NJ Corp  Amazon Business Prime purchases for the Facebook Shop   [MFW XZBLZ 786]

To: Tatiana S <support@mail.salessupport.ladesk.com>
Cc: ███████████ , tatiana@passivescaling.com

Hi Tatiana,

Thank you for the phone call. As we discussed, you have changed the plan I signed up for. You are now charging me 12% on products purchased instead of 35% on the profit made. This makes me uncomfortable and not confident I'll make the same profit I was expecting from the agreement I signed. I'd like to revisit this next month and see how it's working out.

Thank you,
Shona
[Quoted te  t hidden]

---

Tatiana S <support@mail.salessupport.ladesk.com>          Thu, Aug 11, 2022 at 8:08 AM
To: Shona Killoughery ███████████
Cc: steven@fba.support, tatiana@passivescaling.com

**Hi Shona,**

Sounds like a plan, thank you.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:** ███████████
**Email:** Tatiana@passivescaling.com

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

-----Original message-----
From: Shona Killoughery <███████████ >
Sent: 08/11/2022 17:07:21

Hi Tatiana,

Thank you for the phone call. As we discussed, you have changed the plan I signed up for. You are now charging me 12% on products purchased instead of 35% on the profit made. This makes me uncomfortable and not confident I'll make the same profit I was expecting from the agreement I signed. I'd like to revisit this next month and see how it's working out.

Thank you,
Shona

[Quoted text hidden]

**Attachment E**
https://mail.google.com/mail/u/0/?ik=52c8243706&view=pt&search=all&permthid=thread-f:1740332170046013324&simpl=msg-f:1740332170046013324&simpl=...    7/7

**PX10**                                                **000560**

# Email communication:



**Tatiana S** <support@mail.salessupport.ladesk.com>
to me ▾

Wed, Sep 14, 2022, 12:49 PM   ☆   ↩   ⋮

**Hi Shona,**

**We hope that everything is going well.**

**Please be advised that we have paused the work on the Facebook Commerce accounts for the time being. Our goal is to achieve the best results for you as a client and at the moment, Facebook is going through some changes and we don't want to utilize the platform until this is figured out.**

**Our experience with Walmart Sellers indicates it will be a much better platform. We have everything automated for Walmart Seller accounts that should allow us to source/list/reprice the items faster, scale faster, increase sales, and maximize profits. If you're interested in shifting there for the time being we need to gather all of your necessary information, we can schedule a Zoom meeting, and submit your Walmart Seller application.**

**FYI, this is different from the previous process we had on Walmart. At this time, Walmart approvals are similar to amazon and the process we do there is 2 step dropship, so it's 100% compliant.**

**It would be great to work together as a team on this. We would love to hear more from you.**

**If you have any questions or concerns, please do not hesitate to contact us.**

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

---

**Shona K**
to Tatiana ▾

Wed, Sep 14, 2022, 12:55 PM   ☆   ↩   ⋮

Hi Tatiana,

I'm not interested in a Walmart account. I previously tried one with another company and it failed miserably.

Please issue a refund for my $15,000. When should I expect that?

Thank you,
Shona
...

---

**Tatiana S** <support@mail.salessupport.ladesk.com>
to me ▾

Wed, Sep 14, 2022, 1:03 PM   ☆   ↩   ⋮

**Hi Shona,**

I'm unsure of how the other business operated your Walmart.

However, our procedure is automated; we follow a two-step model in which we send the items to our warehouse, repack the boxes, and then ship them to the consumer. We are fully compliant.

Additionally, unlike your store, which I believe was shut down, our Walmart stores are stable.

**Therefore, we are offering this as an option; however, if you choose not to, we can continue to develop your Facebook business.**

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

Attachment F



**Shona K**                                                                           Sep 14, 2022, 1:18 PM   ☆   ↩   ⋮
to Tatiana ▾

Hi Tatiana,

I'd like a full refund. I did not sign up for Walmart and am not interested in Walmart. Im also not going to continue with Facebook since you just clearly stated your pausing your efforts due to issues that are not beneficial to me, your client. Please let me know when I should expect my refund.

