## DECLARATION OF KIRK BAUSCH
### Pursuant to 28 U.S.C. § 1746

I, Kirk Bausch, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Kirk Bausch. I am over the age of 18 and reside in Irvine, California.

2. I sold products on Amazon through a third-party Amazon store in my own company name, but it was managed through a third-party management company. This company violated Amazon's policies by using the "dropshipping" or "Fulfilled By Merchant" ("FBM") method to fulfill customer orders. Dropshipping is when customer orders are filled by purchasing the item from another retailer, like Walmart, rather than purchasing items wholesale and fulfilling orders from a warehouse operated by Amazon (also known as "Fulfilled by Amazon" or "FBA"). Amazon informed me that my account was no longer eligible for FBM, but that I could sell using the FBA model.

3. I looked for another third-party management company to manage my store, and in approximately August 2021, I saw some online ads on Facebook for a company called Optimyze Digital. They are the sales and marketing arm for Passive Scaling, a company that manages e-commerce stores on Amazon and Walmart for consumers. I submitted a form online and scheduled a call. I spoke with a salesperson named Shion. He said I could recoup my initial investment and start-up costs within 18 months and, if I did not, I could get a full refund. I was also told that I was guaranteed to get 10-12% return on my investment monthly.

4. I spoke with Shion a few times and, as it turns out, the company was in my neighborhood and I visited the company's office in Irvine, California. I was initially skeptical, but after

visiting the office in person and seeing people working there, I felt more comfortable and believed this was a legitimate business.

5. I received a contract that was between me and Passive Scaling Inc. When we went through the contract, Shion showed me testimonials of clients who purchased through Optimyze Digital and were working with Passive Scaling and those people, under Passive Scaling's management, were making $100,000 per month in net profits. I also received profit projections that showed how much I could make with an Amazon store or Walmart store. Attached as **Attachment A** is a true and correct copy of this projection chart.

6. According to the contract, Passive Scaling was supposed to deliver an e-commerce, done for you, Walmart automation store. The contract also reiterated Shion's promise that I was guaranteed to recoup my investment if I was not profitable by month eighteen (18). Shion clarified that any net profit up to that point would be deducted from any refund. Attached as **Attachment B** is a true and correct copy of this contract.

7. I asked a retired attorney to review the contract and she pointed out that there is a clause that contradicts the guaranteed refund. One paragraph says that the initial fee is not refundable. I pointed this out to Shion and he had me speak with Asante, an Optimyze Digital executive, and they both said that the refund policy is accurate and I would be entitled to a refund if needed. I believed them.

8. Based on the guarantee of recouping my investment in eighteen (18) months and the other customer testimonials, I decided to buy into this business opportunity. The contract was between me and Passive Scaling, Inc., a NJ company whose address is 223 Veterans Blvd., Carlstadt, NJ 07020. It was signed by Amanada Peremen, Operations Manager of Passive Scaling Inc. On approximately September 22, 2021, I wired $30,000 for the initial fee to

Passive Scaling which was supposed to go towards "warehousing expenses, full time employees and benefits, consulting expertise, web build & store build, product selection, & initial inventory." I also was expected to pay a monthly management fee of $199 or pay 35% of my net profits and a monthly software fee of $99. Finally, I was supposed to pay a minimum of $10,000 for "working capital" which would be used to purchase products. Attached as **Attachment C** is a true and correct copy of the email confirming my wire transfer.

9. For the money I paid, Passive Scaling was supposed to maintain my store, including configuring it, source and list products in my store, respond to customer inquiries and problems, handle returns and billing, and maintain oversight of my store, including its financial performance.

10. I was concerned that Optimyze Digital was not in the contract anywhere, but Shion explained that Optimyze Digital is the sales and marketing entity and Passive Scaling is their sister company that does store operations. He pointed out that Steven (the owner of Passive Scaling) is the person I see in the videos they had posted on the Optimyze website and YouTube videos describing the business opportunity. I watched the videos and they showed Steven with the owners and employees of Optimyze Digital. The video showed the warehouse, the back office, the CFO's office, and the Optimyze Digital team sitting in a half circle, including Steven. In the videos, Steven and the owners of Optimyze Digital are together and refer to themselves as partners.

11. The contract contained a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate

information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

12. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in their advertisements, profit calcuator, or over the phone with the sales agent. I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

13. Passive Scaling offered both Walmart and Amazon "done for you" e-commerce stores, but I purchased the Walmart store. The company used the "dropshipping" model as described above. This meant that I would have products listed on my online third-party Walmart store and once a customer purchased a product, Passive Scaling would fulfill that order by ordering it from somewhere else and shipping it directly to that customer. The benefit to this model was that I would not have to pay to maintain products in bulk in a warehouse. Passive Scaling had a guarantee that if my store was shut down, the company would reestablish a new store at no cost to me.

14. In approximately October 2021, I noticed that Passive Scaling's support team seemed either disorganized or overwhelmed, but I tried to be patient. When the store was finally approved and went live, Passive Scaling loaded product images into the store. I noticed that there was some kind of alert on my store, but Passive Scaling said to ignore it. My Walmart store went live and then Walmart shut it down one day later. Attached as **Attachment D** is a true and correct copy of the termination notification.

**PX1**                                                                 **000004**

15. I quickly contacted my support people, Tatiana and Trudy.  I also got on the phone with Shion, Asante and Steven.  They told me that this was not a problem and that I just got unlucky because Walmart just went through a purge and my store got caught in the purge.

16. Despite having an agreement that I would not have to pay for a new store if mine was shut down, Shion asked me to come into the Irvine office and told me that in order to open another store, I would have to pay $795 to buy an aged store (one that already had a positive selling history).  I just wanted to get back online so I didn't challenge this and purchased the aged Walmart store.

17. Passive Scaling did the work to reapply for the second Walmart store and when they did, Walmart denied the application.

18. I told both Optimyze Digital and Passive Scaling that I was entitled to a full refund based on the contract since both stores failed.  They agreed this is what the contract said, but they asked me to consider a replacement Amazon store.  I didn't want to do this and pushed back, but Steven called me from New Jersey and reasoned with me that his operation was suited for Amazon and told me they have hundreds of success stories with Amazon and would guarantee better results.

19. Steven showed me the Walmart profit forecast and then showed me how much better the Amazon profit forecast was, and I agreed to replace the store with a new Amazon store. Attached as **Attachment E** are true and correct copies of the two profit forecasts.

