## DECLARATION OF IAN PLOCHER
### Pursuant to 28 U.S.C. § 1746

I, Ian Plocher, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1. My name is Ian Plocher. I am over the age of 18 and reside in Irvine, California.

2. Around August 2021, I learned about an opportunity to make passive income by purchasing e-commerce stores. A sales agent from Optimyze Digital told me I could make thousands of dollars and showed me charts and spreadsheets showing how much money I could make. Attached hereto as **Attachment A** is a true and correct copy of a "profit forecast" the sales agent gave me.

3. I understood that the stores were going to use the "Fulfilled by Merchant" model, otherwise known as dropshipping, because it had high margins. With dropshipping, when a customer placed an order for an item in my store, Passive Scaling would purchase that item from a different retailer and then send it to the customer. I wouldn't have to pay to store any inventory in a warehouse.

4. I decided to purchase six stores—four main stores and two backup stores. Two of the main stores and one backup store were supposed to be Amazon stores, and the other two main stores and other backup store were supposed to be Walmart. (None of the Walmart stores ever opened.) I paid $100,000 and signed a contract with Passive Scaling.

5. The contract had a refund provision that would allow me to get a refund if I didn't make my money back. This refund provision was key to me agreeing to sign the contract.

6. I planned to spend $20,000 per store on inventory, or $120,000 total. In addition to the initial fee to Passive Scaling and the cost of inventory, I was also charged $594 per month

PX29                                                                 001783

for the Sales Support software. (The software was $99 per month per store, and I had six stores. I received a separate invoice for each store each month.)

7. My account started out doing okay, but shortly after opening, the trouble began. My accounts were shut down for a while, but I never got a straight answer from Passive Scaling about why.

8. I was confused that I was buying items wholesale because I'd been told my stores would use dropshipping, where I wouldn't have to store anything. Passive Scaling would tell me to purchase a certain item for a certain price, saying that Passive Scaling could sell the item for more than what I paid for it. But Passive Scaling wasn't able to sell the products for that price or even what I paid for them, so it ended up selling the products at a loss to get rid of them.

9. The inventory I was stocking was also different from what I'd been told before I signed the contract. Originally Optimyze Digital said that Passive Scaling and its CEO, Steven Rozenfeld, would be able to purchase big-name brands, like Nike and Colgate, by using 1HR Deliveries, Steven's wholesale company. (No one told me at the time that 1HR was also owned by Steven.) But in reality, my store sold items like industrial-sized pumps, food items, and beauty products. Attached hereto as **Attachment B** are true and correct copies of several purchase orders and invoices for store inventory.

10. I also had inventory that went missing. Passive Scaling would charge me for inventory, and I would pay it by ACH or wire transfer (not by credit card). One order of about $8,000 supposedly never arrived at the warehouse.

11. Passive Scaling kept telling me that the money would really start coming in closer to the end of the 18-month period—once the store gets going, it really goes. I felt pressure to go

PX29

"all in" on Passive Scaling and to trust the company. On May 18, 2022, a business partner and I signed a contract with Passive Scaling for three more Amazon stores—two stores and one sub-account—for $50,000. The contract was signed by "Amanada Peremen, Operations Manager" on behalf of Passive Scaling. Attached hereto as **Attachment C** is a true and correct copy of my contract with Passive Scaling.

12. The contract contains a non-disparagement clause that says:

> "During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true."

13. I never received any document from Optimyze Digital or Passive Scaling with any information substantiating their earning and profit claims contained in charts and spreadsheets they showed me, or made over the phone with the sales agent. I also never received a document from either Optimyze Digital or Passive Scaling telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

14. Around December 2023, I had had it with Passive Scaling. I sent an email to Passive Scaling requesting a full refund of the $100,000 I had paid under the first contract. Around the same time, I also sent a request asking for a refund of the $50,000 for the second set of stores.

15. Once I asked for a refund, I dealt with Jerdonna Palmer, who told me my request was being reviewed by the "legal team." Jerdonna eventually told me that "legal" said I wasn't

PX29                                                                                                001785

eligible for a refund, and Passive Scaling shut my stores. Passive Scaling also promised that Steven would email me, but he never did.

