**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Suite 201
Roseland, New Jersey 07068
(973) 622-1800
Anthony Sodono, III, Esq. (asodono@msbnj.com)
Michele M. Dudas, Esq. (mdudas@msbnj.com)
Sari B. Placona, Esq. (splacona@msbnj.com)
*Counsel to Anthony Sodono, III, Temporary Receiver*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>             Plaintiff,<br><br>      v.<br><br>THEFBAMACHINE INC., a corporation;<br>PASSIVE SCALING INC., a corporation;<br>SALES.SUPPORT NEW JERSEY INC., a corporation;<br>1HR DELIVERIES INC., a corporation;<br>HOURLY RELIEF INC., a corporation;<br>3PL LOGISTIC AUTOMATION INC., a corporation;<br>FBA SUPPORT NJ CORP., a corporation;<br>DAILY DISTRO LLC, a limited liability company;<br>CLOSTER GREEN CORP., doing business as WRAITH & CO., a corporation; and<br>BRATISLAV ROZENFELD, also known as Steven Rozenfeld and Steven Rozen, individually and as an officer or owner of THEFBAMACHINE INC., PASSIVE SCALING INC., SALES.SUPPORT NEW JERSEY INC., 1HR DELIVERIES INC., HOURLY RELIEF INC., 3PL LOGISTIC AUTOMATION INC., FBA SUPPORT NJ CORP., DAILY DISTRO LLC, and CLOSTER GREEN CORP., doing business as WRAITH & CO., a corporation,<br><br>             Defendants. | Civil Action No. 24-6635 (JXN) (LDW)<br><br>**REPORT OF ANTHONY SODONO, III, TEMPORARY RECEIVER PURSUANT TO *TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE*** |

Anthony Sodono, III, the temporary receiver ("**Temporary Receiver**") appointed pursuant to this Court's June 3, 2024, *Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue* ("**TRO**"), entered by the Honorable Julian X. Neals, United States District Judge, on June 3, 2024 [ECF 5], hereby submits his initial report (the "**Report**"), summarizing his efforts to marshal and collect assets, administer the Receivership Estate, and otherwise perform the duties mandated by the TRO.

The Federal Trade Commission ("**Plaintiff**" or "**FTC**") is the plaintiff in this matter.  The defendants in the matter are TheFBAMachine, Inc. ("**FBA**"); Passive Scaling Inc. ("**Passive**"); Sales.Support New Jersey Inc. ("**Sales.Support**"); 1HR Deliveries Inc. ("**1HR**"); Hourly Relief Inc. ("**Hourly**"); 3PL Logistic Automation Inc. ("**3PL**"); FBA Support NJ Corp. ("**FBA Support**"); Daily Distro, LLC ("**Daily Distro**"); Closter Green Corp. d/b/a Wraith & Co. ("**Wraith**") (where appropriate, FBA, Passive, Sales.Support, 1HR, Hourly, 3PL, FBA Support, Daily Distro, and Wraith will be collectively referred to as the "**Receivership Entities**"); and Bratislav Rozenfeld, a/k/a Steven Rozenfeld a/k/a Steven Rozen, individually and as an officer or owner of the Receivership Entities, or any of them ("**Rozenfeld**") (where appropriate, the Receivership Entities and Rozenfeld will be collectively referred to as the "**Defendants**").[1] The Temporary Receiver is a neutral third-party appointed pursuant to the TRO.

## PRELIMINARY STATEMENT

Upon the Temporary Receiver's appointment, the following actions were immediately undertaken in accordance with the TRO: (a) identification of assets of the Defendants, securing

---

[1] On June 14, 2024, the FTC amended its Complaint to name Amanda Rozenfeld, a/k/a Amanda Peremen, a/k/a Amanada Peremen as a Defendant ("**A. Rozenfeld**").  As of the submission of this Report, the TRO has not been extended to A. Rozenfeld.

the Assets (as defined in the TRO), warehouse(s) and business locations; (b) immediate travel to Miami, Florida for an extensive in-person interview ("**Interview**") with Rozenfeld on June 6, 2024 to obtain information about the Receivership Entities, Rozenfeld's personal Assets, and to secure Rozenfeld's laptop and other electronic devices, if any, for imaging; (c) communications with the Plaintiff and Defendants in an attempt to obtain access to, understand and address any urgent issues respecting the implementation of the TRO and Defendants' Assets and/or operations relating to the Receivership Entities; (d) communications/interviews with numerous customers of the Receivership Entities; (e) communications/interviews with various former and current employees of the Receivership Entities, particularly those employed at the Defendants' primary warehouse located at 2011 Eighth Street, North Bergen, New Jersey ("**North Bergen Warehouse**"); (f) coordination of attempts to obtain financial information of the Defendants, or any of them, with various financial institutions, the Defendants and other third-parties, including subpoenaing Defendants' accountant; and (g) communications with vendors, creditors and other businesses associated with the operation of the Receivership Entities including, but not limited to, Amazon and GoHighLevel.

Based upon information the Temporary Receiver's analysis and investigation of the Receivership Entities, as well as the information relayed by certain customers, the Temporary Receiver determined that at least a portion of the Receivership Entities' customers were not receiving services or results which were promised and represented by the Defendants, including being misled about profits and the business model implemented by the Defendants. Therefore, the Temporary Receiver made a determination that the Receivership Entities' business should not and cannot continue. Moreover, despite being cooperative with the requests of the Temporary Receiver for login credentials and background information, Defendants have failed to comply with

the letter and spirit of the TRO in their failure to produce certain financial information, refusal to produce Rozenfeld's Cell Phone (defined below) for imaging despite it being utilized for business purposes, and what appears to be attempts to mutilate data and/or divert Assets of the Receivership Entities to third-parties, including to overseas accounts. The Temporary Receiver is still conducting due diligence, however, Defendants, through counsel, after initially cooperating with the Temporary Receiver, have failed to engage in any meaningful discussions or provide any relevant financial information for the last month.

**A. <u>Significant Events During Litigation</u>**

The TRO scheduled an order to show cause hearing for June 17, 2024, at 9:30 a.m. ("**Hearing**"). Rozenfeld was served with the TRO on June 5, 2024, after agreeing to voluntarily meet with the FTC's process server in Florida.

On June 5, 2024, the Temporary Receiver posted a bond with the Travelers Casualty & Surety Co. [ECF 24].

On June 13, 2024, the Temporary Receiver filed an application to retain McManimon, Scotland & Baumann, LLC ("**MSB**"), as his counsel and Eisner Advisory Group ("**Eisner**") as his accountants ("**Retention Application**"). ECF 20. No party objected to the Retention Application, which resulted in the Order approving MSB serving as counsel and Eisner serving as accountants to the Temporary Receiver, entered on June 18, 2024. ECF 26.

