Frances L. Kern
Colleen Robbins
Federal Trade Commission
600 Pennsylvania Ave, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202) 326-3395 (Fax)

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> THEFBAMACHINE INC. et al., <br><br> Defendants. | CIVIL ACTION NO. 24-CV-6635 (JXN) (LDW) |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR PRELIMINARY INJUNCTION WITH OTHER EQUITABLE RELIEF AS TO AMANDA ROZENFELD**

**TABLE OF CONTENTS**

I. THE FTC HAS SHOWN IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST PEREMEN. ................................................................... 1

    A. Peremen Directly Participated in the Violative Conduct. ................................. 1

        1. The Evidence Refutes Peremen's Sworn Statement………………………2

        2. Even if Someone Impersonated Peremen, Additional Evidence Shows She Directly Participated……………………………………………………………3

    B. Peremen Had the Requisite Knowledge for Individual Liability. ..................... 4

    C. Peremen's Self-Serving Affidavit Does Not Require the Court to Deny the PI ................................................................................................................... 5

II. THE EQUITIES WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION..... 7

III. THE COURT SHOULD PRELIMINARILY FREEZE PEREMEN'S ASSETS AND ALLOW EXPEDITED DISCOVERY TO PRESERVE THE POSSIBILITY OF REFUNDS TO DEFENDANTS' VICTIMS............................ 7

IV. CONCLUSION ........................................................................................................ 9

# TABLE OF AUTHORITIES

**Cases**

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, 793 F.3d 313 (3d Cir. 2015) ..................... 6

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3d Cir. 1993) ....................................................... 8

*Collick v. Weeks Marine, Inc.*, 397 F. App'x 762 (3d Cir. 2010) .................................................... 6

*FTC v. Millennium Telecard*, No. 11-2479, 2011 WL 2745963 (D.N.J. July 12, 2011) ................. 4

*FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492 (D.N.J. Aug. 11, 1997) ........ 7

*FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) ........................... 7

*FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193 (3d Cir. 2019).......................................... 1, 7

*FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) .......................................................................... 7

*FTC v. World Patent Mktg.*, No. 17-cv-20848, 2017 WL 3508639 (S.D. Fla. Aug. 16, 2017)....... 8

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 334 (9th Cir. 1989).................................................1, 7

*In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424 (D.N.J. 1998).................................................. 1

*In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380 (D. Md. 2019) ................................................ 8

*Jackson v. Se. Penn. Transp. Auth.*, No. 21-2671, 2023 WL 195156 ............................................ 6

*Kashmir Crown Baking LLC v. Kashmir Foods, Inc.*, No. 12-cv-01780, 2013 WL 12142539
   (D.N.J. Jan. 18, 2013) ................................................................................................................ 6

*Schoch v. First Fid. Bancorporation*, 912 F.2d 654 (3d Cir. 1990) .............................................. 6

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000).................................................................7-8

*SEC v. Manor Nursing Ctr.*, 458 F.2d 1082 (2d Cir. 1972)............................................................ 8

**Statute**

15 U.S.C. § 53(b) ........................................................................................................................ 1, 7

