## THIRD DECLARATION OF TYLER BROOME
### Pursuant to 28 U.S.C. § 1746

I, Tyler Broome, hereby state that I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify as follows:

1. I am a United States citizen. I work as an Investigator for the Federal Trade Commission ("FTC") in the Bureau of Consumer Protection's Division of Marketing Practices. The Division of Marketing Practices investigates persons and entities that may be violating the FTC Act and other laws enforced by the FTC. My office address is 600 Pennsylvania Avenue, NW, CC-8563, Washington, DC 20580.

2. This third declaration details additional documents that were obtained after the filing of *Federal Trade Commission vs. THEFBAMACHINE Inc. et al.*, Case No. 24-cv-6635 in the United States District Court for the District of New Jersey on June 3, 2024.

1

3.  On August 14, 2024, I captured the following images of an Instagram account associated with Amanda Rozenfeld, which utilizes the handle 'mrs_amanda_roze.' These screenshots show: (1) the number of posts made by the 'mrs_amanda_roze' account, the number of accounts that are following the 'mrs_amanda_roze' account, and the number of accounts that 'mrs_amanda_roze' is following, (2) the account was established sometime in March 2012, and (3) this account follows 'kingofamzn' which is a handle associated with Steven Rozenfeld.



PX 37                                                                                                002699

4.  Also on August 14, 2024, I viewed posts made by 'kingofamzn' and captured six that were posted between July 9, 2023 and February 29, 2024.  Each of these posts was liked by 'mrs_amanda_roze.'

5.  Children of Amanda and Steven Rozenfeld appear in some of the videos posted by 'kingofamzn,' including some of the videos referenced below .

6.  The children of Amanda and Steven Rozenfeld have attended private school in Englewood, New Jersey.

    a.  This post is dated July 9, 2023 featuring text referencing Amazon FBA and a caption prompting readers to contact 'kingofamzn.'  This post was liked by 'mrs_amanda_roze.'



PX 37

002700

b.  This post is dated November 14, 2023 and features Steven Rozenfeld.  In the video post, Steven Rozenfeld says "our program has put together a simple way for you guys to learn how to leverage your debt and grow your business."  This post was liked by 'mrs_amanda_roze.'



PX 37                                                                                                    002701

c.  This post is dated January 31, 2024 and features Steven Rozenfeld talking about scaling your Amazon FBA business.  This post was liked by 'mrs_amanda_roze.'



**PX 37**                                                                                    002702

d.  This post is dated February 15, 2024 and features Steven Rozenfeld talking about how to become a millionaire.  This post was liked by 'mrs_amanda_roze.'



PX 37                                                                                         002703

e.  This post is dated February 19, 2024 and features Steven Rozenfeld talking about increasing your profits.  This post was liked by 'mrs_amanda_roze.'



PX 37                                                                                                           002704

f.  This post is dated February 29, 2024 and features Steven Rozenfeld.  The caption

begins with, "Here's the key to reaching 100 million with your business."  This

post was liked by 'mrs_amanda_roze.'



7.  On June 3, 2024, the United States District Court for the District of New Jersey issued a

temporary restraining order (TRO) which permitted the FTC and the court-appointed

Receiver to access the Defendants' business premises and records.

8.  As part of the TRO, the FTC imaged electronic records from the Defendants.  The imaged

files were transferred to FTC drives and into a dedicated Relativity database.  **Attachment A**

consists of true and accurate copies of documents from the Relativity database.

9.  Among the documents obtained from the Defendants are eight Excel spreadsheets for

"Amanda Rozenfeld – MODERN PRODUCTIONS LLC."  The title of each spreadsheet

8

includes a month and year, and the spreadsheets show the total units sold, the total units refunded, total sales, total cost, and profit.  Below is a summary of this information contained in the eight spreadsheets for Modern Productions LLC:

    a.  September 2021

        i.  0 units sold, 0 units refunded

        ii.  Total sales: $0

        iii.  Total cost: $0

        iv.  Total profit: $0

    b.  November 2021

        i.  2 units sold, 2 units refunded

        ii.  Total sales: $75.72

        iii.  Total cost: $41.41

        iv.  Total profit: ($11.84)

    c.  March 2022

        i.  0 units sold, 0 units refunded

        ii.  Total sales: $0

        iii.  Total cost: $0

        iv.  Total profit: $0

    d.  April 2022

        i.  0 units sold, 0 units refunded

        ii.  Total sales: $0

        iii.  Total cost: $0

        iv.  Total profit: $0

                                                                

e.  May 2022

  i.  0 units sold, 0 units refunded

  ii.  Total sales: $0

  iii.  Total cost: $0

  iv.  Total profit: $0

f.  June 2022

  i.  0 units sold, 0 units refunded

  ii.  Total sales: $0

  iii.  Total cost: $0

  iv.  Total profit: $0

g.  August 2022

  i.  0 units sold, 0 units refunded

  ii.  Total sales: $0

  iii.  Total cost: $0

  iv.  Total profit: $0

h.  October 2022

  i.  8 units sold, 0 units refunded

  ii.  Total sales: $243.44

  iii.  Total cost: ($128.80)

  iv.  Total profit: $35.74

10. **Attachment B** consists of true and accurate copies of documents obtained from Gusto after

the FTC provided them a copy of the TRO.

10

11. **Attachment C** is a true and accurate copy of a credit card statement provided by counsel to the Receiver.

12. **Attachment D** is a true and accurate copy of an email and attachment sent to Amanda Rozenfeld on June 6, 2024.

13. There is an American Express credit card in the name of 'A Pereman' that appears to be a personal credit card.  I am aware that Amanda Rozenfeld's maiden name is Pereman. Between June and mid-August 2021, the charges on this credit card amount to approximately $131,000.  The majority of these transactions appear to be personal charges, including: goods from luxury brands (Gucci, Christian Dior Couture, Louis Vuitton), restaurants (for example, $975.97 paid to Sushi House Unico on June 26, 2021), jewelry (for example, $989.88 paid to SKU Diamond Jewelry on July 21, 2021), private school ($8,402.85 paid to Dwight Englewood School over this time period), salons and spas, and travel.  In addition, there was a charge for $93,600.00 paid to goli.com.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 19, 2024
Washington, D.C.

_____
Tyler Broome

11



## SIGNATURE BANK

565 Fifth Avenue, 12ᵗʰ Floor
New York, NY 10017

```
                                        Statement Period
                                        From September 01, 2022
                                        To   September 30, 2022
                                        Page     1 of     7

                                        PRIVATE CLIENT GROUP 304
                                        9003 THIRD AVENUE
                                        BROOKLYN, NY 11209


        FBA SUPPORT NJ CORP              9-304
        78 JOHN MILLER
        SUITE 2111
        KEARNY NJ  07032
                                        See Back for Important Information


                                        Primary Account: ████2897      17
```

        IMPORTANT MESSAGE ABOUT IDENTITY THEFT! SIGNATURE BANK WILL NEVER
        ASK YOU TO PROVIDE PERSONAL OR BUSINESS ACCOUNT INFORMATION THROUGH
        E-MAIL. IF YOU RECEIVE ANY E-MAIL OR OTHER INQUIRY THAT APPEARS TO COME
        FROM SIGNATURE, DO NOT RESPOND TO IT OR CLICK ON ANY LINKS INCLUDED IN
        THE E-MAIL. INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE OR CONTACT
        YOUR ACCOUNT OFFICER. FOR MORE INFORMATION ON IDENTITY THEFT, VISIT
        OUR WEBSITE AT WWW.SIGNATURENY.COM. CLICK ON "ABOUT US", "PRIVACY
        & SECURITY", "IDENTITY THEFT" FOR MORE INFORMATION ON SAFEGUARDING YOUR
        IDENTITY AND PERSONAL INFORMATION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. |
| --- | --- | --- |
| BANK DEPOSIT ACCOUNTS | | |
| ████2897    MONOGRAM CHECKING | 48,073.45 | 47,559.92 |
| | | |
| RELATIONSHIP TOTAL | | 47,559.92 |

SIGNATURE BANK

Statement Period
From September 01, 2022
To   September 30, 2022
Page     2 of     7

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

```
FBA SUPPORT NJ CORP                9-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032
```

See Back for Important Information

Primary Account: ████2897      17

MONOGRAM CHECKING        ████2897

Summary

```
Previous Balance as of September 01, 2022              48,073.45
    21 Credits                                        174,420.56
    60 Debits                                         174,934.09
Ending Balance as of   September 30, 2022              47,559.92
```

Deposits and Other Credits



SIGNATURE BANK

```
                                        Statement Period
                                   From September 01, 2022
                                   To   September 30, 2022
                                   Page    3 of    7

                                   PRIVATE CLIENT GROUP 304
                                   9003 THIRD AVENUE
                                   BROOKLYN, NY 11209


      FBA SUPPORT NJ CORP              9-304
      78 JOHN MILLER
      SUITE 2111
      KEARNY NJ  07032
                                        See Back for Important Information


                                   Primary Account:    ████2897      17
```

