

# Delivering on Your

# eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

September 08, 2021

**Client**

F█████T████W████

**Company**

PASSIVE SCALING INC

**PX 37**          **Attachment A**          002823



# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $50,000 | 1 | $50,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout. | | | |
| *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business* | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$50,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of September 08, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinaft er "Consultan t"), and F█████ T█ W██ , (hereinafter "Client").

WHEREAS, Client desir es to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Clien t (toge ther, the "Parties"), for $50,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac counts), and one (1) e-commer ce stores on the W almart pla tform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on/W almart st orefronts and configuring the fr ont and back end s ystems nec essary to manage the Stores.
    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.
    C. Respond t o cust omers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts to resol ve cust omer inquiries, handle product r eturns, and manage billing ma tters.
    D. Maintain oversight of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion t o, and does no t intend t o, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)



2. **CLIENT RESPONSIBILITIES -**

   A. Client understands ther e is a period tha t will dela y the c ommenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configur ation period (and perhaps longer , depending on the circumstanc es specific t o each pr oposed S tores) where Client must c omple te certain obliga tions. Until Clien t satisfies all c ontractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultant canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

   B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and main tain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand ($ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon/W almart ac count or Stores in Vacation M ode, such t erms being de fined or r eferenced on the Amaz on/W almart w ebsite or in other writt en ma terials made a vailable t o Client; and (ii) Client shall no t allo w its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

   C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion f or the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

   A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of fifty thousand dollars ($50,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the F ee is non-refundable.



B.  Client shall also ther eafter, beginning in the mon th following the mon th in which the F ee is paid, pay Consultan t one hundr ed nine ty nine ($199.00) USD per mon th (the "Maintenance Fee"), or thirty five per cent (35%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional  ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider . Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C.  Consultan t shall in voice Client mon thly, and Client has seventy-tw o (72) hours to remit pa ymen t.

4.  **TERM -**
This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereaft er. Upon comple tion of the Initial Term, the Agreemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5.  **TERMINATION –**
Client may termina te this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may termina te this Agreemen t, at any time, f or cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) an y act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on/W almart ma y take from time t o time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE T AX** –

Consultan t does no t provide tax r eporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinanc e.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does no t hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyright, trademark, tr ade dr ess, trade secret, or any other intellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty Rights, whatsoe ver, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm o f this Agreemen t Client will ha ve access to Consultan t's Confiden tial Informa tion which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titiv e nature of Consultan t's business, services, and its trade secr ets, and that Consultan t conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which r estrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer , supplier, client, distribut or, vendor , licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther dir ectl y or indirectl y, to any third party an y Confiden tial Information for any purpose e xcept as approved in writing b y Consultan t. Further , the Parties shall (a) not assist nor enable an yone to access or use any of Confiden tial Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoe ver except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confiden tial Informa tion shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confiden tial Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



E. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Con fidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Con fidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly required by the court order.

F. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confiden tial Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Con fidential Information.

G. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secrets shall surviv e such expiration and such duties o f confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secret as a matter of law.

H. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the reasonable and pr oper pr otection o f Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable t o it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in en forcing Consultant's rights hereunder.



10. **REFUND POLICY** –

    A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen (18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

    B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($50,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($50,000.00).

    C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or
warranties as to: (1) the accuracy, the reliability , or the comple teness, of any
matter within the sc ope of this Agreemen t, including but no t limit ed to the
Stores, the products ther ein, or the da ta, informa tion, content, softw are,
technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2)
the satisfaction o f any regula tion (governmen t or o therwise ) requiring
disclosur e of informa tion on the pr oducts pr ovided thr ough or in c onnection
with the S tores or the appr oval or complianc e of the Stores or any softw are or
information and c ontent contained in the S tores; or (3) tha t the Stores will sa tisfy
Client's economic needs and r equir emen ts or reach any particular le vel of
sales, income, or ne t profits.



C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii) economic changes tha t affect consumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and conditions, which can ma terially affect or e ven interfere with the mark etability of Client's Stores or its products; (v) changes in international politics or economies, which ma y affect, among o ther things, the ability t o package, distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om other sellers o f such pr oduct; (vii) unforeseen events, force majeur e, public health c oncerns, and other external events that could a ffect the performanc e of any Amazon/W almart Stores. Client hereby understands tha t there are no guar antees made b y Consultan t or otherwise as t o the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unknown or unsuspect ed at the time this A greemen t was execut ed, and which if kno wn by Client at that time ma y have materially affected Client's decision to execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultant contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn facts and such unkno wn and unsuspect ed claims and expressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the r elease her ein provided b y Client to Consultan t. Consultant encour ages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the Stores.



D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t Amazon/W almart, fr om time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/ Walmart t o remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon/W almart will in such cases return Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guar antees or representations regarding the S tores in relation to any Amazon/W almart polic y, whether currently in effect or as ma y be amended b y Amazon/W almart fr om time t o time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on/W almart elects t o change an y of its policies. H owever, the Servic es provided b y Consultant to Client pursuan t to this Agreemen t shall where practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

   A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

   B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture between the Parties. Consultant is performing its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

   C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to ⬛⬛⬛⬛⬛@gmail.com. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egistered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



H. **Injunctive Relief -**In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be entitled t o pursue in any court of compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee that, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v oluntarily waived such righ t to do so. Accordingl y, in interpreting this Agreemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment** – Neither party ma y assign its righ ts or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject t o the f oregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion by either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the t erms of this Agreemen t are not being full y performed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f performanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall ha ve thirty (30 ) days from receipt of the no tice to cure such claimed br each.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorne ys' fees and c osts) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating t o the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and c osts) which any Indemnified P arty ma y incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult of the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that r equir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed b y applicable law.

O. **Client Data Management** – Unless Consultan t receives Client's prior writt en consent, Consultant shall no t: (i) access, process, or otherwise use Clien t's Data other than as nec essary to facilita te Consultan t's Services; (ii) give any of its emplo yees access to Client Data except to the e xtent that such individuals needs ac cess to Client Data to facilita te perf ormanc e of Consultan t under this Agreemen t; or (iii) give any other thir d-party ac cess to Client Data except as necessary for such thir d-party t o facilita te perf ormanc e under this A greemen t. Consultan t shall no t erase Client Data, or any copy ther eof, without Clien t's express writt en consent and shall f ollo w Client's writt en instructions r egarding retention and er asure of Client Data so long as it does no t interfere with the perf ormanc e of Consultan t's Services and perf ormanc e under this A greemen t. Client possesses and r etains all righ t, title, and in terest in and t o Client Data, and Consultan t's use and possession ther eof is solel y in further ance of Consultan t's Services and on Clien t's behalf . Consultant shall c ompl y with all applicable la ws and regula tions go verning the handling o f Client Data and shall not engage in an y activity tha t would plac e Client in viola tion of any applicable law, regula tion, or go vernmen t request, or judicial pr ocess.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



**PX 37**                                **Attachment A**

Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultant may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultant commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court c osts) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica  tion and w aiver
from Clien t, Consultan t would no t mak e any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.



## 14. DEFINITIONS –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringemen t as defined under the U .S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Clien t's Store, and (ii) any Amazon/W almart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringemen t as defined under the U .S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but no t limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions b y Amazon/W almart which inactiv ates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreemen t by Client which results in a condition of Client's Stores where all sales activity in the S tores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/W almart.com where products may be sold to third parties (there is no affiliation, endorsemen t, or sponsorship be tween Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the of the last e xecution date belo w.

**CLIENT:**

By: F█████T███W███ authoriz ed representative and agen t for service of process Date: September 08, 2021

Principal of Client acknowledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed t o by Principal of Client:





**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations Manager, authorized representative and agen t for service of process.

Date: September 08, 2021

*Amanada Peremen*

Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon & Walmart Automation

**Delivered on**

September 20, 2021

**Client**

M████  S████

**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $100,000 | 1 | $100,000 |
| "*Store Infrastructure Fee*" - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, web build & store build, web build & store build for Amazon sub-accounts, product selection, & initial inventory | | | |
| **Management Fee - $199 or 25%**  Minimum management fee of $199 per month or twenty five percent (25%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | $199 | Monthly | $199 |
| **Software Fee**  Fee paid directly to software provider | $99 | Monthly | $99 |
| **Minimum Working Capital - $30,000** | $30,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of dropshipped items. Amazon/Walmart pay every two weeks, and this money covers orders until the scheduled store payout.  *Please note: Walmart places an additional 14 day waiting period for the first 90 days of a new account. This means only one payment from Walmart occurs within the first month of business*  **Recommended credit available for expedited scaling process is $50,000 +** | | | |

| **TOTAL** | | | **$100,298** |
|---|---|---|---|

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of September 20, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and M███████ S██████, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $100,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with four (4) e-commerce stores on the Amazon platform, (including two (2) sub-accounts), and two (2) e-commerce stores on the Walmart platform (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
   A. Maintain Client's Stores, including configuring the Amazon/Walmart storefronts and configuring the front and back end systems necessary to manage the Stores.

   B. Review, research, source, select, and list products for the Client's Stores.

   C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

   D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)

**PX 37**                    **Attachment A**                    002846
                                                                    2

2. **CLIENT RESPONSIBILITIES -**

   A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configur ation period (and perhaps longer , depending on the circumstanc es specific to each pr oposed S tores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultant canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

   B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and maintain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f fifty thousand ($50,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon/W almart ac count or Stores in Vacation Mode, such terms being de fined or r eferenced on the Amaz on/W almart w ebsite or in other writt en materials made a vailable to Client; and (ii) Client shall no t allo w its Stores to remain shut do wn for mor e than nine ty (90) days during the t erm of this Agreemen t.

   C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultant in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

   A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of one hundr ed thousand dollars ($100,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the Fee is non-r efundable.

