
**intuit quickbooks.**

daily distro llc
amanda. rozenfeld
10 Milltown Ct
Union, NJ 07083

| STATEMENT PERIOD | ACCOUNT NUMBER |
|---|---|
| Nov. 02, 2022 to Dec. 01, 2022 | ▮▮▮▮▮31 |

## ACCOUNT SUMMARY

| | |
|---|---|
| Beginning Balance on Nov. 02, 2022 | $7.31 |
| Credits | + $0.00 |
| Debits | - $0.00 |
| Ending Balance on Dec. 01, 2022 | **$7.31** |

## TRANSACTIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|

No Transactions

Banking services provided by Green Dot Bank, Member FDIC

**PX 37**                    **Attachment A**

| | |
|---|---|
| **From:** | Intuit Payments <qbo@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 02 Jun 2022 11:21:53 -0400 |



Hello AMANDA ROZENFELD,

We weren't able to make a deposit or debit from the bank account you have on file for your business's Intuit Quickbooks Payments account. When we tried, we received a Returned Item from the bank.

**What your business needs to know**
• Case number: 1582641120
• Bank Account Number: **********0981

• Return date: 06/02/2022
• Total Return amount: $2,253.81
• Returned Item fee: $25.00
• Individual Returned Items:

| Case Number | Amount | Return Reason |
|---|---|---|
| 1582059260 | ($99.00) | R02 - Account Closed |
| 1582059261 | ($99.00) | R02 - Account Closed |
| 1582059258 | ($99.00) | R02 - Account Closed |
| 1582059260 | ($25.00) | R02 - Account Closed |
| 1582059261 | ($25.00) | R02 - Account Closed |
| 1582059258 | ($25.00) | R02 - Account Closed |

**What your business needs to do**
1. Check out how to resolve ACH returns. It includes details about the reason code above and how to fix it.

2. Once resolved, let us know so we can re-submit the deposit or debit. If you have any questions, you can give us a call at 888-692-9559 or chat with us.

3. If your business owes Intuit money, you can also call the number above to pay over the telephone by credit card or check.

To learn more about issues like this and get help managing your business's Intuit Quickbooks Payments account, visit our **Merchant Service Center.**

Thanks,
The QuickBooks Payments Team

Merchant account: ██████ 0757
Business name: DAILY DISTRO LLC
Case number: 1582641120

This message was sent to steven@dailydistro.com, as an Intuit customer, consistent with your email preferences. If you have chosen not to receive marketing messages, you will continue to receive business communications about your selected Intuit product(s), which may either affect your service or software, your account, or which may be legally required. If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com

Security | Privacy Statement

**PX 37**                    **Attachment A**                    003106

© 2018 // Intuit Inc., All rights reserved. Trademarks.
2800 E. Commerce Center Place, Tucson, AZ 85706

**PX 37**                    **Attachment A**                    003107

| | |
|---|---|
| **From:** | qbo <qbo@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Fri, 29 Jan 2021 18:28:51 -0500 |

01/29/2021

4211 35TH ST,

LONG ISLAND CITY,NY USA 111012301

**CREDIT ADVICE**

Merchant Name (DBA): DAILY DISTRO LLC,

Merchant Number: ████████0757,

Case Number: 555879348,

Dear AMANDA ROZENFELD,

This is to inform you that QuickBooks Payments has credited an amount of $ 12514.23 to your account.Please note that the amount credited to your account is subject to outstanding fees that may be owed.The deposit should be posted to your account within 48 hours.Please verify with your banking institution for the availability of the funds.

Visit us at merchantcenter.intuit.com if you have any questions

Sincerely,
**The Payments team**

This message was sent to you to inform you of a critical matter. Please note if you have chosen not to receive marketing messages from Intuit, that choice applies only to promotional materials. You will continue to receive critical notifications that are legally required or that could affect your service or software.

Intuit respects your privacy. To learn more, read our Privacy Statement.

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2018 Intuit Inc., All rights reserved. Trademarks.

2800 E. Commerce Center Place, Tucson, AZ 85706

# QuickBooks Payments Funds Delayed, Response Required

| | |
|---|---|
| **From:** | Intuit Payments <qbo@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Wed, 13 Jan 2021 14:33:26 -0500 |

Merchant account: 5▮▮▮▮▮▮▮0757,
Business name: DAILY DISTRO LLC,
Case number: 555879348,

Hello AMANDA ROZENFELD,

Additional information is required on the following batch before we can send any more deposits to your bank.

**What is being reviewed**

Batch amount: $6,780.00
Batch date: 12/11/2020
**What you need to do**

**Gather all the following information for each transaction:**

- "Other"

**Submit the requested documents no later than 02/12/2021.**
Please Click Here to upload your documents to Intuit's Secure Portal

If we need anything else, we will contact you. Otherwise, you will receive an email letting you know your deposits are on the way.

Have questions? Contact us via Chat 6:00 AM to 6:00 PM PT Monday - Friday

Thank you,



This message was sent to you to inform you of a critical matter. Please note if you have chosen not to receive marketing messages from Intuit, that choice applies only to promotional materials. You will continue to receive critical notifications that are legally required or that could affect your service or software.

Intuit respects your privacy. To learn more, read our Privacy Statement.

Visit See Security to find out more.

© 2018 Intuit Inc., All rights reserved. Trademarks.

2800 E. Commerce Center Place, Tucson, AZ 85706

.

| | |
|---|---|
| **From:** | Intuit Payments <qbo@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 24 Dec 2020 14:51:20 -0500 |

Merchant account: ███████ 10757,
Business name: DAILY DISTRO LLC,
Case number: 555879348,

Hello AMANDA ROZENFELD,

Additional information is required on the following batch before we can send any more deposits to your bank.

**What is being reviewed**

Batch amount: $6,780.00
Batch date: 12/11/2020
**What you need to do**

**Gather all the following information for each transaction:**

**Submit the requested documents no later than 01/23/2021.**
Please Click Here to upload your documents to Intuit's Secure Portal

If we need anything else, we will contact you. Otherwise, you will receive an email letting you know your deposits are on the way.

Have questions? Contact us via Chat 6:00 AM to 6:00 PM PT Monday - Friday

Thank you,



This message was sent to you to inform you of a critical matter. Please note if you have chosen not to receive marketing messages from Intuit, that choice applies only to promotional materials. You will continue to receive critical notifications that are legally required or that could affect your service or software.

Intuit respects your privacy. To learn more, read our Privacy Statement.

Visit Security to find out more.

© 2018 Intuit Inc., All rights reserved. Trademarks

2800 E. Commerce Center Place, Tucson, AZ 85706

.

# QuickBooks Payments Funds Delayed, Response Required

| | |
|---|---|
| **From:** | Intuit Payments <qbo@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Sat, 12 Dec 2020 17:42:42 -0500 |

Merchant account: ████████ 0757,
Business name: DAILY DISTRO LLC,
Case number: 555879348,

Hello AMANDA ROZENFELD,

Additional information is required on the following batch before we can send any more deposits to your bank.

**What is being reviewed**

Batch amount: $6,780.00
Batch date: 12/11/2020
**What you need to do**

Gather all the following information for each transaction:

- "Bank Statements"
- "Shipping Confirmation"

**Submit the requested documents no later than 01/11/2021.**
Please Click Here to upload your documents to Intuit's Secure Portal

If we need anything else, we will contact you. Otherwise, you will receive an email letting you know your deposits are on the way.

Have questions? Contact us via Chat 6:00 AM to 6:00 PM PT Monday - Friday

Thank you,



This message was sent to you to inform you of a critical matter. Please note if you have chosen not to receive marketing messages from Intuit, that choice applies only to promotional materials. You will continue to receive critical notifications that are legally required or that could affect your service or software.

Intuit respects your privacy. To learn more, read our Privacy Statement.

Visit Security to find out more.

© 2018 Intuit Inc., All rights reserved. Trademarks.

2800 E. Commerce Center Place, Tucson, AZ 85706

.

| | |
|---|---|
| **From:** | QuickBooks Online Payroll <qbopayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Fri, 15 Jul 2022 05:05:49 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, July 22, 2022**

Submit payroll
**Friday, July 15, 2022 by 5:00pm PT**

Pay period (Every Friday)
Sunday, July 10, 2022 - Saturday, July 16, 2022

Employees
Amanda Rozenfeld

Submit payroll by 5:00pm PT Friday, July 15 to pay your employees on direct deposit.

**Run payroll now**

.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

| | |
|---|---|
| **From:** | QuickBooks Online Payroll <qbopayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 12 May 2022 05:09:15 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, May 13, 2022**

Submit payroll
**Thursday, May 12, 2022 by 5:00pm PT**

Pay period (Every Friday)
Sunday, May 1, 2022 - Saturday, May 7, 2022

Employees
Amanda Rozenfeld

Submit payroll by 5:00pm PT Thursday, May 12 to pay your employees on direct deposit.

**Run payroll now**

.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

| | |
|---|---|
| **From:** | QuickBooks Full Service Payroll <qbfspayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Tue, 06 Jul 2021 05:08:25 -0400 |

<u>Click here</u> to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, July 9, 2021**

Submit payroll
**Thursday, July 8, 2021 by 5:00pm PT**

Pay period (Every Friday)
Sunday, June 27, 2021 - Saturday, July 3, 2021

Employees
Amanda Rozenfeld

Pay date
**Friday, July 9, 2021**

Submit payroll
**Thursday, July 8, 2021 by 5:00pm PT**

Pay period (Twice a month)
Sunday, June 20, 2021 - Saturday, July 3, 2021

Employees
Anant Prashar

Submit payroll by 5:00pm PT Thursday, July 8 to pay your employees on direct deposit.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

# Payday Reminder for DAILY DISTRO LLC

| | |
|---|---|
| **From:** | QuickBooks Full Service Payroll <qbfspayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 24 Jun 2021 05:05:08 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, June 25, 2021**

Submit payroll
**Thursday, June 24, 2021 by 5:00pm PT**

Pay period (Every Friday)
Sunday, June 13, 2021 - Saturday, June 19, 2021

Employees
Amanda Rozenfeld

Pay date
**Friday, June 25, 2021**

Submit payroll
**Thursday, June 24, 2021 by 5:00pm PT**

Pay period (Twice a month)
Sunday, June 6, 2021 - Saturday, June 19, 2021

Employees
Anant Prashar

Submit payroll by 5:00pm PT Thursday, June 24 to pay your employees on direct deposit.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

| | |
|---|---|
| **From:** | QuickBooks Full Service Payroll <qbfspayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 17 Jun 2021 05:04:52 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, June 18, 2021**

Submit payroll
**Thursday, June 17, 2021 by 5:00pm PT**

Pay period (Every Friday)
Sunday, June 6, 2021 - Saturday, June 12, 2021

Employees
Amanda Rozenfeld

Submit payroll by 5:00pm PT Thursday, June 17 to pay your employees on direct deposit.

**Run payroll now**

.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

**PX 37**                    **Attachment A**                    003121

# Payday Reminder for DAILY DISTRO LLC

| | |
|---|---|
| **From:** | QuickBooks Full Service Payroll <qbfspayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 27 May 2021 05:04:56 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, May 28, 2021**

Submit payroll
**Thursday, May 27, 2021 by 5:00pm PT**

Pay period (Every Friday)
Sunday, May 16, 2021 - Saturday, May 22, 2021

Employees
Amanda Rozenfeld

Pay date
**Friday, May 28, 2021**

Submit payroll
**Thursday, May 27, 2021 by 5:00pm PT**

Pay period (Twice a month)
Sunday, May 9, 2021 - Saturday, May 22, 2021

Employees
Anant Prashar

Submit payroll by 5:00pm PT Thursday, May 27 to pay your employees on direct deposit.

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

# Payday Reminder for DAILY DISTRO LLC

| | |
|---|---|
| **From:** | QuickBooks Full Service Payroll <qbfspayrollnoreply@intuit.com> |
| **To:** | steven@dailydistro.com |
| **Date:** | Thu, 18 Mar 2021 05:05:27 -0400 |

Click here to sign in to your account.

## Payday Reminder for steven@dailydistro.com none

Time to run your payroll!

Here are the details:

Pay date
**Friday, March 19, 2021**

Submit payroll
**Thursday, March 18, 2021 by 5:00pm PT**

Pay period (Every Friday)
Sunday, March 7, 2021 - Saturday, March 13, 2021

Employees
Michelle Dominguez, Pablo Estrella, Columba Flores, Amanda Rozenfeld, Karibel Schuwerer, Jose Torres

Pay date
**Friday, March 19, 2021**

Submit payroll
**Thursday, March 18, 2021 by 5:00pm PT**

Pay period (Twice a month)
Sunday, February 28, 2021 - Saturday, March 13, 2021

Employees
Anant Prashar

Submit payroll by 5:00pm PT Thursday, March 18 to pay your employees on direct deposit.

**PX 37**                    **Attachment A**                    003124

You have received this business communication as part of our efforts to fulfill your request or service your account. You may receive this and other business communications from us even if you have opted out of marketing messages.

Intuit respects your privacy. To learn more, read our Privacy Statement (https://www.intuit.com/privacy).

If you receive a suspicious email, please report it by forwarding the email to spoof@intuit.com.

Visit Security to find out more.

© 2017 Intuit Inc. All rights reserved. Trademarks (http://about.intuit.com/trademark).

2800 E. Commerce Center Place, Tuscon, AZ 85706

# With a payment plan, you'd pay $1,626.56 a month

| | |
|---|---|
| **From:** | Susan Anderson <susan@trueaccord-notify.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Sun, 14 Apr 2024 18:51:43 -0400 |

You can sign up on our website.

## You can customize the payment plan, too.

Amanda,

You have an outstanding balance of $29,277.92 with Stripe.

Visit our website to select a payment plan that works for you.

We know that this balance may feel overwhelming, but a payment plan can help you regain a sense of control.

### VIEW PAYMENT PLANS

**Would you like to receive important text messages about your account(s)?**

Opting-in means you agree to our **SMS Terms**. Message and data rates may apply. You can opt out at any time.

Your number is ▮▮▮▮▮▮▮▮

### SEND ME TEXT MESSAGES

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ▮▮▮▮▮ **9337**

Unsubscribe  Privacy Policy  Dispute this debt

**PX 37**            **Attachment A**           003126

Need help? Call us at (866) 611-2731 (TTY 711) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2024 True Accord 16635
16011 College Blvd, Suite 130, Lenexa, KS 66219

…

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our [Privacy Policy](Privacy Policy).

.

# Your Stripe account is now with TrueAccord Corp.

| | |
|---|---|
| **From:** | Susan Anderson <susan@email.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Mon, 12 Feb 2024 18:28:43 -0500 |

TrueAccord can help you resolve this.

## TrueAccord Corp. has options for you.

Hi Amanda,

We are TrueAccord Corp., a third party debt collection agency. We are working on behalf of Stripe to collect on your balance of $29,277.92.

By working together, we can resolve this balance.

**VIEW MY OPTIONS**

### Account information

| | |
|---|---|
| **TrueAccord Corp. account number:** | ▮▮▮▮9337 |
| **Balance due:** | $29,277.92 |
| **Current creditor:** | Stripe |

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ▮▮▮▮9337

Unsubscribe Privacy Policy Dispute this debt

PX 37                    **Attachment A**                    003128

Case 2:23-cv-00656-JXN-LDW   Document 58-4   Filed 08/19/24   PageID: 3991

Need help? Call us at (866) 256-3351 X XXX TW between Monday–Friday 8 AM–8 PM ET.

Copyright © 2024 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our [Privacy Policy](#).

**Can we talk?**

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Tue, 18 Jul 2023 18:50:54 -0400 |

Hi Amanda,

My name is Susan and I'm your fully automated customer engagement team member over at TrueAccord Corp.

No matter what the story is behind your balance of $29,277.92 with Stripe, we want to help you solve the problem. So please, let me know what I can do for you. Email me so we can chat about it.

Have a great day!
Susan

Susan Anderson
Customer Engagement Team Member
TrueAccord Corp.
p: (866) 611-2731 (TTY 771)

SEE YOUR OPTIONS

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ████9337

Unsubscribe Privacy Policy Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

...

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications,

and phone calls. To narrow down on a house, shop, and less a person is info; see our Privacy Policy.

003131

# Let's make a deal!

| From: | Susan Anderson <susan@notify.trueaccord.com> |
| To: | Amanda Rozenfeld <steve@dailydistro.com> |
| Date: | Wed, 12 Jul 2023 15:39:25 -0400 |

A simple way to pay less.

## Save $5,855.58 by accepting this offer!

Amanda, we'll make you a deal and let you pay less than you owe by clicking the button below and following the prompts to resolve your balance.

Click the button to receive a 20% reduction on your balance of $29,277.92 with Stripe. Please be aware that this offer is time sensitive. We are not obligated to renew this offer.

TAKE THE DEAL

After you click the button to pay and successfully resolved this balance you will receive an email confirmation.

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: 9337

Unsubscribe Privacy Policy Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET
Copyright © 2023 TrueAccord Corp.
16011 College Blvd, Suite 130, Lenexa, KS 66219

...

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and store your personal information see our Privacy Policy.

| From: | Susan Anderson <susan@notify.trueaccord.com> |
| To: | Amanda Rozenfeld <steve@dailydistro.com> |
| Date: | Thu, 06 Jul 2023 15:18:27 -0400 |

Take this opportunity.

**Amanda, consider different options to clear your Stripe balance of $29,277.92.**

We understand times are tough. You can create a customized payment plan that works for you or call us at (866) 611-2731 (TTY 771) for additional support.

Please reply to this email, or click the button to move forward with your balance.

VIEW YOUR OPTIONS

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ████████9337

Unsubscribe Privacy Policy Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET
Copyright © 2023 TrueAccord Corp.
16011 College Blvd, Suite 130, Lenexa, KS 66219

...

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

| From: | Susan Anderson <susan@notify.trueaccord.com> |
|---|---|
| To: | Amanda Rozenfeld <steve@dailydistro.com> |
| Date: | Fri, 30 Jun 2023 16:42:34 -0400 |

Find out how to pay.

**You can resolve this balance in various ways.**

Amanda,

Pay what you can toward your balance of $29,277.92 with Stripe.

You can also resolve this balance by paying in full if you're able to.

Take care of this balance in whatever way suits you best.

To learn more about paying what you can, visit our website below.

RESOLVE BALANCE

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ████ 9337

Unsubscribe  Privacy Policy  Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

. . .

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

PX 37                                    Attachment A                                    003134

# Pay less than what you owe

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Sat, 24 Jun 2023 18:41:13 -0400 |

Learn more about how.

### Resolve your balance for $23,422.34...

...instead of $29,277.92.

This balance may have been on your mind for a while.

Take care of this balance with Stripe by paying less than what you owe.

PAY LESS

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ███████9337

Unsubscribe  Privacy Policy  Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

...

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

**PX 37**                    **Attachment A**                    003135

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Sun, 18 Jun 2023 17:59:21 -0400 |

...toward your balance.

**This could be a convenient option.**

Amanda,

Pay what you can toward your balance of $29,277.92 with Stripe.

You can pay any amount that is comfortable for you.

Take advantage of this option and visit our website today.

PAY WHAT YOU CAN

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ▆▆▆▆9337

Unsubscribe Privacy Policy Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

...

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

# Amanda, is this a good time?

| From: | Susan Anderson <susan@notify.trueaccord.com> |
|---|---|
| To: | Amanda Rozenfeld <steve@dailydistro.com> |
| Date: | Thu, 15 Jun 2023 15:41:51 -0400 |

If so, please read on.

**Life can come at us pretty hard sometimes.**

TrueAccord is here to help you when the going gets tough.

This is why we want to offer you options for your balance of $29,277.92 with Stripe.

You can select a payment plan where you pay on a schedule that works for you.

You can also pay what you can.

Consider these options and select the one you think is best for you at this time.

If you'd like to choose the pay what you can option, click on the button below.

### PAY WHAT I CAN

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ████ 9337

Unsubscribe  Privacy Policy  Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

. . .

