**Storage Lease**

## Satec Real Estate Holding

**Landlord**

and

## CLOSTER GREEN Corp.

**Tenant**

Premises: 10 Milltown Court, Union NJ

Date:

- 1 -

003232

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Article 1. | Basic Terms and Definitions | 3 |
| Article 2. | Demise; Rent | 4 |
| Article 3. | Use; Rules and Regulations; Tenant Operations; Signs | 5 |
| Article 4. | Condition of the Premises; Landlord's Work | 7 |
| Article 5. | Tenant's Work | 7 |
| Article 6. | Utilities; Services | 9 |
| Article 7. | Common Areas | 10 |
| Article 8. | Repairs and Maintenance | 11 |
| Article 9. | Laws; Hazardous Substances | 11 |
| Article 10. | Insurance | 13 |
| Article 11. | Casualty | 14 |
| Article 12. | Assignment and Subletting | 15 |
| Article 13. | Access; Changes in Building and Real Property | 15 |
| Article 14. | Default | 16 |
| Article 15. | Remedies | 17 |
| Article 16. | Security | 19 |
| Article 17. | Broker | 20 |
| Article 18. | Notices; Consents and Approvals | 20 |
| Article 19. | No Representations; Liability; Tenant Indemnity | 21 |
| Article 20. | End of Term | 22 |
| Article 21. | Miscellaneous | 23 |

**Exhibits**

| | | Page |
|---|---|---|
| Exhibit A | - Fixed Rent | 26 |
| Exhibit B | - Landlord's Work | 27 |
| Exhibit C | - Premises | 28 |
| Exhibit D | - Commencement Date Agreement | 29 |
| Exhibit E | - Rules | 31 |
| Exhibit H | - Full Guaranty | 32 |

PX 37

**Attachment A**

003233

## Storage Lease

Lease dated _24ᵗʰ. of March 2021_, between **Satec Real Estate Holding**, a limited liability company, ("**Landlord**"), and **Closter Green Corp,** a legal entity, located at 223 Veterans Boulevard, Carlstadt NJ 07072 under EIN- 46-3590571_("Tenant").

### Article 1. Basic Terms and Definitions

**Section 1.1**   Additional Rent. All sums, other than the Fixed Rent, payable by Tenant to Landlord under this lease, including the payment of deficiencies and increases in the Security, if any.

**Section 1.2**   Building.      The building and improvements located at 10 Milltown Court, Union NJ.

**Section 1.3**   Commencement Date.   24ᵗʰ of February 2021, subject to the provisions of Section 2.6.

**Section 1.4**   Expiration Date.   The date that is of 36 months from the Commencement Date occurs, subject to the provisions of Section 2.6.

**Section 1.5**   Fixed Rent. The Fixed Rent is of 5,500 USD per month to be increased by 3.5% per every 12 months of lease period in comparison to the previous 12 months period, Starting on The Fixed Rent Commencement Date and ending on expiration date as described in exhibit D.

**Section 1.6**   Canceled.

**Section 1.7**   Guarantor. Mrs. Amanda Rozenfeld, 757A Undercliff Ave, Edgewater NJ 07020, SSN- 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. If there is more than one person or entity comprising Guarantor, the liability of all persons and entities comprising Guarantor shall be joint and several.

**Section 1.8**   Landlord's Work.      The work, if any, described in Exhibit B to this lease.

**Section 1.9**   Notice Address.

(a)      Landlord. 10 Milltown Court, Union NJ.

(b)      Tenant. Prior to the Commencement Date at 223 Veterans Boulevard, Carlstadt NJ 07072 After the Commencement Date, the Premises.

**Section 1.10** Permitted Use. **Storage usage**, and for no other purpose.

**Section 1.11** Premises. The portion of the Building shown on Exhibit C to this lease.

**Section 1.12** Real Property. The Building and the land on which it is located.

- 3 -

**Attachment A**   003234

**Section 1.13** <u>Rent.</u> The Fixed Rent and all Additional Rent and in addition the increase in rent per each 12 months period.

**Section 1.14** <u>Security</u>. $11,000, so to allow the Landlord to have maintain 2 months of Fixed Rent as security.

**Section 1.15** <u>Term</u>. The period commencing on the Commencement Date and ending on the Expiration Date, subject to earlier termination or extension of this lease pursuant to the terms hereof.

**Section 1.16** <u>Certain Definitions</u>. Any reference in this lease to (a) "<u>legal action</u>", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "<u>person</u>" includes any individual or entity, (c) "<u>this lease</u>" includes the Rules and the other Exhibits to this lease, and (d) "<u>including</u>" means "including without limitation".

## Article 2. <u>Demise; Rent</u>

**Section 2.1** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, for the Term, at the Rent and on the other terms of this lease.

**Section 2.2** Tenant shall pay Landlord the Rent, without notice, abatement, deduction or offset (except as expressly provided in this lease), in lawful money of the United States of America, by Tenant's check or another method approved by Landlord, at Landlord's Notice Address or another address Landlord designates, and as provided in this lease. The Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term, except that on the signing and delivery of this lease by Tenant, Tenant shall pay Landlord one full monthly installment of the Fixed Rent, to be applied to the first full monthly installment of the Fixed Rent due under this lease. Rent shall be pro-rated for any partial month according to the number of days in the month occurring during the Term. Landlord's delay in rendering, or failure to render, any statement required to be rendered by Landlord for any Rent for any period shall not waive Landlord's right to render a statement or to collect that Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

**Section 2.3** If a Fixed Rent Commencement Date is specified in <u>Article 1</u> of this lease: (a) Tenant is not required to pay Fixed Rent until the Fixed Rent Commencement Date provided Tenant does not default in performing its obligations under this lease beyond any applicable cure period; and (b) if the Fixed Rent Commencement Date is not the first day of a month, the Fixed Rent for the month in which the Fixed Rent Commencement Date occurs shall be apportioned according to the number of days in that month and shall be due and payable when invoiced.

**Section 2.4** Unless otherwise specified in this lease, all Additional Rent shall be paid by Tenant within thirty (30) days after Tenant is billed therefor.

**Section 2.5** Canceled.

- 4 -

one or more dry chemical fire extinguishers; (i) conduct its business at the Premises in a dignified manner in accordance with high standards of retail operation; and, (j) prevent any odors or any noise from transmitting beyond the Premises.

**Section 3.6** Tenant shall not (a) place or maintain any merchandise, show cases, tables for service, trash, refuse or other items in any vestibule or entry of the Premises, on on the walkways, sidewalks or elsewhere outside the Premises; (b) obstruct, or permit its employees, contractors, customers or invitees to obstruct, any driveway, walkway, sidewalk, parking area, or other Common Areas (hereinafter defined); (c) use or permit the use of any advertising medium objectionable to Landlord (such as, without limitation, loudspeakers, phonographs, public address systems, sound amplifiers, reception of radio or television broadcasts within the Building) which is in any manner audible or visible outside of the Premises; (d) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or without the Premises; (e) cause or permit odors or fumes to emanate from the Premises; (f) solicit business in any Common Areas, including without limitation through distribution of handbills or other advertising matter in any Common Areas or the display of any merchandise in the Common Areas; (g) receive or ship articles of any kind outside the designated loading areas, if any, for the Premises; (h) conduct or permit to be conducted any auction, fire sale (except to liquidate inventory in response to an actual fire and only if such sale is not conducted for more than forty-five (45) days), bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision is not intended to limit Tenant's freedom in setting its own selling prices); (i) use the Premises for any activity that is not generally considered appropriate for retail businesses conducted in accordance with good and generally accepted standards of operation; (j) use the Premises for any hazardous activity or in such manner as to constitute a nuisance of any kind (public or private); (k) cause waste; (l) do anything which, in Landlord's reasonable judgment, disturbs other occupants of the Building; or (m) permit its employees, invitees or deliverymen to loiter immediately outside the Premises or the Building or within the Common Areas or to park cars in the Common Areas with "For Sale" signs (or signs of similar import) on them.

**Section 3.7** Tenant acknowledges that Landlord intends the space in the Building to be operated in a manner that does not offend the community that it serves. Accordingly, Tenant shall not use the Premises for any immoral or disreputable use or activity or for any use that is objectionable to the community in which the Premises are located; and Tenant shall not sell, distribute, display, advertise or offer for sale at the Premises any item or service which, in Landlord's good faith judgment, may tend to injure or detract from the image of the Building within such community or that results in any picketing or protests. Without limiting the generality of the foregoing, Tenant shall not sell, distribute, display or offer for sale (a) any drug paraphernalia, (b) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, recording, representation or merchandise of any kind, (c) any counterfeit goods or (d) any gun(s).

**Section 3.8** The term "Sign" includes all signs, designs, monuments, logos, banners, projected images, awnings, canopies, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics, and decorations. No Sign shall be exhibited, installed, inscribed, painted or affixed, without the prior consent of Landlord, on any part of the outside of the Building or on the windows or doors of the Premises; except that Landlord's consent

- 6 -

**Attachment A**

003236

**Section 2.6** Landlord and Tenant shall execute an agreement setting forth the Commencement Date, the Fixed Rent Commencement Date and the Expiration Date in the form attached hereto as Exhibit D.

**Section 2.7** Notwithstanding anything to the contrary in this lease or in any exhibit or diagram attached to it, loading deck or other area outside the boundary of the Real Property is included in the Premises. If Tenant is permitted to use or occupy any loading deck or other area, it is under a revocable license.

## Article 3. Use; Rules and Regulations; Tenant Operations; Signs

**Section 3.1** Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this lease. Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Tenant shall store in the Premises only the merchandise that Tenant sells on a retail basis for the Permitted Use of the Premises and shall use commercially reasonable efforts to minimize the areas used for storage and to maximize the area used for retail sales.

**Section 3.2** Tenant shall not use the Premises, or any part thereof, in violation of the certificate of occupancy, if any, for the Premises or the Building.

**Section 3.3** Tenant shall, and shall cause its employees, contractors, and invitees to, comply with the rules and regulations annexed hereto as Exhibit E and such reasonable changes therein (whether by modification, restatement, elimination or addition) as Landlord may make at any time or times hereafter and communicate to Tenant (the "Rules"). Landlord is not required to enforce the Rules against Tenant or any other tenant or occupant, their employees, contractors or invitees, and Landlord shall not be liable to Tenant for any violation of the Rules by another tenant or occupant or any of their employees, contractors or invitees. Landlord's failure to enforce the Rules against Tenant or any other occupant of the Building shall not be considered a waiver of the Rules, provided that the Rules shall not be enforced in a discriminatory manner.

**Section 3.4** The continuous operation of Tenant's business in the Premises is of material importance to Landlord because of the adverse impact on the Building of vacant space.

**Section 3.5** Tenant shall, at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean and keep all exterior surfaces of the Premises clean; (b) replace promptly any cracked or broken glass of the Premises with glass of like color, grade, and quality; (c) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests and shall arrange for extermination at regular intervals, not less frequently than monthly and more often as necessary; (d) keep any garbage, trash, rubbish or other refuse in vermin-proof containers within the interior of the Premises that are kept closed until removed; (e) deposit such garbage, trash, rubbish and refuse, on a daily basis, in receptacles provided or required by the carter engaged by Tenant pursuant to the terms of this lease; (f) remove from the Premises all rubbish resulting from and/or remaining after any fire or other similar casualty in the Premises; (g) keep all mechanical apparatus and equipment free of vibration and noise which may be transmitted beyond the Premises; (h) keep in the Premises and maintain in good working order

- 5 -

**Attachment A**

Plans"), and obtain Landlord's approval of Tenant's Plans. Landlord's approval of Tenant's Plans shall not be unreasonably withheld or delayed to the extent Landlord's consent to Tenant's Work shown on Tenant's Plans is not to be unreasonably withheld or delayed pursuant to this Article. Before commencing Tenant's Work, Tenant shall (a) obtain (and deliver to Landlord copies of) all required permits and authorizations of any Authority for such work, and (b) deliver to Landlord such security as shall be reasonably satisfactory to Landlord, and (c) deliver to Landlord certificates (in form reasonably acceptable to Landlord) evidencing the following insurance coverages from each contractor and subcontractor:   (i) worker's compensation insurance covering all persons to be employed in the performance of any Tenant's Work, and   (ii) commercial general liability insurance on a primary and non-contributory basis with a limit of liability approved by Landlord, and with contractual liability coverage, naming Landlord, Landlord's managing agent, if any, any Superior Landlord (hereinafter defined) and any Mortgagee (hereinafter defined) as additional insureds, and (iii) comprehensive automobile liability insurance (covering all owned, non-owned and/or hired motor vehicles to be used in connection with Tenant's Work) with a limit of liability approved by Landlord and (iv) builders risk insurance for the full value of the Tenant's Work performed by such contractor and subcontractor.

**Section 5.3**   Tenant shall reimburse Landlord, within fifteen (15) days of being billed therefore, for any reasonable out-of-pocket expenses incurred by Landlord in connection with Landlord's review of Tenant's Plans and inspection of Tenant's Work, including outside experts retained by Landlord for that purpose. Landlord's consent to Tenant's Work and Landlord's approval of Tenant's Plans shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, and shall not constitute any representation or warranty by Landlord regarding the adequacy for any purpose of Tenant's Work or Tenant's Plans or their compliance with Laws, and shall not relieve Tenant from obtaining Landlord's express written approval to revisions thereto. Promptly after substantial completion of Tenant's Work, but in no event later than six (6) months after the commencement of such work, Tenant shall, at Tenant's expense, obtain and deliver to Landlord copies of all sign-offs, letters of completion, approvals and certificates of any Authority required upon the completion of Tenant's Work (including any required amendments to the certificate of occupancy for the Premises and/or Building) and "as-built" plans and specifications for Tenant's Work prepared as reasonably required by Landlord.

**Section 5.4**   If, in connection with Tenant's Work or any other act or omission of Tenant or Tenant's employees, agents or contractors, a mechanic's lien, financing statement or other lien or violation of any Laws, is filed against Landlord or all or any part of the Real Property, Tenant shall, at Tenant's expense, have such lien removed by bonding or otherwise within thirty (30) days after Tenant receives notice of the filing.

**Section 5.5**   All construction managers, contractors and subcontractors performing work for which a license is required by applicable Laws, shall be licensed by the appropriate Authorities and approved by Landlord, which approval shall not be unreasonably withheld or delayed. Landlord's approval of such construction managers, contractors and subcontractors shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, shall not constitute any warranty by Landlord regarding the adequacy, professionalism, competence or experience of the approved construction manager, contractor, or subcontractor, and shall not relieve Tenant from obtaining Landlord's express prior written approval if Tenant seeks to

- 8 -

**Attachment A**                     003238

shall not be required for any Sign placed inside the windows or doors of the Premises if such Signs are attractive and professionally produced and do not violate any other provisions of this lease. Notwithstanding the foregoing, no neon Signs or blinking or flashing Signs are permitted. Unless otherwise expressly permitted, Tenant may not install Signs advertising a fire sale, liquidation sale, distress sale, foreclosure sale, receiver's or sheriff's sale, going out of business sale, lost lease sale, or Signs of similar import. Tenant shall, at its own expense, obtain all required licenses and permits for any Signs installed by Tenant, and renew them as required by applicable Laws. All Sign(s) shall be installed and removed in a good and workerlike manner, without damaging the Real Property, and in compliance with all applicable Laws and the applicable provisions of this lease. Prior to installing any permitted Sign, Tenant shall deliver to Landlord any permits or approvals required by applicable Laws in connection with such installation. Tenant shall maintain any permitted Signs in good, clean, neat and safe condition, and at the expiration or sooner termination of this lease, Tenant shall cause such Signs to be removed and cause the cancellation of any issued licenses or permits. Tenant shall not change or alter any Sign approved by Landlord in any respect whatsoever, without first obtaining Landlord's prior consent to such change or alteration. Landlord may remove any Sign(s) installed or maintained in violation of this Article, and Tenant shall reimburse Landlord for all costs incurred by Landlord in so removing any such Sign promptly after being billed therefor. In addition, Landlord may, from time to time, temporarily remove any Sign in connection with any repairs, improvements, alterations, additions or replacements being made to the Real Property.

## Article 4. Condition of the Premises; Landlord's Work

**Section 4.1** Tenant has examined the Premises and, subject to Landlord performing Landlord's Work, if any, (a) Tenant accepts possession of the Premises in its "AS IS" condition on the date of this lease, subject to normal wear and tear and the removal of substantially all of the existing occupant's personal property, if any, and (b) Landlord has no obligation to perform any work, supply any materials, incur any expenses or make any installations to prepare the Premises for Tenant's occupancy.

**Section 4.2** If any Landlord's Work is specified in Article 1 and the Exhibit referred to therein, Landlord shall, at its expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this lease. Tenant shall not impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work.

## Article 5. Tenant's Work

**Section 5.1** Except as may be expressly provided in this lease, Tenant shall not replace any fixtures in the Premises or make any changes, improvements, alterations or additions (collectively, "Tenant's Work"), to the Premises, the Real Property, the Building systems, or any part thereof, without Landlord's prior consent.

**Section 5.2** Prior to commencing any Tenant's Work other than purely Cosmetic Alterations, Tenant shall, at Tenant's expense, deliver to Landlord detailed plans and specifications, for Tenant's Work, in form reasonably satisfactory to Landlord, prepared, certified, signed and sealed by an architect or engineer licensed to practice in the State of New York, and suitable for filing with the applicable Authority, if filing is required by applicable Laws (such plans and specifications together with revisions thereto, collectively, "Tenant's

- 7 -

**Attachment A**     003239

of the gas consumption bills of the **Real Property** upon receiving notice from the landlord to do so.

**Section 6.2**   Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, distributed in or serve the Premises. If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant agrees to pay Landlord, on demand, as Additional Rent, the cost for providing such additional utility facilities.

**Section 6.3**   Landlord has no obligation to provide to Tenant or the Premises any services except as expressly set forth in this lease. Without limiting the foregoing, Landlord is not responsible for providing heat, electric, water, gas, air conditioning, steam, sewer service, cleaning service, trash collection, extermination, cable or internet service or ventilation to the Premises. Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

**Section 6.4**   If any utility or other service (a) becomes unavailable from any public utility company, public authority or any other person or entity supplying or distributing same (including Landlord), or (b) is interrupted by reason of Laws, the making of any repairs or improvements, or measures taken to secure the safety of the Real Property, or the safety and welfare of its tenants or occupants, or the public, or by reason of any cause beyond Landlord's reasonable control, (i) Landlord shall not be liable to Tenant in damages or otherwise, (ii) Tenant may not abate Rent or be relieved of any of its obligations under this lease, and (iii) such lack of availability or interruption shall not constitute an actual or constructive eviction, or a disturbance of Tenant's use of the Premises.

**Section 6.5**   Tenant shall enter into, and maintain at all times during the Term, a contract for the daily removal of Tenant's trash from the Building, with the carter selected by Tenant and approved by Landlord, to provide trash removal services to the Building, subject to any applicable Rules.

## Article 7.  Common Areas

**Section 7.1**   The "Common Areas" are those areas and facilities which may be furnished by Landlord (or others on behalf of Landlord) in or near the Building for the non-exclusive common use of tenants and other occupants of the Building, their employees, customers, and invitees, including parking areas, access areas (other than public streets), driveways, loading docks and loading areas, sidewalks, lighting facilities, and other similar common areas, facilities or improvements.

**Section 7.2**   Landlord will operate and maintain, or shall cause to be operated and maintained, the Common Areas in a manner deemed by Landlord to be reasonable and appropriate. Landlord shall have the right (i) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas; (ii) to enter into, modify and terminate any

- 10 -

employ any other or additional construction manager, contractor or subcontractor. Promptly following substantial completion of Tenant's Work, but in no event later than six (6) months after the commencement of such work, Tenant shall furnish to Landlord lien waivers and releases, in form reasonably satisfactory to Landlord, from all construction managers, contractors, subcontractors, and materialmen furnishing work, services or materials in connection with Tenant's Work.

**Section 5.6** Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which the floor was designed to carry and which is allowed by any Laws.

**Section 5.7** Tenant shall be liable for any damage caused to any part of the Building, including its fixtures and equipment, arising from, or as a result of, Tenant's Work and/or its installation and/or removal of its Signs. If Tenant performs with Landlord's approval any work on the roof of the Building (for example, in connection with repair, maintenance, or installation of any air conditioning system), Tenant shall use only a contractor approved by Landlord for such work and shall not do or cause anything to be done which would invalidate Landlord's then effective roof guaranty for the Building. Tenant shall also be responsible for promptly repairing (including any necessary replacement) any damage to the roof or Building caused by such work; provided that Landlord may, at its option, effect any such repair or replacement, in which event Tenant shall reimburse Landlord for all costs incurred by Landlord in connection therewith within fifteen (15) days after Tenant is billed therefor.

**Section 5.8** On or before the Expiration Date or sooner termination of this lease, if applicable, Tenant shall, at Tenant's expense, remove from the Building (a) all Tenant's Work which Landlord designates for removal in a notice given by Landlord to Tenant on or before the date which is thirty (30) days prior to the Expiration Date (or prior to the sooner termination of this lease, if applicable) and (b) Tenant's trade fixtures, equipment and personal property which are removable without material damage to the Premises or the Building ("Tenant's Property"). Tenant shall repair any damage to the Premises, and/or the Real Property, caused by the installation or removal of Tenant's Property, Signs or Tenant's Work. Except as expressly provided in this Section, Tenant's Work shall not be removed. Any Tenant's Property or Tenant's Work that Tenant was required to remove and which is not removed by Tenant by the Expiration Date or sooner termination of this lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's

### Article 6. Utilities; Services

**Section 6.1** Landlord shall be responsible for providing any utility service to the Premises and for providing meters, submeters or other devices for the measurement of utilities supplied to the Premises, Tenant shall be solely responsible for and shall promptly pay, to Landlord or the utility companies', as applicable, as and when the same become due and payable, all charges for water, sewer, electricity, telephone, cable service, internet service, steam, and any other utility or other communication device used or consumed in the Premises and supplied by a public utility or public authority or any other person, firm, or entity supplying same. If Landlord has designated any person or persons to provide one or more utility services to the Real Property, Tenant shall use the designated person(s) to obtain the applicable utility services. Without derogating from the above and to avoid any doubt the Tenant shall pay a 1/3

- 9 -

"Authority" or "Authorities") applicable to Tenant's occupancy of the Premises, Tenant's Work, Tenant's Property or the Premises. If, however, compliance requires structural work to the Premises, Tenant shall be required to effect such compliance, at Tenant's expense, only if the obligation to comply arises from Tenant's Work, Tenant's Property, Tenant's manner of using the Premises, or any acts or negligence of Tenant, its employees, contractors, agents, or invitees. Tenant shall promptly deliver to Landlord a copy of any notice, communication or other materials relating to the Premises, the Real Property (including the Building systems), Tenant's Property, Tenant's Work and/or Hazardous Substances (hereinafter defined) received by Tenant from, or sent by Tenant to, any Authority. Tenant shall have an obligation to remediate any Hazardous Substances pursuant to this Section if the need for such remediation arises from Tenant's Work, Tenant's specific manner of use of the Premises, or the actions or omissions to act of Tenant, subtenants, and/or any of their employees, contractors, agents or invitees.