Thank you,
Shona
•••

**Tatiana S** <support@mail.salessupport.ladesk.com>                                 Sep 14, 2022, 1:30 PM   ☆   ↩   ⋮
to me ▾

**Hi Shona,**

We have a contract that we have signed. I did mention changes on the Facebook accounts, which is a Facebook dropdown.

So we are moving the Facebook stores to the Facebook dropdown. This is a new version of a store on Facebook and it's working a lot better.

This change may take us 1-2 weeks. So that's why we have implemented the backup plan for the Walmart stores.

I understood your request, and we will keep the Facebook store active, and work on the Facebook Dropdown in the following days.

Please let me know if you have any questions or concerns.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

**Shona K**                                                                           Sep 14, 2022, 3:53 PM   ☆   ↩   ⋮
to Tatiana ▾

I have many concerns. And please don't insult me by trying to state something different than what you sent. Your message was clear:

**Please be advised that we have paused the work on the Facebook Commerce accounts for the time being. Our goal is to achieve the best results for you as a client and at the moment, Facebook is going through some changes and we don't want to utilize the platform until this is figured out.**

I am not happy to move forward with this. There have been so many changes that trying to state I signed a contract isn't going to cut it. You stated you understood my request - it was clear and in writing that I want a refund. I never stated that I wanted to keep my facebook account. I stated the complete opposite. Your emails are infuriating and insulting.

Please provide a name and contact number for who I need to speak with to receive a full refund.

Thank you,
Shona
•••

**Tatiana S** <support@mail.salessupport.ladesk.com>                                 Sep 15, 2022, 8:49 AM   ☆   ↩   ⋮
to me ▾

**Hi Shona,**

Unfortunately, we are not offering any refunds outside of what is outlined in your contract.

We are improving the Facebook model for better performance by using Facebook dropdown stores as that is a new feature on Facebook and working better than what you originally signed up for.

Our email was to offer you a complimentary Walmart upgrade, which you are refusing. Please note this is a 1-time offer and will not be offered again in the future.

**Kind Regards,**
**Tatiana S.**
**Senior Procurement Manager**
**Direct:**
**Email: Tatiana@passivescaling.com**

**\*\*If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.\*\***

Attachment F

**PX10**

000562



After having to schedule a google meets call with Jerdona, she simply said she would have to look into a refund with the legal department. She stated she would contact me by Monday, September 26th. I never heard from her on that date.





**Shona K**
to tatiana, Tatiana, shion, Jerdonna, jerdonna ▾

Thu, Oct 6, 2022, 8:15 AM  ☆  ↩  ⋮

Hi Jerdonna,

You will not continue to manage a facebook store that doesn't work. That is not part of any contract I signed. I have in writing that the facebook platform I signed up to, you will no longer be utilizing as it's not working for you. I was not offered an upgrade. I was offered a Walmart store instead. I have in writing that I do not want a walmart store. You were already aware I had a walmart store as the sales person, Shion Galata, who sold me on a Facebook store already sold me a Walmart store, I have this in writing also. I will be taking further legal action on this situation as you are clearly in breach of contract. I will also be sharing my experience publicly as no-one else should have to deal with such an unprofessional company.

Shona
⋯

After the above message, I was able to get Steven on the phone and had to fight for my refund. However, he would only give it by installments over a 6 month period. He stated I would receive $2500 every month for six months, starting in October. That was not the case...



**Tatiana S** <support@mail.salessupport.ladesk.com>
to me ▾

Oct 10, 2022, 11:20 AM  ☆  ↩  ⋮

Hi Shona,

Thank you for sharing the banking details with us.

We will work on the refund as agreed with Steven (payout within 6 months).

Let me know if you have any questions.

Sincerely,

Tatiana S.

⋯

**Shona**
to Tatiana ▾

Oct 10, 2022, 11:24 AM  ☆  ↩  ⋮

Hi Tatiana,

The agreement was monthly for 6 months. What date should I expect my first payment?