20. In approximately January 2022, I paid $750 for this Amazon store, which was another aged store, and I was told it would come out of my initial fee.  Amazon approved the application and opened the store in approximately February 2022.  Passive Scaling started building the store and within one week of progress, I was unable to login to the store.  I contacted

Tatiana and Trudy and they told me the store was shut down due to a conflict with the ownership of the store. Apparently they tried to fast track the store's opening and took over an existing store from another person, but that person still had his name tied to the store. This is a violation of Amazon's policies as only one person can own a store at a time. I was so frustrated. I begged for my money back on the Google chat feature and What's App I used to communicate with Passive Scaling, but the support people told me I could not get a refund. They said that they would open another store for me, but I have to again pay for the entity.

21. I talked to Steven and he told me that I had to trust him. He said that he has clients who are earning $100,000 per month and he will handle this.

22. In approximately June 2022, I purchased my fourth store (second Amazon store) with Passive Scaling. My store did get approved by Amazon, but Passive Scaling informed me that Amazon no longer allowed dropshipping on its platform and Amazon was shutting down stores that used this model. Passive Scaling told me that I had to buy inventory and store it in Steven's warehouse, known as FBA Support NJ Corp. and I had to pay $6,347 for inventory to a company called "1 Hr Relief", which I believe Steven co-owns. Attached as **Attachment F** is a true and correct copy of the payment receipt.

23. The inventory took weeks to arrive and had to be re-shipped out to Amazon's warehouses for fulfillment of customer's orders. At this point I was very upset and felt like I had been scammed. I called Steven's cell and he snapped back and said I need to calm down and let them do their work and we'll make money. I argued with him and he told me to stop calling.

24. My store actually sold a few items, but after all the fees, I wasn't even clearing 10% net. I pointed this out to the Passive Scaling team and they said we need to scale and buy more

inventory.  They said they would find the higher profit items, and I bought another few thousand dollars' worth of inventory.

25. In approximately July 2022, not too long after that purchase, I pointed out to Tatiana and Jerdonna (both Passive Scaling employees) that my inventory was not accurate and seemed a lot lighter than what I bought.  They told me that their 'recon' team will look into it and get it resolved.  It never got resolved.

26. Passive Scaling then told me that $6,000 of my inventory was lost in transit.  I was told that it was Amazon's fault and Passive Scaling was looking into it.  I never saw any proof that it was Amazon's fault and I kept getting the run around.

27. I continually texted and called Steven about this issue, and he would answer sometimes, but finally he snapped and told me to shut up and said, "I can't do magic, you need to be patient, these things take time. We have hundreds of profitable businesses and you will be profitable but you calling all the time is not helping, so stop calling and texting and just talk to the support team (meaning Tatiana, Trudy, Jerdonna, Yvette etc..)."

28. However, all this team would tell me is the recon team is looking into it and I should buy more inventory.  I said absolutely not.

29. I would follow up every 7-10 days with Passive Scaling's support team, and it was like I had to start the story over from the beginning every time.  I kept getting the same blanket reply "recon team is looking into it."  At this point, I knew I had been scammed and hoped to get to the 18-month mark to get my refund.

30. In December 2022, I messaged Passive Scaling and said that I have been asking since August about my inventory and I always received the answer that they will get back to me

at the end of the week or month, and no one ever did.  Attached as **Attachment G** is a true and correct copy of chat conversations I had with Passive Scaling.

31. In February 2023, I had a conversation with Passive Scaling and asked for an update from Steven.  I also said, "are you guys even a real organization? Or a scam? I'm literally being ripped off and it sucks." *See* **Attachment G.**

32. In April 2023, I wrote to Jerdonna, "same story for a year + :( next week, next week…nothing."  Jerdonna told me that Steven was working on my store.  I told her that I was afraid of another shutdown because it didn't seem like anyone was giving it attention. Jerdonna said she would check.  I told her that I paid for 4 stores and have not made any money.  I told her I needed concrete dates and commitments.  I was also charged $99 for salessupport software, but nothing was happening with my store. *See* **Attachment G.**

33. In May 2023 I reached out to Jerdonna again and asked if she or Steven could give me an update with truthful facts.  Jerdonna responded, but she said she would escalate my issue. *See* **Attachment G**.

34. In June 2023, I reached out to Jerdonna and said, "I still have NO confirmation about that missing inventory or anything else…what's the deal? Is Steven saying anything? Why isn't anyone helping me get this resolved?"  Jerdonna said she would check.  I responded back, "the store has never done anything since launch.  We had 2 walmart stores terminated and now on AMZ store #2…and I wired money, product shipped to amz and got lost or something and for the last 6-7 months you guys keep telling me you'll locate it.  2 months ago, Steven said through you guys, Yvette, You, or the many other employees not there now that you will just credit my account of purchase product to replace the product."  I

**PX1**                                                                                          **000008**

also said that I have returned no profit.  Jerdonna just said she is following up on this.  *See* **Attachment G**.

35. In approximately July or August 2023, I was in the market in my neighborhood, and I ran into Asante from Optimyze Digital.  We had a cordial conversation and he told me that he is not part of Optimyze Digital or Passive Scaling any longer and he is aware of some lawsuits against the company.  He told me that my contract allowed me to initiate a refund and he told me to reason with Jerdonna at Passive Scaling because she's the one he would rely on; Steven was no good.  Asante also took my cell and connected me with other disgruntled people.  I spoke with another Passive Scaling client, Matt, from that connection.

36. In approximately August 2023, I told Jerdonna that I spoke with Asante and he confirmed that I was entitled to a full refund because 18 months has passed and I was supposed to be profitable and have earned a minimum of $30,000 of profit.  I also asked her to please have sales.support stop charging my card.  *See* **Attachment G**.

37. I reached out to Matt and he had an eerily similar story as mine and shared that he's heard the same story from another one or two people as well. He started arbitration, but Steven missed the arbitration appointments.

38. Jerdonna seemed to routinely forget the conversations we had every time I spoke with her, and she kept telling me she had to review my case with Steven and the recon team.  I told her this was no longer about my product refund (approximately $8,000), but that I was eligible for a full refund because I was past the 18-month mark.  She said she would speak with Steven and let me know the details.  She never followed up, but then on September 6, 2023, she told me I need to send in a formal request.

39. In September 2023, I filed a complaint with the Better Business Bureau ("BBB") and noticed that there were a bunch of negative BBB reviews.  I mentioned to Jerdonna that there are a lot of BBB complaints and she was mentioned in them. *See* **Attachment G**.

40. One day after I filed the complaint, I received an email from Passive Scaling informing me that this was an official notice from Passive Scaling Inc responding to my recent BBB complaint.  It said that after reviewing the complaint, the company is proceeding to move forward with action against me for breach of the terms of the contract.  Further, if I do not remove my BBB complaint within 7 days, the company will terminate the contract on September 29, 2023 and proceed with the breach of contract case.  Specifically, the email said that I was in breach of the non-disparagement clause of my contract, among other clauses.  The email said it was from the "Client Support Team" at Passive Scaling Inc. Attached as **Attachment H** is a true and correct copy of this email.