16. I was able to get Steven's phone number from Jerdonna, so I tried reaching out to him directly to get my refund. Around December 11, 2023, I texted Steven. Initially he denied that the number was his, but when I told him Jerdonna gave me the number, he admitted it was him. He wrote, "I'm not with passive anymore and I was a minority owner there. I've moved on and taken coaching gig so I can't really help you much unfortunately." He said I should contact Jerdonna about my refund. When I asked him who the owner of Passive Scaling was, he wrote, "Sorry I don't have more information unfortunately." Attached hereto as **Attachment D** are true and correct screenshots of my text exchange with Steven.

17. I still haven't been able to get my money back from Passive Scaling.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____, 2024

Irvine, California

Ian Plocher

4

| Passive Scaling Amazon & Walmart 24 month forecast | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 | Year 1 |
| Gross Revenue | - | 6,600 | 13,200 | 19,800 | 26,400 | 33,000 | 39,600 | 46,200 | 52,800 | 59,400 | 66,000 | 72,600 | 435,600 |
| Cost of Goods | - | 3,960 | 7,920 | 11,880 | 15,840 | 19,800 | 21,780 | 25,410 | 29,040 | 32,670 | 36,300 | 39,930 | 244,530 |
| Amazon Fees | - | 1,600 | 3,200 | 4,800 | 6,400 | 8,000 | 9,600 | 11,200 | 12,800 | 14,400 | 16,000 | 17,600 | 105,600 |
| Store Profit | - | 1,040 | 2,080 | 3,120 | 4,160 | 5,200 | 8,220 | 9,590 | 10,960 | 12,330 | 13,700 | 15,070 | 85,470 |
| Management Fee | - | 364 | 728 | 1,092 | 1,456 | 1,820 | 2,877 | 3,357 | 3,836 | 4,316 | 4,795 | 5,275 | 29,915 |
| Clients Profit | - | 676 | 1,352 | 2,028 | 2,704 | 3,380 | 5,343 | 6,234 | 7,124 | 8,015 | 8,905 | 9,796 | 55,556 |

|  | Month 13 | Month 14 | Month 15 | Month 16 | Month 17 | Month 18 | Month 19 | Month 20 | Month 21 | Month 22 | Month 23 | Month 24 | Year 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Revenue | 79,200 | 83,200 | 89,600 | 96,000 | 102,400 | 108,800 | 115,200 | 121,600 | 128,000 | 134,400 | 140,800 | 147,200 | 1,346,400 |
| Cost of Goods | 43,560 | 45,760 | 49,280 | 52,800 | 56,320 | 59,840 | 63,360 | 66,880 | 70,400 | 73,920 | 77,440 | 80,960 | 740,520 |
| Amazon Fees | 19,200 | 20,800 | 22,400 | 24,000 | 25,600 | 27,200 | 28,800 | 30,400 | 32,000 | 33,600 | 35,200 | 36,800 | 336,000 |
| Store Profit | 16,440 | 16,640 | 17,920 | 19,200 | 20,480 | 21,760 | 23,040 | 24,320 | 25,600 | 26,880 | 28,160 | 29,440 | 269,880 |
| Management Fee | 5,754 | 5,824 | 6,272 | 6,720 | 7,168 | 7,616 | 8,064 | 8,512 | 8,960 | 9,408 | 9,856 | 10,304 | 94,458 |
| Clients Profit | 10,686 | 10,816 | 11,648 | 12,480 | 13,312 | 14,144 | 14,976 | 15,808 | 16,640 | 17,472 | 18,304 | 19,136 | 175,422 |



**SWIFT SHIP**
1057 Pennsylvania Ave
Linden
New Jersey 07036
United States

**INVOICE**

November 17, 2022
11172022_IAN

## BILL TO

Ian Plocher - Consumer zip llc

███████████████████████  Irvine CA 92614,

## SHIP TO

FBA16YNGX4G5
Amazon
Amazon ABE8
Ian Plocher - Consumer zip llc
████████████████,  Irvine CA 92614,

| Description | Vendor SKU UPC | Vendor | Prep Totals | | | | Product Costs | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Prep Required | Bundle Quantity | Shipped Bundles | Total | Single | Price | Total |
| Jiffy Banana Muffin Mix 7 Ounce (Pack of 3) | 447498 72486009297 | 1 Hour Delivery-17777 | Labeling: $0.34 Pack: $0.46 | 3 | 104 | Labeling: $35.36 Pack: $47.84 Total: $83.20 | 312 | -- | -- |
| Mix 2D Labels | | -- | -- | -- | -- | -- | 26 | $0.34 | $8.84 |
| Box Labels | | -- | -- | -- | -- | -- | 26 | $0.34 | $8.84 |