On June 14, 2024, an Order Extending the TRO and Adjourning the Preliminary Injunction Hearing ("**Extension Order**") was entered by the Court [ECF 22], which extended the TRO by the consent of the parties until the Court ruled on the FTC's application for a preliminary injunction, and the Hearing was adjourned until July 30, 2024, at 11:00 a.m. As set forth in the Extension Order, the parties jointly requested additional time to negotiate, if possible, a stipulated

4

preliminary injunction and to allow the Defendants' counsel to file a responsive brief. Pursuant to the Extension Order, Defendants had until July 15, 2024, to file their answering pleadings, and the FTC had until July 23, 2024, to file any responsive or supplemental pleadings.

On June 14, 2024, the FTC filed its Amended Complaint against A. Rozenfeld. ECF 27.

On June 24, 2024, the Temporary Receiver docketed a letter and proposed order to request release of funds frozen by certain banking institutions and to pay costs related to fulfillment of any existing orders and processing of returns at the North Bergen Warehouse. The inventory was already paid for by the customers. There were concerns about some inventory with limited shelf-life and also to clear the North Bergen Warehouse. The Temporary Receiver's decision was based upon negative feedback received from certain customers of Passive Scaling and/or FBA that caused the Temporary Receiver to question whether the Receivership Entities could be operated legally pursuant to Section XII(T) of the TRO and based upon the Defendants' failure to produce financials that would allow the Temporary Receiver's accountants to determine whether the Receivership Entities could be operated profitably. *Id.* On June 26, 2024, the order was entered ("**North Bergen Order**") and filed on the docket. ECF 33.

Defendants did not file any Opposition by July 15, 2024, as required by the TRO and Extension Order. On July 23, 2024, the FTC docketed its supplemental submission. ECF 38.

On July 25, 2024, counsel to the FTC and Defendants docketed a joint letter regarding the status of the Order to Show Cause hearing [ECF 40], in response to the Court's Text Order issued on July 24, 2024. ECF 39.

On July 28, 2024, McCarter & English, LLP entered its appearance on behalf of A. Rozenfeld.

B. **Inspection of Warehouses and Temporary Receiver's Meeting with Rozenfeld**

1. **North Bergen Warehouse**

On Wednesday, June 5, 2024, at approximately 9:30 a.m., the Temporary Receiver and his counsel, Michele M. Dudas, Esq., arrived at the North Bergen Warehouse with Frances Kern, Esq., and Colleen Robbins, Esq., counsel to the FTC. A pickup truck with a sign that read "Security Patrol" pulled up and inquired whom the Temporary Receiver was there to see. The security guard contacted someone named "Michelle." Ms. Dudas spoke with "Michelle" through the security guard's phone, and she advised she would be at the North Bergen Warehouse around 10:00 a.m. The security guard told the Temporary Receiver that Rozenfeld comes "once a month." The Temporary Receiver learned that the Receivership Entities, or some of them, previously occupied Unit 102, but had moved to a downstairs unit, Unit B-2. Unit B-2 is down a flight of stairs, and there are two units to the left (for an unrelated farm/food processing operation ["**Farm**"]), and Daily Distro's unit to the right. There was no door on the wall to Unit B-2. The opening of Unit B-2 is surrounded by cement walls. After entering the open doorway and going through a short hallway which contained pallets of inventory, to the left is the room is where operations are handled. The North Bergen Warehouse was described as a "fulfillment center."

A representative of the FTC arranged for the North Bergen Police to be dispatched to accompany the Temporary Receiver and the FTC at the North Bergen Warehouse. Someone from the Farm informed the Temporary Receiver that Rozenfeld comes in "about once a month." While waiting for the North Bergen Police, a delivery truck branding the name "KeHE" arrived. The driver said its warehouse is in Maryland and that KeHE makes deliveries to the North Bergen Warehouse every Wednesday and Friday, and the driver only deals with Christian (one of the North Bergen Employees [defined below]). KeHE's invoices are submitted to Wraith.

The Temporary Receiver came to learn that Michelle's full name is Michelle Dominguez ("**Ms. Dominguez**"), and she has worked for Rozenfeld for approximately four (4) years.  Ms. Dominguez advised that only "prepping" is done at the North Bergen Warehouse, which means they do intake of inventory and organize returns for clients (specifically, the customer orders come in from KeHE, the North Bergen Warehouse prepares the orders, ships to Amazon, and then Amazon fulfills orders to the customer).  All order information is received from "virtual assistants," most of whom are located overseas.  The majority of the inventory consists of electric coolers, water pumps, food, and health/beauty items.  A variety of vendors are used, but Ms. Dominguez advised that the main vendors are KeHE, Krasdale (for food), and Platsky (for pumps).

Ms. Dominguez further advised that operations were moved last year to Unit 102 at the North Bergen Warehouse from 10 Milltown Road, Union, New Jersey. Prior to that,  they operated out of Carlstadt, New Jersey. Operations originally started in Long Island City, New York.  Ms. Dominguez stated that Rozenfeld only comes to the North Bergen Warehouse "every few months." Significantly, Ms. Dominguez provided the Cell Phone Number (defined below) as her contact information for Rozenfeld.

At approximately 10:30 a.m. on June 5, 2024, Mihir Desai, the Distribution Manager arrived at the North Bergen Warehouse.  Mr. Desai uses one (1) of the two (2) laptops at the North Bergen Warehouse.  Besides Ms. Dominguez, the other employees at the North Bergen Warehouse were:

- Columba Flores (packing boxes on June 5, 2024)
- Jose Humberto (not there on June 5, 2024)
- Enma Violeta (not there on June 5, 2024)
- Jaime Isais (deals with shipping) (not there on June 5, 2024); he had second laptop
- Christian Gonzalez – return processor
- Diana Angel (not there)

These employees are collectively referred to as the "**North Bergen Employees**."[2]

Ms. Dominguez advised that ADP was used for payroll processing for the North Bergen Employees, and they generally worked Monday through Friday, from 9:00 a.m. until 5:00 p.m. The North Bergen Employees used "UAttend" to track the number of hours worked and get paid weekly on Fridays. The only e-mail used by the North Bergen Warehouse is Warehouse@sales.support. All communications are conducted through Google Chat. All cell phones of the North Bergen Warehouse Employees are their personal phones, and they do not have any direct communications with any customers. There was limited paperwork at the North Bergen Warehouse and appeared to be only invoices and/or purchase orders.

The Temporary Receiver called Rozenfeld on the Cell Phone Number, and he agreed to meet with the Temporary Receiver in Florida on June 6, 2024. During that call Rozenfeld also provided certain login credentials. Rozenfeld denied using the Cell Phone Number for any business purposes. Rozenfeld confirmed Mikhail Usher, Esq., would be representing the Defendants, and the Temporary Receiver and Ms. Dudas had a subsequent call with Mr. Usher. Counsel to the Temporary Receiver followed up with an e-mail to Mr. Usher on June 5, 2024, regarding Rozenfeld's representations that he did not use the Cell Phone Number for business purposes. *See* **Exhibit "A"** hereto.