# TABLE OF EXHIBITS

| Exhibit | Description | Bates Range |
|---|---|---|
| PX 1 | Declaration of Kirk Bausch | 1–75 |
| PX 2 | Declaration of Eueal Berta | 76–124 |
| PX 3 | Declaration of Michael Hickenlooper | 125–53 |
| PX 4 | Declaration of Giordano Lanuto | 154–77 |
| PX 5 | Declaration of Carlos Angeles, III | 178–222 |
| PX 6 | Declaration of Acacia Chidi | 223–58 |
| PX 7 | Declaration of Alvaro Lizaraso | 259–324 |
| PX 8 | Declaration of Kayleigh Severn | 325–410 |
| PX 9 | Declaration of Pankil Shah | 411–513 |
| PX 10 | Declaration of Shona Killoughery | 514–73 |
| PX 11 | Declaration of Alpesh Patel | 574–630 |
| PX 12 | Declaration of Nichelle Washington | 631–63 |
| PX 13 | Declaration of Lynn Rojas | 664–762 |
| PX 14 | Declaration of Kenny Craig | 763–876 |
| PX 15 | Declaration of Ross Laughter | 877–911 |
| PX 16 | Declaration of Ernest Balenzuela | 912–81 |
| PX 17 | Declaration of Andrew Easton | 982–1073 |
| PX 18 | Declaration of Tyler Broome | 1074–1100 |
| PX 19 | Declaration of Elizabeth Anne Miles | 1101–28 |
| PX 20 | Declaration of Reeve Tyndall | 1129–1503 |
| PX 21 | Declaration of Alison Briginshaw | 1504–31 |
| PX 22 | Declaration of Manny Bayo | 1532–33 |
| PX 23 | Second Declaration of Reeve Tyndall | 1534–57 |
| PX 24 | Declaration of Matthew Genes | 1558–1761 |
| PX 25 | Declaration of Terry Cooke | 1762–64 |
| PX 26 | Declaration of Karen Denny | 1765–67 |
| PX 27 | Declaration of James Deren | 1768–78 |
| PX 28 | Declaration of Mark Ramirez | 1779–82 |
| PX 29 | Declaration of Ian Plocher | 1783–1818 |
| PX 30 | Declaration of Luke Rotta | 1819–1903 |
| PX 31 | Declaration of Benjamin Vafai | 1904–05 |
| PX 32 | Declaration of Jatinder Vij | 1906–07 |
| PX 33 | Declaration of Bryce Wilbanks | 1908–10 |
| PX 34 | Declaration of Richard Kaplan | 1911–2379 |

| Exhibit | Description | Bates Range |
|---|---|---|
| PX 34 | Declaration of Richard Kaplan | 1911–2379 |
| PX 35 | Second Declaration of Tyler Broome | 2380–82 |
| PX 36 | Third Declaration of Reeve Tyndall | 2383–2697 |
| PX 37 | Third Declaration of Tyler Broome | 2698–3351 |

I.  **THE FTC HAS SHOWN IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST PEREMEN.**

The FTC has shown that defendant Amanda Rozenfeld, aka Amanda Peremen ("Peremen"), participated directly in Defendants' scheme and, at the very least, had an awareness of a high probability of fraud along with an intentional avoidance of the truth. Despite her protestations to the contrary in a self-serving affidavit, the FTC has additional evidence that corroborates its position. Thus, Plaintiff has shown a likelihood of success on the merits, and the evidence establishes that Peremen should be held liable for injunctive and monetary relief for Defendants' violations.

   A.  **Peremen Directly Participated in the Violative Conduct.[1]**

In response to the FTC's voluminous evidence that Peremen participated directly in the conduct of the corporate defendants ("Corporate Defendants") – including by signing consumers' contracts as Operations Manager,[2] receiving consumer complaints,[3] being billed for job postings and domain registrations,[4] and being named on debt collection emails, account management chargeback notices, and accounting summary emails[5] – Peremen argues that she "only learned of the operations, business practices, and industry of the Corporate Defendants after reading FTC's Amended Complaint." (Def.'s Br. at 3). This appears to be based on a contention that an imposter has been posing as her and forging her signature. However, the evidence provides many reasons

---

[1] Peremen cites *FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193, 197 (3d Cir. 2019) to argue the Court must consider a four-part test for injunctive relief (Def's Br. at 4, 9) and that Plaintiff has not demonstrated irreparable harm if injunctive relief is not granted (*id.* at 9). Peremen has cited the wrong standard. In *Penn State*, the court makes clear that the more stringent four-part test is not applicable for actions brought under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). 914 F.3d at 197. In addition, because this is a statutory enforcement action, irreparable harm is presumed. *See, e..g.*, *FTC v. World Wide Factors, Ltd.*, 882 F.2d 334, 346 (9th Cir. 1989) ("Harm to the public interest is presumed."); *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 439 (D.N.J. 1998) ("The passage of the FTC [Act] . . . results in an implied finding that violations of this statutory enactment will harm the public and should be restrained if necessary.").