SIGNATURE BANK

Statement Period
From September 01, 2022
To   September 30, 2022
Page    4 of    7

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

FBA SUPPORT NJ CORP                     9-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

See Back for Important Information

Primary Account:  ▮▮▮2897        17

**Withdrawals and Other Debits**

Sep 07   OUTGOING WIRE                                      2,000.00
         REF#  20220907B6B7261F005607
         TO:   amanda rozenfeld           ABA:  121000248
         BANK: WELLS FARGO BANK, NA       ACCT# ▮▮▮▮6334

**PX 37**                    **Attachment A**                    002712

SIGNATURE BANK

Statement Period
From September 01, 2022
To   September 30, 2022
Page     5 of     7

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

FBA SUPPORT NJ CORP                    9-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

See Back for Important Information

Primary Account: ▢▢▢2897          17

SIGNATURE BANK

Statement Period
From September 01, 2022
To    September 30, 2022
Page    6 of    7

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

FBA SUPPORT NJ CORP                    9-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

See Back for Important Information

Primary Account: ███████2897        17

███████  Serial Number

| Date | Serial Number | Amount | Date | Serial Number | Amount |
|------|---------------|--------|------|---------------|--------|
| Sep 07 | 7272051 | 503.92 | Sep 20 | 7272059 | 541.56 |
| Sep 06 | 7272052 | 510.02 | Sep 19 | 7272060 | 528.71 |
| Sep 07 | 7272053 | 510.65 | Sep 19 | 7272061 | 323.58 |
| Sep 07 | 7272054 | 510.65 | Sep 19 | 7272062 | 397.39 |
| Sep 13 | 7272055 | 403.54 | Sep 27 | 7272063 | 635.72 |
| Sep 12 | 7272056 | 510.03 | Sep 26 | 7272064 | 547.36 |
| Sep 13 | 7272057 | 411.13 | Sep 26 | 7272065 | 547.98 |
| Sep 19 | 7272058 | 510.66 | Sep 26 | 7272066 | 423.59 |

**PX 37**                    **Attachment A**                    002714

SIGNATURE BANK

```
                                          Statement Period
                                    From September 01, 2022
                                    To   September 30, 2022
                                    Page    7 of    7

                                    PRIVATE CLIENT GROUP 304
                                    9003 THIRD AVENUE
                                    BROOKLYN, NY 11209


          FBA SUPPORT NJ CORP              9-304
          78 JOHN MILLER
          SUITE 2111
          KEARNY NJ  07032
                                             See Back for Important Information


                                    Primary Account: ██████2897        17

   Date      Serial Nbr          Amount    Date    Serial Nbr          Amount
   Sep 26    7272067             519.15

Daily Balances
Aug 31          48,073.45                 Sep 16          34,820.65
Sep 01          43,356.59                 Sep 19          33,082.29
Sep 02          43,287.92                 Sep 20          66,305.22
Sep 06          56,262.14                 Sep 21          69,773.77
Sep 07          53,043.83                 Sep 22          85,910.81
Sep 08          46,661.57                 Sep 23          37,364.84
Sep 09          64,561.75                 Sep 26          35,326.76
Sep 12          65,396.19                 Sep 27          34,691.04
Sep 13          64,448.67                 Sep 28          42,984.50
Sep 14         101,927.22                 Sep 29          48,199.50
Sep 15          35,588.61                 Sep 30          47,559.92

Rates for this statement period - Overdraft
Sep 22, 2022   16.000000 %
Sep 01, 2022   15.250000 %
```

**PX 37**                    **Attachment A**                    002715

**flagstar**

```
                                         Statement Period
                                         From April   01, 2024
                                         To   April   30, 2024
                                         Page    1 of    8

                                         PRIVATE CLIENT GROUP 304
                                         9003 THIRD AVENUE
                                         BROOKLYN, NY 11209


         FBA SUPPORT NJ CORP              8-304
         78 JOHN MILLER
         SUITE 2111
         KEARNY NJ  07032

                                                    See Back for Important Information


                                         Primary Account: ████2897        0
```

IMPORTANT NOTICE: EFFECTIVE AS OF APRIL 15, 2024, FLAGSTAR PRIVATE BANK (THE
"BANK") HAS UPDATED ITS PRIVACY NOTICE, CALIFORNIA CONSUMER PRIVACY ACT
DISCLOSURE NOTICE, AND ONLINE PRIVACY STATEMENT (COLLECTIVELY, THE "PRIVACY
DOCUMENTATION").

THE UPDATED PRIVACY DOCUMENTATION WILL REPLACE ALL PRIVACY DOCUMENTATION IN
EFFECT PRIOR TO APRIL 15, 2024. ON OR AFTER APRIL 15, 2024, PLEASE VISIT
HTTPS://WWW.FLAGSTAR.COM/PRIVATE-BANK/ABOUT-US/AGREEMENTS-AND-DISCLOSURES.
HTML TO VIEW THE FULL TEXT OF THE UPDATED PRIVACY DOCUMENTATION.

| Relationship Summary | | Opening Bal. | Closing Bal. |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| ████2897  MONOGRAM CHECKING | | 122,065.30 | 61,447.18 |
| | RELATIONSHIP TOTAL | | 61,447.18 |

**PX 37**                    **Attachment A**

**flagstar**

Statement Period
From April   01, 2024
To   April   30, 2024
Page    2 of    8

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

FBA SUPPORT NJ CORP                8-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

See Back for Important Information

Primary Account: ████2897        0

MONOGRAM CHECKING        ████2897

Summary

 Previous Balance as of April   01, 2024                        122,065.30
      18 Credits                                                241,385.49
      61 Debits                                                 302,003.61
 Ending Balance as of   April   30, 2024                         61,447.18

Deposits and Other Credits



**flagstar**

```
                                          Statement Period
                                    From April    01, 2024
                                    To   April    30, 2024
                                    Page     3 of     8

                                    PRIVATE CLIENT GROUP 304
                                    9003 THIRD AVENUE
                                    BROOKLYN, NY 11209


        FBA SUPPORT NJ CORP                8-304
        78 JOHN MILLER
        SUITE 2111
        KEARNY NJ   07032
                                        See Back for Important Information


                                    Primary Account: ████2897          0
```

![flagstar](flagstar logo)

```
                                      Statement Period
                                  From April    01, 2024
                                  To   April    30, 2024
                                  Page     4 of    8

                                  PRIVATE CLIENT GROUP 304
                                  9003 THIRD AVENUE
                                  BROOKLYN, NY 11209


         FBA SUPPORT NJ CORP                  8-304
         78 JOHN MILLER
         SUITE 2111
         KEARNY NJ  07032
                                      See Back for Important Information


                                  Primary Account: ████2897          0
```



```
Apr 05  OUTGOING WIRE                                         3,000.00
        REF#  20240405B6B7261F003962
        TO:   amanda rozenfeld           ABA:   121000248
        BANK: WELLS FARGO BANK, N.A.      ACCT# ████6334
```



Statement Period
From April    01, 2024
To    April    30, 2024
Page    5 of    8

PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209

FBA SUPPORT NJ CORP              8-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

See Back for Important Information

Primary Account: ████████2897        0

**flagstar**

```
                              Statement Period
                              From April    01, 2024
                              To   April    30, 2024
                              Page     6 of     8

                              PRIVATE CLIENT GROUP 304
                              9003 THIRD AVENUE
                              BROOKLYN, NY 11209
```

```
        FBA SUPPORT NJ CORP                8-304
        78 JOHN MILLER
        SUITE 2111
        KEARNY NJ  07032
```

                              See Back for Important Information

                              Primary Account: ████2897          0



PRIVATE CLIENT GROUP 304
9003 THIRD AVENUE
BROOKLYN, NY 11209


FBA SUPPORT NJ CORP                    8-304
78 JOHN MILLER
SUITE 2111
KEARNY NJ  07032

                                    See Back for Important Information


                        Primary Account:  ███████2897        0

PX 37                           Attachment A                            002722

**flagstar**

                                                    Statement Period
                                                    From April   01, 2024
                                                    To   April   30, 2024
                                                    Page    8 of    8