B. Client shall also ther eafter, beginning in the mon th follo wing the mon th in which the F ee is paid, pay Consultan t one hundr ed nine ty nine ($199.00) USD per mon th (the "Maintenance Fee"), or twenty five percent (25%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**

This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereaft er. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION** –

Client may termina te this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may termina te this Agreemen t, at any time, f or cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) any act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on/W almart ma y take from time t o time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner. The Parties hereby mutuall y agree not t o disparage, insult, or fabricate information regarding the o ther party in an y online or offline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE TAX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or de termining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on/W almart platform and no t a distinct or se verable pr oduct or servic e that can be port ed, removed or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does not hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amazon/W almart, or an y of Amazon's copyright, trademark, tr ade dr ess, trade secret, or any other in tellectual pr operty righ t that Amazon/W almart ma y hold (the "Intellectual Pr operty R ights"). Further, Consultant canno t, and does no t, grant or convey to Client any Intellectual Pr operty Rights, whatsoe ver, in Client's Stores, or Amazon/W almart, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm o f this Agreemen t Client will ha ve access to Consultan t's Confidential Information which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultan t conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollowing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which restrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party.

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther directl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Information shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the extent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.

E. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or o ther injunctiv e relief above with r espect t o the Con fidential Information referred to ther ein and Receiving Party is ther eafter requir ed by court or der to disclose such Con fidential Information, Receiving Party ma y disclose onl y such Con fidential Information as is expressly requir ed by the c ourt order.

F. **Maintenance of Confidential Information**. The Receiving Party agr ees that it shall tak e all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing P arty's Confiden tial Informa tion. Without limiting the f oregoing, Receiving Party shall tak e at least those measur es that Receiving Party tak es to protect its o wn confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Con fidential Information.

G. **Confidentiality Term**: Regardless of any termina tion of this Agreemen t, the parties expressly ackno wledge and agr ee tha t their respectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years follo wing the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, ho wever, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secr ets shall surviv e such expiration and such duties o f confidentiality shall c ontinue and no t expire so long as such Confidential Informa tion is deemed a tr ade secr et as a matter of law.

H. **In signing this Agreemen t**, Client ackno wledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsider ed all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the r easonable and pr oper pr otection o f Consultan t, and tha t each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., thr oughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable to it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t oge ther with r easonable a ttorneys' fees incurred in en forcing Consultan t's rights her eunder.

10. **REFUND POLICY** –

    A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30 ) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

    B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($100,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($100,000.00 ).

    C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.

11. **LIMITATION OF LIABILITY -**

A.  UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

A.  CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or o therwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) tha t the Stores will satisfy Client's economic needs and r equir emen ts or reach any particular le vel of sales, income, or ne t profits.

C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential
growth o f the Clien t's Stores carries financial and o ther risks. Client her eby
understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o
numer ous business risks, including but no t limit ed to: (i) a changing legal
environmen t in which r egula tions can emer ge or change tha t affects the
commer cial sale of products thr ough Amaz on/W almart via Clien t's Stores; (ii)
economic changes tha t affect c onsumer spending, the emer genc e of
recessions due t o economic and o ther issues (including public health issues)
and the lik e; (iii) changes in the popular appeal o f and demand f or different
types of Amazon/W almart pr oducts; (iv) changes in Amazon's terms and
conditions, which can ma terially affect or e ven interfere with the mark etability
of Client's Stores or its products; (v) changes in international politics or
economies, which ma y affect, among o ther things, the ability t o package,
distribut e and ship Amaz on/W almart pr oducts, and the c osts ther eof; (vi)
market forces, including incr eased and changing le vels of compe tition f or any
given product fr om other sellers o f such pr oduct; (vii) unforeseen events, force
majeur e, public health c oncerns, and other e xternal events that could a ffect the
performanc e of any Amazon/W almart Stores. Client hereby understands tha t
there are no guar antees made b y Consultan t or otherwise as t o the Stores
sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk
of a total loss of his, her or its investmen t. Client acknowledges the substan tial
risks gener ally involved with an e-c ommer ce business. Client recognizes that
there is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client
may discover facts or incur or suff er claims which w ere unkno wn or
unsuspect ed at the time this A greemen t was execut ed, and which if kno wn b y
Client at that time ma y have materially affect ed Client's decision t o execut e this
Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f
Consultan t contained in the pr eceding subsections, Clien t assumes any and all
risks of such unkno wn facts and such unkno wn and unsuspect ed claims and
expressly releases Consultan t for any liability which Consultan t could ha ve had
in connection ther ewith in the absenc e of the release her ein provided b y Client
to Consultan t. Consultant encour ages Client to only invest funds tha t Client can
afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely
lose, and to consult Clien t's legal and/or business advisors prior t o investing in
the Stores.

D. **Amazon/W almart Terms and Conditions** - Client hereby understands tha t
Amazon/W almart, fr om time t o time, with or without cause, can and does
suspend ac counts for various reasons, some of which ma y not be ob vious or
justified in Clien t's view. In the event Client's Stores is suspended, Compan y will
assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on/
Walmart t o remedy the situa tion at no extra cost. Consultan t makes no
representations or w arranties of any kind, however, that Amazon/W almart will
in such cases return Clien t's Stores to active status. Furthermor e, Client agrees
and understands tha t Consultan t makes no guar antees or representations
regarding the S tores in relation to any Amazon/W almart polic y, whether
currently in effect or as ma y be amended b y Amazon/W almart fr om time t o
time. Client understands tha t Consultan t has no control over or input in when
and whe ther Amaz on/W almart elects t o change an y of its policies. H owever,
the Servic es provided b y Consultan t to Client pursuan t to this Agreemen t shall
wher e practical be c onsistent with Amaz on's current policies. In the e vent in
which Clien t's store is suspended be yond a 30 da y period, and no r evenue is
earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine
($199.00) USD per month or 25% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the
subject ma tter of this Agreemen t subject t o the limita tions as to Client under
Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a
partnership or a join t venture betw een the Parties. Consultant is performing its
services to Client as an independen t contractor and no t as Client's agent or
emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email
address(es) provided b y each Party to the o ther and as o therwise se t forth
belo w. All notices to Consultan t shall be sen t to info@passivescaling.com. If to
Client, notice shall be sen t electr onicall y to            @gmail.com .
Alternatively, such writt en notice will also be deemed giv en upon personal
deliv ery, or on receipt or refusal if sent by U.S. first class certified or r egistered
mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate
deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Miami-Dade County, Florida. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.

H. **Injunctive Relief -** In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment** – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or relating t o the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indirectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client** - Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult o f the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that requir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultant may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court costs) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultan t would no t make any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.



14.**DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon/Walmart transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's

6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

7. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon/Walmart fees related to Client's store.

8. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store

9. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

10. "Suspension" means an action or actions by Amazon/Walmart which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

11. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

12. The term "Store" means the Client's wholly owned e-commerce location on the third-party Amazon.com/Walmart.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon/Walmart).

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecuted as of the of the last e xecution
date below.

**CLIENT:**

By: M███  S████ authorized representative and agen t for service of process Date:
September 21, 2021

Principal of Client acknowledges and agr ees to be bound b y all of the pr ovisions of this
Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and Agreed to by
Principal of Client:



M███ █████

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations Manager, authorized
representative and agen t for service of process.

Date:  September 21, 2021



Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon Automation

**Delivered on**

October 29, 2021

**Client**

P███ R██████

**Company**

PASSIVE SCALING INC

Attachment A

002865

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee - $199 or 35%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$30,298** |

Attachment A

002866
1

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of October 29, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose addr ess is 78 John Miller W ay, Suite 227 Kearny, NJ 07032 (hereinafter "Consultan t"), and P████ R██████, (hereinafter "Client").

WHEREAS, Client desir es to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Client (toge ther, the "Parties"), for $30,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the f ollowing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac count) (the "Stores"):

AMENDMENT : Client reserves the righ t to pur chase an additional tw o (2) e-commer ce stores on the Amaz on pla tform, (including one (1) sub-ac count) (the "Stores") store for $20,000 within no mor e than nine ty (90) days of signing this agr eemen t, which will be available as an additional c ontract reflecting the t erms of the additional st ore.
If Consultan t, upon Consultan t's sole discr etion, begins o ffering W almart st ore managemen t progr ams, Client reserves the righ t to pur chase an additional W almart st ore for $20,000 after signing this agr eemen t, which will be a vailable as an additional c ontract reflecting the terms of the additional st ore.

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on storefronts and configuring the fr ont and back end s ystems nec essary to manage the S tores.

    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.



**Attachment A**

C. Respond to customers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts to resolve customer inquiries, handle product r eturns, and manage billing ma tters.

D. Maintain oversight of Client's Stores and its financial perf ormanc e; however, Consultan t shall ha ve no obliga tion to, and does no t intend to, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)

2. **CLIENT RESPONSIBILITIES -**

A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configuration period (and perhaps longer , depending on the circumstanc es specific to each pr oposed S tores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equirements for the cr eation and oper ation of Client's Stores, Consultant cannot commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and maintain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand ($ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such t erms being defined or referenced on the Amaz on website or in other writt en materials made available t o Client; and (ii) Client shall no t allow its Stores to remain shut down for mor e than nine ty (90) days during the t erm of this Agreemen t.

C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultan t carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**



A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($ 30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

4. **TERM -**
This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE T AX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinanc e.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on platform and not a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does no t hold itself out t o have any righ ts, endorsemen ts, relations, or affiliation with Amaz on, or any of Amazon's copyrigh t, trademark, tr ade dr ess, trade secr et, or any other intellectual pr operty righ t that Amazon may hold (the "In tellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or c onvey to Client any Intellectual Property R ights, whatsoe ver, in Client's Stores, or Amazon, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultant's Confidential Information which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultant conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which r estrictions ar e fair and support ed by adequa te consideration: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attempt to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultant, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attempt to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther directl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Information shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



**Attachment A**          002871

6

D. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Con fidential Information referred to ther ein and Receiving Party is ther eafter requir ed by court or der to disclose such Con fidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly requir ed by the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agr ees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termina tion of this Agreemen t, the parties expressly acknowledge and agr ee that their r espectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years follo wing the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secr ets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secr et as a matter of law.

G. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the r easonable and pr oper pr otection o f Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable to it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such br each or thr eatened br each, without ha ving to post bond, t oge ther with r easonable a ttorneys' fees incurred in en forcing Consultant's rights hereunder .





## 10. REFUND POLICY –

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial st ores costs, Client has the option to request a refund within a thirty (30 ) day period following their 18th month of working da ys. To exercise the Refund Op tion, Client must no tify Consultant of that election in writing. In tha t event, subject t o Paragraph (C), Consultant will refund a portion o f the Fee, as defined in Paragraph (B) below (the "Refund Amoun t").

B. The Refund Amoun t shall be calcula ted by the follo wing formula: (x) the Fee ($30,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cur e Stores; provided, ho wever, that (1) Client has not engaged in any act that interferes with the oper ation of Client's Stores or of Consultant's Services or which w ould be in br each of this Agreemen t, including, without limita tion, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreemen t remains in full f orce and effect at the time Client exercises the Refund Op tion. The Parties further agree that under no cir cumstanc e shall the Refund Amoun t exceed the F ee of ($30,000.00 ).

C. Client's right to exercise the Refund Op tion for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultan t first managing one replac ement store per store resulting in a Prohibited Action (the "Cur e Stores") for Client, and the Cur e Stores also resulting in a Prohibited Action.

11. **LIMITATION OF LIABILITY -**

A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or otherwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) tha t the Stores will satisfy Client's economic needs and r equir emen ts or reach any particular le vel of sales, income, or ne t profits.



C.  **Business Rsk** – Client hereby understands tha t the cr eation and po tential
growth o f the Clien t's Stores carries financial and o ther risks. Client hereby
understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o
numer ous business risks, including but no t limit ed to: (i) a changing legal
environmen t in which r egula tions can emer ge or change tha t affects the
commer cial sale of products thr ough Amaz on via Client's Stores; (ii) economic
changes tha t affect consumer spending, the emer genc e of recessions due t o
economic and o ther issues (including public health issues) and the lik e; (iii)
changes in the popular appeal o f and demand f or different types o f Amazon
products; (iv) changes in Amazon's terms and c onditions, which can ma terially
affect or e ven interfere with the mark etability o f Client's Stores or its products;
(v) changes in international politics or ec onomies, which ma y affect, among
other things, the ability t o package, distribut e and ship Amaz on products, and
the costs ther eof; (vi) market forces, including incr eased and changing le vels of
compe tition f or any given product fr om other sellers o f such pr oduct; (vii)
unforeseen e vents, force majeur e, public health c oncerns, and other e xternal
events that could a ffect the perf ormanc e of any Amazon Stores. Client hereby
understands tha t ther e are no guar antees made b y Consultan t or otherwise as
to the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t
Client is at risk of a total loss of his, her or its investmen t. Client acknowledges
the substan tial risks gener ally involved with an e-c ommer ce business. Client
recognizes that ther e is a possibility tha t subsequen t to the e xecution o f this
Agreemen t, Client may discover facts or incur or suff er claims which w ere
unknown or unsuspect ed at the time this A greemen t was execut ed, and which
if known by Client at that time ma y have materially affected Client's decision t o
execute this Agreemen t. By oper ation of this Agreemen t, and in particular the
disclaimers o f Consultan t contained in the pr eceding subsections, Clien t
assumes any and all risks of such unkno wn facts and such unkno wn and
unsuspect ed claims and e xpressly releases Consultan t for any liability which
Consultan t could ha ve had in connection ther ewith in the absenc e of the
release her ein provided b y Client to Consultan t. Consultant encourages Client
to only invest funds tha t Client can afford to invest in an illiquid basis o ver a
longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or
business advisors prior t o investing in the S tores.



D. **Amazon Terms and Conditions** - Client hereby understands tha t Amazon, from time to time, with or without cause, can and does suspend ac  counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on to remedy the situa tion at no extra cost. Consultant makes no representations or w arranties of any kind, however, that Amazon will in such cases r eturn Clien t's Stores to activ e status. Furthermor e, Client agrees and understands tha t Consultan t makes no guarantees or representations regarding the S tores in relation to any Amazon polic y, whether curr ently in effect or as ma y be amended b y Amazon from time to time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on elects t o change an y of its policies. H owever, the Services provided b y Consultan t to Client pursuan t to this Agreemen t shall where practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 35% of net pr ofits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture between the P arties. Consultant is performing its services to Client as an independen t contractor and not as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All notices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to ▮▮▮▮▮▮▮@gmail.com . Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egistered mail, postage pr epaid, return receipt request ed, or by a recognized priv ate delivery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Hudson County, New Jersey. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be en titled t o pursue in an y court o f compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee tha t, in the e vent of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee tha t (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v olun tarily waived such righ t to do so. Accordingl y, in interpreting this A greemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment** – Neither party ma y assign its righ ts or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject t o the f oregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion b y either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the t erms of this Agreemen t are not being full y perf ormed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall ha ve thirty (30 ) days from receipt of the no tice to cure such claimed br each.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against any Indemnified P arty by any person, entity or go vernmen tal authority , throughout the w orld, in connection with or relating to the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indirectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultant agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur or which ma y be asserted against any Indemnified P arty by any person, entity or go vernmen tal authority , throughout the w orld, as a direct result of the services exclusiv ely perf ormed b y Consultant under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that requires survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.



O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultan t may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and c ourt c osts) related t o the Minist erial Act. Client
also waives any claims against Consultan t that may be related t o the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultan t would no t mak e any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.



14. **DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.



6.  "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U .S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

7.  "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8.  "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9.  "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: P███ R███ authorized representative and agent for service of process Date: November 01, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:



P████ R██████

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date: November 01, 2021



Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon Automation

**Delivered on**

November 09, 2021

**Client**

M     As

**Company**

PASSIVE SCALING INC

   **Attachment A**   002888

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $30,000 | 1 | $30,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee - $199 or 35%** Minimum management fee of $199 per month or thirty five percent (35%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | $199 | Monthly | $199 |
| **Software Fee** Fee paid directly to software provider | $99 | Monthly | $99 |
| **Minimum Working Capital - $15,000** This is the minimum requirement of available credit or capital to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. **Recommended credit available for expedited scaling process is $30,000 +** | $15,000 | 0 | $0 |
| **TOTAL** | | | **$30,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of November 09, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 78 John Miller Way, Suite 227 Kearny, NJ 07032 (hereinafter "Consultant"), and M███████ A███ (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-account) (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.

    B. Review, research, source, select, and list products for the Client's Stores.

    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)

**PX 37**                            **Attachment A**

2. **CLIENT RESPONSIBILITIES -**

    A. Client understands ther e is a period tha t will dela y the c ommenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configuration period (and perhaps longer , depending on the circumstanc es specific to each proposed Stores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equirements for the cr eation and oper ation of Client's Stores, Consultant cannot commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

    B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and maintain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand (\$ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or payment of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amaz on website or in other writt en materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for mor e than nine ty (90) days during the t erm of this Agreemen t.

    C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultant carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultant in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

    A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of thirty thousand dollars (\$ 30,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the F ee is non-refundable.



B. Client shall also ther eafter, beginning in the mon th follo wing the mon th in which the F ee is paid, pay Consultan t one hundr ed ninet y nine ($199.00) USD per mon th (the "Maintenance Fee"), or thirty five per cent (35%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**
This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereafter. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION –**
Client may terminate this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may terminate this Agreemen t, at any time, f or cause, with fourteen (14) days writt en notice to Client. Consultant may terminate the Option Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) an y act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on may take from time to time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not t o disparage, insult, or f abricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE T AX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or de termining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinanc e.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on pla tform and no t a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does no t hold itself out t o have any righ ts, endorsemen ts, relations, or affiliation with Amaz on, or any of Amazon's copyrigh t, trademark, tr ade dr ess, trade secr et, or any other intellectual pr operty righ t that Amaz on ma y hold (the "In tellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or c onvey to Client any Intellectual Property R ights, whatsoe ver, in Client's Stores, or Amazon, and Consultan t holds no legal or equitable righ ts in Client's Stores.



**Attachment A**    002891
5

9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultant's Confidential Information which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secr ets, and that Consultant conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollo wing r estrictions on Client's activities are necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which restrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the A greemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party.

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther directl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Information shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



D. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Con fidential Information referred to therein and Receiving Party is thereafter requir ed by court or der to disclose such Con fidential Information, Receiving Party ma y disclose onl y such Confidential Information as is expressly requir ed by the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agr ees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party tak es to protect its o wn confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Con fidential Information.

F. **Confidentiality Term**: Regardless of any termina tion of this Agreemen t, the parties expressly acknowledge and agr ee that their r espectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years follo wing the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, ho wever, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secr ets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secr et as a matter of law.

G. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsider ed all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such r estraints are necessary for the r easonable and pr oper pr otection o f Consultan t, and that each and e very one of the r estraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., thr oughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable t o it, shall be en titled t o preliminary and permanen t injunctiv e relief against an y such br each or thr eatened br each, without ha ving to post bond, t oge ther with r easonable a ttorneys' fees incurred in en forcing Consultant's rights hereunder .