We collect personal information to provide our services. We do not sell all personal information. Most of the information we have

is provided by the customer directly and collected directly through the Services, apps, applications, and phone calls. For more details on how we use, share, and delete personal information see our <u>Privacy Policy</u>.

**Take some time to read this message**

| From: | Susan Anderson <susan@notify.trueaccord.com> |
| To: | Amanda Rozenfeld <steve@dailydistro.com> |
| Date: | Fri, 09 Jun 2023 18:31:38 -0400 |

It contains important information.

**You have an outstanding balance with Stripe.**

Amanda,

We understand that sometimes priorities may get shifted from time to time.

We hope this email serves as a reminder to make your balance of $29,277.92 a priority for the time being.

TrueAccord offers flexible payment plan options that will allow you to take care of this balance on your own terms.

Sign up for a plan today and shift your attention back to other priorities on your list.

SELECT A PLAN

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ████9337

Unsubscribe  Privacy Policy  Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET
Copyright © 2023 TrueAccord Corp.
16011 College Blvd, Suite 130, Lenexa, KS 66219

. . .

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

PX 37                    Attachment A                    003139

# We're here to help you with your Stripe balance

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Sat, 03 Jun 2023 17:42:26 -0400 |

Find out how.

**Start resolving your balance of $29,277.92 with Stripe.**

Hi Amanda,

We're TrueAccord, a third party collection agency that is changing the way debt collection works.

With our emphasis on digital communications and payment plans, we work with people like you to resolve their outstanding balances in a way that works best for you, too.

Best of all, it can all be done online!

### FIND OUT HOW

We choose to email you rather than call. We provide you with payment options that are all customizable.

Take a moment to see why we're different, and how we're aiming to help people like you daily.

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ███████9337

Unsubscribe  Privacy Policy  Dispute this debt

Need help? Call us at (866) 611-2731 (TTY 771) between Monday - Friday, 8 AM - 8 PM ET

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

**PX 37**             **Attachment A**                    003140

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

# Amanda, we can help with your Stripe account

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Thu, 25 May 2023 15:42:36 -0400 |

Take a look at our different options.

**Amanda Rozenfeld, your balance of $29,277.92 is past due. If you can't pay in full, we can still help you solve this.**

This account has been placed with TrueAccord Corp. for collection. You have an <u>overdue balance</u> of $29,277.92 with Stripe. **We would like to help you no matter what your current financial situation is.**

So take a look at your <u>payment options</u> or shoot us an email and talk to us about what's happening.

**Account information**

| | |
|---|---|
| **TrueAccord Corp. account number:** | ▮▮▮▮▮9337 |
| **Balance due:** | $29,277.92 |
| **Current creditor:** | Stripe |

**VIEW PAYMENT OPTIONS**

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

Your TrueAccord account number is: ▮▮▮▮9337

<u>Unsubscribe</u> <u>Privacy Policy</u> <u>Dispute this debt</u>

**PX 37**                    **Attachment A**                    003142

Case 2:23-cv-00635-JLR-DW     Document 58-4     Filed 08/19/24
PageID: 4005

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

# Amanda Rozenfeld, still looking for options to resolve your account?

| | |
|---|---|
| **From:** | Susan Anderson <susan@notify.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Fri, 12 May 2023 18:34:07 -0400 |

We can help.

**This is an important message for Amanda Rozenfeld. If you are not this person, please disregard and delete it.** Email not displaying correctly?

[Skip to our message](#).

It's time to get serious.

Amanda Rozenfeld, your Stripe account balance of $29,277.92 is still outstanding.

We would like to help you, however in order to do so we'll need to know how we can help. If you're looking for payment plan options, we have many to choose from.

If you're looking to pay your account in one lump sum that is available as well.

**Take A Look**

If you're going through tough times and need additional support, please don't hesitate to email us back or call us at (866) 611-2731 (TTY 771) Monday - Friday, 8 AM - 8 PM ET.

**This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.**

Copyright © 2023 TrueAccord Corp.

16011 College Blvd, Suite 130, Lenexa, KS 66219

(866) 611-2731 (TTY 771)

Office Hours: Monday - Friday, 8 AM - 8 PM ET

PX 37                    **Attachment A**                    003144

**Your TrueAccord account number is:** ████████ 9337

**Click here for more information about your balance**

Not ready to pay? Get help managing your debt.

Unsubscribe    Dispute this debt    Privacy Policy

Log in to your account

We collect personal information to provide our services. We do not sell personal information. Most of the information we have is provided to us by the current creditor and/or collected directly through the use of our services, emails, web applications, and phone calls. For more details on how we use, share, and delete personal information see our Privacy Policy.

# How can we help?

| | |
|---|---|
| **From:** | Susan Anderson <susan@email.trueaccord.com> |
| **To:** | Amanda Rozenfeld <steve@dailydistro.com> |
| **Date:** | Tue, 12 Jul 2022 18:48:59 -0400 |

Let us give you the tools you need to manage your account.

**This is an important message for Amanda Rozenfeld. If you are not this person, please disregard and delete it.** Email not displaying correctly?

Skip to our message.

Let us give you the tools you need to manage your account.

Hi Amanda,

We're here to help you manage your balance of $29,277.92 with Stripe. If you're not ready to pay right now, we'd love to help you get on the path towards payment, and ultimately financial freedom.

The first step is understanding your finances. We've put together some tips and tools that we think could help your financial footing.

## Get Help

This communication is from a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

---

Copyright © 2022 TrueAccord

16011 College Blvd, Suite 130, Lenexa, KS 66219

(866) 611-2731 (TTY 771)

Office Hours: M-F, 8 AM - 8 PM ET

**Your TrueAccord account number is:** ████████ 9337

**Click here for more information about your balance**

Not ready to pay? Get help managing your debt.

Unsubscribe    Dispute this debt    Privacy Policy

Log in to your account

Date: March 7, 2023

**From: C⬛⬛⬛ K⬛ (KZ Solutions LLC)**

⬛⬛⬛⬛

Cross Plains,

WI - ⬛⬛

**To: Passive Scaling Inc.**

223 Veterans Blvd.,

Carlstadt,

NJ - 07020

To Whom It May Concern,

I am writing to formally terminate the contract between Passive Scaling Inc. Inc. and C⬛⬛⬛ K⬛ of KZ Solutions LLC in accordance with Section 5 of the contract signed on April 11, 2022, effective immediately.

As per the terms of our agreement, which is shown below, we have the right to terminate the contract if the consultant fails to deliver the services as agreed upon. In this case, our Amazon store, KZ Solutions LLC, was deactivated on September 27, 2022, and despite our numerous attempts to have it reactivated, your team has failed to do so, nor have they provided any explanation as to how this happened in the first place.

**"TERMINATION – Client may terminate this Agreement at any time by providing written notice to consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to: (1) any act or omission by Client, which interferes with the operation of the Store or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Store, which, Consultant may only reactivate, at Consultant's sole discretion."**

We have been seeking assistance from your team for the past several months to no avail, and your team has not shown any interest in resolving the issue or refunding us, as per the contract's terms. This

**PX 37**                    **Attachment A**                    003148

situation is unacceptable, and we have decided to terminate our agreement with your company.

Please note that we will be removing your access to our Amazon account after March 21, 2023. We ask that you work with us to resolve any outstanding issues relating to inventory that we paid for. We are also requesting that you refund us the full amount paid for the services that were not provided as per our contract.

We are disappointed and frustrated with the way this situation has been handled, and we hope that you will take our concerns seriously and work with us to resolve the matter.

Regards,



KZ Solutions LLC

By signing below, I acknowledge that I have received and understand the terms of this termination letter. I further acknowledge that my electronic signature, as set forth below, shall have the same force and effect as my original signature.



Amanda Peremen

Passive Scaling, Director of Operations

**PX 37**                              **Attachment A**                              003149

# Amendment No. 1 to Storage Lease

August ____, 2022

This Amendment No. 1 (the **"Amendment"**) to that certain Storage Lease dated March 17, 2021 (the **"Lease Agreement"**) is made by and between **FBA SUPPORT NJ CORP.**, having its registered office at 820 Carnegie Center, Princeton, New Jersey 08540 (**"Tenant"**) and **SATEC REAL ESTATE HOLDING, LLC**, having its office at 10 Milltown Court, Union, New Jersey 07083 ("**Landlord**"). All capitalized terms not otherwise defined herein shall have the meanings as defined in the Lease Agreement.

The Tenant has advised the Landlord that the Tenant seeks to extend the Term of the Lease Agreement and, further, seeks to decrease the size of the Premises, as further defined in this Amendment.

Landlord and Tenant, having subsequently conferred, have agreed that the following provisions of the Lease Agreement are hereby amended, effective September 1, 2022 (the **"Effective Date"**):

1. Section 1.12 of the Lease Agreement, captioned **"Premises,"** is amended as follows:

   a) Premises shall be decreased by approximately 980 rentable square feet ( **"RSF")**  which shall be reclaimed by the Landlord (the **"Reclaimed Space"**). See annexed, Exhibit A, for a diagram of the Reclaimed Space. The term **"Premises"** shall hereafter mean the original Premises defined in the Lease Agreement, less the Reclaimed Space.

2. Sections 1.16, 1.3 and 1.4 of the Lease Agreement, captioned **"Term," "Commencement Date" and "Expiration Date"** are amended to provide that:

   a) The **"Term"** shall be from September 1, 2022 (the amended **"Commencement Date"**) until August 31, 2023 (the amended **"Expiration Date"**).

3. Section 1.6 and Exhibit A of the Lease Agreement captioned "**Fixed Rent,"** are amended to provide that:

   a) Fixed Rent for the Premises (as defined by Paragraph 1 of this Amendment) will be **$5,500.00** per month commencing on the Commencement Date and continuing throughout the Term.

4. Article 6 of the Lease Agreement is amended to provide that:

1

**PX 37**                    **Attachment A**                    003150

a) Tenant shall reimburse to Landlord, as Additional Rent, or pay directly to each utility provider, for all utility service related to or otherwise arising out of the Premises. In the event that the Reclaimed Space is not separately metered for some or all utility services, payment for those non-separated metered utility services shall continue to be the responsibility of the Tenant _less_ twenty percent (20%), which twenty percent (20%) shall be the responsibility of the Landlord.

5. Section 1.8 of the Lease Agreement captioned **"Guarantor,"** is hereby amended to provide that:

a) Amanda Rozenfeld and Bratislav Rozenfeld are each a Guarantor (**"Guarantor"**) of the Tenant's obligations to Landlord under the Lease Agreement and this Amendment; and each shall guaranty each and every of Tenant's obligations under the Lease Agreement and this Amendment. To evidence such obligation, each Guarantor shall execute and provide to the Landlord, as a condition precedent to the effectiveness of this Amendment, the **"Full Guaranty,"** annexed to this Amendment as **Exhibit B.** Said Full Guaranty shall replace original Exhibit H to the Lease Agreement.

6. Sections 1.9 and 4.2 of the Lease Agreement, captioned **"Landlord's Work,"** are hereby amended to provide the following additional language:

a) Exhibit B to the Lease Agreement is hereby deleted; and is replaced by Exhibit C, annexed hereto. Exhibit C shall specify Landlord's Work applicable to the Reclaimed Space, and Tenant's required cooperation.

7. Section 15.8 of the Lease Agreement is hereby amended to provide for adjudication of legal actions only in New Jersey Courts, venued in Union County, New Jersey, and pursuant to internal New Jersey law.

8. All other provisions of the Lease Agreement, to the extent not modified by this Amendment, shall remain in full force and effect.

**<u>TERMINATION:</u>**

**<u>THIS LEASE CAN BE TERMINATED WITH 60 DAY NOTICE TO THE LANDLORD.</u>**

2

**<u>TENANT:</u>**                           **<u>LANDLORD:</u>**
**FBA SUPPORT NJ CORP.**          **SATEC REAL ESTATE HOLDING, LLC**


By: _____      By: _____
Name: **Bratislav Rozenfeld**         Name: **Daniel Branover**
Title: **Officer**                      Title:  **Member**
Date:                             Date:

3

# EXHIBIT A

## *"RECLAIMED SPACE"*

4

# EXHIBIT B

**"FULL GUARANTY"**

5

# EXHIBIT C

## *"LANDLORD'S WORK"*

Landlord shall undertake work within the Premises to properly demise the Reclaimed Space (**"Landlord's Work"**). Tenant shall remove all of its furniture, equipment and personal property from the Reclaimed Space no later than the date this Amendment is executed by Tenant; and Tenant shall cooperate with Landlord so as to expedite the completion of the Landlord Work. Landlord shall also, as part of Landlord's Work, enlarge a doorway opening in the Premises for the benefit of Tenant.

6

**PX 37**                    **Attachment A**

# CUSTOMSPACE LEASE AGREEMENT

**You (the "Lessee"):**

Company Name: Wraithco

Industry/Business: eCommerce

Representative: Steven Rozenfeld

Title: CTO

Address: ███████████

Edgewater, NJ 07020

Phone Number: ███-9040

Email: steven@wraithco.com

Tax ID: ███████

Emergency Contact: Amanda Rozenfeld

Email: ███████@gmail.com

**The Details:**

Date of Lease: 05/23/2019

Commencement Date: 07/01/2019

Monthly Rent: $ 2,110.00

First Month Rent: $ 2,110.00

Security Deposit: $ 2,110.00

Annual Increase: 3.5%

Initial Lease Term: Month to month,

thereafter reverting to month to month.

Hours of Access: 24 hours

Total Employees: 8

**The Space:**

☑ Self-service storage space of approximately 1,000 square feet, numbered: C5

☑ Private office suite(s) totaling approximately 205 square feet, numbered: O14

☐ _____ parking spot(s), numbered: _____

☐ _____

**Utilities:**

CustomSpace ☐ shall or ☑ shall not provide electrical service in leased self-service storage space.

Customer ☐ shall or ☑ shall not be responsible for their pro-rata share of electrical costs.

☐ If this box is checked, disregard the above and refer to Addendum for custom utility billing arrangement.

## Definitions:

**"CustomSpace", "we", or "us"** means the CustomSpace entity you are contracting with, which is 7001 Anpesil Dr Warehousing LLC. **ANY CHECKS SHOULD BE PAYABLE TO THIS NAME.**

Our contact details are:
7001 Anpesil Dr
North Bergen, NJ 07047
northbergen@customspace.co
(801) 810-2009

**"Facility"** means the premises commonly known as 7001 Anpesil Dr, North Bergen NJ 07047.
**"Governing State"** means the State of New Jersey.
**"Master Landlord"** means Pelvil Realty, LLP, a New Jersey limited liability partnership.

## Insurance:

CustomSpace **DOES NOT PROVIDE** insurance for your business or your stored products/inventory. This Lease requires you to obtain the following insurance coverage, at your own expense:

**Liability**: Commercial General Liability coverage with limits of $1 million per occurrence and $2 million in the aggregate, covering your operations and your use of any equipment, including vehicles, plus bodily injury, property damage liability and fire damage liability coverage.

**Property**: Coverage for the full replacement cost for any property you have at the Facility, plus any improvements you have made to Your Space, on an all-risks basis, unless you reasonably determine that it is not commercially viable to obtain this coverage.

**Worker's Compensation**: As required by applicable law.

Your insurance carrier must have an A.M. Best rating of at least B+, be authorized to do business in the Governing State, and the parties below must be listed as additional insureds. You must provide insurance certificates to CustomSpace evidencing the required coverage. CustomSpace may prohibit you from taking occupancy of the Space until you have provided us these certificates. CustomSpace may terminate this Lease with fourteen (14) days written notice if you fail to provide evidence of your compliance with these requirements, unless you provide evidence within that notice period.

**Additional Insureds:**

| | |
|---|---|
| 7001 Anpesil Dr Wareshousing LLC | Pelvil Realty, LLP |
| 7001 Anpesil Dr | P.O. Box 462 |
| North Bergen, NJ 07047 | Warwick, NY 10990 |

## Location-Specific Terms:

The following uses and business operations are prohibited at the Facility, in addition to those listed elsewhere in this Lease: commercial woodworking and cabinetry, commercial printing operations, paint wholesaling, and agricultural/farm equipment and product wholesaling.

NAICS Code of Lessee: <u>423850</u>

Your liability insurance must include coverage for owned, non-owned, and hired autos.

This Lease is made as of the Date of Lease between **CustomSpace** and **Lessee**.

    **1. Rental.** CustomSpace agrees to rent to Lessee and Lessee agrees to lease from CustomSpace the Space, located in the Facility.

    **2. Term.** The Initial Term shall commence on the Commencement Date. After the conclusion of the Initial Term, this Lease will automatically revert to a Month to Month Lease. Either party may terminate this Lease at any time following the Initial Term by giving the other party at least 30 days' written notice of intention to terminate. If either party wishes to terminate this Lease at the end of the Initial Term, they must give the other party at least 30 days' written notice of intention to terminate.

    **3. Rent.** The Monthly Rent shall be payable on the 1st of each month following the Commencement Date and throughout the term of this Lease. Upon execution of this Lease and prior to taking occupancy of the Space, Tenant shall pay to CustomSpace the First Month Rent for the period between the Commencement Date and the 1st of the following month. Monthly Rent is due on the first of every month. A 10% late fee applies after the 10th of every month. Regardless of the Term, the Monthly Rent will increase by the Annual Increase each year as of April 1st, except in the calendar year of the Commencement Date. Once the Initial Term of the Lease has expired, the Monthly Rent may be increased with a thirty (30) day written notice, provided that rental rates shall not be increased in the first six (6) months of the Lease (except with respect to the Annual Increase). The rent is not in any way connected to the approximate square footage of the Space.

    **4. Termination for Nonpayment of Rent.** If any part of the Rent (or other charges, such as labor or insurance) due from Lessee under this Lease remains unpaid for fourteen consecutive days, CustomSpace may at CustomSpace's sole option, terminate this Lease and the right of Lessee to use, access and occupy the Facility and Space by sending a preliminary lien notice, in the form provided by law, to Lessee at Lessee's last-known address and to any alternative address provided, specifying a date on which Lessee's right to use the Space terminates unless all sums due are paid by Lessee before the date specified in the preliminary lien notice. If Lessee fails to pay the full amount due by the date specified in the preliminary lien notice, CustomSpace may enter the Space, remove any property to a place of safe keeping, and enforce CustomSpace's lien against that property by sale of the property in the manner provided by law. The property may be sold to satisfy the lien. CustomSpace requests that Lessee provides an alternative address.

    **5. Security Deposit.** Lessee will pay to CustomSpace the Security Deposit upon execution of this Lease. CustomSpace may use any amounts from that Deposit that are reasonably necessary to remedy Lessee's defaults in the payment of rent or to repair damages caused by Lessee. If applied toward rent or damages during the term of this Lease, Lessee agrees to reinstate the total Security Deposit on fourteen days' written notice to Lessee. Upon termination of this Lease, the balance, if any, of the security deposit will be mailed to Lessee at Lessee's last known address within 30 days after Lessee surrenders the Space. THE DEPOSIT MAY NOT BE APPLIED TOWARDS THE LAST MONTH'S RENT.

    **6. Use and Maintenance of Space.** Lessee may use the Space for storage, office, warehouse, distribution, and related uses. Notwithstanding the preceding sentence, Lessee may not use the Space: for the use or storage of any flammable, toxic, hazardous, radioactive, or explosive materials,; for primarily industrial or manufacturing purposes; for the keeping of live animals; as a living or residential space; in any manner that would likely or actually violates or contravenes any governmental law, code, statute, regulation, or rule; to conduct any auction; in any manner that would cause CustomSpace to breach the Master Lease (defined as the lease which CustomSpace holds for the entire Facility); or for any unlawful purpose. Lessee may not permit the accumulation of refuse, or dispose of liquid or other waste, in or about the Space, nor cause or permit any nuisance or other condition or act that may interfere with the use of the surrounding premises by other Lessees or CustomSpace. Lessee may not place any signs on the Facility or the Space without CustomSpace's written consent which may be withheld or granted in its sole discretion. Lessee may not make any changes or improvements to the Space, including drywall modifications or electrical work, without written consent from CustomSpace. The Space is leased as-is unless specified otherwise in this Lease.