**Section 9.2** Tenant shall not, and shall not permit any of its employees, contractors, agents, or invitees, to introduce into the Premises or the Real Property, use in the Premises or the Real Property or cause to be released from the Premises or the Real Property any Hazardous Substances. Notwithstanding the preceding sentence, Tenant may use cleaning and office products in accordance with their customary use, provided that Tenant complies with all applicable Laws in connection therewith, and further provided that in no event may Tenant release or discharge such cleaning and/or office products into the plumbing, drainage or sewer system in excessive amounts. If Tenant breaches its obligations hereunder, Tenant, at Tenant's expense, shall immediately take all remedial action necessary to clean up any release, spill or discharge of Hazardous Substances. "Hazardous Substances" mean any flammable or otherwise hazardous material, any explosive and/or radioactive material, hazardous waste, hazardous or toxic substance or related material, asbestos and any material containing asbestos, petroleum and any petroleum derivative, pollutants, contaminants and any other substance or material which is defined as, determined to be, or identified as, a hazardous or toxic material or substance pursuant to any applicable Laws.

**Section 9.3** If Tenant shall be obligated to remediate any Hazardous Substances, it shall remove and dispose of any such Hazardous Substances in compliance with all applicable Laws. Tenant's remediation plan shall be subject to Landlord's approval and Tenant shall keep Landlord fully apprised of the progress of Tenant's remediation efforts.

**Section 9.4** Tenant shall indemnify, defend and hold harmless Landlord, its managing agent, its Superior Landlord, if any, its Mortgagee, if any, and their respective members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any violation by Tenant of its obligations with respect to Hazardous Substances under this lease or otherwise under any applicable Laws.

**Section 9.5** If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this lease, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any applicable Laws in connection therewith.

- 12 -

easement and other agreements pertaining to the use and maintenance of the Common Areas; (iii) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; (iv) to close temporarily any or all portions of the Common Areas; (v) to discourage non-customer parking; and (vi) to do and perform such other acts in and to said areas and improvements as Landlord shall determine to be advisable.

## Article 8. Repairs and Maintenance

**Section 8.1**   Landlord shall, at Landlord's expense, make all structural repairs needed to the exterior walls, structural columns, structural roof, and structural floors that enclose the Premises (excluding all doors, door frames, storefronts, windows and glass); provided that Tenant gives Landlord notice of the necessity for such repairs. Notwithstanding the foregoing, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all such repair costs to structural elements that are necessitated by the negligence or misconduct of Tenant, its employees, contractors, agents, subtenants, employees, customers and invitees.

**Section 8.2**   If the Premises are sprinklered, Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Laws, those elements of the sprinkler system within the Premises, including the repair and replacement of the sprinkler heads and pipes if damaged only if it is caused due to negligence and/or misusage and/or misconduct by the Tenant. If the Premises are not sprinklered and a sprinkler system in the Premises is required under applicable Laws for Tenant's Permitted Use or manner of use of the Premises, or Tenant's Work requires the installation of a sprinkler system in the Premises, Tenant shall install such system as part of Tenant's Work, at Tenant's expense.  Landlord shall not be responsible for maintenance, repairs or replacement of any element of the sprinkler system within the Premises.

**Section 8.3**   Subject to Section 10.4, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all damage to the Building resulting from any act or omission of Tenant, Tenant's subtenants, or any of Tenant's or subtenants' employees, agents, employees, invitees or contractors.

**Section 8.4**   Landlord shall have no liability to Tenant, the Rent shall not be abated, and Tenant shall not be deemed actually or constructively evicted by reason of Landlord performing any repairs or other work to all or any portion of the Premises and/or the Real Property.  Landlord shall endeavor to perform such repairs or other work in a manner that reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property, but Landlord is not required to employ overtime labor or incur additional expenses.

## Article 9. Laws; Hazardous Substances

**Section 9.1**   Tenant shall, at Tenant's expense, comply with all present and future laws, rules, regulations, orders, ordinances, judgments, requirements and (if Landlord adopts same) recommendations (collectively, "Laws") of the United States of America, the State of New Jersey, the city, town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency, department, commission, board, bureau, and any fire insurance rating body (collectively,

- 11 -

**Attachment A**                    003243

**Section 10.2** Tenant shall deliver to Landlord and each additional insured (a) certificates in form reasonably acceptable to Landlord evidencing the insurance required by this lease to be maintained by Tenant before the Commencement Date. All required insurance shall be primary and non-contributory, issued by companies satisfactory to Landlord and contain a provision whereby it cannot be canceled unless Landlord and any additional insureds are given at least thirty (30) days' prior written notice of the cancellation.

**Section 10.3** Tenant shall not do or permit to be done any act which shall invalidate or be in conflict with Landlord's insurance policies, or increase the rates of insurance applicable to the Real Property. If, as the result of a Default, Tenant's occupancy of the Premises (whether or not such occupancy is a Permitted Use), and/or specific hazards attributable to Tenant's occupancy, the insurance rates for the Real Property or Building increase, Tenant shall reimburse Landlord for one hundred (100%) percent of such increase in premium(s), within fifteen (15) days after Tenant is billed therefor.

**Section 10.4** Provided its right of full recovery under its insurance policy is not adversely affected, Landlord and Tenant each hereby releases the other (and the other's agents and employees) with respect to any claim (including a claim for negligence) it may have against the other for damage or loss covered by its property insurance (including business interruption and loss of rent). Landlord and Tenant shall, to the extent obtainable, each procure a clause in, or endorsement on, any property insurance carried by it, pursuant to which the insurance company waives its right of subrogation against the other party to this lease and its agents and employees or consents to a waiver of the right of recovery against the other party to this lease and its agents and employees. If an additional premium is required for the waiver or consent, the other party shall be advised of that amount and may, but is not obligated to, pay the same. If that party elects not to pay the additional premium, the waiver or consent shall not be required in favor of that party.

### Article 11. Casualty

**Section 11.1** If (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) is damaged by fire or other casualty so that Tenant is deprived of reasonable access to the Premises or so that the Premises or any part of the Premises is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises, Tenant shall give prompt notice to Landlord. Subject to the provisions of this Article (i) Landlord shall, at Landlord's expense, repair the damage to the Premises, excluding the damage to Tenant's Work or Tenant's Property and (ii) Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent required by Landlord in connection with Landlord's repair of the damage and shall promptly after Landlord's substantial completion of the repair to the Premises, commence to diligently repair Tenant's Work and Tenant's Property in order to resume its normal business in the Premises. Until the repairs to be performed by Landlord are substantially completed, the Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have reasonable access or which is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises and which Tenant does not actually use.

**Section 11.2** If (a) the Premises are rendered wholly untenantable, or (b) the Premises are damaged by any cause which is not covered by Landlord's insurance, or (c) the Premises are damaged in whole or in part during the last two (2) years of the Term, or (d) the

- 14 -

**Attachment A**

**Section 9.6**  Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Laws relating to the operation of its business. Landlord does not covenant, warrant or make any representation that any Authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this lease.

**Section 9.7**  Subject to the provisions of this Section, provided that Tenant is not in Default, Tenant, at Tenant's expense, may contest by appropriate proceedings prosecuted diligently and in good faith the legality or applicability of any Laws affecting the Premises for which Tenant is responsible hereunder (any such proceedings instituted by Tenant, a "Compliance Challenge"), provided however, that Tenant's delay in compliance shall not cause (a) Landlord or Tenant to be subject to imprisonment or prosecution for a crime, (b) the Real Property or any part thereof to be condemned or vacated, (c) the certificate of occupancy for the Building or any part thereof to be suspended or cancelled, and/or (d) the use and enjoyment of its space by another lessee or licensee at the Real Property to be adversely affected. Tenant must give Landlord at least ten (10) business days notice before Tenant initiates a Compliance Challenge, and shall not initiate it if Landlord reasonably objects. At Landlord's request, prior to initiating a Compliance Challenge, Tenant shall furnish Landlord with either cash or a bond from a surety company reasonably satisfactory to Landlord in form and substance, in an amount equal to 120% of the sum, as reasonably estimated by Landlord, of (i) the cost of such compliance and (ii) the amount of any and all penalties and fines that may accrue by reason of non-compliance and (iii) the amount of any Landlord liability to third parties. Tenant shall keep Landlord informed regularly as to the status of any Compliance Challenge.

### Article 10. Insurance

**Section 10.1**  Tenant shall, at Tenant's expense, maintain at all times during the Term and at all times when Tenant is in possession of the Premises such insurance as shall be required by Landlord, including: (a) commercial general liability insurance (or successor form of insurance designated by Landlord) in respect of the Premises, on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than ($2,000,000 annually and $1,000,000 per occurrence)  naming as additional insureds Landlord and any other person designated by Landlord, (b) property insurance in an amount equal to one hundred (100%) percent of full replacement value (with a deductible not exceeding five thousand ($5,000) dollars) covering Tenant's Work (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises, against fire and other risks included in the standard New Jersey form of property insurance, including business interruption insurance covering a period of twelve (12) months,  (c) workers' compensation and employer's liability insurance providing statutory benefits for Tenant's employees at the Premises. Waiver of Subrogation Clause shall be added to the General Liability and Workers Compensation / Employers Liability policies in favor of Lanlord. (d) such other insurance as Landlord may reasonably require. Such liability insurance policy shall include contractual liability, fire and legal liability coverage.

- 13 -

**Attachment A**                    003245

or designation by which the Real Property and/or Building is known. Landlord's exercise of its rights pursuant to this Section shall not reduce the number of parking spaces serving the Real Property below that required by any Laws.

Section 13.3 If there is to be any excavation or construction adjacent to the Building, Tenant shall permit Landlord and/or any other person to enter the Premises to perform such work as Landlord or that person deems necessary to protect the Building, without any abatement of the Rent or liability to Tenant.

Section 13.4 Landlord shall have the exclusive right to use all or any part of the roof of the Building for any purpose, and to erect temporary scaffolds and other aids to construction on the exterior of the Premises in connection with alterations, repairs, improvements, and/or additions Landlord may make to the Building, provided that access to the Premises shall not be denied. Landlord may make any use it desires of the side exterior walls or rear walls of the Building.

Section 13.5 Landlord shall exercise Landlord's rights under this Article in a manner which reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense), but Landlord is not required to employ overtime labor or incur additional expenses.

### Article 14. Default

Section 14.1 Each of the following (a "Default") is a material default by Tenant under this lease:

(a)    Tenant fails to pay when due any Rent and the failure continues for three (3) days following Landlord's notice (which notice shall also be considered any demand required by any Laws). If, however, Landlord gives such a notice of failure to pay Rent twice in any twelve (12) month period, any additional failure to pay any Rent when due within that twelve (12) month period shall be considered a Default, without the requirement of any notice by Landlord.

(b)    Tenant fails to comply with any other term of this lease and the failure continues for ten (10) days following Landlord's notice

(c)    A third party institutes against Tenant or Guarantor, if any, any legal action seeking any relief from its debts under any applicable bankruptcy or insolvency Laws which is not dismissed within thirty (30) days, or Tenant or Guarantor, if any, institutes any legal action seeking such relief, and/or a receiver, trustee, custodian or other similar official is appointed for Tenant or Guarantor, if any, or for all or a substantial portion of its assets, or Tenant or Guarantor, if any, commits any other act indicating insolvency such as making an assignment for the benefit of its creditors.

(d)    Except as otherwise expressly permitted under this lease, Tenant vacates or abandons the Premises prior to the Expiration Date.

(e)    Guarantor, if any, shall be in breach of its obligations under its guaranty of Tenant's obligations under this lease.

- 16 -

**PX 37**                    **Attachment A**                    003246

cost of repairing any damage to the Building by fire or other casualty exceeds twenty-five percent (25%) of the replacement cost thereof, as reasonably estimated by a reputable contractor, architect or engineer selected by Landlord, Landlord shall have the right, by notice given to Tenant within thirty (30) days following the date of the damage, to terminate this lease. If this lease is terminated pursuant to this Section, the Term shall expire on the fifteenth (15th) day after the notice is given as fully and completely as if such date were the stated Expiration Date.

Section 11.3 This Article constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Laws shall have no application to a fire or other casualty.

## Article 12. Assignment and Subletting

Tenant shall not, without Landlord's prior consent, assign, encumber or otherwise transfer this lease or any interest in this lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article. The transfer or issuance (by one or more related or unrelated transactions) of ownership interests of Tenant, or any Guarantor, or any direct or indirect owner of Tenant, which results in 50 percent or more of the ownership interests of that person being held by persons who did not hold 50 percent or more of those ownership interests on the date of this lease shall be considered an assignment of this lease which requires Landlord's consent, unless such ownership interests are publicly traded on a national stock exchange or over-the-counter market. Tenant shall not permit any advertising or circulars regarding availability of the Premises for sublease or assignment to publicize an asking price that is equal to or less than Landlord's then current asking price.

## Article 13. Access; Changes in Building and Real Property

Section 13.1 Landlord reserves the right to (a) place (and have access to) concealed ducts, pipes and conduits through the Premises (without a material reduction or reconfiguration of the useable area of the Premises), and (b) enter the Premises at reasonable times on reasonable prior notice, which may be oral (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others or to perform any work or make any improvement Landlord deems necessary or desirable to the Premises or the Building or for the purpose of complying with Laws. If Tenant is not present when Landlord desires to enter the Premises, Landlord or Landlord's contractors may enter the Premises (by force, in the event of an emergency) without liability to Tenant.

Section 13.2 Landlord reserves the right at any time and from time to time to (a) make changes or revisions in the Real Property, including but not limited to the Building areas, walkways, driveways, parking areas, or other Common Areas, (b) construct improvements in the Real Property, (c) construct additions to, or additional stories on, the Building (which right includes the right to make use of structural elements of the Premises, including without limitation columns and footings, for such construction, provided such use does not materially encroach on the interior of the Premises), and (d) change the name, number

- 15 -

**Attachment A**                    003247

(e)    Landlord may recover from Tenant, and Tenant shall pay Landlord, on request, in lieu of any further deficiency pursuant to the preceding paragraph of this Section (as liquidated damages for such deficiency) the amount by which (i) the unpaid Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding the termination, re-entry or obtaining of possession) exceeds (ii) the then fair market rental value of the Premises, including the Additional Rent for the same period, both discounted to present value at an annual rate of interest equal to five (5%) percent. If, before presentation of proof of liquidated damages, Landlord relets the Premises or any portion of the Premises for any period pursuant to a bona fide lease with an unrelated third party, the net rents (after deducting reletting costs) payable in connection with the reletting shall be considered to be the fair market rental value for the Premises or the portion of the Premises relet during the term of the reletting.

(f)    Tenant shall also pay Landlord, as additional damages, any expenses incurred by Landlord in connection with the termination, reentry or obtaining of possession, and the reletting of the Premises, including all repossession costs, brokerage commissions, reasonable attorneys' fees and disbursements, alteration costs and other expenses of preparing the Premises for reletting.

(g)    Nothing contained in this lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Laws.

**Section 15.2** Tenant hereby waives (a) the service of any notice of intention to re-enter or obtain possession of the Premises or to institute any legal action in connection therewith, except as provided in this lease and (b) on its own behalf and on behalf of all persons claiming under Tenant, including all creditors, any rights Tenant and all such persons might otherwise have under any Laws to redeem the Premises, to re-enter or repossess the Premises, or to restore this lease, after (i) Tenant is dispossessed pursuant to any Laws or by any Authority, (ii) Landlord reenters or obtains possession of the Premises, or (iii) the Expiration Date, whether by operation of law or pursuant to this lease. The words "re-enter," "re-entry" and "re-entered" as used in this lease shall not be considered to be restricted to their technical legal meanings. Landlord shall have the right to enjoin any Default and the right to invoke any remedy allowed by any Laws in addition to any remedies provided in this lease. All remedies provided in this lease are cumulative and Landlord's right to invoke, or the invocation of, any remedy shall not preclude Landlord from invoking any other remedy under this lease or under any and all Laws.

**Section 15.3** Landlord and Tenant each hereby waive trial by jury in any legal action brought by either party against the other in connection with this lease. If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**Section 15.4** If Tenant fails to comply with any of its obligations under this lease, Landlord may, at its option, cure such breach of this lease. All costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord in that connection

- 18 -

**Section 14.2** If a Default occurs, this lease is subject to the conditional limitation that Landlord may, at any time during the continuance of the Default, give notice to Tenant that this lease shall terminate on the date specified in that notice, which date shall not be less than five (5) days after Landlord gives such notice to Tenant. If Landlord gives that notice, this lease and the Term shall expire and come to an end on the date set forth in that notice as if said date were the date originally fixed in this lease as the Expiration Date and Tenant shall quit and surrender the Premises to Landlord (but Tenant shall remain liable as provided in this lease).

**Section 14.3** If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit.

### Article 15. Remedies

**Section 15.1** If this lease is terminated pursuant to Article 14 or Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or by force or otherwise (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises), all of the provisions of this Section shall apply (in addition to any other applicable provisions of this lease).

    (a)    Tenant, and all other occupants, shall vacate and surrender to Landlord the Premises in accordance with this lease.

    (b)    Landlord, at Landlord's option, may (i) relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, but Landlord shall have no obligation to relet the Premises, or any portion of the Premises, or to collect any rent (and the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this lease), and (ii) make any changes to the Premises as Landlord, in Landlord's judgment, considers advisable or necessary in connection with a reletting, without imposing any liability or obligation on Landlord or relieving Tenant of any obligation or liability under this lease.

    (c)    Tenant shall pay Landlord all Rent payable to the date on which this lease is terminated or Landlord re-enters or obtains possession of the Premises.

    (d)    Tenant shall also pay to Landlord, as damages, any deficiency between (i) the aggregate Rent for the period which otherwise would have constituted the unexpired portion of the Term and (ii) the rents, if any, applicable to that period collected under any reletting of all or any portion of the Premises. Tenant shall pay any deficiency in monthly installments on the days specified in this lease for payment of installments of the Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. If Landlord relets the Premises, or any portion of the Premises, together with other space in the Building, the rents collected under the reletting and the expenses of the reletting shall be equitably apportioned for the purposes of this Article.

- 17 -

**PX 37**                                     **Attachment A**                                     903249

amount of the monthly installment of Fixed Rent so that the amount of Security required under this lease shall then be equal to 2 months' of then current Fixed Rent. If Landlord uses all or any part of the Security, Tenant shall, within fifteen (15) days following Landlord's notice, deposit with Landlord an amount sufficient to restore the full amount of the Security. Landlord shall not, unless required by any Laws, pay interest to Tenant on the Security, and if Landlord is required to maintain the Security in an interest bearing account or pay any interest to Tenant, Landlord shall retain the maximum amount of interest permitted under any Laws (which Landlord may withdraw and retain annually or at any other times). Tenant shall not assign (other than to a permitted assignee of this lease) or encumber the Security, and no prohibited assignment or encumbrance by Tenant of the Security shall bind Landlord. Landlord shall not be required to exhaust its remedies against Tenant or the Security before having recourse to Tenant, any Guarantor, the Security or any other security held by Landlord, or before exercising any right or remedy, and recourse by Landlord to any one of them, or the exercise of any right or remedy, shall not affect Landlord's right to pursue any other right or remedy or Landlord's right to proceed against the others. If there is then no uncured breach, the Security and any accrued and unpaid interest thereon, or any balance, shall be paid or delivered to Tenant promptly after the Expiration Date and Tenant's vacating of the Premises in accordance with this lease. If Landlord's interest in the Real Property is sold or leased, Landlord shall transfer the Security and any accrued and unpaid interest thereon, or any balance, to the new Landlord and, upon such transfer, the assignor shall thereupon be automatically released by Tenant from all liability for the return of the Security or any interest (and Tenant agrees to look solely to the assignee for the return of the Security or any interest).

### Article 17. Broker

**Section 17.1** Tenant represents to Landlord that it has dealt with no broker in connection with this lease other than the Broker. Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant in connection with this lease, and all costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord shall indemnify, defend and hold harmless Tenant from and against all claims, costs, expenses, liabilities and damages including reasonable attorneys' fees and expenses (a) arising from Landlord's failure to comply with its obligation in the preceding sentence and (b) any claims for any brokerage commissions or other compensation by any broker (other than the Broker) with whom Landlord, but not Tenant, has had dealings in connection with this lease.

### Article 18. Notices; Consents and Approvals

**Section 18.1** Except as may be provided in this lease, all notices and other communications under this lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its Notice Address. Either party may, by notice given in accordance with this Article, designate a different Notice Address, which address change shall become effective upon receipt, the date rejected or the date of attempted delivery (if the receiving party is not present).

- 20 -

**Attachment A**          003250

shall be paid by Tenant to Landlord as Additional Rent within fifteen (15) days after Tenant is billed therefor.

**Section 15.5** Tenant shall also reimburse Landlord for all costs and expenses (including reasonable attorneys' fees and disbursements), incurred by Landlord in connection with a default by Tenant, including instituting, prosecuting and/or defending any legal action by or against Tenant whether a non-payment or holdover proceeding, or other proceeding, if Landlord prevails in such legal action, together with interest thereon at the Default Rate (hereinafter defined).

**Section 15.6** The failure of Landlord to seek redress for a Default, or of Landlord or Tenant to insist upon the strict performance of any term of this lease, shall not prevent Landlord from redressing a subsequent Default or Landlord or Tenant from thereafter insisting on strict performance. The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this lease shall not be deemed a waiver of the Default or failure. No term of this lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same. No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

**Section 15.7** If Tenant fails to pay any installment of the Fixed Rent or any Additional Rent within five (5) days after the due date thereof, in addition to any other right or remedy of Landlord, Tenant shall pay to Landlord within fifteen (15) days following Landlord's invoice (a) a late charge equal to the greater of one hundred ($100.00) dollars and four (4%) percent of the amount unpaid and (b) interest at the rate (the "Default Rate") of twelve (12%) percent per annum on the amount unpaid, from the date the payment was first due to and including the date paid and, (c) and Landlord's bank charges for the return of any Tenant's check.

**Section 15.8** All legal actions relating to this lease shall be adjudicated in the courts of the State of New York having jurisdiction in the county in which the Building is located. Tenant irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this lease or any guaranty of Tenant's obligations under this lease, and Tenant shall not assert, by way of motion, as a defense or otherwise, any objection to any such court being the venue of such legal action or claim that such venue is an inconvenient forum for Tenant or any principal of Tenant.