Thank you,
Shona

**Tatiana S** <support@mail.salessupport.ladesk.com>
to me ▾

Oct 10, 2022, 11:33 AM  ☆  ↩  ⋮

Hi Shona,

The first payout will be processed within 30 days of signing the agreement.

I don't have the exact date, but it will be before November 6.

Sincerely,

⋯

**Shona K**
to Tatiana ▾

Oct 10, 2022, 11:53 AM  ☆  ↩  ⋮

Ok, thank you.
⋯

**Shona K**
to jerdonna, tatiana, Tatiana, Tatiana ▾

Nov 7, 2022, 5:36 PM  ☆  ↩  ⋮

Hi Tatiana,

Today is the 7th and I have not received my first refund payment. Please advise as to the reason for non-payment and confirm payment will be sent asap.

Thank you,
Shona

**Attachment G**



**Shona K**
to Tatiana, Tatiana, jerdonna, tatiana ▾

Nov 9, 2022, 7:15 PM

Please respond. You are now in breach of contract. Ignoring my emails provides me with more evidence for my legal case.

···

**Tatiana S** <support@mail.salessupport.ladesk.com>
to me, Tatiana, jerdonna, tatiana ▾

Nov 10, 2022, 7:19 AM

Hi Shona,

The first payment is within 30 days, but we can make it sooner if you need the money.

···

**Shona K**
to shion, Tatiana, Tatiana, jerdonna, tatiana ▾

Nov 10, 2022, 7:39 AM

Tatiana, it's been more than 30 days. That's my point. Please send my first payment by tomorrow EOD. This communication is infuriating. Read the emails I'm writing and the responses you are sending.

···

**Tatiana S** <support@mail.salessupport.ladesk.com>
to me, shion, Tatiana, jerdonna, tatiana ▾

Nov 15, 2022, 6:14 AM

Hi Shona,

Have you received the first wire?

···

**Shona K**
to steven, Tatiana, shion, Tatiana, jerdonna, tatiana ▾

Nov 15, 2022, 10:26 AM

I've already told you, multiple times. I have not received my refund. In any form. I'm starting legal proceedings. These email responses are pointless and a waste of my time. This company is a scam and I'm not putting up with it any longer.

For documentation purposes - this is the 4th email regarding not getting my first installment of a refund payment. On this thread are Tatiana S, Jerdonna P, Shion Galata and Steven.

···

**Tatiana S** <support@mail.salessupport.ladesk.com>
to me, shion, Tatiana, jerdonna, tatiana, steven ▾

Nov 15, 2022, 10:28 AM

Hi Shona,

Please check the information below:

Wire Confirmation The wire transfer request below has been transmitted successfully. Tran
Currency Effective Date Confirmation Number Approval Status PASSIVE SCALING INC - ▉

The first payout was sent to you as we agreed.

**Shona K**
to Tatiana, shion, Tatiana, jerdonna, tatiana, steven ▾

Nov 15, 2022, 10:38 AM

This payment was not sent as agreed. The agreement was that I would receive the first payment by November 6th. Your email stated it was sent yesterday, Nov 14th. And again, I don't have it. This text you've copied and pasted means nothing.

···

**Shona K**
to Tatiana, steven ▾

Nov 15, 2022, 5:45 PM

The wire is pending in my account as of this afternoon.

This cannot happen again next month. Please confirm the payment will be in my account before December 7th.

···

Attachment G











**Steven R** <steven@wraithco.com>                                      Nov 15, 2022, 6:19 PM  ☆  ↩  ⋮
to me, Tatiana ▾

Hey Shona,

Unfortunately we have no way to make such guarantees.

Your payments are on our payment schedules and of course we will do our best to make sure it's done before the due date.

Since this is an accommodation that we made specifically for you which is outside of your contract agreement we will continue to do our best to hold up to it.

If for any reason , please feel free to reach out to us otherwise and thank you for your patience.

⋯

**Shona**                                                              Nov 16, 2022, 6:36 AM  ☆  ↩  ⋮
to shion, Steven, Tatiana ▾

Steven,

This is not an accommodation you made for me. You requested this payment plan, not me. My full refund should have been given upfront last month. This is not outside of the agreement, this is the agreement you requested. This is an accommodation I made for you.