41. A few months later, Matt reached out to me and said he got a settlement because Steven never paid for the arbitration and the judgment will be awarded against Passive Scaling. Apparently, Steven was claiming that he is no longer an owner of Passive Scaling.

**PX1**                                                                                                     **000010**

42. I lost approximately $40,000. I never made any profits and when I switched over to purchasing inventory, somehow it went missing and was lost. I can't let Steven or Passive Scaling or Optimyze Digital steal hard-earned money from hopeful business investors, such as myself.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _____ February 13 _, 2024        *Kirk Bausch*
Puerto Vallarta, Mexico                                    Kirk Bausch

**PX1**                                                                              **000011**



| | Starting Period | Q4 ▾ |
|---|---|---|
| | Bundle type | Single Walmart Store ▾ |
| | Working Capital Per Store | 100000 ▾ |
| | Management Profit Percentage | 35% ▾ |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $905,097 | $1,981,039 | $2,886,136 |
| Expenses | $787,434 | $1,723,504 | $2,510,938 |
| Client's Profit | $117,663 | $257,535 | $375,198 |

| Projected Asset Value at Mo 25 | - | $1,188,623 |
|---|---|---|

**Twenty Four Month Forecast**

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Year 1 | | 1% c.back | 2% c.back | Miles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | - | 10,570 | 15,725 | 24,057 | 37,903 | 31,684 | 23,947 | 25,618 | 35,733 | 26,827 | 29,442 | 32,649 | | | | | |
| Gross Revenue | - | 32,524 | 48,386 | 74,023 | 116,626 | 97,489 | 73,682 | 78,824 | 109,949 | 82,546 | 90,591 | 100,457 | 905,097 | | $5,295 | $10,590 | 588,313 |
| Cost of Goods | - | 21,141 | 31,451 | 48,115 | 75,807 | 63,368 | 47,893 | 51,236 | 71,467 | 53,655 | 58,884 | 65,297 | 588,313 | | | | |
| Amazon Fees | - | 4,879 | 7,258 | 11,103 | 17,494 | 14,623 | 11,052 | 11,824 | 16,492 | 12,382 | 13,589 | 15,069 | 135,765 | | | | |
| **Store Profit** | - | 6,505 | 9,677 | 14,805 | 23,325 | 19,498 | 14,736 | 15,765 | 21,990 | 16,509 | 18,118 | 20,091 | 181,019 | | | | |
| Management Fee | - | 2,277 | 3,387 | 5,182 | 8,164 | 6,824 | 5,158 | 5,518 | 7,696 | 5,778 | 6,341 | 7,032 | 63,357 | | 35.00% | | |
| **Clients Profit** | - | 4,228 | 6,290 | 9,623 | 15,161 | 12,674 | 9,579 | 10,247 | 14,293 | 10,731 | 11,777 | 13,059 | 117,663 | | 65.00% | | |

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Year 2 | | 1% c.back | 2% c.back | Miles |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Working Capital** | 43,634 | 40,541 | 50,771 | 55,725 | 59,441 | 45,254 | 46,985 | 69,497 | 49,677 | 55,495 | 62,631 | 64,188 | | | | | |
| Gross Revenue | 134,257 | 124,741 | 156,218 | 171,463 | 182,895 | 139,242 | 144,569 | 213,836 | 152,852 | 170,755 | 192,711 | 197,500 | 1,981,039 | | $11,589 | $23,178 | 1,287,67 |
| Cost of Goods | 87,267 | 81,082 | 101,542 | 111,451 | 118,882 | 90,507 | 93,970 | 138,993 | 99,354 | 110,991 | 125,262 | 128,375 | 1,287,675 | | | | |
| Amazon Fees | 20,139 | 18,711 | 23,433 | 25,719 | 27,434 | 20,886 | 21,685 | 32,075 | 22,928 | 25,613 | 28,907 | 29,625 | 297,156 | | | | |
| **Store Profit** | 26,851 | 24,948 | 31,244 | 34,293 | 36,579 | 27,848 | 28,914 | 42,767 | 30,570 | 34,151 | 38,542 | 39,500 | 396,208 | | | | |
| Management Fee | 9,398 | 8,732 | 10,935 | 12,002 | 12,803 | 9,747 | 10,120 | 14,969 | 10,700 | 11,953 | 13,490 | 13,825 | 138,673 | | 35.00% | | |
| **Clients Profit** | 17,453 | 16,216 | 20,308 | 22,290 | 23,776 | 18,101 | 18,794 | 27,799 | 19,871 | 22,198 | 25,052 | 25,675 | 257,535 | | 65.00% | | |
| | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | 20.00% | | | | | |

Working Capital = For each two week period

**Attachment A**

**PX1**                                    **000012**



# Delivering on Your eCommerce Objectives

**Project Proposal**
Walmart Automation

**Delivered on**
September 20, 2021

**Client**
Bausch Haus

**Company**
PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* **–** this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build, product selection, & initial inventory | | | |
| **Management Fee – $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or** thirty five percent (35%) of net profit **- this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital – $10,000** | $10,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Walmart pays every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $25,000 +** | | | |

| TOTAL | $30,298 |
|---|---|

1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of September 20, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and Bausch Haus, (hereinafter "Client"),

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with one (1) e-commerce stores on the Walmart platform (the "Store"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.

   B. Review, research, source, select, and list products for the Client's Stores.

   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2021-09-22 07:37:22 (PDT)

2

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Walmart account or Stores in Vacation Mode, such terms being defined or referenced on the Walmart website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



1021-05-22 07:37:22 (PDT)

3

B.  Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C.  Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4.  **TERM -**

This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") under the same terms and, expressly, at the same maintenance fee as detailed in section 3B of this contract, until written notice is provided by either party, to the other party, in accordance with Section 5.

5.  **TERMINATION --**

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Walmart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2021-09-22 07:37:22 (PDT)

4

6. **NON-DISPARAGEMENT –**
   During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**
   Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**
   Client understands that Client's Stores is a service hosted on the Walmart platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Walmart, or any of Walmart's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Walmart may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Walmart, and Consultant holds no legal or equitable rights in Client's Stores.



2021-06-22 07:37:22 (PDT)

**Attachment B**
**PX1**                                                                 **000018**

9. **RESTRICTED ACTIVITIES –**

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation.** During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2021-09-22 07:37:22 (PDT)

6

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information**, The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of one (1) year following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



2021-06-22 07:37:22 (PDT)

**Attachment B**
**PX1**

000020

10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($30,000.00).