**Remarks / Payment Instructions: Credit Card**

| | |
|---|---|
| SUBTOTAL | $0.00 |
| DISCOUNT | $0.00 |
| SUBTOTAL LESS DISCOUNT | $0.00 |
| PREP TOTAL | $100.88 |
| TAX RATE | 0.00% |
| TOTAL TAX | $0.00 |
| SHIPPING/HANDLING | $31.20 |
| TOTAL | $132.08 |
| CREDIT CARD SURCHARGE (3.5%) | $4.62 |

| | |
|---|---|
| **Total** | **$136.70** |
| **Balance Due** | **$0.00** |
| **Total Charged** | **$136.70** |
| **Payment Date** | **November 30, 2022 3:0** |



**SWIFT SHIP**
1057 Pennsylvania Ave
Linden
New Jersey 07036
United States

**INVOICE**

May 13, 2022
05132022_IAN

**BILL TO**

Ian Plocher - Consumer zip llc

████████████████, Irvine CA 92614,

**SHIP TO**

FBA16PV5MTF5
Amazon
Amazon ABE8
Ian Plocher - Consumer zip llc
████████████████, Irvine CA 92614,

| Description | Vendor SKU UPC | Vendor | Prep Totals Prep Required | Bundle Quantity | Shipped Bundles | Total | Product Costs Single | Price | Total |
|---|---|---|---|---|---|---|---|---|---|
| Stonewall Kitchen Sesame Ginger Teriyaki Sauce, 11 Ounces | 1528215 711381024010 | KEHE - 11111 | Labeling: $0.34 Bubblewrapping: $0.80 Boxing: $0.00 | 1 | 24 | Labeling: $8.16 Bubblewrapping: $19.20 Boxing: $0.00 Total: $27.36 | 24 | -- | -- |
| Mix 2D Labels | | -- | -- | -- | -- | -- | 4 | $0.34 | $1.36 |
| Box Labels | | -- | -- | -- | -- | -- | 4 | $0.34 | $1.36 |

**Remarks / Payment Instructions: Credit Card**

| | |
|---|---|
| SUBTOTAL | $0.00 |
| DISCOUNT | $0.00 |
| SUBTOTAL LESS DISCOUNT | $0.00 |
| PREP TOTAL | $30.08 |
| TAX RATE | 0.00% |
| TOTAL TAX | $0.00 |
| SHIPPING/HANDLING | $7.20 |
| TOTAL | $37.28 |
| CREDIT CARD SURCHARGE (3.5%) | $1.30 |

| | |
|---|---|
| **Total** | **$38.58** |
| **Balance Due** | **$0.00** |
| **Total Charged** | **$38.58** |
| **Payment Date** | **August 5, 2022 4:15 PM** |

**PLEASE REFERENCE CUSTOMER PO ON INVOICE AND PACKING SLIP : GBNYE9**

 **PrepCenterLA**
CUSTOMER CODE: 4472
PO #: GBNYE9

**PURCHASE ORDER**
December 20, 2023

**SHIP FROM**

4 Seasons General Merchandise - 44444
2801 E. Vernon
Los Angeles CA 90058, US

**SHIP TO**

Prep Center LA
PO #: GBNYE9
9718 Glenoaks Blvd.
Sun Valley CA 91352, US

| Product Name | Vendor SKU | UPC | Total Units Buy | Total Case Buy | Unit Cost | Subtotal |
|---|---|---|---|---|---|---|
| PIC Mosquito Repellent (12 Packs of 4) CIT 4, Citronella Coils | -- | 072477984077 | 288 | 288 | 0.89 | 256.32 |
| Mason Craft & More Airtight Kitchen Food Storage Clear Glass Pop Up Lid Canister, Medium 2.7 Liter Pop Up Canister | -- | 048552540131 | 60 | 60 | 7.00 | 420.00 |
| Mason Craft More Airtight Kitchen Food Storage Clear Glass Pop Up Lid Canister 2 Pack of Small 1 6 Liter Pop Up Canister | -- | 048552540094 | 80 | 80 | 5.05 | 404.00 |
| STUDIO SILVERSMITHS Pink Fish Shaped Vase Flower Holder Centerpiece | -- | 678976500543 | 24 | 24 | 2.40 | 57.60 |
| JPI DC Comics Batman Emblem Reversible Twin Quilt Bedspread Batman Emblem Bedspread Queen 86 X 86 | -- | 092723044997 | 12 | 12 | 18.00 | 216.00 |