At approximately 12:30 p.m., Fulvio DiPaolo ("**Mr. DiPaolo**")[3] arrived at the North Bergen Warehouse to determine how to secure the North Bergen Warehouse, given that there was an open doorway to Unit B-2 and cement walls. While waiting for Mr. DiPaolo's workers to arrive, various deliveries came in from UPS and Amazon. They appeared to be all customer returns and were moved into the hallway of Unit 102.

---

[2] Mr. Desai is not included as one of the North Bergen Employees.
[3] Mr. DiPaolo is employed by the Temporary Receiver.

4868-0371-0932, v. 1

The North Bergen Employees were discharged mid-afternoon on June 5, 2024. After the North Bergen Warehouse Employees left, the "pull-down" type metal accordion door for Unit 102 was down (despite being open all day) and locked with a padlock. Ms. Dudas contacted Ms. Dominguez to inquire why it was locked, and Ms. Dominguez advised it was protocol and that there was a communal key for the unit since it was used by other tenants. There were hundreds of packages at the North Bergen Warehouse.

At that time, Mr. DiPaolo and Ms. Dudas entered and inspected Unit 102, which was a long hallway that led to another hallway with pull-down doors, and two sets of stairways. One stairway led to an extremely dusty room that had boxes of pillows piled into a closet. The second set of stairs led to a bathroom and breakroom.

In the meantime, the "property manager" Shia from Alley Property Management came to Unit B-2 to question what "was going on" because he heard there was commotion. Shia was informed about the door to be constructed and directed such issues to the landlord. The Temporary Receiver provided the landlord with a copy of the Lease and advised of the construction of the door by e-mail that same date.

Mr. DiPaolo's workers arrived at approximately 2:30 p.m. and began constructing the door at the North Bergen Property. Mr. DiPaolo and Ms. Dudas left at approximately 4:30 p.m., with both units secured.

When Ms. Dudas was at the North Bergen Warehouse at approximately 10:30 a.m. on June 6, 2024 (once again with the assistance of the North Bergen Police), there was a pin in the lock area for Unit 102 and a beam across the Unit B-2 door, but Ms. Dudas was able to access the North Bergen Warehouse without issue. The FTC representatives (Frances Kern, Colleen Robbins, Richard Kaplan and Reeve Tyndall) also were at the North Bergen

Warehouse. Mr. Kaplan imaged all computers. At approximately 7:00 p.m., the Temporary Receiver delivered Rozenfeld's personal laptop to the FTC, which was imaged at that time and was immediately ready to be returned to Rozenfeld. The representatives of the FTC left the North Bergen Warehouse at approximately 9:30 p.m. and both units were secured.

At the Temporary Receiver's request, Mr. DiPaolo has regularly visited the property and inspected the North Bergen Warehouse. Mr. DiPaolo has retrieved numerous packages left for the Receivership Entities and secured the packages in the North Bergen Warehouse. Despite no operations of the Receivership Entities since June 5, 2024, as of the end of June 2024, Mr. DiPaolo estimated that there were approximately four-hundred (400) to five-hundred (500) boxes, mainly consisting of returns delivered to the North Bergen Warehouse.

### 2. Second North Bergen Warehouse

After the initial inspection of the North Bergen Warehouse on June 5, 2024, and while the Temporary Receiver still had the assistance of the North Bergen Police, Ms. Kern, Ms. Robbins, and Ms. Dudas inspected 7001 Anpesil Drive, North Bergen ("**Anpesil Property**"). Upon arrival at the Anpesil Property, there was no ingress to Unit M1 from the exterior of the Anpesil Property. A Federal Express driver directed everyone to the dock where his truck was parked and advised that the main office, ReadySpaces, was off to the left.

Ms. Dudas, Ms. Kern, and Ms. Robbins, along with the North Bergen Police, went inside the main office, and the attached directory, annexed as **Exhibit "B,"** was taped to the wall. Notably, none of the Receivership Entities was listed on the directory. They were met by Alex Hernandez, the General Manager for the Anpesil Property. Mr. Hernandez advised that he had worked for the company for the last six (6) months, and that none of the Receivership Defendants was a current tenant of the Anpesil Property. Mr. Hernandez checked his records and

advised that Wraith was formerly a tenant, but it moved out in June 2020 and still owed more than $4,000 in rent. The printout of outstanding amounts due and owing, annexed as **Exhibit "C,"** was provided, and the Townhouse (defined below) address is listed for Wraith.

### 3. Freehold Warehouse

On June 4, 2024, Sari B. Placona, Esq., counsel to the Temporary Receiver, visited One Industrial Court, Suite 4, Freehold, New Jersey ("**Freehold Warehouse**"). Suite 4 at the Freehold Warehouse was locked, but Ms. Placona spoke with two (2) women in Suite 3 in an attempt to t obtain information. Ms. Placona was told the same two (2) gentlemen appear generally at the same time every day in the afternoon.

At approximately 1:50 p.m. on June 5, 2024, Ms. Kern and Ms. Robbins from the FTC, and Ms. Placona arrived at the Freehold Warehouse, accompanied by the local Police Department. Ms. Placona was informed by the two (2) women in Suite 3 that there was "action" at Suite 4 the day before around 4:30 p.m., and people were removing boxes from the space.

Upon arrival, Suite 4 was locked. Ms. Placona walked down the street to Suite 8 and asked the person there, David, if he knew of the owner of Suite 4. David advised that he did not want to get involved. Shortly thereafter, a tall, thin young man walked toward the women. Ms. Placona recognized this gentleman from her visit at the Freehold Warehouse on June 4, 2024. He advised his name is David Binder. He asked Ms. Placona what she wanted, and she inquired about Suite 4. Mr. Binder proceeded to tell Ms. Placona that his brother, Arthur Binder, owns Suite 4 and that he was on the phone.

Arthur Binder told Ms. Placona that Rozenfeld, Sales.Support, and FBA Support were his only customers of the named defendants. There was Sales.Support inventory at the Freehold Warehouse. Mr. Binder was advised to keep any assets of any of the Receivership Entities in a

separate corner from the other inventory and to not let any of Sales.Support or other named Defendants' inventory out of the warehouse. Arthur advised that he has not spoken to Rozenfeld in "a while." Rozenfeld owed Mr. Binder approximately $20,000. Significantly, he advised the phone number he had for Rozenfeld was the Cell Phone Number.

### 4. Temporary Receiver's Meeting with Rozenfeld in Miami

On the evening of June 5, 2024, the Temporary Receiver scheduled a flight to Florida to meet with Rozenfeld. The Temporary Receiver met with Rozenfeld in Miami on June 6, 2024, at approximately 8:00 a.m. at 2021 Biscayne Boulevard, Miami, Florida ("**Miami Office**"), to conduct the interview. The location is a shared work-space on the third floor, with dozens of unrelated single office spaces around the perimeter with other individual "open" desks in the middle. Rozenfeld works from the Miami Office; and while it may technically be described as the "office" for the Defendants, it was barren and did not contain any records. There were two (2) desks and two (2) file cabinets, and neither cabinet contained any records. Inside the Miami Office was another unrelated desk, and that person who shared the office space was not there. There were no computers or any other devices except for Rozenfeld's having his laptop. There was the "blue board" on the wall, which was the same blue board used by Rozenfeld in videos posted to YouTube. Rozenfeld described the notes on the blue board as the "daily stand-up." Rozenfeld said that meant that it spells out the events of the day and what employees report to him or what Rozenfeld wanted to accomplish. Rent for the Miami Office is $350 per month and was paid for by FBA Support.