[2] PX 1, Att. B, p. 33; PX 2, Att. B, p. 104; PX 7, Att. C, p. 293; PX 8, Att. A, p. 354; PX 9, Att. B, p. 441; PX 13, Att. E, p. 710; PX 14, Att. B, p. 796; PX 37, Att. A, pp. 2724–48, 3166–73 (18 additional contracts).

[3] PX 13, Att. L, p. 732; PX 23, Att. B, p. 1538; PX 37, Att. A, pp. 3164–65, 3174–77.

[4] PX 37, Att. A, pp. 2980–3005, 3196–99.

[5] PX 23 ¶ 9; PX 37, Att. A, pp. 2960–79, 3040–96, 3101–14, 3126–47.

not to accept Pereman's affidavit at face value. In addition, further evidence shows that even if one does take the imposter theory at face value, Peremen herself was nonetheless directly involved in the Defendants' scheme.

### 1. The Evidence Refutes Peremen's Sworn Statement.

Peremen states that the first time she "learned any information about how these companies operate, or even what industry they are in" was when she read the FTC's Amended Complaint, and she has no knowledge of the function or operations of the Corporate Defendants. (Def's Br., Ex. A ¶¶ 4, 7). This is belied by the evidence. The FTC sent Peremen an asset freeze preservation request and the TRO on June 6, 2024, three days after Rozenfeld's and Peremen's joint assets were frozen.[6] In addition, it is evident from Peremen's Instagram account that she follows her husband, co-defendant Bratislav Rozenfeld ("Rozenfeld"), on his KingofAmzn Instagram account where he says "I help 9-5ers make money & invest with Amazon," promotes "7-Figure Amazon FBA Accelerator," and says "DM me 'Amazon' to get started." His stories include posts about the FBA Machine and Passive Scaling, in particular.[7] Not only does Peremen follow the account, but she has commented and liked multiple posts, including videos where their children appear with Rozenfeld.[8]

In addition, Rozenfeld asked Peremen to email a vendor in China with the American Express credit card information for purchasing inventory in September 2021. Peremen responded using her personal email address and provided the credit card information.[9] Peremen also received at her personal email address a message about a virtual session hosted by Amazon for "Warehouse and Shopper Team" jobs.[10] Finally, the Corporate Defendants managed two Walmart stores in Peremen's name, in which she was scheduled to receive a share of the revenue.[11] Given

---

[6] PX 37, Att. D, pp. 3317–51.

[7] PX 20 ¶ 32; PX 37 ¶ 3.

[8] PX 37 ¶¶ 4–5.

[9] PX 37, Att. A, p. 3305.

[10] PX 37, Att. A, pp. 3180-3181.

[11] PX 37 ¶ 9 & Att. A, pp. 3278–79 (emphasis added).

all this evidence, it is difficult to imagine that she had no knowledge about the Defendants or even the industry they are in.

Peremen also claims that she was never involved in the operation of the Corporate Defendants (Def's Br., Ex. A ¶ 7) and never consented to the use of her name or signature (*id*. ¶ 9). Again, this appears to be untrue. On February 24, 2021, Peremen signed a lease for a new warehouse used by Corporate Defendants at 10 Milltown Court in New Jersey. Peremen initialed each page, signed the lease agreement, and even signed as a guarantor with a witness.[12] The contract says that the guarantor represents that it is a "principal" of the tenant.[13] The original tenant was Closter Green Corp., doing business as Wraith & Co., but was subsequently changed to FBA Support NJ Corp.[14] In addition, in an email from Passive Scaling's sales arm, Optimyze Digital, the sales representative answered a consumer who had just signed up and had a question, "Oh I'm sorry! I asked Amanda and *she said she responded*. I'll let her confirm, but I think you are all set."[15] Finally, the FTC has additional evidence that implicates Peremen in this scheme and refutes her impersonator and non-involvement claims, but the FTC believes the Court should review this evidence *in camera* at the preliminary injunction hearing so that it can hear argument on potential evidentiary issues. These facts directly contradict her statements and call into question the trustworthiness of her entire sworn affidavit.