                                                    PRIVATE CLIENT GROUP 304
                                                    9003 THIRD AVENUE
                                                    BROOKLYN, NY 11209

```
          FBA SUPPORT NJ CORP                 8-304
          78 JOHN MILLER
          SUITE 2111
          KEARNY NJ  07032
                                                    See Back for Important Information


                                              Primary Account:  ████2897        0
```



```
Apr 30   OUTGOING WIRE                                                    14,500.00
         REF#  20240430B6B7261F003524
         TO:  INFITEL BPO SERVICES          ABA:  BOPIPHMMX
         BANK: BANK OF THE PHILIPPINE ISLANDS  ACCT#  ████0466
```

```
Daily Balances
Mar 31        122,065.30            Apr 18        42,661.15
Apr 01        159,680.97            Apr 19        40,439.61
Apr 04        159,368.99            Apr 22        28,647.66
Apr 05         97,894.05            Apr 23        29,593.44
Apr 08        125,719.05            Apr 24        19,468.95
Apr 09        122,759.05            Apr 25        17,688.47
Apr 12         31,938.97            Apr 26        13,465.26
Apr 15         59,210.47            Apr 29        75,427.93
Apr 16         91,926.47            Apr 30        61,447.18

Rates for this statement period - Overdraft
          Apr 01, 2024   18.250000  %
```

**PX 37**                       **Attachment A**                       002723

# E-commerce Consulting Contract for
# 1 Amazon Store

**Initial Consulting Fee "Store Infrastructure Fee" - this goes directly towards warehousing expenses, full-time employees & benefits, consulting expertise, web build & store build, & product selection:**

*Price $50,000 ~ Quantity 1 ~ Total Price $50,000*

**Management Fee - $199 or 30% Minimum management fee of $199 per month or thirty percent (30%) of net profit this fee begins the following month after fulfillment of initial payment:**

*Price $199 ~ Monthly $199 ~ Total Price $199*

**Software Fee - Fee paid directly to software provider:**

*Price $99 ~ Monthly $99 ~ Total Price $99*

**Minimum Working Capital - $10,000 This is the minimum requirement of available credit or capital to cover inventory & wholesale price of products. Amazon pay every two weeks, and this money covers orders until the scheduled store payout.**

**Recommended credit available for expedited scaling process is $15,000.**

**Total One-time Fee: $50,298.00**

# AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of,November 16, 2021, by and between, **Passive Scaling Inc.**, a New Jersey Corporation, whose address is **223 Veterans Blvd., Carlstadt, NJ – 07020** (hereinafter "Consultant"), and, **T███ W███████**, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth; NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $10.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with an ecommerce store on the Amazon FBA platform (the "Store"): CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):Maintain Client's Store, including configuring the Amazon FBA storefront and configuring the frontend back end systems necessary to manage the Store. Review, research, source, select, and list products for the Client's Store. Respond to customers' phone and email inquiries in support of Client's Store and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.Maintain oversight of Client's Store and its financial performance; however, Consultant shall have no obligation to, and does not intendto, provide

financial advice to Client concerning the operation of Client's Store (Client shall confer with its professional financial advisors concerning all financial inquiries).

# CLIENT RESPONSIBILITIES

Client understands there is a period that will delay the commencement and commercial operations of the Store, including, without limitation, a 1 to 4 months configuration period (and perhaps longer, depending on the circumstances specific to each proposed Store) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Store, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card issued through a United States federally insured banking institution with a minimum credit limit of fifteen thousand ($15,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit card, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Store, allow for a Suspension, or place its Amazon FBA account or Store in Vacation Mode, such terms being defined or referenced on the Amazon FBA website or in other written materials made available to Client; and (ii) Client shall not allow its Store to remain shut down for more than ninety (90) days during the term of this Agreement. (B) Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

**COMPENSATION**

In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of ninety thousand dollars ($90,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is nonrefundable. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety-nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (30%) of the Net Profit from Client's Store per month (the "Ongoing Commission"), whichever is greater plus an additional ninety-nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than

E-Commerce Consulting Agreement due to breach of this Agreement by Client, there is no activity in Client's Store for said month (or a portion thereof, where such portion exceeds 15 days). Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment. TERM– This

Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of one (1) year (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

## TERMINATION

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon FBA may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

## NON-DISPARAGEMENT

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true.

## SALES / USE TAX

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

## INTELLECTUAL PROPERTY

Client understands that Client's Store is a service hosted on the Amazon FBA platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon FBA, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon FBA may hold (the "Intellectual Property Rights"). Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Store, or Amazon FBA, and Consultant holds no legal or equitable rights in Client's Store.

**PX 37**                              **Attachment A**

## RESTRICTED ACTIVITIES

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through ecommerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration: shareholders, employees, Non-Competition, agents, the Term members of the Agreement, and for two (2) years following the termination of this Agreement (the "Restricted Period"), Client shall not be involved, directly or indirectly, whether as owner, partner, investor, consultant (paid or unpaid), agent, employee, coventure or otherwise, with any business that manages, operates, or promotes e-commerce stores or e-commerce transactions on behalf of third parties anywhere in the United States, regardless of whether Client is physically located within the United States or outside of the United States.

## NON-SOLICITATION

During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

## NON-DISCLOSURE

The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by the Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as "Disclosing Party," and the Party receiving the Confidential Information shall be referred to as "Receiving Party." Notwithstanding the foregoing, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose. If at Disclosing Party's request, Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is

**PX 37**                    **Attachment A**                    002727

thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

**MAINTENANCE OF THE CONFIDENTIAL INFORMATION**

The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, the Receiving Party shall take at least those measures that the Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify the Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

**CONFIDENTIALITY TERM**

Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law. In signing this Agreement, Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.

# LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION

**PX 37**                    **Attachment A**                    002728

RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL. CONSULTANT ASSUMES NO LIABILITY FOR OR RELATING TO THE DELAY, INTERRUPTION, CORRUPTION OR FAILURE OF PRODUCT, DATA OR INFORMATION TRANSMITTED IN CONNECTION WITH THE STORE, INCLUDING WITHOUT LIMITATION ANY ACT OR FAILURE TO ACT BY AMAZON OR ANY FORCE MAJEURE CONDITION (INCLUDING BY WAY OF EXAMPLE ONLY, ANY PUBLIC HEALTH ISSUE). AS A LIQUIDATED DAMAGES REMEDY AND NOT AS A PENALTY, SINCE DAMAGES TO CLIENT RESULTING FROM BREACH OF THIS AGREEMENT BY CONSULTANT ARE DIFFICULT AND IMPRACTICAL, IF NOT IMPOSSIBLE TO CALCULATE, CONSULTANT SHALL ONLY BE LIABLE TO THE EXTENT OF ACTUAL DAMAGES INCURRED BY CLIENT, NOT TO EXCEED A TOTAL OF $5,000.00 USD. AGREEMENT TO THIS PROVISION IS A MATERIAL INDUCEMENT TO CONSULTANT AGREEING TO ENTER INTO THIS AGREEMENT WITH CLIENT. THIS PROVISION 11. (C) SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY WITH ANY OTHER PROVISION IN THIS AGREEMENT.

# DISCLAIMERS AND RELEASE

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT. Without limiting the foregoing, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability, or the completeness, of any matter within the scope of this Agreement, including but not limited to the Store, the products therein, or the data, information, content, software, technology, graphics, or communications provided on or through the Store; (2) the satisfaction of any regulation (government or otherwise) requiring disclosure of information on the products provided through or in connection with the Store or the approval or compliance of the Store or any software or information and content contained in the Store; or (3) that the Store will satisfy Client's economic needs and requirements or reach any particular level of sales, income, or net profits.

**BUSINESS RISK**

Client hereby understands that the creation and potential growth of the Client's Store carries financial and other risks. Client hereby understands that ecommerce is an ever-changing industry that is subject to numerous business risks, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the commercial sale of products through Amazon FBA via Client's Store; (ii) economic changes that affect consumer spending, the emergence of recessions due to economic and other issues (including public health issues) and the like; (iii) changes in the popular appeal of and demand for different types of Amazon FBA products; (iv) changes in Amazon's terms and conditions, which can materially affect or even interfere with the marketability of Client's Store or its products; (v) changes in international politics or economies, which may affect, among other things, the ability to package, distribute and ship Amazon FBA products, and the costs thereof; (vi) market forces, including increased and changing levels of competition for any given product from other sellers of such product; (vii) unforeseen

events, force majeure, public health concerns, and other external events that could affect the performance of any Amazon FBA Store. Client hereby understands that there are no guarantees made by Consultant or otherwise as to the Store's sales, income, or profitability at any time, and acknowledges that Client is at risk of a total loss of his, her or its investment. Client acknowledges the substantial risks generally involved with an ecommerce business. Client recognizes that there is a possibility that subsequent to the execution of this Agreement, Client may discover facts or incur or suffer claims which were unknown or unsuspected at the time this Agreement was executed, and which if known by Client at that time may have materially affected Client's decision to execute this Agreement. By operation of this Agreement, and in particular the disclaimers of Consultant contained in the preceding subsections, Client assumes any and all risks of such unknown facts and such unknown and unsuspected claims and expressly releases Consultant for any liability which Consultant could have had in connection therewith in the absence of the release herein provided by Client to Consultant. Consultant encourages Client to only invest funds that Client can afford to invest in an illiquid basis over a longer-term and perhaps ultimately lose, and to consult Client's legal and/or business advisors prior to investing in the Store.