10. **REFUND POLICY** –

    A. Subject t o Paragraph (C) below, during the Term o f this Agreemen t, if Consultant's Services result in a Prohibit ed Action, twic e, Client has the op tion ("Refund Op tion") to request a r efund. Additionall y, follo wing an eigh teen(18) mon th period if the Clien t has not made back their initial st ores costs, Client has the op tion to request a r efund within a thirty (30 ) day period f ollo wing their 18th mon th of working da ys. To exercise the Refund Op tion, Client must no tify Consultan t of that election in writing. In tha t event, subject t o Paragraph (C), Consultan t will r efund a portion o f the Fee, as defined in Paragraph (B) below (the "Refund Amoun t").

    B. The Refund Amoun t shall be calcula ted by the follo wing f ormula: (x) the Fee ($30,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cur e Stores; provided, ho wever, that (1) Client has not engaged in any act that interferes with the oper ation of Client's Stores or of Consultan t's Services or which w ould be in br each of this Agreemen t, including, without limita tion, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibit ed Action, and (2) this Agreemen t remains in full f orce and effect at the time Clien t exercises the Refund Op tion. The Parties further agree that under no cir cumstanc e shall the Refund Amoun t exceed the F ee of ($30,000.00 ).

    C. Client's right to exercise the Refund Op tion for reason of Prohibit ed Action under Paragraph (A) is expressly conditioned on Consultan t first managing one replac ement store per store resulting in a Prohibit ed Action (the "Cur e Stores") for Client, and the Cur e Stores also resulting in a Prohibit ed Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or
warranties as to: (1) the accuracy, the reliability , or the comple teness, of any
matter within the sc ope of this Agreemen t, including but no t limit ed to the
Stores, the products ther ein, or the da ta, information, content, softw are,
technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2)
the satisfaction o f any regula tion (governmen t or otherwise ) requiring
disclosur e of information on the pr oducts pr ovided thr ough or in c onnection
with the S tores or the appr oval or complianc e of the Stores or any softw are or
information and c ontent contained in the S tores; or (3) tha t the Stores will satisfy
Client's economic needs and r equirements or reach any particular le vel of
sales, income, or ne t profits.



C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on via Client's Stores; (ii) economic changes tha t affect c onsumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types o f Amazon products; (iv) changes in Amazon's terms and c onditions, which can ma terially affect or e ven interfere with the mark etability o f Client's Stores or its products; (v) changes in international politics or ec onomies, which ma y affect, among other things, the ability t o pack age, distribut e and ship Amaz on products, and the costs ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om o ther sellers o f such pr oduct; (vii) unforeseen events, force majeur e, public health c oncerns, and other e xternal events that could a ffect the perf ormanc e of any Amazon Stores. Client hereby understands tha t ther e are no guar antees made b y Consultan t or o therwise as to the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that ther e is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if known b y Client at that time ma y have materially affected Client's decision t o execute this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn f acts and such unkno wn and unsuspect ed claims and e xpressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the release her ein provided b y Client to Consultan t. Consultant enc ourages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and t o consult Clien t's legal and/or business advisors prior t o investing in the S tores.

D. **Amazon Terms and Conditions** - Client hereby understands tha t Amazon, from time t o time, with or without cause, can and does suspend ac  counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on to remedy the situa tion at no extra cost. Consultan t makes no representations or w arranties of any kind, however, that Amazon will in such cases r eturn Clien t's Stores to activ e status. Furthermor e, Client agrees and understands tha t Consultan t makes no guarantees or representations regarding the S tores in relation to any Amazon polic y, whether curr ently in effect or as ma y be amended b y Amazon from time to time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on elects t o change an y of its policies. However, the Services provided b y Consultan t to Client pursuan t to this Agreemen t shall wher e practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 35% of net pr ofits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture between the Parties. Consultant is performing its services to Client as an independen t contractor and not as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All notices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to ███████████@gmail.com. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egistered mail, postage pr epaid, return receipt request ed, or by a recognized priv ate deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect. In such event, the Parties hereby acknowledge their intent to make such invalidated provision, or part of such provision, as to be deemed replaced with a valid provision or part of provision that most closely approximates and gives effect to the intent of the invalid provision. Any such modification shall revise the existing invalid provision, or part thereof, only as much as necessary to make the invalidly-held provision otherwise valid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or extent of any section of this Agreement.

E. **Dispute Resolution -** Except where otherwise expressly set forth in this Agreement, any dispute or claim arising out of or relating to this Agreement shall only be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Hudson County, New Jersey. Any arbitration proceeding, determination, or award, shall be confidential, and neither Party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses of such arbitration proceeding will be divided equally between the parties, though each Party will bear its own expense of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration (except where attorneys' fees and costs shall be awarded pursuant to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either Party more than one (1) year after the cause of action arose.

F. **Amendment -** This Agreement cannot be amended except in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreement may be executed by electronic means and in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all such counterparts together will constitute one and the same instrument.



H. **Injunctive Relief -**In the event of a breach or threatened breach of Section 6 or Section 9, the aggrieved party shall immediately be entitled to pursue in any court of competent jurisdiction specific performance, injunctive relief, damages, or such other remedies and relief as may be available, regardless of any contrary provision of this Agreement. Additionally, due to the difficulty of measuring damages in the event of a breach of this Agreement by Client, the parties agree that, in the event of a breach of either Section 6 or Section 9 by Client, Section 10 will be voided, disabling Client from the refund option of this contract. The Parties further agree that (i) any liquidated damage to be requested by Consultant is an arms-length negotiated amount under the circumstances, and (ii) this Section shall not be construed as a waiver of prohibition of any other remedies of Consultant in the event of a breach of this Agreement by Client.

I. **Independent Counsel -** The Parties acknowledge that each has been advised to seek, and each has had sufficient opportunity to seek, independent legal counsel possessing industry experience in connection with this matter. The Parties have either sought such counsel or voluntarily waived such right to do so. Accordingly, in interpreting this Agreement, no weight shall be placed upon either party. Furthermore, the parties equally drafted this agreement; thus, the Agreement shall be construed neutrally, and no rule of construction shall apply to the disadvantage of any Party.

J. **Assignment** – Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. Prior to any such assignment, said assignee shall execute an agreement identical to this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, and assigns. Any purported assignment or delegation by either party in violation of the foregoing shall be null and void ab initio and of no force and effect.

K. **Cure -** If at any time either Client or Consultant believes the terms of this Agreement are not being fully performed, prior to seeking or commencing any relief expressly permitted under this Agreement, the respective party shall notify the party in question of performance in writing of the specific nature of such claim, and the party receiving such notice shall have thirty (30) days from receipt of the notice to cure such claimed breach.

L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating to the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult o f the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that requir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2, Consultant may offer Client guidanc e and referrals to third-party v endors. Additionall y, Consultant may, in its discretion, and at no additional f ee to Client, offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain Client's writt en consent. Client agrees to reimburse Consultan t for expenses incurred in carrying out a Minist erial Act. In the event Consultan t offers to engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save and hold harmless Consultan t from any cost, claim, damage or liability (including a ttorneys' fees and court c osts) related to the Minist erial Act. Client also waives any claims against Consultan t that may be related to the Minist erial Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to the Minist erial Act is a material induc emen t for Consultan t to make any offer to Client for such Minist erial Act, and without such indemnifica tion and w aiver from Clien t, Consultan t would no t make any such offer of assistance to Client to engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e expiration of the Term of this Agreemen t or its earlier t ermination.

14.**DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.



6. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecuted as of the of the last e xecution date belo w.

**CLIENT:**

By: M██████ A██ authorized representative and agen t for service of process Date: November 10, 2021

Principal of Client acknowledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed t o by Principal of Client:



M█████ A███

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations Manager, authorized representative and agen t for service of process.

Date: November 10, 2021



Amanada Peremen



# Delivering on Your
# eCommerce Objectives

**Project Proposal**

Amazon Automation

**Delivered on**

December 03, 2021

**Client**

Easy Buy Online LLC

**Company**

PASSIVE SCALING INC

**PX 37**

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $100,000 | 1 | $100,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee - $199 or 25%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month or twenty five percent (25%) of net profit - **this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital per store to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$100,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of December 03, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 78 John Miller Way, Suite 227 Kearny, NJ 07032 (hereinafter "Consultant"), and Easy Buy Online LLC, (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $100,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with eight (8) e-commerce stores on the Amazon platform, (including four (4) sub-accounts) (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.
    B. Review, research, source, select, and list products for the Client's Stores.
    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.
    D. Maintain oversight of Client's Stores and its financial performance; however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)

**PX 37**                              **Attachment A**                              002909

2

2. **CLIENT RESPONSIBILITIES -**

    A. Client understands ther e is a period that will dela y the commenc ement and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 month configuration period (and perhaps longer , depending on the circumstanc es specific to each proposed Stores) where Client must c omple te certain obliga tions. Until Client satisfies all contractual and legal r equirements for the cr eation and oper ation of Client's Stores, Consultant cannot commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

    B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and maintain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand (\$ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amaz on website or in other writt en materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for mor e than nine ty (90) days during the t erm of this Agreemen t.

    C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultant carrying out its obliga tions under this A greemen t. Client shall use its best e fforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

    A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of one hundr ed thousand dollars (\$100,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the Fee is non-r efundable.



B. Client shall also ther eafter, beginning in the mon th follo wing the mon th in which the F ee is paid, pay Consultan t one hundr ed nine ty nine ($199.00) USD per mon th (the "Maintenance Fee"), or twenty five per cent (25%) of the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional  ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or payment of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**

This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereaft er. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION** –

Client may termina te this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may termina te this Agreemen t, at any time, for cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) any act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on may take from time to time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultant's sole discr etion.