    **7. Utilities.** CustomSpace promises and is obligated to provide adequate lighting in the Space (except outdoor spaces), Wi-Fi connectivity, and adequate bathroom facilities. CustomSpace is obligated to provide electricity and appropriate heating and/or air conditioning in any office areas in the Facility. Lessee acknowledges that any non-office Space does not have any water, heat, or air conditioning, and that CustomSpace is under no obligation to provide any such services at any time during the term of this Lease.

If Lessee is responsible for their pro-rata share of electrical costs, CustomSpace shall make a reasonable determination of Lessee's share of the costs, and Lessee shall pay such share to CustomSpace or its representative within fourteen days after receipt of CustomSpace's invoice. If not already existing, CustomSpace may permit Lessee to install and maintain electrical connections in their Space at their expense, using only a CustomSpace-approved electrician.

**8. Security.** CustomSpace may install and use video surveillance cameras to monitor and record the activities of Lessee, its agents, employees, contractors, guests, licensees, or invitees ("Lessee Related Persons"), and any other individuals, who may enter in or around the Facility, including the Space and common areas. Lessee understands and agrees that it and all Lessee Related Persons have no expectation of privacy to be free from such surveillance, monitoring, and/or recording, and agrees to advise all Lessee Related Persons that such recording may take place with or without further notice. Lessee is familiar with the area in which the Facility is located and expressly assumes all risks any third parties may present.

**9. Sublease or Assignment.** Lessee may not assign this Lease, sublease all or any part of the Space, or permit any other person to occupy or use all or any part of the Space without the prior written consent of CustomSpace and Master Landlord. Any attempted assignment or sublease in violation of this Paragraph is void and, at the option of CustomSpace in its sole discretion, terminates this Lease and the right of Lessee to use and occupy the Space.

**10. Risk of Loss.** Lessee is solely responsible for locking and securing its goods within the Space. Lessee bears all risk of loss or damage to any property stored in the Space or on the Facility. Any property left outside the Space shall be deemed to be abandoned by Lessee, and CustomSpace may discard or retain such property in its sole discretion. Lessee is advised not to leave property inside any common-use area. Lessee warrants that all items stored in the Space are the property of Lessee and not of any third party.

**11. Release of CustomSpace's Liability.** Lessee agrees that CustomSpace, Master Landlord, and CustomSpace's agents, employees, and assigns (all collectively, "CustomSpace Related Persons") shall not be liable to Lessee or Lessee Related Persons for any loss or damage, injury or death caused to them or their property, as the result of the use and occupancy of the Space or property, whether or not such injury or damage is caused in whole or in part by the active or passive acts, omissions, or negligence of any CustomSpace Related Persons.

**12. Indemnity.** Lessee shall defend, indemnify and hold harmless CustomSpace Related Persons from and against any and all claims arising from Lessee Related Persons' use of the Space or from the conduct of any Lessee Related Person while at the Facility, and shall further defend, indemnify and hold harmless CustomSpace Related Persons from and against any and all claims arising in whole or in part from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising in whole or in part from any act or omission of any Lessee Related Persons, and from and against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon.

**13. Forklift Operations and Responsibilities.** CustomSpace does not operate for Lessee any powered industrial truck, e.g. forklift, pallet jack, or similar (collectively, "Equipment"). Lessee must present the on-site property manager with proof that the Equipment CustomSpace is certified as competent to operate such Equipment on the Property under rules promulgated by OSHA (29 CFR §1910.178) where applicable. Lessee is solely responsible for the proper training, certification, and oversight of its employees, and CustomSpace is solely responsible for the proper maintenance, repair, and good working order of its Equipment. Lessee assumes all risks and liabilities for injuries, damages to property or persons, and loss of life for its operation of such Equipment on the Property. CustomSpace is not responsible for bringing Lessee's property to or removing Lessee's property from the Property nor for receiving shipments except when contracted and CustomSpace is not responsible for any lost, damaged or stolen goods. Use of any Equipment by any CustomSpace without proper training and certification shall be subject to a $50 penalty per occurrence.

**14. Insurance.** Lessee expressly agrees that the insurer shall not be subrogated to any claim of Lessee against any CustomSpace Related Persons, and agrees to indemnify and hold harmless such CustomSpace Related Persons from any expense, cost or damage incurred by reason of any claim or action based in whole or in part upon such subrogation.

**15. Entry for Maintenance and Inspection.** CustomSpace and Master Landlord are entitled to enter into the Space at any reasonable time and for any reasonable purpose, including but not limited to maintenance of the Space and the surrounding premises, inspection by governmental agencies, and determining whether Lessee is conforming to the terms of this Lease and all applicable laws.

**16. Access.** CustomSpace will supply Lessee with an access code OR one physical keycard or fob per employee, which will allow Lessee and its employees access to the Property during the Hours of Access. Lessee agrees to not disclose to others the access code, share keycards or fobs, tamper with the access control system, or to use any other method or device to restrict access to the Facility without the prior written consent of CustomSpace. CustomSpace retains the right to modify any access codes or cancel and reissue keycards or fobs, and CustomSpace shall provide Lessee the new access code or physical access control device in a timely manner. Lessee is required to inform CustomSpace if a physical access control device is lost or stolen, which will incur a re-issue fee of $25. Physical access control devices remain the property of CustomSpace at all times.

**17. Common Use Spaces.** Lessee is entitled to use of any common use spaces on the Premises ("Common Spaces"), including kitchens, dining areas, lounge areas, and conference/meeting rooms during Lessee's Hours of Access. Lessee is liable for damages caused to the Common Spaces by any Lessee Related Persons. Lessee may use the Common Spaces for business and related uses, and shall not use the spaces to host events, parties, or large gatherings without permission from CustomSpace. Lessee shall comply with posted rules regarding use of the Common Spaces, including any requirement to make reservations to use the Spaces. These rules shall apply to Lessee's use of Common Spaces at other facilities operated by or affiliated with CustomSpace, in the event Lessee is permitted to use those Spaces.

**18. Payments.** The default payment method for rent is via recurring ACH payment or bank check. Lessee may also pay rent via Visa or MasterCard credit or debit card, which may be subject to an additional fee of 3%. If Lessee's payment is returned as Non-Sufficient Funds more than once in a twelve month period, CustomSpace may require Lessee to make payment in certified funds only (i.e. cashier's check or credit/debit card). CASH IS NOT ACCEPTED FOR PAYMENT. DO NOT MAKE ANY PAYMENTS IN CASH. If Lessee requests additional services from CustomSpace (e.g. labor or materials), Lessee agrees to pay in full the invoice for the additional services within fourteen days of receipt of the invoice from CustomSpace.

**19. Termination After Destruction / Code Violation / Loss of Rights.** If the Space is destroyed or damaged to the extent that it is no longer usable from any cause other than the conduct or negligence of Lessee, if CustomSpace and Lessee are informed by a city, county, federal, or other regulating body that Lessee's use is unlawful or not in compliance with relevant laws, codes, or statutes, or if CustomSpace suffers a termination, expiration, or material loss of its rights to the Facility, CustomSpace or Lessee may cancel this Lease immediately, effective on delivery of notice to the other party. In the event of cancellation, Lessee's obligation to pay rent terminates immediately; however, Lessee remains liable for any unpaid rent due for occupancy of the Space before the date of the destruction or damage.

**20. Termination for Breach of Lease.** Notwithstanding any other provision of this Lease, the failure of Lessee to comply with any term or condition contained in this Lease constitutes a breach of this Lease. In the event that Lessee breaches this Lease by failing to comply with any term or condition, other than by nonpayment of rent, CustomSpace may, at CustomSpace's sole option, immediately terminate this Lease if the Initial Term has expired. Otherwise, CustomSpace must provide written notice to Lessee of the breach of the Lease and allow Lessee fourteen (14) days to remedy the breach. If the breach is not remedied in this time, CustomSpace may subsequently terminate this Lease. The waiver by CustomSpace of Lessee's breach of any term or condition of this Lease does not constitute a waiver of any subsequent breach. If CustomSpace elects not to terminate this Lease on any breach or default by Lessee, all rent and other sums due under this Lease shall continue to accrue.

**21. Obligations of Lessee on Termination.** Lessee acknowledges that it has inspected the Space and found it to be in good, sanitary, and clean condition. Upon termination of this Lease, Lessee shall immediately vacate the Space, remove all property stored there, repair all damage to the Space and/or Property caused by it, and leave the Space in a good, sanitary, and clean condition. Lessee agrees to reimburse CustomSpace for all costs of emptying or repairing the Space, including but not limited to dump fees, labor, materials, and transportation. Lessee agrees to reimburse CustomSpace within seven (7) days of mailing a statement itemizing all labor and other expenses incurred to dispose of such items. Lessee shall pay to CustomSpace any costs of repairs necessitated by Lessee Related Persons within fourteen of the mailing of a statement for such costs. To the extent it fails to timely make the payments required by this Paragraph, at any time thereafter CustomSpace may deduct such amounts from the Security Deposit.

**22. Rights of CustomSpace on Termination.** On termination of this Lease, CustomSpace may, at CustomSpace's option, enter the Space and remove all personal property; clean and repair the Space; replace the lock and keys; and exercise any and all rights otherwise available to an CustomSpace of a self-service storage facility pursuant to law. Further, CustomSpace may impose a lien on all personal property located in the Space for rent, labor, or other charges, present

or future, and for all expenses incurred for the storage, preservation, sale, or disposition of any and all property stored in the Space. CustomSpace's remedies as specified in this Lease are in addition to, and not in lieu of, any other legal or equitable relief to which CustomSpace would otherwise be entitled.

**23. Service Charges.** For each check that is returned to CustomSpace unpaid, Lessee agrees to pay CustomSpace a service charge equal to 7 percent of the amount of the check or the sum of $45.00, whichever is greater.

**24. Subordination and Non-Disturbance.** This Lease shall be subject and subordinate to the Master Lease between CustomSpace and Master Landlord. In addition, this Lease shall be subject to and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device") now or hereafter placed by Master Landlord upon the Facility, to any and all advances made on the security thereof, and to all renewals, modifications, consolidations, replacements and extensions thereof. Subject to the preceding sentence, Lessee agrees to attorn to Master Landlord, lender and/or any other party who acquires operatorship of the Facility by foreclosing on a Security Device. For Security Devices entered into by Master Landlord after the date of the Master Lease, Lessee's subordination shall be subject to receiving a non-disturbance agreement from any lender that Lessee's possession and the Lease will not be disturbed so long as Lessee is not in breach hereof and attorneys to the record operator of the Facility. Lessee agrees to sign a tenant estoppel certificate within ten (10) days after request by CustomSpace or Master Landlord.

**25. Notices.** All notices required or permitted to be given under this Lease must be delivered by e-mail, certified United States mail, return receipt requested and postage prepaid, or personally served to the parties at their addresses stated herein, or any other address subsequently furnished in writing to the other party. Both parties are entitled to rely on the accuracy of the addresses herein unless notified otherwise in writing. Any notice mailed in accordance with this paragraph will conclusively be presumed to have been received within two business days after mailing.

**26. Attorneys' Fees.** In the event of any action or proceeding between or among the parties hereto at law or in equity arising out of this Lease, including any appeal, contempt proceeding, action or proceeding to enforce indemnity obligations, and any action or proceeding to enforce and/or collect any judgment or other relief granted (collectively "Litigation"), the unsuccessful party to the Litigation shall pay to the prevailing party, in addition to any other relief that may be granted, all costs and expenses of the Litigation, including without limitation the fees and expenses incurred by the prevailing party's attorneys, whether or not otherwise recoverable as "attorneys' fees" or as "costs" under applicable law.

**27. Nonwaiver, Time, Severability, Heirs & Assigns, Governing Law.** Failure of either party to enforce any provision of this Lease is not construed as a waiver of that provision or of either party's right to enforce that provision or any other provision of this Lease. Time is of the essence of this Lease. If any term of this Lease is held by a court of competent jurisdiction to be void or unenforceable, the remainder of this Lease remains in full force and effect. This Lease is binding on and inures to the benefit of the heirs, executors, successors, and assigns of CustomSpace and Lessee. This Lease is governed by and construed in accordance with the laws of the Governing State.

**28. Entire Agreement.** This Lease, including any attachments, exhibits, and amendments, contains the entire agreement between CustomSpace and Lessee with respect to the subject matter of this Lease. Any prior agreements, promises, or negotiations, whether oral or written, that are not expressly set forth in this Lease are of no force or effect.

**29. Modification.** This Lease can be modified only in writing and by both CustomSpace and Lessee. Any purported oral modification of the terms of this Lease is of no force or effect. A modification to the unit number(s), Space, and/or Rent, if made by both parties in writing (regardless of if a new lease is signed), shall not void any other terms of this Lease.

**30. Rules and Regulations, Community and IP.** Lessee acknowledges the rules and regulations attached to this Lease and agrees to abide by the same. Lessee also agrees to ensure its employees and other Lessee Related Persons abide by the same. Unless you inform us otherwise in writing, you also agree to grant CustomSpace permission to use your name, trademark, and/or logo to identify you as a member of the CustomSpace community on the CustomSpace website or other public-facing medium, including in the promotion of our business, and you hereby waive any claims or damages against us relating to such use.

**31. Custom Arrangements.**

**Improvements.** Operator shall make, and Customer will have the right or obligation to make, the following improvements to the Property:

Operator: None _____

_____

Customer Obligation: None _____

_____

Customer Right: None _____

_____

**Utilities, Rights, Options, and Other.** The following terms also apply:

Cost to install a 220 outlet will be $950. There will be no extra charges for

power consumption inside the unit unless the tenant bring another

device that will consume more power.

_____

This Lease Agreement supersedes prior Lease Agreement.

_____

Lessee has carefully read and reviewed this Lease and each term and provision contained herein, and by execution of this Lease shows its informed consent thereto. Lessee explicitly acknowledges that notices may be delivered via e-mail.

**CUSTOMSPACE:**                              **LESSEE:**

By _____          By _____
       [*signature*]                                      [*signature*]

Ricardo Esteves                              Steven Rozenfeld
       [*typed name*]                                 [*typed name*]

General Manager                              CTO
       [*title*]                                          [*if company, title*]

# CUSTOMSPACE FACILITY RULES

For your own safety and the safety of each member of the CustomSpace community, you are required to observe the following rules while at the Facility. Violating any rule may result in a fine or more serious penalties as noted, including an immediate termination of your Lease, even if the Initial Term of the Lease has not yet expired, or being banned from the Facility.

1. **Trash/Refuse.** You are responsible for all garbage. All garbage, recycling, pallets, etc, must be taken directly to the appropriate disposal container or storage location, or if there is no such designated location (for example, for hazardous waste), disposed of off-site at Lessee's expense. Trash may not be placed in any hallway or common space.

2. **Abandoned Property**. If you fail to secure your property/items in your rented space and that property is left in common areas (hallways, loading docks, etc) for over one hour, that property shall be considered "abandoned property" and all pieces thereof shall be subject to a $100.00 per hour common spaces blockage fee. This fee shall not constitute rent and your property remains placed at your own risk.

3. **Visitors.** All persons entering the Facility who are not employees of Lessee or Lessee themselves shall sign in electronically at the front desk and execute the non-disclosure agreement (NDA). Absolutely no visitors may access the Facility without signing in, and all visitors must be accompanied by a representative of the host Lessee.

4. **Equipment.** All shared equipment, including forklifts, carts, and pallet jacks shall be returned to their assigned parking or staging area. Electric equipment shall be plugged in to charge after use. All equipment is subject to a fair-use policy.

5. **Entry and Exit.** It is prohibited to prop open, block closed, or obstruct any gate or doorway to the Facility.

6. **Truck Parking.** No trailers or trucks may be parked in the truck dock areas overnight. The docks are for temporary loading and unloading only.

7. **Sleeping.** Overnight sleeping or living in any part of the Facility, including in a vehicle parked at the Facility, is strictly prohibited. Your Lease may be terminated immediately if CustomSpace determines you to have leased the Space primarily for residential use, and such determination will be made at the sole discretion of CustomSpace.

8. **Intoxication.** It is strictly prohibited to operate any equipment at the Facility while under the influence of alcohol or any other intoxicant. Any person found in violation of this policy may be permanently banned from the Facility and all CustomSpace locations.

9. **Pets.** Pets and domestic animals, except service animals, are not permitted at the Facility.



L████ M██, Owner
Joy, Tranquility, and Serenity, LLC
████████ TX █████

April 23, 2023

Amanda Peremen
Passive Scaling, LLC
223 Veterans Blvd.
Carlstadt, NJ 07020

Re:  Attached Amazon Automation Contract
      Dated:  October 12, 2021

Dear Steven Rozenfeld:

This letter serves as notification of termination of the aforementioned contract, effective upon receipt of this letter.

This notification complies with the minimum notice period required by our agreement.

All outstanding requirements of the contract should be fulfilled by the parties prior to termination, unless otherwise agreed upon in writing.

The reason(s) for this termination is:

Passive Scaling, LLC was contracted to start up and manage an Amazon store for Joy, Tranquility, and Serenity, LLC for a consultation fee of $30,000 (Thirty thousand USD) which Passive Scalling LLC guaranteed the return of through store profit within the 18-month life of the contract.  Passive Scaling INC has been negligent in the operation and management of said store which has resulted in a net loss of $14,148.33 over the life of the contract.

Please provide a response in writing to above listed address of Joy, Tranquility, and Serenity LLC and remittance of $45,148.33 to cover losses of Joy, Tranquility, and Serenity, LLC including $30,000 consultation fee, $1,980.00 in Passive Scaling INC mandated accounting software fees for software that has not been updated by Passive Scaling INC and does not and has not ever accurately reflected the status of said store, negligent shipment of $553.90 worth of purchased goods to the home address of Joy, Tranquility, and Serenity LLC instead of the warehouses of Passive Scaling INC and has gone unresolved for over 10 months despite written notification to several employees of Passive Scaling INC and regular requests for status updates, $2488.00 for the negligent payment by Passive Scaling employees using account information of Joy, Tranquility, LLC to a product vendor that Passive Scaling INC have never ordered product from on behalf of Joy, Tranquility, and Serenity, LLC which has gone unresolved for over 10 months

003164

despite written notification to several employees of Passive Scaling INC and regular requests for status updates, and for no accounting by Passive Scaling INC for products removed from said store despite record by Amazon that at least 105 items had been removed from said store and returned to Passive Scaling INC warehouses.

Please confirm receipt of this letter. If you have any questions or need anything further, I can be reached at ██████@gmail.com.

Your collaboration and cooperation is greatly appreciated.

Sincerely,

L██████ M██
Owner, Joy, Tranquility, and Serenity LLC

# E-COMMERCE CONSULTING AGREEMENT

This E-Commerce Consulting Agreement ("Agreement"), is dated as of October 09, 2021 by and between PASSIVE SCALING INC, a New Jersey Corporation company, whose address is 223 Veterans Blvd., Carlstadt, NJ 07020 (hereinafter "Consultant"), and |        M█ (hereinafter "Client").

WHEREAS, Client desires to engage Consultant's services, as an independent contractor, upon the terms and conditions herein set forth; and

WHEREAS, Consultant desires to render consulting services to Client upon the terms and conditions herein set forth;

NOW, THEREFORE, Consultant and Client (together, the "Parties"), for $30,000.00 and other good and valuable consideration, the receipt and sufficiency are hereby mutually acknowledged, agree to the following terms and conditions whereby Consultant shall consult Client in connection with two (2) e-commerce stores on the Amazon platform, (including one (1) sub-account), (the "Stores");

1. **CONSULTANT'S SERVICES - Consultant agrees to perform the following services ("Services");**
    A. Maintain Client's Stores, including configuring the Amazon storefronts and configuring the front and back end systems necessary to manage the Stores.