### Article 16. Security

**Section 16.1** Tenant has deposited with Landlord, as security for Tenant's compliance with this lease, the Security, in cash. If Tenant defaults in performing any of its obligations under this lease, Landlord may use all or any portion of the Security to cure such breach or for the payment of any other amount due and payable from Tenant to Landlord in accordance with this lease. If Tenant shall, during any twelve (12) month period, twice be in breach of its obligation to pay Rent on the first of the month, Tenant shall promptly after Landlord's request, remit to Landlord an amount equal to 11,000 [2] months of the then current

- 19 -

**Attachment A**                          003251

subject to lien, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies or the collection of any judgment under or in connection with this lease. If Tenant acquires a lien on such other property or assets by judgment or otherwise, Tenant shall promptly release that lien by signing, acknowledging and delivering to Landlord any instrument, prepared by Landlord, required for the lien to be released.

**Section 19.6** If Tenant requests Landlord's consent or approval and Landlord fails or refuses to give such consent or approval, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent or approval, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent.

**Section 19.7** This lease and the obligations of Tenant to pay the Rent and perform Tenant's other obligations under this lease are separate, distinct and independent of Landlord's obligations under this lease.

**Section 19.8** Tenant's obligations shall not be waived, delayed or otherwise affected in any manner, and Landlord shall have no liability, if Landlord is unable to comply with, or is delayed in complying with, any of Landlord's obligations under this lease by reason of any strike, labor trouble, accident, war, government action, Laws or other cause beyond Landlord's control.

**Section 19.9** Tenant shall not perform or permit to be performed any act which may subject Landlord, its partners, members, managers, shareholders, officers, directors and principals or Landlord's managing agent, if any, to any liability. Tenant shall, to the extent not caused by the negligence or willful misconduct of Landlord or its contractors or agents, indemnify, defend and hold harmless Landlord and Landlord's managing agent, if any, from and against all (a) claims arising from any act or omission of Tenant, its subtenants, contractors, agents, employees, invitees or visitors, (b) claims arising from any accident, injury or damage to any person or property in the Premises or any adjacent walkway during the Term or when Tenant is in possession of the Premises, and (c) Tenant's failure to comply with Tenant's obligations under this lease (whether or not a Default), and all liabilities, damages, losses, fines, violations, costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with any such claim or failure.

## Article 20. End of Term

**Section 20.1** On the Expiration Date (a) Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises vacant, broom clean and in good order and condition, except for ordinary wear and tear and damage for which Tenant is not responsible under this lease, and otherwise as may be required by this lease, and (b) Tenant shall remove all of Tenant's Property and any Tenant's Work required to be removed pursuant to this lease. If the last day of the Term is not a business day, this lease shall expire on the immediately preceding business day. Tenant waives, for itself and for any person claiming under Tenant, any right which Tenant or any such person may have under the New Jersey Civil Practice Law and Rules or under any similar Laws.

**Section 20.2** If the Premises are not vacated and surrendered in accordance with this lease (whether by Tenant or any occupant related to Tenant), on the date required by this

- 22 -

**Section 18.2** Any notice or other communication sent as provided in this Article shall be effective (a) on the date received, the date rejected, or the date of attempted delivery (if the receiving party is not present) if sent by overnight courier service, or (b) three (3) business days after mailing by registered or certified mail.

**Section 18.3** If any provision of this lease requires Landlord's consent or approval, such consent or approval shall be effective only if given in writing.

**Section 18.4** Any notice or other communication given by Landlord to Tenant in accordance with this Article may be signed and given by Landlord's attorney or managing agent, if any, with the same force and effect as if signed and given by Landlord.

### Article 19. No Representations; Liability; Tenant Indemnity

**Section 19.1** Neither Landlord nor Landlord's managing agent, if any, has made any warranties, representations, statements or promises with respect to the Premises, the Real Property, the Building systems, any Additional Rent, any Laws or any other matter, unless expressly set forth in this lease. This lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this lease, and any previous agreements between Landlord and Tenant are merged in this lease, which alone expresses their agreement. Tenant is entering into this lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this lease.

**Section 19.2** Any employee of Landlord, Landlord's managing agent, if any, or the Real Property to whom any property is entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to that property and neither Landlord nor Landlord's managing agent, if any, shall be liable for any damages to or loss of property of Tenant or others entrusted to employees, agents or contractors of Landlord, Landlord's managing agent, if any, or the Real Property.

**Section 19.3** Neither Landlord nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant, Tenant's Property, Tenant's Work, Tenant's business or to any other person or property resulting from any cause, except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Section 13.4.

**Section 19.4** In the event of a transfer or lease of the entire Building (a) the transferor or lessor shall be and hereby is relieved of all obligations and liabilities of Landlord under this lease accruing after the effective date of the transfer or lease, and (b) the transferee or lessee shall be deemed to have assumed all of Landlord's obligations and liabilities under this lease effective from and after the effective date of the transfer or lease.

**Section 19.5** In no event shall Landlord, its affiliates, agents, partners, members, managers, shareholders, officers, directors and principals, disclosed or undisclosed, be liable for incidental or consequential damages or have any personal liability under or in connection with this lease. Tenant shall look only to Landlord's interest in the Real Property for the satisfaction of Tenant's remedies or to collect any judgment requiring the payment of money by Landlord under or in connection with this lease, and no other assets of Landlord or such persons shall be

- 21 -

**Attachment A**

003253

lease, Tenant shall indemnify and hold harmless Landlord against all losses, costs, liabilities, claims, damages and expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and disbursements whether in an action by or against Tenant or a third party, and including claims and liabilities of Landlord made by any succeeding tenant(s) or other third party. In addition, Tenant shall be liable to Landlord for per diem use and occupancy in respect of the Premises at a rate equal to twice the Rent payable under this lease for the last year of the Term (which Landlord and Tenant agree is the Rent that is contemplated by them as being fair and reasonable under such circumstances and is not a penalty). In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

**Section 20.3** If during the last fifteen (15) days of the Term, Tenant removes substantially all of Tenant's Property from the Premises, Landlord or any person designated by Landlord may immediately enter and alter the Premises, without releasing Tenant from any obligation or liability under this lease, including the payment of Rent, or incurring any liability or obligation to Tenant.

**Section 20.4** Unless otherwise specifically provided: (a) any obligation of Landlord or Tenant under this lease which by its nature or under the circumstances can only be, or by the terms of this lease may be, performed after the Expiration Date; (b) any liability for a payment with respect to any period ending on or before the Expiration Date; and, (c) all indemnity and hold harmless provisions in this lease, shall survive the Expiration Date.

## Article 21. Miscellaneous

**Section 21.1 Guaranty.** If a Guarantor of this lease is identified in Article 1 of this lease, the following shall apply: At the time this lease is executed and delivered, Tenant shall deliver to Landlord, concurrently with this lease, a guaranty executed by the Guarantor, and properly acknowledged, in the form annexed hereto as Exhibit H. Tenant represents and acknowledges that Guarantor is a principal of Tenant.

**Section 21.2 Patriot Act.** Tenant certifies and represents, both on the date of execution and delivery of this lease and during the entire Term, that neither Tenant nor any nor any person or entity that owns any direct or indirect beneficial interest in Tenant or is acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department (an "SDN").

**Section 21.3 Financial Statements.** Within thirty (30) days after Landlord's request (which request may be made no more than twice for each fiscal year of Tenant), Tenant shall deliver to Landlord Tenant's and each Guarantor's financial statements, in form and scope reasonably satisfactory to Landlord, for Tenant's and each Guarantor's most recent fiscal year (or the preceding fiscal year, if the most recent fiscal year ended only within the last 90 days before Landlord's request). The financial statements Tenant delivers to Landlord shall be audited only if such financial statements are audited for any other purpose, and if not audited, shall be certified as true and complete by Tenant's chief operating officer or chief financial

- 23 -

officer. Tenant shall promptly notify Landlord of any material event or occurrence that relates to Tenant's or any Guarantor's creditworthiness.

   **Section 21.4 <u>General.</u>** (a) Subject to the provisions of this lease, this lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns. No person is intended to be a third party beneficiary of this lease.

   (b) This lease may not be changed or terminated, in whole or in part, except in a writing signed by Landlord and Tenant.

   (c) Notwithstanding any provision of this lease, or any Laws, to the contrary, or the execution of this lease by Tenant, this lease shall not bind or benefit Landlord or Tenant, unless and until this lease is signed and delivered by both Landlord and Tenant.

   (d) No act or omission of Landlord or Tenant, or their respective employees, agents or contractors, including the delivery or acceptance of keys, shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless it is in a writing signed by Landlord.

   (e) The captions in this lease are for reference only and do not define the scope of this lease or the intent of any term. All Article and Section references in this lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this lease.

   (f) If any provision of this lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by all applicable Laws.

   (g) There shall be no presumption against Landlord because Landlord drafted this lease or for any other reason.

   (h) If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this lease.

   (i) Tenant hereby waives any rights Tenant may have in connection with any zoning lot merger, zoning application, or subdivision or transfer of development rights with respect to the Real Property or any part thereof, including any rights Tenant may have to be a party to or to execute or contest any instrument providing for such merger, subdivision or transfer.

   (j) If Tenant is comprised of two or more persons, the liability of those persons under this lease shall be joint and several. Wherever appropriate in this lease, personal pronouns shall be considered to include the other gender and the singular to include the plural.

- 24 -

context so requires. The use of the masculine, feminine, or neuter genders shall be deemed to refer to another gender wherever the context so requires.

If more than one person or entity has signed this Guaranty, each of the undersigned shall be jointly and severally liable for all of the obligations hereunder. Any notice by the Landlord to any one of the undersigned Guarantors shall be deemed given to all of the Guarantors and shall have the same force and effect as though given to all persons constituting the Guarantor.

This Guaranty shall be binding upon Guarantor, his successors and legal representatives, and shall inure to the benefit of Landlord, its successors, grantees, legal representatives and assigns.

This Guaranty shall be governed by and construed in accordance with the laws of the State of New Jersey. All legal actions or proceedings related to this Guaranty shall be adjudicated in the state courts of the State of New Jersey in the county in which the premises demised under the Lease are located. Guarantor irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action or proceeding relating to the Lease. This consent to jurisdiction is self-operative and no further instrument or legal action, other than service of process in any manner permitted by law, is necessary in order to confer jurisdiction upon the person of Guarantor and the subject matter in question in any such court. All communications to Guarantor may be sent, and service in any legal action relating to this Guaranty may be made by delivery of the summons and complaint, to Guarantor at the address shown below.

Date: 03/02/21

Name Amanda Rozenfeld
Home Address: █████████████

Social Security No. █████████████

WITNESS:

34

(k)    Tenant shall not record this lease or any memorandum of this lease.

(l)    This lease shall be governed by, and construed in accordance with, the Laws of the State of New Jersey.

**In Witness Whereof,** Landlord and Tenant have executed this lease on the date of this lease.

Landlord

[                    ]

By: _____
   Name: Amanda Rosenfeld
   Title:

Tenant

_____

By: _____
   Name:
   Title:

- 25 -

# READYSPACES LICENSE AGREEMENT

**You (the "Member"):**

Company Name:
Wraith & Co

Industry/Business: Ecommerce

Tax ID: ███████████

Representative: Steven Rozenfeld

Title: CTO

Address: ███████████████
Edgewater, NJ 07020

Phone Number: 9███████-9040

Email: steven@wraithco.com

*Optional*: Additional Representative for Emergencies and Lien Notices

Name: Amanda Rozenfeld

Phone: ███████████

Address: _____

**The Details:**

Date of License: 01/21/2020

Commencement Date: 02/01/2020

License Fee: $ 3,280.00 per month

First Month License Fee: $ 630.00

Damage Deposit: $ 630.00

Annual Increase: 3.5%

Initial License Term: 1 year ,

thereafter reverting to month to month.

Hours of Access: 24 hours

Max. On-Site Employees: 8

**The Space:**

☑ Self-service warehouse space of approximately 5,600 square feet, numbered: M1

☑ Private office space totaling approximately 280 square feet, numbered: O7

☐ _____ parking spot(s), numbered: _____

☐ _____

**Utilities:**

ReadySpaces ☐ shall or ☑ shall not provide electrical service in the warehouse space.

Member ☐ shall or ☑ shall not be responsible for their share of electrical costs.

☐ If this box is checked, disregard the above and refer to Section 31 for custom utility billing arrangement.

## Definitions:

**"ReadySpaces", "we", or "us"** means the ReadySpaces entity you are contracting with, which is 7001 Anpesil Dr Warehousing LLC. **ANY CHECKS SHOULD BE PAYABLE TO THIS NAME.**

Our contact details are:
7001 Anpesil Dr
North Bergen, NJ 07047
northbergen@readyspaces.com
(201) 479-2629

**"Facility"** means the premises commonly known as 7001 Anpesil Dr, North Bergen NJ 07047.
**"Facility Landlord"** means Pelvil Realty, LLP, a New Jersey limited liability partnership.
**"Facility Lease"** means the lease dated June 30, 2018 and entered into between the Facility Landlord, as landlord, and ReadySpaces, as tenant, for the Facility.
**"Governing State"** means the State of New Jersey.
**"Term"** means the period of time beginning on the Commencement Date up to and including the date this License is terminated and includes the Initial Term.

## Insurance:

ReadySpaces **DOES NOT PROVIDE** insurance for your business or your stored products/inventory. This License requires you to obtain the following insurance coverage, at your own expense:

**Liability**: Commercial General Liability coverage with limits of no less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) in the aggregate, covering your operations and your use of any equipment, including vehicles, plus bodily injury, property damage liability and fire damage liability coverage.

**Property**: Coverage for the full replacement cost for any property you have at the Facility, on an all-risks basis, unless you reasonably determine that it is not commercially viable to obtain this coverage.

**Worker's Compensation**: As required by applicable law.

Your insurance carrier must have an A.M. Best rating of at least B+, be authorized to do business in the Governing State, and the parties below must be listed as additional insureds. You must provide insurance certificates to ReadySpaces evidencing the required coverage. ReadySpaces may prohibit you from taking occupancy of the Space until you have provided us these certificates. ReadySpaces may terminate this License with fourteen (14) days written notice if you fail to provide evidence of your compliance with these requirements, unless you provide evidence within that notice period.

**Additional Insureds:**

| 7001 Anpesil Dr Wareshousing LLC<br>7001 Anpesil Dr<br>North Bergen, NJ 07047 | ReadySpaces Management LLC<br>1919 Vineburn Ave<br>Los Angeles, CA 90032 | Pelvil Realty, LLP<br>P.O. Box 462<br>Warwick, NY 10990 |
|---|---|---|

## Location-Specific Terms:

The following uses and business operations are prohibited at the Facility, in addition to those listed elsewhere in this Lease: commercial woodworking and cabinetry, commercial printing operations, paint wholesaling, and agricultural/farm equipment and product wholesaling.

NAICS Code of Lessee: __423850__

Your liability insurance must include coverage for owned, non-owned, and hired autos.

This License is made as of the Date of License between **ReadySpaces** and **Member**.

     **1. License.** Subject to the terms of this License, ReadySpaces agrees to license to the Member and the Member agrees to license from ReadySpaces the Space in the Facility as further described above.

     **2. Term.** The Initial Term shall be the period of time stipulated on the first page of this License. If the Member continues to occupy the Space pursuant to this License beyond the Initial Term, the Member shall be deemed to be occupying the Space as a licensee on a month to month basis. Either party may terminate this License upon the expiration of the Initial Term or at any time thereafter by giving the other party at least thirty (30) days' written notice of its intention to terminate.

     **3. License Fee.** The License Fee shall be paid each month in advance on the first day of each and every month during the Term commencing on first day of the first month following the Commencement Date. Upon execution of this License, Member shall pay to ReadySpaces the First Month License Fee for the period between the Commencement Date and the first day of the following month. A ten percent (10%) late fee shall apply if a License Fee has not been paid by the Member within ten (10) days after the respective License Fee became payable. Except during the Initial Term, the License Fee will increase by the Annual Increase on every anniversary of April 1st. In addition to the foregoing and once the Initial Term of the License has expired, the License Fee may be increased by ReadySpaces with thirty (30) days written notice to the Member. The License Fee is not in any way related to the size of the Space. If the Member requests any additional services beyond what is contemplated in this License from ReadySpaces (e.g. labor or materials), the Member agrees to pay in full the invoice for the additional services within fourteen (14) days of receipt of the invoice from ReadySpaces. The License Fee, together with any other costs, charges and expenses payable by the Member under the terms of this License, are collectively referred to herein as the "**License Fee**".

     **4. Termination for Nonpayment.** If any part of the License Fee due from the Member under this License remains unpaid for fourteen (14) consecutive days during the Term, ReadySpaces may at ReadySpaces' sole option, terminate this License and the right of the Member to use, access and occupy the Facility and Space by sending a preliminary lien notice (the "**Notice**"), in the form provided by law, to the Member at the Member's last-known address and to any alternative address provided, specifying a date on which the Member's right to use the Space terminates unless all sums due are paid by the Member before the date specified in the Notice. If the Member fails to pay the full amount due by the date specified in the Notice, ReadySpaces may enter the Space, remove any property belonging to the Member to a place of safe keeping, and enforce ReadySpaces' lien against that property by sale of the property in any manner permitted by law. The property may be sold to satisfy the amount owing by the Member. ReadySpaces requests that Member provides a secondary address for copies of lien notices to be sent, pursuant to state law.

     **5. Damage Deposit.** The Member will pay to ReadySpaces the Damage Deposit concurrently with the execution of this License. ReadySpaces may use any amounts from the Damage Deposit that are necessary to remedy any of the Member's defaults in the payment of the License Fee or to repair damage caused by the Member Related Persons (as defined in Section 8). If any portion of the Security Deposit is so applied during the Term, then the Member will, within fourteen (14) days after written demand from ReadySpaces, deliver to ReadySpaces a sufficient amount of funds to restore the Security Deposit to the amount held by ReadySpaces prior to such application. Upon termination of this License, ReadySpaces shall return to the Member the remaining balance of the Security Deposit not applied by ReadySpaces in accordance with this Section 5, if any, within thirty (30) days of the termination of this License by delivering a check to the Member's last known address. THE DEPOSIT MAY NOT BE APPLIED TO THE LAST MONTH'S LICENSE FEE.

     **6. Use and Maintenance of Space.** The Member may use the Space for storage, office use, warehouse, distribution, and related uses. Notwithstanding the foregoing, the Member may not use the Space: in contravention of the stated use at the time of the execution of the License; for the use or storage of any flammable toxic, hazardous, radioactive, or explosive materials; for primarily industrial or manufacturing purposes; for the keeping of live animals; as a living or residential space; in any manner that would actually or potentially violate or contravene any applicable governmental law, code, statute, regulation, or rule; to conduct any auction; in any manner that would cause ReadySpaces to breach the Facility Lease; or for any unlawful purpose. The Member shall not permit the accumulation of refuse, or dispose of liquid or other waste, in or about the Space or the Facility, nor cause or permit any nuisance or other condition or act that may disturb any other occupant of the Facility. The Member must follow the Facility Rules attached hereto with respect to placement of any signage. The Member may not make any changes or improvements to the Space, including without limitation drywall modifications or electrical work, without written consent from ReadySpaces. The Member acknowledges that it has inspected the Space and found it to be in good, sanitary, and clean condition. The Member accepts the Space as-is unless specified otherwise in this License.

**Attachment A**

**7. Utilities.** ReadySpaces covenants and agrees to provide adequate lighting in the Space (except outdoor spaces), Wi-Fi connectivity, and adequate bathroom facilities. ReadySpaces is obligated to provide electricity and appropriate heating and/or air conditioning to any office areas in the Facility. The Member acknowledges that any non-office space within the Facility does not have any water, heating, or air conditioning, and that ReadySpaces is under no obligation to provide any such services at any time during the term of this License. ReadySpaces shall not be liable for utility service interruptions outside of its control including, without limitation, in cases of accident and emergency, in order to carry out maintenance, repairs, alterations, and replacements, or for any other reasonable reason required by ReadySpaces or the Facility Landlord.

If the Member is responsible for their pro-rata share of electrical costs, ReadySpaces shall make a reasonable determination of the Member's share of those costs, and the Member shall pay such share to ReadySpaces or its representative within fourteen (14) days after receipt of ReadySpaces' invoice. If not already existing, ReadySpaces may permit the Member to install and maintain electrical connections in the Space at the Member's sole expense, using an electrician approved by ReadySpaces. Any electrical work paid for by the Member becomes the property of ReadySpaces.

**8. Security.** ReadySpaces may install and use video surveillance cameras to monitor and record the activities of the Member, its agents, employees, contractors, guests, or invitees (collectively, the "**Member Related Persons**"), and any other individuals, who may enter in or around the Facility, including the Space and Common Spaces (as defined in Section 17). The Member understands and agrees that it and all the Member Related Persons have no expectation of privacy, to be free from such surveillance, monitoring, and/or recording, and agrees to advise all the Member Related Persons that such recording may take place with or without further notice.

**9. Transfer of Interests.** The Member may not assign this License, further sublicense all or a ny part of the Space, or permit any other person to occupy or use all of or any part of the Space without the prior written consent of ReadySpaces and Facility Landlord. Any attempted transfer or granting of occupancy rights in violation of this Section shall be null and void and, at the sole discretion of ReadySpaces, sh all terminate this License and the right of Member to use and occupy the Space. The Member acknowledges and agrees, in the case the Member is a corporation, partnership or other business association, that the transfer of majority of its voting shares or the sale of substantially all of its assets shall constitute an assignment under this Section.

**10. Risk of Loss.** The Member is solely responsible for locking and securing its goods and other property within the Space. The Member bears all risk of loss or damage to any of its property or goods stored in or on the Facility and the Space. The Member is advised not to leave goods or other property outside the Space. Any of the Member's goods or property left outside the Space shall be deemed to be abandoned by Member and ReadySpaces may, in its sole discretion, discard such property at the expense of the Member or retain same for it to hold absolutely. ReadySpaces is not responsible for bringing the Member's property to or removing the Member's property from the Facility nor for receiving shipments except when contracted and ReadySpaces is not responsible for any lost, damaged or stolen goods.

**11. Release of ReadySpaces' Liability.** The Member agrees that ReadySpaces, the Facility Landlord, and ReadySpaces' and the Facility Landlord's agents, employees, and assigns (all collectively, the "**ReadySpaces Related Persons**") shall not be liable to the Member or the Member Related Persons for any loss or damage, injury or death caused to them or their property, as the result of the use and occupancy of the Space or Facility, whether or not such injury or damage is caused in whole or in part by the active or passive acts, omissions, negligence or willful misconduct of any ReadySpaces Related Persons. The Member acknowledges and agrees that the Member is familiar with the area in which the Facility is located and expressly assumes all risks any third parties may present.