You have full control of when you pay me. If monthly payments are difficult for you to remember, then I suggest sending full payment asap. To be clear - I will not be chasing these payments moving forward. If I don't receive them each month by the 7th, I will move forward with getting my full refund, my way.

⋯

**Steven R** <steven@wraithco.com>                                      Nov 16, 2022, 8:18 AM  ☆  ↩  ⋮
to me, Tatiana ▾

Hey Shona,

Thanks for the reply.

You're free to do as you wish but please note the waiver has a disparagement agreement that would hold you liable up to 25k for any damages.

Eitherway, since you're getting payments, I don't see why either one of us would have issues moving forward. I will even reach out to the team to see if we can make an early payment for you in consideration of the last late payment.

Have a nice day!

⋯

**Shona K**                                                            Dec 7, 2022, 7:14 PM  ☆  ↩  ⋮
to shion, jerdonna, Jerdonna, Steven, Tatiana ▾

Oh look, no payment. Again.

The $25K is only enforceable with a valid agreement. Since you were late last month and I have received no payment this month, you have voided that agreement.

For documentation purposes - this email is regarding not getting my 2nd installment of a refund payment. Today is December 7th and it's 19:13 PT. On this thread are Tatiana S, Jerdonna P, Shion Galata and Steven.

⋯

**Shona**                                                             Jan 10, 2023, 10:06 AM (8 days ago)  ☆  ↩  ⋮
to Steven, shion, jerdonna, Jerdonna, Tatiana ▾

January 10th - no payment. Again. This is the 3rd month in a row that no payment has been received on time per the agreement.

For documentation purposes - this email is regarding not getting my 3rd installment of a refund payment. Today is January 10th. On this thread are Tatiana S, Jerdonna P, Shion Galata and Steven.

⋯

**Shona**                                                             Jan 17, 2023, 5:13 PM (19 hours ago)  ☆  ↩  ⋮
to Jerdonna, Steven, jerdonna, shion, Tatiana ▾

January 17th- still no payment received and no response or update to these emails.

For documentation purposes - this email is regarding not getting my 3rd installment of a refund payment. Today is January 17th. On this thread are Tatiana S, Jerdonna P, Shion Galata and Steven Rozenfeld.

⋯

As you can see, I have received no response to my emails since December 7th. Today is January 18th.

Attachment I

Text Messages with Shion - December 2022 when I'm fighting to get payment on my refund



Again, I'm completely sorry this happened and the refund has been due longer than you requested. I find it horrible myself, however I can ensure you that Steven and passive scaling isn't a scam. I know you'll be refunded, I'm just not sure why it's taken so long.

Literally so bizarre to me especially because I have no knowledge of anything on the management or finances, that's not my role or department. I'm not involved in those things, every time you've emailed me I've sent screenshots to Steven saying he needs to get this done asap and refund you immediately

I'm on your side 100%

I find this ridiculous as to that this hasn't been taken care of. I've just messaged him, again Im 100% on your side and have notified him again this needs to be done today

I'll do everything I can to make sure this is done this week if not today. I sent him a message and am waiting for his reply



I have no control on the backend of things. I'm not involved in the management of any stores or finances. I have been telling Steven to get this done asap, I'm not sure why this has been delayed.

I will contact him again right now to ensure this is done asap

I am really sorry this has happened. No one is trying to scam you. You will absolutely be returned your money, passive scaling is not a scam.

I'm in utter shock you haven't been refunded yet because that's what I was told. So the fact that you haven't been refunded yet and the fact I have zero control makes it even more frustrating for me and I want to make sure you are taken care of. I'll reach out to Steven right now to make sure you are refunded, as he is the ceo and controls finances. I have zero control on those aspects.

Again, I'm completely sorry this happened and the refund has been due longer than you requested. I

Attachment J

PX10

000569

3/3/24, 5 03 PM                                      Gmail   Re  Settlement follow up

 **Gmail**

                                                        **Shona Killoughery** ▇▇▇▇▇▇▇▇▇▇▇▇

---

## Re: Settlement follow up

2 messages

---

**Jerdonna P** <support@mail.salessupport.ladesk.com>          Fri, Jan 20, 2023 at 11:09 AM
To: Shona Killoughery ▇▇▇▇▇▇▇▇▇▇

Hello Shona

This email is a follow-up to the call we had today regarding the status of the payment amount due from your settlement payment.