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



2021-09-22 07:17:22 (PDT)

8

11. **LIMITATION OF LIABILITY –**

   A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE –**

   A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



2021-06-22 07:37:22 (PDT)

**Attachment B**
**PX1**

**000022**

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits**.**



2021-06-22 07:37:22 (PDT)

10

**Attachment B**
**PX1**

000023

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



2021-06-22 07:37:22 (PDT)

**Attachment B**
**PX1**

000024

D. **Walmart Terms and Conditions -** Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity -** Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ██████████████ Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



2021-09-22 07:37:22 (PDT)

12

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2021-09-22 07:37:22 (PDT)

13

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



1921-05-22 07:37:22 (PDT)

**Attachment B**
**PX1**

000027

L. **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M. **Indemnification of Client –** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N. **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.



2021-09-22 07:37:22 (PDT)

**Attachment B**
**PX1**

000028

O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2021-09-22 07:37:22 (PDT)

16

Q.  **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



2021-09-22 07:37:22 (PDT)

17

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.



2021-09-22 07:37:22 (PDT)

18

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i,e,, greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i,e,, greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Walmart).

**Attachment B**

**PX1**

**000032**

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Bausch Haus authorized representative and agent for service of process Date: September 22, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

2021-09-22 07:37:22 (PDT)

Bausch Haus

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  September 22, 2021

2021-09-22 10:43:51 (PDT)

Amanada Peremen

Attachment B
PX1

000033

| | |
|---|---|
| **From:** | Frances Schaper |
| **To:** | ███████████████ |
| **Subject:** | Payment Confirmation |
| **Date:** | Wednesday, September 22, 2021 4:04:14 PM |

Hi Kirk,

I hope you are well!

I wanted to confirm with you that Passive Scaling has received your wire.

Within 24 hours business hours you will receive your next steps for onboarding, as well as an email from Kerry Anne, our client success manager. She can be reached at support@optimyzedigital.com and will be your go-to point of contact moving forward for any questions and concerns.

Kind regards,

Frances
--



**Payments**

Optimyze Digital LLC

_____

■   payments@optimyzedigital.com

■   www.optimyzedigital.com

■   3333 Michelson Dr. Suite 300, Irvine, CA



**Attachment D**



| | Starting Period | | Q1 ▼ |
| Bundle type | | Single Walmart Store | ▼ |
| Working Capital Per Store | | $100,000 | ▼ |
| Management Profit Percentage | | 35% | ▼ |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $939,562 | $1,962,957 | $2,902,519 |
| Expenses | $817,419 | $1,707,773 | $2,525,192 |
| Client's Profit | $122,143 | $255,184 | $377,327 |
| Projected Asset Value at Mo 25 | - | | $1,177,774 |

Amazon & Walmart 2 Year Financial Projections

Twenty Four Month Forecast

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | - | 10,570 | 15,725 | 24,057 | 38,683 | 33,174 | 37,769 | 32,676 | 28,544 | 22,807 | 25,618 | 35,733 | |
| Gross Revenue | - | 32,524 | 48,386 | 74,023 | 119,026 | 102,075 | 116,213 | 100,540 | 87,828 | 70,174 | 78,824 | 109,949 | 939,562 |
| Cost of Goods | - | 21,141 | 31,451 | 48,115 | 77,367 | 66,349 | 75,538 | 65,351 | 57,088 | 45,613 | 51,236 | 71,467 | 610,715 |
| Walmart Fees | - | 4,879 | 7,258 | 11,103 | 17,854 | 15,311 | 17,432 | 15,081 | 13,174 | 10,526 | 11,824 | 16,492 | 140,934 |
| Store Profit | - | 6,505 | 9,677 | 14,805 | 23,805 | 20,415 | 23,243 | 20,108 | 17,566 | 14,035 | 15,765 | 21,990 | 187,912 |
| Management Fee | - | 2,277 | 3,387 | 5,182 | 8,332 | 7,145 | 8,135 | 7,038 | 6,148 | 4,912 | 5,518 | 7,696 | 65,769 |
| Clients Profit | - | 4,228 | 6,290 | 9,623 | 15,473 | 13,270 | 15,108 | 13,070 | 11,418 | 9,123 | 10,247 | 14,293 | 122,143 |

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | 33,315 | 31,678 | 39,793 | 55,672 | 71,320 | 62,761 | 70,025 | 62,691 | 53,497 | 40,728 | 46,985 | 69,497 | |
| Gross Revenue | 102,507 | 97,471 | 122,440 | 171,299 | 219,445 | 193,111 | 215,460 | 192,896 | 164,606 | 125,317 | 144,569 | 213,836 | 1,962,957 |
| Cost of Goods | 66,630 | 63,356 | 79,586 | 111,344 | 142,639 | 125,522 | 140,049 | 125,382 | 106,994 | 81,456 | 93,970 | 138,993 | 1,275,922 |
| Walmart Fees | 15,376 | 14,621 | 18,366 | 25,695 | 32,917 | 28,967 | 32,319 | 28,934 | 24,691 | 18,798 | 21,685 | 32,075 | 294,444 |
| Store Profit | 20,501 | 19,494 | 24,488 | 34,260 | 43,889 | 38,622 | 43,092 | 38,579 | 32,921 | 25,063 | 28,914 | 42,767 | 392,591 |
| Management Fee | 7,175 | 6,823 | 8,571 | 11,991 | 15,361 | 13,518 | 15,082 | 13,503 | 11,522 | 8,772 | 10,120 | 14,969 | 137,407 |
| Clients Profit | 13,326 | 12,671 | 15,917 | 22,269 | 28,528 | 25,104 | 28,010 | 25,076 | 21,399 | 16,291 | 18,794 | 27,799 | 255,184 |

Working Capital = For each two week period

**Attachment E**

**PX1**                                                                 **000036**

| | | | |
|---|---|---|---|
| 3 | Starting Period | Q3 | |
| 2 | Bundle type | Single Amazon Store | |
| 4 | Working Capital Per Store | $100,000 | |
| 2 | Management Profit Percentage | 30% | |

| Totals | Year 1 | Year 2 | 24 Mo Total |
|---|---|---|---|
| Gross Revenue | $842,591 | $1,938,939 | $2,781,530 |
| Expenses | $742,441 | $1,708,205 | $2,450,646 |
| Client's Profit | $100,150 | $230,734 | $330,884 |