|  | SUBTOTAL | 1353.92 |
|---|---|---|
|  | GRAND TOTAL | 1353.92 |

**PX29**                    **Attachment B**                    **001790**

| TOTAL | 1353.92 |
|-------|---------|

**PLEASE REFERENCE CUSTOMER PO ON INVOICE AND PACKING SLIP : S2WDLY**

 **Closter green corp**
CUSTOMER CODE: 4472
PO #: S2WDLY

**PURCHASE ORDER**

December 20, 2023

### SHIP FROM
1 Hour Delivery-17777
10 Milltown Ct
Union NJ 07083, US

### SHIP TO
Sales.Support NORTH BERGEN
PO #: S2WDLY
2011 8th Street
North Bergen NJ 07047, US

| Product Name | Vendor SKU | UPC | Total Units Buy | Total Case Buy | Unit Cost | Subtotal |
|---|---|---|---|---|---|---|
| Theragun Mini - All-New 4th Generation Portable Muscle Treatment Massage Gun | BR-GUN-002 | 10036050166 | 25 | 25 | 113.00 | 2825.00 |
| Theragun PRO - All-New 4th Generation Percussive Therapy Deep Tissue Muscle Treatment Massage Gun | Pro | 10036050135 | 25 | 25 | 360.00 | 9000.00 |

|  |  |
|---|---|
| SUBTOTAL | 11825.00 |
| GRAND TOTAL | 11825.00 |

| **TOTAL** | **11825.00** |
|---|---|

**PLEASE PRINT AND PLACE A COPY OF THIS PO WITH THE PACKING SLIP**

**PX29**              Attachment B              **001792**

**PLEASE REFERENCE CUSTOMER PO ON INVOICE AND PACKING SLIP : ABK97E**

 **Closter green corp**
CUSTOMER CODE: 4472
PO #: ABK97E

**PURCHASE ORDER**

December 20, 2023

**SHIP FROM**

KEHE - 00000
585 Principio Pkwy W,
North East MD 21901, US

**SHIP TO**

Sales.Support NORTH BERGEN
PO #: ABK97E
2011 8th Street
North Bergen NJ 07047, US

| Product Name | Vendor SKU | UPC | Total Units Buy | Total Case Buy | Unit Cost | Subtotal |
|---|---|---|---|---|---|---|
| James Keiller Marmalade, Orange, 12-Ounce (Pack of 3) | BLY-2800 03-PK3 | 59644990109 | 144 | 144 | 4.51 | 649.44 |
| Dr. Bronnerâ€™s - Pure-Castile Liquid Soap (Peppermint, 32 ounce, 2-Pack) - Made with Organic Oils, 18-in-1 Uses: Face, Body, Hair, Laundry, Pets and Dishes, Concentrated, Vegan, Non-GMO | BLY-9921 8-PK2 | 18787775325 | 120 | 120 | 10.12 | 1214.40 |
| Dr. Bronnerâ€™s - Pure-Castile Liquid Soap (Peppermint, 1 Gallon) - Made with Organic Oils, 18-in-1 Uses: Face, Body, Hair, Laundry, Pets and Dishes, Concentrated, Vegan, Non-GMO | BLY-1504 41-PK1 | 18787765654 | 80 | 80 | 36.01 | 2880.80 |
| Lakewood Pure Lime, Fresh Pressed, 32 Fl Oz (Pack of 6) | BLY-2984 33-PK6 | 42608470984 | 216 | 216 | 6.30 | 1360.80 |

SUBTOTAL 6105.44
GRAND TOTAL 6105.44

**PLEASE PRINT AND PLACE A COPY OF THIS PO WITH THE PACKING SLIP**

**TOTAL 6105.44**

PX29          Attachment B          001793



# Delivering on Your eCommerce Objectives

**Project Proposal**

Amazon Automation

**Delivered on**

May 03, 2022

**Client**

Ian Plocher

**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* **–** this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee – $199 or 25%** | $199 | Monthly | |
| Minimum management fee of $199 per month **or** twenty five percent (25%) of net profit **– this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee (Per Store)** | $99 | Monthly | |
| Monthly fee paid directly to software provider | | | |
| **Minimum Working Capital – $15,000** | $15,000 | | |
| This is the minimum requirement of available credit or capital per store to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,000** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of May 03, 2022 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 78 John Miller Way, Suite 227 Kearny, NJ 07032 (hereinafter "Consultant"), and Ian Plocher, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $50,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with three (3) e-commerce stores on the Amazon platform, (including one (1) sub-account)  (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.