The Temporary Receiver interviewed Rozenfeld for over four (4) hours. The Temporary Receiver notes that Rozenfeld was cooperative and did not hesitate to provide information. The Temporary Receiver confirmed with Rozenfeld that he represented he did no business, *i.e.*, calls,

texts, emails, on his cell phone, (917) XXX-9040 (**"Cell Phone"** or "**Cell Phone Number**").  This seemed difficult to believe considering that it appeared that on Wednesday, June 5, 2024, his employees, Ms. Dominguez and Mr. Desai, appeared to be communicating with Rozenfeld via the Cell Phone. Further, on June 6, 2024, Ms. Dudas conversed with Clifford (Bill) Stiber, a former employee, who confirmed the number he had for Rozenfeld was the Cell Phone Number.  The Temporary Receiver confronted Rozenfeld with this information, and he continually represented his Cell Phone was only for personal use and that he uses Google Chat for business.  As a result, the Temporary Receiver did not seize the Cell Phone but did seize Rozenfeld's laptop, which was turned over to the FTC for imaging on June 6, 2024, and returned to the Temporary Receiver by the FTC on June 7, 2024.  On that date, the laptop was sent to Rozenfeld in Florida via overnight courier.

During the interview, Rozenfeld provided various personal and business information, including former addresses and information relating to A. Rozenfeld and their family, including their children.  The Rozenfeld family is currently residing in a short-term rental in North Miami, Florida.  Rozenfeld disclosed that A. Rozenfeld works for Daily Distro with an annual salary of $50,000. He disclosed one (1) joint checking account and one (1) bank account solely in Rozenfeld's name with a national banking institution that was provided to the Temporary Receiver but is not being disclosed here for privacy reasons.  Rozenfeld stated that he has no overseas accounts (but according to his Financial Statement for Individuals, has at least one account for cryptocurrency; it is unclear where that account is maintained).

Rozenfeld stated that he did not own the unit located at 757A Undercliff Avenue, Edgewater, New Jersey ("**Townhouse**"), the address used for various Receivership Entities, but that it was rented from a third-party.  Rozenfeld now sublets the Townhouse to a construction

company, which is unrelated to Rozenfeld or his family, on a short-term basis.  When Rozenfeld is in New Jersey, he utilizes the Townhouse if it is not rented.

Rozenfeld also solely owns the property located at 3210 Dover Road, Pompano Beach, Florida ("**Florida Property**").  According to public records, Rozenfeld acquired the Florida Property on or about November 30, 2021, from Russell B. McCarver and Diana S. McCarver.  On December 2, 2021, a mortgage in favor of Citadel Servicing Corp. was recorded for a mortgage in the principal amount of $956,250.  Rozenfeld informed the Temporary Receiver that the Florida Property was worth approximately $1,200,000 and had approximately $1,000,000 in debt. According to www.zillow.com, the Florida Property was listed for sale on September 15, 2023, for $1,599,000.  That listing was removed on March 11, 2024, and subsequently re-listed on April 11, 2024 for $1,600,000.  On May 29, 2024, the sale price of the Florida Property was reduced back to $1,599,000. Relevant portions of a printout of the Zillow webpage relating to the Florida Property is annexed as **Exhibit "D."**  The listing agent, Jeffrey Corriolan, was served with the TRO but has refused to remove the listing.  Upon information and belief, Mr. Corriolan informed the FTC that he answered to Rozenfeld.  Shortly after the issuance of the TRO, the listing was modified to reflect an "undisclosed address," but a simple Google search of the full address directs one to the listing.  Rozenfeld was not clear which address is used for his mailing address, but informed the Temporary Receiver that he would be obtaining a Florida driver's license.

Rozenfeld was originally in business with A. Rozenfeld's family members, operating as Wraith, which transformed from a New York City taxi-related company to an e-commerce warehouse in Long Island City.  Rozenfeld stated the Long Island City location was too expensive and that the partnership was dissolved and moved locations to the Anpesil Property.

14

Rozenfeld disclosed the following bank accounts of certain Receivership Entities: 3PL (1 account); Sales.Support (2 accounts), Passive Scaling (1 account); 1HR (2 accounts); FBA Support (1 account); FBA (1 account); as well as additional closed account(s) for Passive Scaling.

Rozenfeld also discussed the roles of each of the Receivership Entities and provided information relating to the roles and duties of the employees of the various Receivership Entities, including: (a) the North Bergen Employees, and two (2) other sales representatives in the United States; (b) eight (8) employees in Pakistan for software development, paid for by Sales.Support; (c) seven (7) employees in Jamaica providing customer support and paid for by FBA and FBA Support; (d) three (3) employees in Macedonia providing management support overseeing "teams," paid for by FBA, FBA Support, and/or Daily Distro; (e) three (3) employees in the Ukraine who help with distribution and processing of orders paid for by Daily Distro; (f) forty-five (45) employees in the Philippines providing data entry for the Amazon stores and product research, paid for by FBA, Daily, and FBA Support (the main location is in Tagum, Philippines, but Rozenfeld did not have an address and visits "infrequently"); and (g) one (1) employee in Mexico providing management services and paid by FBA.

FBA employees are paid by ACH payments through Chase Bank through a system called "upwork.com." FBA Support pays its employees through ADP. Rozenfeld said he has general liability insurance for his companies but did not have directors and officers insurance.

Rozenfeld explained that FBA means "fulfilled by Amazon," "FBM" means "fulfilled by merchant." There are five (5) services provided by the Receivership Entities: (1) warehousing, including preparation; (2) distribution; (3) virtual assistance; (4) software (which ties into everything); and (5) coaching (which services were provided by FBA and the predecessor company, Passive Scaling). Rozenfeld asserted that most complaints about Passive Scaling were

15

from its vendor, Optimize Digital ("**Optimize**"). Hourly was described as a staffing company. Sales.Support was described as a software company out of Pakistan. 3PL was a concept but never started, intended to "help" Amazon warehouses worldwide. FBA Support is the North Bergen Warehouse. Rozenfeld used Wraith when he first started his e-commence company. 1HR is a distribution company.

Rozenfeld disclosed that his accountant is Kevin Carestia. Tax returns for Rozenfeld and his businesses are now past due for 2022 and on extension for 2023. Rozenfeld files joint tax returns with A. Rozenfeld.[4]

At the conclusion of the Interview, at approximately 11:43 a.m., the Temporary Receiver once again asked whether Rozenfeld ever used his cell phone for business purposes and Rozenfeld confirmed that he did not because he transacted all business through "Google Suite."