### 2. Even if Someone Impersonated Peremen, Additional Evidence Shows She Directly Participated.

Even if the Court takes Peremen's assertions at face value and disregards dozens of signed consumer contracts for Passive Scaling, merchant account records for several payment processors, and Corporate Defendant invoices paid using a credit card in her name, the FTC has additional evidence that corroborates that she directly participated. Peremen has been on the payroll for Daily Distro since at least early 2021, and, contrary to her assertions, she consistently

---

[12] PX 37, Att. A, pp. 3150–63, 3188–95, 3200–65.
[13] *Id*. at 3222.
[14] *Id*. at 3188.
[15] PX 37, Att. A, p. 3302.

has been listed as an employee.[16] As mentioned above, Peremen signed a lease for a warehouse for the Corporate Defendants that was used to facilitate the scam, and she personally provided the credit card used to purchase inventory from a warehouse in China.[17] In addition, Peremen's personal American Express credit card was used to pay a $93,600 credit card charge from Goli, in addition to her personal expenses.[18] Passive Scaling filled its clients' Walmart and Amazon stores with Goli products.[19] This is evidence that is not subject to the imposter defense and shows that she directly participated in Defendants' scheme.

### B. Peremen Had the Requisite Knowledge for Individual Liability.

Peremen contends that Plaintiff has not established that she has knowledge of Corporate Defendants' unlawful practices to hold her liable for monetary relief. (Def.'s Br. at 8–9.) Although Peremen sets out the correct standard, she ignores two of the three bases through which Plaintiff can establish knowledge.

Even if Peremen did not have actual knowledge of the material misrepresentations challenged in this action, the evidence shows she, at the very least, had an awareness of a high probability of fraud along with an intentional avoidance of the truth. *See FTC v. Millennium Telecard*, No. 11-2479, 2011 WL 2745963, at *9 (D.N.J. July 12, 2011). Rozenfeld solicited consumers into his Amazon business, including using earnings claims, on his Instagram page, KingofAmzn. Peremen followed his page which says on its face, "I help 9-5ers make money & invest with Amazon" and "7-Figure Amazon FBA Accelerator." She also liked and commented on many posts, including where Rozenfeld says, "it's time to redefine your reality with Amazon FBA," "break free from the mundane 9-5 existence," "want to scale your Amazon FBA," "how to become a millionaire," "learn more about increasing your profits," "here's the key to reaching 100 million with your business," and "if you're hungry for success and eager to grow your

---

[16] PX 37, Att. A, pp. 3006–39, 3097–99, 3115–25, 3280–99.

[17] *See supra* nn. 9, 12.

[18] PX 37 ¶ 13.

[19] *See, e.g.*, PX 8 ¶ 15; *see also* PX 5, ¶¶ 9–17.

business, take action now. Send me a DM or dop a comment with the word 'SUCCESSFUL.'"[20] In February 2021, the same month Passive Scaling started to operate, she signed a lease in one of Corporate Defendant's names.[21] It also appears Peremen did in fact speak with Passive Scaling consumers.[22] In addition, she had two Walmart stores that Corporate Defendants operated on her behalf in which she was supposed to receive a revenue share in the profits, but the stores were not profitable.[23]

Then, on July 6, 2023, a process server attempted to serve Peremen at her home in New Jersey with a complaint against Passive Scaling.[24] Peremen refused to provide her last name and refused to accept service. She then called Rozenfeld, who said on speakerphone that she was authorized to accept service.[25] Again, in March 2024, a process server attempted to serve Peremen at her home in New Jersey with a complaint against Passive Scaling. Peremen first said that Rozenfeld did not live there and she did not know where he was.[26] When the process server handed Peremen the papers, since the address was the company's registered address, Peremen lied and told him her name was Samantha.[27] Peremen actively thwarted service on two occasions—not the actions of someone who was completely unaware of her husband's businesses. All this evidence shows, at the very least, an awareness of a high probability of fraud along with an intentional avoidance of the truth.