**AMAZON FBA TERMS AND CONDITIONS**

Client hereby understands that Amazon FBA, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified in the Client's view. In the event Client's Store is suspended, Company will assist in sending an appeal on behalf of the Client and working with Amazon FBA to remedy the situation at no extra cost. Consultant makes no representations or warranties of any kind, however, that Amazon FBA will in such cases return Client's Store to active status. Furthermore, Client agrees and understands that the Consultant makes no guarantees or representations regarding the Store in relation to any Amazon FBA policy, whether currently in effect or as may be amended by Amazon FBA from time to time. Client understands that Consultant has no control over or input in when and whether Amazon FBA elects to change any of its policies. However, the Services provided by Consultant to Client pursuant to this Agreement shall where practicable be consistent with Amazon's current policies.

# GENERAL PROVISIONS

**NON – EXCLUSIVITY**

Each party is free to contract with others with respect to the subject matter of this Agreement subject to the limitations as to Client under Section 6 and Section 9 of this Agreement.

**RELATIONSHIP OF THE PARTIES**

Nothing herein contained shall constitute a partnership or a joint venture between the Parties. Consultant is performing its services to Client as an independent contractor and not as Client's agent or employee. There is no third-party beneficiary to this Agreement.

**NOTICES**

All notices to either party shall be sent electronically to the email address(es) provided by each Party to the other and as otherwise set forth below. All notices to Consultant shall be sent to info@passivescaling.com. If to the Client, notice shall be sent electronically to, with a courtesy copy

**PX 37**                    **Attachment A**                    002730

sent to. Alternatively, such written notice will also be deemed given upon personal delivery, or on receipt or refusal if sent by U.S. first class certified or registered mail, postage prepaid, return receipt requested, or by a recognized private delivery service, to the addresses stated on Page 1 of this Agreement.

**SEVERABILITY, HEADINGS**

If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such an event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

**DISPUTE RESOLUTION**

Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13. (L)). IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

**AMENDMENT**

This Agreement cannot be amended except in writing and signed by both Parties.

**PX 37**                    **Attachment A**                    002731

DocuSign Envelope ID: BA4607D0-8365-4690-A526-8F58BB7DB3BF

## ELECTRONIC SIGNATURES

This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

## GOVERNING LAW; JURISDICTION

This Agreement, the negotiations thereunder, and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Florida without reference to principles of conflicts of laws. Client hereby irrevocably consents to the personal jurisdiction of and agrees that the sole venue for any dispute arising in connection to this Agreement shall be the courts of competent jurisdiction (State and federal) located within Miami-Dade County, Florida. Client agrees not to commence or prosecute any such action, claim or proceeding other than in such aforementioned courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. Client agrees that Miami-Dade County, Florida is a convenient forum, and waives any objection to the same under forum non-conveniens principles.

## WAIVER

The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law shall not be construed as a waiver or relinquishment of the right to assert or rely upon any such provision, right or remedy.

## FORCE MAJEURE

Neither Party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation acts of God, national health emergency, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies, or interruptions in telecommunications, internet services, or third-party vendors.

## ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral and written agreements relating to the subject matter herein.

## ATTORNEY's FEES

If either party breaches this Agreement, or one party brings any action (including appeal) against the breaching party in connection with this Agreement, the substantially prevailing party in such action shall be entitled to recover his/her/its cost of the action and reasonable atorneys' fees.

## INJUNCTIVE RELIEF

In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance,

**PX 37**    **Attachment A**    002732

injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Client shall owe Consultant total liquidated damages in the amount of Fifty Thousand Dollars ($50,000.00) per breach. The Parties further agree that (i) the liquidated damage amount due from Client as above set forth is not a penalty but is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

## INDEPENDENT COUNSEL

The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

## ASSIGNMENT

Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

## CURE

If at any time either Client believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, Client shall notify Consultant in writing of the specific nature of such claim, and Consultant receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

## INDEMNIFICATION

Client agrees to indemnify, defend, and save and hold harmless Consultant, including its respective insurers, directors, officers, employees, agents, and representatives (collectively the "Indemnified Parties" and each an "Indemnified Party"), and to hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all attorneys' fees and costs) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority, throughout the world, in connection with or

**PX 37**                    **Attachment A**                    002733

relating to the matters referred to in this Agreement, resulting from or relating directly or indirectly to Client's breach of this Agreement. The foregoing indemnity specifically includes, but is not limited to, any breach of any representation, warranty, or covenant in this Agreement applicable to Client, and shall survive expiration or termination of this Agreement.

**SURVIVAL**

Any Section in this Agreement that requires survival shall survive the termination of this Agreement for the maximum period permitted by applicable law.

**CLIENT DATA MANAGEMENT**

Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

**WAIVER OF JURY TRIAL**

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**MINISTERIAL SERVICES**

In furtherance of Client's obligations under Section 2, Consultant may offer Client guidance and referrals to third-party vendors. Additionally, Consultant may, in its discretion, and at no additional fee to Client, offer Client assistance in fulfillment of the obligations in Section 2 ("Ministerial Act"). Before Consultant commences any Ministerial Act, Consultant shall obtain Client's written consent. Client agrees to reimburse Consultant for expenses incurred in carrying out a Ministerial Act. In the event Consultant offers to engage in a Ministerial Act, Client hereby agrees to indemnify, defend and

**PX 37**                    **Attachment A**                    002734

save and hold harmless Consultant from any cost, claim, damage or liability (including attorneys' fees and court costs) related to the Ministerial Act. Client also waives any claims against Consultant that may be related to the Ministerial Act. Client accepts that this indemnification and waiver of all liability related to the Ministerial Act is a material inducement for Consultant to make any offer to Client for such Ministerial Act, and without such indemnification and waiver from Client, Consultant would not make any such offer of assistance to Client to engage in the Ministerial Act. The foregoing indemnity of Client shall survive expiration of the Term of this Agreement or its earlier termination.

## DEFINITIONS

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

## EXHIBIT A: DEFINITIONS

Words or phrases which are initially capitalized or are within quotation marks in the e-commerce consulting agreement ("Agreement") shall have the meanings provided in this Exhibit A.

"Cash Back" means any revenue derived from cash back programs like Be Frugal

"Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

"Confidential information" means any and all information of the Company that is not generally known to the public or those with whom the Company competes or does business, or with whom they plan to compete or do business, and any and all information, publicly known publicly known in whole or in part or not, which, if disclosed would assist in competition against them including without limitation: Consultant's proprietary business information and all information disclosed or made available by Consultant to Client, either directly or indirectly, in writing, orally, by demonstration, or by inspection of tangible or intangible objects, including without limitation documents, files, texts, emails, phone calls, zoom calls, links, source code, software, charts, graphs, and any other form of communication. Confidential Information also includes information disclosed by Client to Consultant. Confidential Information shall not include any information (a) which Client can establish was publicly known and made generally available in the public domain prior to the time of disclosure, other than as a result of an improper disclosure by a party hereto, or (b) was in Client's possession on a nonconfidential basis prior to its disclosure.

**PX 37**                              **Attachment A**

"Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon FBA fees related to Client's store.

"Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit availableby Client to permit Consultant to render its services to Client as provided herein.

"Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

"Proprietary Business Information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding ecommerce transactions, Amazon FBA transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

"Store" means the Client's wholly owned ecommerce location on the third-party Amazon.com FBA.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon FBA).

"Suspension" means an action or actionsby Amazon FBA which inactivates or freeze Client's Store, and which thereby results in an inability for Client to access Client's Store which results in no access or sales activity through the Store, other than where due to the occurrence of a Prohibited Action.

**PX 37**                    **Attachment A**                    002736

"Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Store where all sales activity in the Store has been temporarily halted.

## TERMINATION

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions /Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, in Consultant's sole discretion.

## REFUND POLICY

A.    Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen (18) month period if the Client has not made back their initial store costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, the Client must notify the Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B.    The Refund Amount shall be calculated by the following formula: (x) the Fee less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through Passive Scaling Inc.; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Store or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Store for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee.

C.    Client's right to exercise the Refund Option under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also results in a Prohibited Action.

**PX 37**                    **Attachment A**

# Wire Instructions

Account Name: **Passive Scaling Inc.,**

Bank Address: **223 Veterans Blvd., Carlstadt, NJ - 07020**

Account#: ▮▮ **8687**

Routing#: ▮▮▮▮▮▮▮

# SIGNATURE PAGE

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: T▮▮ W▮▮▮▮ authorized representative and agent for service of process

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:

Date: November 16, 2021



**CONSULTANT:**

By: Passive Scaling Inc., Amanda Peremen, Operations Manager, authorized representative and agent for service of process.