6. **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not to disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7. **SALES / USE TAX** –

Consultant does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8. **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on platform and not a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent plac e or platform. Accordingl y, Consultant does no t hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amaz on, or any of Amazon's copyright, trademark, tr ade dr ess, trade secret, or any other intellectual pr operty righ t that Amazon may hold (the "In tellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Property R ights, whatsoever, in Client's Stores, or Amazon, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES –**

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultan t's Confidential Information which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultan t conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollowing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which restrictions ar e fair and support ed by adequa te consideration: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther dir ectl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Information shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



D. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Confidential Information referred to therein and Receiving Party is thereafter required b y court order to disclose such Con fidential Information, Receiving Party ma y disclose onl y such Confidential Information as is expressly required b y the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obliga tion under this Section 9 shall last f or a period o f five (5) years follo wing the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secr ets shall surviv e such expiration and such duties o f confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secr et as a matter of law.

G. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such restraints are necessary for the reasonable and pr oper pr otection o f Consultan t, and that each and e very one of the restraints is reasonable in r espect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the c ovenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client ther efore agrees that Consultan t, in addition t o any other remedies a vailable to it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such breach or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder.



10. **REFUND POLICY** –

    A. Subject to Paragraph (C) below, during the Term of this Agreemen t, if Consultant's Services result in a Prohibit ed Action, twic e, Client has the op tion ("Refund Op tion") to request a r efund. Additionall y, follo wing an eigh teen(18) mon th period if the Clien t has not made back their initial st ores costs, Client has the op tion to request a r efund within a thirty (30 ) day period f ollo wing their 18th mon th of working da ys. To exercise the Refund Op tion, Client must no tify Consultan t of that election in writing. In tha t event, subject t o Paragraph (C), Consultan t will r efund a portion o f the Fee, as defined in Paragraph (B) below (the "Refund Amoun t").

    B. The Refund Amoun t shall be calcula ted by the follo wing f ormula: (x) the Fee ($100,000.00 ) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cur e Stores; provided, ho wever, that (1) Client has not engaged in any act that interferes with the oper ation of Client's Stores or of Consultan t's Services or which w ould be in br each of this Agreemen t, including, without limita tion, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibit ed Action, and (2) this Agreemen t remains in full f orce and effect at the time Clien t exercises the Refund Op tion. The Parties further agree that under no cir cumstanc e shall the Refund Amoun t exceed the F ee of ($100,000.00 ).

    C. Client's right to exercise the Refund Op tion for reason of Prohibit ed Action under Paragraph (A) is expressly conditioned on Consultan t first managing one replac ement store per store resulting in a Pr ohibit ed Action (the "Cur e Stores") for Client, and the Cur e Stores also resulting in a Prohibit ed Action.



11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF LIABILITY SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or o therwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) tha t the Stores will satisfy Client's economic needs and r equir emen ts or reach any particular le vel of sales, income, or ne t profits.



**Attachment A**

C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client her eby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on via Client's Stores; (ii) economic changes tha t affect consumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types o f Amazon products; (iv) changes in Amazon's terms and c onditions, which can ma terially affect or e ven interfere with the mark etability o f Client's Stores or its products; (v) changes in international politics or ec onomies, which ma y affect, among other things, the ability t o pack age, distribut e and ship Amaz on products, and the costs ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given pr oduct fr om o ther sellers o f such pr oduct; (vii) unforeseen e vents, force majeur e, public health c oncerns, and other e xternal events that could a ffect the perf ormanc e of any Amazon Stores. Client her eby understands tha t ther e are no guar antees made b y Consultan t or o therwise as to the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that ther e is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unkno wn or unsuspect ed at the time this A greemen t was execut ed, and which if known b y Client at that time ma y have materially affect ed Client's decision t o execut e this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn f acts and such unkno wn and unsuspect ed claims and e xpressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the release her ein provided b y Client to Consultan t. Consultant encourages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and t o consult Clien t's legal and/or business advisors prior t o investing in the S tores.



D. **Amazon Terms and Conditions** - Client hereby understands tha t Amazon, from time t o time, with or without cause, can and does suspend ac   counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on to remedy the situa tion at no extra cost. Consultan t makes no representations or w arranties of any kind, however, that Amazon will in such cases r eturn Clien t's Stores to active status. Furthermor e, Client agrees and understands tha t Consultan t makes no guarantees or representations regarding the S tores in relation to any Amazon polic y, whether curr ently in effect or as ma y be amended b y Amazon from time to time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on elects t o change an y of its policies. However, the Services provided b y Consultan t to Client pursuan t to this Agreemen t shall wher e practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed ninety nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture between the P arties. Consultan t is performing its services to Client as an independen t contractor and not as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All notices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the other and as otherwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to easybuy onlinellc@gmail.c om . Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egist ered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining pr ovisions will c ontinue in full f orce and effect. In such event, the Parties hereby acknowledge their in tent to make such invalidated pr ovision, or part of such pr ovision, as to be deemed r eplaced with a valid pr ovision or part o f provision that most closel y approximates and gives effect to the intent of the invalid provision. Any such modifica tion shall r evise the existing invalid pr ovision, or part ther eof, only as much as nec essary to make the invalidl y-held pr ovision otherwise v alid. Headings are used f or convenience of reference only, and in no way define, limit, construe or describe the scope or e xtent of any section o f this Agreemen t.

E. **Dispute Resolution -** Except wher e otherwise e xpressly set forth in this Agreemen t, any disput e or claim arising out o f or relating to this Agreemen t shall onl y be resolved by binding arbitr ation. The arbitr ation of any disput e or claim shall be c onduct ed in accordance with the American Arbitr ation Association ("AAA") rules, as modified by this Agreemen t, which shall tak e place in Hudson Coun ty, New Jersey. Any arbitration pr oceeding, de termina tion, or award, shall be c onfidential, and neither P arty may disclose the e xistence, content or results of any arbitr ation, except as may be required by law or for purposes o f enforcemen t. Judgmen t on any arbitr ation award may be en tered in any court ha ving pr oper jurisdiction. All administr ative fees and expenses of such arbitr ation pr oceeding will be divided equall y betw een the parties, though each Party will bear its o wn expense of counsel, experts, witnesses and preparation and pr esentation of evidenc e at the arbitr ation (except wher e attorneys' fees and costs shall be a warded pursuan t to Section 13.(L**)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out o f or in conjunction with the subject matter of this Agreemen t may be br ought by either P arty mor e than one (1) year after the cause o f action ar ose.

F. **Amendment -** This Agreemen t canno t be amended e xcept in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreemen t may be execut ed by electr onic means and in any number o f counterparts, each of which when so e xecut ed and deliv ered will be deemed an original, and all such c ounterparts t ogether will constitut e one and the same instrumen t.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be en titled t o pursue in an y court of compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee that, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v olun tarily waived such righ t to do so. Accordingl y, in interpreting this A greemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment –** Neither party ma y assign its righ ts or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject to the foregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion by either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the terms of this Agreemen t are not being full y perf ormed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall have thirty (30) days from receipt of the no tice to cure such claimed br each.



L.  **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorne ys' fees and c osts) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in c onnection with or r elating to the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M.  **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorne ys' fees and c osts) which any Indemnified P arty ma y incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct r esult of the services exclusiv ely perf ormed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N.  **Survival** – Any Section in this A greemen t that requir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

**PX 37**                                **Attachment A**

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.



Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultant may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultant commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court costs) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultant would no t make any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.

14.**DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).

5. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

6. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Client's Store, and (ii) any Amazon fees related to Client's store.

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but not limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided herein.

8. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which thereby results in an inability for Client to access Client's Stores which results in no access or sales activity through the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

# Signature Page

IN WITNESS WHEREOF, this Agreemen t is deemed e xecut ed as of the o f the last e xecution date belo w.

**CLIENT:**

By: S▮▮▮H▮▮▮▮authorized representative and agen t for service of process Date: December 15, 2021

Principal o f Client acknowledges and agr ees to be bound b y all of the pr ovisions of this Agreemen t applicable t o Client, as if expressly a party her eto. Accepted and A greed t o by Principal of Client:



Easy Buy Online LL C

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Oper ations Manager, authorized representative and agen t for service of process.

Date:  December 15, 2021



Amanada Peremen



# Delivering on Your eCommerce Objectives

**Project Proposal**

Amazon Automation

**Delivered on**

December 07, 2021

**Client**

Simple Shop Online LLC

**Company**

PASSIVE SCALING INC

# Pricing Breakdown

| Description | Price | Quantity | Total Price |
|---|---|---|---|
| **Initial Consulting Fee** | $100,000 | 1 | $100,000 |
| *"Store Infrastructure Fee"* - this goes directly towards warehousing expenses, full time employees & benefits, consulting expertise, store build, product procurement & selection, wholesale vendor outreach, & store customer service & management | | | |
| **Management Fee - $199 or 25%** | $199 | Monthly | $199 |
| Minimum management fee of $199 per month **or twenty five percent (25%) of net profit - this fee begins the following month after fulfillment of initial payment.** | | | |
| **Software Fee** | $99 | Monthly | $99 |
| Fee paid directly to software provider | | | |
| **Minimum Working Capital - $15,000** | $15,000 | 0 | $0 |
| This is the minimum requirement of available credit or capital per store to cover inventory & wholesale price of products. Amazon pays every two weeks, and this money covers orders until scheduled store payouts from sales during each period. | | | |
| **Recommended credit available for expedited scaling process is $30,000 +** | | | |
| **TOTAL** | | | **$100,298** |

# E-COMMERCE CONSULTING AGREEMENT

This E-Commer ce Consulting A greemen t ("Agreemen t"), is dated as of December 0 7, 2021 by and be tween PASSIVE SCALING INC, a New Jersey Corpor ation compan y, whose address is 78 John Miller W ay, Suite 227 Kearny, NJ 07032 (hereinaft er "Consultan t"), and Simple Shop Online LL C, (hereinafter "Client").