    B. Review, research, source, select, and list products for the Client's Stores.

    C. Respond to customers' phone and email inquiries in support of Client's Stores and shall exercise good faith efforts to resolve customer inquiries, handle product returns, and manage billing matters.

    D. Maintain oversight of Client's Stores and its financial performance, however, Consultant shall have no obligation to, and does not intend to, provide financial advice to Client concerning the operation of Client's Stores (Client shall confer with its professional financial advisors concerning all financial inquiries.)



2023-10-11 18:48:40 (PDT)

003166

## 2. CLIENT RESPONSIBILITIES -

A. Client understands there is a period that will delay the commencement and commercial operations of the Stores, including, without limitation, a 1 to 4 month configuration period (and perhaps longer, depending on the circumstances specific to each proposed Stores) where Client must complete certain obligations. Until Client satisfies all contractual and legal requirements for the creation and operation of Client's Stores, Consultant cannot commence providing the Services as set forth in Section 1 of this Agreement.

B. Within the first eight (8) months of this Agreement, Client will use best efforts to obtain, and maintain for the duration of this Agreement, a credit card or total credit limit issued through a United States federally insured banking institution with a minimum credit limit of thirty thousand ($30,000.00) dollars USD. In no event shall Consultant be responsible for payment of any kind and any other obligation under Client's credit cards, all of which credit card obligations shall be solely that of Client. Furthermore, unless Consultant provides written consent: (i) at no time shall Client Pause its Stores, allow for a Suspension, or place its Amazon account or Stores in Vacation Mode, such terms being defined or referenced on the Amazon website or in other written materials made available to Client; and (ii) Client shall not allow its Stores to remain shut down for more than ninety (90) days during the term of this Agreement.

C. Within thirty (30) days from the commencement of this Agreement, Client shall provide Consultant with only necessary information for the purpose of Consultant carrying out its obligations under this Agreement. Client shall use its best efforts to assist Consultant in obtaining all information deemed necessary by Consultant to implement Consultant's Services.

## 3. COMPENSATION -

A. In consideration for this Agreement, Client shall pay Consultant a one-time consulting fee of thirty thousand dollars ($30,000.00) USD (the "Fee"), via wire transfer or ACH to Consultant's bank account within 72 hours of execution of this Agreement. Except as expressly permitted under Section 10, the Fee is non-refundable.



003167

B. Client shall also thereafter, beginning in the month following the month in which the Fee is paid, pay Consultant one hundred ninety nine ($199.00) USD per month (the "Maintenance Fee"), or thirty five percent (35%) of the Net Profit from Client's Stores per month (the "Ongoing Commission"), whichever is greater plus an additional ninety nine dollars ($99) software fee paid directly to the software provider. Client shall not be responsible for payment of the Ongoing Commission or the Maintenance Fee if, other than due to breach of this Agreement by Client, there is no activity in Client's Stores for said month (or a portion thereof, where such portion exceeds 15 days).

C. Consultant shall invoice Client monthly, and Client has seventy-two (72) hours to remit payment.

## 4. TERM -

This Agreement shall commence on the last date of execution by both parties and shall continue in effect for a period of eighteen (18) months (the "Initial Term") thereafter. Upon completion of the Initial Term, the Agreement shall automatically extend on a month-to-month basis (the "Option Term") until written notice is provided by either party, to the other party, in accordance with Section 5.

## 5. TERMINATION –

Client may terminate this Agreement at any time by providing written notice to Consultant. Consultant may terminate this Agreement, at any time, for cause, with fourteen (14) days written notice to Client. Consultant may terminate the Option Term, without cause, at any time. For this Section, "cause" shall include, but not be limited to; (1) any act or omission by Client, which interferes with the operation of the Stores or Consultant's ability to render Services, in Consultant's sole discretion; or (2) Client's breach or threatened breach of any term in this Agreement. If Client breaches any term under this Agreement, independent of any actions Amazon may take from time to time, Consultant may Pause Client's Stores, which, Consultant may only reactivate, in Consultant's sole discretion.



2021-10-11 10:40:49 (UTC)

### 6. NON-DISPARAGEMENT –

During this Agreement and for one (1) year thereafter, the Parties mutually agree that any issues or problems that either party has regarding the other with respect to this Agreement, shall be discussed with the other party in a professional and private manner. The Parties hereby mutually agree not to disparage, insult, or fabricate information regarding the other party in any online or offline forum or any other forum whatsoever, including but not limited to social media channels, regardless of whether such comments or information would not constitute libel or slander, and regardless of whether such comments could be deemed factually true

### 7. SALES / USE TAX –

Consultant does not provide tax reporting or tax management services of any kind. Client is responsible for determining if Client is responsible for collecting and remitting sales or use tax under any applicable state or local law, regulation, or ordinance.

### 8. INTELLECTUAL PROPERTY –

Client understands that Client's Stores is a service hosted on the Amazon platform and not a distinct or severable product or service that can be ported, removed or installed in or on a different place or platform. Accordingly, Consultant does not hold itself out to have any rights, endorsements, relations, or affiliation with Amazon, or any of Amazon's copyright, trademark, trade dress, trade secret, or any other intellectual property right that Amazon may hold (the 'Intellectual Property Rights'), Further, Consultant cannot, and does not, grant or convey to Client any Intellectual Property Rights, whatsoever, in Client's Stores, or Amazon, and Consultant holds no legal or equitable rights in Client's Stores.



2023-10-11 18:48:43 (PDT)

003169

9. **RESTRICTED ACTIVITIES** –

Client acknowledges that during the Term of this Agreement Client will have access to Consultant's Confidential Information which, if disclosed, could assist in competition against Consultant by third parties. Client recognizes the highly competitive nature of Consultant's business, services, and its trade secrets, and that Consultant conducts its business electronically, through e-commerce, and throughout the United States. Therefore, Client agrees that the following restrictions on Client's activities are necessary to protect the good will, Confidential Information, and other legitimate business interests of Consultant, which restrictions are fair and supported by adequate consideration, shareholders, employees, Non-Competition, agents, the Term members of the Agreement:

A. **Non-Solicitation**: During the Restricted Period, Client agrees that it will not, directly, or indirectly through another Person: (i) induce or attempt to induce any employee or contractor of Consultant to leave the employ or contract of Consultant, or in any way interfere with the relationship between Consultant and any of its employees or contractors, or (ii) induce or attempt to induce any customer, supplier, client, distributor, vendor, licensee, or other business relation of Consultant to cease doing business with Consultant, or in any way interfere with Consultant's relationship with any such party.

B. **Non-Disclosure**: The Parties agree not to use, reveal, make available, nor disclose, whether directly or indirectly, to any third party any Confidential Information for any purpose except as approved in writing by Consultant. Further, the Parties shall (a) not assist nor enable anyone to access or use any of Confidential Information; and (b) not use nor exploit any of the Confidential Information for any purpose whatsoever except in accordance with the terms of this Agreement. For purposes of this Agreement, the Party disclosing the Confidential Information shall be referred to as 'Disclosing Party,' and the Party receiving the Confidential Information shall be referred to as 'Receiving Party'.

C. **Notwithstanding the foregoing**, Receiving Party will: 1) promptly notify the Disclosing Party, to the extent legally permissible, if Receiving Party becomes required by court order to disclose any Confidential Information; 2) cooperate with Disclosing Party if Disclosing Party decides to oppose or to seek to restrain such disclosure; and 3) subject to the foregoing, only disclose that information which its counsel advises it is legally compelled to disclose.



2021-10-11 18:46:43 (PDT)

003170

6

D. **If at Disclosing Party's request,** Receiving Party is unable to obtain a protective order or other injunctive relief above with respect to the Confidential Information referred to therein and Receiving Party is thereafter required by court order to disclose such Confidential Information, Receiving Party may disclose only such Confidential Information as is expressly required by the court order.

E. **Maintenance of Confidential Information.** The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of Disclosing Party's Confidential Information. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own confidential information. Receiving Party shall also immediately notify Disclosing Party, in writing, of any unauthorized use or disclosure of the Confidential Information.

F. **Confidentiality Term:** Regardless of any termination of this Agreement, the parties expressly acknowledge and agree that their respective rights and obligation under this Section 9 shall last for a period of five (5) years following the expiration of this Agreement or permissible termination of this Agreement; provided, however, that Client's duties of confidentiality thereunder with respect to Consultant's trade secrets shall survive such expiration and such duties of confidentiality shall continue and not expire so long as such Confidential Information is deemed a trade secret as a matter of law.

G. **In signing this Agreement,** Client acknowledges that he/she/it has carefully read, consulted with legal counsel, and considered all the terms and conditions of this Agreement, including the restraints imposed on Client, throughout the United States, under this Section 9. Client agrees that all such restraints are necessary for the reasonable and proper protection of Consultant, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area (i.e., throughout the United States). Client further acknowledges that, were Client to breach any of the covenants contained in this Section 9, however caused, the damage to the Consultant would be irreparable. Client therefore agrees that Consultant, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any such breach or threatened breach, without having to post bond, together with reasonable attorneys' fees incurred in enforcing Consultant's rights hereunder.



10. **REFUND POLICY –**

A. Subject to Paragraph (C) below, during the Term of this Agreement, if Consultant's Services result in a Prohibited Action, twice, Client has the option ("Refund Option") to request a refund. Additionally, following an eighteen(18) month period if the Client has not made back their initial stores costs, Client has the option to request a refund within a thirty (30) day period following their 18th month of working days. To exercise the Refund Option, Client must notify Consultant of that election in writing. In that event, subject to Paragraph (C), Consultant will refund a portion of the Fee, as defined in Paragraph (B) below (the "Refund Amount.").

B. The Refund Amount shall be calculated by the following formula: (x) the Fee (S30,000.00) less (y) any Net Profit and Cash Back Client received during the Refund Period, and less (z) any Net Profit and Cash Back Client received through the Cure Stores; provided, however, that (1) Client has not engaged in any act that interferes with the operation of Client's Stores or of Consultant's Services or which would be in breach of this Agreement, including, without limitation, a Suspension of Client's Stores for any reason other than the occurrence of a Prohibited Action, and (2) this Agreement remains in full force and effect at the time Client exercises the Refund Option. The Parties further agree that under no circumstance shall the Refund Amount exceed the Fee of (S30,000.00).

C. Client's right to exercise the Refund Option for reason of Prohibited Action under Paragraph (A) is expressly conditioned on Consultant first managing one replacement store (the "Cure Store") for Client, and the Cure Store also resulting in a Prohibited Action.



2021-10-11 18:48:43 (PDT)

# Signature Page

IN WITNESS WHEREOF, this Agreement is deemed executed as of the of the last execution date below.

**CLIENT:**

By: I⬛⬛⬛ M⬛ authorized representative and agent for service of process Date: October 12, 2021

Principal of Client acknowledges and agrees to be bound by all of the provisions of this Agreement applicable to Client, as if expressly a party hereto, Accepted and Agreed to by Principal of Client:



I⬛⬛⬛ M⬛⬛

**CONSULTANT:**

By: PASSIVE SCALING INC. Amanada Peremen, Operations Manager, authorized epresentative and agent for service of process.

Date: October 12, 2021



Amanada Peremen

003173

**Store refund**

**From:**   Jamison Christian ██████████ >

**To:**   Sherica S <sherica@passivescaling.com>, Jerdonna P <jerdonna@passivescaling.com>, Steven R
<info@sales.support>, info@passivescaling.com, Alex <alex@passivescaling.com>, Amananda Peremen
<sales@passivescaling.com>, Kerry Anne S <kerryanne@passivescaling.com>, Trudy S <rose@passivescaling.com>,
Tatiana S <tatiana@passivescaling.com>

**Date:**   Mon, 08 May 2023 19:26:24 -0400

I have not gotten an update or any communication regarding my store or
my refund in months. If I need to get my attorneys office involved at
this point I am happy to do so.


Respectfully,
██████ R. C██████, Sgt, USMC, Ret. TSAC-F

# RE: Emerald May LLC- Contract Termination and Refund Request

| | |
|---|---|
| **From:** | ▓▓▓▓▓▓▓▓▓▓▓ |
| **To:** | steven@passivescaling.com, jerdonna@passivescaling.com, info@passivescaling.com, Tatiana S <support@mail.salessupport.ladesk.com>, support@passivescaling.com, steven@fba.support |
| **Cc:** | support@optimyzedigital.com, Erin Davidson <erin@optimyzedigital.com>, asante@optimyzedigital.com, payments@optimyzedigital.com |
| **Date:** | Wed, 26 Apr 2023 14:52:28 -0400 |

Dear Steven and Jerdonna,

It has now been **14 days** without response to my cancellation letter and refund request with Passive Scaling.

I would like to resolve this matter in good faith and without involving legal representation, however, we cannot resolve this matter without communication between both parties.

**<span style="color:red">If you do not respond by Friday, April 28th at 5pm EST I will be taking legal action and will immediately move forward with arbitration proceedings.</span>**

Regards,

J▓▓▓ M▓▓▓▓

**Emerald May LLC**
**Email:** ▓▓▓▓▓▓▓▓▓▓▓▓▓
**Cell:** ▓▓▓▓▓▓▓

---

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Monday, April 24, 2023 12:22 PM
**To:** steven@passivescaling.com; jerdonna@passivescaling.com; info@passivescaling.com; 'Tatiana S' <support@mail.salessupport.ladesk.com>; support@passivescaling.com
**Cc:** support@optimyzedigital.com; 'Erin Davidson' <erin@optimyzedigital.com>; asante@optimyzedigital.com; payments@optimyzedigital.com
**Subject:** RE: Emerald May LLC- Contract Termination and Refund Request
**Importance:** High

Dear Steven and Jerdonna,

**+ Optimyze Team**

Further to my previous emails dated  April 12, April 13 and April 18,  can you please confirm by response that you have received my termination and refund request letter dated **April 12th, 2023**?

I have re-attached the letter and have also re-attached our fully executed agreement dated October 13,2023.  The initial 18 month term of our contract has not worked out and I would like to recoup the initial consulting fee as outlined in our agreement (Section 10A) , as well as the credit's owed for inventory in excess of $5000+.

At this point I have copied the Optimyze team who sold this opportunity and handled payment of the initial consulting fee and onboarding with Passive Scaling.

I would like to resolve this matter between all parties as soon as possible and look forward to your response.

Regards,



**Emerald May LLC**

003175

**Email:** ███████████
**Cell:** ███████████

---

**From:** ███████████████████████████
**Sent:** Tuesday, April 18, 2023 1:53 PM
**To:** steven@passivescaling.com; jerdonna@passivescaling.com; info@passivescaling.com
**Subject:** RE: Emerald May LLC- Contract Termination and Refund Request
**Importance:** High

Dear Steven / Jerdonna,

Can you please confirm receipt of my cancellation notice and refund request sent last Wednesday, April 12th?

Best regards,

J██ M███████

**Emerald May LLC**
**Email:** ████████████████
**Cell:** ███████████

---

**From:** █████████████████████████████
**Sent:** Wednesday, April 12, 2023 4:20 PM
**To:** steven@passivescaling.com; jerdonna@passivescaling.com; amanada@passivescaling.com; info@passivescaling.com
**Subject:** Emerald May LLC- Contract Termination and Refund Request
**Importance:** High

Dear Steven,

I hope my email finds you well.

Please see the following documents enclosed for your reference;

1. **Contract Termination Letter**
2. **Fully Executed Contract- Emerald May LLC**
3. **Emerald May P&L- 2022**

Over the past 3 months I have been working on resolving various issues with my store but there has been no progress.

As you will see from the attached P&L for 2022, my store posted a NET loss of **-$7,962** in 2022 and my store is continuing to lose money under the management of Passive Scaling.

I have decided that I cannot continue our contract beyond the initial 18 month term and would therefore like to cancel the agreement effective tomorrow, **April 13th 2023**.

I have attached a letter explaining my position and would like to receive a refund for the initial consulting fee and all outstanding inventory within 7 days. This includes;

- Initial Consulting Fee: $30,000
- FBM Wallet: $1064
- 1HR Credit: $4050
- Outstanding Inventory: credit for any inventory not yet shipped to Amazon

Please can you confirm receipt of this cancellation notice and refund request?

003176

I will be happy to discuss this further should you have any questions.

Best regards,

 █

**Emerald May LLC**
**Email:** █
**Cell:** █



LYNN ███████ ROJAS

███████ NJ ███████

May 26, 2022

**VIA CERTIFIED MAIL RRR**

Ms. Amanda Peremen
Operations Manager
Passive Scaling Inc.
223 Veterans Blvd.
Carlstadt, NJ 07020

Re: <u>BREACH OF CONTRACT – REFUND DEMAND</u>

Dear Ms. Peremen,

In October 2021, I paid $30,000.00 to Passive Scaling Inc. to set up 1 e-commerce store on the Walmart platform. Passive Scaling committed to setting up this store and having initial transactions within three (3) months.

I fully performed each and every time something was requested from me without delay and on a timely basis. To the contrary, Passive Scaling has not delivered on any of its commitments and has failed to perform its contractual obligations.

I have sent countless emails and had many conversations various representatives of Passive Scaling and nothing happens other than more unkept promises. I am a meticulous recordkeeper and have documented all the written and oral communications with Passive Scaling regarding this matter.

It is clear that Passive Scaling has failed to perform and is unwilling or unable to do so. I have made multiple requests for my money back. I am once again demanding the full and immediate return of my $30,000.00. If the entire $30,000.00 is not returned to me, in cash, within the next five (5) business days, I will be turning this matter over to the law firm I work with. They will pursue litigation that will include breach of contract and consumer fraud claims (seeking treble damages).

Please email me at ███████████ com for my wire instructions.

Sincerely,

Lynn ████ Rojas

Cc:  Mark A. Lustbader, Esq.

003178

# Request #73612: Was the ticket resolved?

| | |
|---|---|
| **From:** | AMZScout <support@amzscout.zendesk.com> |
| **To:** | Amanda <amanda@sales.support> |
| **Date:** | Wed, 05 May 2021 12:04:14 -0400 |

##- Please type your reply above this line -##

Hello Amanda,

Do you still need any help or have any questions? If yes, please, simply reply to this email or click the link below to let us know. Remember - we're here to help.

Here's a reminder of what the previous request was about:

Best regards,
AMZScout Support team
https://amzscout.net

This email is a service from AMZScout. Delivered by **Zendesk**

003179



**From:** njworkforcedevelopment-noreply@dol.nj.gov
**Date:** March 30, 2021 at 4:47:32 PM EDT
**To:** ████████@gmail.com
**Subject:** Amazon - Virtual (Online) Information Session - 4/2/2021

# Amazon

## Virtual (Online) Information Session

*Join us at our upcoming info event!*
You or someone you know could learn more about
**Warehouse** and **Shopper Team** Jobs.

### Friday, April 2, 2021
From 12:00 pm to 1:00 pm

### Virtual

### Find a job that fits your life...

Come learn about a variety of Amazon positions with multiple shift options available. Whether you're looking for a full time job with health care benefits on your first day or a flexible part time job, we have a job for you. Plus, we've innovated the job application so it's faster, easier, and hopefully even a little fun!

- Job Locations: Various locations throughout New Jersey.
- Salary: $15.00/hour or more
- Benefits for select positions:
  - Medical
  - Flexible Schedules

**Attachment A**

003180

Paid time off
Tuition Assistance

**Interested candidates must register first**

◎ Register at: https://bit.ly/3rShUGC
◎ Once you have registered, you will receive the link to the Open House two days before the event

*Warehouse/Shopper Team Member*
*NJ1469408*

Unsubscribe - (please allow 48hrs for systems to update)

003181

Sent from my iPhone

003183

Sent from my iPhone

003184



Sent from my iPhone



003186

**PX 37**

# Re: Fw: Insurance documents for new tenant

| | |
|---|---|
| **From:** | Steven R <steven@sales.support> |
| **To:** | Danny Branover <dannyb@satecinc.com> |
| **Cc:** | "Eli Galimidi (████████████)" ████████████████████ |
| **Date:** | Tue, 16 Mar 2021 09:43:45 -0400 |

Hi,

The accountant is preparing letter. Will let you know once I have it.