**12. Indemnity.** The Member shall defend, indemnify and hold harmless the ReadySpaces Related Persons from and against any and all claims arising from the Member Related Persons' use of the Space or from the conduct of any of the Member Related Person while at the Facility, and shall further defend, indemnify and hold harmless the ReadySpaces Related Persons from and against any and all claims arising in whole or in part from any breach or default in the performance of any obligation on the Member's part to be performed under the terms of this License, or arising in whole or in part from any act or omission of any the Member Related Persons, and from and against all costs, legal fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon.

**13. Forklift Operations and Responsibilities.** ReadySpaces shall not be required to operate for the Member any forklift, scissor lift, or similar powered industrial equipment (collectively, the "**Equipment**"). The Member must present, upon request, to the on-site manager with proof that any persons desiring to use the Equipment are certified as competent to operate the Equipment at the Facility under rules promulgated by OSHA (29 CFR §1910.178) where applicable.

The Member is solely responsible for the proper training, certification, and oversight of its employees. The Member assumes all risks and liabilities for injuries, damages to property or persons, and loss of life for its operation of the Equipment.

**14. Waiver of Subrogation.** The insurance policies obtained by the Member pursuant to this Lease will contain a waiver of any subrogation rights which the Member's insurers may have against all or any of ReadySpaces, the Facility Landlord, the ReadySpaces Related Persons and/or any mortgagee of the Facility, and those for whom such parties, as applicable, is in law responsible, whether or not the damage is caused by the aforementioned parties' act, omission, or negligence. The Member herby waives its rights of subrogation against such parties.

**15. Entry for Maintenance and Inspection.** ReadySpaces and the Facility Landlord are entitled to enter into the Space at any reasonable time (and in the case of emerg ency, at any time) and for any reasonable purpose, including but not limited to maintenance of the Space and the surrounding  premises, inspection by governmental agencies or insurance companies, and determining whether the Member is conforming to the terms of this License and all applicable laws.

**16. Access.** ReadySpaces will (i) supply the Member with an access code; OR (ii) one physical keycard or fob per employee, which will allow the Member and its employees access to the Facility during the Hours of Access. The Member agrees not to disclose to any third party whatsoever any access code, share keycards or fobs, tamper with the access control system, or to use any other method or device to gain access to the Facility without the prior written consent of ReadySpaces. ReadySpaces retains the right to change any access codes or cancel and reissue keycards or fobs, and ReadySpaces shall provide the Member the new access code or physical access control device in a timely manner. The Member is required to immediately inform ReadySpaces if a physical access control device is lost or stolen, and will be responsible to pay forthwith a re-issue fee of $25. Physical access control devices remain the property of ReadySpaces at all times. The Member shall return all physical keycards or fobs immediately upon the termination of this License or upon ReadySpaces' request.

**17. Common Use Spaces.** The Member is entitled to use of any common use spaces in the Facility ("**Common Spaces**"), including loading docks, kitchens, dining areas, lounge areas, and meeting rooms during the Hours of Access. The Member may use the Common Spaces for business and related uses, but shall not use the spaces to host events, parties, or private gatherings without written consent from ReadySpaces. The Member shall comply with posted rules and signage regarding use of the Common Spaces, including any requirement to make reservations to use the Common Spaces. These rules shall apply to Member's use of Common Spaces at other facilities operated by or affiliated with ReadySpaces, in the event the Member is permitted to use those premises in connection with this License.

**18. Payments.** The default payment method for the License Fee is via recurring ACH payment or bank check. The Member may also pay the License Fee via Visa or MasterCard credit or debit card, which may be subject to an additional fee of three percent (3%). If the Member's payment is returned as "non-sufficient funds" more than once in any twelve (12) month period during the Term, ReadySpaces may require the Member to make payment in certified funds only (i.e. cashier's check). CASH IS NOT ACCEPTED FOR PAYMENT. DO NOT MAKE ANY PAYMENTS IN CASH. Payments via wire transfer are not accepted without prior written approval from ReadySpaces. Any unpaid balance owed by the Member to ReadySpaces may be referred to a third-party collections agency and may also be reported to third party credit bureaus.

**19. Involuntary Termination.** If the Space is destroyed or damaged to the extent that it is no longer usable due to any cause other than the conduct or negligence of the Member, if ReadySpaces and Member are informed by a municipal, provincial, federal, or other regulating body that the Member's use of the Space is unlawful or not in compliance with relevant laws, codes, or statutes, or if ReadySpaces suffers a termination, expiration, or material loss of its rights to the Facility under the Facility Lease or otherwise, either ReadySpaces or the Member may cancel this License immediately, effective on delivery of notice to the other party. In the event of cancellation, the Member's obligation to pay the License Fee terminates immediately; however, the Member remains liable for any unpaid License Fees due for occupancy of the Space up to and including the date of the termination.

**20. Termination for Breach/Abandonment.** Notwithstanding any other provision of this License, the failure of the Member to comply with any term or condition contained in this License constitutes a breach of this License. In the event that the Member breaches this License by failing to comply with any term or condition ReadySpaces may, at ReadySpaces' sole option, immediately terminate this License if the Initial Term has expired. Otherwise, ReadySpaces shall provide written notice to the Member of the breach of the License – or, if ReadySpaces reasonably believes that the Member has abandoned the Space, a notice of abandonment – and allow the Member fourteen (14) days to remedy the breach or confirm that the Space has not been abandoned, as applicable. If the breach is not remedied in this time (or the Member has failed to respond to the notice), ReadySpaces may subsequently terminate this License. The waiver by ReadySpaces of the

Member's breach of any term or condition of this License does not constitute a waiver of any subsequent breach. If ReadySpaces elects not to terminate this License on any breach or default by the Member, all License Fees due under this License shall continue to accrue.

**21. Obligations of the Member on Termination.** Upon termination of this License, the Member shall immediately vacate the Space, remove all property stored thereto, repair all damage to the Space and/or the Facility caused by the Member, and leave the Space in a good, sanitary, and "broom-swept" condition. The Member agrees to reimburse ReadySpaces for all costs of emptying or repairing the Space, including but not limited to dump fees, labor, materials, and transportation. The Member agrees to reimburse ReadySpaces within fourteen (14) days of mailing a statement itemizing all the aforementioned expenses incurred to dispose of such items. The Member shall pay to ReadySpaces any costs of repairs necessitated by the Member Related Persons within fourteen days of the mailing of a statement for such costs. At its sole discretion, ReadySpaces may also elect to deduct such amounts from the Security Deposit prior to returning the same.

**22. Rights of ReadySpaces on Termination.** On termination of this License, ReadySpaces may, at ReadySpaces' option, enter the Space and remove all personal property; clean and repair the Space; replace the lock and keys; and exercise any and all rights otherwise available to ReadySpaces or a self-service storage facility permitted under the laws of the Governing State. Further, ReadySpaces may impose a lien on all personal property located in the Space for License Fees, labor, or other charges, present or future, and for all expenses incurred for the storage, preservation, sale, or disposition of any and all property stored in the Space. ReadySpaces' remedies as specified in this License are in addition to, and not in lieu of, any other legal or equitable relief to which ReadySpaces would otherwise be entitled.

**23. Returned Payments.** For each payment that is returned to ReadySpaces (including bank check, ACH transfer, and disputed credit card charges) for any reason including, without limitation, insufficient funds, the Member agrees to pay ReadySpaces a service charge equal to $45 and such charge will constitute a portion of the License Fee hereunder.

**24. Subordination and Non-Disturbance.** This License shall be subject and subordinate to the Facility Lease, and any ground lease, mortgage, deed of trust, or other hypothecation or security device now or hereafter placed by the Facility Landlord upon the Facility. Subject to the preceding sentence, the Member agrees to attorn to the Facility Landlord, lender and/or any other party who acquires the operating rights of the Facility. The Member agrees to sign an estoppel certificate within ten (10) days after request by ReadySpaces or the Facility Landlord.

**25. Notices.** All notices required or permitted to be given under this License (including, but not limited to, lien notices) must be delivered by certified United States mail, return receipt requested and postage prepaid, by e-mail, by nationally recognized overnight courier, or personally served to the parties at their addresses stated herein, or any other address subsequently furnished in writing to the other party. Both parties are entitled to rely on the accuracy of the addresses herein unless notified otherwise in writing. Any notice mailed in accordance with this paragraph will conclusively be presumed to have been received within two (2) business days after mailing.

**26. Attorneys' Fees.** In the event of any action or proceeding between or among the parties hereto at law or in equity arising out of this License, including any appeal, contempt proceeding, action or proceeding to enforce indemnity obligations, and any action or proceeding to enforce and/or collect any judgment or other relief granted (collectively "**Litigation**"), the unsuccessful party to the Litigation shall pay to the prevailing party, in addition to any other relief that may be granted, all costs and expenses of the Litigation, including without limitation the fees and expenses incurred by the prevailing party's attorneys, whether or not otherwise recoverable as "attorneys' fees" or as "costs" under applicable law.

**27. Nonwaiver, Time, Severability, Heirs & Assigns, Governing Law.** Failure of either party to enforce any provision of this License is not construed as a waiver of that provision or of either party's right to enforce that provision or any other provision of this License. Time is of the essence in this License. If any term of this License is held by a court of competent jurisdiction to be void or unenforceable, the remainder of this License will remain in full force and effect. This License is binding on and inures to the benefit of the heirs, executors, successors, and assigns of ReadySpaces and the Member. This License is governed by and construed in accordance with the laws of the Governing State.

**28. Modification.** This License can only be modified in writing and signed by both ReadySpaces and the Member. Any purported oral modification of the terms of this License is of no force or effect. A modification to the unit number(s), Space, and/or License Fee, if made by both parties in writing (regardless of if a new license is signed), shall not void any other terms of this License.

**29. Entire Agreement.** This License, including any attachments, exhibits, and amendments, contains the entire agreement between ReadySpaces and the Member with respect to the subject matter of this License. Any prior agreements, promises, or negotiations, whether oral or written, that are not expressly set forth in this License are of no force or effect.

**30. Rules and Regulations, Community and Intellectual Property.** The Member acknowledges the rules and regulations attached to this License and agrees to abide by the same, as may be modified by ReadySpaces from time to time. The Member also agrees to ensure its employees and other Member Related Persons abide by the same. Unless the Member informs ReadySpaces otherwise in writing, the Member agrees to grant ReadySpaces permission to use its name, trademark, and/or logo to identify the Member as a member of the ReadySpaces community on the ReadySpaces website or other public-facing medium, including in the promotion of ReadySpaces' business, and the Member hereby waives any claims or damages against ReadySpaces relating to such use.

**31. Special Provisions.**

**Improvements.** ReadySpaces shall make, and Member will have the right or obligation to make, the following improvements to the Facility, in order for it to be suitable for Member's use:

ReadySpaces: None
_____

_____

Member Obligation: None
_____

_____

Member Right: None
_____

_____

**Utilities, Rights, Options, and Other.** The following terms also apply to this License:

This is an update to the original lease dated on 5/29/2019. Annual increase for unit M1 will still take effect on April 2020. Security deposit of unit M1 was paid on 06/05/2019. License Fee includes both units (M1 and O7). First Month License Fee and Damage Deposit - O7 only.

_____

Member has carefully read and reviewed this License and each term and provision contained herein, and by execution of this License shows its consent thereto. Member explicitly acknowledges that notices may be delivered via e-mail.

**READYSPACES:**                          **MEMBER:**

By _____          By _____
        [*signature*]                              [*signature*]

Ricardo Esteves                          Steven Rozenfeld
_____                  _____
        [*typed name*]                           [*typed name*]

General Manager                          CTO
_____                  _____
        [*title*]                                [*if company, title*]

# READYSPACES FACILITY RULES

To ensure a safe and enjoyable experience for each member of the ReadySpaces community, you are required to observe the following rules while at the Facility. Violating any rule may result in a fine or more serious penalties as noted, including an immediate termination of your License (even if the Initial Term of the License has not yet expired) or being banned from the Facility.

1. **Trash/Refuse.** You are responsible for all garbage. All garbage, recycling, pallets, etc., must be taken directly to the appropriate disposal container or storage location, or if there is no such designated location (for example, for hazardous waste), disposed of off-site at Member's expense. Trash may not be placed in any hallway or Common Space or near/outside of disposal containers. Garbage generated off-site may not be dumped at CustomSpace. Violation of this regulation shall be subject to a $150 penalty per occurrence.

2. **Abandoned Property**. If you fail to secure your property in your Space and that property is left in Common Spaces (hallways, loading docks, etc.) or any other area for over one hour, such property shall be considered abandoned, and all pieces thereof shall be subject to a $100 per hour blockage fee. This fee shall not constitute payment of your License Fee and your property remains placed at your own risk.

3. **Visitors.** All persons entering the Facility who are not employees of Member or Member themselves shall sign in electronically at the main entrance and execute the non-disclosure agreement (NDA). Absolutely no visitors may access the Facility without signing in, and all visitors must be accompanied by a representative of the host Member.

4. **Equipment.** All shared equipment, including forklifts, carts, and pallet jacks shall be returned to their assigned parking or staging area. All equipment is subject to a fair-use policy. Failure to follow posted equipment use and maintenance guidelines can result in revocation of equipment use privileges. Use of any Equipment provided by CustomSpace without proper training and certification shall be subject to a $50 penalty per occurrence.

5. **Entry and Exit.** It is prohibited to prop open, block closed, or obstruct any gate or doorway to the Facility.

6. **Truck Parking.** No trailers or trucks may be parked in the truck dock areas overnight. The docks are for temporary loading and unloading only.

7. **Sleeping.** Overnight sleeping or living in any part of the Facility, including in a vehicle parked at the Facility, is strictly prohibited. Your License may be terminated immediately if ReadySpaces determines you to have licensed the Space for residential use, and such determination will be made at the sole discretion of ReadySpaces.

8. **Smoking/Intoxication.** It is strictly prohibited to operate any equipment at the Facility while under the influence of alcohol, marijuana, or any other intoxicant. Any person found in violation of this policy may be permanently banned from the Facility and all ReadySpaces locations. It is prohibited to smoke or vape inside the Facility.

9. **Pets.** Unfortunately, pets and domestic animals, except service animals, are not permitted at the Facility.

10. **Signage.** In office and warehouse areas, you may place one sign on or near each door (or set of doors) for your Space, not to exceed 325 square inches and viewable from inside the Facility only. Requests for signage that does not meet these conditions, or for signage on the exterior of the Facility, in entry areas, or in other Common Spaces must be made in writing and include detailed sign specifications. Approval of such requests is at the sole discretion of ReadySpaces. Member is responsible for removal of and for any damage caused by signs at the termination of their License.

11. **Forklifts.** Member may not operate any diesel or propane powered forklifts (or any other vehicles) in the Facility. If Member wishes to operate their own equipment, it must be battery powered and must be parked inside Member's own space when not in use.

12. **Stacking.** No part or portion of Member's property may be stored such that it is above (a) twelve (12) feet above the Facility's floor or (b) two feet below the sprinkler heads, whichever is lower.



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI  OH   45999-0023

Date of this notice:  10-31-2018

Employer Identification Number:

██████████

Form:  SS-4

Number of this notice:  CP 575 G

DAWN DISTRIBUTION LLC
AMANDA ROZENFELD SOLE MBR
██████████
LONG IS CITY, NY   11101

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


             WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 83-2384718.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     A limited liability company (LLC) may file Form 8832, *Entity Classification Election*,
and elect to be classified as an association taxable as a corporation.  If the LLC is
eligible to be treated as a corporation that meets certain tests and it will be electing S
corporation status, it must timely file Form 2553, *Election by a Small Business
Corporation*.  The LLC will be treated as a corporation as of the effective date of the S
corporation election and does not need to file Form 8832.

     To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

     *  Keep a copy of this notice in your permanent records.  **This notice is issued only
        one time and the IRS will not be able to generate a duplicate copy for you.**  You
        may give a copy of this document to anyone asking for proof of your EIN.

     *  Use this EIN and your name exactly as they appear at the top of this notice on all
        your federal tax forms.

     *  Refer to this EIN on your tax-related correspondence and documents.

     If you have questions about your EIN, you can call us at the phone number or write to
us at the address shown at the top of this notice.  If you write, please tear off the stub
at the bottom of this notice and send it along with your letter.  If you do not need to
write us, do not complete and return the stub.

     Your name control associated with this EIN is DAWN.  You will need to provide this
information, along with your EIN, if you file your returns electronically.

     Thank you for your cooperation.

**PX 37**                          **Attachment A**                                003266

(IRS USE ONLY)    575G                    10-31-2018  DAWN  O  9999999999  SS-4

                          Keep this part for your records.    CP 575 G (Rev. 7-2007)

-------------------------------------------------------------------------------------

    Return this part with any correspondence
    so we may identify your account.  Please                            CP 575 G
    correct any errors in your name or address.

                                                                    9999999999

    Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  10-31-2018
    (    )    -                                EMPLOYER IDENTIFICATION NUMBER:  ████████
    _____   _____  FORM:  SS-4              NOBOD


    INTERNAL REVENUE SERVICE                    DAWN DISTRIBUTION LLC
    CINCINNATI  OH  45999-0023                  AMANDA ROZENFELD SOLE MBR
    ▏▎▍▏▎▍▏▎▍▏▎▍▏▎▍▏▎▍▏▎▍▏▎             ████████
                                                LONG IS CITY, NY  11101


**PX 37**                        **Attachment A**                        003267

**Attachment A**

# Re: Your PODS quote

| | |
|---|---|
| **From:** | Steven Rozenfeld <steven@wraithco.com> |
| **Cc:** | Wraith& Co <mgmt@wraithco.com>, floren Perem <floren@wraithco.com> |
| **Date:** | Wed, 13 Jul 2016 16:13:07 -0400 |

Let's move returns to the cage and I'll have Amanda go to warehouse to sell them. I can't do as many from home due to storage issues. If they are damaged or stolen it won't matter as much as Melissa

On Jul 13, 2016 4:11 PM, wrote:

They both take up same amount of space. One is in process of being sold. One is dead returns. One is worth 12k. One is worthless. One is by the door. Another is all the way in the back and not accessible.

On Jul 13, 2016 3:19 PM, "Phil Sackoor" <phil@wraithco.com> wrote:

Up to ownership. Value of Melissa and Doug is a little less than $12K worth of product. Jason's activity has sold nothing so far. Do not have a value of returns because we process in dribs and drabs due to space, time, and mapower combined.

Please let me know whatever you decide and I will follow through.

Regards,

Phil Sackoor
Executive Vice President
Wraith & Co
O: (347) 410-8262
M: ████████
E: Phil@WraithCo.com
W: www.WraithCo.com
Skype: phil.sackoor
On 7/13/2016 1:58 PM, Steven Rozenfeld wrote:

If we are not doing anything with returns , why dont we put returns there instead? Otherwise , if we sell something from melissa and doug , we will have to send someone there to get the product.

On Wed, Jul 13, 2016 at 12:57 PM, Phil Sackoor <phil@wraithco.com> wrote:

Can we get a cargo van and load them up and remove in the next few days? We can use an Escape, but it will be A LOT of trips.

Regards,

Phil Sackoor
Executive Vice President
Wraith & Co
O: (347) 410-8262
M: ████████
E: Phil@WraithCo.com
W: www.WraithCo.com
Skype: phil.sackoor

**PX 37**                                        **Attachment A**                              003269

On 7/13/2016 12:59 PM, Floren wrote:

We have a cage at the new warehouse that we can use. It's available immediately

--

Floren Peremen

On Jul 13, 2016, at 12:44 PM, Phil Sackoor <phil@wraithco.com> wrote:

We can keep ignoring the problem, but I offered a solution.  Hopefully nobody gets hurt.

Regards,

Phil Sackoor
Executive Vice President
Wraith & Co
O: (347) 410-8262
M: ███████████
E: Phil@WraithCo.com
W: www.WraithCo.com
Skype: phil.sackoor
On 7/13/2016 12:45 PM, Steven Rozenfeld wrote:

Argenis is going to help sticker and john said if he helps it should be fine.

On Wed, Jul 13, 2016 at 12:21 PM, Phil Sackoor <phil@wraithco.com> wrote:

This is the cheapest container they have and can store it for us until we move into the new warehouse.  Can we please consider this?  Melissa and Doug inventory are consistently screwing up day to day processes because of space issues.

We gave Steve about 8 boxes of processed returns yesterday and he advised he cannot take more until Friday.  The space it frees up is limited.

We received 4 pallets today on 3 orders.  There is no room in there really at all.

Regards,

Phil Sackoor
Executive Vice President
Wraith & Co
O: (347) 410-8262
M: ███████████
E: Phil@WraithCo.com
W: www.WraithCo.com
Skype: phil.sackoor

-------- Forwarded Message --------
**Subject:**    Your PODS quote
**Date:**    Wed, 13 Jul 2016 10:21:26 -0600
**From:**    PODS Customer Care Team <noreply@email.pods.com>

**Reply-To:** PODS Customer Care Team <reply-fe521574736c0d7b771d-226868_HTML-750714489-1200498-46895@email.pods.com>

**To:** phil@wraithco.com

Is this email not displaying correctly? **View it online.**

Please add pods@email.pods.com to your safe sender list or address book.

Commercial  How PODS Works

July 13, 2016

**Your PODS quote for local service**

Thank you for considering PODS.

**Your service quote is included below and is based on the dates, months of storage, and location(s) you provided.**
All quoted prices based on postal or zip codes are estimates. Both origination and destination (if applicable) addresses are required to quote exact charges.

Our customers love the convenience of packing and unpacking at their own pace with the added flexibility of monthly storage as needed. We offer easy-to-load containers, our unique PODZILLA® delivery system, and secure Storage Centers, making it clear why PODS is the most trusted brand in portable moving and storage!

**Ready to order?**
Contact Corporate Client Services at **855-247-2590** and provide your quote number. You can also retrieve your previous quote and book online.

| **Book Online Now** |
| :---: |

Sincerely,

PODS Customer Care Team

| **Quote Details** |
| :---: |

**Quote expires: 07/19/2016**

**Quote Number: 6852709**

**Container(s):**
1 x 7-foot length container

PX 37                                   **Attachment A**                                   003271

**Your requested first delivery date is July 15, 2016**

Your total estimated moving price listed below excludes all applicable taxes and is based on the date(s), months of storage, and location(s) you provided. Your final price will be confirmed when you place your order.

| Description | Price |
| --- | --- |
| **Container Delivery** | **$119.99 USD** |
| Deliver Empty Container to Your Location | |
| **Recurring** | **$169.99 USD** |
| Monthly Rental of Container in Storage Center | |
| Container Only Protection Option - Monthly Fee | |
| **Return To Storage** | **$0.00 USD** |
| **Redeliver To Customer** | **$119.99 USD** |
| Redeliver Container to Your Location | |
| **Final Pickup** | **$0.00 USD** |

This email was sent to: phil@wraithco.com

This email was sent by PODS Enterprises, LLC
5585 Rio Vista Drive Clearwater, FL 33760

**Unsubscribe | Privacy Policy | Preferences**

This is a system-generated email. Replies will not be read or forwarded for handling.