As per the agreement, the team has made arrangements to make the payment of 10000 which is the final payment due.

We would also like to take this opportunity to remind you of the clause in the contract that discusses the results of doing anything that can damage the company's reputation.

As per the agreement, the fine is upwards of 25000 plus legal fees. In light of this, we wanted to give you the opportunity to withdraw the complaint filed based on the fact that the company has paid what was due and also that you are aware that the details of the report were highly exaggerated.

Please provide Witten proof that you have with Drew the complaint or will proceed with legal action in line with the contract signed.

Please reply back if you agree with those terms for the final payment due.

Sincerely,
Jerdonna P
Kind Regards,
Jerdonna P.
Client Support Director
Email jerdonna@passivescaling.com

**If you need immediate assistance, please give us a call at (850)721-1791 and ask for a manager.**

---

**Shona Killoughery** ▇▇▇▇▇▇▇▇▇▇▇ >          Fri, Jan 20, 2023 at 11:54 AM
To: Jerdonna P <support@mail.salessupport.ladesk.com>, Shion Galata <shion@optimyzedigital.com>, Steven R <steven@wraithco.com>, Tatiana <tatiana@sales.support>, shion@passivescaling.com, tatiana@passivescaling.com

Hello Jerdonna,

I don't agree with most of this email. The only true statement in this email is the following:

"As per the agreement, the team has made arrangements to make the payment of 10000 which is the final payment due."

During our phone call today, I made it very clear to Steven that I would not be removing anything until final payment is received into my account. Until that happens, I will not be removing anything and will continue to post each week.

I find it hilarious that you stated the report was highly exaggerated given everything in there has written documentation as proof. Another lie.

And once again, you broke the agreement many months ago so stated that you still have one that prevents me from sharing my experience is incorrect, as you well know.

Once I receive my full refund, I will update my complaints.

**Attachment K**

**PX10**                                                                **000570**

3/3/24, 5 03 PM                                    Gmail  Re  Settlement follow up

Shona
[Quoted te  t hidden]



## Shion Galata · 2nd

Sales Executive

Irvine, California, United States · **Contact info**

**500+** connections

**22 mutual connections:** Milton Estrada, Tracey Thomas, and 20 others

**UC Irvine**

[ **Connect** ]   [ ✈ **Message** ]   [ More ]

---

## Highlights



**Shion follows you**
Shion has been following you since Apr 2022

---

## Experience



**Neuroscience Sales Specialist**
Eli Lilly and Company
Nov 2019 - Jun 2020 · 8 mos
Sacramento, California Area

- Served as the Business Operations Lead for the San Francisco District
- Top district in the region for Q1 of 2020.                    ...see more



**Associate Neuroscience Specialty Representative**
Vanda Pharmaceuticals
Oct 2018 - Nov 2019 · 1 yr 2 mos

- Cultivate meaningful relationships with health care providers while communicating complex disease
state and product knowledge.                    ...see more



**UC Irvine**
9 mos

   ●   **Research Staff**
       May 2016 - Jan 2017 · 9 mos
       Irvine, CA



## Steven Rozenfeld · 2nd

Brand Manager | Digital Strategist | Driving Brand Awareness | Ecommerce Specialist

New York City Metropolitan Area · **Contact info**

**500+** connections

     **Baruch College**

 Connect    ◢ Message    More

---

### Experience

**CTO ▶ Brand Engagement ◆ Ecommerce Strategies◆ Improving Business Performance & Driving Sales Growth**
Wraith
Aug 2014 – Aug 2019 · 5 yrs 1 mo
Greater New York City Area

Wraith is a group of quirky, creative individuals whose mission is to be the next wave of commerce. An online retailer exploring new roads of commerce. We curate quality products for modern cons ...see more

Attachment L

PX10                                                           000573