Projected Asset Value at Mo 25 — $988,859



Amazon & Walmart 2 Year Financial Projections

**Twenty Four Month Forecast**

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | - | - | 2,743 | 6,777 | 12,029 | 29,717 | 36,619 | 32,000 | 38,275 | 42,443 | 43,352 | 29,887 | |
| Gross Revenue | - | - | 8,441 | 20,853 | 37,011 | 91,436 | 112,675 | 98,463 | 117,768 | 130,594 | 133,391 | 91,959 | 842,591 |
| Cost of Goods | - | - | 5,487 | 13,554 | 24,057 | 59,433 | 73,239 | 64,001 | 76,549 | 84,886 | 86,704 | 59,773 | 547,684 |
| Amazon Fees | - | - | 1,688 | 3,754 | 6,662 | 16,458 | 20,282 | 17,723 | 21,198 | 23,507 | 24,010 | 16,553 | 151,835 |
| Store Profit | - | - | 1,266 | 3,545 | 6,292 | 15,544 | 19,155 | 16,739 | 20,021 | 22,201 | 22,676 | 15,633 | 143,072 |
| Management Fee | - | - | 380 | 1,064 | 1,888 | 4,663 | 5,746 | 5,022 | 6,006 | 6,660 | 6,803 | 4,690 | 42,921 |
| Clients Profit | - | - | 886 | 2,482 | 4,404 | 10,881 | 13,408 | 11,717 | 14,014 | 15,541 | 15,874 | 10,943 | 100,150 |

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Capital | 47,784 | 45,230 | 38,283 | 36,203 | 52,205 | 77,219 | 49,677 | 44,755 | 55,495 | 62,631 | 64,188 | 56,485 | |
| Gross Revenue | 147,029 | 139,169 | 117,794 | 111,394 | 160,632 | 237,596 | 152,852 | 137,707 | 170,755 | 192,711 | 197,500 | 173,800 | 1,938,939 |
| Cost of Goods | 95,569 | 90,460 | 76,566 | 72,406 | 104,411 | 154,437 | 99,354 | 89,510 | 110,991 | 125,262 | 128,375 | 112,970 | 1,260,310 |
| Amazon Fees | 26,465 | 25,050 | 21,203 | 20,051 | 28,914 | 42,767 | 27,513 | 24,787 | 30,736 | 34,688 | 35,550 | 31,284 | 349,009 |
| Store Profit | 24,995 | 23,659 | 20,025 | 18,937 | 27,307 | 40,391 | 25,985 | 23,410 | 29,028 | 32,761 | 33,575 | 29,546 | 329,620 |
| Management Fee | 7,498 | 7,098 | 6,007 | 5,681 | 8,192 | 12,117 | 7,795 | 7,023 | 8,709 | 9,828 | 10,073 | 8,864 | 98,886 |
| Clients Profit | 17,496 | 16,561 | 14,017 | 13,256 | 19,115 | 28,274 | 18,189 | 16,387 | 20,320 | 22,933 | 23,503 | 20,682 | 230,734 |

Working Capital = For each two week period

| | Q3 - 2021 | | Q4 - 2021 | | | Q1 - 2022 | | | Q2 - 2022 | | | Q3 - 2022 | | | Q4 - 2022 | | | Q1 - 2023 | | | Q2 - 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | - | - | 8,441 | 20,853 | 37,011 | 91,436 | 112,675 | 98,463 | 117,768 | 130,594 | 133,391 | 91,959 | 147,029 | 139,169 | 117,794 | 111,394 | 160,632 | 237,596 | 152,852 | 137,707 | 170,755 | 192,711 | 197,500 | 173,800 |
| Total Cost | - | - | 7,555 | 18,371 | 32,607 | 80,555 | 99,267 | 86,746 | 103,754 | 115,053 | 117,517 | 81,016 | 129,533 | 122,608 | 103,777 | 98,138 | 141,517 | 209,322 | 134,663 | 121,320 | 150,435 | 169,778 | 173,998 | 153,118 |
| Client's Profit | - | - | 886 | 2,482 | 4,404 | 10,881 | 13,408 | 11,717 | 14,014 | 15,541 | 15,874 | 10,943 | 17,496 | 16,561 | 14,017 | 13,256 | 19,115 | 28,274 | 18,189 | 16,387 | 20,320 | 22,933 | 23,503 | 20,682 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 16.15% | 18.31% | 18.31% | 18.31% | 18.31% | 18.31% | 18.31% | 18.31% | 18.31% | 18.31% |
| | | | 4.50% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% |
| | | | 10.50% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% |
| | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% | 5.10% |
| | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% | 11.90% |

| Actual Rev | | $15,000.00 | |
|---|---|---|---|
| COG | | $11,000.00 | 73.33% |
| AMZ Fees | $0.00 | $3,000.00 | |
| Store Profit | | $1,000.00 | |
| Manag Fee | | $300.00 | |
| Digitium Profit | | $700.00 | 4.67% |
| Cash back:) | 1% | $21.00 | |
| TOTAL TO Digi | | $721.00 | |



Payment receipt

# You paid $6,347.85

to FBA Support NJ Corp on 10/3/2022

| | |
|---|---|
| Invoice no. | ███ |
| Invoice amount | $6,347.85 |
| Total | $6,347.85 |

No additional transfer fees or taxes apply.

| | |
|---|---|
| Status | Paid |
| Payment method | Bank Wallet |
| Authorization ID | ███ |

Thank you

## FBA Support NJ Corp

9173929040

steven@fba.support

████████  Edgewater, NJ  ████

**Payment services brought by:**
Intuit Payments Inc.
2700 Coast Avenue, Mountain View, CA 94043
Phone number 1-888-536-4801
NMLS #1098819

For more information about Intuit Payments' money transmission licenses, please visit https://www.intuit.com/legal/licenses/payment-licenses/.



**Attachment G**

PX1                                                                      000039



**Attachment G**







**Attachment G**

**PX1**                                                            **000043**





**Attachment G**

**PX1**                                                                 **000045**



**Attachment G**

PX1    000046







**Attachment G**





Jerdonna P
,
Jun 14, 2022, 11:16 AM

Hi Kirk
I am back in office today
My schedule is full but i will carve out a spot for you

You
,
Jun 14, 2022, 12:18 PM

cool. i'm in meetings for another 3hrs but free after that...which is about 1:15PM/PT. if it works for you, I'd love to jump on it. thx

Jerdonna P
,
Jun 15, 2022, 7:30 AM

Hey Kirk we have a meeting sent for today we will try to finalize all the missing peices and start the application process if we have enough time

You
,
Jun 15, 2022, 8:46 AM



You
,
Jun 15, 2022, 6:41 PM

Hey Jerdonna. i sent you an email. can we arrange time to do the amz app and verification tomorrow? I'm traveling on SAT and out of the country for a couple weeks so the sooner the better:) please confirm

Jerdonna P
,
Jun 15, 2022, 6:44 PM

I have 2 30 est tomorromw can that work ?

You
,
Jun 15, 2022, 7:01 PM

**Attachment G**

**PX1**                                                          **000052**

yes! thank you so much. is there a link you an send me?

Jerdonna P

,

Jun 15, 2022, 7:08 PM

I sent an invite

You

,

Jun 15, 2022, 7:18 PM

thank you. i appreciate your flexibility with me. see ya tomorrow

Jerdonna P

,

Jun 15, 2022, 7:35 PM

no problem

You

,

Jun 16, 2022, 4:41 PM

Again, thank you for your time and patience today:)  Good news, the sales & Use tax just came in and i forwarded you the doc(s). Let's get this going:)) have a great one.