    B. Review, research, source, select, and list products for the Client's Stores.

    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)


2022-05-18 16:14:57  (PDT)

Attachment C

2

2. **CLIENT RESPONSIBILITIES –**

   A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

   B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

   C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

3. **COMPENSATION –**

   A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifty thousand dollars ($50,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



2022-05-18 16:14:57 (PDT)

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or twenty five percent (25%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider per store, per month. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM –**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2022-05-18 16:14:57 (PDT)

6. **NON-DISPARAGEMENT –**

    During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

7. **SALES / USE TAX –**

    Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

8. **INTELLECTUAL PROPERTY –**

    Client understands that Client's Stores is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon, and Consultant holds no legal or equitable rights in Client's Stores.



2022-05-18 16:14:57 (PDT)

PX29                          Attachment C                          001799

9. **RESTRICTED ACTIVITIES --**
Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation**. During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure.** The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party".

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2022-05-18 16:14:57 (PDT)

D. **If at Disclosing Party's request**, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement**, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



2022-05-18 16:14:57 (PDT)

10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($50,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($50,000.00).

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.



2022-05-18 16:14:57 (PDT)

11. **LIMITATION OF LIABILITY –**

A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



2022-05-18 16:14:57 (PDT)

B. **Without limiting the foregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Stores, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Stores; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Stores or the approval or compliance of the Stores or any software or information and content contained in the Stores; or (3) that the Stores will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.



2022-05-18 16:14:57 (PDT)

C. **Business Risk –** Client hereby understands that the creation and potential growth of the Client's Stores carries financial and other risks. Client hereby understands that e-commerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon via Client's Stores; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Stores or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon Stores. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Stores sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an e-commerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Stores.



2022-05-18 16:14:57 (PDT)

D. **Amazon Terms and Conditions** - Client hereby understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in Client's view. In the event Client's Stores is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon will in such cases return Client's Stores to active status. Furthermore, Client agrees and understands that Consultant makes no guarantees or representations regarding the Stores in relation to any Amazon policy, whether currently in effect or as may be amended by Amazon from time to time. Client understands that Consultant has no control over or input in when and whether Amazon elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practical be consistent with Amazon's current policies. In the event in which Client's store is suspended beyond a 30 day period, and no revenue is earned during this period, the "Maintenance Fee" of one hundred ninety nine ($199.00) USD per month or 35% of net profits will be waived.

13. **GENERAL PROVISIONS -**
    A. **Non-exclusivity** - Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

    B. **Relationship of the Parties –** Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

    C. **Notices -** All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to Client, notice shall be sent electronically to ███████@gmail.com. Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.



2022-05-18 16:14:57 (PDT)

D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution –** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Hudson County, New Jersey. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13,(L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



2022-05-18 16:14:57 (PDT)

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



2022-05-18 16:14:57 (PDT)

L.  **Indemnification of Consultant –** Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

M.  **Indemnification of Client -** Consultant agrees to indemnify, defend, and save and hold harmless Client, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, as a direct result of the services exclusively performed by Consultant under the terms of this agreement, or the Consultants breach of this agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

N.  **Survival –** Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

2022-05-18 16:14:57 (PDT)

O. **Client Data Management –** Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



2022-05-18 16:14:57 (PDT)

Q. **Ministerial Services –** In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfilment of the obligations in Section 2 ("Ministerial Act"), Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.



2022-05-18 16:14:57 (PDT)

14. **DEFINITIONS –**

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.


2022-05-18 16:14:57 (PDT)

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: Ian Plocher authorized representative and agent for service of process Date:  May 18, 2022

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

*Ian Plocher*
2022-05-18 16:14:57 (PDT)
_____

Ian Plocher

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date:  May 18, 2022

*Amanada Peremen*
2022-05-04 17:35:03 (PDT)
_____

Amanada Peremen



**Attachment D**