The Temporary Receiver notes that Rozenfeld has been cooperative and has complied with all requests for login credentials, including the two-factor authentication process, from June 5, 2024, up through the end of June 2024, at which time all substantive communications from counsel to the Defendants essentially ceased.[5]

---

[4] The Temporary Receiver subpoenaed Mr. Carestia on June 18, 2024. After providing an extension of time to respond to the Subpoena, Mr. Carestia informed counsel to the Temporary Receiver on July 12, 2024, as follows: Rozenfeld hired Mr. Carestia to prepare several tax returns and provided a retainer in March or April 2024. Rozenfeld's bookkeeper, "Eric," prepared the financial statements, and Mr. Carestia noticed an issue and advised Rozenfeld and "Eric," who were finalizing the tax return information. Eric has since resigned, and Rozenfeld advises he does not have access to QuickBooks. When pressed on the specific issue, Rozenfeld noted that it related to profit/loss that Eric coded bank transfers from one company to another as income and expense. The Profit & Loss Statement will be completely differently. Mr. Carestia is preparing tax returns for all delinquent years. Rozenfeld never filed any tax returns for the companies. Rozenfeld did not file taxes for 2022 and 2023. The corporate entities pay the taxes, and they are not pass-through entities.

[5] After June 27, 2024, all discussions with Mikhail Usher, Esq., counsel to Defendants, ceased. For purposes of full disclosure, after several follow-up e-mails of counsel to the Temporary Receiver went unanswered, on July 11, 2024, Mr. Usher advised he would be available "after July 15, 2024"; however, no such communications were ever received from Mr. Usher.

**C. Significant Communications with Parties and Related Information Regarding Receivership Matters**

Below is a summary of significant meetings and communications with parties[6] and other informational sources:

On June 4, 2024, the Temporary Receiver, his counsel, and Anthony Calascibetta, CPA, from Eisner, met in person with representatives of the FTC, including Ms. Kern, Ms. Robbins, and Reeve Tyndall (virtually) to obtain information regarding the Defendants, including the locations of various warehouses and offices that would need to be inspected and secured by the Temporary Receiver.

As described in detail above, on June 5, 2024, the Temporary Receiver and representatives of the FTC visited the North Bergen Warehouse, the Anpesil Property, and Freehold Warehouse. On the evening of June 5, 2024, the Temporary Receiver traveled to Florida for a June 6, 2024, morning meeting with Rozenfeld.

On June 5, 2024, the Temporary Receiver spoke with Rozenfeld, utilizing the Cell Phone Number. During those calls, Rozenfeld was cooperative in providing login credentials for certain accounts of the Defendants. On that date, the Temporary Receiver also spoke with Mikhail Usher, Esq., who advised he would be representing the Defendants in this proceeding.

As also described in detail above, on June 6, 2024, the Temporary Receiver met with Rozenfeld in person in Miami at the Interview. On June 6, 2024, representatives of the FTC, including their Digital Imaging Unit, along with counsel to the Temporary Receiver arrived at the North Bergen Warehouse to image computers and two (2) laptops of certain employees. Later that evening, the Temporary Receiver returned from Miami and delivered Rozenfeld's laptop to the

---

[6] While there was a higher number of communications with the FTC and its counsel, it is based upon various requests and responsiveness from the FTC. The Temporary Receiver did not receive the same level of responsiveness or cooperation from counsel to the Defendants.

FTC for imaging.  On the morning of June 7, 2024, the FTC returned Rozenfeld's laptop to the Temporary Receiver, and arrangements were made to have the laptop overnighted for next day (weekend) delivery to Rozenfeld.

On June 10, 2024, Rozenfeld, using an e-mail address of amanda@sales.support, provided login information for certain online platforms of the Receivership Entities.

On June 10, 2024, the Temporary Receiver and his counsel had a call to discuss status and various issues with the FTC.

On June 11, 2024, Rozenfeld submitted his Financial Statement of Individuals.

On June 12, 2024, the Temporary Receiver and his counsel communicated with Amazon's legal department regarding the TRO.  A follow up call with counsel to the FTC was had the same date.

On June 17, 2024, the Temporary Receiver's counsel had a lengthy conversation with Rozenfeld and his counsel, Alex Susi, Esq., to obtain additional information.  The following is a summary of relevant information provided during that conversation:

> FBA has approximately 74 customers.  They should all still be active.  Once the customers hit certain milestones, they can use the services "*a la carte.*"
>
> Passive Scaling used the services of Optimize because it did not have the services in sales.  Optimize was supposed to do everything for the customers, and Passive Scaling allegedly paid significant fees associated with Optimize's services.  The investments by the customers were between $35,000 and $100,000 per store.  The "profit calculator" and prices and packages were set by Optimize.  Rozenfeld claimed that "half the money" paid by the customers to Passive Scaling was in turn paid to Optimize.
>
> Rozenfeld stated that the customers were unhappy with these services and determined it would be easier to manage sales themselves, which resulted in FBA's business model. Rozenfeld allegedly removed the profit guaranties, but represented that if the customers bought inventory, the inventory would sell, and offered 1-on-1 coaching services. As a result, the prices for stores associated with FBA were lower, generally between $5,000 and $6,000 per store.  All customers would get the same services for the

18

first ninety (90) days, whether they started with a larger or smaller investment. Services of virtual assistants would be provided for an hourly fee (which appeared to range from $2 to $5 per hour).  For a $6,900 investment, customers were expected to have a return of $10,000 in revenue in 3 months.  The customers were responsible for setting up their stores and there were systems allegedly in place to mitigate competition amongst the customers.  Generally, small quantities of inventory were purchased to make sure the numbers were accurate and the product sold.  Once the Amazon store was set up, then an account would be set up with a vendor, buy inventory and ship to Amazon, at which time Amazon would sort it.  It generally took 2–4 weeks from the time the purchase of inventory was made from the vendor to get the product to Amazon.  Rozenfeld stated that it generally took a month to see initial sales. Virtual assistants were only needed for new orders.  When asked about customers' complaints that they did not have access to KeHE or their inventory which made the clients reliant on the virtual assistants, Rozenfeld denied it and said it was stored in a Google sheet provided to the customer.  There were other fees that could be paid by the customers, from coaching services to warehouse services.

Additional background of the companies consistent with Rozenfeld's information at the Interview was provided.

Counsel to the Temporary Receiver specifically inquired into the lavish lifestyle items Rozenfeld posted to social media, particularly Instagram. Rozenfeld advised they were not personal assets but provided at a photo shoot paid for by Optimize.[7]

On June 17, 2024, Rozenfeld belatedly provided his Financial Statement of Corporate Defendant for 1HR.  On June 18, 2024, Rozenfeld belatedly provided the Financial Statement of Corporate Defendants FBA, Sales.Support, Hourly Relief, 3PL, FBA Support, and Daily Distro. On June 18, 2024, Rozenfeld also provided forecasted monthly revenues.  On June 19, 2024, Rozenfeld provided information regarding active Passive Scaling and FBA customers.