### C. Peremen's Self-Serving Affidavit Does Not Require the Court to Deny the PI.

Peremen argues that the affidavit she submitted in support of her response "inevitably" creates a credibility question requiring the Court to deny Plaintiff's application for a PI. (Def.'s

---

[20] PX 20 ¶ 32 & Att. AA, p. 1311–12; PX 37 ¶¶ 3–4.

[21] *See supra* n. 12.

[22] *See supra* n. 15.

[23] *See supra* n. 11.

[24] PX 23, Att. C, p. 1541.

[25] *Id*.

[26] PX 22 ¶¶ 3, 7.

[27] *Id*. ¶ 8.

Br. at 5.) Such an argument is nonsensical. By Peremen's reading of the law, courts would effectively grant preliminary injunctions only in cases where the defendants are in default, since every litigant faced with a potential preliminary injunction holds a get-out-of-jail-free card in the form of an affidavit asserting mere blanket denials of the movant's evidence. In the same way "unsupported allegations . . . and pleadings are insufficient to repel summary judgment," *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990), the filing of a bare-bones affidavit of general denials is inadequate to automatically defeat a preliminary injunction application.[28]

While an "abundance of contradictory facts on *both sides* of the record," *Collick v. Weeks Marine, Inc.*, 397 F. App'x 762, 764 (3d Cir. 2010) (emphasis added), may mean a movant is unable to establish a likelihood of success on the merits to obtain a PI, that is far from the case here. Plaintiff has submitted over 3,000 pages of evidence from multiple witnesses, while Peremen relies on a cursory, four-page affidavit devoid of detail. If the Court is unable to ascertain the reliability of the evidence on the record, then a hearing—not a summary denial—is the appropriate remedy. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, 793 F.3d 313, 324, 326 (3d Cir. 2015) (holding that district court's denial of preliminary injunction based on movant's failure to establish likelihood of success on the merits was error when credibility was an issue and the court did not hold an evidentiary hearing, explain its rationale for discounting certain evidence, or hear oral argument).

---

[28] While a preliminary injunction and summary judgment differ in important substantive and procedural ways, both instances require the court to consider whether purported factual disputes are genuine. *See Jackson v. Se. Penn. Transp. Auth.*, No. 21-2671, 2023 WL 195156, at *7 (3d Cir. Jan. 17, 2023) (holding that plaintiff did not establish a genuine issue of material fact to defeat summary judgment when plaintiff's evidence was a single declaration containing statements that "are either conclusory, contrary to the facts, or not material to the issues presented"); *Kashmir Crown Baking LLC v. Kashmir Foods, Inc.*, No. 12-cv-01780, 2013 WL 12142539, at *7, *9 (D.N.J. Jan. 18, 2013) (noting that defendant's proffer of "substantial evidence that calls into question the validity" of the plaintiff's trademark meant a preliminary injunction was not appropriate because the evidence "presents material issues of fact that cannot be resolved *on this record*" (emphasis added)).

## II. THE EQUITIES WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION.

Once the FTC has established a likelihood of success on the merits of its claims, the court must weigh the equities to determine whether an injunction is in the public interest. *Penn State Hershey Med. Ctr.*, 914 F.3d at 197 (applying the two-part standard for preliminary injunction set forth in Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)). "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors*, 882 F.2d at 347. Peremen argues that the equities weigh against issuing a preliminary injunction against her. (Def.'s Br. at 11–12.) Specifically, she argues that "the balance of the equities only tips in the Plaintiff's favor if the assets the plaintiff targets are commensurate with any ill-gotten gains." (Def's Br. at 12). This is simply not the law. *FTC v. Ross*, 897 F. Supp. 2d 369, 388 (D. Md. 2012) ("[O]nce a defendant is found to be individually liable for a corporate defendant's deceptive acts, he or she is jointly and severally liable for the total amount of consumer redress."). While Defendants' scheme defrauded consumers of more than $15 million and some of its spoils were used to purchase a $1.275 million home,[29] far, far less has been frozen.[30] Given the deception involved in Defendants' scheme and Peremen's awareness of and participation in it, "the public interest in preventing further violations of the law and preserving viable assets outweighs an individual's interest in protecting potentially ill-gotten profits," *FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492, at *3 (D.N.J. Aug. 11, 1997).