Date: November 16, 2021


Amanda Peremen

# Delivering on Your eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

August 13, 2021

**Client**

T███ W███

**Company**

PASSIVE SCALING INC

**Attachment A**

002738

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of August 13, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose addr ess is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultan t"), and T██ W█ █, (hereinafter "Client").

WHEREAS, Client desires to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Clien t (toge ther, the "Parties"), for $50,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac counts), and one (1) e-commer ce stores on the W almart pla tform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on/W almart st orefronts and configuring the fr ont and back end s ystems nec essary to manage the Stores.
    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.
    C. Respond t o cust omers ' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts to resol ve cust omer inquiries, handle product r eturns, and manage billing ma tters.
    D. Maintain oversigh t of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion to, and does no t intend to, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)



2. **CLIENT RESPONSIBILITIES -**

   A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configur ation period (and perhaps longer , depending on the circumstanc es specific to each proposed S tores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equir ements for the cr eation and oper ation of Client's Stores, Consultant cannot commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

   B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and main tain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand (\$ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon/W almart ac count or Stores in Vacation M ode, such t erms being de fined or referenced on the Amaz on/W almart w ebsite or in other writt en materials made a vailable to Client; and (ii) Client shall no t allo w its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

   C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultant in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

   A. In consider ation for this Agreemen t, Client shall pay Consultan t a one-time consulting f ee of fifty thousand dollars (\$50,000.00  ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the F ee is non-refundable.



B. Client shall also ther eafter, beginning in the mon th following the mon th in which the F ee is paid, pay Consultan t one hundr ed ninety nine ($199.00) USD per mon th (the "Maintenance Fee"), or thirty five per cent (35%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thly, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**
This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereaft er. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may terminate this Agreemen t, at any time, f or cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) any act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on/W almart ma y take from time t o time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE TAX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or de termining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, removed or installed in or on a diff erent place or platform. Accordingl y, Consultant does not hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyright, trademark, tr ade dr ess, trade secret, or any other in tellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty R ights, whatsoe ver, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultan t's Confidential Informa tion which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recogniz es the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultan t conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees tha t the f ollo wing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Informa tion, and other legitima te business interests of Consultan t, which restrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party.

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther directl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoe ver except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Informa tion shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



E. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protective order or other injunctiv e relief above with respect t o the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Con fidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly required by the court order.

F. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

G. **Confidentiality Term**: Regardless of any termina tion of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultant's trade secrets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secret as a matter of law.

H. **In signing this Agreement**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and considered all the t erms and conditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such restraints are necessary for the reasonable and pr oper protection o f Consultan t, and that each and e very one of the restraints is reasonable in respect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the covenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable t o it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such breach or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder.



10. **REFUND POLICY** –

   A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

   B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($50,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($50,000.00).

   C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.



11. **LIMITATION OF LIABILITY -**

   A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS,
   DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR
   ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR
   EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING,
   WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS,
   ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS
   REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER
   ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT,
   INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR
   OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE
   BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION
   OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A
   THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED
   CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO.
   SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE
   ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S
   RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S
   PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

   A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE"
   BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY
   NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING
   CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT
   NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS.
   CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS
   TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY
   DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND
   CONDITIONS, WHETHER EXPRESS OR IMPLIED ARISING BY STATUTE,
   OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR
   OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR
   CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,
   NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S
   SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS
   AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or otherwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) that the Stores will satisfy Client's economic needs and r equirements or reach any particular le vel of sales, income, or ne t profits.



C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client her eby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii) economic changes tha t affect c onsumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or diff erent types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and conditions, which can ma terially affect or e ven interfere with the mark etability of Client's Stores or its products; (v) changes in international politics or economies, which ma y affect, among o ther things, the ability t o pack age, distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om o ther sellers o f such pr oduct; (vii) unforeseen e vents, force majeur e, public health c oncerns, and other e xternal e vents that could a ffect the performanc e of any Amazon/W almart Stores. Client hereby understands tha t there are no guar antees made b y Consultan t or otherwise as t o the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if kno wn b y Client at that time ma y have materially affect ed Client's decision t o execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn facts and such unkno wn and unsuspect ed claims and expressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the release her ein provided b y Client to Consultan t. Consultant encour ages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the Stores.



D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t Amazon/W almart, fr om time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/ Walmart to remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon/W almart will in such cases return Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guar antees or representations regarding the Stores in relation to any Amazon/W almart polic y, whether currently in effect or as ma y be amended b y Amazon/W almart fr om time t o time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on/W almart elects t o change an y of its policies. However, the Servic es provided b y Consultan t to Client pursuan t to this Agreemen t shall where pr actical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed ninety nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture betw een the Parties. Consultant is perf orming its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to ▇▇▇▇@gmail.com . Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sent by U.S. first class certified or r egistered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery service, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining pr ovisions will c ontinue in full f orce and effect. In such event, the Parties hereby acknowledge their in tent to make such invalidated pr ovision, or part of such pr ovision, as to be deemed r eplaced with a valid pr ovision or part of provision that most closel y approximates and gives effect to the intent of the invalid pr ovision. Any such modifica tion shall r evise the existing invalid pr ovision, or part ther eof, only as much as nec essary to make the invalidl y-held pr ovision otherwise v alid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or e xtent of any section of this Agreemen t.

E. **Dispute Resolution -** Except wher e otherwise e xpressly set forth in this Agreemen t, any disput e or claim arising out o f or relating to this Agreemen t shall onl y be resolved by binding arbitr ation. The arbitr ation of any disput e or claim shall be c onduct ed in accordance with the American Arbitr ation Association ("AAA") rules, as modified by this Agreemen t, which shall tak e place in Miami-Dade Coun ty, Florida. Any arbitration pr oceeding, de termina tion, or award, shall be c onfidential, and neither P arty ma y disclose the e xistence, content or results of any arbitr ation, except as may be required by law or for purposes of enforcemen t. Judgmen t on any arbitr ation award may be entered in any court ha ving pr oper jurisdiction. All administr ative fees and expenses of such arbitr ation pr oceeding will be divided equall y betw een the parties, though each Party will bear its o wn expense of counsel, experts, witnesses and preparation and pr esentation of evidenc e at the arbitr ation (except wher e attorneys' fees and costs shall be a warded pursuan t to Section 13.(**L)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out o f or in conjunction with the subject matter of this Agreemen t may be br ough t by either P arty mor e than one (1) year after the cause of action ar ose.

F. **Amendment -** This Agreemen t canno t be amended e xcept in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreemen t may be execut ed by electr onic means and in any number o f counterparts, each of which when so e xecut ed and deliv ered will be deemed an original, and all such c ounterparts toge ther will constitut e one and the same instrumen t.



H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment –** Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save
and hold harmless Consultan t, including its r espectiv e insurers, directors,
officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified
Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty
harmless fr om and against an y and all claims, damages, losses, liabilities and
expenses (including all a ttorneys' fees and costs) which any Indemnified P arty
may incur or which ma y be asserted against any Indemnified P arty by any
person, entity or go vernmen tal authority , throughout the w orld, in connection
with or r elating to the ma tters referred to in this Agreemen t, resulting fr om or
relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing
indemnity specificall y includes, but is no t limit ed to, any breach of any
representation, warranty, or covenant in this Agreemen t applicable t o Client,
and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save
and hold harmless Clien t, including its r espectiv e insurers. directors, officers,
emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties"
and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless
from and against an y and all claims, damages, losses, liabilities and e xpenses
(including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur
or which ma y be asserted against any Indemnified P arty by any person, entity
or governmen tal authority , throughout the w orld, as a direct r esult of the
services exclusiv ely perf ormed b y Consultan t under the t erms of this
agreemen t, or the Consultan ts breach of this agreemen t. The foregoing
indemnity specificall y includes, but is no t limit ed to, any breach of any
representation, warranty, or covenant in this Agreemen t applicable t o Client,
and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that r equir es survival shall surviv e the
termina tion of this Agreemen t for the maximum period permitt ed by applicable
law.