WHEREAS, Client desires to engage Consultan t's services, as an independen t contractor, upon the t erms and c onditions her ein set forth; and

WHEREAS, Consultant desires to render c onsulting servic es to Client upon the t erms and conditions her ein set forth;

NOW, THEREFORE, Consultant and Client (toge ther, the "Parties"), for \$100,000.00 and other good and v aluable c onsider ation, the r eceipt and sufficienc y are hereby mutuall y acknowledged, agr ee to the follo wing t erms and c onditions wher eby Consultan t shall consult Clien t in connection with eigh t (8) e-commer ce stores on the Amaz on pla tform, (including f our (4) sub-accounts) (the "Stores"):

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services"):**
    A. Maintain Client's Stores, including c onfiguring the Amaz on storefronts and configuring the fr ont and back end s ystems nec essary to manage the S tores.
    B. Review, research, source, select, and list pr oducts f or the Clien t's Stores.
    C. Respond t o cust omers' phone and email inquiries in support o f Client's Stores and shall e xercise good f aith efforts t o resolve cust omer inquiries, handle product r eturns, and manage billing ma tters.
    D. Maintain oversigh t of Client's Stores and its financial perf ormanc e; however, Consultant shall ha ve no obliga tion to, and does no t intend to, provide financial advice to Client concerning the oper ation of Client's Stores (Client shall c onfer with its pr ofessional financial advisors c oncerning all financial inquiries.)



2. **CLIENT RESPONSIBILITIES -**

A. Client understands ther e is a period tha t will dela y the commenc emen t and commer cial oper ations of the Stores, including, without limita tion, a 1 to 4 mon th configur ation period (and perhaps longer , depending on the circumstanc es specific to each pr oposed Stores) where Client must c omple te certain obliga tions. Until Clien t satisfies all contractual and legal r equir emen ts for the cr eation and oper ation of Client's Stores, Consultant canno t commenc e providing the Servic es as set forth in Section 1 of this Agreemen t.

B. Within the first eigh t (8) months of this Agreemen t, Client will use best e fforts to obtain, and main tain for the dur ation of this Agreemen t, a credit car d or total credit limit issued thr ough a Unit ed States feder ally insured banking institution with a minimum cr edit limit o f thirty thousand (\$ 30,000.00 ) dollars USD. In no event shall Consultan t be responsible f or paymen t of any kind and an y other obliga tion under Clien t's credit car ds, all of which cr edit car d obliga tions shall be solel y that of Client. Furthermor e, unless Consultan t provides writt en consent: (i) at no time shall Clien t Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation M ode, such t erms being defined or referenced on the Amaz on website or in other writt en materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for mor e than nine ty (90) days during the t erm of this Agreemen t.

C. Within thirty (30 ) days from the c ommenc emen t of this Agreemen t, Client shall provide Consultan t with onl y necessary informa tion for the purpose o f Consultant carrying out its obliga tions under this A greemen t. Client shall use its best efforts to assist Consultan t in ob taining all in forma tion deemed nec essary by Consultan t to implemen t Consultan t's Services.

3. **COMPENSATION -**

A. In consider ation for this Agreemen t, Client shall pa y Consultan t a one-time consulting f ee of one hundr ed thousand dollars (\$100,000.00 ) USD (the "Fee"), via wire transfer or ACH to Consultan t's bank account within 72 hours o f execution o f this Agreemen t. Except as expressly permitt ed under Section 10, the Fee is non-r efundable.



B. Client shall also ther eafter, beginning in the mon th follo wing the mon th in which the F ee is paid, pay Consultan t one hundr ed nine ty nine ($199.00) USD per mon th (the "Maintenance Fee"), or twenty five percent (25%) o f the N et Profit from Clien t's Stores per mon th (the "Ongoing Commission "), whichever is greater plus an additional ninety nine dollars ($99) so ftw are fee paid dir ectl y to the softw are provider. Client shall no t be responsible f or paymen t of the Ongoing Commission or the M aintenance Fee if, other than due t o breach of this Agreemen t by Client, there is no activity in Clien t's Stores for said mon th (or a portion ther eof, where such portion e xceeds 15 days).

C. Consultan t shall in voice Client mon thl y, and Client has seventy-tw o (72) hours to remit pa ymen t.

4. **TERM -**

This Agreemen t shall commenc e on the last da te of execution b y both parties and shall continue in e ffect f or a period o f eigh teen (18) months (the "Initial Term") thereaft er. Upon comple tion of the Initial Term, the A greemen t shall aut omaticall y extend on a mon th-t o-mon th basis (the "Option Term") until writt en notice is provided by either party , to the o ther party , in accordance with Section 5.

5. **TERMINATION –**

Client may termina te this Agreemen t at any time b y providing writt en notice to Consultan t. Consultant may termina te this Agreemen t, at any time, f or cause, with fourt een (14) days writt en notice to Client. Consultant may termina te the Op tion Term, without cause, a t any time. For this Section, "cause" shall include, but no t be limit ed to: (1) an y act or omission b y Client, which in terferes with the oper ation of the Stores or Consultan t's ability t o render Servic es, in Consultant's sole discr etion; or (2) Client's breach or thr eatened br each of any term in this A greemen t. If Client breaches any term under this A greemen t, independen t of any actions Amaz on may take from time to time, Consultan t may Pause Client's Stores, which, Consultan t may onl y reactiv ate, in Consultan t's sole discr etion.



6.  **NON-DISPARAGEMENT** –

During this Agreemen t and for one (1) year thereafter, the Parties mutuall y agree that any issues or problems tha t either party has r egarding the o ther with r espect t o this Agreemen t, shall be discussed with the o ther party in a pr ofessional and priv ate manner . The Parties hereby mutuall y agree not t o disparage, insult, or fabricate information regarding the o ther party in an y online or o ffline forum or an y other forum whatsoever, including but no t limit ed to social media channels, r egardless of whe ther such c ommen ts or information w ould no t constitut e libel or slander , and regardless of whe ther such c ommen ts could be deemed f actuall y true.

7.  **SALES / USE T AX** –

Consultan t does no t provide tax reporting or tax managemen t services of any kind. Client is responsible f or determining if Clien t is responsible f or collecting and remitting sales or use tax under an y applicable sta te or local la w, regula tion, or ordinance.

8.  **INTELLECTUAL PROPERTY** –

Client understands tha t Client's Stores is a service hosted on the Amaz on platform and not a distinct or se verable pr oduct or servic e that can be port ed, remo ved or installed in or on a diff erent place or platform. Accordingl y, Consultant does no t hold itself out t o have any rights, endorsemen ts, relations, or affiliation with Amaz on, or any of Amazon's copyrigh t, trademark, tr ade dress, trade secret, or any other intellectual pr operty righ t that Amazon may hold (the "In tellectual Pr operty R ights"). Further , Consultant canno t, and does no t, grant or convey to Client any Intellectual Property R ights, whatsoever, in Client's Stores, or Amazon, and Consultan t holds no legal or equitable righ ts in Client's Stores.



9. **RESTRICTED ACTIVITIES** –

Client acknowledges tha t during the T erm of this Agreemen t Client will ha ve access to Consultan t's Confidential Informa tion which, if disclosed, c ould assist in compe tition against Consultan t by third parties. Client recognizes the highl y compe titive nature of Consultan t's business, services, and its trade secrets, and that Consultan t conducts its business electr onicall y, through e-c ommer ce, and throughout the Unit ed States. Therefore, Client agrees that the f ollowing r estrictions on Client's activities ar e necessary to protect the good will, Con fidential Information, and other legitima te business interests of Consultan t, which r estrictions ar e fair and support ed by adequa te consider ation: shareholders, emplo yees, Non-Compe tition, agents, the Term members o f the Agreemen t:

A. **Non-Solicitation**. During the Restrict ed Period, Client agrees that it will no t, directl y, or indirectl y through ano ther Person: (i) induce or attemp t to induc e any emplo yee or contractor of Consultan t to leave the emplo y or contract of Consultan t, or in any way interfere with the r elationship be tween Consultan t and any of its emplo yees or contractors, or (ii) induce or attemp t to induc e any customer, supplier, client, distribut or, vendor, licensee, or other business relation of Consultan t to cease doing business with Consultan t, or in any way interfere with Consultan t's relationship with an y such party .

B. **Non-Disclosure**. The Parties agree not to use, reveal, make available, nor disclose, whe ther dir ectl y or indirectl y, to any third party an y Confidential Information for any purpose e xcept as approved in writing b y Consultan t. Further, the Parties shall (a) not assist nor enable an yone to access or use any of Confidential Information; and (b) not use nor e xploit an y of the Con fidential Information for any purpose wha tsoever except in accordance with the t erms of this Agreemen t. For purposes o f this Agreemen t, the Party disclosing the Confidential Informa tion shall be r eferred to as "Disclosing Party," and the Party receiving the Con fidential Information shall be r eferred to as "Receiving Party".

C. **Notwithstanding the f oregoing**, Receiving Party will: 1) promp tly notify the Disclosing Party, to the e xtent legall y permissible, if R eceiving Party bec omes required by court or der to disclose an y Confidential Information; 2) cooper ate with Disclosing P arty if Disclosing P arty decides t o oppose or t o seek to restrain such disclosur e; and 3) subject to the f oregoing, onl y disclose tha t information which its c ounsel advises it is legall y compelled t o disclose.



D. **If at Disclosing Party's request**, Receiving Party is unable t o obtain a protectiv e order or other injunctiv e relief above with r espect t o the Con fidential Information referred to therein and Receiving Party is thereafter required by court or der to disclose such Con fidential Information, Receiving Party may disclose onl y such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information**. The Receiving Party agrees that it shall take all reasonable measur es to protect the secr ecy of and avoid disclosur e and unauthoriz ed use of Disclosing Party's Confidential Information. Without limiting the f oregoing, Receiving Party shall tak e at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immedia tely notify Disclosing P arty, in writing, of any unauthoriz ed use or disclosur e of the Confidential Information.