On Mon, Mar 15, 2021 at 4:15 PM Steven R <steven@sales.support> wrote:

> Hey Danny,
> The EIN is the same as I gave you above for FBA SUPPORT NJ CORP.
>
> The guarantor is Amanda Rozenfeld. We will fill in the ss, and address on the doc in person to avoid sharing our SS via email.
>
> I will bring you a signed minutes meeting sheet for you as well as a letterhead saying my company is authorized to sign.
>
>
>
> On Mon, Mar 15, 2021 at 8:45 AM Danny Branover <dannyb@satecinc.com> wrote:
>
>> Summary of what's needed:
>>
>> 1. Name and EIN for the company on the lease.
>>
>> 2. Name, SSN and address for the guarantor.
>>
>> 3. Accountant's or lawyer's letter stating who is the person authorized to sign on behalf of the company leasing the space and the EIN number. And that the deposit wired to SATEC was on behalf of that company.
>>
>>
>> Once you send me the above I will have the new documents ready for you and the guarantor to sign and notarized at our office.
>>
>>
>> H. Daniel Branover
>>
>>
>> SATEC Powerful Solutions
>>
>> dannyb@satec-global.com
>>
>>
>> www.satec-global.com
>>
>>
>> off. +1-908-686-9510
>>
>> cell. ████████████

---

From: Steven R <steven@sales.support>
Sent: Monday, March 15, 2021 8:26:37 AM
To: Danny Branover <dannyb@satecinc.com>
Cc: Eli Galimidi ████████████████████  ████████████████████

PX-37                                                                003188

**Subject:** Re: Fw: Insurance documents for new tenant!

Danny,

I cc'd you in a email showing you I have to reroute a shipment on the day my lease suppose to start.

If you tell me exactly what you need now , I can work on it tonight and we can start again on 1st ? I'm not sure running out of options here.

On Mon, Mar 15, 2021 at 7:59 AM Danny Branover <dannyb@satecinc.com> wrote:

We will be OK with a letter from your accountant stating that he is the accountant for the company and attesting to the name of the person authorized to sing on it's behalf.

Right now I have a lease from one company, a certificate of insurance from another an a bank transfer from a third. We need to get it straightened out prior to the commencement of the lease.

H. Daniel Branover

SATEC Powerful Solutions

dannyb@satec-global.com

www.satec-global.com

off. +1-908-686-9510

cell. +█████████

---

**From:** Steven R <steven@sales.support>
**Sent:** Monday, March 15, 2021 7:42:56 AM
**To:** Danny Branover <dannyb@satecinc.com>
**Cc:** Eli Galimidi █████████████ ██████     ████████████████████████>

**Subject:** Re: Fw: Insurance documents for new tenant!

Hey Danny,

All we would have is minutes meeting.

However, I don't think I have access to the binder as it's in a different office.

Will we have access to the space today? We have a delivery arriving since we started paying since the 15th.

On Mon, Mar 15, 2021 at 5:57 AM Danny Branover <dannyb@satecinc.com> wrote:

Good morning Steven,


I will send you a new lease and guarantee under the new company for your and your wife's signatures.

Meanwhile please provide ASAP an operation agreement or the tax filings showing the member authorized to sign for the new company.

H. Daniel Branover

SATEC Powerful Solutions

10 Milltown Court | Union, NJ 07083 | USA

Tel. +1-908-686-9510 | Cell. <span style="background:black">█████████</span>

www.satec-global.com

---

**From:** Steven R <steven@sales.support>
**Sent:** Friday, March 12, 2021 4:34 PM
**To:** Danny Branover <dannyb@satecinc.com>
**Cc:** Eli Galimidi <span style="background:black">████████████████████████</span>
**Subject:** Re: Fw: Insurance documents for new tenant!

the one on insurance

On Fri, Mar 12, 2021 at 4:29 PM Danny Branover <dannyb@satecinc.com> wrote:

I think the name of the corporation appears in more than one place. I will check on Sunday.

Which company will need actually going to be operating out of the space?

H. Daniel Branover

SATEC Powerful Solutions

dannyb@satec-global.com

www.satec-global.com

off. +1-908-686-9510



cell. +1 <span style="background:black">████████</span>

**PX 37**

003190

**From:** Steven R <steven@sales.support>
**Sent:** Friday, March 12, 2021 4:21:09 PM
**To:** Danny Branover <dannyb@satecinc.com>
**Cc:** Eli Galimidi ███████████████████████
**Subject:** Re: Fw: Insurance documents for new tenant!


OK so we are good?


Can I pick up keys Monday?


Also, when will you remove the wall?


On Fri, Mar 12, 2021 at 12:07 PM Danny Branover <dannyb@satecinc.com> wrote:

 I think so

 H. Daniel Branover


 SATEC Powerful Solutions

 dannyb@satec-global.com


 www.satec-global.com


 off. +1-908-686-9510

 cell. +1 ███████████


---

**From:** Steven R <steven@sales.support>
**Sent:** Friday, March 12, 2021 11:41:48 AM
**To:** Danny Branover <dannyb@satecinc.com>
**Cc:** Eli Galimidi ████████████████████████████████ >
**Subject:** Re: Fw: Insurance documents for new tenant!


Fba support NJ Corp

84-3739287                                                    003191

Can we change the first page and leave the signatures please ? Its gonna be the same signatures and guarantors.

On Thu, Mar 11, 2021 at 4:47 PM Danny Branover <dannyb@satecinc.com> wrote:

Sure.

Just get me all the information on the company (Address, EIN etc.) and who is the officer signing and who is the guarantor?

**H. Daniel Branover**

CEO| SATEC Powerful Solutions

Off. +1-908-686-9510 | Mob. ███████████
dannyb@satec-global.com | www.satec-global.com

**From:** Steven R <steven@sales.support>
**Sent:** Thursday, March 11, 2021 4:43 PM
**To:** Olga R <OLGA@diamanteins.com>
**Cc:** Danny Branover <dannyb@satecinc.com>
**Subject:** Re: Fw: Insurance documents for new tenant!

Daniel,

The insurance is under fba support.

Not Closter green.  So I think we need change the lee to the right company name since the insurance is already paid for

On Thu, Mar 11, 2021 at 4:41 PM Olga R <OLGA@diamanteins.com> wrote:

COI for:

FBA SUPPORT NJ CORP

is attached.

**PX 37**

Please review it and let me know.

Thank you.

Olga


On Thu, Mar 11, 2021 at 4:17 PM Danny Branover <dannyb@satecinc.com> wrote:

  Steven,


  Not sure what you mean but always happy to help.


  Olga, when can we get the correct COI?


  **H. Daniel Branover**
  CEO**|** SATEC Powerful Solutions

  Off. +1-908-686-9510 **|** Mob. ███████████
  dannyb@satec-global.com  **|**  www.satec-global.com



---

**From:** Steven R <steven@sales.support>
**Sent:** Thursday, March 11, 2021 4:09 PM
**To:** Eli Galy <eligaly@yahoo.com>; dannyb@satec-global.com; Olga R <OLGA@diamanteins.com>
**Subject:** Re: Fw: Insurance documents for new tenant!


Hi Daniel,


Sorry for the headache.


Can we sign a new lease for FBA support NJ corp?


The insurance is already done on the wrong name.


On Wed, Mar 10, 2021 at 5:34 PM Eli Galy ████████████████ > wrote:

  Please forward this email to your broker insurance and follow the full instructions etc...ty congratulations...blessings

----- Forwarded Message -----

**From:** "Danny Branover" <dannyb@satecinc.com>

**To:** "Eli Galy" ████████████████

**Cc:**

**Sent:** Wed, Mar 10, 2021 at 5:32 PM

**Subject:** Re: Insurance documents for new tenant!

Please send the rider with the coverage per the lease agreement and with our company's as co insured.

H. Daniel Branover

SATEC Powerful Solutions

dannyb@satec-global.com

www.satec-global.com

off. +1-908-686-9510

cell. ████████████

---

**From:** Eli Galy ████████████████
**Sent:** Wednesday, March 10, 2021 5:18:36 PM
**To:** Danny Branover <dannyb@satecinc.com>
**Subject:** Insurance documents for new tenant!

Sent from Yahoo Mail on Android

----- Forwarded Message -----

**From:** "Steven R" <steven@sales.support>

**To:** ██████████████████████

**Cc:**

**Sent:** Wed, Mar 10, 2021 at 5:01 PM

**Subject:** Fwd: Landlord info

**PX 37**

---------- Forwarded message ---------

From: Olga R <OLGA@diamanteins.com>
Date: Wed, Mar 10, 2021 at 3:23 PM
Subject: Re: Landlord info
To: Steven R <steven@sales.support>

Steven,

Finance agreement along with our payment is attached. You will receive coupons from Premins within 2 weeks.

Thank you.

Olga

On Wed, Mar 10, 2021 at 2:51 PM Olga R <OLGA@diamanteins.com> wrote:

Steven,

Certificate is attached.

Thank you.

Olga

On Mon, Mar 8, 2021 at 4:56 PM Steven R <steven@sales.support> wrote:

Lanlord name

Daniel Branover...

company name

satec Inc...

10 Milltown court

union nj 07083

**PX 37**

# craigslist post 7290157956: "Amazon Warehouse work product preping - START AS EARLY AS TODAY!"

| | |
|---|---|
| **From:** | "craigslist - automated message, do not reply" <robot@craigslist.org> |
| **To:** | steven@sales.support |
| **Date:** | Fri, 12 Mar 2021 08:58:06 -0500 |

This email contains:

1) information about your transaction
2) instructions for how to locate and manage your post
3) instructions for contacting craigslist
4) terms of use

-------------------------------------------------------------------

1) information about your transaction

posting ID: 7290157956
date: 2021-03-12
Payment ID: 203014469
Credit Card Holder Name: amanda rozenfeld

Item: jobs posting
Title: Amazon Warehouse work product preping - START AS EARLY AS TODAY!
Location: north jersey
Category: general labor
Price: $35.00 USD

**Quantity: 1 posting**
Total: $35.00 USD

The terms of use are in section 4 below.
-------------------------------------------------------------------

2) how to locate and manage your posts

Your ad can be found here:

newjersey.craigslist.org/lab/d/edgewater-amazon-warehouse-work-product/7290157956.html

*** Please keep in mind that it may take up to 30 minutes for your posts to fully appear and be searchable in each appropriate category and area.

To edit, delete, or repost your ad:

https://post.craigslist.org/manage/7290157956

-------------------------------------------------------------------

3) contact information for craigslist

for customer service issues:
email: support@craigslist.org

003196

for questions related to billing:
email: billing@craigslist.org
phone: 415-399-5200, extension 8283
mailing address: craigslist.org, PO Box 438 San Francisco, CA 94104-0438, USA
fax: (415) 398-5213

---------------------------------------------------------------------

4) terms of use


WELCOME TO CRAIGSLIST. We (craigslist, Inc.) hope you find
it useful. By accessing or otherwise interacting with our servers,
services, websites, mobile app ("App"), or any associated
content/postings (together, "CL"), you agree to these Terms of Use
("TOU") (last updated August 16, 2019). You acknowledge and agree CL is
a private site owned and operated by craigslist, Inc. If you are
accessing or using CL on behalf of a business, you represent and
warrant to CL that you have authority to accept the TOU on behalf of
that business and that that business agrees to the TOU. If you do not
agree to the TOU, you are not authorized to use CL or download the App.
We may modify the TOU at any time in our sole discretion. You are
responsible for periodically checking for changes and are bound by them
if you continue to use CL. Our privacy policy
(cl.com/about/privacy.policy),
https://cl.com/about/privacy.policy
prohibited list (cl.com/about/prohibited),
https://cl.com/about/prohibited
and all other policies, site rules, and agreements referenced below or
on CL, are fully incorporated into this TOU, and you agree to them as
well.
LICENSE. If you agree to the TOU and (1) are of sufficient
age and capacity to use CL and be bound by the TOU, or (2) use CL on
behalf of a business, thereby binding that business to the TOU, we
grant you a limited, revocable, non-exclusive, non-assignable license
to use CL in compliance with the TOU; unlicensed use is unauthorized.
You agree not to display, "frame," make derivative works, distribute,
license, or sell, content from CL, excluding postings you create. You
grant us a perpetual, irrevocable, unlimited, worldwide, fully
paid/sublicensable license to use, copy, display, distribute, and make
derivative works from content you post.
USE. Unless licensed by us in a separate written or
electronic agreement, you agree not to use or provide software (except
our App and general purpose web browsers and email clients) or services
that interact or interoperate with CL, e.g. for downloading, uploading,
creating/accessing/using an account, posting, flagging, emailing,
searching, or mobile use. You agree not to copy/collect CL content via
robots, spiders, scripts, scrapers, crawlers, or any automated or
manual equivalent (e.g., by hand). Misleading, unsolicited, and/or
unlawful postings/communications/accounts are prohibited, as is buying
or selling accounts. You agree not to post content that is prohibited
by any of CL's policies or rules referenced above ("Prohibited
Content"). You agree not to abuse CL's flagging or reporting processes.
You agree not to collect CL user information or interfere with CL. You
agree we may moderate CL access/use in our sole discretion, e.g., by
blocking, filtering, re-categorizing, re-ranking, deleting, delaying,
holding, omitting, verifying, or terminating your
access/license/account. You agree (1) not to bypass said moderation,

PX-37

003197

(2) we are not liable for moderating or not moderating, and (3) nothing we say or do waives our right to moderate, or not. Unless licensed by us in a separate written or electronic agreement, you agree not to (i) rent, lease, sell, publish, distribute, license, sublicense, assign, transfer, or otherwise make available CL or our application programming interface ("API"), (ii) copy, adapt, create derivative works of, decompile, reverse engineer, translate, localize, port or modify the App, the API, any website code, or any software used to provide CL, (iii) combine or integrate CL or the API with any software, technology, services, or materials not authorized by us, (iv) circumvent any functionality that controls access to or otherwise protects CL or the API, or (v) remove or alter any copyright, trademark or other proprietary rights notices. You agree not to use CL or the API in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

LIQUIDATED DAMAGES. You further agree that if you violate the TOU, or you encourage, support, benefit from, or induce others to do so, you will be jointly and severally liable to us for liquidated damages as follows for: (A) collecting/harvesting CL users' information, including personal or identifying information - $1 per violation; (B) publishing/misusing personal or identifying information of a third party in connection with your use of CL without that party's express written consent - $1,000 per violation; (C) misrepresenting your identity or affiliation to anyone in connection with your use of CL - $1,000 per violation; (D) posting or attempting to post Prohibited Content - $4 per violation; (E) posting or attempting to post Prohibited Content in any paid section of CL - the price per post applicable to that section of CL; (F) sending an unauthorized/unsolicited email to an email address obtained from CL - $25 per violation; (G) using CL user information to make/send an unauthorized/unsolicited text message, call, or communication to a CL user - $500 per text/call/communication; (H) creating a misleading or unlawful CL account or buying/selling a CL account - $4 per violation; (I) abusing or attempting to abuse CL's flagging or reporting processes - $1 per violation; (J) distributing any software to facilitate violations of the USE Section - $1,000 per violation; (K) aggregating, displaying, framing, copying, duplicating, reproducing, making derivative works from, distributing, licensing, selling, or exploiting CL content for any purpose without our express written consent - $3,000 for each day you engage in such violations; (L) requesting, viewing, or accessing more than 1,000 pages of CL in any 24-hour period - $0.25 per page during the 24 hour period after the first 1,000 pages; (M) bypassing or attempting to bypass our moderation efforts - $4 per violation. You agree that these amounts are (1) a reasonable estimate of our damages (as actual damages are often difficult to calculate), (2) not a penalty, and (3) not otherwise limiting on our ability to recover under any legal theory or claim, including statutory damages and other equitable relief (e.g., for spam, we can elect between the above liquidated damages or statutory damages under the anti-spam statute). You further agree that repeated violations of the USE section will irreparably harm and entitle us to injunctive or equitable relief, in addition to monetary damages.

FEES. When you make a paid posting (cl.com/about/help/posting_fees), https://cl.com/about/help/posting_fees you authorize us to charge your account. Any tax is additional. Fees are non-refundable, even for posts we remove, delay, omit,

003198

re-categorize, re-rank, or otherwise moderate. We may refuse any posting.

Case 2:24-cv-06835-JXN-LDW   Document 58-4   Filed 08/19/24   Page 95 of 127
PageID: 4061

DISCLAIMER & LIABILITY. To the full extent permitted by law, craigslist, Inc., and its officers, directors, employees, agents, licensors, affiliates, and successors in interest ("CL Entities") (1) make no promises, warranties, or representations as to CL, including its completeness, accuracy, availability, timeliness, propriety, security or reliability; (2) provide CL on an "AS IS" and "AS AVAILABLE" basis and any risk of using CL is assumed by you; (3) disclaim all warranties, express or implied, including as to accuracy, merchantability, fitness for a particular purpose, and non-infringement, and all warranties arising from course of dealing, usage, or trade practice; and (4) disclaim any liability or responsibility for acts, omissions, or conduct of you or any party in connection with CL. CL Entities are NOT liable for any direct, indirect, consequential, incidental, special, punitive, or other losses, including lost profits, revenues, data, goodwill, etc., arising from or related to CL, and in no event shall such liability exceed $100 or the amount you paid us in the year preceding such loss. Some jurisdictions restrict or alter these disclaimers and limits, so some may not apply to you.

CLAIMS & INDEMNITY. Any claim, cause of action, demand, or dispute arising from or related to CL ("Claims") will be governed by the internal laws of California, without regard to conflict of law provisions, except to the extent governed by US federal law. Any Claims will be exclusively resolved in San Francisco, CA (except we may seek preliminary or injunctive relief anywhere). You agree to (1) submit to the personal jurisdiction of courts in San Francisco, CA; (2) indemnify and hold CL Entities harmless from any Claims, losses, liability, or expenses (including attorneys' fees) that arise from a third party and relate to your use of CL; and (3) be liable and responsible for any Claims we may have against your officers, directors, employees, agents, affiliates, or any other party, directly or indirectly, paid, directed or controlled by you, or acting for your benefit.

TRADEMARKS. CRAIGSLIST, "CL" and the peace symbol logo are registered trademarks with the U.S. Patent and Trademark Office and with multiple trademark offices around the world.

MISC. Unless you have entered into a separate written or electronic agreement with us that expressly references the TOU, this is the exclusive and entire agreement between us and you, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral. Users complying with prior written licenses may access CL thereby until authorization is terminated. Our actions or silence toward you or anyone else does not waive, modify, or limit the TOU or our ability to enforce it. The USE, LIQUIDATED DAMAGES, and CLAIMS & INDEMNITY sections survive termination of the TOU, and you will remain bound by those sections. If a TOU term is unenforceable, it shall be limited to the least extent possible and supplemented with a valid provision that best embodies the intent of the parties. The English version of the TOU controls over any translations. If you reasonably believe content infringes your IP rights, see cl.com/about/dmca.

**PX 37**

**Storage Lease**

Satec Real Estate Holding

**Landlord**

and

CLOSTER GREEN Corp.