   

.

--
Wraith&Co

--
Wraith&Co

| | |
|---|---|
| **From:** | Abe <abe@wraithco.com> |
| **To:** | Steven Rozenfeld <steven@wraithco.com> |
| **Cc:** | floren Perem <floren@wraithco.com> |
| **Date:** | Mon, 11 Jul 2016 10:47:31 -0400 |

Ok

--------*Abe*--------
D:201-538-2798
Wraithco.com

On Jul 10, 2016, at 11:09 PM, Steven Rozenfeld <steven@wraithco.com> wrote:

Let's try ?

On Jul 10, 2016 6:35 PM, "Abe" <abe@wraithco.com> wrote:

20%

--------*Abe*--------
D:201-538-2798
Wraithco.com

On Jul 10, 2016, at 12:59 PM, Steven Rozenfeld <steven@wraithco.com> wrote:

Whatever you want. 30% ? She's really good at it cause she sells high end clothing so she shows all her pieces really well. I'm sure she'll get us more money for it then Argenis would. He listed 10 in one at some point which seemed pretty dumb to me. If we lower the commission she'll need to sell more shit faster and cheaper so I dont think that'll be more profitable for us

On Jul 9, 2016 11:21 AM, "Abe" <abe@wraithco.com> wrote:

What's the deal structure.
I don't want a 100 emails now negotiating this deal so present something realistic we can just say ok go ahead. What do you have in mind.

--------*Abe*--------
D:201-538-2798



On Jul 8, 2016, at 9:39 PM, Steven Rozenfeld <steven@wraithco.com> wrote:

1/3rd of the trailer is returned goods. I'm positive Amanda will do a much better job then Argenis selling the stuff also.

On Jul 8, 2016 9:38 PM, "Steven Rozenfeld" <steven@wraithco.com> wrote:

I have somewhat of a solution.

I'll take as much refunds as I can home. Phil will log it all. Amanda will sell it and take a commission for herself. Whatever she doesn't sell I will return and the rest she will show sales for.

The other option is hire someone to do just eBay.

On Jul 8, 2016 9:09 PM, <steven@wraithco.com> wrote:

1. That guy is a waste of space. Kaz is right. Everytime I talk to him he talks to me about getting wasted every night. Why the fuck would you talk to your boss about that ?

2. Jason is working on ts right now. He's really close to getting sales. What are you planning to do if we sell something ?

3. If we have lose products that are on the floor and we can't stack boxes on the space since it's being used by loose items. If you put that loose item on top then you have more floor space for boxes.

4. We can put some boxes in my office for time being. What about the storage room on top dispatch ?

Sent from my iPhone

On Jul 8, 2016, at 7:49 PM, Abe <abe@wraithco.com> wrote:

Seems perfect. This is an emergency. Our employees are giving us clear feedback that this is an issue we shouldn't ignore it. Let's move it Monday .

--------*Abe*--------
D:201-538-2798
*Wraithco.com*

On Jul 8, 2016, at 7:46 PM, Floren <floren@wraithco.com> wrote:

**PX 37**                                    **Attachment A**                                    003274
We have a cage in the warehouse that can be locked and is not being used right now

On Jul 8, 2016, at 7:34 PM, Abe Israel <abe@wraithco.com> wrote:

Your so hard headed. Wall shelves will create zero space everyone agrees, Its obvious it will not create any space what so ever so what do we do. Seriously this is an issue. What should we do.

--------Abe--------
D:201-538-2798
Wraithco.com

On Fri, Jul 8, 2016 at 7:28 PM, Steven Rozenfeld <steven@wraithco.com> wrote:

Wall shelves

On Fri, Jul 8, 2016 at 5:24 PM, Abe Israel <abe@wraithco.com> wrote:

Move melissa and Doug to the ware house?

--------Abe--------
D:201-538-2798
Wraithco.com

On Fri, Jul 8, 2016 at 5:14 PM, Phil Sackoor <phil@wraithco.com> wrote:

I received this Email from John today about work concerns.  Please see below.  I agree with most of his points actually.

Regards,

Phil Sackoor
Executive Vice President
Wraith & Co
O: (347) 410-8262
M: (646) 245-7461
E: Phil@WraithCo.com
W: www.WraithCo.com
Skype: phil.sackoor

-------- Forwarded Message --------

| | |
|---|---|
| **Subject:** | Warehouse |
| **Date:** | Fri, 8 Jul 2016 17:04:59 -0400 |
| **From:** | Operations@ Wraithco.com <operations@wraithco.com> |
| **To:** | Phil Sackoor <phil@wraithco.com> |

Good afternoon, I would like to address and ask for suggestions regarding the extreme overcrowding of the trailer.
In recent days there has been a heavy influx of product and work materials that have the trailer almost full to max capacity. This overcrowding has led to safety hazards and hurts efficiency/productivity. Tight spaces make shipments to be processed difficult to reach. Falling boxes and unsure footing lead to dangerous trips and falls.
It appears the main cause of the overcrowding is the large inventory of Melissa & Doug product that currently takes up a large portion of

storage space. I had suggested the idea of using a small commercial storage unit to store the M&D inventory temporarily but was informed that idea is impractical and cannot be done.

I realize this is a temporary situation until we move on to the actual warehouse, but that will not be for nearly another two months which is a considerable amount of time to deal with the over crowding. I would like to maintain good morale, high efficiency/productivity and am open to suggestions to solve this problem.

Thank you.   JM

--
Wraith&Co

**Attachment A**

| From: | Vincent M (via Google Chat) <chat-noreply@google.com> on behalf of |
| | Vincent M (via Google Chat)   chat-noreply@google.com |
| Sent: | Wednesday, August 24, 2022 12:25 AM |
| To: | jerdonna@hourlyrelief.com |
| Subject: | Vincent M <vincent@hourlyrelief.com> messaged you on Google Chat while you were away |

Vincent M <vincent@hourlyrelief.com> messaged you on Google Chat while you were away

**Vincent M**
List of hassan need to work in part @Jerdonna P
Special Foods LLC-active yet no salessupport and amazon
Brighton Solutions LLC-account lock for amazon MODERN PRODUCTIONS LLC-salessupport in active and amazon lock
MASCK ENTERPRISES LLC-walmart lock INSPIRATIONAL DESIGNS LLC-no new orders last 2 weeks

**Jerdonna P**
Thanks

**Vincent M**
Hello @Jerdonna P, can I ask if the store ENTOUCH LLC with the clients name JEAN ROBINSON can we process the orders with it,its long time active and just now it has a lot of orders especially goli

**Jerdonna P**
yes we can

**Jerdonna P**
hey

**Jerdonna P**
Hey

**Vincent M**
yes @Jerdonna P ?

**Jerdonna P**
Hey is wem enterprise up

37                                   **Attachment A**                                   003278

 Vincent M

hey @Jerdonna P yes it is, but no salessuport set up and no orders

 Vincent M

*Vincent M sent you an image.*

Open in Google Chat

Google Chat: An intelligent messaging app, built for teams.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you have been mentioned in this conversation by a Google Chat user. You cannot reply to this email. You may have received this email from Google Chat even if you use classic Hangouts. Learn more

Unsubscribe from these emails by changing your email reminder preferences for Google Chat. Email reminder preferences cannot be set on mobile devices.

Learn more

**gusto**

Daily Distro LLC

---

# January 2024 Invoice

**Account Name**    Daily Distro LLC

**Invoice #**    INV03213693

**Address**    Steven Rozen
3616 29th St
Long Island City, New York
11106
United States

# Summary

| Product | Charge | Credit | Total |
|---|---|---|---|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| Subtotal | $52.00 |
|---|---|
| Sales Tax | $4.62 |
| Total | $56.62 |
| Due Amount | $56.62 |

# Product Summary

**Payroll Invoice January 2024**

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |

**Attachment A**    003280


| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |

# Charges

**Payroll**

| Reason | Name | Amount |
|---|---|---|
| Employee | Amanda Rozenfeld | $6.00 |
| Employee | Mihir Desai | $6.00 |

# Credits

| | |
|---|---|
| **Credit Subtotal** | $0.00 |

Attachment A   003281

# February 2024 Invoice

**Account Name**   Daily Distro LLC

**Invoice #**   INV03551017

**Address**   Steven Rozen
3616 29th St
Long Island City, New York
11106
United States

# Summary

| Product | Charge | Credit | Total |
|---------|--------|--------|-------|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| Subtotal | $52.00 |
|----------|--------|
| Sales Tax | $4.62 |
| Total | $56.62 |
| Due Amount | $56.62 |

# Product Summary

**Payroll Invoice February 2024**

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|--------|----------|------|--------|-----------|--------------|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |


| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |

## Charges

**Payroll**

| Reason | Name | Amount |
|---|---|---|
| Employee | Mihir Desai | $6.00 |
| Employee | Amanda Rozenfeld | $6.00 |

## Credits

| | |
|---|---|
| **Credit Subtotal** | $0.00 |

# March 2024 Invoice

| | |
|---|---|
| **Account Name** | Daily Distro LLC |
| **Invoice #** | INV03913785 |
| **Address** | Steven Rozen<br>3616 29th St<br>Long Island City, New York 11106<br>United States |

# Summary

| Product | Charge | Credit | Total |
|---|---|---|---|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| | |
|---|---|
| **Subtotal** | $52.00 |
| **Sales Tax** | $4.62 |
| **Total** | $56.62 |
| **Due Amount** | $56.62 |

# Product Summary

**Payroll Invoice March 2024**

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |


| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |

## Charges

**Payroll**

| Reason | Name | Amount |
|---|---|---|
| Employee | Amanda Rozenfeld | $6.00 |
| Employee | Mihir Desai | $6.00 |

## Credits

| Credit Subtotal | $0.00 |
|---|---|

# April 2024 Invoice

**Account Name**     Daily Distro LLC

**Invoice #**     INV04265873

**Address**     Steven Rozen
3616 29th St
Long Island City, New York
11106
United States

# Summary

| Product | Charge | Credit | Total |
|---------|--------|--------|-------|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| | |
|---|---|
| **Subtotal** | $52.00 |
| **Sales Tax** | $4.62 |
| **Total** | $56.62 |
| **Due Amount** | $56.62 |

# Product Summary

### Payroll Invoice April 2024

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|--------|----------|------|--------|-----------|--------------|
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |


| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|--------|----------|------|--------|-----------|--------------|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |

## Charges

**Payroll**

| Reason | Name | Amount |
|--------|------|--------|
| Employee | Amanda Rozenfeld | $6.00 |
| Employee | Mihir Desai | $6.00 |

## Credits

| | |
|--|--|
| **Credit Subtotal** | $0.00 |

**Attachment A**

# May 2024 Invoice

| | |
|---|---|
| **Account Name** | Daily Distro LLC |
| **Invoice #** | INV04613959 |
| **Address** | Steven Rozen |
| | 3616 29th St |
| | Long Island City, New York |
| | 11106 |
| | United States |

# Summary

| Product | Charge | Credit | Total |
|---|---|---|---|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| | |
|---|---|
| **Subtotal** | $52.00 |
| **Sales Tax** | $4.62 |
| **Total** | $56.62 |
| **Due Amount** | $56.62 |

**Attachment A**    003288

# Product Summary

**Payroll Invoice May 2024**

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|---|---|---|---|---|---|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |

# Charges

**Payroll**

| Reason | Name | Amount |
|---|---|---|
| Employee | Mihir Desai | $6.00 |
| Employee | Amanda Rozenfeld | $6.00 |

# Credits

| Credit Subtotal | $0.00 |
|---|---|

# June 2024 Invoice

**Account Name**   Daily Distro LLC

**Invoice #**   INV04988824

**Address**   Steven Rozen
3616 29th St
Long Island City, New York
11106
United States

# Summary

| Product | Charge | Credit | Total |
|---------|--------|--------|-------|
| Payroll | $52.00 | $0.00 | $52.00 |

**Total**

| | |
|---|---|
| **Subtotal** | $52.00 |
| **Sales Tax** | $4.62 |
| **Total** | $56.62 |
| **Due Amount** | $56.62 |

# Product Summary

**Payroll Invoice June 2024**

| Reason | Quantity | Rate | Amount | Sales Tax | Total Amount |
|--------|---------|------|--------|-----------|--------------|
| Employee | 2 | $6.00 | $12.00 | $1.07 | $13.07 |
| Base Fee | 1 | $40.00 | $40.00 | $3.55 | $43.55 |

# Charges

**Payroll**

| Reason | Name | Amount |
|--------|------|--------|
| Employee | Amanda Rozenfeld | $6.00 |
| Employee | Mihir Desai | $6.00 |

# Credits

| Credit Subtotal | $0.00 |
|-----------------|-------|

Report generated by

gusto

Daily Distro LLC
3616 29th St
Long Island City, NY 11106

# Payroll Journal Report

Date Range: 01/01/2024 - 12/31/2024
Report Created On: 07/08/2024

## Employee Earnings

Payroll period: 01/01/2024 - 01/14/2024 Pay day: 01/19/2024

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | FUTA | $19.62 | | | Net Pay | $2,707.36 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $3,269.23 | | | | NJ State Tax | $139.62 | NJ Employer SUI | $87.70 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ WF/SWF | $3.84 | | | Employer Cost | $3,396.74 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | NJ Employer SDI | $16.35 | | | | |
| | | | | | | | | Total | $561.87 | Total | $127.51 | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | FUTA | $10.20 | | | Employer Cost | $1,896.35 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ Employer SUI | $45.60 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | Total | $168.96 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | | | Total | $196.35 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | -- | -- | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | FUTA | $29.82 | | | Employer Cost | $5,293.09 |
| | | | | | | | | NJ State Tax | $169.77 | NJ Employer SUI | $133.30 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ WF/SWF | $5.84 | | | | |

37    **Attachment A**    003292

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | Total | $730.83 | Total | $323.86 | | | | |

**Payroll period: 01/15/2024 - 01/28/2024 Pay day: 02/09/2024**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | FUTA | $19.62 | | | Net Pay | $2,707.36 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $3,269.23 | | | | NJ State Tax | $139.62 | NJ Employer SUI | $87.70 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ WF/SWF | $3.84 | | | Employer Cost | $3,396.74 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | NJ Employer SDI | $16.35 | | | | |
| | | | | | | | | Total | $561.87 | Total | $127.51 | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | FUTA | $10.20 | | | Employer Cost | $1,896.35 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ Employer SUI | $45.60 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | Total | $168.96 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | | | Total | $196.35 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | -- | -- | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | FUTA | $29.82 | | | Employer Cost | $5,293.09 |
| | | | | | | | | NJ State Tax | $169.77 | NJ Employer SUI | $133.30 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ WF/SWF | $5.84 | | | | |

2/8     37     **Attachment A**     003293

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | Total | $730.83 | Total | $323.86 | | | | |

**Payroll period: 01/29/2024 - 02/11/2024 Pay day: 02/21/2024**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | FUTA | $2.77 | | | Net Pay | $2,707.36 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $3,269.23 | | | | NJ State Tax | $139.62 | NJ Employer SUI | $87.70 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ WF/SWF | $3.84 | | | Employer Cost | $3,379.89 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | NJ Employer SDI | $16.35 | | | | |
| | | | | | | | | Total | $561.87 | Total | $110.66 | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | FUTA | $10.20 | | | Employer Cost | $1,896.35 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ Employer SUI | $45.60 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | Total | $168.96 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | | | Total | $196.35 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | -- | -- | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | FUTA | $12.97 | | | Employer Cost | $5,276.24 |
| | | | | | | | | NJ State Tax | $169.77 | NJ Employer SUI | $133.30 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ WF/SWF | $5.84 | | | | |

37

**Attachment A**

003294

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | Total | $730.83 | Total | $307.01 | | | | |

**Payroll period: 02/12/2024 - 02/25/2024 Pay day: 03/11/2024**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir  78 John Miller Way, Kearny, NJ 07032 | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | NJ Employer SUI | $87.70 | | | Net Pay | $2,707.36 |
| | Gross | – | – | $3,269.23 | | | | NJ State Tax | $139.62 | NJ WF/SWF | $3.84 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ Employer SDI | $16.35 | | | Employer Cost | $3,377.12 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | Total | $107.89 | | | | |
| | | | | | | | | Total | $561.87 | | | | | | |
| Rozenfeld, Amanda  78 John Miller Way, Kearny, NJ 07032 | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| | Gross | – | – | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | FUTA | $10.20 | | | Employer Cost | $1,896.35 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ Employer SUI | $45.60 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | Total | $168.96 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | | | Total | $196.35 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | – | – | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | FUTA | $10.20 | | | Employer Cost | $5,273.47 |
| | | | | | | | | NJ State Tax | $169.77 | NJ Employer SUI | $133.30 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ WF/SWF | $5.84 | | | | |

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | Total | $730.83 | Total | $304.24 | | | | |

**Payroll period: 02/26/2024 - 03/10/2024 Pay day: 03/22/2024**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | NJ Employer SUI | $87.70 | | | Net Pay | $2,707.36 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | – | – | $3,269.23 | | | | NJ State Tax | $139.62 | NJ WF/SWF | $3.84 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ Employer SDI | $16.35 | | | Employer Cost | $3,377.12 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | Total | $107.89 | | | | |
| | | | | | | | | Total | $561.87 | | | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | – | – | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | FUTA | $1.20 | | | Employer Cost | $1,887.35 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ Employer SUI | $45.60 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | Total | $168.96 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | | | Total | $187.35 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | – | – | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | FUTA | $1.20 | | | Employer Cost | $5,264.47 |
| | | | | | | | | NJ State Tax | $169.77 | NJ Employer SUI | $133.30 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ WF/SWF | $5.84 | | | | |

PX 37

**Attachment A**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | Total | $730.83 | Total | $295.24 | | | | |

**Payroll period: 03/25/2024 - 04/07/2024 Pay day: 04/18/2024**

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| Desai, Mihir  78 John Miller Way, Kearny, NJ 07032 | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | NJ Employer SUI | $87.70 | | | Net Pay | $2,707.36 |
| | Gross | – | – | $3,269.23 | | | | NJ State Tax | $139.62 | NJ WF/SWF | $3.84 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ Employer SDI | $16.35 | | | Employer Cost | $3,377.12 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | Total | $107.89 | | | | |
| | | | | | | | | Total | $561.87 | | | | | | |
| Rozenfeld, Amanda  78 John Miller Way, Kearny, NJ 07032 | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| | Gross | – | – | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | NJ Employer SUI | $45.60 | | | Employer Cost | $1,886.15 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | Total | $168.96 | Total | $186.15 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | – | – | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | NJ Employer SUI | $133.30 | | | Employer Cost | $5,263.27 |
| | | | | | | | | NJ State Tax | $169.77 | NJ WF/SWF | $5.84 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | Total | $294.04 | | | | |
| | | | | | | | | Total | $730.83 | | | | | | |

Payroll period: 04/08/2024 - 04/21/2024 Pay day: 05/06/2024

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description n | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | NJ Employer SUI | $87.70 | | | Net Pay | $2,707.36 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $3,269.23 | | | | NJ State Tax | $139.62 | NJ WF/SWF | $3.84 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ Employer SDI | $16.35 | | | Employer Cost | $3,377.23 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | Total | $107.89 | | | | |
| | | | | | | | | Total | $561.87 | | | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | NJ Employer SUI | $45.60 | | | Employer Cost | $1,886.15 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | Total | $168.96 | Total | $186.15 | | | | |
| Payroll Totals | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | -- | -- | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | NJ Employer SUI | $133.30 | | | Employer Cost | $5,263.27 |
| | | | | | | | | NJ State Tax | $169.77 | NJ WF/SWF | $5.84 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | Total | $294.04 | | | | |
| | | | | | | | | Total | $730.83 | | | | | | |

Payroll period: 04/22/2024 - 05/05/2024 Pay day: 05/28/2024

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description n | Amount |
| Desai, Mihir | Regular | 80.00 | $40.87 | $3,269.23 | | | | Federal Income Tax | $405.42 | NJ Employer SUI | $87.70 | | | Net Pay | $2,707.36 |

| Employee Information | Earnings | | | | Deductions/Contributions | | | Employee Taxes | | Employer Taxes | | Reimbursements | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Hours | Rate | Total | Description | Employee Deduction | Employer Contribution | Description | Amount | Description | Amount | Description | Amount | Description | Amount |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $3,269.23 | | | | NJ State Tax | $139.62 | NJ WF/SWF | $3.84 | | | Check Amount | $2,707.36 |
| | | | | | | | | NJ Employee SUI | $13.89 | NJ Employer SDI | $16.35 | | | Employer Cost | $3,377.12 |
| | | | | | | | | NJ Family Leave Insurance | $2.94 | Total | $107.89 | | | | |
| | | | | | | | | Total | $561.87 | | | | | | |
| Rozenfeld, Amanda | Regular | 80.00 | $21.25 | $1,700.00 | | | | Social Security | $105.40 | Social Security | $105.40 | | | Net Pay | $1,531.04 |
| 78 John Miller Way, Kearny, NJ 07032 | Gross | -- | -- | $1,700.00 | | | | Medicare | $24.65 | Medicare | $24.65 | | | Check Amount | $1,531.04 |
| | | | | | | | | NJ State Tax | $30.15 | NJ Employer SUI | $45.60 | | | Employer Cost | $1,886.15 |
| | | | | | | | | NJ Employee SUI | $7.23 | NJ WF/SWF | $2.00 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $1.53 | NJ Employer SDI | $8.50 | | | | |
| | | | | | | | | Total | $168.96 | Total | $186.15 | | | | |
| **Payroll Totals** | Regular | 160.00 | $31.06 | $4,969.23 | | | | Federal Income Tax | $405.42 | Social Security | $105.40 | | | Net Pay | $4,238.40 |
| | Gross | -- | -- | $4,969.23 | | | | Social Security | $105.40 | Medicare | $24.65 | | | Check Amount | $4,238.40 |
| | | | | | | | | Medicare | $24.65 | NJ Employer SUI | $133.30 | | | Employer Cost | $5,263.27 |
| | | | | | | | | NJ State Tax | $169.77 | NJ WF/SWF | $5.84 | | | | |
| | | | | | | | | NJ Employee SUI | $21.12 | NJ Employer SDI | $24.85 | | | | |
| | | | | | | | | NJ Family Leave Insurance | $4.47 | Total | $294.04 | | | | |
| | | | | | | | | Total | $730.83 | | | | | | |



**Capital**One Business

**Spark Cash Select credit card I Visa Signature Business ending in 0867**
Jun 26, 2024 - Jul 26, 2024  |  31 days in Billing Cycle

## Payment Information

| | |
|---|---|
| Payment Due Date | For online and phone payments, the deadline is 8pm ET. |
| **Aug 20, 2024** | |
| New Balance | Minimum Payment Due |
| **$7,618.67** | **$242.00** |

**LATE PAYMENT WARNING:** If we do not receive your minimum payment by your due date, you may have to pay a $39.00 late fee and your APRs may be increased up to the Penalty APR of 34.65%.