Jerdonna P

,

Jun 16, 2022, 4:49 PM

Happy to assist
nice i will put them together so as soon as the store is active we can do the next steps

Jerdonna P

,

Jun 20, 2022, 3:51 PM

Hey Kirk i am running a bit late for our meeting today

You

,

Jun 20, 2022, 3:51 PM

Ok. No prob

**Attachment G**

**PX1**                                        **000053**

Jerdonna P

,

Jun 20, 2022, 3:55 PM

okay

You

,

Jun 20, 2022, 4:32 PM

hello.digitalSyndicate@gmail.com

Jerdonna P

,

Jul 14, 2022, 12:20 PM

Hi Kirk
just following up to check on the process
please confirm if you need any assistance with anything

You

,

Jul 14, 2022, 12:27 PM

Hi Jerdonna. i'm at a loss for words. I can use any help. Can we jump on a call?

Jerdonna P

,

Jul 14, 2022, 12:27 PM

sure

Video meeting
Google Meet
Join video meeting


Jerdonna P

,

Jul 14, 2022, 4:25 PM

Hey Kirk trudy tried to call you
please reach out to her via chat

You

,

**Attachment G**

**PX1**                                                      **000054**

Jul 14, 2022, 4:26 PM

i'm sitting in chat and on the call line now. i replied to her that i'm available now

Jerdonna P
,
Jul 14, 2022, 4:27 PM

I advised her

You
,
Jul 14, 2022, 5:07 PM

thanks! we had a good chat. looking forward to the future:)

Jerdonna P
,
Jul 14, 2022, 5:09 PM

that is good happy for rogress
proggress

You
,
Jul 26, 2022, 3:21 PM

Hi Jerdonna, we are

having issue with my sales.support can you help with  reauthorize the msw for digital syndicate?.

Jerdonna P
,
Jul 26, 2022, 3:21 PM

hey can we meet

You
,
Jul 26, 2022, 3:22 PM

yep

Jerdonna P
,
Jul 26, 2022, 3:22 PM

Video meeting
Google Meet
Join video meeting

You
,
Jul 27, 2022, 9:28 AM

Hey Jerdonnna. i just saw that the WRONG credit card was charged for the sales.support subscription. I pointed out a few weeks ago that the website wouldn't allow me to change/update the CC and it needed to be replace...either you or Trudy confirmed you can get it done...well, it didn't and the card ending 1795 was charged. I just updated the default card myself and it finally took...PLEASE have sales.support credit the card 1795 and charge the default card. Please confirm. thanks

You
,
Jul 27, 2022, 2:25 PM

Disregard. i worked directly with Sales.support and got it fixed.

Jerdonna P
,
Jul 27, 2022, 2:25 PM

Ok no problem

Jerdonna P
,
Jul 28, 2022, 10:48 AM

Hey Kirk

You
,
Jul 28, 2022, 10:48 AM

hi.

Jerdonna P
,
Jul 28, 2022, 10:48 AM

**Attachment G**

Question how did you get in Contact with the sales.suppot team

You

,

Jul 28, 2022, 10:49 AM

the chat thing on their site

Jerdonna P

,

Jul 28, 2022, 10:49 AM

ok sue
sure
thanks

You

,

Jul 28, 2022, 10:49 AM


Jerdonna P

,

Jul 28, 2022, 10:49 AM

nice

You

,

Jul 28, 2022, 10:50 AM

i'm stoked to see some product ordered:) looking forward to get the sales going 🙂

Jerdonna P

,

Jul 28, 2022, 10:50 AM

I see that to
keep me posted

You

,

Jul 28, 2022, 10:51 AM

i also saw that you were able to get those credential/tokes inside sales.support - thanks!

**Attachment G**

**PX1**                                                    **000057**

Jerdonna P

,

Jul 28, 2022, 10:51 AM

yes , happy we got that fixed

Jerdonna P

,

Jul 28, 2022, 10:56 AM

By any chance are you free for a call

You

,

Jul 28, 2022, 11:01 AM

Yes. Gimme 5 mins

Jerdonna P

,

Jul 28, 2022, 11:01 AM

sure no problem

You

,

Jul 28, 2022, 11:04 AM

i'm free now. are you gonna call via chat or my cell? 949-233-6371

Jerdonna P

,

Jul 28, 2022, 11:05 AM


Video meeting
Google Meet
Join video meeting

can you join on pc
or tablet
so i can check on something with the store

Jerdonna P

,

**Attachment G**

**PX1**                                                                 **000058**

Aug 2, 2022, 1:56 PM

Hey
are you busy
can you take a call from steven ?

You

,

Aug 2, 2022, 2:02 PM

I'm free

You

,

Aug 26, 2022, 10:26 AM

Hi Jerdonna. I bought that First United entity through a provider you guys recommended. Now that the biz is done, who can i speak to in regards to dissolving it and (possibly) selling back to them or refund? thx

You

,

Sep 2, 2022, 7:54 PM

following up
Hi Jerdonna. I bought that First United entity through a provider you guys recommended. Now that the biz is done, who can i speak to in regards to dissolving it and (possibly) selling back to them or refund? thx

You

,

Sep 6, 2022, 8:58 AM

Kirk Bausch, Fri 5:54 PM
following up
Hi Jerdonna. I bought that First United entity through a provider you guys recommended. Now that the biz is done, who can i speak to in regards to dissolving it and (possibly) selling back to them or refund? thx

Jerdonna P

,

Sep 6, 2022, 9:06 AM

Hi Krik
You would have to reach out to the Wyoming team to have clarity and provide how to dissolve the llc

**Attachment G**

**PX1**                                                          **000059**

You

,

Sep 6, 2022, 9:09 AM

@Jerdonna P what is there contact information? thanks

Jerdonna P

,

Sep 6, 2022, 9:11 AM

Try any of these pleaase let me know if you get through

You

,

Sep 6, 2022, 9:11 AM



Jerdonna P

,

Feb 1, 12:32 PM

Hey Kirk
can you give me a call when you have a chance its is about the store

You

,

Mar 30, 6:52 PM

Jerdonna...where is Sherica? what's going on with my account?

Jerdonna P

,

Mar 30, 6:54 PM

I Kirk sherica has resigned I think on Tuesday Steven and Jane are now working on you account.
We the team spoke about it today they in the process of getting inventory for kehe for the store in addition to that some credit will also be applied
I will request and update form them tomorrow

You

,

Mar 30, 6:54 PM

**Attachment G**

great, thanks.

You

,

Apr 4, 1:51 PM

any updates?