Based upon the negative feedback received from a significant number of customers and outstanding financial information required from the Defendants, on June 22, 2024, the Temporary Receiver informed Rozenfeld and his counsel of the decision to shut down operations of the

---

[7] Given this explanation, the luxury assets and posts of world travel were a ruse to lure clients to do business with the Defendants.

Receivership Entities and only re-open the North Bergen Warehouse to fulfill any existing orders and process returns.  *See* **Exhibit "E."**

On June 26, 2024, the Temporary Receiver learned of the BPO E-Mail (described below) and informed the FTC of same.  *See* **Exhibit "F."**  Given the concern with this communication, on July 1, 2024, the Temporary Receiver, with the assistance of the FTC, changed all e-mail passwords related to the Receivership Entities, except for the "warehouse" e-mail, which needed to be utilized in connection with implementation of the North Bergen Order.

On June 27, 2024, counsel to the Temporary Receiver had a call with Mr. Usher and Rozenfeld regarding outstanding information, at which time additional information was promised, and a follow up call was subsequently scheduled for June 28, 2024.  No additional information was received, so the June 28, 2024, call was rescheduled for some time during the week of July 1, 2024.

On July 1, 2024, the Temporary Receiver and his counsel had a follow up call with Amazon based upon Amazon's concern of compliance with the TRO.

On July 8, 2024, the Temporary Receiver and his counsel had a call with representatives of Eisner, and their stated concern that they could not prepare financial analyses based upon the information lacking from Defendants. A request for a call with Eisner, Rozenfeld and counsel was made of Mr. Usher.

On July 9, 2024, the Temporary Receiver's counsel sent notice to approximately thirty (30) known Passive Scaling customers and approximately eighty (80) known FBA customers (based upon the lists Rozenfeld provided on June 18, 2024).  Copies of the e-mails[8] are annexed as **Exhibit "G."**

---

[8] The e-mail addresses of the customers are not displayed on the copies of the e-mails annexed as Exhibit "G."

On July 10, 2024, it came to the Temporary Receiver's attention that the virtual assistants sent new communications to customers of the Receivership Entities.  *See Attachment P* to PX 36. ECF 38-15.

The Temporary Receiver reinstated operations at the North Bergen Warehouse solely to comply with the North Bergen Order on Monday, July 15, 2024.[9]

There has been unusual delay by the Internal Revenue Service in issuing the tax identification number ("**Tax ID**") to the Temporary Receiver to allow him to open a bank account; despite applying for the Tax ID on June 25, 2024, it has yet to be issued by the IRS.  Any monies received or funds paid by the Temporary Receiver have been deposited into the attorney trust account of MSB and will be transferred to the Temporary Receiver's bank account once established after the issuance of the Tax ID.

Pursuant to the TRO, Section XII(E), the Temporary Receiver has taken action to divert the mail of the Receivership Entities to the Temporary Receiver's address.

**D.  <u>Communications with Customers of Receivership Entities</u>**

Between June 11, 2024, and continuing through July 25, 2024, the Temporary Receiver and his counsel fielded calls from dozens of FBA and Passive Scaling customers.  The responses have varied drastically, from a few customers being satisfied with their services, to some being indifferent, and a third category of former or current customers who described a generally chaotic business model for which they never got a straight answer and certainly not at the profit levels promised by representatives of the Defendants.

Additional former and current customers contacted the Temporary Receiver in response to the July 9, 2024, e-mails regarding the operations.  A significantly large number of these customers

---

[9] Coincidentally, on that same date, several e-mails from virtual assistants were received by counsel to the Temporary Receiver. Any communications with virtual assistants were limited, if at all.

advised that they had not received a clear answer regarding their inventory, profits, losses, and other requested financial information. The North Bergen Employees had difficulty in providing any information regarding inventory without purchase orders or invoice information.

These comments and lack of information available to the customers formed and subsequently confirmed the Temporary Receiver's decision to cease operations of the Receivership Entities.

### E. **Reinstatement of North Bergen Warehouse for Limited Purposes**

At the end of June, 2024, the Temporary Receiver contacted Ms. Dominguez to coordinate the former North Bergen Employees to be hired as independent contractors and return to work at the North Bergen Warehouse for the limited purpose of implementing the North Bergen Order. Ms. Dominguez advised they would agree to work only if paid their past due wages of approximately $9,000, and expected to resume operations on or about Thursday, July 11, 2024.

Immediately upon entry of the North Bergen Order on the docket on June 27, 2024, the Temporary Receiver arranged with Flagstar Bank and TD Bank to release frozen funds so that the past due wages could be paid as well as pay YMB Enterprises ("**YMB**"), the primary shipper used by the Defendants at the North Bergen Warehouse.

On July 8, 2024, the Temporary Receiver received $99,754.13 from Flagstar Bank and deposited the funds in MSB's attorney trust account. Despite being informed by TD Bank on June 27, 2024 that it would take "up to three (3) business days to process the release of the levy," the Temporary Receiver did not receive funds from TD Bank until nearly one month later on July 26, 2024, and only after numerous calls were made and efforts expended by the Temporary Receiver. On July 26, 2024, a check in the amount of $51,271.83 was received from TD Bank and deposited in MSB's attorney trust account.

On July 10, 2024, Ms. Dominguez advised that the former North Bergen Employees would be able to start on Monday, July 15, 2024, instead of July 11, 2024. With the oversight of Mr. DiPaolo, operations resumed on July 15, 2024.  The Temporary Receiver visited the North Bergen Warehouse on July 16, 2024. Operations continue and the Temporary Receiver is taking action to clear out the North Bergen Warehouse in the most expeditious manner possible, for the benefit of the customers and the landlord so that unnecessary rent or other fees do not accrue.

**F.  <u>Missing Financial Information and Contempt of TRO by Rozenfeld</u>**

While Rozenfeld appeared to be forthcoming and cooperative in the early days of this litigation, he (through counsel), has failed to have any meaningful conversations or provide any information since approximately June 27, 2024 (*see* Footnote 5, above).

Most significantly, the Temporary Receiver has determined with certainty that Rozenfeld has repeatedly misrepresented that he does not use his Cell Phone for business purposes.  The Cell Phone Number was provided by former employee(s) as a contact for Rozenfeld and was the phone number provided by Ms. Dominguez on June 5, 2024.  It has appeared as the contact number for DockNLoad Logistics (*see* **Exhibit "H"**), the Freehold Warehouse and other business-related applications submitted by Defendants including, but not limited to, an Intuit Merchant Application.[10]  The Temporary Receiver gave Rozenfeld ample opportunity to be truthful and voluntarily turn over his Cell Phone, which demands have gone wholly ignored.  *See* e-mail dated July 18, 2024, annexed as **Exhibit "H."**  *__The Temporary Receiver requests an order holding Rozenfeld in contempt of the TRO for failing to turn over his Cell Phone and also compelling him to do so or suffer sanctions if he continues to be in contempt.__*

---

[10] The Intuit Application was designated as confidential and is not being produced here.  It is available for *in camera* review by the Court and/or counsel to the parties.