## III. THE COURT SHOULD PRELIMINARILY FREEZE PEREMEN'S ASSETS AND ALLOW EXPEDITED DISCOVERY TO PRESERVE THE POSSIBILITY OF REFUNDS TO DEFENDANTS' VICTIMS.

An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits of a Section 19 claim and the refund of money would be an appropriate final remedy. *See FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466, at *5 (D. Ariz. Sept. 23, 2021). "A freeze of assets is designed to preserve the status quo by preventing the dissipation and

---

[29] PX 18 ¶ 83; PX 35 ¶ 7.

[30] PX 23 ¶ 8 (noting that, as of June 26, 2024, less than $196,000 in cash and marketable securities were frozen).

7

diversion of assets." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993)). "Dissipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress." *FTC v. World Patent Mktg.*, No. 17-cv-20848, 2017 WL 3508639, at *17 (S.D. Fla. Aug. 16, 2017). Where "the law presumes irreparable harm, as in an FTC enforcement action, the FTC need only establish 'a possibility of dissipation of assets'" to obtain an asset freeze. *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 419 (D. Md. 2019).

An asset freeze is necessary here to preserve the status quo, ensure that funds do not disappear during the course of the action, and preserve assets for consumer redress. Defendants' business model is permeated with deceptive and unfair practices, and they have taken in at least $15.9 million from consumers. Where a company's business operations are permeated by fraud, as they are here, courts have found a strong likelihood that assets may be dissipated during the pendency of the case. *SEC v. Manor Nursing Ctr.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money"). Some courts also consider whether the amount of frozen assets will be sufficient to compensate consumers.[31] Here, the frozen funds pale in comparison to the amount of consumer harm.[32]

Credit card statements show that between June and August 2021, Peremen spent over $130,000 on her personal American Express card. The statements include mostly personal spending on luxury handbags (e.g., Louis Vuitton), luxury clothing (e.g., Christian Dior Couture), jewelry, and travel.[33] Among her personal charges, there is a $93,600 charge for Goli

---

[31] *See, e.g., World Patent Mktg.,* 2017 WL 3508639, at *17 ("Dissipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress.").

[32] PX 18 ¶ 82; PX 23 ¶ 8 (stating that, as of June 26, 2024, a total of approximately $195,500 in cash and marketable securities was frozen, of which approximately $56,300 is held by Rozenfeld individually or jointly with Peremen).

[33] PX 37 ¶ 13.

products, inventory used to stock Passive Scaling clients' stores.[34] This type of spending will certainly dissipate assets. Since the Court issued the TRO in June, the evidence also shows that Peremen took a trip to Paris.[35] As mentioned prior, Rozenfeld has used some of the spoils of this scheme to purchase a $1.275 million home he shares with Peremen. The best way to preserve funds for effective final relief, on behalf of the many consumers who have lost their hard-earned money, is to freeze Peremen's assets up to the amount of consumer injury, $15.9 million, and allow for limited expedited discovery.

### IV.   CONCLUSION

In the face of the FTC's contrary evidence, Peremen's pleas that she is ignorant of Defendants' scheme are not credible. Because Plaintiff has demonstrated it is likely to succeed on the merits of its claims against Peremen and the equities weigh in its favor, the Court should grant Plaintiff's application for a preliminary injunction against Amanda Rozenfeld.

Dated:  August 19, 2024

Respectfully submitted,

*Colleen Robbins*
Frances L. Kern (Minnesota Bar No. 0395233)
Colleen Robbins (New Jersey Bar No. 027091997)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-2391; fkern@ftc.gov (Kern)
(202) 326-2548; crobbins@ftc.gov (Robbins)
(202) 326-3395 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[34] *Id.*; *see, e.g.*, PX 8 ¶ 15; *see also*, PX 5, ¶¶ 9–17.
[35] PX 36 ¶ 39.