O. **Client Data Managemen t** – Unless Consultan t receives Client's prior writt en consent, Consultant shall no t: (i) access, process, or otherwise use Clien t's Data other than as nec essary to facilita te Consultant's Services; (ii) give any of its emplo yees access to Client Data except to the e xtent that such individuals needs ac cess to Client Data to facilita te perf ormanc e of Consultan t under this Agreemen t; or (iii) give any other thir d-party ac cess to Client Data except as necessary for such thir d-party t o facilita te perf ormanc e under this A greemen t. Consultan t shall no t erase Client Data, or any copy ther eof, without Clien t's express writt en consent and shall f ollo w Client's writt en instructions r egarding retention and er asure of Client Data so long as it does no t interfere with the perf ormanc e of Consultan t's Services and perf ormanc e under this A greemen t. Client possesses and r etains all righ t, title, and in terest in and t o Client Data, and Consultan t's use and possession ther eof is solel y in further ance of Consultan t's Services and on Clien t's behalf . Consultant shall c ompl y with all applicable la ws and regula tions go verning the handling o f Client Data and shall not engage in an y activity tha t would plac e Client in viola tion of any applicable law, regula tion, or go vernmen t request, or judicial pr ocess.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



**PX 37**                                   **Attachment A**                        002755
                                                                                     16

Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2, Consultant may offer Client guidanc e and referrals to third-party v endors. Additionall y, Consultant may, in its discretion, and at no additional f ee to Client, offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain Client's writt en consent. Client agrees to reimburse Consultan t for expenses incurred in carrying out a Minist erial Act. In the event Consultan t offers to engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save and hold harmless Consultan t from any cost, claim, damage or liability (including a ttorneys' fees and court c osts) related t o the Minist erial Act. Client also waives any claims against Consultan t that may be related t o the Minist erial Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to the Minist erial Act is a material induc emen t for Consultan t to make any offer to Client for such Minist erial Act, and without such indemnifica tion and w aiver from Clien t, Consultan t would no t make any such offer of assistance to Client to engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e expiration of the Term of this Agreemen t or its earlier t ermination.



14. **DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the of the last e xecution date belo w.

**CLIENT:**

By: T█ W█ authorized representative and agen t for service of process Date:  August 31, 2021

Principal of Client ackno wledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and Agreed to by Principal of Client:



T█ W█

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Pereman, Oper ations M anager, authorized representative and agen t for service of process.

Date:  August 31, 2021



Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

August 21, 2021

**Client**

IL2AZ Investments I LLC

**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** <br> Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | $199 | Monthly | $199 |
| **Software Fee** <br> Fee paid directly to software provider | $99 | Monthly | $99 |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. <br><br> *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* <br><br> **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of August 21, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose addr ess is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultan t"), and IL2AZ Investmen ts I LLC, (hereinafter "Client").

WHEREAS, Client desires to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Client (toge ther, the "Parties"), for $50,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac counts), and one (1) e-commer ce stores on the W almart pla tform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on/W almart st orefronts and configuring the fr ont and back end s ystems nec essary to manage the Stores.

    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.

    C. Respond t o cust omers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts t o resol ve cust omer inquiries, handle product r eturns, and manage billing ma tters.

    D. Maintain oversigh t of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion t o, and does no t intend t o, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)



2. **CLIENT RESPONSIBILITIES -**

   A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configur ation period (and perhaps longer , depending on the circumstanc es specific t o each pr oposed S tores) where Client must c omple te certain obliga tions. Until Clien t satisfies all c ontractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultant canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

   B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and main tain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand ($ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon/W almart ac count or Stores in Vacation M ode, such t erms being de fined or referenced on the Amaz on/W almart w ebsite or in other writt en materials made available t o Client; and (ii) Client shall no t allow its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

   C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

   A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of fifty thousand dollars ($50,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the F ee is non-refundable.



B. Client shall also ther eafter, beginning in the mon th follo wing the mon th in which the F ee is paid, pay Consultan t one hundr ed ninety nine ($199.00) USD per mon th (the "Maintenance Fee"), or thirty five per cent (35%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**
This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereafter. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION** –
Client may termina te this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may termina te this Agreemen t, at any time, f or cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, " cause" shall include, but no t be limit ed to: (1) any act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on/W almart ma y take from time t o time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE TAX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, removed or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does not hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyright, trademark, tr ade dress, trade secret, or any other intellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty Rights"). Further, Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty Rights, whatsoever, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES –**

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultant's Confidential Information which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultant conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which r estrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultant, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther dir ectl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Information shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



E. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protective order or other injunctiv e relief above with respect t o the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

F. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

G. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obligation under this Section 9 shall last f or a period o f five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secr ets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secr et as a matter of law.

H. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efully read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the r easonable and pr oper pr otection o f Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other r emedies a vailable to it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder .



10. **REFUND POLICY –**

A. Subject t o Paragraph (C) below, during the Term o f this Agreemen t, if Consultant's Services result in a Prohibit ed Action, twic e, Client has the op tion ("Refund Op tion") to request a r efund. Additionall y, follo wing an eigh teen(18) mon th period if the Clien t has not made back their initial st ores costs, Client has the op tion to request a r efund within a thirty (30 ) day period f ollo wing their 18th mon th of working da ys. To exercise the Refund Op tion, Client must no tify Consultant of that election in writing. In tha t event, subject t o Paragraph (C), Consultant will r efund a portion o f the Fee, as defined in Paragraph (B) below (the "Refund Amoun t").

B. The Refund Amoun t shall be calcula ted by the follo wing f ormula: (x) the Fee ($50,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cur e Stores; provided, ho wever, that (1) Client has not engaged in any act that interferes with the oper ation of Client's Stores or of Consultan t's Services or which w ould be in br each of this Agreemen t, including, without limita tion, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibit ed Action, and (2) this Agreemen t remains in full f orce and effect at the time Clien t exercises the Refund Op tion. The Parties further agree that under no cir cumstanc e shall the Refund Amoun t exceed the F ee of ($50,000.00 ).

C. Client's right to exercise the Refund Op tion for reason of Prohibit ed Action under Paragraph (A) is expressly conditioned on Consultan t first managing one replac ement store per store resulting in a Prohibit ed Action (the "Cur e Stores") for Client, and the Cur e Stores also resulting in a Prohibit ed Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS,
DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR
ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR
EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING,
WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS,
ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS
REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER
ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT,
INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR
OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE
BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION
OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A
THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED
CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO.
SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE
ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S
RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S
PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE"
BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY
NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING
CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT
NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS.
CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS
TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY
DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND
CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE,
OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR
OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR
CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,
NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S
SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS
AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions provided on or thr ough the S tores; (2) the satisfaction of any regula tion (governmen t or otherwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) that the Stores will satisfy Client's economic needs and r equirements or reach any particular le vel of sales, income, or net profits.



C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii) economic changes tha t affect c onsumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and conditions, which can ma terially affect or e ven interfere with the mark etability of Client's Stores or its products; (v) changes in international politics or economies, which ma y affect, among o ther things, the ability t o pack age, distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om other sellers o f such pr oduct; (vii) unforeseen events, force majeur e, public health c oncerns, and other e xternal e vents that could a ffect the performanc e of any Amazon/W almart Stores. Client hereby understands tha t there are no guar antees made b y Consultan t or otherwise as t o the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if kno wn b y Client at that time ma y have materially affect ed Client's decision to execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn facts and such unkno wn and unsuspect ed claims and expressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the r elease her ein provided b y Client to Consultan t. Consultant encour ages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the Stores.



D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t Amazon/W almart, fr om time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/ Walmart to remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon/W almart will in such cases return Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guar antees or representations regarding the S tores in relation to any Amazon/W almart polic y, whether currently in effect or as ma y be amended b y Amazon/W almart fr om time t o time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on/W almart elects t o change an y of its policies. H owever, the Services provided b y Consultant to Client pursuan t to this Agreemen t shall where practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture betw een the P arties. Consultant is performing its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com, If to Client, notice shall be sen t electr onicall y to ⬛⬛⬛⬛ @yahoo.com. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egistered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery service, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be entitled t o pursue in an y court of compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee that, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v olun tarily waived such righ t to do so. Accordingl y, in interpreting this Agreemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment –** Neither party ma y assign its righ ts or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject t o the foregoing, this Agreemen t shall be binding upon and inure to the bene fit of the parties her eto, their successors, and assigns. Any purport ed assignmen t or delega tion by either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the t erms of this Agreemen t are not being full y perf ormed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall have thirty (30) days from receipt of the no tice to cure such claimed br each.



L.  **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating t o the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed t o, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M.  **Indemnification of Client -** Consultant agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur or which ma y be asserted against any Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult of the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N.  **Survival** – Any Section in this A greemen t that r equir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

O.  **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P.  **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultant may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultant commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court costs) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultant would no t make any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.



## 14. DEFINITIONS –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

10. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the o f the last e xecution date belo w.

**CLIENT:**

By: B███ B██████ authoriz ed representative and agen t for service of process Date: September 20, 2021

Principal of Client ackno wledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed t o by Principal of Client:



IL2AZ Investmen ts I LLC

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations Manager, authorized representative and agen t for service of process.

Date: September 20, 2021

Amanada Peremen

Amanada Peremen

# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

August 22, 2021

**Client**



**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of August 22, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose addr ess is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultan t"), and A███ L███ (hereinafter "Client").