F. **Confidentiality Term**: Regardless of any termination of this Agreemen t, the parties expressly acknowledge and agr ee that their respectiv e rights and obliga tion under this Section 9 shall last f or a period of five (5) years following the expiration of this Agreemen t or permissible t ermination of this Agreemen t; provided, however, that Client's duties of confidentiality ther eunder with respect t o Consultan t's trade secrets shall surviv e such expiration and such duties of confidentiality shall c ontinue and no t expire so long as such Confidential Information is deemed a tr ade secret as a matter of law.

G. **In signing this Agreemen t**, Client acknowledges tha t he/she/it has car efull y read, consult ed with legal c ounsel, and c onsidered all the t erms and c onditions of this Agreemen t, including the r estraints imposed on Clien t, throughout the United States, under this Section 9. Clien t agrees that all such restraints are necessary for the reasonable and pr oper pr otection of Consultan t, and that each and every one of the restraints is reasonable in respect t o subject ma tter, length o f time and geogr aphic area (i.e., throughout the Unit ed States). Client further ackno wledges tha t, were Client to breach any of the covenants contained in this Section 9, ho wever caused, the damage t o the Consultan t would be irr eparable. Client therefore agrees that Consultan t, in addition t o any other remedies a vailable t o it, shall be en titled t o preliminary and permanen t injunctiv e relief against any such breach or thr eatened br each, without ha ving to post bond, t ogether with r easonable a ttorneys' fees incurred in enforcing Consultant's rights hereunder.



## 10. **REFUND POLICY** –

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen (18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee ($100,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of ($100,000.00).

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store per store resulting in a Prohibited Action (the "Cure Stores") for Client, and the Cure Stores also resulting in a Prohibited Action.

*EB*

**PX 37**                    **Attachment A**                    002936
8

11. **LIMITATION OF LIABILITY -**

    A. UNDER NO CIRCUMSTANCES WILL CONSULTANT, OR ANY OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES, HOWSOEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING, WITHOUT LIMITATION, NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS OR THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION OF **LIABILITY** SHALL NOT LIMIT CLIENT'S RIGHTS TO FILE SUIT AGAINST A THIRD PARTY OR PRODUCT VENDOR FOR ANY OF THE ABOVE LISTED CAUSES OF ACTION OR ANY OTHER CAUSE OF ACTION RELATED THERETO. SPECIFICALLY, CONSULTANT HEREBY COVENANTS THAT IT SHALL NOT TAKE ANY ACTION WHICH IS LIKELY TO CAUSE WAIVER OF ANY OF CLIENT'S RIGHTS WITH RESPECT TO THIRD-PARTY LIABILITY WITHOUT CLIENT'S PRIOR WRITTEN APPROVAL.

12. **DISCLAIMERS AND RELEASE -**

    A. CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY, INCLUDING, BUT NOT LIMITED TO REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO CONSULTANT'S SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT



B. **Without limiting the f oregoing**, Consultant makes no representations or warranties as to: (1) the accuracy, the reliability , or the comple teness, of any matter within the sc ope of this Agreemen t, including but no t limit ed to the Stores, the products ther ein, or the da ta, information, content, softw are, technology , graphics, or communica tions pr ovided on or thr ough the S tores; (2) the satisfaction o f any regula tion (governmen t or o therwise ) requiring disclosur e of information on the pr oducts pr ovided thr ough or in c onnection with the S tores or the appr oval or complianc e of the Stores or any softw are or information and c ontent contained in the S tores; or (3) that the Stores will satisfy Client's economic needs and r equir emen ts or reach any particular le vel of sales, income, or ne t profits.

$\mathcal{EB}$

C. **Business Rsk** – Client hereby understands tha t the cr eation and po tential growth o f the Clien t's Stores carries financial and o ther risks. Client hereby understands tha t e-c ommer ce is an ever-changing industry tha t is subject t o numer ous business risks, including but no t limit ed to: (i) a changing legal environmen t in which r egula tions can emer ge or change tha t affects the commer cial sale of products thr ough Amaz on via Client's Stores; (ii) economic changes tha t affect consumer spending, the emer genc e of recessions due t o economic and o ther issues (including public health issues) and the lik e; (iii) changes in the popular appeal o f and demand f or different types o f Amazon products; (iv) changes in Amazon's terms and c onditions, which can ma terially affect or e ven interfere with the mark etability o f Client's Stores or its products; (v) changes in international politics or ec onomies, which ma y affect, among other things, the ability t o package, distribut e and ship Amaz on products, and the costs ther eof; (vi) market forces, including incr eased and changing le vels of compe tition f or any given product fr om other sellers o f such pr oduct; (vii) unforeseen e vents, force majeur e, public health c oncerns, and other e xternal events that could a ffect the perf ormanc e of any Amazon Stores. Client hereby understands tha t ther e are no guar antees made b y Consultan t or otherwise as to the Stores sales, income, or pr ofitability a t any time, and ackno wledges tha t Client is at risk of a total loss of his, her or its investmen t. Client acknowledges the substan tial risks gener ally involved with an e-c ommer ce business. Client recognizes that ther e is a possibility tha t subsequen t to the e xecution o f this Agreemen t, Client may discover facts or incur or suff er claims which w ere unknown or unsuspect ed at the time this A greemen t was execut ed, and which if known by Client at that time ma y have materially affected Client's decision t o execute this Agreemen t. By oper ation of this Agreemen t, and in particular the disclaimers o f Consultan t contained in the pr eceding subsections, Clien t assumes any and all risks of such unkno wn f acts and such unkno wn and unsuspect ed claims and e xpressly releases Consultan t for any liability which Consultan t could ha ve had in connection ther ewith in the absenc e of the release her ein provided b y Client to Consultan t. Consultant encourages Client to only invest funds tha t Client can afford to invest in an illiquid basis o ver a longer t erm and perhaps ultima tely lose, and to consult Clien t's legal and/or business advisors prior t o investing in the S tores.

*EB*

**Attachment A**

D. **Amazon Terms and Conditions** - Client hereby understands tha t Amazon, from time t o time, with or without cause, can and does suspend ac counts for various reasons, some of which ma y not be ob vious or justified in Clien t's view. In the event Client's Stores is suspended, Compan y will assist in sending an appeal on behalf o f the Clien t and w orking with Amaz on to remedy the situa tion at no extra cost. Consultan t makes no representations or w arranties of any kind, however, that Amazon will in such cases r eturn Clien t's Stores to activ e status. Furthermor e, Client agrees and understands tha t Consultan t makes no guarantees or representations regarding the S tores in relation to any Amazon polic y, whether curr ently in effect or as ma y be amended b y Amazon from time to time. Client understands tha t Consultan t has no control over or input in when and whe ther Amaz on elects t o change an y of its policies. However, the Services provided b y Consultan t to Client pursuan t to this Agreemen t shall wher e practical be c onsistent with Amaz on's current policies. In the e vent in which Clien t's store is suspended be yond a 30 da y period, and no r evenue is earned during this period, the "M aintenance Fee" of one hundr ed nine ty nine ($199.00) USD per month or 35% of net profits will be w aived.

13. **GENERAL PROVISIONS -**

A. **Non-exclusivity** - Each party is fr ee to contract with o thers with r espect t o the subject ma tter of this Agreemen t subject t o the limita tions as to Client under Section 6 and Section 9 o f this Agreemen t.

B. **Relationship of the Parties** – Nothing her ein contained shall c onstitut e a partnership or a join t venture betw een the P arties. Consultant is performing its services to Client as an independen t contractor and no t as Client's agent or emplo yee. There is no third-party bene ficiary to this Agreemen t.

C. **Notices -** All no tices to either party shall be sen t electr onicall y to the email address(es) provided b y each Party to the o ther and as o therwise se t forth below. All notices to Consultan t shall be sen t to info@passivescaling.com. If to Client, notice shall be sen t electr onicall y to simpleshoponlinellc@gmail.c om. Alternatively, such writt en notice will also be deemed giv en upon personal deliv ery, or on receipt or refusal if sen t by U.S. first class certified or r egist ered mail, postage pr epaid, return r eceipt request ed, or by a recognized priv ate deliv ery servic e, to the addr esses stated on Page 1 of this Agreemen t.



D. **Severability, Headings -** If any provision is held to be invalid or unenforceable for any reason, the remaining pr ovisions will c ontinue in full f orce and effect. In such event, the Parties hereby acknowledge their in tent to make such invalidated pr ovision, or part of such pr ovision, as to be deemed r eplaced with a valid pr ovision or part of provision that most closel y approximates and gives effect to the intent of the invalid provision. Any such modifica tion shall r evise the existing invalid provision, or part ther eof, only as much as nec essary to make the invalidly-held pr ovision otherwise v alid. Headings are used for convenience of reference only, and in no way define, limit, construe or describe the scope or e xtent of any section of this Agreemen t.

E. **Dispute Resolution -** Except wher e otherwise e xpressly set forth in this Agreemen t, any disput e or claim arising out o f or relating to this Agreemen t shall onl y be resolved by binding arbitr ation. The arbitr ation of any disput e or claim shall be c onduct ed in accordance with the American Arbitr ation Association ("AAA") rules, as modified by this Agreemen t, which shall tak e place in Hudson Coun ty, New Jersey. Any arbitration pr oceeding, de termina tion, or award, shall be c onfidential, and neither P arty may disclose the e xistence, content or results of any arbitr ation, except as may be required by law or for purposes of enforcemen t. Judgmen t on any arbitr ation award may be en tered in any court ha ving pr oper jurisdiction. All administr ative fees and expenses of such arbitr ation pr oceeding will be divided equall y betw een the parties, though each Party will bear its o wn expense of counsel, experts, witnesses and preparation and pr esentation of evidenc e at the arbitr ation (except wher e attorneys' fees and costs shall be a warded pursuan t to Section 13.(**L)**. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out o f or in conjunction with the subject matter of this Agreemen t may be br ought by either P arty mor e than one (1) year after the cause of action ar ose.