**Tenant**

Premises: 10 Milltown Court, Union NJ

Date:

- 1 -



**PX 37**                                                                 003200

## TABLE OF CONTENTS

Page

Article 1.   Basic Terms and Definitions ...................................................
Article 2.   Demise; Rent...............................................................   3
Article 3.   Use; Rules and Regulations; Tenant Operations; Signs.....................   4
Article 4.   Condition of the Premises; Landlord's Work...............................   5
Article 5.   Tenant's Work.............................................................   7
Article 6.   Utilities; Services.......................................................   7
Article 7.   Common Areas..............................................................   9
Article 8.   Repairs and Maintenance...................................................   10
Article 9.   Laws; Hazardous Substances...............................................   11
Article 10.  Insurance.................................................................   11
Article 11.  Casualty..................................................................   13
Article 12.  Assignment and Subletting.................................................   14
Article 13.  Access; Changes in Building and Real Property.............................   15
Article 14.  Default...................................................................   15
Article 15.  Remedies..................................................................   16
Article 16.  Security..................................................................   17
Article 17.  Broker....................................................................   19
Article 18.  Notices; Consents and Approvals...........................................   20
Article 19.  No Representations; Liability; Tenant Indemnity............................   20
Article 20.  End of Term...............................................................   21
Article 21.  Miscellaneous.............................................................   22
                                                                                         23

Exhibits

Exhibit A   -   Fixed Rent.............................................................   26
Exhibit B   -   Landlord's Work........................................................   27
Exhibit C   -   Premises...............................................................   28
Exhibit D   -   Commencement Date Agreement............................................   29
Exhibit E   -   Rules..................................................................   31
Exhibit H   -   Full Guaranty..........................................................   32

- 2 -

003201

Section 1.13 Rent. The Fixed Rent and all Additional Rent and in addition the increase in rent per each 12 months period.

Section 1.14 Security. $11,000, so to allow the Landlord to have maintain 2 months of Fixed Rent as security.

Section 1.15 Term. The period commencing on the Commencement Date and ending on the Expiration Date, subject to earlier termination or extension of this lease pursuant to the terms hereof.

Section 1.16 Certain Definitions. Any reference in this lease to (a) "legal action", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "person" includes any individual or entity, (c) "this lease" includes the Rules and the other Exhibits to this lease, and (d) "including" means "including without limitation".

### Article 2. Demise; Rent

Section 2.1 Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, for the Term, at the Rent and on the other terms of this lease.

Section 2.2 Tenant shall pay Landlord the Rent, without notice, abatement, deduction or offset (except as expressly provided in this lease), in lawful money of the United States of America, by Tenant's check or another method approved by Landlord, at Landlord's Notice Address or another address Landlord designates, and as provided in this lease. The Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term, except that on the signing and delivery of this lease by Tenant, Tenant shall pay Landlord one full monthly installment of the Fixed Rent, to be applied to the first full monthly installment of the Fixed Rent due under this lease. Rent shall be pro-rated for any partial month according to the number of days in the month occurring during the Term. Landlord's delay in rendering, or failure to render, any statement required to be rendered by Landlord for any Rent for any period shall not waive Landlord's right to render a statement or to collect that Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

Section 2.3 If a Fixed Rent Commencement Date is specified in Article 1 of this lease: (a) Tenant is not required to pay Fixed Rent until the Fixed Rent Commencement Date provided Tenant does not default in performing its obligations under this lease beyond any applicable cure period; and (b) if the Fixed Rent Commencement Date is not the first day of a month, the Fixed Rent for the month in which the Fixed Rent Commencement Date occurs shall be apportioned according to the number of days in that month and shall be due and payable when invoiced.

Section 2.4 Unless otherwise specified in this lease, all Additional Rent shall be paid by Tenant within thirty (30) days after Tenant is billed therefor.

Section 2.5 Canceled.

- 4 -

003202

## Storage Lease

**Lease** dated _24th. of March 2021 _, between **Satec Real Estate Holding**, a limited liability company, ("**Landlord**"), and **Closter Green Corp,** a legal entity, located at 223 Veterans Boulevard, Carlstadt NJ 07072 under EIN- 46-3590571 _("Tenant").

### Article 1.  Basic Terms and Definitions

**Section 1.1**  Additional Rent.  All sums, other than the Fixed Rent, payable by Tenant to Landlord under this lease, including the payment of deficiencies and increases in the Security, if any.

**Section 1.2**  Building.           The building and improvements located at 10 Milltown Court, Union NJ.

**Section 1.3**  Commencement Date.  24th of February 2021, subject to the provisions of Section 2.6.

**Section 1.4**  Expiration Date.  The date that is of 36 months from the Commencement Date occurs, subject to the provisions of Section 2.6.

**Section 1.5**  Fixed Rent.  The Fixed Rent is of 5,500 USD per month to be increased by 3.5% per every 12 months of lease period in comparison to the previous 12 months period, Starting on The Fixed Rent Commencement Date and ending on expiration date as described in exhibit D.

**Section 1.6**  Canceled.

**Section 1.7**  Guarantor. Mrs. Amanda Rozenfeld, 757A Undercliff Ave, Edgewater NJ 07020, SSN- 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. If there is more than one person or entity comprising Guarantor, the liability of all persons and entities comprising Guarantor shall be joint and several.

**Section 1.8**  Landlord's Work.       The work, if any, described in Exhibit B to this lease.

**Section 1.9**  Notice Address.

(a)       Landlord.  10 Milltown Court, Union NJ.

(b)       Tenant.  Prior to the Commencement Date at 223 Veterans Boulevard, Carlstadt NJ 07072 After the Commencement Date, the Premises.

**Section 1.10** Permitted Use.  **Storage usage**, and for no other purpose.

**Section 1.11** Premises.  The portion of the Building shown on Exhibit C to this lease.

**Section 1.12** Real Property.  The Building and the land on which it is located.

- 3 -

PX 37

003203

**Section 2.6**   Landlord and Tenant shall execute an agreement setting forth the Commencement Date, the Fixed Rent Commencement Date and the Expiration Date in the form attached hereto as Exhibit D.

**Section 2.7**   Notwithstanding anything to the contrary in this lease or in any exhibit or diagram attached to it, loading deck or other area outside the boundary of the Real Property is included in the Premises. If Tenant is permitted to use or occupy any loading deck or other area, it is under a revocable license.

## Article 3. Use; Rules and Regulations; Tenant Operations; Signs

**Section 3.1**   Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this lease. Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Tenant shall store in the Premises only the merchandise that Tenant sells on a retail basis for the Permitted Use of the Premises and shall use commercially reasonable efforts to minimize the areas used for storage and to maximize the area used for retail sales.

**Section 3.2**   Tenant shall not use the Premises, or any part thereof, in violation of the certificate of occupancy, if any, for the Premises or the Building.

**Section 3.3**   Tenant shall, and shall cause its employees, contractors, and invitees to, comply with the rules and regulations annexed hereto as Exhibit E and such reasonable changes therein (whether by modification, restatement, elimination or addition) as Landlord may make at any time or times hereafter and communicate to Tenant (the "Rules"). Landlord is not required to enforce the Rules against Tenant or any other tenant or occupant, their employees, contractors or invitees, and Landlord shall not be liable to Tenant for any violation of the Rules by another tenant or occupant or any of their employees, contractors or invitees. Landlord's failure to enforce the Rules against Tenant or any other occupant of the Building shall not be considered a waiver of the Rules, provided that the Rules shall not be enforced in a discriminatory manner.

**Section 3.4**   The continuous operation of Tenant's business in the Premises is of material importance to Landlord because of the adverse impact on the Building of vacant space.

**Section 3.5**   Tenant shall, at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean and keep all exterior surfaces of the Premises clean; (b) replace promptly any cracked or broken glass of the Premises with glass of like color, grade, and quality; (c) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests and shall arrange for extermination at regular intervals, not less frequently than monthly and more often as necessary; (d) keep any garbage, trash, rubbish or other refuse in vermin-proof containers within the interior of the Premises that are kept closed until removed; (e) deposit such garbage, trash, rubbish and refuse, on a daily basis, in receptacles provided or required by the carter engaged by Tenant pursuant to the terms of this lease; (f) remove from the Premises all rubbish resulting from and/or remaining after any fire or other similar casualty in the Premises; (g) keep all mechanical apparatus and equipment free of vibration and noise which may be transmitted beyond the Premises; (h) keep in the Premises and maintain in good working order

- 5 -

003204

one or more dry chemical fire extinguishers; (i) conduct its business at the Premises in a dignified manner in accordance with high standards of retail operation; and, (j) prevent any odors or any noise from transmitting beyond the Premises.

Section 3.6 Tenant shall not (a) place or maintain any merchandise, show cases, tables for service, trash, refuse or other items in any vestibule or entry of the Premises, or on the walkways, sidewalks or elsewhere outside the Premises; (b) obstruct, or permit its employees, contractors, customers or invitees to obstruct, any driveway, walkway, sidewalk, parking area, or other Common Areas (hereinafter defined); (c) use or permit the use of any advertising medium objectionable to Landlord (such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within the Building) which is in any manner audible or visible outside of the Premises; (d) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (e) cause or permit odors or fumes to emanate from the Premises; (f) solicit business in any Common Areas, including without limitation through distribution of handbills or other advertising matter in any Common Areas or the display of any merchandise in the Common Areas; (g) receive or ship articles of any kind outside the designated loading areas, if any, for the Premises; (h) conduct or permit to be conducted any auction, fire sale (except to liquidate inventory in response to an actual fire and only if such sale is not conducted for more than forty-five (45) days), going out of business sale (except, one time only, to liquidate inventory at the end of the term of this lease and only if such sale is not conducted for more than forty-five (45) days), bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision is not intended to limit Tenant's freedom in setting its own selling prices); (i) use the Premises for any activity that is not generally considered appropriate for retail businesses conducted in accordance with good and generally accepted standards of operation; (j) use the Premises for any hazardous activity or in such manner as to constitute a nuisance of any kind (public or private); (k) cause waste; (l) do anything which, in Landlord's reasonable judgment, disturbs other occupants of the Building; or (m) permit its employees, invitees or deliverymen to loiter immediately outside the Premises or the Building or within the Common Areas or to park cars in the Common Areas with "For Sale" signs (or signs of similar import) on them.

Section 3.7 Tenant acknowledges that Landlord intends the space in the Building to be operated in a manner that does not offend the community that it serves. Accordingly, Tenant shall not use the Premises for any immoral or disreputable use or activity or for any use that is objectionable to the community in which the Premises are located; and Tenant shall not sell, distribute, display, advertise or offer for sale at the Premises any item or service which, in Landlord's good faith judgment, may tend to injure or detract from the image of the Building within such community or that results in any picketing or protests. Without limiting the generality of the foregoing, Tenant shall not sell, distribute, display or offer for sale (a) any drug paraphernalia, (b) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, recording, representation or merchandise of any kind, (c) any counterfeit goods or (d) any gun(s).

Section 3.8 The term "Sign" includes all signs, designs, monuments, logos, banners, projected images, awnings, canopies, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics, and decorations. No Sign shall be exhibited, installed, inscribed, painted or affixed, without the prior consent of Landlord, on any part of the outside of the Building or on the windows or doors of the Premises; except that Landlord's consent

- 6 -

003205

shall not be required for any Sign placed inside the windows or doors of the Premises if such Signs are attractive and professionally produced and do not violate any other provisions of this lease. Notwithstanding the foregoing, no neon Signs or blinking or flashing Signs are permitted. Unless otherwise expressly permitted, Tenant may not install Signs advertising a fire sale, liquidation sale, distress sale, foreclosure sale, receiver's or sheriff's sale, going out of business sale, lost lease sale, or Signs of similar import. Tenant shall, at its own expense, obtain all required licenses and permits for any Signs installed by Tenant, and renew them as required by applicable Laws. All Sign(s) shall be installed and removed in a good and workerlike manner, without damaging the Real Property, and in compliance with all applicable Laws and the applicable provisions of this lease. Prior to installing any permitted Sign, Tenant shall deliver to Landlord any permits or approvals required by applicable Laws in connection with such installation. Tenant shall maintain any permitted Signs in good, clean, neat and safe condition, and at the expiration or sooner termination of this lease, Tenant shall cause such Signs to be removed and cause the cancellation of any issued licenses or permits. Tenant shall not change or alter any Sign approved by Landlord in any respect whatsoever, without first obtaining Landlord's prior consent to such change or alteration. Landlord may remove any Sign(s) installed or maintained in violation of this Article, and Tenant shall reimburse Landlord for all costs incurred by Landlord in so removing any such Sign promptly after being billed therefor. In addition, Landlord may, from time to time, temporarily remove any Sign in connection with any repairs, improvements, alterations, additions or replacements being made to the Real Property.

## Article 4. Condition of the Premises; Landlord's Work

Section 4.1 Tenant has examined the Premises and, subject to Landlord performing Landlord's Work, if any, (a) Tenant accepts possession of the Premises in its "AS IS" condition on the date of this lease, subject to normal wear and tear and the removal of substantially all of the existing occupant's personal property, if any, and (b) Landlord has no obligation to perform any work, supply any materials, incur any expenses or make any installations to prepare the Premises for Tenant's occupancy.

Section 4.2 If any Landlord's Work is specified in Article 1 and the Exhibit referred to therein, Landlord shall, at its expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this lease. Tenant shall not impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work.

## Article 5. Tenant's Work

Section 5.1 Except as may be expressly provided in this lease, Tenant shall not replace any fixtures in the Premises or make any changes, improvements, alterations or additions (collectively, "Tenant's Work"), to the Premises, the Real Property, the Building systems, or any part thereof, without Landlord's prior consent.

Section 5.2 Prior to commencing any Tenant's Work other than purely Cosmetic Alterations, Tenant shall, at Tenant's expense, deliver to Landlord detailed plans and specifications, for Tenant's Work, in form reasonably satisfactory to Landlord, prepared, certified, signed and sealed by an architect or engineer licensed to practice in the State of New York, and suitable for filing with the applicable Authority, if filing is required by applicable Laws (such plans and specifications together with revisions thereto, collectively, "Tenant's

- 7 -

003206

Plans"), and obtain Landlord's approval of Tenant's Plans. Landlord's approval of Tenant's Plans shall not be unreasonably withheld or delayed to the extent Landlord's consent to Tenant's Work shown on Tenant's Plans is not to be unreasonably withheld or delayed pursuant to this Article. Before commencing Tenant's Work, Tenant shall (a) obtain (and deliver to Landlord copies of) all required permits and authorizations of any Authority for such work, and (b) deliver to Landlord such security as shall be reasonably satisfactory to Landlord, and (c) deliver to Landlord certificates (in form reasonably acceptable to Landlord) evidencing the following insurance coverages from each contractor and subcontractor: (i) worker's compensation insurance covering all persons to be employed in the performance of any Tenant's Work, and (ii) commercial general liability insurance on a primary and non-contributory basis with a limit of liability approved by Landlord, and with contractual liability coverage, naming Landlord, Landlord's managing agent, if any, any Superior Landlord (hereinafter defined) and any Mortgagee (hereinafter defined) as additional insureds, and (iii) comprehensive automobile liability insurance (covering all owned, non-owned and/or hired motor vehicles to be used in connection with Tenant's Work) with a limit of liability approved by Landlord and (iv) builders risk insurance for the full value of the Tenant's Work performed by such contractor and subcontractor.

Section 5.3    Tenant shall reimburse Landlord, within fifteen (15) days of being billed therefore, for any reasonable out-of-pocket expenses incurred by Landlord in connection with Landlord's review of Tenant's Plans and inspection of Tenant's Work, including outside experts retained by Landlord for that purpose. Landlord's consent to Tenant's Work and Landlord's approval of Tenant's Plans shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, and shall not constitute any representation or warranty by Landlord regarding the adequacy for any purpose of Tenant's Work or Tenant's Plans or their compliance with Laws, and shall not relieve Tenant from obtaining Landlord's express written approval to revisions thereto. Promptly after substantial completion of Tenant's Work, but in no event later than six (6) months after the commencement of such work, Tenant shall, at Tenant's expense, obtain and deliver to Landlord copies of all sign-offs, letters of completion, approvals and certificates of any Authority required upon the completion of Tenant's Work (including any required amendments to the certificate of occupancy for the Premises and/or Building) and "as-built" plans and specifications for Tenant's Work prepared as reasonably required by Landlord.

Section 5.4    If, in connection with Tenant's Work or any other act or omission of Tenant or Tenant's employees, agents or contractors, a mechanic's lien, financing statement or other lien or violation of any Laws, is filed against Landlord or all or any part of the Real Property, Tenant shall, at Tenant's expense, have such lien removed by bonding or otherwise within thirty (30) days after Tenant receives notice of the filing.

Section 5.5    All construction managers, contractors and subcontractors performing work for which a license is required by applicable Laws, shall be licensed by the appropriate Authorities and approved by Landlord, which approval shall not be unreasonably withheld or delayed. Landlord's approval of such construction managers, contractors and subcontractors shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, shall not constitute any warranty by Landlord regarding the adequacy, professionalism, competence or experience of the approved construction manager, contractor, or subcontractor, and shall not relieve Tenant from obtaining Landlord's express prior written approval if Tenant seeks to

- 8 -

003207

employ any other or additional construction manager, contractor or subcontractor. Promptly following substantial completion of Tenant's Work, but in no event later than six (6) months after the commencement of such work, Tenant shall furnish to Landlord lien waivers and releases, in form reasonably satisfactory to Landlord, from all construction managers, contractors, subcontractors, and materialmen furnishing work, services or materials in connection with Tenant's Work.

Section 5.6 Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which the floor was designed to carry and which is allowed by any Laws.

Section 5.7 Tenant shall be liable for any damage caused to any part of the Building, including its fixtures and equipment, arising from, or as a result of, Tenant's Work and/or its installation and/or removal of its Signs. If Tenant performs with Landlord's approval any work on the roof of the Building (for example, in connection with repair, maintenance, or installation of any air conditioning system), Tenant shall use only a contractor approved by Landlord for such work and shall not do or cause anything to be done which would invalidate Landlord's then effective roof guaranty for the Building. Tenant shall also be responsible for promptly repairing (including any necessary replacement) any damage to the roof or Building caused by such work; provided that Landlord may, at its option, effect any such repair or replacement, in which event Tenant shall reimburse Landlord for all costs incurred by Landlord in connection therewith within fifteen (15) days after Tenant is billed therefor.

Section 5.8 On or before the Expiration Date or sooner termination of this lease, if applicable, Tenant shall, at Tenant's expense, remove from the Building (a) all Tenant's Work which Landlord designates for removal in a notice given by Landlord to Tenant on or before the date which is thirty (30) days prior to the Expiration Date (or prior to the sooner termination of this lease, if applicable) and (b) Tenant's trade fixtures, equipment and personal property which are removable without material damage to the Premises or the Building ("Tenant's Property"). Tenant shall repair any damage to the Premises, and/or the Real Property, caused by the installation or removal of Tenant's Property, Signs or Tenant's Work. Except as expressly provided in this Section, Tenant's Work shall not be removed. Any Tenant's Property or Tenant's Work that Tenant was required to remove and which is not removed by Tenant by the Expiration Date or sooner termination of this lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's

## Article 6. Utilities; Services

Section 6.1 Landlord shall be responsible for providing any utility service to the Premises and for providing meters, submeters or other devices for the measurement of utilities supplied to the Premises, Tenant shall be solely responsible for and shall promptly pay, to Landlord or the utility companies', as applicable, as and when the same become due and payable, all charges for water, sewer, electricity, telephone, cable service, internet service, steam, and any other utility or other communication device used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm, or entity supplying same. If Landlord has designated any person or persons to provide one or more utility services to the Real Property, Tenant shall use the designated person(s) to obtain the applicable utility services. Without derogating from the above and to avoid any doubt the Tenant shall pay a 1/3

- 9 -

003208

of the gas consumption bills of the **Real Property** upon receiving notice from the landlord to do so.

**Section 6.2**   Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, as Additional Rent, the cost for providing such additional utility facilities.

**Section 6.3**   Landlord has no obligation to provide to Tenant or the Premises any services except as expressly set forth in this lease. Without limiting the foregoing, Landlord is not responsible for providing heat, electric, water, gas, air conditioning, steam, sewer service, cleaning service, trash collection, extermination, cable or internet service or ventilation to the Premises. Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

**Section 6.4**   If any utility or other service (a) becomes unavailable from any public utility company, public authority or any other person or entity supplying or distributing same (including Landlord), or (b) is interrupted by reason of Laws, the making of any repairs or improvements, or measures taken to secure the safety of the Real Property,  or the safety and welfare of its tenants or occupants, or the public, or by reason of any cause beyond Landlord's reasonable control, (i) Landlord shall not be liable to Tenant in damages or otherwise, (ii) Tenant may not abate Rent or be relieved of any of its obligations under this lease, and (iii) such lack of availability or interruption shall not constitute an actual or constructive eviction, or a disturbance of Tenant's use of the Premises.