**MINIMUM PAYMENT WARNING:** If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay... | You will pay off the balance shown on this statement in about... | And you will end up paying an estimated total of... |
|---|---|---|
| Minimum Payment | 29 Years | $25,833 |
| $320 | 3 Years | $11,529 |

Estimated savings if balance is paid off in about 3 years: $14,304

If you would like information about credit counseling services, call 888-326-8055.

## Account Summary

| | |
|---|---|
| Previous Balance | $5,627.46 |
| Payments | - $203.00 |
| Other Credits | $0.00 |
| Transactions | + $2,027.46 |
| Cash Advances | + $0.00 |
| Fees Charged | + $0.00 |
| Interest Charged | + $166.75 |
| **New Balance** | **= $7,618.67** |
| Credit Limit | $7,500.00 |
| Available Credit (as of Jul 26, 2024) | $0.00 |
| Cash Advance Credit Limit | $3,750.00 |
| Available Credit for Cash Advances | $0.00 |

### Rewards Summary — Rewards as of: 07/26/2024

| **Rewards Balance** | Track and redeem your rewards with our |
|---|---|
| **$1,453.51** | mobile app or on capitalone.com |

| Previous Balance | Earned This Period | Redeemed this period |
|---|---|---|
| $1,420.84 | $32.67 | $0.00 |

## Account Notifications

Please check page 3 of this statement for your Account Notifications.

---

Pay or manage your account at capitalone.com    Customer Service: 800-867-0904    See reverse for Important Information



**Capital**One Business

2000880      01 AB 0.547  **AUTO  T5 0 5935 07020-145057    -C07-P00891-I

BRATISLAV ROZENFELD
DAILY DISTRO LLC

EDGEWATER, NJ

Save time, stay informed.
Discover new features with the Capital One Mobile app.

Scan this QR Code with your phone's camera to download the top-rated Capital One Mobile app.

Payment Due Date: **Aug 20, 2024**      Account ending in 0867

| New Balance | Minimum Payment Due | Amount Enclosed |
|---|---|---|
| **$7,618.67** | **$242.00** | $ _____ |

Please send us this portion of your statement and only one check (or one money order) payable to Capital One to ensure your payment is processed promptly. Allow at least seven business days for delivery.

Capital One
PO Box 981600
Boston, MA 02298-1600-00

1        0867 26 7618670203000242002

20008860002228400000053 of 0000034-C07-p-5915-00891



Page 2 of 3
**Spark Cash Select credit card I Visa Signature Business ending in 0867**
Jun 26, 2024 - Jul 26, 2024   I 31 days in Billing Cycle

| Transactions | |
|---|---|

Visit capitalone.com to see detailed transactions.

**BRATISLAV ROZENFELD #0867: Payments, Credits and Adjustments**

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Jul 3 | Jul 3 | CAPITAL ONE MOBILE PYMTAuthDate 03-Jul | -$203.00 |

**BRATISLAV ROZENFELD #0867: Transactions**

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| Jun 26 | Jun 27 | KANOO PAYS242-3234192<br>$130.00<br>BSD<br>1.000000000 Exchange Rate | $130.00 |
| Jun 27 | Jun 29 | COMMONWEALTH BREWERYNASSAU<br>$65.00<br>BSD<br>1.000000000 Exchange Rate | $65.00 |
| Jul 1 | Jul 2 | UPWORK -710860801866-262-4478CA | $150.15 |
| Jul 1 | Jul 2 | YMCA SOUTH FLORIDA ASSOCIFT LAUDERDALEFL | $21.00 |
| Jul 4 | Jul 5 | INTUIT *QBooks OnlineCL.INTUIT.COMCA | $90.00 |
| Jul 8 | Jul 9 | PURRFECT G* PURRFECT G132-39687848GA | $127.50 |
| Jul 11 | Jul 12 | DESAKI RESTAURANTSWIFTWATERPA | $344.14 |
| Jul 11 | Jul 12 | FLIGHT FAST TRACKPUNTA GORDAFL | $927.00 |
| Jul 11 | Jul 13 | KALAHARI RESTAURANT - PA877-5252427PA | $42.67 |
| Jul 13 | Jul 15 | SUNOCO 8000367402FORT LEENJ | $30.00 |
| Jul 14 | Jul 15 | HIGHLEVEL INC.HTTPSGOHIGHLETX | $100.00 |
| **BRATISLAV ROZENFELD #0867: Total Transactions** | | | **$2,027.46** |

| **Total Transactions for This Period** | | | **$2,027.46** |
|---|---|---|---|

| Fees | |
|---|---|

| Trans Date | Post Date | Description | Amount |
|---|---|---|---|
| **Total Fees for This Period** | | | **$0.00** |

| Interest Charged | |
|---|---|

| | |
|---|---|
| Interest Charge on Purchases | $166.75 |
| Interest Charge on Cash Advances | $0.00 |
| Interest Charge on Other Balances | $0.00 |
| **Total Interest for This Period** | **$166.75** |

| Totals Year-to-Date | |
|---|---|

| | |
|---|---|
| **Total Fees charged** | $39.00 |
| **Total Interest charged** | $971.63 |

Additional Information on the next page

**PX 37**                    **Attachment A**                    003301

# Re: Confirmation Email - Congratulations!

| | |
|---|---|
| **From:** | Ed Wade <​█████████████​> |
| **To:** | Erin Davidson <erin@optimyzedigital.com> |
| **Cc:** | Amananda Peremen <sales@passivescaling.com> |
| **Date:** | Sat, 09 Oct 2021 10:37:15 -0400 |

Thank you Erin. Look forward to next steps.

On Saturday, October 9, 2021, 10:29:33 AM EDT, Erin Davidson <erin@optimyzedigital.com> wrote:

Oh I'm sorry! I asked Amanda and she said she responded. I'll let her confirm, but I think you're all set. Kerry Anne from our team should be reaching out to you early next steps with more info.

Best,
Erin

On Oct 9, 2021, at 7:21 AM, Edward Wade ███████████> wrote:

Hi Erin,
No one has contacted me.

Ed

On Tue, Oct 5, 2021 at 11:51 AM Erin Davidson <erin@optimyzedigital.com> wrote:

Hi Ed,
That's great! When the check comes through on 10/6 and we've processed the funds, the welcome email will get sent out. On there will be a calendar link to schedule your onboarding call. Excited to get you started!

Best,
Erin

On Tue, Oct 5, 2021 at 8:03 AM Ed Wade <​███████████​> wrote:

You're all done. Here's what to expect next.
MMTNQ5LYNR7M
CONFIRMATION CODE
Check Delivery
Your check is scheduled for delivery on Wednesday, October 6th
Confirmation Email
You'll get an email from capitalone@notification.capitalone.com sent to ████████████ with a tracking number to track your check once it ships.

On Tuesday, October 5, 2021, 08:49:18 AM EDT, Ed Wade ████████████> wrote:

Hi Amanda/Erin,

I just ordered a cashier's check in the amount of $30,000.00 from my Capital One account. It's scheduled to be delivered via FedEx at the address below on October 6th. Let me know if you need anything else.

When will I receive a call from a project manager to start?

Thanks,

**PX 37**                                      **Attachment A**                                      003302

Hi Ed,

Congratulations! The first major step has been taken towards the growth of your new eCommerce program.

Here is a copy of the proposal for your records.

**Download now**

Now that the contract has been signed, we've laid out the payment details below so the team can get started as soon as possible.

See below for wire details:

Company Name: Passive Scaling INC
Name of Bank: Chase Bank
Address: 78 John Miller Way, Suite 227, Kearny, NJ 07032
Account #: ███████████
Routing #: ███████████ (WIRE)
#: ███████████ (ACH)
**\*\*\*\*\*PLEASE ENTER NAME (AS DISPLAYED ON CONTRACT) IN MEMO SECTION OF TRANSFER FOR OUR TEAM TO MATCH RECORDS**

Once the payment has been submitted, please email a receipt to info@passivescaling.com and payments@optimyzedigital.com so we can match the sender name to our records as soon as possible, and once payment has cleared to our account, our team will reach out with instructions for your next steps!

Please reach out to both emails if you have not received an onboarding email within 24 business hours of payment completion, *and include your confirmation.* We will be there every step of the process!

For alternative payment conditions, please reach out to payments@optimyzedigital.com.

Thanks again, and we look forward to building your program!

**PX 37**                                **Attachment A**                                003303

PX 37

**Attachment A**

003304

# Re: Re: 40HQ go karts frame balance

| | |
|---|---|
| **From:** | hetty@mainbon.com |
| **To:** | amanda.██████@gmail.com, steven@wraithco.com |
| **Cc:** | amanda██████@gmail.com, clyde@mainbon.com, irene@mainbon.com |
| **Date:** | Sat, 18 Sep 2021 00:32:06 -0400 |
| **Attachments:** | invoice S0007.pdf (449.93 kB) |

Dear Steven and Amanda,

Good day, how are you

Pls be aware, we make the credit card payment deduction through our this company title, the attachment invoice helps show the validity to the bank, it is helpful for us to get the deposit, if your side bank make confirmation with you, just let them know it is real, until now we still not get the payment for your credit card, thanks for your cooperation

Hetty

------------------ Original ------------------
**From:** amanda rozenfeld < amanda.██████@gmail.com>
**Send time:** Sunday, September 12, 2021 12:46 AM
**To:** Steven R < steven@wraithco.com>
**Cc:** amanda rozenfeld < amanda██████@gmail.com>; hetty@mainbon.com; clyde@mainbon.com; felix@hourlyrelief.com; irene@mainbon.com; ivy@mainbon.com
**Subject:** Re: 40HQ go karts frame balance

Amanda Rozenfeld



5020

Exp 1

Amanda██████@gmail.com

Sent from my iPhone

> On Sep 10, 2021, at 2:07 AM, Steven R <steven@wraithco.com> wrote:
>
> Hey Amanda,
>
> Please provide Hetty with CC info for the American Express card.
>
> Thanks
>
> On Thu, Sep 9, 2021 at 10:51 PM < hetty@mainbon.com> wrote:
>
>> Dear Mr.Steven,
>>
>> Good day
>>
>> The sea freight 1*40HQ from ningbo china to LAX usa is usd17000 for your reference this week

Attachment is the commercial invoice with FOB price, pls check and confirm, if pay through credit card, 30% deposit will be USD5940, pls provide me your credit card information as below, we will charge from our side:

Card Number:

Billing Address & Postal Code:

Expiration Date:

Card Verification #:

Name on Card:

Phone & Email:


waiting for your reply

hetty


----------------- Original -----------------
**From:** hetty@mainbon.com
**Send time:** Wednesday, August 18, 2021 02:44 PM
**To:** steven< steven@wraithco.com >
**Cc:** felix@hourlyrelief.com;Clyde< clyde@mainbon.com >;Irene< irene@mainbon.com >;Ivy< ivy@mainbon.com >
**Subject:** Re: Re: Re: Re: Re: Re:         Re: Re: Re: Re: Re: 40HQ go karts frame balance
Dear Mr.Steven,

Good day

As we discussed on whatsapp, pls confirm and reply us email regarding products informations
Changing the destination port to Los Angeles, USA, the sea freight 1*40HQ from ningbo china to LAX usa is usd16000 for your reference this week

Attachment is the commercial invoice with FOB price, pls check and confirm, if pay through credit card, 30% deposit will be USD5940, pls provide me your credit card information as below, we will charge from our side:

Card Number:

Billing Address & Postal Code:

Expiration Date:

Card Verification #

Name on Card:

Phone & Email:


waiting for your reply

hetty


----------------- Original -----------------
**From:** hetty@mainbon.com
**Send time:** Friday, August 13, 2021 12:18 PM

**Attachment A**

003306

**To:** steven <steven@wraithco.com>
**Cc:** felix@hourlyrelief.com;Clyde < clyde@mainbon.com>;Irene < irene@mainbon.com>;Ivy < ivy@mainbon.com>
**Subject:** Re: Re: Re: Re: Re:        Re: Re: Re: Re: Re: 40HQ go karts frame balance

Dear Steven,

Exactly, high freight rates are common and normal now, i have checked with more than 5 freight logistics companies, this is the lowest price for this week

Freight charge increase & containers shortage cause by pandemic are currently common problems for all importers, so i suggest you place order as quickly as possible, freight cost and raw materials price are keeping going up since pandemic, ealier you get the goods, you are earning, you have the goods in your warehouse, you are earning now

Hetty

----------------- Original -----------------
**From:** Steven R < steven@wraithco.com>
**Send time:** Friday, August 13, 2021 04:08 AM
**To:** hetty@mainbon.com
**Cc:** Felix G < felix@hourlyrelief.com>;Clyde < clyde@mainbon.com>;Irene < irene@mainbon.com>;Ivy < ivy@mainbon.com>
**Subject:** Re: Re: Re: Re:        Re: Re: Re: Re: Re: 40HQ go karts frame balance

19k?!?! For shipping.

On Wed, Aug 11, 2021 at 4:01 AM < hetty@mainbon.com> wrote:

Dear Steven,

Have a nice day
I have browsed your clients comments on amazon before, most are good feedback, we are selling domestic and overseas many years, our quality is reliable, but if you have any suggestion, we are glad to make improvement on our products

Here are some details of the products need you double confirm:

1. black color 600pcs, red color 200pcs, blue color 200pcs, white color 200pcs, totally 1200pcs in 1*40HQ container
   destination port: New York, USA

2. Fabric Flag with  GOTOWHEELS logo as below:

<image.png>

3. Color box packing:

<image.png>

4. Brown outside box as below :

<image.png>

5. The bar code on outside box still as below:

<image.png>
<image.png>

6. Logo sticker on the frame:

<image.png>

7. each kart still need 10 straps, with foam on each corner, no pallet for the packages

8.through credit card payment, if so, pls check the attached PI for the go karts frame, because of the covid-19 virus situation,
the raw materials price get raised, and the delivery time around 20 days after we get the deposit

See attachment, the price we quote you is FOB price, cause now freight cost is so not stable, this week is usd19000 from
Ningbo China to New York USA for your reference, before shipment how much shipping company charge us,
then we quote you freight cost, by the way this time,do you need us to arrange customs clearance and send into your warehouse?

Please confirm these details with us.

Looking forward to hearing from you

Best regards

Hetty Ho

------------------ Original ------------------
**From:**  Steven R < steven@wraithco.com>
**Send time:**  Wednesday, August 11, 2021 12:08 AM
**To:**  hetty@mainbon.com
**Cc:**  felix@hourlyrelief.com;Clyde < clyde@mainbon.com>;Irene < irene@mainbon.com>;Ivy < ivy@mainbon.com>
**Subject:**  Re: Re: Re:          Re: Re: Re: Re: Re: 40HQ go karts frame balance
Lets do 600 and then 200 of the other colors.

Lets do it like last time but I remmeber there was a problem last time. Please check our previous complaints to make sure it doesnt happen again.

You can use your frieght broker this time and yes CC works well for us if thats okay for you.

On Tue, Aug 10, 2021 at 3:21 AM < hetty@mainbon.com> wrote:

Dear Steven,

I am so glad to hear from you, wish everything is fine with you

For 1*40HQ container go kart frame, the delivery time recently is 15-20 days after receipt of deposit

I have some questions as below:

1. how to assign the quantity of colors, one 40HQ can load 1200pcs
2. pls confirm if you need the same kart frame as last order, each kart still need 10 straps, and the same carton box
3. do you need any pallet for the packages this time

**Attachment A**

4. how about your payment term, still credit card?
5. Do you have your own cooperate freight forwarder company this time, if not, do use the freight agent of our side, to contact with you and clear customs and send it to your warehouse?

Looking forward to hearing from you

Best regards

Hetty Ho

Shanghai Mainbon Industry Co.,Ltd

ADD:1212,578 Tianbao Road,Shanghai 200086 China

Email: hetty@mainbon.com

Whatsapp/wechat/phone no.+█████████

----------------- Original -----------------
**From:** Steven R < steven@wraithco.com>
**Send time:** Tuesday, August 10, 2021 12:48 PM
**To:** hetty@mainbon.com;Felix G < felix@hourlyrelief.com>
**Cc:** Clyde < clyde@mainbon.com>;Irene < irene@mainbon.com>;Ivy < ivy@mainbon.com>
**Subject:** Re: Re:      Re: Re: Re: Re: 40HQ go karts frame balance
Hi Guys,

Can we place an order for full container for Q4?

Looping in Felix to help coordinate.

Thanks

On Tue, Jun 16, 2020 at 12:01 AM < hetty@mainbon.com> wrote:

hi,steven,

I have followed your Amazon store before, and it received many good reviews on January, I believe it is not caused by quality problems, I hope you can solve the problem steadily.
It will take about one and a half months from ordering to receipt. And now is the peak season, our production plan is very full. If you don t have much inventory, we suggest you arrange the order as soon as possible, or give us an estimated time, we can prepare the material arrangement in advance

hetty

----------------- Original -----------------
**From:** Steven R < steven@wraithco.com>
**Send time:** Tuesday, June 16, 2020 11:04 AM
**To:** hetty@mainbon.com
**Cc:** Clyde < clyde@mainbon.com>;Irene < irene@mainbon.com>;Ivy < ivy@mainbon.com>
**Subject:** Re:      Re: Re: Re: Re: Re: 40HQ go karts frame balance
Hi,

PX 37                              Attachment A                              003309

We were about to place the order but then other day amazon ding our listing with more bad reviews. We are fighting now for our listing back.

On Mon, Jun 15, 2020 at 11:02 PM < hetty@mainbon.com> wrote:

hi,Steven


have a nice day

how about the payment way you think of, through TT or new available credit card?


if TT,2.9% transfer fee can be saved, 30% deposit will be USD5004,Bank Information as below, please arrange the transfer from your side:

Bank: ShanghaiPuDong Development Bank, HongKou Branch

Bank Address: No. 731QuYang Road, Shanghai 200437 China

SWIFT: ███████

Beneficiary:Shanghai Mainbon Industry Co., Ltd.

Beneficiary Address:1212, 578 TianBao Road, Shanghai 200086 China

A/C No.: ████████████


if by new available credit card,30% deposit will be USD5150, pls provide me your credit card information as below, we will charge from our side:

Card Number:

Billing Address & Postal Code:

Expiration Date:

Card Verification #

Name on Card

Phone & Email:


waiting for your reply

hetty


**PX 37**                    **Attachment A**                    003310

Original

**From:** Clyde Chen < clyde@mainbon.com >
**Send time:** Thursday, June 11, 2020 01:22 PM
**To:** Steven R < steven@wraithco.com >; hetty@mainbon.com < hetty@mainbon.com >
**Cc:** Irene < irene@mainbon.com >;Ivy < ivy@mainbon.com >
**Subject:** Re: Re: Re: Re: Re: 40HQ go karts frame balance

Not yet. Declined.
We will try again tomorrow morning your time.

Sent from Mainbon business email box.

------------------------------------------------------------------

Steven R< steven@wraithco.com >
2020   06   11   10:12:06
< hetty@mainbon.com >
Clyde< clyde@mainbon.com >; Irene< irene@mainbon.com >; Ivy< ivy@mainbon.com >
Re: Re: Re: Re: Re: Re: 40HQ go karts frame balance

Oh,

Do you have it now ?

On Wed, Jun 10, 2020 at 10:05 PM < hetty@mainbon.com > wrote:

Dear Steven,

yes, clyde already charge it, it was supposed to be 2 days later to get it

hetty

----------------- Original -----------------
**From:** Steven R < steven@wraithco.com >
**Send time:** Wednesday, June 10, 2020 08:52 PM
**To:** hetty@mainbon.com
**Cc:** Clyde < clyde@mainbon.com >;Irene < irene@mainbon.com >;Ivy < ivy@mainbon.com >
**Subject:** Re: Re: Re: Re: Re: 40HQ go karts frame balance
Please charge the card now.

On Wed, Jun 10, 2020 at 4:23 AM < hetty@mainbon.com > wrote:

Dear Mr.Steven,

**PX 37**                            **Attachment A**                            003311

Have a good day
Nice to receive your mail, after we get the deposit from this credit card in these days, we will arrange the production as soon as possible for you.

Best regards
Hetty

Original

**From:** Steven R < steven@wraithco.com >
**Send time:** Tuesday, June 9, 2020 09:32 PM
**To:** hetty@mainbon.com
**Cc:** Clyde < clyde@mainbon.com >;Irene < irene@mainbon.com >;Ivy < ivy@mainbon.com >
**Subject:** Re: Re: Re: Re: 40HQ go karts frame balance
Yes.

On Thu, Jun 4, 2020 at 9:58 PM < hetty@mainbon.com > wrote:

dear Mr.steven,

good day
see attached if the proforma invoice is okay, pls arrange the 30% deposit( USD5150) as soon as possible, now the production is busy, after we get the deposit, we can push the order for you.
by the way, if through credit card payment, Amex card same as last time, pls confirm me the card details as below:

Card Number: ███████ 2021

Billing Address & Postal Code: 7001 anpesil drive, North Bergen, NJ 07047 USA

Expiration Date: ████

Card Verification # ██████

Name on Card : Floren Peremen

Phone & Email: ██████

steven@wraithco.com

best regards
waiting for your reply

hetty

------------------ Original ------------------
From:  Steven R < steven@wraithco.com >
Send time:  Thursday, June 4, 2020 09:34 PM
To:  hetty@mainbon.com
Cc:  clyde < clyde@mainbon.com >;irene < irene@mainbon.com >;ivy < ivy@mainbon.com >
Subject:  Re: Re: Re: 40HQ go karts frame balance

**PX 37**                              **Attachment A**                              003312

Looks good !