You

,

Apr 11, 5:08 PM

Any help or support in my account?

Jerdonna P

,

Apr 12, 8:42 AM

I will have Jane get in contract with you she is working with steven on the store

You

,

Apr 12, 2:16 PM

My store has been absent from any attention, I'm now fearful of another shut down. I've been extremely patient, can Jane contact me this week?

You

,

Apr 17, 6:09 PM

Hi Jerdonna.. i still haven't heard from Jane or Steve? can you help?

Jerdonna P

,

Apr 18, 9:02 AM

let me check on that for you

You

,

Apr 25, 8:17 AM

i'm still waiting for something...anything...help please. i paid for a store x 4 and have not made any money and just flailing over here? can anybody help with some concrete dates and commitments?

**Attachment G**

**PX1**                                            **000061**

AND...i was charged the $99 fee from salessupport for what?

Jerdonna P

,

Apr 25, 9:54 AM

Hi Kirk
nothingg from Jane as yet?
Wen i spoke to the team last week they has so inventory set to dhip to your store i will follow up

You

,

Apr 25, 2:26 PM

i've heard nothing from Jane. same story for a year + :( next week, next week..nothing.

and, i'm not clear what your message is saying?

You

,

May 11, 1:37 PM

Jerdonna. is there any update.? every time i write, i have another person to talk to or something is in motion but nothing ever happens. How can we resolve this? this is crazy and frankly, i'm at the point now that i'm basically being scammed. can you or Steve give me an update with truthful facts to get this going ?

Jerdonna P

,

May 12, 3:01 PM

Hi Kirk have you spoken to Yevett recently

You

,

May 12, 3:08 PM

That's my point, no. Nobody's communicating with me.

Jerdonna P

,

May 17, 6:42 AM

Hi Kirk please let me know if you are not contract by noon today so that i can escalate your issue

You

**Attachment G**

**PX1**                                    **000062**

,
Jun 21, 8:04 AM

Jerdonna..is Yvette still with the company? I still have NO confirmation about that missing inventory or anything else....what's the deal? Is Steve saying anything? Why isn't anyone helping me get this resolved?
It's always, some excuse of some team is looking into it blah blah blah.

Jerdonna P

,
Jun 21, 8:05 AM

Hi Kirk

You

,
Jun 21, 8:05 AM

Hi

Jerdonna P

,
Jun 21, 8:05 AM

Ley me check i just got back

You

,
Jun 21, 8:06 AM

I gotta be blunt...i appreciate you 'checking', but how about somebody getting things done? i've been chasing this for months and months and months...i paid $35,000 dollars..NOTHING returned, no profit NOTHING!!

Jerdonna P

,
Jun 21, 8:14 AM

Please help me to understand the issue
is it that you have missing inventory
itis that the inventory is not selling

You

,
Jun 21, 8:20 AM

**Attachment G**

**PX1**                                                    **000063**

seriously...this is exactly what i figured. The store has never done anything since launch. we had 2 walmart stores terminated and now on AMZ store #2...and i wired money, product shipped to amz and got lost or something and for the last 6-7 months you guys keep telling me you'll locate it. 2 months ago, Steve said through you guys Yvette, you, or the many other employees not there now that you will just credit my account of purchase product to replcae the product. Do you remember this?


You

,
Jun 21, 9:54 AM

Feedback?????

Jerdonna P

,
Jun 22, 7:05 AM

I am following up on this

You

,
Aug 3, 1:14 PM

@Jerdonna P is Yvette around? i lost touch with her about a month ago?
and, still have nothing going on with the store. can we (you and me) schedule a zoom?

Jerdonna P

,
Aug 4, 10:19 AM

Hi Kirk
I will check for you

You

,
Aug 4, 2:59 PM

let's schedule a zoom

You

,
Aug 11, 9:59 AM

@Jerdonna P this is crazy. you guys have done nothing with my store. I have lost over $40,000 with you. I'm at my wits end. Constant turnover with employees, Steve never gets back to me, no


**Attachment G**

**PX1**                                                            **000064**

one is willing to help.

i spoke to Asante about this. He confirmed I'm entitled to a FULL REFUND of my money b/c 18months have passed and per the agreement, i would be profitable at minimum $30K. Can you coordinate the $30K refund. All my stores have been shut down b/c of the poor execution. yes, all 4 stores! (2 walmarts and 2 amz's).

I'm fully aware that i'm not the only client you have that has lost a ton of money too. It's rather concerning that your organization can sleep at night when most of your clients have lost money.

Please have sales.support STOP charging my card too. i've diligently let that go but enough is enough.

please confirm
kirk█████████

Jerdonna P

,

Aug 11, 11:47 AM

Hi Kirk i am doing som check i will provide next steps on you account next week

You

,

Aug 11, 11:54 AM

What day, Monday? Every time there's a check or crap it goes no where.

Just do the right thing and refund my money. I did everything you needed. You did not perform.

You

,

Aug 15, 8:35 AM

@Jerdonna P anything. are you guys seriously in the business to steal from people? why can't anybody just get this resolved? Asante said you may be the only upstanding person here...but i'm loosing hope

Jerdonna P

,

Aug 16, 11:24 AM

Hi kirk we can meet on Friday for next steps I am out of the office due to illness today

You

,

**Attachment G**

**PX1**                                                        **000065**

Aug 16, 11:42 AM

Ok. 630am/pt?

You

,
Aug 18, 7:33 AM

Jerdonna, we still meeting?

You

,
Aug 21, 5:31 PM

???? @Jerdonna P

You

,
Aug 22, 7:51 AM

@Jerdonna P send me a scheduling link so we can have a meeting

You

,
Aug 28, 7:04 PM

@Jerdonna P what's going on? are you avoiding me? i would like to have a meeting

You

,
Aug 31, 7:43 AM

@Jerdonna P what's going on....why are you avoiding a meeting. send me a meeting link.

Jerdonna P (via Meet)

,
Aug 31, 2:02 PM

,

You (via Meet)

,
Sep 5, 9:48 AM

,

**Attachment G**

**PX1**                                                                    **000066**

Jerdonna P
,
Sep 5, 9:48 AM

Hi Kirk I will call you back soon

You
,
Sep 5, 5:32 PM

still waiting. in the meantime, you are recognized star in some of the posts:
https://www.bbb.org/us/ca/irvine/profile/marketing-consultant/optimyze-digital-llc-1126-1000079497/complaints
https://www.bbb.org/us/nj/north-bergen/profile/business-consultant/passive-scaling-0221-90221843/complaints



Optimyze Digital LLC | Complaints | Better Business Bureau® Profile
www.bbb.org

**Attachment G**

**PX1**                                                                    **000067**



Passive Scaling | Complaints | Better Business Bureau® Profile
www.bbb.org

You
,
Sep 5, 6:03 PM

https://www.bizapedia.com/nj/passive-scaling-inc.html



PASSIVE SCALING INC
www.bizapedia.com

Ms. Palmer

Jerdonna P (via Meet)
,
Sep 6, 8:47 AM
,

Jerdonna P

**Attachment G**

,
Sep 6, 8:48 AM
, Edited

Hi Kirk I have made our legal team aware of you BBB query
As for any thing else directly relating to me or my person that will be handled by me and my legal team

You (via Meet)

,
Sep 6, 8:53 AM
,

You

,
Sep 6, 8:54 AM

And ... My refund??