As of this date, the Financial Statement of Corporate Defendants have not been produced for Passive Scaling or Wraith, in violation of the Financial Disclosures Section V of the TRO, which required production within five (5) days of service of the TRO.  Moreover, Defendants have not executed the IRS Form 4506 (Request for Copy of a Tax Return) pursuant to Section V.[11]

Pursuant to Section VI of the TRO, Foreign Asset Repatriation, Defendants were required, within five (5) days of service of the TRO, to provide the FTC and Temporary Receiver with a full accounting, of any assets and documents and accounts outside of the United States, execute a Consent to Release of Financial Records, and transfer to the United States any documents and assets located in foreign countries.  Despite demand, no such information has not been produced as of this date.

Pursuant to Section IX of the TRO, Rozenfeld and/or agents or representatives of the Receivership Entities, were required to preserve records.  In addition to failing to produce information, according to information obtained from the FTC's Digital Imaging Unit, Rozenfeld and various employees of the Receivership Entities appeared to have mutilated and modified information in the Defendants' records.  *See Attachment D* to Declaration of Richard Kaplan filed by the FTC at PX 34, ECF 38-12.  Moreover, on or about June 26, 2024, virtual assistants employed by the Receivership Entities contacted customers of the Receivership Entities to direct (and therefore convert) payment due and owing to Defendants to the Bank of Philippines ("**BPO E-Mail**").  *See* **Exhibit "F."**  These communications from the virtual assistants are particularly troubling considering on June 22, 2024, the Temporary Receiver informed Rozenfeld that he would not be continuing the Defendants' business operations mere days prior. The virtual

---

[11] On June 17, 2024, Rozenfeld belatedly produced the Financial Statement of Corporate Defendant 1HR.  On June 18, 2024, Rozenfeld belatedly produced the Financial Statement of Corporate Defendants FBA, Sales.Support, Hourly Relief, 3PL, FBA Support, and Daily Distro.

assistants, through Infitel BPO, sought to circumvent the Temporary Receiver's decision pursuant to his powers and duties under the TRO, and made blatant attempts to divert assets of the Receivership Entities to overseas bank accounts. Rozenfeld is copied on the communications. As a result, upon learning of the BPO E-Mail, on or about July 1, 2024, all passwords for any e-mails associated with the Defendants (except for the North Bergen Warehouse so orders could be processed) were changed, with the assistance of the FTC's Digital Imaging Unit.

On July 10, 2024, Rozenfeld, utilizing the e-mail stevenrozenfba@gmail.com, e-mailed customers of the Receivership Entities. *See Attachment P* to the Third Declaration of Reeve Tyndall. ECF 38-15 (2650-2653). On that same date, the virtual assistants once again contacted customers of the Receivership Entities advising a "new warehouse" was up and running and requested payment of $100. *Id*. at 2654-2655. Rozenfeld has failed to provide any information regarding any new business activities, in violation of Section X of the TRO.

Eisner preliminarily reviewed information obtained from third parties, including bank statements produced by financial institution(s) and certain information voluntarily produced by Defendants. On June 24, 2024, the following documents were requested from counsel to Defendants: (a) breakout of projected revenues and operating expenses by type; (b) copies of supporting assumptions, components, calculations and supporting documentation and analyses that support projected revenues and operating expenses; (c) copies of prior years (2020 through 2023) and current fiscal year 2024 financial statements including balance sheets and statements of profits and losses; (d) copies of Federal and State tax returns for 2020 through 2023 or latest years filed; and (e) copies of general ledgers for the January 1, 2020, through May 2024. Several attempts to obtain additional information and to schedule a call between Eisner and Rozenfeld went ignored

by Defendants.  A copy of the e-mail chain between counsel to the Temporary Receiver and

counsel to Defendants between June 24, 2024, and July 11, 2024 is annexed as **Exhibit "J."**

As of the issuance of this Report, the Defendants have not provided the Temporary

Receiver with a complete list of known assets, the Financial Statements for Corporate Defendants

Passive Scaling and Wraith, and have failed to provide additional financial information required

by Eisner. Therefore, the Temporary Receiver has been unable to fulfill his obligations with

respect to Section XII(L) of the TRO in that neither he nor his retained accountants, Eisner, have

been able to accurately "make an accounting, as soon as practicable, of the Assets and financial

condition of the receivership and file the accounting with the Court and deliver copies thereof to

all parties."

Given these issues and recognizing the litigation is still in its early stages, at this point, the

Temporary Receiver is unable to make a determination regarding the Defendants' true financial

condition, including where potentially millions of dollars obtained by the Defendants went

(offshore or otherwise), or if the funds were carelessly spent on a lavish lifestyle Rozenfeld did

not have the ability to fund on his own, with the public being fooled by the façade Rozenfeld

portrayed on social media.

### G.  Temporary Receiver's Notice Regarding Additional Receivership Entities[12]

Pursuant to the TRO, Section XII(U), if the Temporary Receiver "identifies a nonparty

entity as a Receivership Entity" he shall "promptly notify the entity as well as the parties, and

inform the entity that it can challenge the Receiver's determination by filing a motion with the

Court . . ."  Based upon information obtained by the FTC and the Temporary Receiver's

investigation, the Temporary Receiver has determined that the following non-Receivership

---

[12] Each of the entities listed below is in inactive status with the respective State filing offices based upon the failure to file annual reports.

Entities should each be designated as a Receivership Entity and treated as such moving forward: (a) 1800 NE 27th Corp. ("**1800 NE**") and (b) OGAMZPL21 Inc. ("**OGAMZPL21**"). As such, notice is hereby given to 1800 NE and OGAMZPL21 that it may challenge the Temporary Receiver's determination by filing a motion with the Court.

### 1. 1800 NE 27TH CORP

According to public records, 1800 NE was formed on November 12, 2021, with the State of Florida and lists Rozenfeld as the officer and director. A copy of the information obtained from Florida Division of Corporations is annexed as **Exhibit "K."**

As set forth in each of the seven (7) Financial Statements of the Corporate Defendants, Rozenfeld disclosed an interest in 1800 NE in Item 8 – Business Related to Individuals.[13] Moreover, in connection with limited bank accounts obtained for 1800 NE reveal payments to Tesla (which, upon information and belief, the vehicle drove by Rozenfeld and/or A. Rozenfeld), payments for rent on 1919 Sunrise Key Boulevard, Fort Lauderdale, Florida (according to Rozenfeld's Financial Statement for Individuals, was a rental property for Rozenfeld from February 1, 2024 through June 1, 2024), payments for the Florida Property, payments from AirBNB (which, upon information and belief, relate to the Townhouse and/or Florida Property), and various transfers between FBA Support and Daily Distro bank accounts.

### 2. OGAMZPL21 INC

According to public records, OGAMZPL21 was formed on December 14, 2021, with the State of New Jersey and lists Rozenfeld as the principal. A copy of the information obtained from the State of New Jersey, Business Records Service, is annexed as **Exhibit "L."**

---

[13] Item 8 requires the deponent to "list all corporations, partnerships, and other business entities in which the Corporation's principal stockholders, board members, or officers (*i.e.* the individuals listed in Items 4 – 6 above) have an ownership interest."