WHEREAS, Client desires to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Client (toge ther, the "Parties"), for $50,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac counts), and one (1) e-commer ce stores on the W almart pla tform (the "Stores"):

AMENDMENT: Consultant will pr ovide Clien t an LLC free of charge upon signing the agreemen t.

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including c onfiguring the Amaz on/W almart st orefronts and configuring the fr ont and back end s ystems nec essary to manage the Stores.

   B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.

   C. Respond t o cust omers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts t o resol ve cust omer inquiries, handle product r eturns, and manage billing ma tters.



D.  Maintain oversight of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion to, and does no t intend to, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)

2. **CLIENT RESPONSIBILITIES -**

A.  Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 mon th configur ation period (and perhaps longer , depending on the circumstanc es specific to each pr oposed S tores) where Client must c omple te certain obliga tions. Until Clien t satisfies all c ontractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultan t canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

B.  Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and main tain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand ($ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon/W almart ac count or Stores in Vacation Mode, such t erms being de fined or r eferenced on the Amaz on/W almart w ebsite or in other writt en materials made a vailable to Client; and (ii) Client shall no t allo w its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

C.  Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**



A.  In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of fifty thousand dollars ($50,000.00  ) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.

B.  Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission "), whichever is greater plus an additional  ninety nine dollars ($99) so ftware fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C.  Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4.  **TERM -**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5.  **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this A greement, independent of any actions Amazon/W almart may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



6. **NON-DISPARAGEMENT –**

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not t o disparage, insult, or f abricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE T AX –**

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or de termining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8. **INTELLECTUAL PROPERTY –**

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does no t hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyright, trademark, tr ade dress, trade secret, or any other in tellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty R ights, whatsoe ver, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.

9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access
to Consultan t's Confiden tial Informa tion which, if disclosed, c ould assist in
compe tition against Consultan t by third parties. Client recogniz es the highl y
compe titiv e nature of Consultan t's business, services, and its trade secr ets, and that
Consultant conducts its business electr onicall y, through e-c ommer ce, and
throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions
on Client's activities ar e necessary to protect the good will, Con fidential Information,
and other legitima te business interests of Consultan t, which restrictions ar e fair and
support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition,
agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t,
directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e
any emplo yee or contractor of Consultan t to leave the emplo y or contract of
Consultant, or in any way interfere with the r elationship be tween Consultan t
and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any
customer, supplier, client, distribut or, vendor, licensee, or other business
relation of Consultan t to cease doing business with Consultan t, or in any way
interfere with Consultan t's relationship with an y such party.

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor
disclose, whe ther dir ectl y or indirectl y, to any third party an y Confiden tial
Information for any purpose e xcept as approved in writing b y Consultan t.
Further, the Parties shall (a) not assist nor enable an yone to access or use any
of Confiden tial Information; and (b) not use nor e xploit an y of the Con fidential
Information for any purpose wha tsoe ver except in accordance with the t erms of
this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the
Confiden tial Information shall be r eferred to as "Disclosing Party," and the Party
receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the
Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes
required by court or der to disclose an y Confiden tial Information; 2) cooper ate
with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain
such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information
which its c ounsel advises it is legall y compelled t o disclose.



D. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Con fidential Information referred to therein and Receiving Party is ther eafter requir ed by court or der to disclose such Con fidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly requir ed by the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agr ees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Con fidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their r espectiv e rights and obliga tion under this Section 9 shall last f or a period of five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secrets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secret as a matter of law.

G. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the r easonable and pr oper pr otection of Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable to it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder.



10. **REFUND POLICY –**

    A. Subject to Paragraph (C) below, during the Term of this Agreemen t, if Consultant's Services result in a Prohibit ed Action, twic e, Client has the op tion ("Refund Op tion") to request a r efund. Additionall y, follo wing an eigh teen(18) mon th period if the Clien t has not made back their initial st ores costs, Client has the op tion to request a r efund within a thirty (30 ) day period f ollo wing their 18th mon th of working da ys. To exercise the Refund Op tion, Client must no tify Consultan t of that election in writing. In tha t event, subject t o Paragraph (C), Consultan t will r efund a portion o f the Fee, as defined in Paragraph (B) below (the "Refund Amoun t").

    B. The Refund Amoun t shall be calcula ted by the follo wing f ormula: (x) the Fee ($50,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cur e Stores; provided, ho wever, that (1) Clien t has not engaged in any act tha t interferes with the oper ation of Client's Stores or of Consultan t's Services or which w ould be in br each of this Agreemen t, including, without limita tion, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibit ed Action, and (2) this Agreemen t remains in full f orce and effect at the time Clien t exercises the Refund Op tion. The Parties further agree that under no cir cumstanc e shall the Refund Amoun t exceed the F ee of ($50,000.00 ).

    C. Client's right to exercise the Refund Op tion for reason of Prohibit ed Action under Paragraph (A) is expressly conditioned on Consultan t first managing one replac emen t store per store resulting in a Prohibit ed Action (the "Cur e Stores") for Client, and the Cur e Stores also resulting in a Prohibit ed Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or o therwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) tha the Stores will satisfy Client's economic needs and r equirements or reach any particular le vel of sales, income, or ne t profits.



**PX 37**                    **Attachment A**

C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii) economic changes tha t affect consumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and conditions, which can ma terially affect or e ven interfere with the mark etability of Client's Stores or its products; (v) changes in international politics or economies, which ma y affect, among o ther things, the ability t o pack age, distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om other sellers o f such pr oduct; (vii) unforeseen events, force majeur e, public health c oncerns, and other external events that could affect the performanc e of any Amazon/W almart Stores. Client hereby understands tha t there are no guar antees made b y Consultan t or otherwise as t o the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if kno wn by Client at that time ma y have materially affect ed Client's decision t o execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn facts and such unkno wn and unsuspect ed claims and expressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the r elease her ein provided b y Client to Consultan t. Consultant encourages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the Stores.



D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t Amazon/W almart, fr om time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/ Walmart to remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon/W almart will in such cases return Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guar antees or representations regarding the S tores in relation to any Amazon/W almart polic y, whether currently in effect or as ma y be amended b y Amazon/W almart fr om time t o time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on/W almart elects t o change an y of its policies. H owever, the Servic es provided b y Consultan t to Client pursuan t to this Agreemen t shall wher e practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed ninety nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture betw een the P arties. Consultant is perf orming its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to _____@gmail.com. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receip t or refusal if sen t by U.S. first class certified or r egistered mail, postage prepaid, return r eceip t request ed, or by a recognized priv ate deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held t o be invalid or unen forceable for any reason, the remaining pr ovisions will c ontinue in full f orce and effect. In such event, the Parties hereby acknowledge their in tent to make such invalidated pr ovision, or part of such pr ovision, as to be deemed r eplac ed with a valid pr ovision or part o f provision that most closel y approximates and gives effect t o the intent of the invalid pr ovision. Any such modifica tion shall r evise the existing invalid pr ovision, or part ther eof, only as much as nec essary to make the invalidl y-held pr ovision otherwise v alid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or e xtent of any section o f this Agreemen t.

E. **Dispute Resolution -** Except wher e otherwise e xpressly set forth in this Agreemen t, any disput e or claim arising out o f or relating t o this Agreemen t shall onl y be resolved by binding arbitr ation. The arbitr ation of any disput e or claim shall be c onduct ed in accordance with the American Arbitr ation Association ("AAA") rules, as modified by this Agreemen t, which shall tak e plac e in Miami-Dade Coun ty, Florida. Any arbitr ation pr oceeding, de terminat ion, or award, shall be c onfidential, and neither P arty ma y disclose the e xistence, content or results o f any arbitr ation, except as may be required by law or f or purposes o f enforcemen t. Judgmen t on any arbitr ation award may be en tered in any court ha ving pr oper jurisdiction. All administr ative fees and expenses of such arbitr ation pr oceeding will be divided equall y bet ween the parties, though each Party will bear its o wn expense of counsel, experts, witnesses and preparation and pr esentation of evidenc e at the arbitr ation (except wher e attorneys' fees and costs shall be a warded pursuan t to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out o f or in conjunction with the subject matter of this Agreemen t may be br ough t by either P arty mor e than one (1) year after the cause o f action ar ose.