F. **Amendment -** This Agreemen t canno t be amended e xcept in writing and signed by both Parties.

G. **Electronic Signatures -** This Agreemen t may be execut ed by electr onic means and in any number o f counterparts, each of which when so e xecut ed and deliv ered will be deemed an original, and all such c ounterparts t oge ther will constitut e one and the same instrumen t.



H. **Injunctive Relief -** In the event of a breach or thr eatened br each of Section 6 or Section 9, the aggrie ved party shall immedia tely be en titled t o pursue in an y court o f compe tent jurisdiction specific perf ormanc e, injunctiv e relief, damages, or such other remedies and r elief as may be available, regardless of any contrary provision of this Agreemen t. Additionall y, due to the difficulty o f measuring damages in the e vent of a breach of this Agreemen t by Client, the parties agr ee that, in the event of a breach of either Section 6 or Section 9 b y Client, Section 10 will be v oided, disabling Clien t from the r efund op tion of this contract. The Parties further agr ee that (i) any liquida ted damage t o be request ed by Consultan t is an arms-length nego tiated amoun t under the circumstanc es, and (ii) this Section shall not be construed as a w aiver of prohibition o f any other remedies o f Consultan t in the e vent of a breach of this Agreemen t by Client.

I. **Independen t Counsel -** The Parties acknowledge tha t each has been advised to seek, and each has had sufficien t opportunity t o seek, independen t legal counsel possessing industry e xperienc e in connection with this ma tter. The Parties have either sough t such counsel or v oluntarily waived such righ t to do so. Accordingl y, in interpreting this A greemen t, no weight shall be plac ed upon either party . Furthermor e, the parties equall y drafted this agr eemen t; thus, the Agreemen t shall be c onstrued neutr ally, and no rule o f construction shall appl y to the disadv antage of any Party.

J. **Assignment** – Neither party ma y assign its righ ts or obliga tions under this Agreemen t without the prior writt en consent of the o ther party . Prior to any such assignmen t, said assignee shall e xecut e an agreemen t iden tical t o this Agreemen t. Subject to the foregoing, this A greemen t shall be binding upon and inure to the bene fit of the parties her eto, their suc cessors, and assigns. Any purport ed assignmen t or delega tion b y either party in viola tion of the f oregoing shall be null and v oid ab initio and o f no force and effect.

K. **Cure -** If at any time either Clien t or Consultan t belie ves the t erms of this Agreemen t are not being full y perf ormed, prior t o seeking or c ommencing an y relief expressly permitt ed under this A greemen t, the respectiv e party shall notify the party in question o f perf ormanc e in writing o f the specific na ture of such claim, and the party r eceiving such no tice shall have thirty (30 ) days from receipt of the no tice to cure such claimed br each.



L. **Indemnification of Consultant** – Client agrees to indemnify , defend, and save and hold harmless Consultan t, including its r espectiv e insurers, directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified Parties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless fr om and against an y and all claims, damages, losses, liabilities and expenses (including all a ttorneys' fees and costs) which any Indemnified P arty may incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, in connection with or r elating to the ma tters referred to in this Agreemen t, resulting fr om or relating dir ectl y or indir ectl y to Client's breach of this Agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

M. **Indemnification of Client -** Consultan t agrees to indemnify , defend, and save and hold harmless Clien t, including its r espectiv e insurers. directors, officers, emplo yees, agents, and representatives (collectiv ely the "Indemnified P arties" and each an "Indemnified P arty"), and to hold each Indemnified P arty harmless from and against an y and all claims, damages, losses, liabilities and e xpenses (including all a ttorneys' fees and costs) which any Indemnified P arty ma y incur or which ma y be asserted against an y Indemnified P arty by any person, en tity or go vernmen tal authority , throughout the w orld, as a direct result of the services exclusiv ely performed b y Consultan t under the t erms of this agreemen t, or the Consultan ts breach of this agreemen t. The foregoing indemnity specificall y includes, but is no t limit ed to, any breach of any representation, warranty, or covenant in this Agreemen t applicable t o Client, and shall surviv e expiration or t ermina tion of this Agreemen t.

N. **Survival** – Any Section in this A greemen t that requir es survival shall surviv e the termina tion of this Agreemen t for the maximum period permitt ed by applicable law.

*EB*

O. **Client Data Management** – Unless Consultant receives Client's prior written consent, Consultant shall not: (i) access, process, or otherwise use Client's Data other than as necessary to facilitate Consultant's Services; (ii) give any of its employees access to Client Data except to the extent that such individuals needs access to Client Data to facilitate performance of Consultant under this Agreement; or (iii) give any other third-party access to Client Data except as necessary for such third-party to facilitate performance under this Agreement. Consultant shall not erase Client Data, or any copy thereof, without Client's express written consent and shall follow Client's written instructions regarding retention and erasure of Client Data so long as it does not interfere with the performance of Consultant's Services and performance under this Agreement. Client possesses and retains all right, title, and interest in and to Client Data, and Consultant's use and possession thereof is solely in furtherance of Consultant's Services and on Client's behalf. Consultant shall comply with all applicable laws and regulations governing the handling of Client Data and shall not engage in any activity that would place Client in violation of any applicable law, regulation, or government request, or judicial process.

P. **Waiver of Jury Trial -** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN MATERIALLY INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

*EB*

Q. **Ministerial Services** – In further ance of Client's obliga tions under Section 2,
Consultan t may offer Client guidanc e and referrals to third-party v endors.
Additionall y, Consultant may, in its discretion, and at no additional f ee to Client,
offer Client assistance in fulfilmen t of the obliga tions in Section 2 ("Ministerial
Act"). Before Consultan t commenc es any Ministerial Act, Consultan t shall ob tain
Client's writt en consent. Client agrees to reimburse Consultan t for expenses
incurred in carrying out a Minist erial Act. In the event Consultan t offers to
engage in a Minist erial Act, Client hereby agrees to indemnify , defend and save
and hold harmless Consultan t from any cost, claim, damage or liability
(including a ttorneys' fees and court c osts) related to the Minist erial Act. Client
also waives any claims against Consultan t that may be related to the Minist erial
Act. Client accepts that this indemnifica tion and w aiver of all liability r elated to
the Minist erial Act is a material induc emen t for Consultan t to make any offer to
Client for such Minist erial Act, and without such indemnifica tion and w aiver
from Clien t, Consultan t would no t make any such offer of assistance to Client to
engage in the Minist erial Act. The foregoing indemnity o f Client shall surviv e
expiration of the Term of this Agreemen t or its earlier t ermination.

$\mathcal{EB}$

P                                                    A

14.**DEFINITIONS** –

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings as provided in Exhibit A of this Agreement, which is fully incorporated by reference and is a material part of this Agreement.

# EXHIBIT A

1. "Cash Back" means any revenue derived from cash back programs like BeFrugal.

2. "Client Data" refers to any and all information processed or stored on computers or other electronic media by Consultant, by Client, or on Client's behalf, or provided to Consultant by Client to perform the Services contemplated under this Agreement; including: information on paper or other non-electronic media, information provided to Consultant by Client, and personally identifiable information from Client, Client affiliated third-parties, and other users.

3. The term "proprietary business information" means Consultant's valuable trade secrets and confidential business information regarding its brand, vendors, sources, suppliers, techniques, processes, products, services, including, but not limited to, information regarding e-commerce transactions, Amazon transactions, training materials, marketing and advertising materials, trade or industrial practices, customer and client correspondence, internal memoranda, project files, marketing plans, distribution channels, and relationships with, and identities of, customers, investors, clients, buyers, sellers, brokers, agents, representatives, distributors, manufacturers, and managers, as well as financial information, business, marketing and operating information, geographic sales information, social media analytics, price comparison information, sales data, sales programs, sales volumes, sales conversion rates, sales methods and processes, sales proposals, products, services, training manuals, sales scripts, income information, profit information, operating procedures, pricing policies, strategic plans, intellectual property, information about Consultant's clients, employees and contractors, and other confidential or proprietary information related to Consultant.

4. The term "Stores" means the Client's wholly owned e-commerce location on the third-party Amazon.com where products may be sold to third parties (there is no affiliation, endorsement, or sponsorship between Consultant and Amazon).



5. "Prohibited Action" means any affirmative action taken by Consultant which constitutes: (1) willful copyright infringement as defined under the U.S. Copyright Act or (2) late shipping of product, i.e., greater than five (5) days from the date of expected delivery of the goods, solely due to the fault of Consultant, and as to which the actions under (1) and (2) above have resulted in the Suspension of Client's Store.

6. "Net Profit" means the revenue, income, and sums owed to Client through the operation of Client's Store after deduction of (i) the cost of any goods sold in connection with Clien t's Store, and (ii) any Amazon fees related to Client's store.

7. "Pause" means the Store is considered in "Vacation Mode" due to a variety of reasons, including, but no t limited to, insufficient credit available by Client to permit Consultant to render its services to Client as provided her ein.

8. "Suspension" means an action or actions by Amazon which inactivates or freeze Client's Stores, and which ther eby results in an inability f or Client to access Client's Stores which results in no access or sales activity thr ough the Stores, other than where due to the occurrence of a Prohibited Action.

9. "Vacation Mode" means any action other than a breach of this Agreement by Client which results in a condition of Client's Stores where all sales activity in the Stores have been temporarily halted.

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: E█████ B█████ authorized representative and agent for service of process Date: December 17, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto. Accepted and Agreed to by Principal of Client:



Simple Shop Online LLC

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized representative and agent for service of process.

Date: December 17, 2021



Amanada Peremen