**Section 6.5**   Tenant shall enter into, and maintain at all times during the Term, a contract for the daily removal of Tenant's trash from the Building, with the carter selected by Tenant and approved by Landlord, to provide trash removal services to the Building, subject to any applicable Rules.

### Article 7.  Common Areas

**Section 7.1**   The "Common Areas" are those areas and facilities which may be furnished by Landlord (or others on behalf of Landlord) in or near the Building for the non-exclusive common use of tenants and other occupants of the Building, their employees, customers, and invitees, including parking areas, access areas (other than public streets), driveways, loading docks and loading areas, sidewalks, lighting facilities, and other similar common areas, facilities or improvements.

**Section 7.2**   Landlord will operate and maintain, or shall cause to be operated and maintained, the Common Areas in a manner deemed by Landlord to be reasonable and appropriate. Landlord shall have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas; (ii) to enter into, modify and terminate any

- 10 -

**PX 37**

003209

easement and other agreements pertaining to the use and maintenance of the Common Areas; (iii) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (iv) to close temporarily any or all portions of the Common Areas; (v) to discourage non-customer parking; and (vi) to do and perform such other acts in and to said areas and improvements as Landlord shall determine to be advisable.

## Article 8. Repairs and Maintenance

**Section 8.1** Landlord shall, at Landlord's expense, make all structural repairs needed to the exterior walls, structural columns, structural roof, and structural floors that enclose the Premises (excluding all doors, door frames, storefronts, windows and glass); provided that Tenant gives Landlord notice of the necessity for such repairs. Notwithstanding the foregoing, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all such repair costs to structural elements that are necessitated by the negligence or misconduct of Tenant, its employees, contractors, agents, subtenants, employees, customers and invitees.

**Section 8.2** If the Premises are sprinklered, Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Laws, those elements of the sprinkler system within the Premises, including the repair and replacement of the sprinkler heads and pipes if damaged only if it is caused due to negligence and/or misusage and/or misconduct by the Tenant. If the Premises are not sprinklered and a sprinkler system in the Premises is required under applicable Laws for Tenant's Permitted Use or manner of use of the Premises, or Tenant's Work requires the installation of a sprinkler system in the Premises, Tenant shall install such system as part of Tenant's Work, at Tenant's expense. Landlord shall not be responsible for maintenance, repairs or replacement of any element of the sprinkler system within the Premises.

**Section 8.3** Subject to Section 10.4, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all damage to the Building resulting from any act or omission of Tenant, Tenant's subtenants, or any of Tenant's or subtenants' employees, agents, employees, invitees or contractors.

**Section 8.4** Landlord shall have no liability to Tenant, the Rent shall not be abated, and Tenant shall not be deemed actually or constructively evicted by reason of Landlord performing any repairs or other work to all or any portion of the Premises and/or the Real Property. Landlord shall endeavor to perform such repairs or other work in a manner that reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property, but Landlord is not required to employ overtime labor or incur additional expenses.

## Article 9. Laws; Hazardous Substances

**Section 9.1** Tenant shall, at Tenant's expense, comply with all present and future laws, rules, regulations, orders, ordinances, judgments, requirements and (if Landlord adopts same) recommendations (collectively, "Laws") of the United States of America, the State of New Jersey, the city, town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency, department, commission, board, bureau, and any fire insurance rating body (collectively,

- 11 -

003210

"Authority" or "Authorities") applicable to Tenant's occupancy of the Premises, Tenant's Work, Tenant's Property or the Premises. If, however, compliance requires structural work to the Premises, Tenant shall be required to effect such compliance, at Tenant's expense, only if the obligation to comply arises from Tenant's Work, Tenant's Property, Tenant's manner of using the Premises, or any acts or negligence of Tenant, its employees, contractors, agents, or invitees. Tenant shall promptly deliver to Landlord a copy of any notice, communication or other materials relating to the Premises, the Real Property (including the Building systems), Tenant's Property, Tenant's Work and/or Hazardous Substances (hereinafter defined) received by Tenant from, or sent by Tenant to, any Authority. Tenant shall have an obligation to remediate any Hazardous Substances pursuant to this Section if the need for such remediation arises from Tenant's Work, Tenant's specific manner of use of the Premises, or the actions or omissions to act of Tenant, subtenants, and/or any of their employees, contractors, agents or invitees.

Section 9.2   Tenant shall not, and shall not permit any of its employees, contractors, agents, or invitees, to introduce into the Premises or the Real Property, use in the Premises or the Real Property or cause to be released from the Premises or the Real Property any Hazardous Substances. Notwithstanding the preceding sentence, Tenant may use cleaning and office products in accordance with their customary use, provided that Tenant complies with all applicable Laws in connection therewith, and further provided that in no event may Tenant release or discharge such cleaning and/or office products into the plumbing, drainage or sewer system in excessive amounts. If Tenant breaches its obligations hereunder, Tenant, at Tenant's expense, shall immediately take all remedial action necessary to clean up any release, spill or discharge of Hazardous Substances. "Hazardous Substances" mean any flammable or otherwise hazardous material, any explosive and/or radioactive material, hazardous waste, hazardous or toxic substance or related material, asbestos and any material containing asbestos, petroleum and any petroleum derivative, pollutants, contaminants and any other substance or material which is defined as, determined to be, or identified as, a hazardous or toxic material or substance pursuant to any applicable Laws.

Section 9.3   If Tenant shall be obligated to remediate any Hazardous Substances, it shall remove and dispose of any such Hazardous Substances in compliance with all applicable Laws. Tenant's remediation plan shall be subject to Landlord's approval and Tenant shall keep Landlord fully apprised of the progress of Tenant's remediation efforts.

Section 9.4   Tenant shall indemnify, defend and hold harmless Landlord, its managing agent, its Superior Landlord, if any, its Mortgagee, if any, and their respective members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any violation by Tenant of its obligations with respect to Hazardous Substances under this lease or otherwise under any applicable Laws.

Section 9.5   If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this lease, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any applicable Laws in connection therewith.

- 12 -

PX 37

003211

**Section 9.6** Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Laws relating to the operation of its business. Landlord does not covenant, warrant or make any representation that any Authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this lease.

**Section 9.7** Subject to the provisions of this Section, provided that Tenant is not in Default, Tenant, at Tenant's expense, may contest by appropriate proceedings prosecuted diligently and in good faith the legality or applicability of any Laws affecting the Premises for which Tenant is responsible hereunder (any such proceedings instituted by Tenant, a "Compliance Challenge"), provided however, that Tenant's delay in compliance shall not cause (a) Landlord or Tenant to be subject to imprisonment or prosecution for a crime, (b) the Real Property or any part thereof to be condemned or vacated, (c) the certificate of occupancy for the Building or any part thereof to be suspended or cancelled, and/or (d) the use and enjoyment of its space by another lessee or licensee at the Real Property to be adversely affected. Tenant must give Landlord at least ten (10) business days notice before Tenant initiates a Compliance Challenge, and shall not initiate it if Landlord reasonably objects. At Landlord's request, prior to initiating a Compliance Challenge, Tenant shall furnish Landlord with either cash or a bond from a surety company reasonably satisfactory to Landlord in form and substance, in an amount equal to 120% of the sum, as reasonably estimated by Landlord, of (i) the cost of such compliance and (ii) the amount of any and all penalties and fines that may accrue by reason of non-compliance and (iii) the amount of any Landlord liability to third parties. Tenant shall keep Landlord informed regularly as to the status of any Compliance Challenge.

### Article 10. Insurance

**Section 10.1** Tenant shall, at Tenant's expense, maintain at all times during the Term and at all times when Tenant is in possession of the Premises such insurance as shall be required by Landlord, including: (a) commercial general liability insurance (or successor form of insurance designated by Landlord) in respect of the Premises, on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than ($2,000,000 annually and $1,000,000 per occurrence) naming as additional insureds Landlord and any other person designated by Landlord, (b) property insurance in an amount equal to one hundred (100%) percent of full replacement value (with a deductible not exceeding five thousand ($5,000) dollars) covering Tenant's Work (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises, against fire and other risks included in the standard New Jersey form of property insurance, including business interruption insurance covering a period of twelve (12) months, (c) workers' compensation and employer's liability insurance providing statutory benefits for Tenant's employees at the Premises. Waiver of Subrogation Clause shall be added to the General Liability and Workers Compensation / Employers Liability policies in favor of Lanlord. (d) such other insurance as Landlord may reasonably require. Such liability insurance policy shall include contractual liability, fire and legal liability coverage.

- 13 -

003212

Section 10.2 Tenant shall deliver to Landlord and each additional insured (a) certificates in form reasonably acceptable to Landlord evidencing the insurance required by this lease to be maintained by Tenant before the Commencement Date. All required insurance shall be primary and non-contributory, issued by companies satisfactory to Landlord and contain a provision whereby it cannot be canceled unless Landlord and any additional insureds are given at least thirty (30) days' prior written notice of the cancellation.

Section 10.3 Tenant shall not do or permit to be done any act which shall invalidate or be in conflict with Landlord's insurance policies, or increase the rates of insurance applicable to the Real Property. If, as the result of a Default, Tenant's occupancy of the Premises (whether or not such occupancy is a Permitted Use), and/or specific hazards attributable to Tenant's occupancy, the insurance rates for the Real Property or Building increase, Tenant shall reimburse Landlord for one hundred (100%) percent of such increase in premium(s), within fifteen (15) days after Tenant is billed therefor.

Section 10.4 Provided its right of full recovery under its insurance policy is not adversely affected, Landlord and Tenant each hereby releases the other (and the other's agents and employees) with respect to any claim (including a claim for negligence) it may have against the other for damage or loss covered by its property insurance (including business interruption and loss of rent). Landlord and Tenant shall, to the extent obtainable, each procure a clause in, or endorsement on, any property insurance carried by it, pursuant to which the insurance company waives its right of subrogation against the other party to this lease and its agents and employees or consents to a waiver of the right of recovery against the other party to this lease and its agents and employees. If an additional premium is required for the waiver or consent, the other party shall be advised of that amount and may, but is not obligated to, pay the same. If that party elects not to pay the additional premium, the waiver or consent shall not be required in favor of that party.

### Article 11. Casualty

Section 11.1 If (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) is damaged by fire or other casualty so that Tenant is deprived of reasonable access to the Premises or so that the Premises or any part of the Premises is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises, Tenant shall give prompt notice to Landlord. Subject to the provisions of this Article (i) Landlord shall, at Landlord's expense, repair the damage to the Premises, excluding the damage to Tenant's Work or Tenant's Property and (ii) Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent required by Landlord in connection with Landlord's repair of the damage and shall promptly after Landlord's substantial completion of the repair to the Premises, commence to diligently repair Tenant's Work and Tenant's Property in order to resume its normal business in the Premises. Until the repairs to be performed by Landlord are substantially completed, the Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have reasonable access or which is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises and which Tenant does not actually use.

Section 11.2 If (a) the Premises are rendered wholly untenantable, or (b) the Premises are damaged by any cause which is not covered by Landlord's insurance, or (c) the Premises are damaged in whole or in part during the last two (2) years of the Term, or (d) the

- 14 -

003213

cost of repairing any damage to the Building by fire or other casualty exceeds twenty-five percent (25%) of the replacement cost thereof, as reasonably estimated by a reputable contractor, architect or engineer selected by Landlord, Landlord shall have the right, by notice given to Tenant within thirty (30) days following the date of the damage, to terminate this lease. If this lease is terminated pursuant to this Section, the Term shall expire on the fifteenth (15th) day after the notice is given as fully and completely as if such date were the stated Expiration Date.

Section 11.3 This Article constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Laws shall have no application to a fire or other casualty.

.

## Article 12. Assignment and Subletting

Tenant shall not, without Landlord's prior consent, assign, encumber or otherwise transfer this lease or any interest in this lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article. The transfer or issuance (by one or more related or unrelated transactions) of ownership interests of Tenant, or any Guarantor, or any direct or indirect owner of Tenant, which results in 50 percent or more of the ownership interests of that person being held by persons who did not hold 50 percent or more of those ownership interests on the date of this lease shall be considered an assignment of this lease which requires Landlord's consent, unless such ownership interests are publicly traded on a national stock exchange or over-the-counter market. Tenant shall not permit any advertising or circulars regarding availability of the Premises for sublease or assignment to publicize an asking price that is equal to or less than Landlord's then current asking price.

## Article 13. Access; Changes in Building and Real Property

Section 13.1 Landlord reserves the right to (a) place (and have access to) concealed ducts, pipes and conduits through the Premises (without a material reduction or reconfiguration of the useable area of the Premises), and (b) enter the Premises at reasonable times on reasonable prior notice, which may be oral (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others or to perform any work or make any improvement Landlord deems necessary or desirable to the Premises or the Building or for the purpose of complying with Laws. If Tenant is not present when Landlord desires to enter the Premises, Landlord or Landlord's contractors may enter the Premises (by force, in the event of an emergency) without liability to Tenant.

Section 13.2 Landlord reserves the right at any time and from time to time to (a) make changes or revisions in the Real Property, including but not limited to the Building areas, walkways, driveways, parking areas, or other Common Areas, (b) construct improvements in the Real Property, (c) construct additions to, or additional stories on, the Building (which right includes the right to make use of structural elements of the Premises, including without limitation columns and footings, for such construction, provided such use does not materially encroach on the interior of the Premises), and (d) change the name, number

- 15 -

003214

or designation by which the Real Property and/or Building is known. Landlord's exercise of its rights pursuant to this Section shall not reduce the number of parking spaces serving the Real Property below that required by any Laws.

**Section 13.3** If there is to be any excavation or construction adjacent to the Building, Tenant shall permit Landlord and/or any other person to enter the Premises to perform such work as Landlord or that person deems necessary to protect the Building, without any abatement of the Rent or liability to Tenant.

**Section 13.4** Landlord shall have the exclusive right to use all or any part of the roof of the Building for any purpose, and to erect temporary scaffolds and other aids to construction on the exterior of the Premises in connection with alterations, repairs, improvements, and/or additions Landlord may make to the Building, provided that access to the Premises shall not be denied. Landlord may make any use it desires of the side exterior walls or rear walls of the Building.

**Section 13.5** Landlord shall exercise Landlord's rights under this Article in a manner which reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense), but Landlord is not required to employ overtime labor or incur additional expenses.

### Article 14. Default

**Section 14.1** Each of the following (a "Default") is a material default by Tenant under this lease:

(a) Tenant fails to pay when due any Rent and the failure continues for three (3) days following Landlord's notice (which notice shall also be considered any demand required by any Laws). If, however, Landlord gives such a notice of failure to pay Rent twice in any twelve (12) month period, any additional failure to pay any Rent when due within that twelve (12) month period shall be considered a Default, without the requirement of any notice by Landlord.

(b) Tenant fails to comply with any other term of this lease and the failure continues for ten (10) days following Landlord's notice

(c) A third party institutes against Tenant or Guarantor, if any, any legal action seeking any relief from its debts under any applicable bankruptcy or insolvency Laws which is not dismissed within thirty (30) days, or Tenant or Guarantor, if any, institutes any legal action seeking such relief, and/or a receiver, trustee, custodian or other similar official is appointed for Tenant or Guarantor, if any, or for all or a substantial portion of its assets, or Tenant or Guarantor, if any, commits any other act indicating insolvency such as making an assignment for the benefit of its creditors.

(d) Except as otherwise expressly permitted under this lease, Tenant vacates or abandons the Premises prior to the Expiration Date.

(e) Guarantor, if any, shall be in breach of its obligations under its guaranty of Tenant's obligations under this lease.

- 16 -

**PX 37**                                                                          003215

**Section 14.2** If a Default occurs, this lease is subject to the conditional limitation that Landlord may, at any time during the continuance of the Default, give notice to Tenant that this lease shall terminate on the date specified in that notice, which date shall not be less than five (5) days after Landlord gives such notice to Tenant. If Landlord gives that notice, this lease and the Term shall expire and come to an end on the date set forth in that notice as if said date were the date originally fixed in this lease as the Expiration Date and Tenant shall quit and surrender the Premises to Landlord (but Tenant shall remain liable as provided in this lease).

**Section 14.3** If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit.

### Article 15. Remedies

**Section 15.1** If this lease is terminated pursuant to Article 14 or Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or by force or otherwise (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises), all of the provisions of this Section shall apply (in addition to any other applicable provisions of this lease).

(a)     Tenant, and all other occupants, shall vacate and surrender to Landlord the Premises in accordance with this lease.

(b)     Landlord, at Landlord's option, may (i) relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, but Landlord shall have no obligation to relet the Premises, or any portion of the Premises, or to collect any rent (and the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this lease), and (ii) make any changes to the Premises as Landlord, in Landlord's judgment, considers advisable or necessary in connection with a reletting, without imposing any liability or obligation on Landlord or relieving Tenant of any obligation or liability under this lease.

(c)     Tenant shall pay Landlord all Rent payable to the date on which this lease is terminated or Landlord re-enters or obtains possession of the Premises.

(d)     Tenant shall also pay to Landlord, as damages, any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term and (ii) the rents, if any, applicable to that period collected under any reletting of all or any portion of the Premises. Tenant shall pay any deficiency in monthly installments on the days specified in this lease for payment of installments of the Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. If Landlord relets the Premises, or any portion of the Premises, together with other space in the Building, the rents collected under the reletting and the expenses of the reletting shall be equitably apportioned for the purposes of this Article.

- 17 -

003216

(e)      Landlord may recover from Tenant, and Tenant shall pay Landlord, on request, in lieu of any further deficiency pursuant to the preceding paragraph of this Section (as liquidated damages for such deficiency) the amount by which (i) the unpaid Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding the termination, re-entry or obtaining of possession) exceeds (ii) the then fair market rental value of the Premises, including the Additional Rent for the same period, both discounted to present value at an annual rate of interest equal to five (5%) percent. If, before presentation of proof of liquidated damages, Landlord relets the Premises or any portion of the Premises for any period pursuant to a bona fide lease with an unrelated third party, the net rents (after deducting reletting costs) payable in connection with the reletting shall be considered to be the fair market rental value for the Premises or the portion of the Premises relet during the term of the reletting.

(f)      Tenant shall also pay Landlord, as additional damages, any expenses incurred by Landlord in connection with the termination, reentry or obtaining of possession, and the reletting of the Premises, including all repossession costs, brokerage commissions, reasonable attorneys' fees and disbursements, alteration costs and other expenses of preparing the Premises for reletting.

(g)      Nothing contained in this lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Laws.

**Section 15.2** Tenant hereby waives (a) the service of any notice of intention to re-enter or obtain possession of the Premises or to institute any legal action in connection therewith, except as provided in this lease and (b) on its own behalf and on behalf of all persons claiming under Tenant, including all creditors, any rights Tenant and all such persons might otherwise have under any Laws to redeem the Premises, to re-enter or repossess the Premises, or to restore this lease, after (i) Tenant is dispossessed pursuant to any Laws or by any Authority, (ii) Landlord reenters or obtains possession of the Premises, or (iii) the Expiration Date, whether by operation of law or pursuant to this lease. The words "re-enter," "re-entry" and "re-entered" as used in this lease shall not be considered to be restricted to their technical legal meanings. Landlord shall have the right to enjoin any Default and the right to invoke any remedy allowed by any Laws in addition to any remedies provided in this lease. All remedies provided in this lease are cumulative and Landlord's right to invoke, or the invocation of, any remedy shall not preclude Landlord from invoking any other remedy under this lease or under any and all Laws.