On Thu, Jun 4, 2020 at 4:05 AM < hetty@mainbon.com> wrote:


Dear Mr.Steven,

Sorry for late reply, have a good day
as you mentioned on whatsapp everything is same as before, here are some details of the products need you double confirm:



1, Fabric Flag with  GOTOWHEELS logo as below:

<image.png>

2   Color box packing:

<image.png>

3,Brown outside box as below :

<image.png>



4, The bar code on outside box still as below:

<image.png>
<image.png>

5.Logo sticker on the frame:

<image.png>

6.each kart still need 10 straps, with foam on each corner, no pallet for the packages

7.through credit card payment, same color assignment   black 600pcs, red 200pcs,blue 200pcs,white 200pcs    , if so,pls check the attached PI for the go karts frame, because of the covid-19 virus situation, the raw materials price get raised, but we still remain the same price for you as before, and the delivery time should be 20 days after we get the deposit



Please confirm these details with me.

Thanks a lot!

Hetty


**PX 37**                                        **Attachment A**

——————— Original ———————
**From:** hetty@mainbon.com
**Send time:** Tuesday, May 26, 2020 05:46 PM
**To:** steven< steven@wraithco.com>
**Cc:** Ivy< ivy@mainbon.com>;Irene< irene@mainbon.com>;clyde< clyde@mainbon.com>
**Subject:** Re: Re: 40HQ go karts frame balance

Dear Steven,


How are you, wish everything is fine with you

This is hetty from mainbon, I will do the follow up thing for you, I have been working in mainbon more than 6 years, nice to meet you.

For one 40HQ go kart frame balance, I have some questions as below:

1. how to assign the quantity of colors, one 40HQ can load 1200pcs
2. pls confirm if you need the same kart frame as last order, each kart still need 10 straps, and the same carton box
3. do you need any pallet for the packages this time
4. how about your payment term, still credit card?
5. Do you have your own cooperate freight forwarder company this time, if not, do we use the freight agent of our side, to contact with you and clear customs and send it to your warehouse?



By the way,i added your wechat, pls pass my application, it is convenient to contact with each other

Looking forward to hearing from you

Best regards

Hetty Ho

Shanghai Mainbon Industry Co.,Ltd

ADD:1212,578 Tianbao Road,Shanghai 200086 China

Email: hetty@mainbon.com

Whatsapp/wechat/phone ▬▬▬▬▬▬▬▬



——————— Original ———————
**From:** Clyde Chen ❄ < clyde@mainbon.com>
**Send time:** Tuesday, May 26, 2020 04:25 PM
**To:** Steven R < steven@wraithco.com>
**Cc:** Ivy Gu 💕 < ivy@mainbon.com>; hetty@mainbon.com < hetty@mainbon.com>;Irene 颜贞珍 < irene@mainbon.com>
**Subject:** Re: 40HQ go karts frame balance

**PX 37**                          **Attachment A**                          003314

Dear Steven,

How are you!

Hope this email finds you well and healthy and good luck.

Ivy is taking maternity leave. Hetty will follow up your project. Hetty work in Mainbon so many years, she is also very profession. I am sure you will be satisfied with her services.

Best regards,

Clyde Chen

---

**From:** Steven R <steven@wraithco.com>
**Date:** Tuesday, May 26, 2020 at 12:46
**To:** Ivy Gu <ivy@mainbon.com>
**Cc:** Clyde Chen <clyde@mainbon.com>
**Subject:** Re: 40HQ go karts frame balance

Hi Guys

Hope all is well.

I would like to see if you can provide me one container reorder.

On Mon, Oct 7, 2019 at 11:41 PM Ivy Gu <ivy@mainbon.com> wrote:

Hi Steven,

 Good day!

Please check the attached B/L copy. We finally caught the ship at 6th Oct, ETD is about 4th Nov.

As the agreed payment terms on PI that balance against the copy of B/L, please pay the balance of $12014.72. Once received the balance, I will inform the agent to telex release the original B/L.

Do you still pay through the AMEX account which you paid the deposit?

For the shipping freight and delivery charge in USA, I will ask the shipping agent to make a list, and give me to confirm there is no unnecessary charge, then I will send to you. You can pay to us or the shipping agent is OK.

Please first confirm the balance. Thank you!

Best regards,

Ivy Gu

---

**发件人:** Ivy Gu 💕 <ivy@mainbon.com>
**日期**

**From:**        Tyndall, Reeve
**To:**          amanda█████@gmail.com; musheresq@gmail.com
**Cc:**          Robbins, Colleen B.; Kern, Frances; Anthony Sodono
**Subject:**     TRO Notice - Amanda Rozenfeld
**Date:**        Thursday, June 6, 2024 12:36:04 PM
**Attachments:** Amanda Rozenfeld - TRO Notice.pdf

Please see attached.

_____

Reeve Tyndall, Investigator

Federal Trade Commission

Bureau of Consumer Protection,

Division of Marketing Practices

600 Pennsylvania Ave. NW

BCP-DMP-1144, Maildrop CC-5201

Washington, DC 20580

Phone: (202) 326-2452

Fax: (202) 326-3395

**PX 37**                          **Attachment D**



# Federal Trade Commission
WASHINGTON, D.C. 20580
UNITED STATES OF AMERICA

Reeve Tyndall, Investigator
600 Pennsylvania Ave. NW CC-8528
Washington, DC 20580
P: (202) 326-2452
rtyndall@ftc.gov

June 6, 2024

Amanda Rozenfeld
amandaro████@gmail.com

**Temporary Restraining Order issued in *FTC v. THEFBAMACHINE, Inc., et al. (24-cv-6635)***

**URGENT: RECIPENT MUST FREEZE ASSETS AND PRESERVE DOCUMENTS**

Dear Sir or Madam:

You are hereby served with a Temporary Restraining Order issued by the U.S. District Court for New Jersey on June 3, 2024, which contains the following provisions:

**ASSET FREEZE:**  Pursuant to Section III of the attached TRO, an asset freeze applies to the following individuals and entities.  If you need additional identifying information, please contact Reeve Tyndall at (202) 326-2452 or rtyndall@ftc.gov.

| Defendant | SSN/EIN |
|-----------|---------|
| BRATISLAV ROZENFELD | XXX-XX-XXXX |
| THEFBAMACHINE INC. | 88-4126748 |
| PASSIVE SCALING INC. | 86-2127553 |
| SALES.SUPPORT NEW JERSEY INC. | 86-2174636 |
| 1HR DELIVERIES INC. | 86-2151329 |
| HOURLY RELIEF INC. | 86-2079791 |
| 3PL LOGISTIC AUTOMATION INC. | 86-2103300 |
| FBA SUPPORT NJ CORP. | 84-3739328 |
| DAILY DISTRO LLC | 82-2901018 |
| CLOSTER GREEN CORP. d/b/a WRAITH & CO. | 46-3590571 |

**SWORN STATEMENT AND DOCUMENT PRODUCTION**:  Pursuant to Section IV of the TRO, within 3 days of being served with this order you are required to provide to the FTC a sworn statement identifying Defendants' accounts setting forth, among other things:

1)  The identification number of each such account or Asset;

2)  The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other Asset was remitted; and

**PX 37**                    **Attachment D**                    003318

3) The identification of any safe deposit box, commercial mail box, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any Defendant.

4) For the time period January 1, 2024 to present, copies of all records or other documents pertaining to any account or asset, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mailboxes, and storage facilities.

Service of your certified statement and copies of statements may be made by secure email to rtyndall@ftc.gov.

**DOCUMENT PRESERVATION:**  Pursuant to Section VI of the TRO, you are under a legal duty to preserve, effective immediately, all documents, records and data, in whatever format they are stored – electronic, paper or otherwise (including records and data on backup media) – in your custody, possession or control concerning the Defendants.

**APPOINTMENT OF TEMPORARY RECEIVER:**  Pursuant to Section XI of the TRO, the Court has appointed the following Temporary Receiver:

Anthony Sodono, III
asodono@msbnj.com
(732) 236-9268
C/O MSB, 75 Livingston Avenue, Suite 201, Roseland NJ 07068

If you have any questions regarding the TRO or asset freeze provision, you can reach me at rtyndall@ftc.gov or (202) 326-2452.

Sincerely,

/s/ Reeve Tyndall

Attachment: Temporary Restraining Order

2

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Civil Action No. 24-6635 (JXN) (LDW) |
| Plaintiff, | |
| v. | *EX PARTE* |
| | **TEMPORARY RESTRAINING ORDER** |
| THEFBAMACHINE INC., a corporation; | **WITH ASSET FREEZE, APPOINTMENT** |
| | **OF A TEMPORARY RECEIVER, AND** |
| PASSIVE SCALING INC., a corporation; | **OTHER EQUITABLE RELIEF, AND** |
| | **ORDER TO SHOW CAUSE WHY A** |
| SALES.SUPPORT NEW JERSEY INC., a corporation; | **PRELIMINARY INJUNCTION SHOULD** |
| | **NOT ISSUE** |
| 1HR DELIVERIES INC., a corporation; | |
| | **FILED UNDER SEAL** |
| HOURLY RELIEF INC., a corporation; | |

3PL LOGISTIC AUTOMATION INC., a corporation;

FBA SUPPORT NJ CORP., a corporation;

DAILY DISTRO LLC, a limited liability company;

CLOSTER GREEN CORP., doing business as WRAITH & CO., a corporation; and

BRATISLAV ROZENFELD, also known as Steven Rozenfeld and Steven Rozen, individually and as an officer or owner of THEFBAMACHINE INC., PASSIVE SCALING INC., SALES.SUPPORT NEW JERSEY INC., 1HR DELIVERIES INC., HOURLY RELIEF INC., 3PL LOGISTIC AUTOMATION INC., FBA SUPPORT NJ CORP., DAILY DISTRO LLC, and CLOSTER GREEN CORP., doing business as WRAITH & CO., a corporation,

   Defendants.

1

Plaintiff, the Federal Trade Commission, has filed its Complaint for Permanent Injunction, Monetary Judgment, and Other Equitable Relief pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b (Docket No. _1_ ), and has moved, pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue against TheFBAMachine Inc.; Passive Scaling Inc.; Sales Support New Jersey Inc.; 1HR Deliveries Inc.; Hourly Relief Inc.; 3PL Logistic Automation Inc.; FBA Support NJ Corp.; Daily Distro LLC; Closter Green, doing business as Wraith & Co.; and Bratislav Rozenfeld, also known as Steven Rozenfeld and Steven Rozen (collectively, "Defendants") (Docket No.1-16).

## FINDINGS OF FACT

The Court, having considered the Complaint, the Emergent *Ex Parte* Application for a Temporary Restraining Order, declarations, exhibits, and the memorandum of points and authorities filed in support thereof, and being otherwise advised, finds that:

A.      This Court has jurisdiction over the subject matter of this case, and there is good cause to believe that it will have jurisdiction over all parties hereto and that venue in this district is proper.

B.      In numerous instances, Defendants, in the marketing and selling of business opportunities and coaching services ("Defendants' Products"), have violated the FTC Act and rules governing their conduct. Specifically, Defendants have (1) made false or unsubstantiated earnings claims, (2) violated multiple trade regulation rule provisions in the selling of Defendants' Products, and (3) used threats and non-disparagement clauses to discourage purchasers from publishing truthful reviews about Defendants and their products or services.

2

C.      There is good cause to believe that Defendants have engaged in and are likely to engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b, and that Plaintiff is therefore likely to prevail on the merits of this action. As demonstrated by the declarations of consumers who purchased Defendants' Products, investigator declarations, transcripts of sales calls, and the additional evidence contained in the FTC's pages of exhibits, the FTC has established a likelihood of success in showing that, in numerous instances, Defendants have made false or unsubstantiated statements, and engaged in other unfair or deceptive acts or practices in the marketing of Defendants' Products.

D.      There is good cause to believe that Defendants have taken at least $11.1 million from consumers in connection with their unlawful practices.

E.      There is good cause to believe that immediate and irreparable harm will result from Defendants' ongoing violations of the FTC Act, the Business Opportunity Rule, and the CRFA unless Defendants are restrained and enjoined by order of this Court.

F.      There is good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for consumers—including monetary restitution, rescission, or refunds—will occur from the sale, transfer, destruction, or other disposition or concealment by Defendants of their assets or records, unless Defendants are immediately restrained and enjoined by order of this Court; and that, in accordance with Fed. R. Civ. P. 65(b), the interests of justice require that this Order be granted without prior notice to Defendants.

3

Thus, there is good cause for relieving Plaintiff of the duty to provide Defendants with prior notice of its Application for a Temporary Restraining Order.

G.    Good cause exists for appointing a temporary receiver over the Receivership Entities, freezing Defendants' assets, permitting Plaintiff and the Receiver immediate access to the Defendants' business premises, and permitting Plaintiff and the Receiver to take expedited discovery.

H.    Weighing the equities and considering Plaintiff's likelihood of ultimate success on the merits, a temporary restraining order with an asset freeze, the appointment of a temporary receiver, immediate access to business premises, expedited discovery, and other equitable relief is in the public interest.

I.    This Court has authority to issue this Order pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Fed. R. Civ. P. 65; and the All Writs Act, 28 U.S.C. § 1651.

J.    No security is required of any agency of the United States for issuance of a temporary restraining order. Fed. R. Civ. P. 65(c).

## DEFINITIONS

For the purpose of this Order, the following definitions shall apply:

A.    "**Asset**" means any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held.

B.    "**Corporate Defendants**" means TheFBAMachine Inc.; Passive Scaling Inc.; Sales Support New Jersey Inc.; 1HR Deliveries Inc.; Hourly Relief Inc.; 3PL Logistic Automation Inc.; FBA Support NJ Corp.; Daily Distro LLC; and Closter Green Corp., doing business as Wraith & Co.; and each of their subsidiaries, affiliates, successors, and assigns.

**PX 37**                    **Attachment D**                    003323

C.    **"Defendants"** means the Corporate Defendants and the Individual Defendant, individually, collectively, or in any combination.

D.    **"Document"** is synonymous in meaning and equal in scope to the usage of "document" and "electronically stored information" in Fed. R. Civ. P. 34(a) and includes writings, drawings, graphs, charts, photographs, sound and video recordings, images, Internet sites, web pages, websites, electronic correspondence, including e-mail and instant messages, contracts, accounting data, advertisements, FTP Logs, Server Access Logs, books, written or printed records, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, computer records, customer or sales databases and any other electronically stored information, including Documents located on remote servers or cloud computing systems, and other data or data compilations from which information can be obtained directly or, if necessary, after translation into a reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

E.    **"Earnings Claim(s)"** means any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits. Earnings Claims include, but are not limited to: (1) any chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and (2) any statements from which a prospective purchaser can reasonably infer that he or she will earn a minimum level of income.

F.    **"Electronic Data Host"** means any person or entity in the business of storing, hosting, or otherwise maintaining electronically stored information. This includes, but is not

5

limited to, any entity hosting a website or server, and any entity providing "cloud based" electronic storage.

G.    **"General Media"** means any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, website, commercial bulk email, and mobile communications.

H.    **"Individual Defendant"** means Bratislav Rozenfeld.

I.    **"Receiver"** means the temporary receiver appointed in Section XI of this Order and any deputy receivers that shall be named by the temporary receiver.

J.    **"Receivership Entities"** means Corporate Defendants as well as any other entity that has conducted any business related to the marketing and sale of Defendants' Products, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant.

## ORDER

## I.    PROHIBITED BUSINESS ACTIVITIES

**IT IS THEREFORE ORDERED** that Defendants; Defendants' officers, agents, employees, and attorneys; and all other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, in connection with the advertising, marketing, promoting, or offering for sale of any goods or services, are temporarily restrained and enjoined from:

A.    Making any Earnings Claims to a prospective purchaser, unless the Earnings Claim is non-misleading and, at the time the Earnings Claims is made, Defendants (1) have a reasonable basis for the claim; (2) have in their possession written materials that substantiate the claimed earnings; and (3) make the written substantiation for Earnings Claims available upon request to the consumer, potential purchaser or investor, the Receiver, and the FTC;

6

B.    Making any Earnings Claims in the General Media, unless the Earnings Claim is non-misleading and, at the time the Earnings Claims is made, Defendants (1) have a reasonable basis for the claim; (2) have in their possession written materials that substantiate the claimed earnings; and (3) state in immediate conjunction with the claim (a) the beginning and ending dates when the represented earnings were achieved and (b) the number and percentage of all persons who purchased Defendant's products or services prior to the ending date in Section I.B.3.a who achieved at least the stated level of earnings;

C.    Disseminating any industry financial, earnings, or performance information, unless Defendants have written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial, earnings, or performance experience of purchasers of Defendants' products or services;

D.    Failing to provide any consumer, potential purchaser, or investor with disclosure documents in the form and manner required by 16 C.F.R. §§ 437.2, 437.3(a)(1)-(5), and 437.4;

E.    Misrepresenting or assisting others in misrepresenting, expressly or by implication, that Defendants' products or services:

       1.    Will allow purchasers to earn a specific level or range of actual or potential sales, or gross or net income or profits, revenues, financial gains, percentage gains, or return on investment with little to no effort on their part; and

       2.    Will use artificial intelligence to maximize revenues;

F.    Misrepresenting or assisting others in misrepresenting, expressly or by implication, any other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics; and

7

G.     Prohibiting or restricting any consumer, potential purchaser, or investor from communicating reviews, performance assessments, and similar analyses about Defendants' products or services, or the conduct of Defendants; or that impose a penalty or fee against any consumer, potential purchaser, or investor who engages in such communications.

## II.     PROHIBITION ON RELEASE OF CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Defendants; Defendants' officers, agents, employees, and attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.     Selling, renting, leasing, transferring, or otherwise disclosing, the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order; and

B.     Benefitting from or using the name, address, birth date, telephone number, email address, credit card number, bank account number, Social Security number, or other financial or identifying information of any person that any Defendant obtained in connection with any activity that pertains to the subject matter of this Order.

Provided, however, that Defendants may disclose such identifying information to a law enforcement agency; to their attorneys as required for their defense; as required by any law, regulation, or court order; or in any filings, pleadings, or discovery in this action in the manner required by the Federal Rules of Civil Procedure and by any protective order in the case.

## III.     ASSET FREEZE

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who

8

receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, relinquishing, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any Assets that are:

    1.    owned or controlled, directly or indirectly, by any Defendant;

    2.    held, in part or in whole, for the benefit of any Defendant;

    3.    in the actual or constructive possession of any Defendant; or

    4.    owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant.

B.    Opening or causing to be opened any safe deposit boxes, commercial mailboxes, or storage facilities titled in the name of any Defendant, or subject to access by any Defendant, except as necessary to comply with written requests from the Receiver acting pursuant to its authority under this Order;

C.    Incurring charges or cash advances on any credit, debit, or ATM card issued in the name, individually or jointly, of any Corporate Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant or of which any Defendant is an officer, director, member, or manager. This includes any corporate bankcard or corporate credit card account for which any Defendant is, or was on the date that this Order was signed, an authorized signor; or

9

D.    Cashing any checks or depositing any money orders or cash received from consumers, clients, or customers of any Defendant.

The Assets affected by this Section shall include: (1) all Assets of Defendants as of the time this Order is entered; and (2) Assets obtained by Defendants after this Order is entered if those Assets are derived from any activity that is the subject of the Complaint in this matter or that is prohibited by this Order. This Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this order.

### IV.    DUTIES OF ASSET HOLDERS AND OTHER THIRD PARTIES

**IT IS FURTHER ORDERED** that any financial or brokerage institution, Electronic Data Host, credit card processor, payment processor, merchant bank, acquiring bank, independent sales organization, third party processor, payment gateway, insurance company, business entity, or person who receives actual notice of this Order (by service or otherwise) that:

(a) has held, controlled, or maintained custody, through an account or otherwise, of any Document on behalf of any Defendant or any Asset that has been owned or controlled, directly or indirectly, by any Defendant; held, in part or in whole, for the benefit of any Defendant; in the actual or constructive possession of any Defendant; or owned or controlled by, in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed or controlled by any Defendant;

(b) has held, controlled, or maintained custody, through an account or otherwise, of any Document or Asset associated with credits, debits, or charges made on behalf of any Defendant, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities; or

10

(c) has extended credit to any Defendant, including through a credit card account, shall:

A.       Hold, preserve, and retain within its control and prohibit the withdrawal, removal, alteration, assignment, transfer, pledge, encumbrance, disbursement, dissipation, relinquishment, conversion, sale, or other disposal of any such Document or Asset, as well as all Documents or other property related to such Assets, except by further order of this Court; provided, however, that this provision does not prohibit Individual Defendant from incurring charges on a personal credit card established prior to entry of this Order, up to the pre-existing credit limit;

B.       Deny any person, except the Receiver, access to any safe deposit box, commercial mailbox, or storage facility that is titled in the name of any Defendant, either individually or jointly, or otherwise subject to access by any Defendant;

C.       Provide Plaintiff's counsel and the Receiver, within three (3) days of receiving a copy of this Order, a sworn statement setting forth, for each Asset or account covered by this Section:

1.       The identification number of each such account or Asset;

2.       The balance of each such account, or a description of the nature and value of each such Asset as of the close of business on the day on which this Order is served, and, if the account or other Asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other Asset was remitted; and

3.       The identification of any safe deposit box, commercial mailbox, or storage facility that is either titled in the name, individually or jointly, of any Defendant, or is otherwise subject to access by any; and

11

D.      Upon the request of Plaintiff's counsel or the Receiver, promptly provide Plaintiff's counsel and the Receiver with copies of all records or other Documents pertaining to any account or Asset covered by this Section, including originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, including wire transfers and wire transfer instructions, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and all logs and records pertaining to safe deposit boxes, commercial mailboxes, and storage facilities.

Provided, however, that this Section does not prohibit any transfers to the Receiver or repatriation of foreign Assets specifically required by this order.

## V.      FINANCIAL DISCLOSURES

**IT IS FURTHER ORDERED** that each Defendant, within five (5) days of service of this Order upon them, shall prepare and deliver to Plaintiff's counsel and the Receiver:

A.      completed financial statements on the forms attached to this Order as **Attachment A** (Financial Statement of Individual Defendant) for Individual Defendant, and **Attachment B** (Financial Statement of Corporate Defendant) for each Corporate Defendant; and

B.      completed **Attachment C** (IRS Form 4506, Request for Copy of a Tax Return) for each Individual Defendant and Corporate Defendant.

## VI.      FOREIGN ASSET REPATRIATION

**IT IS FURTHER ORDERED** that within five (5) days following the service of this Order, each Defendant shall:

A.      Provide Plaintiff's counsel and the Receiver with a full accounting, verified under oath and accurate as of the date of this Order, of all Assets, Documents, and accounts outside of the United States which are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant, or for the benefit of any

12

corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

B.      Take all steps necessary to provide Plaintiff's counsel and Receiver access to all Documents and records that may be held by third parties located outside of the territorial United States of America, including signing the Consent to Release of Financial Records appended to this Order as **Attachment D**;

C.      Transfer to the territory of the United States all Documents and Assets located in foreign countries which are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant, or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant; and

D.      The same business day as any repatriation, (1) notify the Receiver and counsel for Plaintiff of the name and location of the financial institution or other entity that is the recipient of such Documents or Assets; and (2) serve this Order on any such financial institution or other entity.