Jerdonna P

,
Sep 6, 8:54 AM

on a call

You

,
Sep 6, 8:56 AM

It appears that my situation is exactly like all the complaints.

Are you initiating a refund?

Jerdonna P

,
Sep 6, 8:59 AM

I dont make those decisions As you should know I am an employee of the company, additionally all discussion moving forward will either be via official written response or if directed I will proceed with a meeting or you will required to move forward either through direct contact with legal or via what ever channel provided by the bbb

You

,
Sep 6, 9:00 AM

**Attachment G**

**PX1**                                              **000069**

Give me a contact to communicate with a decision maker and legal point of contact for your company.

Jerdonna P
,
Sep 6, 9:01 AM

you will be contacted with next steps

You
,
Sep 6, 9:03 AM

As far as your role as employee
..you are still complicit. You are referred to regularly.

Who will contact me? What are their names and roles

Jerdonna P
,
Sep 6, 9:09 AM
, Edited

complicit would have ment that i personally know of something illegal and am party to that illegal thing, considering that in my role with the company that has never been the case. But this is not the matter at hand, once I have details on the point of contact for this matter I will provide that in the mean time I would encourage you to review the terms of the contract you singed has legal proceeding are not a matter of thought, opinion or feeling on the presented matter but solely a matter of the fact and any terms /agreement that was entered in to by the parties in question that would govern any case presented

You
,
Sep 6, 9:12 AM

Jerdonna P
,
Sep 6, 9:38 AM

Personally attacking me the employee of the company will not aid you in reaching the resolution you seak
Also the team responded to your query

**Attachment G**

You
,
Sep 6, 9:43 AM

Its not a personal attack. It's facts.

Not sure how anybody can sleep when ripping off others.

I begged for you guys to help and nothing.

Karma....

Jerdonna P
,
Sep 6, 10:01 AM

I am sorry you feel that way but i did as much as i could within my professional capabilities, and am yet to compromise my integrity as a person or an employee, i hope you are able to reached the desired resolution with the company
I will follow up wit s have further direction

**Attachment G**

**PX1**                                                    **000071**

2/1/24, 2:13 PM                                Gmail - Passive Scaling INC. follow up on Bausch Haus complain

 Gmail

**Kirk Bausch**                       ▆▆▆▆▆▆▆▆▆▆ >

---

## Passive Scaling INC. follow up on Bausch Haus complain

1 message

---

**Passive Scaling Support** <sales@passivescaling.com>                              Wed, Sep 6, 2023 at 9:37 AM
To: ▆▆▆▆▆▆▆▆▆▆
Cc: Jerdonna P <jerdonna@passivescaling.com>

Dear Mr  B Haus

The following is the official notice from Passive Scaling Inc  responding to a recently filed BBB by client Bausch Haus.
It has been brought to our attention that the named party above filed a complaint with the BBB with complaint ID:20560408 on September 5, 2023.

After reviewing the complaint in its entirety the company is proceeding to move forward with action against the listed party above for Blatant breach of the terms of the contract that was attached to the BBB complaint.

The consultant Passive Scaling INC. would like to advise the client  Bausch Haus that the consultant Passive Scaling INC  has the intention of executing its right to terminate the contract of client Bausch Haus effective attached below  **Friday, September  29, 2023**, if the above-mentioned complaint is not removed within **7 business days** the consultant will proceed with breaches based on the below terms.

The following comes as a result of the client  Bausch Haus being found to be in breach of the following terms of the contract signed on  September 22, 2021  The company found that by filing a BBB the client had breached  the following terms :

*6. NON-DISPARAGEMENT – During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true*

*9. RESTRICTED ACTIVITIES – G. In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to*

*preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.*

By naming employees of the company and providing a defamatory statement the client breached the following terms of the agreement

*12  DISCLAIMERS AND RELEASE   A  CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.*

By signing this contract and/or entering into any armaments to the marketplace that the service would be provided through  the client acknowledges  that they also agreed to the following terms:

*12. DISCLAIMERS AND RELEASE - C. Business Risk – Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Walmart via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Walmart products; (iv) changes in Walmart's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Walmart products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Walmart Stores  Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that*

*Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.*

*D. Walmart Terms and Conditions - Client hereby understands that Walmart, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Walmart to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Walmart will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Walmart policy, whether currently in effect or as may be amended by Walmart from time to time. Client understands that Consultant has no control over or input in when and whether Walmart elects to change any of its policies  However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Walmart's current policies  In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety-nine ($199.00) USD per month or 35% of net profits will be waived*

Finally, the consultant Passisve Scaling INC found that the client   Bausch Haus by filling a BBB complaint also breached the following terms and conditions of the signed contract and thus does not qualify for a refund:

*13  GENERAL PROVISIONS   H  Injunctive Relief  In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.*

As a company, Passive Sacling Inc. seeks to resolve any and all disputes in a mutually beneficial way, at times without enacting the terms of the contract. As a company whose sole earning is through the success of its client, any action taken by a client that hinders the consultant's earning capabilities or creates panic among the consultant's other clients is seen as zero tolerance.

As mentioned above the consultant is willing to forego any action required to remedy the above client breach if the above BBB  is removed within **7 business days.**   If the above issue is not resolved the consultant will proceed with executing its right to terminate the contract of client Bausch Haus effective  Friday, September 29, 2023.

The consultant has shown on several occasions its willingness to work with the client to resolve any concerns within the scope of the contract and any other courtesies that it can express to the client in resolving their

**Attachment H**

**PX1**                                                                                                 **000074**

concerns. This client has been reluctant to work with the consultant and has taken steps to prevent the consultant from executing its services ( removing the team's access to the Amazon store on 07/31/2023).

The consultant will also take the following action if the route of contract termination is taken:

- work with the client to make arrangements for any and all inventory in the warehouse that belongs to the client, which the consultant has been covering storage costs for.
- The consultant though not required to will also additionally assist the client if needed to terminate the service of any third party enlisted throughout this process.

Best regards,

Client Support Team

Passive Scaling Inc.

---

📄 **Walmart Automation (2021 09 22  14 43 ADT) (2) pdf**
881K

**Attachment H**

**PX1**                                                                **000075**