Additionally, in connection with limited bank account information obtained for OGAMZPL21, there were transfers between accounts owned by Defendants FBA Support and 1HR.

Because each of these entities has conducted business related to the Defendants, including receipt of assets derived from activities that are the subject of the Complaint in this matter, and the Temporary Receiver has determined that it is controlled and/or owned by Rozenfeld, the Receiver submits that these entities are Receivership Entities, subject to the provisions of the TRO.

The Temporary Receiver reserves the right to identify additional entities that may constitute additional Receivership Entities.

**H.  Miscellaneous Information**

**1.  Creditors of Defendants**

**a.  Zoeller Pump Company**

On July 17, 2024, the Temporary Receiver was contacted by counsel to Zoeller Pump Company ("**Zoeller**"), regarding past-due amounts from Daily Distro in excess of $324,000.  A copy of the statement received from Zoeller is annexed as **Exhibit "M."**  Shortly before receiving the e-mail, Ms. Dudas already had scheduled a call with Ms. Dominguez, to discuss certain issues involving inventory and returns that are being processed for the North Bergen Warehouse. Ms. Dominguez mentioned that while customers bought directly from KeHE, the Receivership Entities, specifically Daily Distro, "also purchased their own inventory."  Based upon this comment, Ms. Dudas asked whether Ms. Dominguez ever heard of Zoeller, and she responded in the affirmative, that is one of the companies Daily Distro regularly bought from directly.  Ms. Dominguez advised that the process was that Daily Distro would purchase the inventory from

Zoeller, and then 1HR would sell it to the customer.  Ms. Dominguez stated that the customer paid

for the product before it was ordered.

### b.  *No-Vell*

On July 27, 2024, Ms. Dudas received a call from Ms. Dominguez because someone came

to the North Bergen Warehouse unannounced to reclaim Thrift cleaning product (by way of

background, Ms. Dominguez advised that because it is cleaning product, it cannot be sold through

Amazon due to it being flammable and it was sold by the company directly).  Kevin Gordon from

No-Vell spoke with Mr. DiPaolo, who referred him to Ms. Dudas.  No-Vell was unaware of the

lawsuit and left immediately without causing any issue.  Mr. Gordon stated that No-Vell is the

local distributor for Thrift and sold to Daily Distro.  It is owed about $35,000, and it observed

about $18,000 worth of product at the North Bergen Warehouse (about 3 pallets worth).

### c.  *Landlords and Other Creditors*

The Landlord for the Anpesil Property advised it was owed nearly $4,400 in rents (*see*

**Exhibit "C"**).  A small warehouse in Illinois (DockNLoad) is owed approximately $1,200.  YMB,

the primary shipper for the North Bergen Warehouse was owed $7,083 for May 2024, and June 4,

2024.  *See* e-mail between Ms. Dudas and YMB dated June 25, 2024, annexed as **Exhibit "N."**

The Temporary Receiver paid Google approximately $2,500 on July 11, 2024, to reinstate the

Defendants' Google Suite so the warehouse e-mail could be reinstated to process the orders at the

North Bergen Warehouse pursuant to the North Bergen Order.  The landlord for the Freehold

Property asserted it is owed approximately $20,000.  The Temporary Receiver has received

conflicting information regarding the amounts due and owing to the landlord for the North Bergen

Warehouse, but that landlord asserts it is owed $22,139.45 for the B-2 unit, and $21,870.52 for

Unit 102 (which amounts the Temporary Receiver disputes).[14]  *See* statements received on July 23, 2024, attached as **Exhibit "O."**  Many customers of FBA and/or Passive Scaling have asserted they are entitled to a return on their initial investment based upon the failure to meet revenue guaranties contained in their contracts with FBA and/or Passive Scaling.  Mr. Desai advised he is owed in excess of $11,000 for past due salary.

### 2.    Potential Additional Fraud by Defendants

There is concern that the issues with Zoeller reveals potential deception by the Defendants, because Daily Distro would buy the product from Zoeller, the customer would pay 1HR for the product, and the vendor (Zoeller) was never paid in turn by either entity.

Moreover, in the July 17, 2024, interview with Ms. Dominguez, in connection with the processing of returns under the North Bergen Order (which supposedly made up the 500 or so packages), Ms. Dominguez said the Receivership Entities never returned the returned products to the customers, because the "customers never wanted them back."  This conflicts with complaints from customers regarding lost or unaccounted for returns.  Instead, 1HR would re-sell the "returns" and Mr. Desai was in charge of processing the re-sold returns.  Ms. Dominguez stated that with the other Receivership Entities shut down, they did not have anywhere to ship the returns if 1HR is not operating because they cannot in turn sell the product to its customers.  The Temporary Receiver intends to move returns that are not damaged or unsellable to a separate warehouse in Riverdale, New Jersey, for storage and, if necessary, eventual sale to bring additional funds into the receivership estate.

---

[14] For instance, why would the North Bergen Warehouse landlord allow the Defendants to take larger space in the B-2 unit if there were still amounts due and owing from April owed for Unit 102?  Moreover, why would the landlord continue to bill for Unit 102 if the Defendants moved to the Unit B-2?

**3.      Lawsuit[15]**

As of the Filing Date, there was pending litigation in the Circuit Court for Pinellas County Florida captioned *James David Wegener v. Passive Scaling, Inc.* bearing Civil Action File No. (the "**Wegener Complaint**").  The Wegener Complaint demands $25,000 allegedly due and owing to Mr. Wegener from Passive Scaling. On June 7, 2024, MSB notified Honorable Thomas M. Ramsberger of the Sixth Judicial Circuit Court of Florida (the "**Florida Court**") that the TRO provided for a stay of all the Receivership Defendants.  Ms. Placona was requested to appear before the Florida Court on June 24, 2024.  Ms. Placona advised the Florida Court of the TRO however, the Florida Court advised the Supreme Court of Florida that there was an Order in place that prohibited the stay.  The Florida Court questioned the jurisdiction of the United States District Court, District of New Jersey, and specifically the TRO's validity over the Florida Court.  Counsel for Wegener submitted an Order Denying the Stay.

Ms. Placona later provided counsel for Mr. Wegener the case law authority for the stay over the Florida Court.  Ms. Placona and counsel for Mr. Wegener thereafter agreed to file a joint motion to stay the Complaint.  The joint motion has been filed with the Florida Court.  A hearing is scheduled for September 4, 2024, at 3:15 p.m.

---

[15] According to public records, there are other lawsuits filed against the Defendants.  The Wegener Complaint is included in this Report given the Temporary Receiver's involvement in the Florida Court.

## <u>CONCLUSION</u>

The Temporary Receiver shall continue to administer the Defendants' estate and act in accordance with the TRO until further order of this Court or the time he is formally discharged by the Court.

Dated: July 28, 2024             /s/ Anthony Sodono, III

                                             ANTHONY SODONO, III
                                             Temporary Receiver