F. **Amendment -** This Agreemen t canno t be amended e xcept in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreemen t may be execut ed by electr onic means and in any number o f counterparts, each of which when so e xecut ed and deliv ered will be deemed an original, and all such c ounterparts t oge ther will constitut e one and the same instrumen t.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be en titled t o pursue in an y court of compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee that, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v oluntarily waived such righ t to do so. Accordingl y, in interpreting this Agreemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment –** Neither party ma y assign its rights or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject to the foregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion by either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the terms of this Agreemen t are not being full y performed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall have thirty (30) days from receipt of the no tice to cure such claimed br each.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating t o the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult of the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agr eemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that r equir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2, Consultant may offer Client guidanc e and referrals to third-party v endors. Additionall y, Consultant may, in its discretion, and at no additional f ee to Client, offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial Act"). Before Consultant commenc es any Ministerial Act, Consultan t shall ob tain Client's writt en consent. Client agrees to reimburse Consultan t for expenses incurred in carrying out a Minist erial Act. In the event Consultan t offers to engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save and hold harmless Consultan t from any cost, claim, damage or liability (including a ttorneys' fees and court c osts) related to the Minist erial Act. Client also waives any claims against Consultan t that may be related to the Minist erial Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to the Minist erial Act is a material induc emen t for Consultan t to make any offer to Client for such Minist erial Act, and without such indemnifica tion and w aiver from Clien t, Consultant would no t make any such offer of assistance to Client to engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e expiration of the Term of this Agreemen t or its earlier t ermination.



14. **DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and iden tities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the o f the last e xecution date belo w.

**CLIENT:**

By: A▇▇L▇▇ authoriz ed representative and agen t for service of process Date:  August 23, 2021

Principal of Client ackno wledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed to by Principal of Client:





**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, CFO, authorized representative and agen t for service of process.

Date:  August 23, 2021

*Amanada Peremen*

Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

September 07, 2021

**Client**

H▮▮ S▮▮▮▮

**Company**

PASSIVE SCALING INC

**PX 37**                    **Attachment A**                    002802

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $100,000 | 1 | $100,000 |

"*Store Infrastructure Fee*" - this goes directly
towards warehousing expenses, full time
employees & benefits, consulting expertise, web
build & store build, web build & store build for
Amazon sub-accounts, product selection, &
initial inventory

| | | | |
|---|---|---|---|
| **Management Fee - $199 or 25%** | $199 | Monthly | $199 |

Minimum management fee of $199 per month **or**
twenty five percent (25%) of net profit - **this fee
begins the following month after fulfillment of
initial payment.**

| | | | |
|---|---|---|---|
| **Software Fee** | $99 | Monthly | $99 |

Fee paid directly to software provider

| | | | |
|---|---|---|---|
| **Minimum Working Capital - $30,000** | $30,000 | 0 | $0 |

This is the minimum requirement of available
credit or capital to cover inventory & wholesale
price of dropshipped items. Amazon/Walmart
pay every two weeks, and this money covers
orders until the scheduled store payout.

*Please note: Walmart places an additional 14 day
waiting period for the first 90 days of a new
account. This means only one payment from
Walmart occurs within the first month of business*

**Recommended credit available for expedited
scaling process is $50,000 +**

| **TOTAL** | | | **$100,298** |
|---|---|---|---|

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of September 0 7, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinaft er "Consultant"), and H███ S██████, (hereinafter "Client").

WHEREAS, Client desi res to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Client (toge ther, the "Parties"), for $100,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with f our (4) e-commer ce stores on the Amaz on pla tform, (including tw o (2) sub-accounts), and two (2) e-commer ce stores on the W almart pla tform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on/W almart st orefronts and configuring the fr ont and back end s ystems nec essary to manage the Stores.
    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.
    C. Respond t o cust omers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts to resol ve cust omer inquiries, handle product r eturns, and manage billing ma tters.
    D. Maintain oversigh t of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion to, and does no t intend t o, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)



2. **CLIENT RESPONSIBILITIES -**

    A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configuration period (and perhaps longer , depending on the circumstanc es specific to each proposed Stores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultant canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

    B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and maintain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f fifty thousand ($50,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or plac e its Amazon/W almart ac count or Stores in Vacation Mode, such t erms being de fined or referenced on the Amaz on/W almart w ebsite or in other writt en materials made a vailable t o Client; and (ii) Client shall no t allo w its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

    C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary information for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

    A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of one hundr ed thousand dollars ($100,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the Fee is non-r efundable.



**Attachment A**

B. Client shall also ther eafter, beginning in the mon th following the mon th in which the F ee is paid, pay Consultan t one hundr ed ninety nine ($199.00) USD per mon th (the "Maintenance Fee"), or twenty five percent (25%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**
This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereafter. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may terminate this Agreemen t, at any time, for cause, with fourteen (14) days writt en notice to Client. Consultant may terminate the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) any act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on/W almart ma y take from time t o time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or f abricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE T AX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinanc e.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does not hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyrigh t, trademark, tr ade dr ess, trade secret, or any other in tellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty R ights, whatsoe ver, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES –**

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultant's Confidential Informa tion which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultant conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which r estrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultant, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther dir ectl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultant. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Informa tion shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



E. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protective order or other injunctiv e relief above with respect t o the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly required by the court order.

F. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

G. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultant's trade secrets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secret as a matter of law.

H. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such restraints are necessary for the reasonable and pr oper pr otection of Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable t o it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t oge ther with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder .



10. **REFUND POLICY** –

   A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

   B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($100,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($100,000.00).

   C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS,
DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR
ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR
EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING,
WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS,
ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS
REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER
ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT,
INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR
OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE
BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION
OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A
THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED
CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO.
SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE
ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S
RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S
PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE"
BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY
NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING
CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT
NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS.
CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS
TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY
DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND
CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE,
OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR
OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR
CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE,
NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S
SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS
AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or o therwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) that the Stores will satisfy Client's economic needs and r equirements or reach any particular le vel of sales, income, or net profits.

*GS*

C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii) economic changes tha t affect consumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and conditions, which can ma terially affect or e ven interfere with the mark etability of Client's Stores or its products; (v) changes in international politics or economies, which ma y affect, among o ther things, the ability t o package, distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om other sellers o f such pr oduct; (vii) unforeseen events, force majeur e, public health c oncerns, and other external events that could affect the performanc e of any Amazon/W almart Stores. Client hereby understands tha t there are no guar antees made b y Consultan t or otherwise as t o the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if kno wn by Client at that time ma y have materially affected Client's decision to execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn facts and such unkno wn and unsuspect ed claims and expressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the release her ein provided b y Client to Consultan t. Consultant encourages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the Stores.



**Attachment A**                                 002813
                                                                                                    11

D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t Amazon/W almart, from time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/ Walmart to remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon/W almart will in such cases return Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guar antees or representations regarding the S tores in relation to any Amazon/W almart polic y, whether currently in effect or as ma y be amended b y Amazon/W almart fr om time t o time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on/W almart elects t o change an y of its policies. H owever, the Servic es provided b y Consultan t to Client pursuan t to this Agreemen t shall where practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 25% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture between the Parties. Consultant is performing its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to ⬛⬛⬛⬛⬛@gmail.com. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egistered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery service, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be en titled t o pursue in an y court of compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee tha t, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v olun tarily waived such righ t to do so. Accordingl y, in interpreting this A greemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment –** Neither party ma y assign its rights or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject to the foregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion by either party in viola tion of the foregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the terms of this Agreemen t are not being full y performed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall have thirty (30 ) days from receipt of the no tice to cure such claimed br each.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorne ys' fees and costs) which any Indemnified P arty may incur or which ma y be assert ed against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating t o the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorne ys' fees and costs) which any Indemnified P arty ma y incur or which ma y be assert ed against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult of the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agr eemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that requir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

O. **Client Data Management** – Unless Consultan t receives Client's prior writt en consent, Consultant shall no t: (i) access, process, or otherwise use Clien t's Data other than as nec essary to facilitate Consultant's Services; (ii) give any of its emplo yees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performanc e of Consultan t under this Agreemen t; or (iii) give any other thir d-party ac cess to Client Data except as necessary for such thir d-party t o facilitate performanc e under this A greemen t. Consultan t shall no t erase Client Data, or any copy ther eof, without Clien t's express writt en consent and shall f ollow Client's writt en instructions r egarding retention and er asure of Client Data so long as it does no t interfere with the performanc e of Consultan t's Services and perf ormanc e under this A greemen t. Client possesses and retains all righ t, title, and in terest in and t o Client Data, and Consultan t's use and possession ther eof is solel y in further ance of Consultan t's Services and on Clien t's behalf . Consultant shall c ompl y with all applicable la ws and regula tions go verning the handling o f Client Data and shall not engage in an y activity tha t would plac e Client in viola tion of any applicable law, regula tion, or go vernmen t request, or judicial pr ocess.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRETLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultan t may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court c osts) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultan t would no t mak e any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.



## 14. DEFINITIONS –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's



6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the o f the last e xecution date belo w.

**CLIENT:**

By: H ████ S ████ authoriz ed representative and agen t for service of process Date: September 13, 2021

Principal o f Client ackno wledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed t o by Principal o f Client:



H ██ n S ████

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations M anager, authorized representative and agen t for service of process.

Date:  September 13, 2021



Amanada Peremen