**Section 15.3** Landlord and Tenant each hereby waive trial by jury in any legal action brought by either party against the other in connection with this lease. If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**Section 15.4** If Tenant fails to comply with any of its obligations under this lease, Landlord may, at its option, cure such breach of this lease. All costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord in that connection

- 18 -

003217

shall be paid by Tenant to Landlord as Additional Rent within fifteen (15) days after Tenant is billed therefor.

Section 15.5 Tenant shall also reimburse Landlord for all costs and expenses (including reasonable attorneys' fees and disbursements), incurred by Landlord in connection with a default by Tenant, including instituting, prosecuting and/or defending any legal action by or against Tenant whether a non-payment or holdover proceeding, or other proceeding, if Landlord prevails in such legal action, together with interest thereon at the Default Rate (hereinafter defined).

Section 15.6 The failure of Landlord to seek redress for a Default, or of Landlord or Tenant to insist upon the strict performance of any term of this lease, shall not prevent Landlord from redressing a subsequent Default or Landlord or Tenant from thereafter insisting on strict performance. The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this lease shall not be deemed a waiver of the Default or failure. No term of this lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same. No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

Section 15.7 If Tenant fails to pay any installment of the Fixed Rent or any Additional Rent within five (5) days after the due date thereof, in addition to any other right or remedy of Landlord, Tenant shall pay to Landlord within fifteen (15) days following Landlord's invoice (a) a late charge equal to the greater of one hundred ($100.00) dollars and four (4%) percent of the amount unpaid and (b) interest at the rate (the "Default Rate") of twelve (12%) percent per annum on the amount unpaid, from the date the payment was first due to and including the date paid and, (c) and Landlord's bank charges for the return of any Tenant's check.

Section 15.8 All legal actions relating to this lease shall be adjudicated in the courts of the State of New York having jurisdiction in the county in which the Building is located. Tenant irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this lease or any guaranty of Tenant's obligations under this lease, and Tenant shall not assert, by way of motion, as a defense or otherwise, any objection to any such court being the venue of such legal action or claim that such venue is an inconvenient forum for Tenant or any principal of Tenant.

### Article 16. Security

Section 16.1 Tenant has deposited with Landlord, as security for Tenant's compliance with this lease, the Security, in cash. If Tenant defaults in performing any of its obligations under this lease, Landlord may use all or any portion of the Security to cure such breach or for the payment of any other amount due and payable from Tenant to Landlord in accordance with this lease. If Tenant shall, during any twelve (12) month period, twice be in breach of its obligation to pay Rent on the first of the month, Tenant shall promptly after Landlord's request, remit to Landlord an amount equal to 11,000 [2] months of the then current

- 19 -

003218

amount of the monthly installment of Fixed Rent so that the amount of Security required under this lease shall then be equal to 2 months' of then current Fixed Rent. If Landlord uses all or any part of the Security, Tenant shall, within fifteen (15) days following Landlord's notice, deposit with Landlord an amount sufficient to restore the full amount of the Security. Landlord shall not, unless required by any Laws, pay interest to Tenant on the Security, and if Landlord is required to maintain the Security in an interest bearing account or pay any interest to Tenant, Landlord shall retain the maximum amount of interest permitted under any Laws (which Landlord may withdraw and retain annually or at any other times). Tenant shall not assign (other than to a permitted assignee of this lease) or encumber the Security, and no prohibited assignment or encumbrance by Tenant of the Security shall bind Landlord. Landlord shall not be required to exhaust its remedies against Tenant or the Security before having recourse to Tenant, any Guarantor, the Security or any other security held by Landlord, or before exercising any right or remedy, and recourse by Landlord to any one of them, or the exercise of any right or remedy, shall not affect Landlord's right to pursue any other right or remedy or Landlord's right to proceed against the others. If there is then no uncured breach, the Security and any accrued and unpaid interest thereon, or any balance, shall be paid or delivered to Tenant promptly after the Expiration Date and Tenant's vacating of the Premises in accordance with this lease. If Landlord's interest in the Real Property is sold or leased, Landlord shall transfer the Security and any accrued and unpaid interest thereon, or any balance, to the new Landlord and, upon such transfer, the assignor shall thereupon be automatically released by Tenant from all liability for the return of the Security or any interest (and Tenant agrees to look solely to the assignee for the return of the Security or any interest).

### Article 17. Broker

Section 17.1 Tenant represents to Landlord that it has dealt with no broker in connection with this lease other than the Broker. Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant in connection with this lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, costs, expenses, liabilities and damages including reasonable attorneys' fees and expenses (a) arising from Landlord's failure to comply with its obligation in the preceding sentence and (b) any claims for any brokerage commissions or other compensation by any broker (other than the Broker) with whom Landlord, but not Tenant, has had dealings in connection with this lease.

### Article 18. Notices; Consents and Approvals

Section 18.1 Except as may be provided in this lease, all notices and other communications under this lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its Notice Address. Either party may, by notice given in accordance with this Article, designate a different Notice Address, which address change shall become effective upon receipt, the date rejected or the date of attempted delivery (if the receiving party is not present).

- 20 -

PX 37

003219

**Section 18.2** Any notice or other communication sent as provided in this Article shall be effective (a) on the date received, the date rejected, or the date of attempted delivery (if the receiving party is not present) if sent by overnight courier service, or (b) three (3) business days after mailing by registered or certified mail.

**Section 18.3** If any provision of this lease requires Landlord's consent or approval, such consent or approval shall be effective only if given in writing.

**Section 18.4** Any notice or other communication given by Landlord to Tenant in accordance with this Article may be signed and given by Landlord's attorney or managing agent, if any, with the same force and effect as if signed and given by Landlord.

### Article 19. No Representations; Liability; Tenant Indemnity

**Section 19.1** Neither Landlord nor Landlord's managing agent, if any, has made any warranties, representations, statements or promises with respect to the Premises, the Real Property, the Building systems, any Additional Rent, any Laws or any other matter, unless expressly set forth in this lease. This lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this lease, and any previous agreements between Landlord and Tenant are merged in this lease, which alone expresses their agreement. Tenant is entering into this lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this lease.

**Section 19.2** Any employee of Landlord, Landlord's managing agent, if any, or the Real Property to whom any property is entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to that property and neither Landlord nor Landlord's managing agent, if any, shall be liable for any damages to or loss of property of Tenant or others entrusted to employees, agents or contractors of Landlord, Landlord's managing agent, if any, or the Real Property.

**Section 19.3** Neither Landlord nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant, Tenant's Property, Tenant's Work, Tenant's business or to any other person or property resulting from any cause, except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Section 13.4.

**Section 19.4** In the event of a transfer or lease of the entire Building (a) the transferor or lessor shall be and hereby is relieved of all obligations and liabilities of Landlord under this lease accruing after the effective date of the transfer or lease, and (b) the transferee or lessee shall be deemed to have assumed all of Landlord's obligations and liabilities under this lease effective from and after the effective date of the transfer or lease.

**Section 19.5** In no event shall Landlord, its affiliates, agents, partners, members, managers, shareholders, officers, directors and principals, disclosed or undisclosed, be liable for incidental or consequential damages or have any personal liability under or in connection with this lease. Tenant shall look only to Landlord's interest in the Real Property for the satisfaction of Tenant's remedies or to collect any judgment requiring the payment of money by Landlord under or in connection with this lease, and no other assets of Landlord or such persons shall be

- 21 -

003220

subject to lien, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies or the collection of any judgment under or in connection with this lease. If Tenant acquires a lien on such other property or assets by judgment or otherwise, Tenant shall promptly release that lien by signing, acknowledging and delivering to Landlord any instrument, prepared by Landlord, required for the lien to be released.

**Section 19.6** If Tenant requests Landlord's consent or approval and Landlord fails or refuses to give such consent or approval, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent or approval, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent.

**Section 19.7** This lease and the obligations of Tenant to pay the Rent and perform Tenant's other obligations under this lease are separate, distinct and independent of Landlord's obligations under this lease.

**Section 19.8** Tenant's obligations shall not be waived, delayed or otherwise affected in any manner, and Landlord shall have no liability, if Landlord is unable to comply with, or is delayed in complying with, any of Landlord's obligations under this lease by reason of any strike, labor trouble, accident, war, government action, Laws or other cause beyond Landlord's control.

**Section 19.9** Tenant shall not perform or permit to be performed any act which may subject Landlord, its partners, members, managers, shareholders, officers, directors and principals or Landlord's managing agent, if any, to any liability. Tenant shall, to the extent not caused by the negligence or willful misconduct of Landlord or its contractors or agents, indemnify, defend and hold harmless Landlord and Landlord's managing agent, if any, from and against all (a) claims arising from any act or omission of Tenant, its subtenants, contractors, agents, employees, invitees or visitors, (b) claims arising from any accident, injury or damage to any person or property in the Premises or any adjacent walkway during the Term or when Tenant is in possession of the Premises, and (c) Tenant's failure to comply with Tenant's obligations under this lease (whether or not a Default), and all liabilities, damages, losses, fines, violations, costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with any such claim or failure.

### Article 20. End of Term

**Section 20.1** On the Expiration Date (a) Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises vacant, broom clean and in good order and condition, except for ordinary wear and tear and damage for which Tenant is not responsible under this lease, and otherwise as may be required by this lease, and (b) Tenant shall remove all of Tenant's Property and any Tenant's Work required to be removed pursuant to this lease. If the last day of the Term is not a business day, this lease shall expire on the immediately preceding business day. Tenant waives, for itself and for any person claiming under Tenant, any right which Tenant or any such person may have under the New Jersey Civil Practice Law and Rules or under any similar Laws.

**Section 20.2** If the Premises are not vacated and surrendered in accordance with this lease (whether by Tenant or any occupant related to Tenant), on the date required by this

- 22 -

lease, Tenant shall indemnify and hold harmless Landlord against all losses, costs, liabilities, claims, damages and expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and disbursements whether in an action by or against Tenant or a third party, and including claims and liabilities of Landlord made by any succeeding tenant(s) or other third party. In addition, Tenant shall be liable to Landlord for per diem use and occupancy in respect of the Premises at a rate equal to twice the Rent payable under this lease for the last year of the Term (which Landlord and Tenant agree is the Rent that is contemplated by them as being fair and reasonable under such circumstances and is not a penalty). In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

**Section 20.3** If during the last fifteen (15) days of the Term, Tenant removes substantially all of Tenant's Property from the Premises, Landlord or any person designated by Landlord may immediately enter and alter the Premises, without releasing Tenant from any obligation or liability under this lease, including the payment of Rent, or incurring any liability or obligation to Tenant.

**Section 20.4** Unless otherwise specifically provided: (a) any obligation of Landlord or Tenant under this lease which by its nature or under the circumstances can only be, or by the terms of this lease may be, performed after the Expiration Date; (b) any liability for a payment with respect to any period ending on or before the Expiration Date; and, (c) all indemnity and hold harmless provisions in this lease, shall survive the Expiration Date.

### Article 21. Miscellaneous

**Section 21.1 Guaranty.** If a Guarantor of this lease is identified in Article 1 of this lease, the following shall apply: At the time this lease is executed and delivered, Tenant shall deliver to Landlord, concurrently with this lease, a guaranty executed by the Guarantor, and properly acknowledged, in the form annexed hereto as Exhibit H. Tenant represents and acknowledges that Guarantor is a principal of Tenant.

**Section 21.2 Patriot Act.** Tenant certifies and represents, both on the date of execution and delivery of this lease and during the entire Term, that neither Tenant nor any nor any person or entity that owns any direct or indirect beneficial interest in Tenant or or is acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department (an "SDN").

**Section 21.3 Financial Statements.** Within thirty (30) days after Landlord's request (which request may be made no more than twice for each fiscal year of Tenant), Tenant shall deliver to Landlord Tenant's and each Guarantor's financial statements, in form and scope reasonably satisfactory to Landlord, for Tenant's and each Guarantor's most recent fiscal year (or the preceding fiscal year, if the most recent fiscal year ended only within the last 90 days before Landlord's request). The financial statements Tenant delivers to Landlord shall be audited only if such financial statements are audited for any other purpose, and if not audited, shall be certified as true and complete by Tenant's chief operating officer or chief financial

- 23 -

003222

officer. Tenant shall promptly notify Landlord of any material event or occurrence that relates to Tenant's or any Guarantor's creditworthiness.

Section 21.4 General. (a) Subject to the provisions of this lease, this lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns. No person is intended to be a third party beneficiary of this lease.

(b)    This lease may not be changed or terminated, in whole or in part, except in a writing signed by Landlord and Tenant.

(c)    Notwithstanding any provision of this lease, or any Laws, to the contrary, or the execution of this lease by Tenant, this lease shall not bind or benefit Landlord or Tenant, unless and until this lease is signed and delivered by both Landlord and Tenant.

(d)    No act or omission of Landlord or Tenant, or their respective employees, agents or contractors, including the delivery or acceptance of keys, shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless it is in a writing signed by Landlord.

(e)    The captions in this lease are for reference only and do not define the scope of this lease or the intent of any term. All Article and Section references in this lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this lease.

(f)    If any provision of this lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by all applicable Laws.

(g)    There shall be no presumption against Landlord because Landlord drafted this lease or for any other reason.

(h)    If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this lease.

(i)    Tenant hereby waives any rights Tenant may have in connection with any zoning lot merger, zoning application, or subdivision or transfer of development rights with respect to the Real Property or any part thereof, including any rights Tenant may have to be a party to or to execute or contest any instrument providing for such merger, subdivision or transfer.

(j)    If Tenant is comprised of two or more persons, the liability of those persons under this lease shall be joint and several. Wherever appropriate in this lease, personal pronouns shall be considered to include the other gender and the singular to include the plural.

- 24 -

003223

(k)  Tenant shall not record this lease or any memorandum of this
lease.

(l)  This lease shall be governed by, and construed in accordance with,
the Laws of the State of New Jersey.

**In Witness Whereof**, Landlord and Tenant have executed this lease on the date
of this lease.

Landlord

[                    ]

By:  DANIEL BRANOVER
Name:
Title:  MEMBER

Tenant

By:
Name:
Title:

- 25 -



**Exhibit A**

**Fixed Rent**

A monthly rate of 5,500 USD to be increased by 3.5 percent per each 12 months of rent period.

- 26 -

003225

**Exhibit B**

**Landlord's Work**

**Not applicable**

27

PX 37

003226

Insurance          Client to

Introducti

Aerr

55/310

4

56/309

Exhibit C

Premises

(not drawn to scale)

28

003227

5. Landlord and Tenant hereby ratify and confirm the terms and provisions of the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this instrument as of the date above written.

_____, Landlord

By: DANIEL BRANOVER
MEMBER, Authorized Signatory

_____, Tenant

By: _____, Authorized Signatory

30

## Exhibit D

### COMMENCEMENT DATE AGREEMENT

THIS COMMENCEMENT DATE AGREEMENT made as of the _24th_____ day of _February_____, 21 __, between **Satec Real Estate Holding** ("Landlord") and **Closter Green Corp** ("Tenant")

### RECITALS

A. Landlord and Tenant are landlord and tenant under that certain lease dated as of ___14th, of February_____, 21__, (the "Lease") pursuant to which Landlord has leased certain premises more particularly described therein to Tenant (the "Premises"). (Capitalized terms not described herein are described in the Lease.)

B. The Commencement Date has occurred, the Fixed Rent Commencement Date and the Expiration Date shall be on 14th, of March 2024

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1. The Commencement Date is 24th, of February 2021.

2. The Fixed Rent Commencement Date is 15th of March 2021

3. The Expiration Date shall be on 14th, of March 2024

4. This Commencement Date Agreement is the document that Landlord and Tenant intended to execute pursuant to the Lease.

29

**PX 37**

003229

## Exhibit E
### Rules

The following are the Rules adopted by Landlord, as of the date of the lease to which these Rules are attached, with respect to the Building. A violation of any of the following Rules shall be deemed a material breach of the lease.

1. Tenant shall not engage in any conduct which will unreasonably interfere with the business, use and occupancy of any other tenant at the Building. Tenant shall not make or permit to be made any unseemly or disturbing noises or disturb or interfere with the occupants of the Building or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, television, talking machine, bullhorn or other amplifying device, noise, or in any other way.

2. Tenant shall not store any materials or objects outside of the Premises.

3. Tenant shall not drill holes into the exterior walls or roof of the Building, nor will Tenant attach wires or other devices to the exterior walls or roof without the prior written consent of the Landlord. No curtains, blinds, shades, or screens shall be attached to or hung upon, or used in connection with, any windows or doors of the Premises without the prior written consent of Landlord.

4. Tenant shall not use the bathrooms or other Building systems or any plumbing fixtures for any purpose or in any manner other than for the purposes and in the manner they were intended to be used, and no rubbish, rags, paper towels or other inappropriate materials shall be thrown therein. Tenant shall keep the interior heat in the Premises at such a level that pipes will not freeze in the winter months. Any and all damage resulting from any failure to comply with the foregoing requirements shall be borne by the tenant who, or whose agents, employees, contractors, visitors, or licensees have, caused such damage.

5. Landlord shall have the right to prohibit any advertising by any Tenant which in Landlord's sole judgment, tends to impair the reputation of the Building or the desirability of the Building for retail tenants. Upon notice from Landlord, any such advertising shall immediately cease.

6. Tenant shall not bring into, or permit in, the Premises any animals (except service animals for the disabled).

7. No hand trucks or similar devices may be used for moving articles in or out of the Premises, except those equipped with rubber tires, side guards and such other safeguards as Landlord requires.

8. Tenant shall, at all times, keep a copy of all keys for the Premises with the Landlord together with instructions for disarming any security systems. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant, nor shall changes be made to any existing locks or the mechanisms thereof without the prior written consent of Landlord. Upon the termination of the tenancy, Tenant shall restore all keys to the Landlord including keys to stores, bathrooms, and/or offices.

31

PX 37

## Exhibit H

### Full Guaranty

Lease:     Lease, dated 24th. of __February_____, 2021, between _ **Satec Real Estate Holding**, as Landlord, and **Closter Green Corp**, as Tenant, for certain premises in the Building known as _10 Milltown Court, in _Union_____, ___Union_____ County, State of New Jersey

Landlord:    **Satec Real Estate Holding** Llc, its successors and assigns

Tenant:    **Closter Green Corp**, its successors and assigns

Guarantor    The signatories to this Guaranty

To induce Landlord to enter into the Lease and intending to be legally bound, Guarantor has executed and delivered this Guaranty to Landlord. Each person signing this Guaranty represents that he is a principal of Tenant. To avoid any doubt the decision of the Landlord to enter this Lease Agreement based on the acceptance of one Guarantor is based solely on the declaration of personal wealth statement delivered by the Guarantor and attached as Appendix H1.

Guarantor guarantees to Landlord the full and timely performance and observance of all the agreements to be performed and observed by Tenant under the Lease.

Landlord is not obligated to give Guarantor notice of any default by Tenant under the Lease or any termination notice, and Guarantor hereby waives such notices. Guarantor waives all other notices required or permitted to be given under the Lease or otherwise. Guarantor also waives acceptance and notice of acceptance of this Guaranty, and all demands for payment or performance.

Guarantor waives all defenses other than payment in full and complete performance.

Guarantor's liability under this Guaranty shall not be affected or impaired by any delay by or failure of Landlord in enforcing any of its rights or remedies under the Lease or at law, or by any deferral, waiver, settlement or release of Tenant's obligations under the Lease or any accord and satisfaction or any forbearance by Landlord in exercising any of its rights and remedies or by any other action, inaction, or omission by Landlord.

This Guaranty is independent of any security or remedies which Landlord has under the law. Landlord may proceed against Guarantor at any time, either independently of or concurrently with or in lieu of Landlord's application of any security held by Landlord or Landlord's exercise of any remedies Landlord may have against Tenant. Landlord is not required to resort to any security deposit or other collateral it may hold and is not required to pursue any

32

**PX 37**     003231