### VII.    NON-INTERFERENCE WITH REPATRIATION

**IT IS FURTHER ORDERED** that Defendants; Defendants' officers, agents, employees, and attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign Assets, or in the hindrance of the repatriation required by this Order, including, but not limited to:

A.      Sending any communication or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all Defendants' Assets have been fully repatriated pursuant to this Order; or

B.      Notifying any trustee, protector, or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all Defendants' Assets have been fully repatriated pursuant to this Order.

## VIII.   CONSUMER CREDIT REPORTS

**IT IS FURTHER ORDERED** that Plaintiff may obtain credit reports concerning Individual Defendant pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), and that, upon written request, any credit reporting agency from which such reports are requested shall provide them to Plaintiff.

## IX.    PRESERVATION OF RECORDS

**IT IS FURTHER ORDERED** that Defendants; Defendants' officers, agents, employees, and attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from:

A.      Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that relate to: (1) the business, business practices, Assets, or business or personal finances of any Defendant; (2) the business practices or finances of entities directly or indirectly under the control of any Defendant; or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

B.      Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' Assets.

## X.    REPORT OF NEW BUSINESS ACTIVITY

**IT IS FURTHER ORDERED** that Defendants; Defendants' officers, agents, employees, and attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby temporarily restrained and enjoined from creating, operating, or exercising any control over any business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing Plaintiff's counsel and the Receiver with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## XI.    TEMPORARY RECEIVER

**IT IS FURTHER ORDERED** that __Anthony Sodono, III__ is appointed as temporary receiver of the Receivership Entities with full powers of an equity receiver. The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.

## XII.    DUTIES AND AUTHORITY OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver is directed and authorized to accomplish the following:

A.      Assume full control of Receivership Entities by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, attorney, or

15

agent of any Receivership Entity from control of, management of, or participation in, the affairs of the Receivership Entity;

B.      Take exclusive custody, control, and possession of all Assets and Documents of, or in the possession, custody, or under the control of, any Receivership Entity, wherever situated;

C.      Take exclusive custody, control, and possession of all Documents or Assets associated with credits, debits, or charges made on behalf of any Receivership Entity, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

D.      Conserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets. The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Entities. The Receiver shall have full power to sue for, collect, and receive, all Assets of the Receivership Entities and of other persons or entities whose interests are now under the direction, possession, custody, or control of the Receivership Entities. Provided, however, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer's debt to the Receivership Entities has resulted from the deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

E.      Obtain, conserve, hold, manage, and prevent the loss of all Documents of the Receivership Entities, and perform all acts necessary or advisable to preserve such Documents. The Receiver shall: divert mail; preserve all Documents of the Receivership Entities that are accessible via electronic means (such as online access to financial accounts and access to

16

electronic documents held onsite or by Electronic Data Hosts) by changing usernames, passwords, or other log-in credentials; take possession of all electronic Documents of the Receivership Entities stored onsite or remotely; take whatever steps necessary to preserve all such Documents; and obtain the assistance of the FTC's Digital Forensic Unit for the purpose of obtaining electronic documents stored onsite or remotely;

F.      Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

G.      Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure Assets of the Receivership Entities, such as rental payments;

H.      Take all steps necessary to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses. Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable: (1) securing the location by changing the locks and alarm codes and disconnecting any internet access or other means of access to the computers, servers, internal networks, or other records maintained at that location; and (2) requiring any persons present at the location to leave the premises, to provide the Receiver with proof of identification, and/or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises Documents or Assets of the

17

Receivership Entities. Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security. If requested by the Receiver, the United States Marshal will provide appropriate and necessary assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

I.    Take all steps necessary to prevent the modification, destruction, or erasure of any web page or website registered to and operated, in whole or in part, by any Defendants, and to provide access to all such web pages or websites to Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives;

J.    Enter into and cancel contracts and purchase insurance as advisable or necessary;

K.    Prevent the inequitable distribution of Assets and determine, adjust, and protect the interests of consumers who have transacted business with the Receivership Entities;

L.    Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties;

M.    Institute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal, or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order, including but not limited to, actions challenging fraudulent or voidable transfers;

N.    Issue subpoenas to obtain Documents and records pertaining to the Receivership, and conduct discovery in this action on behalf of the receivership estate, in addition to obtaining other discovery as set forth in this Order;

O.      Open one or more bank accounts at designated depositories for funds of the Receivership Entities. The Receiver shall deposit all funds of the Receivership Entities in such designated accounts and shall make all payments and disbursements from the receivership estate from such accounts. The Receiver shall serve copies of monthly account statements on all parties;

P.      Maintain accurate records of all receipts and expenditures incurred as Receiver;

Q.      Allow Plaintiff's representatives, agents, and assistants, as well as Defendants' representatives and Defendants themselves, reasonable access to the premises of the Receivership Entities, or any other premises where the Receivership Entities conduct business. The purpose of this access shall be to inspect and copy any and all books, records, Documents, accounts, and other property owned by, or in the possession of, the Receivership Entities or their agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access;

R.      Allow Plaintiff's representatives, agents, and assistants, as well as Defendants and their representatives, reasonable access to all Documents in the possession, custody, or control of the Receivership Entities;

S.      Cooperate with reasonable requests for information or assistance from any state or federal civil or criminal law enforcement agency;

T.      Suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably;

U.      If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court. Provided, however, that the Receiver may delay

providing such notice until the Receiver has established control of the nonparty entity and its assets and records, if the Receiver determines that notice to the entity or the parties before the Receiver establishes control over the entity may result in the destruction of records, dissipation of assets, or any other obstruction of the Receiver's control of the entity;

V.      If in the Receiver's judgment the business operations cannot be continued legally and profitably, take all steps necessary to ensure that any of the Receivership Entities' web pages or websites relating to the activities alleged in the Complaint cannot be accessed by the public, or are modified for consumer education and/or informational purposes, and take all steps necessary to ensure that any telephone numbers associated with the Receivership Entities cannot be accessed by the public, or are answered solely to provide consumer education or information regarding the status of operations; and

W.      Prepare a written report at or before any hearing described in Section XXVI that describes (1) the steps taken by the Receiver to implement the terms of the Order; (2) the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps the Receiver intends to take in the future to protect receivership assets, recover receivership assets from third parties, and adjust receivership liabilities; (4) the Receiver's opinion on whether any portion of the business of any of the Receivership Entities can continue to operate legally and profitably; and (5) any other matters which the Receiver believes should be brought to the Court's attention.

## XIII.   TRANSFER OF RECEIVERSHIP PROPERTY TO RECEIVER

**IT IS FURTHER ORDERED** that Defendants and any other person with possession, custody, or control of property of, or records relating to, the Receivership Entities shall, upon notice of this Order by personal service or otherwise, fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the Assets and Documents of the

Receivership Entities and immediately transfer or deliver to the Receiver possession, custody, and control of, the following:

      A.     All Assets held by or for the benefit of the Receivership Entities;

      B.     All Documents or Assets associated with credits, debits, or charges made on behalf of any Receivership Entity, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third party processors, payment gateways, insurance companies, or other entities;

      C.     All Documents of or pertaining to the Receivership Entities;

      D.     All computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities;

      E.     All Assets and Documents belonging to other persons or entities whose interests are under the direction, possession, custody, or control of the Receivership Entities; and

      F.     All keys, codes, user names, and passwords necessary to gain or to secure access to any Assets or Documents of or pertaining to the Receivership Entities, including access to their business premises, means of communication, accounts, computer systems (onsite and remote), Electronic Data Hosts, or other property.

In the event that any person or entity fails to deliver or transfer any Asset or Document, or otherwise fails to comply with any provision of this Section, the Receiver may file an Affidavit of Non-Compliance regarding the failure and a motion seeking compliance or a contempt citation.

## XIV.   PROVISION OF INFORMATION TO RECEIVER

**IT IS FURTHER ORDERED** that Defendants shall immediately provide to the Receiver:

21

A.    A list of all Assets and accounts of the Receivership Entities that are held in any name other than the name of a Receivership Entity, or by any person or entity other than a Receivership Entity;

B.    A list of all agents, employees, officers, attorneys, servants, and those persons in active concert and participation with the Receivership Entities, or who have been associated or done business with the Receivership Entities; and

C.    A description of any Documents covered by attorney-client privilege or attorney work product, including files where such Documents are likely to be located, authors or recipients of such Documents, and search terms likely to identify such electronic Documents.

## XV.    COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants' or Receivership Entities' officers, agents, employees, and attorneys; all other persons in active concert or participation with any of them; and any other person with possession, custody, or control of property of or records relating to the Receivership Entities who receive actual notice of this Order shall fully cooperate with and assist the Receiver. This cooperation and assistance shall include, but is not limited to, providing information to the Receiver that the Receiver deems necessary to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any keys, codes, user names, and passwords required to access any computers, electronic devices, mobile devices, and machines (onsite or remotely) and any cloud account (including specific method to access account) or electronic file in any medium; advising all persons who owe money to any Receivership Entity that all debts should be paid directly to the Receiver; and transferring funds at the Receiver's direction and producing records related to the Assets and sales of the Receivership Entities.

22

## XVI.   NON-INTERFERENCE WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Defendants; Receivership Entities; Defendants' or Receivership Entities' officers, agents, employees, and attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, and any other person served with a copy of this Order, are hereby restrained and enjoined from directly or indirectly:

    A.     Interfering with the Receiver's efforts to manage, or take custody, control, or possession of, the Assets or Documents subject to the receivership;

    B.     Transacting any of the business of the Receivership Entities;

    C.     Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Entities; or

    D.     Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## XVII. STAY OF ACTIONS

**IT IS FURTHER ORDERED** that, except by leave of this Court, during the pendency of the receivership ordered herein, Defendants; Defendants' officers, agents, employees, attorneys; and all other persons in active concert or participation with any of them, who receive actual notice of this Order; and their corporations, subsidiaries, divisions, or affiliates; and all investors, creditors, stockholders, lessors, customers, and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Entities, including, but not limited to:

**PX 37**                                      **Attachment D**                                      003342

A.      Filing or assisting in the filing of a petition for relief under the Bankruptcy Code,

11 U.S.C. § 101 *et seq.*, or of any similar insolvency proceeding on behalf of the Receivership

Entities;

B.      Commencing, prosecuting, or continuing a judicial, administrative, or other action

or proceeding against the Receivership Entities, including the issuance or employment of process

against the Receivership Entities, except that such actions may be commenced if necessary to toll

any applicable statute of limitations; or

C.      Filing or enforcing any lien on any asset of the Receivership Entities; taking or

attempting to take possession, custody, or control of any Asset of the Receivership Entities; or

attempting to foreclose, forfeit, alter, or terminate any interest in any Asset of the Receivership

Entities, whether such acts are part of a judicial proceeding, acts of self-help, or otherwise.

Provided, however, that this Order does not stay: (1) the commencement or continuation

of a criminal action or proceeding; (2) the commencement or continuation of an action or

proceeding by a governmental unit to enforce such governmental unit's police or regulatory

power; or (3) the enforcement of a judgment, other than a money judgment, obtained in an action

or proceeding by a governmental unit to enforce such governmental unit's police or regulatory

power.

## XVIII. COMPENSATION OF RECEIVER

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver

as herein authorized, including counsel to the Receiver and accountants, are entitled to

reasonable compensation for the performance of duties pursuant to this Order and for the cost of

actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession

or control of, or which may be received by, the Receivership Entities. The Receiver shall file

with the Court and serve on the parties periodic requests for the payment of such reasonable

24

compensation, with the first such request filed no more than sixty (60) days after the date of entry of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

## XIX.   RECEIVER'S BOND

**IT IS FURTHER ORDERED** that the Receiver shall file with the Clerk of this Court a bond in the sum of $35,000 with sureties to be approved by the Court, conditioned that the Receiver will well and truly perform the duties of the office and abide by and perform all acts the Court directs. 28 U.S.C. § 754.

## XX.    IMMEDIATE PRODUCTION OF BUSINESS RECORDS

**IT IS FURTHER ORDERED** that that the Corporate Defendants shall allow the Receiver and FTC's employees and agents access to the Corporate Defendants' business records to inspect and copy Documents in preparation for the preliminary injunction hearing and to identify and locate assets.

The Corporate Defendants shall, immediately upon receiving notice of this Order, produce to the FTC for inspection, inventory, and copying, at a location designated by FTC, the following materials: (1) all customer information, including names, phone numbers, addresses, e-mail addresses, customer complaints, and payment information for all consumers who have purchased Corporate Defendants' business opportunities and coaching services; (2) all contracts, including settlement agreements with customers; (3) any correspondence, including electronic correspondence, that refers or relates to the Corporate Defendants' business opportunities and coaching services; (4) an electronic copy of all advertisements for the Corporate Defendants' business opportunities and coaching services; (5) all telephone and videoconferencing scripts used during the sales process; (6) all slide decks, sales projections, charts, and spreadsheets used during the sales process; (7) all Documents pertaining to Earnings Claims and other

**PX 37**                        **Attachment D**                        003344

representations related to the marketing, advertising, promotion, offer for sale, or sale of Defendants' business opportunities and coaching services, including substantiation for any Earnings Claims; and (8) accounting information, including profit and loss statements, annual reports, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state or local business or personal income or property tax returns, and 1099 forms. The FTC shall return any materials produced pursuant to this Section within seven (7) days of the Corporate Defendants' production.

## XXI.    IMMEDIATE ACCESS TO BUSINESS PREMISES AND RECORDS

**IT IS FURTHER ORDERED** that:

A.    In order to allow Plaintiff and the Receiver to preserve Assets and evidence relevant to this action and to expedite discovery, Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, shall have immediate access to the business premises and storage facilities owned, controlled, or used by the Receivership Entities. Such locations include, but are not limited to, 78 John Miller Way, #2111, Kearney, NJ, and 2011 8th St., North Bergen, NJ; and any offsite location or commercial mailbox used by the Receivership Entities. The Receiver may exclude Defendants, Receivership Entities, and their employees from the business premises during the immediate access;

B.    Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to remove Documents from the Receivership Entities' premises in order that they may be inspected, inventoried, and copied. Plaintiff shall return any removed materials to the Receiver within five (5) business days of completing inventorying and copying, or such time as is agreed upon by Plaintiff and the Receiver;

26

C.      Plaintiff's access to the Receivership Entities' documents pursuant to this Section shall not provide grounds for any Defendant to object to any subsequent request for documents served by Plaintiff;

D.      Plaintiff and the Receiver, and their representatives, agents, contractors, and assistants, are authorized to obtain the assistance of federal, state, and local law enforcement officers as they deem necessary to effect service and to implement peacefully the provisions of this Order;

E.      If any Documents, computers, or electronic storage devices containing information related to the business practices or finances of the Receivership Entities are at a location other than those listed herein, including personal residence(s) of any Defendant, then, immediately upon receiving notice of this order, Defendants and Receivership Entities shall produce to the Receiver all such Documents, computers, and electronic storage devices, along with any codes or passwords needed for access. In order to prevent the destruction of computer data, upon service of this Order, any such computers or electronic storage devices shall be powered down in the normal course of the operating system used on such devices and shall not be powered up or used until produced for copying and inspection; and

F.      If any communications or records of any Receivership Entity are stored with an Electronic Data Host, such Receivership Entity shall, immediately upon receiving notice of this order, provide the Receiver with the username, passwords, and any other login credential needed to access the communications and records, and shall not attempt to access, or cause a third-party to attempt to access, the communications or records.

## XXII.  DISTRIBUTION OF ORDER BY DEFENDANTS

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer,

27

director, employee, agent, independent contractor, client, attorney, spouse, subsidiary, division, and representative of any Defendant, and shall, within ten (10) days from the date of entry of this Order, provide Plaintiff and the Receiver with a sworn statement that this provision of the Order has been satisfied, which statement shall include the names, physical addresses, phone number, and email addresses of each such person or entity who received a copy of the Order.

Furthermore, Defendants shall not take any action that would encourage officers, agents, members, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns, or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

### XXIII. EXPEDITED DISCOVERY

**IT IS FURTHER ORDERED** that, notwithstanding the provisions of the Fed. R. Civ. P. 26(d) and (f) and 30(a)(2)(A)(iii), and pursuant to Fed. R. Civ. P. 30(a), 33, 34, and 45, Plaintiff and the Receiver are granted leave, at any time after service of this Order, to conduct limited expedited discovery for the purpose of discovering: (1) the nature, location, status, and extent of Defendants' Assets; (2) the nature, location, and extent of Defendants' business transactions and operations; (3) Documents reflecting Defendants' business transactions and operations; or (4) compliance with this Order. The limited expedited discovery set forth in this Section shall proceed as follows:

A.      Plaintiff and the Receiver may take the deposition of parties and non-parties. Forty-eight (48) hours' notice shall be sufficient notice for such depositions. The limitations and conditions set forth in Rules 30(a)(2)(A) and 31(a)(2)(A) of the Federal Rules of Civil Procedure regarding subsequent depositions of an individual shall not apply to depositions taken pursuant to this Section. Any such deposition taken pursuant to this Section shall not be counted towards

the deposition limit set forth in Rules 30(a)(2)(A) and 31(a)(2)(A), and depositions may be taken by telephone or other remote electronic means;

B.      Plaintiff and the Receiver may serve upon parties requests for production of Documents or inspection that require production or inspection within five (5) days of service, provided, however, that three (3) days of notice shall be deemed sufficient for the production of any such Documents that are maintained or stored only in an electronic format;

C.      Plaintiff and the Receiver may serve upon parties interrogatories that require response within five (5) days after Plaintiff serves such interrogatories;

D.      Plaintiff and the Receiver may serve subpoenas upon non-parties that direct production or inspection within five (5) days of service;

E.      Service of discovery upon a party to this action, taken pursuant to this Section, shall be sufficient if made by facsimile, email, or by overnight delivery;

F.      Any expedited discovery taken pursuant to this Section is in addition to, and is not subject to, the limits on discovery set forth in the Federal Rules of Civil Procedure and the Local Rules of this Court. The expedited discovery permitted by this Section does not require a meeting or conference of the parties, pursuant to Rules 26(d) and (f) of the Federal Rules of Civil Procedure;

G.      The Parties are exempted from making initial disclosures under Fed. R. Civ. Procedure 26(a)(1) until further order of this Court.

## XXIV. SERVICE OF THIS ORDER

**IT IS FURTHER ORDERED** that copies of this Order as well as the Application for Temporary Restraining Order and all other pleadings, Documents, and exhibits filed contemporaneously with that Application (other than the complaint and summons), may be served by any means, including facsimile transmission, email, or other electronic messaging,

29

personal or overnight delivery, U.S. Mail or FedEx, by agents and employees of Plaintiff, by any law enforcement agency, or by private process server, upon any Defendant, or any person (including any financial institution) that may have possession, custody, or control of any Asset or Document of any Defendant, or that may be subject to any provision of this Order pursuant to Rule 65(d)(2) of the Federal Rules of Civil Procedure. For purposes of this Section, service upon any branch, subsidiary, affiliate, or office of any entity shall effect service upon the entire entity.

## XXV.  CORRESPONDENCE AND SERVICE ON PLAINTIFF

**IT IS FURTHER ORDERED** that, for the purpose of this Order, all correspondence and service of pleadings on Plaintiff shall be addressed via email to Frances Kern (fkern@ftc.gov) and Colleen Robbins (crobbins@ftc.gov).

## XXVI. PRELIMINARY INJUNCTION HEARING

**IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 65(b), Defendants shall appear before this Court on the ___**17**<sup>th</sup>___ day of _____**June**_____, 2024, at ___**9:30 a.m.**___, to show cause, if there is any, why this Court should not enter a preliminary injunction, pending final ruling on the Complaint against Defendants, enjoining the violations of the law alleged in the Complaint, continuing the freeze of their Assets, continuing the receivership, and imposing such additional relief as may be appropriate.

## XXVII.    BRIEFS AND AFFIDAVITS CONCERNING PRELIMINARY INJUNCTION

**IT IS FURTHER ORDERED** that:

A.    Defendants shall file with the Court and serve on Plaintiff's counsel any answering pleadings, affidavits, motions, expert reports or declarations, or legal memoranda no later than four (4) days prior to the order to show cause hearing scheduled pursuant to this Order. Plaintiff may file responsive or supplemental pleadings, materials, affidavits, or memoranda with

**PX 37**                    **Attachment D**                    003349

the Court and serve the same on counsel for Defendants no later than one (1) day prior to the order to show Cause hearing. Provided that such affidavits, pleadings, motions, expert reports, declarations, legal memoranda, or oppositions must be served by personal or overnight delivery, facsimile, or email, and be received by the other party or parties no later than 5:00 p.m. (Eastern) on the appropriate dates set forth in this Section.

B.      An evidentiary hearing on Plaintiff's request for a preliminary injunction is not necessary unless Defendants demonstrate that they have, and intend to introduce, evidence that raises a genuine and material factual issue. The question of whether this Court should enter a preliminary injunction shall be resolved on the pleadings, declarations, exhibits, and memoranda filed by, and oral argument of, the parties. Live testimony shall be heard only on further order of this Court. Any motion to permit such testimony shall be filed with the Court and served on counsel for the other parties at least five (5) days prior to the preliminary injunction hearing in this matter. Such motion shall set forth the name, address, and telephone number of each proposed witness, a detailed summary or affidavit revealing the substance of each proposed witness's expected testimony, and an explanation of why the taking of live testimony would be helpful to this Court. Any papers opposing a timely motion to present live testimony or to present live testimony in response to another party's timely motion to present live testimony shall be filed with this Court and served on the other parties at least three (3) days prior to the order to show cause hearing.

Provided, however, that service shall be performed by personal or overnight delivery, facsimile, or email, and Documents shall be delivered so that they shall be received by the other parties no later than 5:00 p.m. (Eastern) on the appropriate dates provided in this Section.

31

## XXVIII.    DURATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire fourteen (14) days from the date of entry noted below, unless within such time, the Order is extended for an additional period pursuant to Fed. R. Civ. P. 65(b)(2).

**IT IS FURTHER ORDERED** that Defendants may move to dissolve or modify the Temporary Restraints on two (2) days advance notice to Plaintiff and the Court.

## XXIX. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**SO ORDERED,** this ___3rd___ day of June, 2024, at _12:20 p.m._

_____
JULIAN XAVIER NEALS
United States District Judge

**PX 37**                              **Attachment D**                         003351